No. 23-16032

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

———————————

East Bay Sanctuary Covenant, *et al.*,

*Plaintiffs-Appellees*,

v.

Joseph R. Biden, President of the United States, in his official capacity, *et al.*,

*Defendants-Appellants.*

———————————

On Appeal from the United States District Court
for the Northern District of California

———————————

## EMERGENCY MOTION UNDER CIRCUIT RULE 27-3
## FOR STAY PENDING APPEAL BY AUGUST 3

———————————

WILLIAM C. PEACHEY
  *Director*

EREZ REUVENI
  *Assistant Director*

PATRICK GLEN
CHRISTINA P. GREER
  *Senior Litigation Counsel*
  *Office of Immigration Litigation*
  *Civil Division*
  *U.S. Department of Justice*
  *P.O. Box 868, Ben Franklin Station*
  *Washington, DC 20044*

BRIAN M. BOYNTON
  *Principal Deputy Assistant Attorney*
  *General*

ABBY C. WRIGHT
SEAN R. JANDA
BRIAN J. SPRINGER
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7260*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue, NW*
  *Washington, DC 20530*
  *202-514-3388*

## CIRCUIT RULE 27-3 CERTIFICATE

The undersigned counsel certifies that the following is the information required by Circuit Rule 27-3:

**(1)    Telephone numbers and addresses of the attorneys for the parties**

*Counsel for Plaintiffs–Appellees:*

Melissa Crow
    (crowmelissa@uchastings.edu)
Center for Gender & Refugee Studies
1121 14th Street NW, Suite 200
Washington, DC 20005
202-355-4471

Anne Peterson
    (petersonanne@uchastings.edu)
Blaine Bookey
Julie Bouroiseau
Karen Musalo
    (musalok@uchastings.edu)
Center for Gender & Refugee Studies
200 McAllister Street
San Francisco, CA 94102
415-610-5729

Keren Zwick
    (kzwick@heartlandalliance.org)
Richard Caldarone
    (rcaldarone@heartlandalliance.org)
Colleen Cowgill
    (ccowgill@heartlandalliance.org)
Mary Georgevich
    (mgeorgevich@heartlandalliance.org)
National Immigrant Justice Center
224 South Michigan Avenue, Suite 600
Chicago, IL 60604
312-660-1370

Michelle (Minju) Y. Cho
    (mcho@aclu.org)
American Civil Liberties Union of
    Northern California, Inc.
39 Drumm Street
San Francisco, CA 94111
415-621-2493

Lee Gelernt (lgelernt@aclu.org)
Omar Jadwat (ojadwat@aclu.org)
Anand Balakrishnan
    (abalakrishnan@aclu.org)
American Civil Liberties Union
    Foundation
Immigrants' Rights Project
125 Broad Street, 18th Floor
New York, NY 10004
212-549-2660

Katrina Eiland (keiland@aclu.org)
Morgan Russell (mrussell@aclu.org)
Spencer Amdur (samdur@aclu.org)
Oscar Sarabia Roman
    (osarabia@aclu.org)
American Civil Liberties Union
    Foundation
Immigrants' Rights Project
39 Drumm Street
San Francisco, CA 94111
415-343-1198

i

*Counsel for Defendants–Appellants:*

Brian M. Boynton (brian.m.boynton@usdoj.gov)
William C. Peachey (william.peachey@usdoj.gov)
Erez Reuveni (erez.r.reuveni@usdoj.gov)
Patrick Glen (patrick.glen@usdoj.gov)
Christina P. Greer (christina.p.greer@usdoj.gov)
Abby C. Wright (abby.wright@usdoj.gov)
Sean R. Janda (sean.r.janda@usdoj.gov)
Brian J. Springer (brian.j.springer@usdoj.gov)
U.S. Department of Justice
Civil Division
950 Pennsylvania Avenue NW
Washington, DC 20530
202-514-3388

## (2)    Facts showing the existence and nature of the emergency

The district court vacated a rule that was designed to address a significant anticipated influx of migration following the termination of the Title 42 order by rendering presumptively ineligible for asylum certain noncitizens who do not follow certain lawful, safe, and orderly migration pathways. Vacatur of the Rule threatens to impose severe harm on the government and the public and to lead to severe disruption at the southwest border. This Court should thus grant a stay pending appeal.

## (3)    When and how counsel notified

Government counsel notified plaintiffs' counsel by e-mail of the government's intent to file this stay motion on July 25, 2023. Service will be effected by electronic service through the CM/ECF system and e-mail. Plaintiffs' counsel Katrina Eiland indicated that plaintiffs oppose the stay motion.

**(4)**     **Submissions to the district court**

In the government's summary judgment briefing, the government requested that the district court "stay any order it issues for fourteen days to allow for orderly review in the court of appeals." *See* Dkt. No. 176, at 35. The district court entered the requested administrative stay. The government requested an additional stay pending appeal on July 25, 2023, and requested that the district court grant or deny that motion by the end of the day on July 26, 2023 to permit the government to promptly seek appellate relief if necessary. *See* Dkt. No. 190 The court has not, however, yet acted on the motion.

*Counsel for Defendants–Appellants*

BRIAN M. BOYNTON
 *Principal Deputy Assistant Attorney General*

ABBY C. WRIGHT
SEAN R. JANDA
BRIAN J. SPRINGER
 *Attorneys, Appellate Staff*
 *Civil Division, Room 7260*
 *U.S. Department of Justice*
 *950 Pennsylvania Avenue NW*
 *Washington, DC 20530*
 *202-514-3388*
 *sean.r.janda@usdoj.gov*

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ...........................................................................................1

STATEMENT ...............................................................................................2

ARGUMENT ...............................................................................................7

I.      The Equities Overwhelmingly Favor a Stay...................................8

II.     The Government Is Likely to Prevail on the Merits......................... 12

        A.      The District Court Erred in Ignoring Limitations on Its Authority
                to Grant Relief...............................................................12

        B.      The Rule Is Consistent with the INA and Comports with the
                APA.............................................................................16

CONCLUSION ........................................................................... 22

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

# INTRODUCTION

The government respectfully requests that the Court grant a stay pending appeal of the district court's judgment. The district court vacated a rule promulgated by DHS and the Department of Justice to encourage orderly migration at the southwest border. *See Circumvention of Lawful Pathways*, 88 Fed. Reg. 31,314 (May 16, 2023). In the two months it has been in effect, the Rule has already reduced irregular migration, encouraged the use of lawful migration pathways, and prevented the enormous influx of migrants that had been widely predicted to follow the expiration of the then-operative Title 42 public-health order in May. The district court's erroneous vacatur threatens to wipe away that progress.

The Rule is of paramount importance to the orderly management of the Nation's immigration system at the southwest border. Plaintiffs point to no imminent irreparable injury that could remotely justify upending the status quo—inviting the harms the Rule was designed to prevent—during the pendency of this appeal. And the government is likely to prevail. The Supreme Court's decision in *United States v. Texas*, 143 S. Ct. 1964 (2023), makes clear that plaintiffs lack standing and any cause of action to challenge immigration policy choices on the ground that plaintiffs will increase their own voluntary expenditures in response. On the merits, the Rule reflects a lawful and reasonable exercise of the Executive's discretion under the immigration laws to establish limitations and conditions on asylum.

1

The district court's contrary view rests on the mistaken premise that the Rule is materially similar to two rules issued by the previous Administration and held unlawful by this Court. *See East Bay Sanctuary Covenant v. Biden* (*East Bay I*), 993 F.3d 640 (9th Cir. 2021); *East Bay Sanctuary Covenant v. Garland* (*East Bay II*), 994 F.3d 962 (9th Cir. 2021). But although the Rule takes account of some overlapping considerations, its validity is not governed by those decisions both because it does not categorically restrict eligibility for asylum and because it is directed at solving a different problem.

The district court granted a 14-day administrative stay of its judgment, but it has not acted on the government's motion for a full stay pending appeal. To ensure that the Solicitor General has an opportunity to seek an emergency stay from the Supreme Court if necessary, the government respectfully asks that the Court act on this stay motion by no later than August 3, 2023—5 days before the expiration of the district court's administrative stay. By that date, we request that the Court either grant a stay pending appeal or enter its own administrative stay pending the Court's resolution of this motion. If the Court denies a stay, we respectfully ask that the Court enter a 14-day administrative stay to permit the Solicitor General an opportunity to seek relief from the Supreme Court.

## STATEMENT

**1.** Asylum is a form of discretionary immigration relief that (among other benefits) prevents the removal of a noncitizen and creates a path to lawful permanent

residence and U.S. citizenship. *See* 8 U.S.C. § 1158. A noncitizen present in the United States and not in removal proceedings may affirmatively apply for asylum, and requests for asylum may also be raised defensively by noncitizens in removal proceedings under 8 U.S.C. § 1229a or expedited removal proceedings under 8 U.S.C. § 1225(b)(1).

To obtain asylum, a noncitizen generally must clear three hurdles. First, the noncitizen must show that they qualify as a "refugee." 8 U.S.C. §§ 1101(a)(42), 1158(b)(1)(A). Second, they must show that they are not subject to a disqualifying exception or bar. *See id.* § 1158(a)(2), (b)(2). Third, they must demonstrate that they merit a favorable exercise of the discretion to grant asylum. *See id.* § 1158(b)(1)(A).

In all cases, asylum is a matter of executive "discretion," not of "entitlement." *INS v. Cardoza-Fonseca*, 480 U.S. 421, 428 n.6 (1987). The Immigration and Nationality Act (INA) specifies categories of noncitizens ineligible for asylum but provides that the Attorney General and Secretary of Homeland Security "may by regulation establish additional limitations and conditions, consistent with [§ 1158], under which an alien shall be ineligible for asylum." 8 U.S.C. § 1158(b)(2)(C). Attorneys General and Secretaries have invoked that discretionary authority for decades to establish bars beyond those required by the statute. *See, e.g.*, *Asylum Procedures*, 65 Fed. Reg. 76,121, 76,126 (Dec. 6, 2000) (denying asylum to applicants who can safely relocate within their home countries).

In contrast to discretionary asylum, two other forms of mandatory immigration protection—statutory withholding of removal and protection under the regulations implementing U.S. obligations under Article 3 of the Convention Against Torture and other Cruel, Inhuman or Degrading Treatment or Punishment (CAT)—ensure that a noncitizen is not removed to a country where he is more likely that not to be persecuted or tortured. *See Moncrieffe v. Holder*, 569 U.S. 184, 187 n.1 (2013).

**2.** Throughout the COVID-19 pandemic, a series of public-health orders, referred to as Title 42 orders, were in effect. Under those orders, covered noncitizens who arrived at the southwest border were generally not processed into the United States but were expelled. When the COVID-19 public-health emergency expired on May 11, 2023, the then-operative Title 42 order ended.

The government then resumed processing all noncitizens encountered at the border under Title 8 authorities, which use substantially more resource-intensive procedures. *See* 88 Fed. Reg. at 31,331. Under those procedures, noncitizens who are processed for expedited removal and who demonstrate a "significant possibility" that they "could establish eligibility for asylum," 8 U.S.C. § 1225(b)(1)(B)(v), are entitled to remain in the United States pending resolution of their claims—a process that often takes years. 88 Fed. Reg. at 31,326, 31,337.

Last fiscal year, border encounters were "at historically high levels" even while Title 42 was in effect. 88 Fed. Reg. at 31,331. The government expected that the end of Title 42 would cause the number of noncitizens seeking to enter the United States

irregularly at the southwest border to dramatically increase—perhaps to record highs. *See id.* Such an increase, paired with Title 8's more-involved procedures, would overwhelm the government's ability to process noncitizens in a safe, expeditious, and orderly way. These predictions proved prescient: in the days before the end of Title 42, "DHS saw a historic surge in migration" that "culminated with the highest recorded encounter levels" in history and "placed significant strain on DHS's operational capacity at the border." Add.41.

**3.** The Departments therefore determined it necessary to encourage migrants to use specified migration pathways. Conversely, they determined it necessary to discourage migrants from disregarding those options in favor of irregular migration, which not only increases the number of noncitizens unlawfully present in the country but also diverts limited government resources from processing those who enter in an orderly manner and from other critical border security initiatives.

Following notice and comment, the Departments issued the Rule pursuant to their authority under statute to set conditions on the discretionary relief of asylum. *See* 8 U.S.C. § 1158(b)(2)(C). The Rule generally establishes a "rebuttable presumption of ineligibility for asylum" that applies to certain noncitizens who enter the United States at the southwest border "without documents sufficient for lawful admission" between May 11, 2023, and May 11, 2025. *See* 88 Fed. Reg. 31,314; 8 C.F.R. §§ 208.33(a)(1), 1208.33(a)(1). That presumption does not apply to various noncitizens, including those who availed themselves of specified orderly migration pathways, such as by first

5

seeking asylum in another country, using parole processes that DHS has constructed, or scheduling an appointment on the CBP One mobile app to be inspected at a port of entry. 8 C.F.R. §§ 208.33(a)(2), 1208.33(a)(2). The presumption may also be overcome, if, for example, a noncitizen demonstrates they faced "an acute medical emergency" or an "imminent and extreme threat to life or safety" or other "exceptionally compelling circumstances exist." *Id.* §§ 208.33(a)(3), 1208.33(a)(3). And all noncitizens in removal proceedings may continue to pursue statutory withholding of removal or CAT protection.

In short, to avoid the anticipated overwhelming of the immigration system, the Rule encourages migrants to use lawful and orderly migration pathways by generally conditioning the discretionary grant of asylum on migrants' availing themselves of such pathways (or demonstrating exceptionally compelling circumstances). At the same time, the government "has taken significant steps to expand" lawful options, including by expanding refugee processing elsewhere in the Western Hemisphere, working with other countries to address regional migration problems, increasing certain country-specific opportunities for migrants to obtain advance travel authorization into the United States, and providing additional opportunities for migrants to enter the United States for seasonal employment. 88 Fed. Reg. at 31,317. As one example, since the Rule was issued, the government has increased by nearly 50%—to more than 40,000 per month—the number of appointments available through the CBP One app, where noncitizens can schedule an arrival at ports of entry

for orderly processing. *See* CBP, *CBP One Appointments Increased to 1,450 Per Day* (June 30, 2023), https://perma.cc/F3L4-48FB.

**4.** Plaintiffs—organizations that provide services to noncitizens—brought statutory and procedural claims challenging the Rule under the APA. They are not regulated by the Rule, but they claim to have standing based on a need to divert resources in response to the Rule.

On cross-motions for summary judgment, the district court vacated the Rule. The court concluded that the Rule is inconsistent with the INA, Add.15-19; that it is arbitrary and capricious, Add.19-30; and that the notice-and-comment process was ineffective, Add.30-33. The court vacated the Rule, notwithstanding multiple bars to such relief and the "significant strain on DHS components, border communities, and interior cities" that such relief would cause. Add.12-15, 33-34 (quotation omitted). The court administratively stayed its judgment for 14 days, Add.35, but has not resolved the government's request for a stay pending appeal, *see* Dkt. No. 190.

## ARGUMENT

All four relevant factors favor staying the vacatur order. *See Nken v. Holder*, 556 U.S. 418, 426 (2009). The Supreme Court has recently and repeatedly stayed or reversed broad relief against the Executive's immigration policies. *E.g.*, *United States v. Texas*, 143 S. Ct. 1964 (2023); *Biden v. Texas*, 142 S. Ct. 2528 (2022); *Mayorkas v. Innovation Law Lab*, 140 S. Ct. 1564 (2020); *DHS v. New York*, 140 S. Ct. 599 (2020); *Trump v. Hawaii*, 138 S. Ct. 2392 (2018). Indeed, in litigation involving a substantially

more restrictive asylum-related rule issued by the previous Administration, the Supreme Court granted a stay of an injunction issued by the same district court. *Barr v. East Bay Sanctuary Covenant*, 140 S. Ct. 3 (2019). This Court should likewise stay the judgment entered here.

## I. The Equities Overwhelmingly Favor a Stay

The Rule ensures the orderly administration of the immigration laws across the southwest border at a time of enormous uncertainty and upheaval in international migration patterns. It guides day-to-day actions of thousands of federal employees, and it has proven remarkably effective in preventing migration spikes and channeling migrants into orderly pathways. It is of paramount importance to the United States, and to the public interest, that the Rule remain in place during this appeal.

**1.** Vacatur of the Rule would impose enormous harms on the government and the public. That conclusion is not surprising, as the Rule was promulgated to avert looming threats to the immigration system and the public interest by channeling irregular migration into orderly pathways. The government anticipated that the expiration of Title 42 would lead to a substantial increase in unlawful migration at the southwest border and would severely strain the government's enforcement resources. To prepare, "DHS led a comprehensive" all-of-government effort that "included record deployments of personnel, infrastructure, and resources to support DHS's frontline personnel at a substantial cost to other DHS operations." Add.40-41. As part of that effort, the Departments promulgated the Rule to encourage noncitizens

to use "lawful, safe, and orderly" migration processes—and, conversely, to discourage "dangerous and irregular border crossings." Add.37.

These fears were well founded. "DHS saw a historic surge in migration" in the days before Title 42 ended that "culminated with the highest recorded encounter levels" in history and "placed significant strain on DHS's operational capacity at the border." Add.41. Encounters between ports of entry nearly doubled in the month before May 11, increasing "from an average of approximately 4,900 per day" to "approximately 9,500 per day," including even higher numbers in the final few days. *Id.*

That historic increase in migration had substantial consequences for DHS and the public. Between May 8 and 11, the Border Patrol's "daily in-custody average" was approximately 50% above "its holding capacity." Add.41. To manage that increase, the Border Patrol "had to redirect limited resources from other mission needs" to "focus on processing apprehended noncitizens." Add.42. As a result, the Border Patrol had a decreased "ability to respond to noncitizens avoiding detection, other agency calls for assistance, and noncitizens in distress." *Id.* In addition, that overcrowding, combined with an increased average time in custody because of the many noncitizens who CBP needed to process, generated serious "health and safety risks to noncitizens, government personnel, and contract support staff." *Id.* The substantial increase in migration "also led to significant challenges for local border communities." *Id.*

Against that backdrop, the Rule has proven remarkably effective in channeling migration into the United States through lawful and orderly pathways and alleviating the negative consequences of irregular migration. Between May 12 and June 13, "encounters between ports of entry at the [southwest border] have decreased by 69 percent compared to their peak just before the end of Title 42." Add.43. "As a result of this swift and sustained decline in encounters, the number of noncitizens" in Border Patrol holding facilities "decreased from a high of more than 28,500 on May 10" to "approximately 8,600 on June 9." *Id.*

Along with other improvements DHS has implemented, the Rule has also allowed DHS to "process credible fear cases more quickly than ever before," and to reduce backlogs and holding times, thereby allowing claims to be adjudicated more quickly. Add.45. Similarly, noncitizens' use of the CBP One app to schedule an appointment to present at a port of entry, as encouraged under the Rule, has allowed CBP to "significantly improve the efficiency of its processes at the border." Add.47-48. That efficiency, "in turn, has allowed CBP to greatly increase its ability to process inadmissible noncitizens at land border ports of entry." Add.48.

The district court's vacatur threatens to erase that success. The government expects that, if the Rule is unavailable for any amount of time, the "current decline in border encounters will quickly be erased by a surge in border crossings that could match—or even exceed—the levels seen in the days leading up to the end of the Title 42" order. Add.48-49. As of June 14, DHS estimated there were more than 100,000

migrants "in Northern Mexico, within eight hours of the U.S. border, with many more along the transit route between Colombia" and the southwest border. Add.49 The government understands "many of these migrants are waiting to see whether the strengthened consequences associated with the rule's implementation are real"; thus, the government "anticipates that any interruption in the rule's implementation will result in another surge in migration that will significantly disrupt and tax DHS operations." *Id.*; *see* 88 Fed. Reg. at 31,446 (discussing immediate increases in border encounters following vacatur of other immigration initiatives). And the negative consequences of such an increase—for the government, for migrants, and for the public—would be even greater than were the consequences of the pre-May 11 increase because "Title 8 processes take substantially longer and are more operationally complex than" the Title 42 processes that were used before May 11. Add.49.

Failing to stay the vacatur would also risk subjecting the immigration system to a policy whipsaw. Implementing that order would potentially require DHS to retrain thousands of officers on how to process asylum requests in the absence of the Rule—only to revert to the Rule should DHS prevail on appeal or in the Supreme Court. The Rule is also a critical part of a concerted approach to reducing irregular migration in the region developed in conjunction with foreign governments. Add.56-60.

**2.** Conversely, the organizational plaintiffs will not be substantially harmed by a stay pending appeal. In concluding that plaintiffs had suffered an injury from the

Rule, which has been in effect for more than two months, the district court relied on plaintiffs' assertions that the Rule will "require them to divert resources from existing programs." Add.8. That asserted injury is not a cognizable injury sufficient to support plaintiffs' standing or any statutory basis for this suit. *See infra* pp. 12-13. But even if it were, a marginal short-term reallocation in organizational resources cannot outweigh the substantial harms to the government and the public described above. Indeed, plaintiffs did not seek a temporary restraining order or preliminary injunction against enforcement of the Rule—a tacit acknowledgment that they suffer no irreparable injury from the Rule during the pendency of this litigation.

## II.    The Government Is Likely to Prevail on the Merits

### A.    The District Court Erred in Ignoring Limitations on Its Authority to Grant Relief

**1.** Plaintiffs lack standing because they have not suffered an injury that is "legally and judicially cognizable." *Texas*, 143 S. Ct. at 1970 (quotation omitted). Plaintiffs are organizations that provide services to asylum seekers. The Rule does not regulate plaintiffs, and no party—organizational or otherwise—has a "judicially cognizable interest in procuring enforcement of the immigration laws" against somebody else. *Sure-Tan, Inc. v. NLRB*, 467 U.S. 883, 897 (1984) (citing *Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973)). The Supreme Court recently reiterated that this principle "remains the law today" in holding that two States lacked standing to challenge DHS immigration enforcement policies. *See Texas*, 143 S. Ct. at 1970. Just as

the States could not establish a cognizable interest in the Executive's exercise of discretion regarding which noncitizens to prioritize for "arrests and prosecutions" based on allegations of indirect monetary effects, *id.* at 1971-72 & n.3, plaintiffs cannot justify judicial intrusion into the Executive's exercise of discretion regarding which noncitizens may be granted asylum based on similar voluntary spending decisions.

In disregarding this principle, the district court did not substantively distinguish the *Texas* States' and plaintiffs' asserted monetary injuries. Instead, the court asserted that the grant of asylum "implicates the Executive's provision of legal benefits or legal status," not "the Executive's exercise of enforcement discretion." Add.10-11. But as explained, every grant of asylum is itself discretionary, *see supra* pp. 2-4, and is directly linked to enforcement—and, more critically, plaintiffs have no more cognizable interest in whether the Executive exercises its discretion to provide that benefit to third parties than they do in whether the Executive exercises its discretion to arrest or prosecute third parties.[1]

---

[1] For similar reasons, and in light of *Texas*, plaintiffs are not within the zone of interests protected by the INA's asylum provisions, *cf. Kowalski v. Tesmer*, 543 U.S. 125, 134 (2004) (holding lawyers unable to assert the rights of prospective clients), and their attempt at judicial review is precluded by the reticulated provisions of 8 U.S.C. § 1252 that grant a right of review to noncitizens directly affected in certain circumstances but not to other parties, including entities like plaintiffs, *see Block v. Community Nutrition Inst.*, 467 U.S. 340, 349 (1984). The government acknowledges that this Court addressed a similar argument in *East Bay II*, 994 F.3d at 666-67, but the government disagrees with that ruling, which did not have the benefit of *Texas*.

**2.** The relief granted by the district court was impermissible. Under 8 U.S.C. § 1252(f)(1), courts generally lack the "authority to enjoin or restrain the operation of," as relevant here, the statutes governing removal and withholding (§§ 1225(b)(1), 1229a, 1231). That bar applies where, as here, a litigant requests relief that would "interfere with the Government's efforts to operate" those statutes by forcing officials "to take actions" and "refrain from actions" that, "in the Government's view," are not statutorily required or prohibited. *Garland v. Aleman Gonzalez*, 142 S. Ct. 2057, 2065 (2022). Similarly, the court erred in entertaining plaintiffs' programmatic challenge to the Departments' "implementation" of expedited removal, given the prohibition on bringing such challenges except in certain actions brought in the District of Columbia. *See* 8 U.S.C. § 1252(a)(2)(A), (e).

In disregarding those limitations, the district court primarily concluded that the Rule implements the Departments' authority under the asylum section—§ 1158—not the removal and expedited removal sections of the statute. Add.12-14. But the relevant jurisdictional provisions reflect Congress's determination that district courts generally may not interfere in removal and expedited removal proceedings, and the vast majority of asylum claims are raised defensively and adjudicated in those proceedings. It is indisputable that the court's vacatur "restrains" the Executive in its operation of removal and expedited removal proceedings in precisely the way that Congress has forbidden. And even if the district court's contrary view were correct, the district court should not have vacated the Rule as applied to removal, expedited

removal, and withholding proceedings. *See NRDC v. Wheeler*, 955 F.3d 68, 81 (D.C. Cir. 2020) (explaining that "a court may invalidate only some applications" of a regulation).

The district court's universal vacatur was improper in its own right. The court did not suggest that such sweeping relief was necessary to remedy plaintiffs' asserted injuries. Rather, the court viewed universal vacatur as the APA's "standard remedy." Add.33-34. But even assuming the APA authorizes such relief,[2] it is a discretionary equitable remedy. *See, e.g., Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1405 (9th Cir. 1995). And the serious problems caused by universal relief are well catalogued. *See Arizona v. Biden*, 40 F.4th 375, 395-98 (6th Cir. 2022) (Sutton, C.J., concurring). At a minimum, universal vacatur must be reserved for "truly extraordinary circumstances." *Texas*, 143 S. Ct. at 1985-86 (Gorsuch, J., concurring in the judgment).

Here, the district court identified no extraordinary circumstances supporting its universal relief. The court should have "limit[ed] the solution to the problem," *see NRDC*, 955 F.3d at 82 (quotation omitted), by declining to vacate the Rule in favor of remand without vacatur or—at most—relief tailored to redressing plaintiffs' asserted injuries, such as prohibiting the application of the Rule as to specific identified clients of plaintiffs.

---

[2] Properly construed, the APA does not authorize "universal" vacatur of a rule, *see Texas*, 143 S. Ct. at 1980-85 (Gorsuch, J., concurring in the judgment), but the government recognizes that this Court's precedent has condoned such relief in some circumstances.

**B.    The Rule Is Consistent with the INA and Comports with the APA**

**1. a.** The Rule reflects a lawful exercise of the Executive Branch's discretion under the INA to set limitations and conditions on eligibility for asylum. Congress specified that the Executive "*may* grant asylum" to a noncitizen who satisfies governing requirements but is never obligated to do so. 8 U.S.C. § 1158(b)(1)(A) (emphasis added). Asylum is always a matter of "discretion"—never of "entitlement." *INS v. Cardoza-Fonseca*, 480 U.S. 421, 428 n.6 (1987). And the INA provides that the responsible agency heads may by rule establish "limitations and conditions" on asylum eligibility, beyond those already set out in the statute, that are "consistent with" the asylum statute. 8 U.S.C. § 1158(b)(2)(C).

The Rule does exactly that: it establishes a condition on asylum that is consistent with the statute. The Rule is aimed at safeguarding the effective functioning of the immigration system and the equitable allocation of the government's limited resources, as well as encouraging other countries in the region to address pressing migration issues, in the face of an anticipated dramatic increase in border encounters. No provision of § 1158 prohibits consideration of these factors or otherwise clashes with the Rule. In the absence of any such conflict, the Rule is clearly "consistent with" § 1158. *See, e.g.*, *Environmental Def. Fund, Inc. v. EPA*, 82 F.3d 451, 457 (D.C. Cir. 1996) (per curiam) (holding that "consistent with" signals "congruity or compatibility").

The statutory history further supports this conclusion. When § 1158 was first enacted in 1980, the statute simply allowed for the Attorney General to grant asylum as a matter of discretion and did not include language allowing the Executive to create "additional limitations and conditions." *See* Refugee Act of 1980, Pub. L. 96-212 § 201(b), 94 Stat. 102, 103-05. Nevertheless, the Attorney General, in the exercise of his broad discretion, issued regulations establishing mandatory bars to asylum eligibility and restricting asylum claims based on past persecution. In 1996, Congress codified six of the Attorney General's mandatory bars and acted to ensure his ability to add further "conditions or limitations." *See* Pub. L. 104-208, div. C, § 604, 110 Stat. 3009 (1996) (codified at 8 U.S.C. § 1158(b)(2)). That decision not only to leave undisturbed the Attorney General's construction of his authority, but to affirmatively endorse the authority to promulgate additional limitations, underlines the district court's error. *See Bob Jones Univ. v. United States*, 461 U.S. 574, 599 (1983).

Multiple provisions of § 1158 underscore that protecting the systemic efficiency of the asylum system is a legitimate concern of eligibility rules. For example, Congress has generally prohibited applications for asylum filed more than one year after entry. 8 U.S.C. § 1158(a)(2)(B). Similarly, Congress has generally prohibited noncitizens from pursuing successive asylum applications. *See id.* § 1158(a)(2)(C). These provisions make clear that the INA does not prioritize the identification of meritorious asylum claims above all else, and that administrative practicality and systemic efficiency are legitimate concerns. Nothing in the statute suggests Congress intended to foreclose

the Departments from similarly taking systemic considerations into account. Indeed, the types of considerations described in the Rule have long played a role in asylum determinations. *See Matter of Pula*, 19 I. & N. Dec. 467, 474 (B.I.A. 1987).

**b.** The district court did not identify any specific provision of the INA with which the Rule conflicts. Nor did the court meaningfully grapple with the statutory context and history described above. Instead, the court primarily concluded that this Court's decisions addressing two other asylum-related rules—in *East Bay I* and *East Bay II*—govern the outcome in this case. Add.16-19. But the court erred in likening the Rule to the rules at issue in those cases, which categorically denied asylum to most noncitizens who entered the United States between ports of entry (*East Bay I*) or who transited a third country without first seeking asylum there (*East Bay II*).

Unlike the port-of-entry rule, which this Court held to constitute a denial of the statutory ability to apply for asylum "whether or not at a designated port of arrival," *East Bay I*, 993 F.3d at 669-70 (quoting 8 U.S.C. § 1158(a)(1)), the Rule does not treat manner of entry as dispositive in determining asylum eligibility. Noncitizens who have received advance travel authorization under a DHS-approved parole process or who are denied protection in another country are not subject to the Rule's presumption. *See* 8 C.F.R. § 208.33(a)(2)(ii)(A), (C). Even those who are subject to the eligibility condition and enter between ports of entry or arrive at a port of entry without a pre-scheduled appointment will be eligible for asylum if they rebut the Rule's presumption by showing that they or a member of their family faced an acute medical emergency

18

or an imminent and extreme threat to life or safety at the time of entry, or that other exceptionally compelling circumstances exist. *See id.* § 208.33(a)(3). *East Bay I* does not speak to the Rule here, which encourages migrants to use orderly pathways and provides multiple exceptions and means of rebutting the presumptive ineligibility for those who do not pursue such pathways.

*East Bay II* provides no firmer grounding for the district court's decision. There, this Court held unlawful a rule that generally deemed ineligible for asylum noncitizens who had transited through a third country unless they had applied for, and been denied, asylum in Mexico or another country through which they transited. *See* 994 F.3d at 968. This Court observed that two bars in § 1158 are similarly aimed at denying asylum to noncitizens who do not need this country's protection—one encompassing noncitizens who may be removed to a safe third country under certain international agreements and one encompassing noncitizens who were firmly resettled in a third country before arriving in the United States—and that both include what the Court described as "critical" requirements to ensure the third-country option is "genuinely safe." *See id.* at 976-77. This Court held that the rule there was inconsistent with the two statutory bars because it was aimed at a similar problem—screening out noncitizens who do not need this country's protection—but failed to include a similar safeguard. *See id.* at 977-78.

Although the government disagrees with the mode of analysis employed in *East Bay II*, the Rule is fully consistent with the principles reflected in that decision. First,

19

the Rule does not impose a categorical proscription on asylum but instead includes multiple safeguards. As explained, a noncitizen who does not believe any third country through which they have traveled is genuinely safe may avoid application of the Rule by presenting at a port of entry pursuant to a prescheduled appointment. And a noncitizen who demonstrates exceptionally compelling circumstances, including a threat to life or safety, may forgo third-country options and nevertheless rebut the Rule's presumption. Second, *East Bay II*'s holding is limited to the two statutory bars discussed in that case. It does not hold more broadly that certain safeguards must be included in regulations that address different subjects. And here, the Rule is not designed to screen out noncitizens who do not require asylum but instead protects the ability of the immigration and asylum systems to function effectively in the face of an impending dramatic increase in border encounters.

In short, the district court misunderstood the limited reach of this Court's decisions in *East Bay I* and *II*, which were directed to the specific categorical rules in those cases. In nevertheless extending those decisions to the Rule, the district court violated this Court's admonition against reading § 1158 to "entirely disable[]" the government "from promulgating regulations with 'additional limitations and conditions' under which an alien would be ineligible for asylum." *East Bay II*, 994 F.3d at 978-79.

**2.** The district court was also wrong to deem the Rule arbitrary and capricious. The court's holding that the Departments may not validly consider the availability of alternatives to asylum, Add.20-22, repackages the court's erroneous statutory holding.

The district court also improperly reweighed the evidence before the agencies and concluded that some pathways are, in its view, insufficiently available to noncitizens. *See* Add.24-30. But there is no basis for the court to invalidate the Rule based on its own views. *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021). And, regardless, the Rule describes in depth the functioning of, and the limitations on, the available orderly pathways. *See, e.g.*, 88 Fed. Reg. at 31,315-18, 31,325, 31,337, 31,410-14. In doing so, the Rule forthrightly acknowledges that its limitations "will result in the denial of some asylum claims that otherwise may have been granted" but concludes that such a result is justified by "the benefits to the overall functioning of the system" that the Rule occasions. 88 Fed. Reg. at 31,332; *see East Bay II*, 994 F.3d at 990 (Miller, J., concurring in part and dissenting in part) (explaining that review "would [have] be[en] deferential" had the agencies acknowledged that the costs of "denying meritorious claims" were outweighed by the benefits of "relieving burdens on the asylum system"). Those explanations satisfy the APA's reasoned decisionmaking requirement.

**3.** The district court similarly erred in concluding that the 33-day comment period, during which DHS received more than 50,000 comments, was insufficient. The APA "mandates no minimum comment period," *Riverbend Farms, Inc. v. Madigan*,

958 F.2d 1479, 1484 (9th Cir. 1992), and "a 30-day comment period" can provide the requisite opportunity for meaningful public participation under 5 U.S.C. § 553(b)-(c), even when "substantial rule changes are proposed," *National Lifeline Ass'n v. FCC*, 921 F.3d 1102, 1117 (D.C. Cir. 2019). The agency's choice not to provide a longer comment period was particularly justified under the circumstances presented here— the imminent expiration of Title 42 and the anticipated increase in irregular migration. *See Omnipoint Corp. v. FCC*, 78 F.3d 620, 629-30 (D.C. Cir. 1996).

The separate policy initiatives that the district court identified, Add.31, were outside the scope of the Rule or expressly addressed. *See, e.g.*, 88 Fed. Reg. at 31,316-17, 31,363. Nor were plaintiffs entitled to more information about DHS's prediction of the number of anticipated border encounters. *See* Add.31-32. The agencies provided extensive data demonstrating the scope of the problem. *See* 88 Fed. Reg. at 31,328. Plaintiffs' nonspecific assertions of prejudice are unavailing given the ample time to comment and the submission of tens of thousands of comments.

## CONCLUSION

For the foregoing reasons, the Court should grant a stay of the judgment pending appeal. The government respectfully requests that the Court grant a stay pending appeal or an administrative stay by August 3 to ensure that the Solicitor General has an opportunity to seek an emergency stay from the Supreme Court if necessary. If the Court denies a stay, the government asks that the Court enter an

administrative stay for 14 days to permit the Solicitor General to file, and the Supreme

Court to consider, a stay application.

Respectfully submitted,

WILLIAM C. PEACHEY
   *Director*

EREZ REUVENI
   *Assistant Director*

PATRICK GLEN
CHRISTINA P. GREER
   *Senior Litigation Counsel*
   *Office of Immigration Litigation*
   *Civil Division*
   *U.S. Department of Justice*
   *P.O. Box 868, Ben Franklin Station*
   *Washington, DC 20044*

BRIAN M. BOYNTON
   *Principal Deputy Assistant Attorney*
   *General*

ABBY C. WRIGHT

*/s/ Sean R. Janda*
SEAN R. JANDA
BRIAN J. SPRINGER
   *Attorneys, Appellate Staff*
   *Civil Division, Room 7260*
   *U.S. Department of Justice*
   *950 Pennsylvania Avenue NW*
   *Washington, DC 20530*
   *(202) 514-3388*

July 2023

**CERTIFICATE OF SERVICE**

I hereby certify that on July 27, 2023, I electronically filed the foregoing

response with the Clerk of the Court for the United States Court of Appeals for the

Ninth Circuit by using the appellate CM/ECF system. Participants in the case are

registered CM/ECF users, and service will be accomplished by the appellate

CM/ECF system.

*/s/ Sean R. Janda*
SEAN R. JANDA

**CERTIFICATE OF COMPLIANCE**

This motion complies with the type-volume limit of Circuit Rules 27-1(1)(d) and 32-3(2) because it contains 5575 words. This motion also complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 27(d)(1)(E) and 32(a)(5)-(6) because it was prepared using Microsoft Word 2016 in Garamond 14-point font, a proportionally spaced typeface.

*/s/ Sean R. Janda*
SEAN R. JANDA

No. 23-16032

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

———————————

East Bay Sanctuary Covenant, *et al.*,

*Plaintiffs-Appellees*,

v.

Joseph R. Biden, President of the United States, in his official capacity, *et al.*,

*Defendants-Appellants.*

———————————

On Appeal from the United States District Court
for the Northern District of California

———————————

## ADDENDUM TO EMERGENCY MOTION
## FOR STAY PENDING APPEAL

———————————

WILLIAM C. PEACHEY
*Director*

EREZ REUVENI
*Assistant Director*

PATRICK GLEN
CHRISTINA P. GREER
*Senior Litigation Counsel*
*Office of Immigration Litigation*
*Civil Division*
*U.S. Department of Justice*
*P.O. Box 868, Ben Franklin Station*
*Washington, DC 20044*

BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney*
*General*

ABBY C. WRIGHT
SEAN R. JANDA
BRIAN J. SPRINGER
*Attorneys, Appellate Staff*
*Civil Division, Room 7260*
*U.S. Department of Justice*
*950 Pennsylvania Avenue, NW*
*Washington, DC 20530*
*202-514-3388*

# TABLE OF CONTENTS

**Page**

District Court Opinion and Order (July 25, 2023) (Dkt. 187) ................................. Add.1

Declaration of Blas Nuñez-Neto (June 16, 2023) (Dkt. 176-2) ............................ Add.36

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| EAST BAY SANCTUARY COVENANT, et al., | Case No. 18-cv-06810-JST |
| Plaintiffs, | |
| v. | **ORDER GRANTING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| JOSEPH R. BIDEN, et al., | |
| Defendants. | Re: ECF Nos. 169, 176 |

Before the Court are motions for summary judgment filed by Plaintiffs East Bay Sanctuary Covenant ("EBSC"), Central American Resource Center of Los Angeles, Tahirih Justice Center, National Center for Lesbian Rights, Immigrant Defenders Law Center, and American Gateways, ECF No. 169; and Defendants Joseph R. Biden, Merrick Garland, United States Department of Justice ("DOJ"), David Neal, Executive Office of Immigration Review, Alejandro Mayorkas, United States Department of Homeland Security ("DHS"), Ur Jaddou, United States Citizenship and Immigration Services, Troy A. Miller, United States Customs and Border Protection ("CBP"), Tae D. Johnson, and Immigration and Customs Enforcement ("ICE"), ECF No. 176. The Court will grant Plaintiffs' motion for summary judgment and deny Defendants' motion for summary judgment.

## I. BACKGROUND

On May 16, 2023, DHS and DOJ published a final rule, Circumvention of Lawful Pathways ("the Rule"), which applies a presumption of asylum ineligibility to noncitizens who traveled through a country other than their own before entering the United States through the southern border with Mexico. 88 Fed. Reg. 31314, 31449–52 (May 16, 2023). Unless they meet one of several exceptions, such individuals will be presumed ineligible for asylum; they may rebut

this presumption only upon a showing of "exceptionally compelling circumstances" at the time of entry. *Id.* The Rule provides exceptions for unaccompanied children, noncitizens authorized to travel to the United States pursuant to a DHS-approved parole process, certain noncitizens who present at a port of entry, and noncitizens who have been denied asylum or other forms of protection by another country. *Id.*

Plaintiffs are organizations that represent and assist asylum seekers. They argue the Rule is invalid under the Administrative Procedure Act ("APA") for three reasons: first, it is contrary to law; second, it is arbitrary and capricious; and third, it was issued without adequate opportunity for public comment.

### A. Statutory Framework

"In 1980, to limit the [Executive's] parole power, create a predictable and permanent admissions system, and fulfill international obligations, Congress passed the Refugee Act," which "provided a statutory basis for asylum, the granting of status to refugees who arrive or have been physically present in the United States." *Bringas-Rodriguez v. Sessions*, 850 F.3d 1051, 1060 (9th Cir. 2017) (en banc); *see also EBSC v. Biden* (*Entry V*), 993 F.3d 640, 658 (9th Cir. 2021) ("[T]he Refugee Act of 1980 . . . established an asylum procedure available to any migrant, 'irrespective of such alien's status,' and irrespective of whether the migrant arrived 'at a land border or port of entry.'") (quoting Pub. L. No. 96-212, § 208(a), 94 Stat. 102, 105 (1980)).

This statutory basis is now found in the Immigration and Nationality Act ("INA"), which provides that any noncitizen who arrives in the United States, "whether or not at a designated port of arrival" and "irrespective of [their] status, may apply for asylum." 8 U.S.C. § 1158(a)(1).[1] The statute grants the Attorney General or Secretary of Homeland Security discretion to grant asylum to applicants who qualify as refugees, *id.* § 1158(b)(1)(A), defined as those "unable or unwilling to return to" their home countries "because of persecution or a well-founded fear of persecution on

---

[1] This provision does not apply to noncitizens whom the Attorney General determines can be removed to a safe third country, 8 U.S.C. § 1158(a)(2)(A); or to noncitizens who apply for asylum more than one year after arrival or have previously been denied asylum in the United States, *id.* § 1158(a)(2)(B)–(C), unless they demonstrate changed or extraordinary circumstances, *id.* § 1158(a)(2)(D).

United States District Court
Northern District of California

United States District Court
Northern District of California

account of race, religion, nationality, membership in a particular social group, or political

opinion," *id.* § 1101(a)(42). Certain noncitizens are statutorily barred from eligibility for asylum:

those who have persecuted others on the basis of race, religion, nationality, membership in a

particular social group, or political opinion; those who have been convicted by final judgment of a

particularly serious crime; those who there are serious reasons to believe have committed a serious

nonpolitical crime outside the United States prior to arrival; those who there are reasonable

grounds to regard as terrorists or a danger to the security of the United States; and those who have

firmly resettled in another country prior to arriving in the United States. *Id.* § 1158(b)(2)(A)(i)–

(vi). The statute also provides that "[t]he Attorney General may by regulation establish additional

limitations and conditions" on asylum eligibility, so long as such limitations and conditions are

"consistent with this section." *Id.* § 1158(b)(2)(C).

### B. The Challenged Rule

The Rule establishes a "rebuttable presumption" of asylum ineligibility which applies to all

noncitizens who enter the United States at the southern border between May 11, 2023, and

May 11, 2025, "after . . . travel[ing] through a country other than [their] country of citizenship,

nationality, or, if stateless, last habitual residence."[2] 88 Fed. Reg. at 31450. The presumption

does not apply to unaccompanied minor children. *Id.* Otherwise, noncitizens are exempt from

this presumption only if they (1) have "authorization to travel to the United States to seek parole,

pursuant to a DHS-approved parole process"; (2) "[p]resented at a port of entry, pursuant to a pre-

scheduled time and place, or presented at a port of entry without a pre-scheduled time and place,"

provided they demonstrate, by a preponderance of the evidence, that "it was not possible to access

or use the DHS scheduling system due to language barrier, illiteracy, significant technical failure,

or other ongoing and serious obstacle"; or (3) "[s]ought asylum or other protection in a country

---

[2] This requirement applies only if the country or countries the noncitizen traveled through are
parties to the 1951 Convention Relating to the Status of Refugees, July 28, 1951, 19 U.S.T. 6259,
189 U.N.T.S. 150, or 1967 Protocol Relating to the Status of Refugees, Jan. 31, 1967, 19 U.S.T.
6223, 606 U.N.T.S. 268. 88 Fed. Reg. at 31450. As noted in the preamble to the Rule, all but one
of the countries in North, Central, and South America are parties to at least one of these
agreements. 88 Fed. Reg. at 31411.

1   through which [they] traveled and received a final decision denying that application," provided the

2   denial was for a reason other than abandonment of the claim.[3]  *Id.*  To rebut this presumption,

3   noncitizens must demonstrate, by a preponderance of the evidence, the existence of "exceptionally

4   compelling circumstances" at the time of entry.  Such circumstances exist in cases of acute

5   medical emergencies, "imminent and extreme threat to life or safety, such as an imminent threat of

6   rape, kidnapping, torture, or murder," or "severe . . . trafficking in persons."  *Id.*[4]

7       In simpler terms, under the Rule, noncitizens other than Mexican nationals who cross the

8   southern border are presumed ineligible for asylum unless they (1) have received advance

9   permission to travel to the U.S. to apply for parole; (2) present at a port of entry for a pre-

10  scheduled appointment (or without an appointment, if they can demonstrate an "ongoing and

11  serious obstacle" that precluded pre-scheduling); or (3) have already sought and been denied

12  asylum or other protection in another country en route to the U.S.[5]  The presumption may be

13  rebutted only upon a showing of exceptionally compelling circumstances.

14      The Attorney General and DHS Secretary issued the challenged Rule "pursuant to their

15  shared and respective authorities concerning asylum, statutory withholding, and CAT

16  determinations" under the INA, including their discretionary authority to grant asylum to refugees,

---

[3] The exception for noncitizens who apply for and are denied asylum or other protection in transit countries does not differentiate among denials for reasons other than abandonment—for example, claims that are not cognizable under the asylum laws of those transit countries or applications that are procedurally barred.  *See* 88 Fed. Reg. at 31450 ("A final decision includes any denial by a foreign government of the applicant's claim for asylum or other protection through one or more of that government's pathways for that claim.  A final decision does not include a determination by a foreign government that the alien abandoned the claim.").  To qualify for this exception, noncitizens must have applied for and been denied asylum in a country through which they traveled, regardless of whether or not their applications had any possibility of being granted, and regardless of whether or not that country is a safe option for them.

[4] The Rule provides that exceptionally compelling circumstances will also be found, in removal proceedings pursuant to 8 U.S.C. § 1229(a), where a principal asylum applicant is eligible for statutory withholding of removal or Convention Against Torture ("CAT") withholding and would be granted asylum but for the presumption, and an accompanying family member does not independently qualify for protection from removal or the principal applicant has a spouse or child who would be eligible to follow to join them if they were granted asylum.  88 Fed. Reg. at 31452. In such cases, the presumption will be deemed rebutted.

[5] As noted above, unaccompanied children are also not subject to the presumption.  Because this challenge largely does not concern the exception for unaccompanied children, the Court does not discuss this exception in detail.

United States District Court
Northern District of California

8 U.S.C. § 1158(b)(1)(A); their authority to establish requirements and procedures to govern asylum applications, *id.*; and their authority to establish additional limitations and conditions for asylum eligibility "consistent with this section," *id* § 1158(b)(2)(C).   88 Fed. Reg. at 31323.

The agencies issued a Notice of Proposed Rulemaking ("the Notice") on February 23, 2023, and received public comments until March 27, 2023.  Circumvention of Lawful Pathways, 88 Fed. Reg. 11704, 11704 (Feb. 23, 2023).  Including the last day, the comment period spanned 33 days.[6]  In promulgating the Rule, the agencies invoked the foreign affairs and good cause exceptions to the APA's required 30-day delayed effective date for substantive rules.  *Id.* at 31444–47.  The Rule took effect on May 11, 2023.  *Id.* at 31314.

  **C.**  **Procedural History**

This case began in November 2018, when Plaintiffs filed suit to challenge an interim final rule, Aliens Subject to a Bar on Entry Under Certain Presidential Proclamations; Procedures for Protection Claims, 83 Fed. Reg. 55934 (Nov. 9, 2018), and accompanying presidential proclamation which together barred asylum eligibility for noncitizens who entered the United States outside of designated ports of entry ("Entry Rule").  ECF No. 1.  This Court enjoined the Entry Rule.  *EBSC v. Trump* (*Entry I*), 349 F. Supp. 3d 838 (N.D. Cal. 2018) (granting temporary restraining order); *EBSC v. Trump* (*Entry II*), 354 F. Supp. 3d 1094 (N.D. Cal. 2018) (granting preliminary injunction).  The Ninth Circuit and Supreme Court declined to stay the temporary restraining order pending appeal.  *EBSC v. Trump* (*Entry III*), 932 F. 3d 742 (9th Cir. 2018); *Trump v. EBSC* (*Entry IV*), 139 S. Ct. 782 (2018) (mem.).  This Court stayed the case in March 2019, pending resolution of the appeal.  ECF No. 113.  The Ninth Circuit subsequently held that the Entry Rule was substantively invalid and affirmed this Court's orders granting preliminary injunctive relief.  *Entry V*, 993 F.3d at 640.

In 2019, DOJ and DHS issued an interim final rule that rendered noncitizens who crossed

---

[6] The parties dispute the exact length of the comment period:  Defendants include the final day of the comment period in their calculation, while Plaintiffs omit the final day.  For purposes of this motion, the Court assumes that the public could begin submitting comments on the day the Notice was issued and could continue to submit comments until the end of the day the comment period closed, such that the comment period was 33 days long.

**Add.5** 5

the southern border after traveling through a country other than their own categorically ineligible for asylum ("Transit Rule"). Asylum Eligibility and Procedural Modifications, 84 Fed. Reg. 33829 (July 16, 2019). The Transit Rule contained three exceptions under which noncitizens could remain eligible for asylum: (1) if they had applied for and been denied asylum or other protection in at least one country en route to the United States; (2) if they qualified as victims of human trafficking; and (3) if the only countries they traveled through were not parties to one of three international treaties. *Id.* at 33843. This Court enjoined the Transit Rule. *EBSC v. Barr* (*Transit I*), 385 F. Supp. 3d 922 (N.D. Cal. 2019). The Ninth Circuit narrowed the scope of the injunction, staying it outside of the Ninth Circuit, and explained that this Court retained jurisdiction to further develop the record in support of a broader injunction. *EBSC v. Barr* (*Transit II*), 934 F.3d 1026 (9th Cir. 2019). Following remand, this Court restored the nationwide scope of the injunction. *EBSC v. Barr* (*Transit III*), 391 F. Supp. 3d 974 (N.D. Cal. 2019). The Supreme Court then stayed the injunction pending appeal. *Barr v. EBSC* (*Transit IV*), 140 S. Ct. 3 (2019) (mem.). On appeal, the Ninth Circuit affirmed this Court's order granting a nationwide injunction and held that the Transit Rule was substantively invalid. *EBSC v. Garland* (*Transit V*), 994 F.3d 962 (9th Cir. 2020).

The Rule Plaintiffs presently challenge removed provisions implementing the Entry and Transit Rules. *See* 88 Fed. Reg. at 31319. On May 11, 2023—the day the Rule was scheduled to take effect, which was five days before its publication—Plaintiffs filed a motion seeking to lift the stay in this case and requesting leave to file an amended and supplemental complaint. ECF No. 147. Pursuant to the parties' subsequent stipulation, the Court granted the motion and adopted the parties' proposed case schedule, which contemplated proceeding directly to summary judgment. ECF No. 163. The parties now move for summary judgment. ECF Nos. 169, 176. The Court permitted and has considered amicus briefs by a group of former immigration judges and members of the Board of Immigration Appeals ("BIA"), ECF No. 172, and by National Citizenship and Immigration Services Council 119, ECF No. 174-1.

## II.    JURISDICTION

The Court has jurisdiction under 28 U.S.C. § 1331.

United States District Court
Northern District of California

## III. LEGAL STANDARD

Granting summary judgment is proper when a "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). For cases involving review of agency action under the APA, "[t]he function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." *City & County of San Francisco v. United States*, 130 F.3d 873, 877 (9th Cir. 1997) (quoting *Occidental Eng'g Co. v. INS*, 753 F.2d 766, 769 (9th Cir. 1985)). In such cases, a court's review is generally limited to the administrative record. *Lands Council v. Powell*, 395 F.3d 1019, 1029–30 (9th Cir. 2005).

## IV. DISCUSSION

### A. Preliminary Issues

The Court begins by addressing preliminary issues that affect this Court's jurisdiction to reach the merits and grant the relief sought—namely, Article III standing, statutory standing, and provisions of the INA that limit judicial review.

#### 1. Article III Standing

"Article III confines the federal judicial power to the resolution of 'Cases' and 'Controversies.'" *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021). "For there to be a case or controversy under Article III, the plaintiff must have a 'personal stake' in the case—in other words, standing." *Id.* (quoting *Raines v. Byrd*, 521 U.S. 811, 819 (1997)). "[T]o establish standing, a plaintiff must show (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant, and (iii) that the injury would likely be redressed by judicial relief." *Id.* "The party invoking federal jurisdiction bears the burden of establishing" each element of standing. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). At summary judgment, plaintiffs "must 'set forth' by affidavit or other evidence 'specific facts,' which for purposes of the summary judgment motion will be taken as true." *Id.* (internal citation omitted).

Plaintiffs assert organizational standing to challenge the Rule. "An organization may establish standing on its own behalf by showing that the defendant's conduct resulted in 'a

diversion of its resources and frustration of its mission,' or caused a substantial loss in organizational funding." *Transit V*, 994 F.3d at 974 (internal citation omitted) (quoting *Fair Hous. of Marin v. Combs*, 285 F.3d 899, 905 (9th Cir. 2002)); *see Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982) (allegations that challenged practices "frustrated" organization's mission and required reallocation of resources are sufficient to confer direct standing because "[s]uch concrete and demonstrable injury to the organization's activities—with the consequent drain on the organization's resources—constitutes far more than simply a setback to the organization's abstract social interests"). "[U]nder *Havens Realty*, 'a diversion-of-resources injury is sufficient to establish organizational standing,' if the organization shows that, independent of the litigation, the challenged 'policy frustrates the organization's goals and requires the organization to expend resources in representing clients they otherwise would spend in other ways.'" *Entry III*, 932 F.3d at 765 (first quoting *Nat'l Council of La Raza v. Cegavske*, 800 F.3d 1032, 1040 (9th Cir. 2015), then quoting *Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 657 F.3d 936, 943 (9th Cir. 2011) (en banc)).

Plaintiffs are immigration legal services organizations that represent noncitizens seeking asylum. ECF No. 169-2 ¶¶ 5, 7; ECF No. 169-3 ¶¶ 4, 12–13; ECF No. 169-5 ¶ 10; ECF No. 169-6 ¶¶ 6, 9, 11; ECF No. 169-7 ¶¶ 6, 12; ECF No. 175 ¶¶ 6–7. Plaintiffs assert that the Rule frustrates their organizational goals, requires them to reallocate resources in a manner which will limit the number of clients they serve, and will cause them to lose funding. ECF No. 169-2 ¶¶ 11, 13; ECF No. 169-3 ¶ 17; ECF No. 169-5 ¶ 11; ECF No. 169-6 ¶ 14; ECF No. 169-7 ¶¶ 19–20, 26; ECF No. 175 ¶ 18.

The Rule will frustrate Plaintiffs' missions and require them to divert resources from existing programs. ECF No. 169-2 ¶ 16; ECF No. 169-3 ¶¶ 25–26; ECF No. 169-5 ¶ 24; ECF No. 175 ¶¶ 18, 21. Under the Rule, many of Plaintiffs' clients will be presumed ineligible for asylum. ECF No. 169-2 ¶¶ 7, 11; ECF No. 169-3 ¶ 18; ECF No. 169-5 ¶¶ 15, 28–43; ECF No. 169-6 ¶¶ 10–11; ECF No. 169-7 ¶¶ 20, 32–43; ECF No. 175 ¶¶ 15, 37. To assist asylum seekers, Plaintiffs will need to overhaul their screening and intake processes to determine whether clients can qualify for an exception to the Rule or rebut the presumption, and assign staff to gather

8

United States District Court
Northern District of California

relevant evidence and prepare such arguments.  ECF No. 169-2 ¶ 13; ECF No. 169-3 ¶ 24; ECF No. 169-5 ¶¶ 20–23.  Because many of their clients will be presumed ineligible for asylum, Plaintiffs will have to assist clients who cannot meet an exception or rebut the presumption in seeking other forms of relief—statutory withholding of removal and CAT withholding—which are far more time- and resource-intensive than asylum, largely because they impose a higher evidentiary standard.  ECF No. 169-2 ¶ 11; ECF No. 169-3 ¶ 21; ECF No. 169-5 ¶ 17; ECF No. 169-7 ¶ 24.  Because of the higher evidentiary standard, Plaintiffs will have to devote resources to filing appeals to the BIA and petitions for review.  ECF No. 169-7 ¶ 24.  Statutory withholding and CAT withholding do not permit principal applicants to petition for derivative applicants—as asylum does—so Plaintiffs will have to devote additional resources to preparing separate applications to ensure the safety of applicants' family members.  ECF No. 169-2 ¶ 12; ECF No. 169-3 ¶¶ 22–23; ECF No. 169-5 ¶¶ 18–19.  Plaintiffs will also need to adjust outreach programs to educate the community about the new Rule and develop new materials for such outreach.  ECF No. 169-3 ¶ 27; ECF No. 169-4 ¶ 35; ECF No. 169-6 ¶ 22; ECF No. 175 ¶ 37.

Because Plaintiffs will need to devote additional resources to each client seeking asylum—for additional screening and preparation to argue that exceptions apply or rebut the presumption; for the complexities involved in preparing statutory withholding and CAT withholding applications; and for the training required to prepare staff to take on these tasks—Plaintiffs will be able to represent fewer clients.  ECF No. 169-2 ¶¶ 13–14; ECF No. 169-4 ¶ 36; ECF No. 169-5 ¶ 23; ECF No. 169-6 ¶ 16; ECF No. 169-7 ¶ 22.  Several Plaintiffs additionally anticipate a loss of funding due to these operational shifts.  ECF No. 169-2 ¶¶ 8, 13–14; ECF No. 169-6 ¶ 16; ECF No. 175 ¶ 36.

EBSC, for instance, focuses on affirmative asylum, which is "core to the organization's mission, and accounts for almost half . . . [its] budget."  ECF No. 169-6 ¶ 8.  A substantial number of EBSC's affirmative asylum clients are likely to be subject to the Rule's presumption of ineligibility:  in 2022, nearly a third of EBSC's affirmative asylum clients crossed the southern border between ports of entry after transiting through a third country, *id.* ¶ 10; EBSC's clients include victims of gender-based violence and indigenous, LGBT, and HIV positive individuals,

United States District Court
Northern District of California

1    who are particularly vulnerable to violence en route to the United States and are likely to have

2    "great difficulty accessing protection" in transit countries, *id.* ¶ 11; and many of EBSC's clients

3    are "illiterate or only marginally literate," such that they will struggle to use the CBP One mobile

4    scheduling application, *id.* Because such individuals will be presumed ineligible for asylum,

5    EBSC will need to "significantly cut [its] affirmative asylum program," which is core to its

6    mission, *id.* ¶ 18, and "make [an] enormous and costly shift in how [it] provide[s] services," *id.*

7    ¶ 19, by pivoting to removal defense work, for which it would need to find new funding sources,

8    *id.* ¶ 21. "If EBSC were no longer able to file [affirmative asylum] cases for most individuals who

9    entered without inspection after transiting through a third country, [it] would face a marked

10   decrease in [its] budget, which would jeopardize [its] entire asylum program." *Id.* ¶ 16.

11          Because Plaintiffs offer uncontroverted evidence that the Rule will frustrate their

12   organizational goals, require diversion of resources, and substantially affect their funding, the

13   Court finds that Plaintiffs have standing to challenge the Rule.

14          Defendants argue that Plaintiffs nevertheless lack standing to challenge "what is, in

15   essence, a decision regarding enforcement of the immigration laws against third parties," such that

16   standing is barred by *Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973), and *Sure-Tan, Inc. v.*

17   *NLRB*, 467 U.S. 883, 897 (1984). ECF No. 176-1 at 22. The Ninth Circuit previously rejected

18   this argument, explaining that those cases concern third-party, not organizational, standing. *Entry*

19   *V*, 993 F.3d at 664 n.6.[7]

20          On reply, Defendants argue that *United States v. Texas*, 143 S. Ct. 1964 (2023),

21   additionally precludes Plaintiffs from challenging the Rule. ECF No. 182 at 8–9. In that case, the

22   Supreme Court held that two states lacked standing to challenge DHS's immigration-related arrest

23   and prosecution priorities, which the states argued conflicted with arrest mandates in the INA. *Id.*

24   at 1969–70. Relying on *Linda R.S.*, the Supreme Court explained that the states had no judicially

25   cognizable interest in the Executive's "exercise of enforcement discretion over whether to arrest or

26   prosecute." *Id.* at 1970. The Court also explicitly noted that "a challenge to an Executive Branch

27

28   _____

[7] The Court notes that the Supreme Court's decision in *United States v. Texas*, 143 S. Ct. 1964 (2023), suggests these cases are not limited to third-party standing.

United States District Court
Northern District of California

policy that involves both the Executive Branch's arrest or prosecution priorities *and* the Executive Branch's provision of legal benefits or legal status could lead to a different standing analysis . . . because the challenged policy might implicate more than simply the Executive's traditional enforcement discretion." *Id.* at 1974 (emphasis in original).

The Rule Plaintiffs challenge does not seem to implicate the Executive's exercise of enforcement discretion over whether to arrest or prosecute. Regardless, the Rule certainly implicates the Executive's provision of legal benefits or legal status because it categorically limits eligibility for asylum, which offers "a number of benefits, including pathways to lawful permanent resident status and citizenship," the opportunity to obtain derivative asylum for spouses and unmarried children, employment authorization, the freedom to travel abroad without prior government approval, and eligibility for certain federal financial benefits. *Entry III*, 932 F.3d at 759–60. Thus, *United States v. Texas*, 143 S. Ct. at 1964, does not bar Plaintiffs from challenging the Rule.

The Court concludes that Plaintiffs have established Article III standing.

### 2. Statutory Standing

Courts "presume that a statutory cause of action extends only to plaintiffs whose interests 'fall within the zone of interests protected by the law invoked.'" *Lexmark Int'l, Inc v. Static Control Components, Inc.*, 572 U.S. 118, 129 (2014) (quoting *Allen v. Wright*, 468 U.S. 737, 751 (1984)). "[T]he test 'forecloses suit only when a plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that' Congress authorized that plaintiff to sue." *Id.* at 130 (quoting *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 225 (2012)). Because Plaintiffs bring an APA challenge to rules promulgated pursuant to the INA, the Court considers whether Plaintiffs fall within the zone of interests protected by the INA. *Patchak*, 567 U.S. at 224.

The Ninth Circuit has already held that organizations that provide asylum services—some of which are parties to this case—fall within the zone of interests protected by the INA, and therefore satisfy the zone-of-interests standard to bring an APA challenge. *See Entry III*, 932 F.3d at 768–69 ("Although the Organizations are neither directly regulated nor benefitted by the INA,

we nevertheless conclude that their interest in 'provid[ing] the [asylum] services [they were] formed to provide' falls within the zone of interests protected by the INA.") (alterations in original) (quoting *El Rescate Legal Servs. v. EOIR*, 959 F.2d 742, 748 (9th Cir. 1991)); *Entry V*, 993 F.3d at 668 ("The Organizations' claims fall within the zone of interests of the INA and of the regulatory amendments implemented by the Rule.").  Because Plaintiffs' "purpose is to help individuals apply for and obtain asylum, provide low-cost immigration services, and carry out community education programs with respect to those services," their "interests are 'marginally related to' and 'arguably within' the scope of the statute," such that the zone-of-interests analysis does not foreclose suit.  *Entry V*, 993 F.3d at 668.

The Court concludes that Plaintiffs have statutory standing to challenge the validity of the Rule.

### 3.    Jurisdictional Bars

Defendants argue that several provisions of the INA prohibit this Court from reviewing the Rule or granting any remedy.

### a.    8 U.S.C. §§ 1252(a)(2)(A)(iv), (e)(1), and (e)(3)

First, Defendants argue that the Rule implements expedited removal, such that 8 U.S.C. §§ 1252(a)(2)(A)(iv), (e)(1), and (e)(3) divest this Court of jurisdiction to review or vacate the Rule.  Section 1252(a)(2)(A)(iv) provides that "no court shall have jurisdiction to review . . . except as provided in subsection (e), procedures and policies adopted by the Attorney General to implement" expedited removal.  Section 1252(e)(1) provides that no court may grant equitable relief "in any action pertaining to an order to exclude" based on expedited removal, while Section 1252(e)(3) limits judicial review of regulations implementing the expedited removal statute to cases initiated in the United States District Court for the District of Columbia.  These provisions therefore limit judicial review of rules implementing the expedited removal statute.

Defendants argue that the Rule implements the expedited removal statute because the presumption of asylum ineligibility must be applied in expedited removal proceedings.  The argument stretches too far.  As the Ninth Circuit previously explained, "[b]ars to asylum eligibility may eventually be relevant to removal proceedings, but they are not 'regulation[s] . . . to

implement [removal orders]' or otherwise entirely linked with removal orders." *Entry V*, 993 F.3d at 666–67. "This is consistent with the purposes of these jurisdictional limitations: allowing collateral APA challenges to an asylum-eligibility rule does not undermine Congress's desire to 'limit all aliens to one bite of the apple with regard to challenging' their removal orders." *Id.* at 667 (quoting *Martinez v. Napolitano*, 704 F.3d 620, 622 (9th Cir. 2012)). The Rule implements the asylum statute by imposing new conditions on asylum eligibility; that the standard articulated in the Rule is also applied in the expedited removal process does not convert the Rule into one implementing the expedited removal statute.

The Court is not persuaded that Defendants' proposed reading of the limit on judicial review imposed by Sections 1252(a)(2)(A)(iv), (e)(1) and (e)(3) is appropriate. "As the Supreme Court has observed, where 'Congress wanted [a] jurisdictional bar to encompass [particular] decisions [under the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA")] . . . it expressed precisely that meaning." *Entry II*, 354 F. Supp. 3d. at 1119 (alterations in original) (quoting *Kucana v. Holder*, 558 U.S. 233, 248 (2010)). Congress could have imposed similar limits on judicial review of challenges to regulations that implement the asylum statute, but it did not do so. "[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Nken v. Holder*, 556 U.S. 418, 430 (2009) (alteration in original) (quoting *INS v. Cardoza-Fonseca*, 480 U.S. 421, 432 (1987)). In the absence of binding authority holding that these provisions limit judicial review of regulations implementing the asylum statute, the Court concludes that it has jurisdiction over this case.

### b.    8 U.S.C. § 1252(f)(1)

Defendants also argue that 8 U.S.C. § 1252(f)(1) divests this Court of jurisdiction to grant the relief Plaintiffs seek. Section 1252(f), titled "[l]imit on injunctive relief," provides that "no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of the provisions of part IV of this subchapter . . . other than with respect to the application of such provisions to an individual alien against whom proceedings under such part

1  have been initiated." 8 U.S.C. § 1252(f)(1).  As the Supreme Court has explained, "[Section]

2  1252(f)(1) generally prohibits lower courts from entering injunctions that order federal officials to

3  take or to refrain from taking actions to enforce, implement, or otherwise carry out the specified

4  statutory provisions."  *Garland v. Aleman Gonzalez*, 142 S. Ct. 2057, 2065 (2022).

5       First, the Court notes that Plaintiffs seek vacatur under the APA, not an injunction.

6  Though Defendants argue that the Section 1252(f)(1) bar also applies to vacatur, they cite no

7  binding authority on this point, and this Court is not aware of any.

8       Further, even if Section 1252(f)(1) did bar relief under the APA, the asylum statute is not

9  among the statutory provisions specified in Section 1252(f)(1).  Defendants argue that, because the

10  Rule provides that the presumption of asylum ineligibility shall apply in removal proceedings

11  initiated under 8 U.S.C. §§ 1225(b)(1) and 1229a, vacating or enjoining the Rule would

12  effectively "enjoin or restrain the operation" of those removal statutes in violation of Section

13  1252(f)(1) by preventing the agencies from applying the Rule's presumption in removal

14  proceedings.

15       The Court is not persuaded by this argument.  "At best, the law governing asylum is

16  collateral to the process of removal."  *Entry V*, 993 F.3d at 667.  The Rule imposes conditions on

17  eligibility for asylum; these conditions are applied across all contexts in which asylum claims may

18  arise.  That any injunction would have a collateral effect on the conditions for asylum eligibility as

19  applied during removal proceedings does not bring it within the bar imposed by Section 1252(f).

20  *See Gonzales v. DHS*, 508 F.3d 1227, 1233 (9th Cir. 2007) (holding that Section 1252(f)(1) did

21  not prohibit injunction directly implicating adjustment of status—which is not among the statutory

22  provisions specified in Section 1252(f)(1)—despite collateral effect on removal); *Aleman*

23  *Gonzalez*, 142 S. Ct. at 2067 n.4 (noting that *Gonzales*, 508 F.3d at 1227, "stands at most for the

24  unresponsive proposition that a court may enjoin the unlawful operation of a provision *that is not*

25  *specified in § 1252(f)(1)* even if that injunction has some collateral effect on the operation of a

26  covered provision") (emphasis in original).  Congress expressly limited the jurisdictional bar of

27  Section 1252(f)(1) to "the provisions of part IV of this subchapter," which do not include the

28  asylum statute.  *Gonzalez v. ICE*, 975 F.3d 788, 813 (9th Cir. 2020) ("[B]y specifying only 'the

14

provisions of Part IV' and reinforcing its focus on only 'such provisions,' the statute's plain text makes clear that its limitations on injunctive relief do *not* apply to *other* provisions of the INA.") (emphasis in original) (internal citation omitted).  The fact that the removal statutes cross-reference the asylum statute does not bring the asylum statute within the limited jurisdictional bar of Section 1252(f)(1).

The Court concludes that it has jurisdiction to review the Rule and grant an appropriate remedy under the APA.

### B.     APA Claims

The APA provides, in relevant part, that courts "shall . . . hold unlawful and set aside agency action . . . found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; . . . in excess of statutory jurisdiction, authority, or limitations . . . ; [or] without observance of procedure required by law."  5 U.S.C. § 706(2).  "[I]n reviewing agency action, a court is ordinarily limited to evaluating the agency's contemporaneous explanation in light of the existing administrative record."  *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2573 (2019).

### 1.     Substantive Validity

Plaintiffs argue the Rule is substantively invalid because it is both not in accordance with law and arbitrary and capricious.

#### a.     "Not in Accordance with Law"

The Rule imposes additional conditions on asylum eligibility; such conditions must be "consistent with" Section 1158.  8 U.S.C. § 1158(b)(2)(C).  The government argues that the conditions imposed by the Rule are consistent with Section 1158, and that the Court should defer to the agencies' interpretation of the statute.

To determine whether judicial deference to an agency's interpretation of a statute is appropriate, courts apply the framework articulated by the Supreme Court in *Chevron*, *U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984).  Under *Chevron*, courts first consider "whether Congress has directly spoken to the precise question at issue"; "[i]f the intent of Congress is clear, that is the end of the matter."  *Campos-Hernandez v. Sessions*, 889 F.3d 564,

United States District Court
Northern District of California

568 (9th Cir. 2018) (quoting *Chevron*, 467 U.S. at 842).  "The first and most important canon of statutory construction is the presumption 'that a legislature says in a statute what it means and means in a statute what it says there.'"  *In re Pangang Grp. Co., LTD.*, 901 F.3d 1046, 1056 (9th Cir. 2018) (quoting *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253 (1992)).  The Court "starts with the plain statutory text and, 'when deciding whether the language is plain, . . . must read the words in their context and with a view to their place in the overall statutory scheme.'"  *Altera Corp. & Subsidiaries v. Comm'r of Internal Revenue*, 926 F.3d 1061, 1075 (9th Cir. 2019) (quoting *King v. Burwell*, 576 U.S. 473, 486 (2015)).  "In addition, [courts] examine the legislative history, the statutory structure, and 'other traditional aids of statutory interpretation' in order to ascertain congressional intent."  *Id.* (quoting *Middlesex Cnty. Sewerage Auth. v. Nat'l Sea Clammers Ass'n*, 453 U.S. 1, 13 (1981)).  "If 'the statute is silent or ambiguous with respect to [a] specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.'"  *Wide Voice, LLC v. FCC*, 61 F.4th 1018, 1025 (9th Cir. 2023) (quoting *Chevron*, 467 U.S. at 843).

Congress granted the agencies authority to impose additional conditions on asylum eligibility, but only those consistent with Section 1158.  The Rule effectively conditions asylum eligibility on whether a noncitizen qualifies for any of three exceptions—presenting at a port of entry, having been denied protection by another country in transit, and having parole-related travel authorization—or can show exceptionally compelling circumstances.[8]  The agencies can only condition asylum eligibility based on these factors if doing so is consistent with Section 1158.

Two of the conditions imposed by the Rule have been previously found to be inconsistent with Section 1158.  Under binding Ninth Circuit precedent, conditioning asylum eligibility on presenting at a port of entry or having been denied protection in transit conflicts with the unambiguous intent of Congress as expressed in Section 1158.  *Entry V*, 993 F.3d at 671 ("[T]he [Entry] Rule is substantively invalid because it conflicts with the plain congressional intent

---

[8] As noted above, by its terms, the Rule only applies to individuals who transited through a country other than their own en route to the U.S. border.  The Rule also contains an exception for unaccompanied minors.

instilled in [Section] 1158(a), and is therefore 'not in accordance with law.'") (quoting 5 U.S.C. § 706(2)(A)); *Transit V*, 994 F.3d at 976 ("We hold, independently of *Chevron*, that the [Transit] Rule is not 'consistent with' [Section] 1158. We note, however, that we would come to the same conclusion even if we were to apply *Chevron*, for the Rule is contrary to the unambiguous language of [Section] 1158."). Section 1158(a) permits noncitizens to apply for asylum regardless of whether or not they arrive at a designated port of entry; a rule that conditions eligibility for asylum on presentment at a port of entry conflicts with Section 1158(a). *Entry V*, 993 F.3d at 669–70. The safe-third-country and firm-resettlement bars, 8 U.S.C. § 1158(a)(2)(A), (b)(2)(A), "specifically address[] the circumstances in which an alien who has traveled through, or stayed in, a third country can be deemed sufficiently safe in that country to warrant a denial of asylum in the United States"; conditioning asylum eligibility on having been denied protection in transit is not consistent with these bars. *Transit V*, 994 F.3d at 978.

Defendants argue that this Court is not bound by the Ninth Circuit's holdings in *Entry V* and *Transit V* because, unlike the Entry and Transit Rules, this Rule does not impose a categorical bar, and a noncitizen may avoid the application of the presumption by qualifying for a different exception. ECF No. 176-1 at 27–29; *see also* 88 Fed. Reg. at 31374 ("[U]nder this [R]ule . . . manner of entry, standing alone, is never dispositive. . . . [T]he narrower application and numerous exceptions and methods of rebutting the presumption demonstrate the differences between the prior, categorical bars [and the Rule]."); *id.* at 31379 ("[T]he [R]ule imposes a condition on asylum . . . eligibility relating to whether the noncitizen availed themselves of a lawful pathway, but the [R]ule does not direct an inquiry as to whether the noncitizen can or should return to a third country.").

The Court is not persuaded that the existence of other exceptions or the opportunity to rebut the presumption materially distinguishes this Rule from the reasoning of *Entry V* and *Transit V*. In *Entry V*, the Ninth Circuit explained that requiring noncitizens to present at ports of entry "effectively [constitutes] a categorical ban on migrants who use a method of entry explicitly authorized by Congress in [S]ection 1158(a)." 993 F.3d at 669–70. The Entry Rule was contrary to law because it excluded noncitizens from eligibility for asylum based on their failure to present

17

at a port of entry, despite express statutory language providing that any noncitizen may apply for asylum, regardless of "whether or not [they arrived] at a designated port of arrival."  8 U.S.C. § 1158(a).  That a noncitizen may attempt to preserve their eligibility for asylum by meeting another of the Rule's exceptions, or that their failure to present at a port of entry may be excused upon a showing of exceptionally compelling circumstances, does not address the reason why restricting asylum eligibility based on place of entry conflicts with the law.  Defendants are correct that the Rule does not impose a categorical bar on all noncitizens subject to the Rule; however, failure to present at a port of entry will exclude those for whom other exceptions are not available and who cannot rebut the presumption.[9]

In *Transit V*, the Ninth Circuit explained that "regulations imposing additional limitations and conditions under [Section] 1158(b)(2)(C) must be consistent with the core principle of [Sections] 1158(a)(2)(A) and (b)(2)(A)(vi)—that an otherwise qualified alien can be denied asylum only if there is a 'safe option' in another country."  994 F.3d at 979.  As written, the Rule imposes a presumption of ineligibility on asylum seekers who did not apply for or were granted asylum in a transit country regardless of whether that country is a safe option.  That noncitizens may try to escape the presumption by satisfying a different exception, or that the presumption of ineligibility may be rebutted in exceptionally compelling circumstances, does not address whether a noncitizen has a safe option in another country.  While Defendants are correct that failure to seek protection in a transit country alone may not be dispositive for many noncitizens subject to the Rule, it would be so for the subset of noncitizens for whom the other exceptions are unavailable

---

[9] For example, a noncitizen ineligible for existing DHS parole programs who has been in Mexico for more than 30 business days—and is therefore ineligible for asylum in Mexico, AR 5715 (Ley Sobre Refugiados, Protección Complementaria y Asilo Político, Diario Oficial de la Federación [DOF] 27-01-2011, últimas reformas DOF 18-02-2022 (Mex.))—must present at a port of entry to avoid the presumption altogether.  If they cannot safely wait for a CBP One appointment to become available, and cannot show some exceptionally compelling circumstance, they are barred from asylum.

18

and who cannot rebut the presumption.[10]  Regulations imposing additional conditions on asylum must be consistent with the core principle of the safe-third-country and firm-resettlement bars. This Rule is not.

The Court concludes that the Rule is contrary to law because it presumes ineligible for asylum noncitizens who enter between ports of entry, using a manner of entry that Congress expressly intended should not affect access to asylum.  The Rule is also contrary to law because it presumes ineligible for asylum noncitizens who fail to apply for protection in a transit country, despite Congress's clear intent that such a factor should only limit access to asylum where the transit country actually presents a safe option.

### b. Arbitrary and Capricious

"The APA's arbitrary-and-capricious standard requires that agency action be reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021). "The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." *Wide Voice*, 61 F.4th at 1024 (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

> Nevertheless, [courts] require the agency to 'examine the relevant data and articulate a satisfactory explanation for its action,' and [courts] will strike down agency action as 'arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency,' or if the agency's decision 'is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'

*Turtle Island Restoration Network v. U.S. Dep't of Com.*, 878 F.3d 725, 732–33 (9th Cir. 2017)

---

[10] For instance, a noncitizen originating from a third country presently in Mexico who is ineligible for existing DHS parole programs and for whom Mexico is not safe, such that they cannot wait for a CBP One appointment to become available, would be subject to the presumption, regardless of whether any country they traveled through presented a safe option for them.  To rebut the presumption, that noncitizen must wait until they experience an extreme and imminent threat to life or safety to enter the United States to seek protection.  88 Fed. Reg. at 31396 ("[D]anger in Mexico generally would justify failing to pre-schedule a time and place to appear at a [port of entry] . . . only when it amounts to an extreme and imminent threat to life or safety.").  If they cannot show that or some other exceptionally compelling circumstance, they are barred from asylum.

(quoting *State Farm*, 463 U.S. at 43).

The Rule is arbitrary and capricious for at least two reasons. First, it relies on the availability of other pathways for migration to the United States, which Congress did not intend the agencies to consider in promulgating additional conditions for asylum eligibility. Second, it explains the scope of each exception by reference to the availability of the other exceptions, although the record shows that each exception will be unavailable to many noncitizens subject to the Rule.

### i. "Lawful Pathways"[11]

As the preamble states, "[t]he [R]ule's primary purpose is to incentivize migrants, including those intending to seek asylum, to use lawful, safe, and orderly pathways to enter the United States, or seek asylum or other protection in another country through which they travel." 88 Fed. Reg. at 31336. The final Rule offers several examples of these "lawful pathways," namely temporary worker visa programs, parole programs, and refugee admission in the United States. *Id.* The agencies justify imposing conditions on asylum eligibility by reference to the availability of these other pathways. *See, e.g.*, *id.* at 31318 ("Available pathways provide lawful, safe[,] and orderly mechanisms for migrants to enter the United States and make their protection claims. . . . [T]his [R]ule also imposes consequences on certain noncitizens who fail to avail themselves of the range of lawful, safe, and orderly means for entering the United States."); *id.* at 31347 ("[T]he meaningful pathways detailed in the [R]ule, combined with the exceptions and rebuttals to the presumption, provide sufficient opportunities for individuals to meet an exception to or rebut the presumption."); *see also* ECF No. 176-1 at 33 ("The [R]ule was promulgated based on several urgent and compelling considerations, including . . . the expansion of lawful, safe, and orderly

---

[11] The preamble to the Rule defines "lawful pathways" and "lawful, safe, and orderly pathways" as "the range of pathways and processes by which migrants are able to enter the United States or other countries in a lawful, safe, and orderly manner and seek asylum and other forms of protection as described in this [R]ule." 88 Fed. Reg. at 31316 n.18. The Rule elsewhere appears to use "pathways" to describe the means by which an individual may qualify for an exception to, or rebut, the presumption. *See, e.g.*, *id.* at 31410 ("The Departments believe that these alternative pathways for a noncitizen to be excepted from or rebut the presumption against asylum eligibility are sufficient."). For the sake of clarity, the Court uses "pathways" and "lawful pathways" to refer to the means by which noncitizens may enter the United States, and not to refer to any exceptions to or opportunities to rebut the presumption imposed under the Rule.

1     pathways noncitizens can pursue to seek entry to the United States.").

2         The agencies' authority to promulgate regulations imposing additional limitations and

3 conditions on asylum eligibility requires only that such conditions be "consistent with" the asylum

4 statute, 8 U.S.C. § 1158(b)(2)(C); the statute does not otherwise mandate that particular factors be

5 considered in the rulemaking process. However, "agency action must be based on non-arbitrary,

6 'relevant factors.'" *Judulang v. Holder*, 565 U.S. 42, 55 (2011) (quoting *State Farm*, 463 U.S. at

7 43). The availability of refugee admissions, parole, or work visas is irrelevant to the availability

8 of asylum, which Congress considered to be independent of any particular means of entry.

9         Consider, for example, parole. The Executive's longstanding discretion to parole

10 noncitizens into the country, codified in 1952, has changed only slightly in the decades since.

11 *Compare* 8 U.S.C. § 1182(d)(5) (1952) ("The Attorney General may in his discretion parole into

12 the United States temporarily under such conditions as he may prescribe for emergent reasons or

13 for reasons deemed strictly in the public interest any alien applying for admission to the United

14 States.") *with* 8 U.S.C. § 1182(d)(5) (2018) ("The Attorney General may . . . in his discretion

15 parole into the United States temporarily under such conditions as he may prescribe only on a

16 case-by-case basis for urgent humanitarian reasons or significant public benefit any alien applying

17 for admission to the United States.").[12] "Prior to the [1980 Refugee Act], asylum for aliens who

18 were within the United States had been governed by regulations promulgated by the INS, pursuant

19 to the Attorney General's broad parole authority." *Cardoza-Fonseca*, 480 U.S. at 427 n.4. The

20 1980 Refugee Act ordered the Attorney General to "establish a procedure for an alien physically

21 present in the United States or at a land border or port of entry, irrespective of such alien's status,

22 to apply for asylum." Pub. L. No. 96-212, § 208(a), 94 Stat. 102, 105 (1980). Asylum would

23 therefore be a benefit for which any qualifying noncitizen at a border or port of entry could apply,

24 independent of the Attorney General's parole power. Imposing conditions on asylum eligibility

25 based on the availability of parole programs relies on a factor that Congress did not intend to be

26

27        [12] While parole is discretionary and must be granted on a case-by-case basis, the Executive has created country-specific programs through which eligible noncitizens may seek individual grants of parole. *See, e.g.*, 87 Fed. Reg. at 63507.

28

United States District Court
Northern District of California

United States District Court
Northern District of California

1    considered in the asylum context.[13]

2          Work visas and refugee admissions are similarly irrelevant to asylum.  The H-2A and

3    H-2B temporary worker visa programs predate Congress's enactment of the asylum statute.  *See*

4    *Mendoza v. Perez*, 754 F.3d 1002, 1007 (D.C. Cir. 2014) ("The H-2A visa program—created by

5    the [INA] of 1952 [] and amended by the Immigration Reform and Control Act of 1986

6    ["IRCA"]—permits employers to hire foreign workers to perform temporary agricultural work in

7    the United States."); *La. Forestry Ass'n Inc. v. Sec'y U.S. Dep't of Lab.*, 745 F.3d 653, 659 (3d

8    Cir. 2014) ("In 1986, Congress enacted [IRCA], which amended the INA by, among other things,

9    bifurcating the H-2 visa program into the H-2A and H-2B programs, which govern the admission

10   of agricultural and nonagricultural workers, respectively.").  The asylum statute expressly instructs

11   that the ability to apply for asylum should not be limited based on status; whether temporary work

12   visas are sufficiently available is irrelevant to whether asylum should remain so.  The Refugee

13   Act, which codified the availability of asylum protection, separately established a permanent

14   refugee admission system. Pub. L. No. 96-212, §§ 207–08.  That Congress provided for refugees

15   and asylees separately—and has maintained that distinction in the intervening decades—indicates

16   that the availability of refugee protection should not impact asylum eligibility.

17         Simply put, the asylum statute contemplates that, subject to certain exceptions, any

18   noncitizen physically present in the United States—regardless of whether they entered on a work

19   visa or with parole-related travel authorization—or at a land border or port of entry—regardless of

20   the size and scope of refugee admissions efforts—may apply for asylum.  To justify limiting

21   eligibility for asylum based on the expansion of other means of entry or protection is to consider

22   factors Congress did not intend to affect such eligibility.  The Rule is therefore arbitrary and

23   capricious.

24                           **ii.     Scope of Exceptions**

25         Plaintiffs additionally argue that the agencies rely on the exceptions to justify the Rule,

26

27   _____

     [13] That Congress later imposed additional limitations on asylum eligibility and granted the
     Attorney General the authority to impose further limitations consistent with the statute does not
28   alter this analysis; none of the statutory limitations is related to the availability of other ways to
     enter or be admitted to the United States.

1  while the record demonstrates that many asylum seekers will be unable to qualify for these

2  exceptions.  In the preamble, the agencies acknowledge that the Rule's exceptions and opportunity

3  for rebuttal are insufficient to ensure that all noncitizens with otherwise meritorious asylum claims

4  will remain eligible for asylum:

> The Departments acknowledge that despite the protections preserved
> by the [R]ule and the availability of lawful pathways, the rebuttable
> presumption adopted in the [R]ule will result in the denial of some
> asylum claims that otherwise may have been granted, but . . . believe
> that the [R]ule will generally offer opportunities for those with valid
> claims to seek protection through asylum, statutory withholding of
> removal, or protection under the CAT . . . .

9  88 Fed. Reg. at 31332.  However, the Rule justifies the breadth of its presumption of ineligibility

10  by reference to its multiple exceptions and the opportunity to rebut it.  *See, e.g.*, 88 Fed. Reg. at

11  31325 ("These exceptions and opportunities for rebuttal are meant to ensure that migrants who are

12  particularly vulnerable, who are in imminent danger, or who could not access the lawful pathways

13  provided are not made ineligible for asylum by operation of the rebuttable presumption."); *id.* at

14  31334 (distinguishing the Transit Rule because "this [R]ule includes a number of broader

15  exceptions and means for rebutting the presumption" and "the means of rebutting or establishing

16  an exception to the presumption are not unduly burdensome"); *id.* at 31347 ("[T]he meaningful

17  pathways detailed in the [R]ule, combined with the exceptions and rebuttals to the presumption,

18  provide sufficient opportunities for individuals to meet an exception to or rebut the

19  presumption."); *id.* at 31418 ("The Departments believe that the [R]ule will generally offer

20  opportunities for those with valid claims to seek protection.").  The Rule further points to the other

21  exceptions and opportunity for rebuttal to justify the scope of each exception.  *See, e.g.*, *id.* at

22  31411 ("Applying for, and being denied, asylum or other protection in a third country is one

23  exception to the rebuttable presumption, but noncitizens who choose not to pursue this path may

24  instead seek authorization to travel to the United States to seek parole pursuant to a DHS-approved

25  parole process, or present at a [port of entry] at a pre-scheduled time and place."); *id.* at 31408

26  (noting that "the parole processes are not universally available, even to the covered populations,"

27  but that individuals who cannot qualify for parole processes "can present at a [port of entry] by

28  using a DHS scheduling mechanism to schedule a time to arrive at [ports of entry] at the [southern

United States District Court
Northern District of California

United States District Court
Northern District of California

border] and not be subject to the presumption of ineligibility"). The Rule therefore assumes that these exceptions will, at the very least, present meaningful options to noncitizens subject to the Rule.

Parole programs are not meaningfully available to many noncitizens subject to the Rule. Though other parole programs exist, *see* ECF No. 176-1 at 31, the Rule generally relies on the parole programs for Cuban, Haitian, Nicaraguan, Venezuelan, and Ukrainian nationals. These programs are country-specific and "are not universally available, even to the covered populations." 88 Fed. Reg. at 31408. The programs are further limited numerically, capped at 30,000 total individuals from Cuba, Haiti, Nicaragua, and Venezuela per month. AR 4553. Puzzlingly, these programs require that individuals fly to an interior port of entry—that is, an airport—rather than cross the southern border. Implementation of a Parole Process for Cubans, 88 Fed. Reg. 1266, 1273 (Jan. 9, 2023) ("Beneficiaries are required to fly at their own expense to an interior [port of entry], rather than arriving at the [southern border]."); Implementation of a Parole Process for Nicaraguans, 88 Fed. Reg. 1255, 1261 (Jan. 9, 2023) (same); Implementation of a Parole Process for Haitians, 88 Fed. Reg. 1243, 1249 (Jan. 9, 2023) (same); Implementation of Changes to the Parole Process for Venezuelans, 88 Fed. Reg. 1279, 1279–80 (Jan. 9, 2023) ("DHS provided the new parole process for Venezuelans who are backed by supporters in the United States to come to the United States by flying to interior [ports of entry]—thus obviating the need for them to make the dangerous journey to the [southern border]."); *see also* Implementation of the Uniting for Ukraine Parole Process, 88 Fed. Reg. 25040, 25041 (Apr. 27, 2022) ("If advance authorization is granted, the recipient will be permitted to board a flight to the United States for the purpose of requesting parole."). Because the Rule's presumption only applies at the southern land border, it necessarily would not apply to beneficiaries of these programs arriving at interior ports of entry. Of course, some number of individuals who receive travel authorization pursuant to a parole program might conceivably cross the southern border anyway.[14] Nevertheless, the record shows

---

[14] For instance, a prior version of the Venezuelan parole program "required [beneficiaries] to fly to the interior, rather than arriving at the [southern border], *absent extraordinary circumstances*," suggesting that there are circumstances in which applicants may have remained eligible for parole despite arriving at the southern border. Implementation of a Parole Process for Venezuelans, 87

that the presumption's exception for parole-related travel authorization will necessarily be unavailable to many asylum seekers—due to the parole programs' limited scope and eligibility requirements—and irrelevant to many noncitizens with travel authorization to apply for parole programs that require applicants to fly to interior ports.

Seeking protection in a transit country is similarly infeasible for many asylum seekers subject to the Rule. The preamble to the Rule notes that, while the agencies "recognize that not every country will be safe for every migrant," they "expect that many migrants seeking protection will be able to access asylum or other protection in at least one transit country." 88 Fed. Reg. at 31411. The record evidence available to Defendants, however, undermines this finding. Though Defendants argue that "the [R]ule adduces substantial evidence that seeking asylum in transit countries is a viable option for many migrants," ECF No. 176-1 at 38, the final Rule only specifically discusses Belize, Colombia, and Mexico as countries where noncitizens can effectively seek protection, 88 Fed. Reg. at 31410–11.

The record suggests that seeking asylum or other protection in Belize or Colombia is not a viable option for many migrants. Belize has a limited asylum system: the country has only ever received 4,104 applications for asylum and has granted just 74 of those applications. AR 5423; *see also* AR 4188–89; AR 4967. The Rule highlights Belize's 2022 amnesty program, which provided a path to citizenship for asylum seekers registered with the Department of Refugees before March 31, 2020, and limited categories of migrants residing in Belize. AR 5425–26; PC 22825.[15] As of September 30, 2022—two months after the end of the registration period—5,097

---

Fed. Reg. 63507, 64512 (Oct. 19, 2022) (emphasis added).

[15] At oral argument, Defendants challenged Plaintiffs' reliance on data provided in public comments. ECF No. 186 at 50:10–13 ("I saw many citations to the comments, the PC record citations, but no citations really, very few, to the actual AR, the record itself."). Public comments form part of the administrative record in the context of informal rulemaking. *Rodway v. U.S. Dep't of Agric.*, 514 F.2d 809, 817 (D.C. Cir. 1975) ("The APA requires the reviewing court to 'review the whole record' in measuring the validity of agency action. The whole record in an informal rule-making case is comprised of comments received, hearings held, if any, and the basis and purpose statement.") (internal citation omitted); *Nat'l Ass'n of Chain Drug Stores v. U.S. Dep't of Health & Hum. Servs.*, 631 F. Supp. 2d 23, 26 (D.D.C. 2009) ("An informal rulemaking record consists of the following materials: (1) the notice of proposed rulemaking; (2) comments submitted by interested persons; (3) hearing transcripts, if any; (4) other factual information considered by the agency; (5) reports of advisory committees, if any; and (6) the agency's

25

United States District Court
Northern District of California

people had applied for amnesty. AR 4968. Because the registration period has ended and eligibility generally requires prior presence in Belize, the amnesty program is not available to newly arriving asylum seekers. Colombia's asylum system has limited capacity and a significant backlog. AR 4231 (2021 State Department report noting that, of approximately 37,000 applications submitted between January 2017 and June 2021, just 753 were granted); AR 1575 (2023 DHS memorandum noting 26,000-case backlog of asylum cases). The Rule specifically references Colombia's two-year-old temporary protection program for Venezuelans, 88 Fed. Reg. at 31411, but eligibility is limited to those who arrived irregularly before January 31, 2021, PC 23296, and those who arrived regularly before January 31, 2023, PC 23398. Nothing in the record suggests this program will be available to newly arriving migrants going forward. And migrants who apply for asylum or other protection in Belize or Colombia are at risk of violence while they wait for their applications to be adjudicated. *See, e.g.*, AR 5423 (Belizean government source noting "many migrants find themselves victims of human trafficking" in the country); AR 4204–05 (2021 State Department report noting that migrants are at risk of forced labor in Belize); AR 4224, 4228–29, 4248 (2021 State Department report noting forced labor and human trafficking of migrants, forced recruitment of migrant children by armed groups, and other violence by armed groups in Colombia); PC 22186–93 (2022 non-governmental organization ["NGO"] report documenting gender-based violence against Venezuelan women in Colombia); PC 25592–607, 25615–19 (2022 news report documenting rising violence related to ongoing armed conflict in Colombia).

The record refutes the suggestion that seeking protection in Mexico is a viable option for many asylum seekers. The Rule cites the large number of individuals applying for protection in Mexico as evidence that noncitizens subject to the presumption may seek safety there. 88 Fed. Reg. at 31414–15 ("The Departments . . . note that more than 100,000 individuals felt safe enough to apply for asylum in Mexico in 2022."). However, while a total of 118,478 individuals applied for protection in 2022, Mexico processed just 34,762 applications that year. AR 5707. Mexico's

---

statement of basis and purpose."). The Court must review the whole record in determining the validity of the agencies' action, and data submitted in public comments is part of that record.

United States District Court
Northern District of California

refugee agency is underfunded and unable to keep up with demand.  *See, e.g.*, PC 24183 (2021 State Department report noting that the increase in agency's budget "was not commensurate with the growth in refugee claims"); PC 22811 (2023 news report quoting refugee agency director explaining that, as a result of increased demand, the agency is "in a situation of near-breakdown"); PC 23082 (2023 NGO report noting that funding has not kept pace with the increase in applications and that the applications processed in 2022 included "many from previous years"); PC 32446–47 (2022 State Department report noting that civil society groups in Mexico reported that migration authorities did not provide information about how to request asylum, dissuaded migrants from doing so, and encouraged them to instead accept voluntary return to their countries of origin).  While they wait for an adjudication, applicants for asylum must remain in Mexico, where migrants are generally at heightened risk of violence by both state and non-state actors.  *See, e.g.*, PC 32446–68 (2022 State Department report noting credible reports of gender-based violence against migrants; reports of migrants being tortured by migration authorities; "numerous instances" of armed groups targeting migrants for kidnapping, extortion, and homicide; and that asylum seekers and migrants were vulnerable to forced labor); PC 22839–42 (NGO report documenting violent crimes against 13,480 migrants in Mexico, by both state and non-state actors, between January 2021 and December 2022); PC 76248–87 (table of crimes summarized in preceding report); PC 21752–58 (2022 NGO report discussing gender-based violence in northern Mexico border cities, including against LGBTQI+ and Black migrants); PC 21610–11 (2022 NGO report concerning gender-based violence against Venezuelan women and LGBTIQ+ migrants in southern Mexico).[16]

---

[16] In addition to these examples, the record is replete with additional documentation of the extraordinary risk of violence many migrants face in Mexico.  *See, e.g.*, PC 22129–30 (2023 news report documenting instances of kidnapping of asylum seekers in northern Mexico); PC 23247–50 (2022 news report quoting Chihuahua state police chief stating that "organized criminal gangs are financing their operations through migrant trafficking"); PC 23082 (2023 NGO report discussing treatment of migrants and asylum seekers); PC 20937–43 (2021 NGO report documenting kidnapping and extortion of Venezuelan migrants in Mexico); PC 29740–29744 (2021 NGO report documenting instances of rape, kidnapping, and other violence experienced by migrant women in Mexico); PC 75946–48 (2022 NGO report documenting violence against migrants in Mexico); AR 4881 (2022 NGO report noting that asylum seekers from Central America have been pursued across the border and found in southern Mexico by their persecutors).

[27]

The record thus undermines the Rule's finding that Belize, Colombia, and Mexico present viable, safe options for many asylum seekers. Defendants argue that sufficient record evidence supports the Rule's finding that transit countries present a viable option for many asylum seekers, instructing the Court to "see generally" over 1,200 pages of the administrative record. ECF No. 176-1 at 31 n.11. At oral argument, Defendants directed the Court to this footnote and sources cited within it for data regarding improved safety and conditions in transit countries. ECF No. 186 at 49:9–20. The sources cited in the footnote document asylum, temporary protection, or other immigration programs of varying capacity presently or formerly available in transit countries. *See, e.g.*, AR 1575–77 (2023 DHS memorandum noting that Costa Rica has established a temporary protection program for certain Cuban, Nicaraguan, and Venezuelan asylum seekers and that Ecuador has opened registration for temporary residence permits for Venezuelans); AR 5465–69 (Costa Rica government website explaining that the temporary protection program applies to nationals of designated countries who applied for asylum prior to September 2022, and is therefore not available to newly arrived migrants); AR 5757–61 (press release from Government of Mexico noting the expansion of temporary labor programs). But none of the sources Defendants cite suggests that safety and conditions in these transit countries have improved, and several of the sources suggest migrants are susceptible to harm in these countries. *See, e.g.*, AR 4256–81 (2021 State Department report noting that migrants in Costa Rica are subject to forced labor and that employers use threats of deportation to withhold wages from Nicaraguan migrants); AR 4282–325 (2021 State Department report noting that migrants and refugees in Ecuador are subject to gender-based violence, human trafficking, forced labor, and forcible recruitment into criminal activity). The record evidence cited by Defendants does not support their argument.

That leaves the exception for noncitizens who present at a port of entry. To avoid the presumption under this exception, noncitizens must secure an appointment using the CBP One mobile application and present at the selected port of entry at the pre-scheduled date and time; if a noncitizen presents at a port of entry but lacks an appointment, they must show "it was not possible to access or use the DHS scheduling system due to language barrier, illiteracy, significant technical failure, or other ongoing and serious obstacle," or they will be subject to the

presumption. 88 Fed. Reg. at 31450. "This exception [to the exception] captures a narrow set of circumstances in which it was truly not possible for the noncitizen to access or use the CBP One app," and exceptions for language barriers or illiteracy "will be assessed on a case-by-case basis." *Id.* at 31406. The sub-exception for technical failure is "intended to cover technical failures of the app itself . . . rather than a situation in which a migrant is unable to schedule an appointment due to high demand or one where there is a fleeting temporary technical error." *Id.* at 31407.

The Rule acknowledges various limitations associated with CBP One, including the existence of "connectivity gaps and unreliable Wi-Fi in central and northern Mexico," the only parts of Mexico in which the app is available; that some individuals may lack smartphones; that the appointment system creates unique challenges for larger families traveling together; that the app is only available in English, Spanish, and Haitian Creole, and some error messages only appear in English; that Login.gov, which applicants must use to access CBP One, is exclusively available in English; and that users have identified various technical issues since the app was first implemented, including the app timing out or becoming overloaded by requests. *Id.* at 31401–05. Additionally, when the Rule was issued, CBP One offered only 1,250 appointments per day across eight southern border ports of entry. AR 2489; 88 Fed. Reg. at 31358. Demand for appointments exceeds supply. PC 21003; PC 21167; PC 25458; PC 25475.

The agencies also "acknowledge that individuals seeking to make an appointment . . . will generally need to wait in Mexico" and "that, in some cases, the conditions in which such individuals wait may be dangerous." 88 Fed. Reg. at 31400. Because CBP One access is limited to central and northern Mexico, asylum seekers must remain in these areas until they successfully secure an appointment. As discussed above, the record suggests that migrants waiting in Mexico are at serious risk of violence. Under the Rule, however, "danger in Mexico generally would justify failing to pre-schedule a time and place to appear at a [port of entry] . . . only when it amounts to an extreme and imminent threat to life or safety." *Id.* at 31396. Until the risk of violence rises to this level, individuals seeking to maintain their eligibility for asylum in the United States—and who cannot satisfy either of the other exceptions to the rule—must remain in Mexico, where the record suggests many will not be safe.

29

While the Rule explains each exception by reference to another, the record suggests these exceptions will not be meaningfully available to many noncitizens subject to the Rule. The Rule is therefore arbitrary and capricious.

### 2. Procedural Validity

Prior to promulgating a rule, the APA generally requires agencies to publish notice of the proposed rulemaking in the Federal Register. 5 U.S.C. § 553(b). After providing notice, "the agency shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation." 5 U.S.C. § 553(c). "The purpose of the notice and comment requirement is to provide for meaningful public participation in the rule-making process." *Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1404 (9th Cir. 1995). "[Courts] determine 'the adequacy of the agency's notice and comment procedure, without deferring to an agency's own opinion of the . . . opportunities it provided.'" *Kern Cnty. Farm Bureau v. Allen*, 450 F.3d 1072, 1076 (9th Cir. 2006) (quoting *Nat. Res. Def. Council v. EPA*, 279 F.3d 1180, 1186 (9th Cir. 2002)). "[T]he failure to provide notice and comment is harmless only where the agency's mistake 'clearly had no bearing on the procedure used or the substance of decision reached.'" *California v. Azar*, 911 F.3d 558, 580 (9th Cir. 2018) (quoting *Riverbend Farms, Inc. v. Madigan*, 958 F.2d 1479, 1487 (9th Cir. 1992)).

Plaintiffs argue that the comment period was too short; that the agencies announced closely related policy changes after the public comment period closed; and that the agencies did not disclose the Office of Immigration Statistics ("OIS") analysis, model, or data underpinning the agencies' prediction of a sharp rise in migrants arriving at the southern border.

The agencies provided 33 days for public comment, which Defendants argue is both sufficient under the APA and justified by the impending expiration of Title 42. "When substantial rule changes are proposed, a 30-day comment period is generally the shortest time period sufficient for interested persons to meaningfully review a proposed rule and provide informed comment." *Nat'l Lifeline Ass'n v. FCC*, 921 F.3d 1102, 1117 (D.C. Cir. 2019); *see also Pangea Legal Servs. v. DHS*, 501 F. Supp. 3d 792, 820 (N.D. Cal. Nov. 19, 2020) (noting that, "[w]hile

not binding, the government's own internal orders state that 'a comment period . . . should generally be at least 60 days'") (quoting Exec. Order No. 13,563, 76 Fed. Reg. 3821, 3821–22 (Jan. 18, 2011)).  The COVID-19 public health emergency, pursuant to which the Title 42 public health order was in effect, was extended several times; at least as of December 13, 2022, DHS was actively preparing for the end of Title 42.  AR 2591.  On January 30, 2023, the Administration formally announced that the COVID-19 public health emergency would expire on May 11.  88 Fed. Reg. at 31435 n.312.  On February 23, the agencies published the Notice.  *Id.* at 11714.  The public comment period extended until March 27, and the final Rule was published on May 16.  *Id.* at 31433.

Shortly after the close of the Rule's comment period, the agencies implemented additional policy changes:  DHS announced it would resume conducting credible fear interviews in CBP custody and would only provide 24 hours' notice for such interviews; DHS would remove non-Mexican nationals, including nationals of Cuba, Haiti, Nicaragua, and Venezuela, to Mexico; and the agencies would indefinitely pause a prior regulation which permitted asylum officers to adjudicate certain asylum applications.[17]  The agencies did not disclose that they would undertake these policy changes, so the public was unable to comment on how they would interact with the Rule, and the Rule did not address these policies.  Plaintiffs argue that these policy changes undermined the rationale for the Rule, because conducting interviews in CBP custody on short notice was likely to dampen the passage rate, while being able to effectuate removals more quickly would lessen overcrowding in border and detention facilities.

The agencies also justified the broad presumption imposed by the Rule using OIS encounter projections which predicted that, once Title 42 was lifted, the agencies would encounter between 11,000 and 13,000 individuals attempting to cross the border without authorization each

---

[17] In the preamble to the Rule, the agencies state that the Rule does not present staggered rulemaking concerns, noting that "[t]he last asylum-related rulemaking, the Asylum Processing [Interim Final Rule ("IFR")], was published on March 27, 2022, and was effective on May 31, 2022[,] . . . [so] commenters did not have to contend with the interplay of intersecting rules and related policy changes when drafting their comments."  88 Fed. Reg. at 31434.  The Asylum Processing IFR was paused shortly after the close of the comment period for the challenged Rule.

United States District Court
Northern District of California

day, "absent policy changes and absent a viable mechanism for removing Cuban, Haitian, Nicaraguan, and Venezuelan [] nationals who do not have a valid protection claim."[18] 88 Fed. Reg. at 11705. "[T]he notice required by the APA, or information subsequently supplied to the public, must disclose the thinking that has animated the form of a proposed rule and the data upon which that rule is based." *California ex rel. Becerra v. U.S. Dep't of the Interior*, 381 F. Supp. 3d 1153, 1173 (N.D. Cal. 2019) (quoting *Home Box Off., Inc. v. FCC*, 567 F.2d 9, 35 (D.C. Cir. 1977)). "Integral to an agency's notice requirement is its duty to 'identify and make available technical studies and data that it has employed in reaching the decisions to propose particular rules.'" *Kern Cnty. Farm Bureau*, 450 F.3d at 1076 (quoting *Solite Corp. v. EPA*, 952 F.2d 473, 484 (D.C. Cir. 1991)). In a footnote, the Notice explains that OIS "generates encounter projections every 2–4 weeks, using the best data and modeling available," and describes the statistical basis for the model and the mathematical processes it incorporates. 88 Fed. Reg. at 11705 n.11. But the Notice does not provide the relevant data that goes into the projections, the factors that impact the model, or the complete OIS analysis on which the Rule depends.

Taken together, these circumstances persuade the Court that the Rule's notice procedures are insufficient under the APA. The Rule is unquestionably complex—it establishes a presumption of asylum ineligibility for noncitizens who enter at the southern border that is subject to various exceptions ,one of which contains its own exception, and is rebuttable only in certain circumstances. That presumption of ineligibility applies across all contexts in which such individuals might be screened for asylum or other protection. The complexity of the Rule suggests that 30 days is unreasonable, particularly because the agencies were preparing for the end of Title 42 well before it was announced, such that they could have issued the Notice with sufficient time to grant a longer comment period and still have had the Rule in place when Title 42 expired. The agencies also did not disclose other, relevant policy changes that would affect the agencies' reasoning for adopting the Rule, including one that controverted an assumption central

---

[18] The removal-to-Mexico policy announced after the comment period closed provides the "viable mechanism" referenced here.

to the agencies' projection of post-Title 42 encounters at the southern border. *See* 88 Fed. Reg. at 11705 ("[E]ncounters could rise to 11,000–13,000 . . . *absent a viable mechanism for removing* Cuban, Haitian, Nicaraguan, and Venezuelan [] nationals who do not have a valid protection claim.") (emphasis added); *Pangea*, 501 F. Supp. 3d at 821 (noting that staggered policy changes "add[] to the overall context in which the notice provided . . . failed to give the public a meaningful opportunity to comment"). The agencies further justified the breadth and urgency of the Rule on the basis of data that they did not disclose; without any insight into the model or the relevance of the factors it is designed to consider, the public had no means by which to challenge that justification. Together, these circumstances denied the public a meaningful opportunity to comment on the Rule.

Defendants argue that the number of comments received, and the fact that Plaintiffs each submitted a comment, indicates that the public was provided sufficient opportunity to provide meaningful commentary. Given more time, however, Plaintiffs would have provided more in-depth analysis of the Rule and its potential impact on their clients. ECF No. 169-5 ¶ 26; ECF No. 169-7 ¶ 30; ECF No. 175 ¶ 19. Had they known about the contemplated policy changes, Plaintiffs would have discussed how these policy changes would intersect with the Rule to affect their clients. ECF No. 169-3 ¶ 30; ECF No. 169-5 ¶ 26; ECF No. 175 ¶ 20. The Court cannot assume that the agencies would not have taken into consideration more comprehensive comments addressing the related border policies or the OIS analysis that justified the Rule, such that the "agenc[ies'] mistake 'clearly had no bearing . . . on the substance of decision reached,'" *Azar*, 911 F.3d at 580. Accordingly, the Court concludes that the agencies' error was not harmless.

### C.    Scope of Relief

When an agency decision is unlawful under the APA, the standard remedy is to vacate the agency action and remand to the agency. *See* 5 U.S.C. § 706(2)(A) (instructing reviewing court to "set aside" agency action); *All. for the Wild Rockies v. U.S. Forest Serv.*, 907 F.3d 1105, 1121 (9th Cir. 2018) ("Although not without exception, vacatur of an unlawful agency action normally accompanies a remand."); *Cal. Wilderness Coal. v. U.S. Dep't of Energy*, 631 F.3d 1072, 1095 (9th Cir. 2011) ("When a court determines that an agency's action failed to follow Congress's

[33]

1    clear mandate the appropriate remedy is to vacate that action.").

2           Defendants urge the Court to remand the Rule without vacating it.  "[Courts] leave an

3    invalid rule in place only 'when equity demands' that [they] do so."  *Pollinator Stewardship*

4    *Council v. EPA*, 806 F.3d 520, 532 (9th Cir. 2015) (quoting *Babbitt*, 58 F.3d at 1405).  "Whether

5    agency action should be vacated depends on how serious the agency's errors are and the disruptive

6    consequences of an interim change that may itself be changed."  *350 Montana v. Haaland*, 50

7    F.4th 1254, 1273 (9th Cir. 2022) (quoting *Nat'l Family Farm Coal. v. EPA*, 966 F.3d 893, 929

8    (9th Cir. 2020)).  Courts also consider "whether the agency would likely be able to offer better

9    reasoning[;] [] whether by complying with procedural rules, it could adopt the same rule on

10   remand[;] or whether such fundamental flaws in the agency's decision make it unlikely that the

11   same rule would be adopted on remand."  *Pollinator*, 806 F.3d at 532.

12          The severity of the agencies' errors in this case counsels strongly in favor of vacatur.  The

13   Rule is both substantively and procedurally invalid.  The agencies cannot adopt the same rule on

14   remand; as described above, the Rule is contrary to law.  "[T]he threat of disruptive consequences

15   cannot save a rule when its fundamental flaws 'foreclose [the agency] from promulgating the same

16   standards on remand.'"  *North Carolina v. EPA*, 531 F.3d 896, 929 (D.C. Cir. 2008) (quoting *Nat.*

17   *Res. Def. Council v. EPA*, 489 F.3d 1250, 1261–62 (D.C. Cir. 2007)); *see also Nat'l Fam. Farm*

18   *Coal.*, 966 F.3d at 1145 (holding that vacatur was necessary, despite potential adverse impacts,

19   because "the 'fundamental flaws' in the [agency's] analysis are so substantial that it is exceedingly

20   'unlikely that the same rule would be adopted on remand'") (quoting *Pollinator*, 806 F.3d at 532).

21          The Court is not persuaded that deviating from the presumed remedy of vacatur and

22   remand is appropriate in this case.  The Court is mindful that this is "a time of heightened irregular

23   migration throughout the Western Hemisphere," ECF No. 176-2 ¶ 4; that such migration has

24   dropped since the Rule went into effect, *id.* ¶¶ 13–16; and that, in the absence of the Rule's

25   presumption of asylum ineligibility, "DHS anticipates a return to elevated encounter levels that

26   would place significant strain on DHS components, border communities, and interior cities," *id.*

27   ¶ 50.  But the Rule—which has been in effect for two months—cannot remain in place, and

28   vacating the challenged Rule would restore a regulatory regime that was in place for decades

United States District Court
Northern District of California

1 before.

2 **CONCLUSION**

3 For the foregoing reasons, Plaintiffs' motion for summary judgment is granted.

4 Defendants' motion for summary judgment is denied. The Rule is hereby vacated and remanded

5 to the agencies.

6 This order shall be stayed for 14 days. The Clerk shall enter judgment and close the file.

7 **IT IS SO ORDERED.**

8 Dated: July 25, 2023



10 JON S. TIGAR
United States District Judge

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
## OAKLAND DIVISION

East Bay Sanctuary Covenant, *et al.*,

        Plaintiffs,

v.

Joseph R. Biden, *et al.*,

        Defendants.

No. 4:18-cv-06810-JST

## DECLARATION OF BLAS NUÑEZ-NETO

I, Blas Nuñez-Neto, pursuant to 28 U.S.C. § 1746, and based upon my personal knowledge and documents and information made known or available to me from official records and reasonably relied upon in the course of my employment, hereby declare as follows:

1.      I am the Assistant Secretary for Border and Immigration Policy for the U.S. Department of Homeland Security (DHS) and have served in this role since March 26, 2023. I previously served as the Acting Assistant Secretary for Border and Immigration Policy since October 1, 2021.  Prior to this acting role, I served as the Chief Operating Officer for U.S. Customs and Border Protection (CBP), a DHS component, since March 5, 2021. In a prior administration, I served DHS as Senior Advisor to then-CBP Commissioner Richard Gil Kerlikowske, from January 12, 2015 to January 16, 2017.

1

**Add.36**

**The challenged rule is critical to DHS' plan to effectively manage irregular migration.**

2.      On May 12, 2023, after a robust regulatory process that included responding to more than 50,000 comments from the public, DHS and the Department of Justice (DOJ) implemented the Circumvention of Lawful Pathways rule.  The rule is designed to incentivize noncitizens to use the new and existing lawful, safe, and orderly processes that DHS has established and expanded, and disincentivize dangerous and irregular border crossings by placing a condition on asylum eligibility for those noncitizens who fail to do so, and who do not otherwise qualify for an exception.  Critically, the rule fits into a broader strategy to address historic migratory challenges impacting the entire Western Hemisphere.  Through a variety of actions, the United States and its foreign partners are seeking to incentivize migrants to use lawful, safe, and orderly pathways, as well as to disincentivize irregular migration.  As such, this rule is a critical component of the United States' regional strategy and aims to discourage noncitizens from crossing the Southwest Border (SWB) unlawfully between ports of entry, or without authorization at a port of entry.[1]

3.      Imposing consequences for unlawfully, or irregularly, crossing the border is, by itself, not sufficient to deter irregular migration.  Migrants have, time and time again, shown that they are willing to endure unfathomable suffering for an opportunity to come to the United States, even if their chances of success are small.  To be effective, the consequences DHS applies must be paired with incentives for migrants to use lawful processes.  DHS and the U.S. Department of State have been working with our foreign partners in the Western Hemisphere to enhance enforcement efforts along national borders and expand lawful pathways in countries

---

[1] U.S. Dep't of Homeland Sec., *Fact Sheet: Department of State and Department of Homeland Security Announce Additional Sweeping Measures to Humanely Manage Border through Deterrence, Enforcement, and Diplomacy* (May 10, 2023), https://www.dhs.gov/news/2023/05/10/fact-sheet-additional-sweeping-measures-humanely-manage-border

**Add.37**

throughout the region—including protection programs—to address the current migration challenge.  DHS has, over the past two years, undertaken a series of measures designed to increase access to processes and pathways for noncitizens to come to the United States or in a safe, orderly, and lawful manner.  But similarly, incentives without consequences are insufficient to deter irregular migration—they must go hand-in-hand.  In concert with the increase in lawful means for migrants to come to the United States in a safe and orderly manner, this rule imposes strengthened consequences on noncitizens who do not avail themselves of the wide range of lawful pathways the U.S. Government has made available for entering the United States, do not seek protection from countries they travel through, and do not merit an exception or otherwise overcome the rule's presumption.  In this way, the rule follows the successful model of the Cuban, Haitian, Nicaraguan, and Venezuelan ("CHNV") processes, which significantly reduced encounters from those countries after their implementation: it creates a viable lawful, safe, and orderly option for noncitizens, and imposes consequences for failing to follow that process.

4.     The rule's condition on asylum eligibility is a temporary measure intended to respond to a time of heightened irregular migration throughout the Western Hemisphere. Importantly, and as detailed further below, the rule is working as intended and has already significantly reduced encounters at the border. In the absence of the rule, DHS planning models suggest that irregular migration could meet or exceed the levels that DHS recently experienced in the days leading up to the end of the Centers for Disease Control and Prevention's (CDC) Title 42 public health Order.  These levels of irregular migration would severely stress DHS and DOJ's continued ability to safely, effectively, and humanely enforce and administer U.S. immigration law, including the asylum system.  They would also quickly overwhelm shelter capacity in border communities and interior cities.

**Add.38**

**Hemispheric conditions are driving encounter levels that strain DHS resources.**

     5.     Violence, food insecurity, severe poverty, corruption, climate change, the continuing effects of the COVID-19 pandemic, and dire economic conditions have all contributed to a significant increase in irregular migration around the globe, fueling the highest levels of irregular migration since World War II. This wave of global migration is challenging many nations' immigration systems, including the United States. In the Western Hemisphere, failing authoritarian regimes in Venezuela, Cuba, and Nicaragua, along with an ongoing humanitarian crisis in Haiti, have driven millions of people from those countries to leave their homes. Additionally, violence, corruption, and the lack of economic opportunity—challenges that are endemic throughout the region—are driving noncitizens from countries such as Brazil, Colombia, Ecuador, and Peru to make the dangerous journey to the U.S. border. This is in addition to the continuing economic headwinds and rule of law concerns in traditional sending countries, such as Guatemala, Honduras, and El Salvador.

     6.     In the early 2010s, after three decades of bipartisan investments in border security and strategy, encounters along the SWB reached modern lows, averaging fewer than 400,000 per year from 2011 to 2017. This followed decades during which annual encounters routinely numbered in the millions. However, even during this period of relatively low encounter levels at the border, DHS faced significant challenges in 2014 due to an unprecedented surge in migration of unaccompanied children, and in 2016 due to a surge in family units at the border— demographics that present unique challenges due to their vulnerability. Between 2017 and 2019, however, encounters along the SWB more than doubled, and—following a significant drop during the beginning of the COVID-19 pandemic, which shut down travel across the world— continued to increase in 2021 and 2022. In fiscal year (FY) 2021, encounters at the SWB reached levels not seen since the early 2000s, with U.S. Border Patrol (USBP) making 1.7

4

**Add.39**

million encounters.  In FY 2022, DHS reached a new high-water mark for encounters at the land border, with total USBP encounters at the SWB exceeding 2.2 million.  As a result of the hemispheric conditions described above, much of this growth in encounters was driven by nationalities that DHS has historically not encountered in large numbers at the border—including countries that make it difficult for DHS to repatriate their nationals who do not establish a legal basis to remain in the United States.

7.      From March 20, 2020 to May 11, 2023, the DHS implemented the CDC's Title 42 public health Order, under which noncitizens encountered by DHS personnel could be quickly expelled to Mexico or to their home country—but only if Mexico or their home country accepted their return.[2]  Importantly, an expulsion under the Title 42 public health Order did not carry with it any lasting consequences for noncitizens, aside from their expulsion.  It was, however, a relatively quick process for frontline personnel.  By contrast, a removal under DHS' traditional Title 8 authorities carries with it significant and lasting consequences, including a minimum 5-year ban on admission and the potential to be criminally prosecuted for illegal re-entry.  Title 8 processes, however, are substantially longer than Title 42 processes.

8.      In preparation for the return to Title 8 processing of all noncitizens, DHS led a comprehensive, all of government planning effort that lasted more than 18 months.  This included record deployments of personnel, infrastructure, and resources to support DHS's frontline personnel at a substantial cost to other DHS operations.  This effort also included the

---

[2] The Title 42 public health Order applied to certain noncitizens arriving from Canada or Mexico who would otherwise be held in a "congregate setting" at a port of entry or U.S. Border Patrol station at or near the U.S. land and adjacent coastal borders.  Public Health Reassessment and Order Suspending the Right To Introduce Certain Persons From Countries Where a Quarantinable Communicable Disease Exists 86 Fed. Reg. 42,828 42,841 (Aug 5, 2021).  Under the Title 42 public health Order, "covered noncitizens apprehended at or near U.S. borders" were "expelled" to Mexico, Canada, or their country of origin.  *Id.* at 42,836.  As a result, they could be processed much faster—in "roughly 15 minutes," as compared to "approximately an hour and a half to two hours" for noncitizens who are processed and issued a notice to appear for removal proceedings under Title 8.  *Id.*

**Add.40**

development and implementation of policy measures, including the rule and its associated lawful pathways and processes, that were critically important components of DHS preparations to manage the anticipated significant influx of migrants at the SWB associated with the end of Title 42's application at the border.

9. In the days leading up to the end of the Title 42 public health Order on May 12, 2023, DHS saw a historic surge in migration. This surge culminated with the highest recorded encounter levels in U.S. country's history over the days immediately preceding May 11, which placed significant strain on DHS's operational capacity at the border. Encounters between ports of entry (thus excluding arrivals scheduled through the CBP One application, who appear at ports of entry) almost doubled from an average of approximately 4,900 per day the week ending April 11, 2023, to an average of approximately 9,500 per day the week ending May 11, 2023, including an average of approximately 10,000 encounters immediately preceding the termination of the public health Order (from May 8 to May 11). The sharp increase in encounters during the 30 days preceding May 11 represents the largest month over month increase in almost two decades—since January 2004.

10. As a result, in the days leading up to the end of the Title 42 public health Order, USBP saw a steady increase in the numbers of noncitizens in custody, leading to significant operational challenges as described below. From May 8 to 11, 2023, USBP's daily in-custody average was approximately 27,000, with a single-day peak of approximately 28,500 on May 10—well above its holding capacity at that time of approximately 18,500. During this same timeframe, eight out of nine SWB sectors were over their holding capacity—with four sectors (El Centro, El Paso, RGV, and Yuma) more than 50 percent over their holding capacity and one sector (Tucson) more than two-and-a-half times its holding capacity.

**Add.41**

11.     As discussed more fully below, this record number of encounters severely strained DHS operations and resources, as well as the resources of other federal government agencies, local communities, and non-governmental organizations.  CBP had to redirect limited resources from other mission needs—particularly, legitimate travel and trade operations, the volume of which now surpasses pre-pandemic levels—to focus on processing apprehended noncitizens.  Overcrowding in CBP facilities increased the potential of health and safety risks to noncitizens, government personnel, and contract support staff—risks which were exacerbated by an increase in the average time in custody, which generally occurs when there are large numbers of noncitizens in custody that must be processed.  To manage these overcrowded conditions, USBP sectors had to pull personnel from the field to perform tasks including processing, transporting, escorting, and detaining noncitizens in custody, as well as other related functions.  This, in turn, decreased USBP's ability to respond to noncitizens avoiding detection, other agency calls for assistance, and noncitizens in distress.

12.     The surge in encounters immediately preceding the end of Title 42 also led to significant challenges for local border communities.  For example, in the days leading up to May 12, local community resources in El Paso, Texas were soon overwhelmed as the number of noncitizens arriving in the United States quickly surpassed the city's capacity.  In anticipation of an influx of noncitizens arriving to the city—an influx that ultimately materialized—the city declared a state of emergency,[3]  as more than 1,000 noncitizens were sleeping on the sidewalks

---

[3] Sneha Dey, *As Title 42 comes to an end, El Paso declares state of emergency,* Tex. Tribune (Apr. 30, 2023), https://www.texastribune.org/2023/04/30/el-paso-state-of-emergency-title-42.

7

**Add.42**

and left without shelter.[4]  Similarly, the cities of Brownsville and Laredo, Texas, declared states of emergency to allow them to seek additional resources to bolster their capacities.[5]

**Implementation of the rule has significantly reduced encounters at the U.S. border and migration throughout the Western Hemisphere.**

13.     In the weeks since May 12, 2023, DHS has executed on its more than 18-month post-Title 42 planning effort by leading a whole-of-government effort to ensure the safe, orderly, and humane management of the nation's borders and the continued enforcement of U.S. immigration laws.  The rule plays an integral role in this effort.  These efforts, and in particular the disincentives to irregular migration put in place through the new rule, have produced significant results.  From May 12 to June 13, 2023, encounters between ports of entry at the SWB have decreased by 69 percent compared to their peak just before the end of Title 42, with CBP averaging approximately 3,360 USBP encounters between ports of entry.  As a result of this swift and sustained decline in encounters, the number of noncitizens in USBP holding facilities has decreased from a high of more than 28,500 on May 10—or 153 percent of its rated holding capacity at that time—to approximately 8,600 on June 9, or 46 percent of its holding capacity.

14.     The strengthened consequences in place at the border under Title 8 authorities, including use of the rule, has reduced migration throughout the Western Hemisphere as intending migrants and the smuggling networks that move them assess the new policies.  For example, daily entries into the perilous Darién jungle between Colombia and Panama have declined by more than 50 percent since May 11, from nearly 1,900 encounters between May 1 and May 11 to

---

[4] Rose Flores, Dakin Andone & Nouran Salahieh, *Migrants Living on the Streets of El Paso are Urged to Turn Themselves in to Immigration Authorities as Expiration of Title 42 Looms,* CNN (May 9, 2023), https://www.cnn.com/2023/05/09/us/title-42-expires-border-immigration-tuesday/index.html.

[5] Edgar Sandoval, Eileen Sullivan & Miriam Jordan, *Some Texas Border Cities Are Already Under a State of Emergency,* New York Times (May 11, 2023), https://www.nytimes.com/2023/05/11/us/texas-el-paso-state-emergency-title-42.html.

**Add.43**

approximately 800 a day between June 1 and June 14. It is clear that actions taken by the U.S. Government to provide both legal pathways and consequences to irregular migration—actions that also spurred regional partners to undertake their own measures seeking to address irregular movements of migrants—were critical factors in reducing migratory flows throughout the Western Hemisphere.

15.     The rule has strengthened the consequences for noncitizens who cross unlawfully between ports of entry, or without prior authorization at ports of entry. Overall, in the four weeks since the rule has been implemented, 46 percent of single adults processed under the rule[6] making credible fear claims have been screened-in,[7] compared to an 83 percent screen-in rate in the pre-pandemic period of 2014 to 2019. As intended, the rule has significantly reduced screen-in rates for noncitizens encountered along the SWB. The decline in encounters at the U.S. border, and entries into the Darién Gap, show that the application of consequences as a result of the rule's implementation is disincentivizing noncitizens from pursuing irregular migration and incentivizing them to use safe and orderly pathways.

16.     Between May 12 to June 13, 2023, U.S. Citizenship and Immigration Services (USCIS) has interviewed approximately 8,195 noncitizens who have been subject to the rule. Out of these noncitizens, 261 (3 percent) were able to establish an exception to the rule; 689 (8 percent) were able to rebut the presumption; and 7,243 (88 percent) were subject to the presumption. Of the noncitizens who were able to establish an exception to the rule, 189 (72 percent) were able to establish a credible fear of persecution or torture under the "significant

---

[6] This includes all categories of noncitizens processed under the rule, including those who establish an exception or rebut the presumption.

[7] The screen-in rate refers to the percentage of cases with a positive fear determination calculated by dividing the number of cases that receive a positive fear determination by cases adjudicated on merit (i.e. positive and negative fear determinations).

**Add.44**

possibility" standard.  Of the noncitizens who were able to rebut the presumption, 528 (77

percent) were able to establish a credible fear of persecution or torture under the "significant

possibility" standard.  Of the noncitizens who were subject to the rule's presumption, 3,036 (42

percent) were able to establish a credible fear of persecution or torture under the "reasonable

possibility" standard.  Additionally, thousands more are currently in CBP or U.S. Immigration

and Customs Enforcement (ICE) custody going through the expedited removal process.

17.    The rebuttable presumption established by the rule has allowed DHS to

significantly increase its use of expedited removal, including by applying it to more nationalities

than it otherwise would have.  This is because, prior to the rule's implementation, the screen-in

rates for noncitizens from some key countries—including Venezuela, Cuba, and Nicaragua—

were sufficiently high as to make it ineffective to refer nationals of those countries into expedited

removal, given the significant, multiagency resources required to process them.  Absent the

rule's impact on screen-in rates, it is likely that DHS would not devote the resources to process

noncitizens from those countries for expedited removal as it would result in issuing a notice to

appear before an immigration judge anyway while unnecessarily increasing time in custody.

This, in turn, may lead to increased encounter levels and all the challenges that they entail.

18.    In its preparations for the end of the Title 42 public health Order, DHS made

improvements to the technology and processes at the border that are now allowing it to process

credible fear cases more quickly than ever before—enhancing its ability to quickly deliver

consequences to noncitizens who do not establish a legal basis to remain in the United States.

DHS has reduced the median time for USCIS to complete fear claim cases for single adults

encountered since May 12 by 57 percent, to 13 days from CBP apprehension compared to 30

days in the pre-pandemic period (2014–2019).  These process enhancements and the rule work

**Add.45**

together to more quickly and effectively, impose consequences on those who do not establish a legal basis to remain in the United States. The rule allows DHS to place more noncitizens into the expedited removal process, and the process enhancements help ensure that the increased use of expedited removal does not result in unhelpful backlogs or increased holding times. Without the rule, these process enhancements would be substantially less effective given significantly higher screen in rates that would, as noted above, make it largely impractical for DHS to apply expedited removal to key nationalities encountered at the border.

19. The rule's implementation has generated widespread understanding that DHS has strengthened consequences at the border for those who enter without authorization even as DHS has significantly increased lawful pathways and processes for noncitizens to come to the United States in a safe and orderly manner. The effect of these developments is that there has been an immediate reduction in encounters at the border.

20. As part of these efforts, DHS has repatriated approximately 50,000 noncitizens, including single adults and family units to more than 100 countries since May 12. This includes more than 1,650 noncitizens from Cuba, Haiti, Nicaragua, and Venezuela who were returned or removed to Mexico during this time-frame—the first time in the United States' bilateral history that the Government of Mexico has accepted third country nationals under Title 8 authorities at the border at scale.

21. The ability to quickly apply consequences at the border is important because DHS must contend with callous human smuggling networks that weaponize misinformation and look for any opportunity to put intending migrants' lives at risk for profit.[8] These criminal

---

[8] *See* U.S. Dep't of Justice, Press Release, *Defendants Indicted in Tractor Trailer Smuggling Incident That Resulted in 53 Deaths* (July 20, 2022), https://www.justice.gov/usao-wdtx/pr/defendants-indicted-tractor-trailer-smuggling-incident-resulted-53-deaths; U.S. Dep't of Justice, Press Release, *Cuban National Sentenced to Over 38 Years in*

organizations intentionally twist information about U.S. immigration policy for the express purposes of encouraging would-be migrants to use their services—services that regularly result in tragedy. Because profit is the motivating factor, criminal organizations have no qualms when it comes to exploiting migrants through false promises—particularly when there are changes in the United States' immigration policy or border operations. This familiar pattern was seen in the weeks leading up to the lifting of Title 42.

22. In the days immediately following the rule's effective date, media reporting confirmed internal DHS analyses that the rule and accompanying messaging were ultimately effective in communicating that there would be stricter consequences for crossing the SWB unlawfully between ports of entry, or without authorization at ports of entry, after the end of Title 42. For example, a *Washington Post* article states that in interviews with migrants waiting on the Mexican side of the SWB, U.S. messaging relating to stricter penalties under Title 8 authorities were a factor in many intending migrants' decisions to attempt to cross the border "before—not after—Title 42's expiration."[9] Similarly, the article further describes migrants' understanding that there would be consequences associated with irregularly crossing the SWB without scheduling an appointment at a port of entry through the CBP One app.[10]

23. As part of its preparations for the end of the Title 42 public health Order and the implementation of the rule, DHS significantly expanded access to land border ports of entry. The CBP One mobile app, which is available to download for free to a mobile device, allows

---

*Prison for Drug Trafficking and Other Crimes after Using His Border Ranch as a Criminal Corridor* (Mar. 9, 2022), https://www.justice.gov/usao-wdtx/pr/cuban-national-sentenced-over-38-years-prison-drug-trafficking-and-other-crimes-after.
[9] *See* Mary Beth Sheridan, Reyes Mata III, Maria Sacchetti & Nick Miroff, *End of Title 42 Pandemic Border Policy Brings Reset, But No Sudden Rush*, Wash. Post (May 12, 2023).
https://www.washingtonpost.com/nation/2023/05/12/title-42-pandemic-ends-border-migrants/
[10] *See also* Valerie Gonzalez, *Migrants Rush Across U.S. Border in Final Hours Before Title 42 Asylum Restrictions are Lifted*, Associated Press: PBS (May 11, 2023), https://www.pbs.org/newshour/politics/migrants-rush-across-u-s-border-in-final-hours-before-title-42-asylum-restrictions-are-lifted.

**Add.47**

noncitizens of any nationality who are in Central or Northern Mexico to schedule an appointment to present at a port of entry along the SWB in a safe and orderly manner. The advance biographic and biometric information captured by the app allows CBP to significantly improve the efficiency of its processes at the border—even as it ensures that every individual processed is thoroughly vetted against national security and public safety systems. This, in turn, has allowed CBP to greatly increase its ability to process inadmissible noncitizens at land border ports of entry compared to its 2014-2019 pre-pandemic average. On June 1, CBP expanded the number of available daily appointments from 1,000 to 1,250 per day—almost four times the average number of noncitizens processed per day at ports of entry than in the years preceding the pandemic. This expansion has allowed a greater number of noncitizens to present themselves in a safe and orderly manner at ports of entry each day during their scheduled appointment time. DHS has also made a series of updates to the app that have significantly improved access to appointments and provided greater predictability to migrants about the process. This app, available in English, Spanish, and Haitian Creole, effectively cuts out the smugglers, decreases migrant exploitation, and improves safety and security in addition to making the process more efficient.

24.     The rule's combination of strengthened consequences at the U.S. land border, regional partnership, and increased lawful pathways and processes for noncitizens has had an immediate impact on encounters at the U.S. border and migration throughout the region. **If DHS cannot rely on the rule, DHS expects an increase in encounters between ports of entry that will severely tax operational capacities to the detriment of other critical missions and expects the absence of the rule to negatively impact receiving communities in the United States and our relationships with foreign partners.**

25.     As detailed in the rule, DHS planning models suggest that, without the strengthened consequences, including those put in place by the rule, these elevated encounter

**Add.48**

levels would have continued after May 11.[11]  Thus, if the rule is unavailable for any amount of time, DHS expects that the current decline in border encounters will quickly be erased by a surge in border crossings that could match—or even exceed—the levels seen in the days leading up to the end of the Title 42 public health Order.

26.     To put the current situation on the ground into perspective, CBP's Southern Border Intelligence Center estimates that as of June 14, 2023, approximately 104,000 migrants are in Northern Mexico, within eight hours of the U.S. border, with many more along the transit route between Colombia and the SWB.  It appears that many of these migrants are waiting to see whether the strengthened consequences associated with the rule's implementation are real.[12]  DHS anticipates that any interruption in the rule's implementation will result in another surge in migration that will significantly disrupt and tax DHS operations.  This expectation is not speculative.  DHS needs only to look back to the pre-May 12 surge, which was only blunted by the application of strengthened consequences at the border and expanded access to lawful pathways and processes, in large part as a result of the rule's implementation on May 12, to identify the repercussions of losing the rule.  A similar surge now would put even greater strain on DHS operations, given that Title 8 processes take substantially longer and are more operationally complex than Title 42 processes at the border.

**Impact on CBP**

---

[11] *Circumvention of Lawful Pathways*, 88 Fed. Reg. 31,314, 31316 & n.14 (May 16, 2023).

[12] *See* José Ignacio Castañeda Perez, *Here's Why There Was No Immediate Migrant Influx at the Arizona Border When Title 42 Ended*, Ariz. Republic (June 1, 2023) https://www.azcentral.com/story/news/politics/border-issues/2023/06/01/title-42-lifted-but-no-immediate-migrant-influx-was-seen/70269773007/.  This news article explains that due to new immigration rules and consequences, migrants and transnational smuggling networks are taking a "wait and see" approach when it comes to the SWB.  This observation is noted by Adam Isacson, director for defense oversight at the Washington Office on Latin America, who states that "[b]oth migrants and their smugglers right now are trying to figure out what those new pathways are."

27.     CBP, a component of DHS, is charged with enforcing federal customs and immigration laws at or near the international border, including at and between U.S. ports of entry, while facilitating lawful international travel and trade. CBP facilities, whether operated by the Office of Field Operations (OFO) or USBP, are designed for short-term custody and have limited holding capacity. These facilities are only designed to hold noncitizens for a few days, generally for the purpose of immigration processing and subsequent transfer to the custody of another agency, or release pending removal proceedings, as appropriate. CBP facilities typically do not provide services adequate for longer-term detention, such as beds, routine medical care, or recreational areas. If the rule is enjoined, CBP will likely once again be required to hold more noncitizens than its short-term, small capacity holding facilities can handle. This will exacerbate overcrowding of facilities, which can create unsafe conditions.

28.     As noted above, CBP experienced severe overcrowding in the period leading up to May 12, 2023. During this time, USBP encounters outpaced processing and movement out of USBP custody—generally via transfer to ICE custody, repatriation, expulsion, or release—of noncitizens from CBP holding facilities by an average of 950 noncitizens daily for seven days in a row. The inability to process noncitizens out of USBP custody quickly enough to match the rate at which agents were making apprehensions led to a sharp increase in the number of noncitizens in USBP custody, as detailed above. This sharp increase in its in-custody numbers, in turn, required Border Patrol agents to be reassigned from frontline border security enforcement activities to support processing operations in its facilities.

29.     Previous migration trends tended to heavily impact only a couple of sectors over a given period of time, shifting locations across the SWB over time. Under these circumstances, USBP had the ability to "laterally decompress" migrants to less-impacted sectors by leveraging

15

**Add.50**

air and ground transportation contracts, helping to mitigate the effects of migrant surges in over-capacity sectors.  As noted above, between May 8 and 11, 2023, however, eight out of the nine SWB Sectors were over capacity, which limited USBP's ability to move noncitizens laterally to alleviate the pressure in over capacity sectors.

30.     As part of its preparations for and response to this surge, CBP instituted a number of other extraordinary measures at great expense to the agency.  For example, USBP had to expand processing facility support by hiring additional armed facility guards, porters, data entry specialists, and Border Patrol Processing Coordinators.  To address personnel shortages caused by the increased encounter numbers, USBP executed memoranda of agreement with other federal agencies to provide surge support.[13]  Some of these agreements required USBP to reimburse the cost of these agencies' support, totaling more than $50,600,000 in FY 2023 (almost twice the cost in FY 2022).[14]  USBP also expanded transportation contracts to increase its number of leased buses, transportation routes, transportation hours, and flights and routes in response to the increased encounter numbers.  It also began increasing holding capacity through the expansion of the soft-sided facilities in El Paso and Yuma sectors.  These facilities have significantly increased USBP's temporary holding capacity, but at a cost.  Specifically, the El Paso expansion cost more than $46 million to mobilize, and costs nearly $26 million per month to maintain.  The Yuma expansion cost more than $14 million to mobilize and more than $6 million per month to maintain.

31.     Overcrowding at CBP facilities adversely impacts noncitizens in CBP custody as well as CBP personnel.  DHS's Office of Health Security (OHS) notes that overcrowding and

---

[13] Agencies included ICE Homeland Security Investigations, Federal Air Marshals, U.S. Marshals Service, Bureau of Prisons, U.S. Secret Service, National Oceanic and Atmospheric Administration, U.S. Coast Guard, U.S. Forest Service, DHS Volunteer Support, and ICE Enforcement and Removal Operations

[14] Total cost in FY 2022 was more than $26,500,000.

**Add.51**

increased movement of noncitizens between facilities may result in adverse health outcomes, including the spread of communicable diseases (e.g., COVID-19, measles, varicella, etc.) among noncitizens held in these facilities. Furthermore, noncitizens held in overcrowded facilities may be particularly vulnerable to communicable diseases due to situational factors relating to the arduous journey to the SWB, including, in many cases, days and weeks of poor health and nutrition, lack of access to health care, and/or inadequate water, sanitation, and hygiene services. For these reasons, surges, which inherently increase the risk of overcrowding in CBP holding facilities along the SWB, negatively impact CBP's ability to avoid preventable harm and mitigate health and welfare risks to noncitizens and the DHS workforce.

32. OFO operations at ports of entry would also be adversely impacted if the rule is unavailable to DHS. During surges of noncitizens encountered between ports of entry, OFO often needs to provide assistance to USBP to process noncitizens. Because each port of entry has a finite number of resources and processing capacity to facilitate lawful trade and travel, and irregular migration, any diversion of resources toward processing increased numbers of noncitizens takes resources away from those missions. This, in turn, challenges OFO's ability to execute its national security, counter-narcotics, and trade and travel missions by requiring the diversion of critical resources.

33. In response to the pre-May 11 surge, 124 OFO personnel—who are dedicated to the processing of legitimate travel and trade operations of which volume now surpasses pre-pandemic levels—were detailed to assist USBP processing of apprehensions between ports of entry. For example, in April 2023, OFO detailed staff from ports of entry in Laredo, Texas, to the Rio Grande Valley—a move that required Laredo to close some vehicle lanes, slowing down its operations. In mid-April 2023, CBP also had to temporarily close ports of entry in the El

**Add.52**

Paso, TX area in order to manage the surge in encounters in that area of operations. This included the cessation, and subsequent resumption at reduced volume, of all port of entry operations at the Bridge of the Americas (BOTA) in El Paso, Texas—a port of entry that primarily focuses on processing cargo shipments—from April 13 through April 17, 2023. The economic impact of this five-day processing slowdown was likely acute; in FY2022, more than $10.7 billion in imports passed through the BOTA port of entry, or roughly $205 million per week. Additionally, from April 13 to 17, 2023, the Ysleta port of entry in El Paso also detailed personnel to assist USBP, necessitating a reduction on open travel lanes by approximately 37 percent for commercial cargo and 58 percent for passenger traffic. At both locations, increased wait times for inspection reached as high as 180 minutes—with substantial economic costs as a result.

34.     OFO also had to take extraordinary measures to ensure that legitimate trade and travel continued to flow along the SWB. In addition to the personnel detailed to support USBP operations between ports of entry, OFO temporarily deployed approximately 420 personnel to support SWB ports of entry, at a cost of approximately $4 million monthly, and deployed approximately 39 OFO Special Response Team operators to SWB locations to ensure continuation of safe and secure operations at ports of entry. In the weeks leading up to the end of the Title 42 public health Order, as certain ports of entry began processing increased numbers of noncitizens seeking an exception to the public health Order and due to OFO providing assistance to USBP to process noncitizens encountered between ports of entry, OFO spent over $8 million in support of overtime needs. OFO also repurposed the Brownsville Immigration Hearing Facility to process noncitizens at a cost of over $13.8 million in FY23 through June 30, and approximately $1.5 million monthly thereafter.

**Add.53**

**Impact on ICE**

35.     Within ICE, ERO oversees programs and conducts operations to identify and arrest removable noncitizens, to detain these noncitizens when necessary, and to remove noncitizens with final orders of removal from the United States to more than 170 countries around the world. ERO employs approximately 6,000 immigration officers nationwide, including executive leadership, the supervisory chain of command, and all field officers.  Over the past two years, ERO has routinely detailed personnel to the SWB to support USBP frontline operations— impacting its ability to execute its missions.  As of June 6, 2023, ERO had 134 personnel deployed to support USBP operations along the SWB.

36.     As of May 10, 2023, ICE had approximately 22,000 noncitizens in custody, or 64 percent of its funded bedspace, in part due to pandemic-related restrictions on congregant settings that impacted ERO's ability to fully utilize beds in its detention network.  These COVID-19 related restrictions were lifted with the end of the public health emergency on May 11, 2023. Since then, ICE bed usage increased quickly as part of DHS' comprehensive efforts to deliver consequences at the border.  On June 11, 2023, ICE had approximately 29,800 noncitizens in its custody.  This sharp increase in detention bed usage has come even as daily encounters have remained comparatively low compared to their pre-May 12 levels—a direct result of the record number of noncitizens being processed under expedited removal through the rule.  However, if another surge developed as a result of the rule not being in place, the anticipated increase of custodial transfer requests from CBP under Title 8 processes would quickly overwhelm ICE's detention capacity—which is limited by its appropriated funding— such that further CBP requests for bedspace would have to be declined.  This, in turn, would

require CBP to release more noncitizens from its custody who might otherwise be processed for expedited removal.

37.     In the event of a similar surge in the future, increased CBP encounters would have a significant impact on ICE transportation resources.  If CBP sectors become overwhelmed to the point where CBP's transportation assets and contracts are insufficient, ICE would have to divert its transportation resources from interior and removal operations to assist CBP.  This would include the use of ICE Air Charters typically needed for removal and interior movements to instead decompress the border, an increase in ICE Air Commercial removals, and increased ground transportation for removals to Mexico.  This, in turn, would impact ERO's ability to execute its core enforcement mission of apprehending and removing noncitizens from the interior of the United States.

**Impact on Communities**

38.     An increase in encounters between ports of entry will also strain the communities along the border and in the interior of the United States who receive noncitizens released from DHS custody pending the outcome of their immigration proceedings.  DHS generally seeks to release noncitizens in the vicinity of hospitality sites—locations which provide immediate resources and social service assistance—run by non-governmental organizations or municipalities along the SWB.  DHS has, over the past two years, worked closely with partners to build these kinds of capacity at the border. As a result of these efforts, these sites can currently provide overnight shelter and other kinds of support for thousands of noncitizens each day. Absent the rule, DHS anticipates encounter levels that would require noncitizens to be released from custody at levels that will greatly exceed the capacity of these sites to receive them.

**Add.55**

39.     The Department supports border and interior communities receiving noncitizens through the humanitarian relief provided under the Emergency Food and Shelter Program (EFSP) as well as the newly established Shelter and Services Program (SSP).  However, even with the increase in Congressional funding from $150 million in FY2022 to $800 million in FY 2023 for these programs, DHS recognizes that the demand from communities and NGOs for this funding still far exceeds what has been made available.  For example, in April, the EFSP National Board received $1.26 billion in applications for only $350 million in available funds.  DHS anticipates that SSP funding will also, unfortunately, not fully meet the needs of our community and NGO partners at the border and within the interior.

**Impact on Relationships with Foreign Partners**

40.     The United States' border management strategy is predicated on the belief that migration is a shared responsibility among all countries in the region—something that is reflected by the critical diplomatic efforts that DHS and the Department of State have been making to engage with partners throughout the Western Hemisphere.  DHS relies on and works closely with its foreign partners to manage migration throughout the region.[15]  Regional partner countries have encouraged and supported DHS's approach to address irregular migration through the application of disincentives for unlawful entry—through increased enforcement and consequences—coupled with incentives to provide intending migrants with expanded lawful pathways and processes, including humanitarian protection, innovative parole processes, and labor migration.

---

[15] *See, e.g.*, *Creating a Comprehensive Regional Framework to Address the Causes of Migration, To Manage Migration Throughout North and Central America, and To Provide Safe and Orderly Processing of Asylum Seekers at the United States Border*, Exec. Order 14,010, 86 FR 8,267, 8,270 (Feb. 2, 2021); The White House, *Los Angeles Declaration on Migration and Protection* (June 10, 2022), *https://www.whitehouse.gov/briefing-room/statements-releases/2022/06/10/los-angeles-declaration-on-migration-and-protection/*

41.     Prior to the end of the Title 42 public health Order, regional partner countries expressed great concern that, without specific action from the United States to combat the misperception that the end of the Order would mean an open U.S. border, a surge of irregular migration would flow through their countries as migrants seek to enter the United States.  One foreign partner, for example, noted that they believed the formation of caravans in the spring of 2022 were spurred by rumors—and the subsequent official announcement—of the anticipated end of the Title 42 public health Order.  Moreover, regional partner countries have repeatedly expressed concerns about the ways in which recent migratory flows challenge their local communities and immigration infrastructure and have regularly highlighted how policy announcements have a direct and immediate impact on migratory flows through their countries.

42.     Regional partners have observed that, as a central part of a consequence framework that aims to slow migratory flows in the region, this rule is working and has reduced irregular migration in their countries as well as on our border.  As noted earlier, following the development of the enforcement process for Venezuelans announced in October 2022—an approach that was subsequently expanded to include processes for Cuban, Haitian, and Nicaraguan nationals in January 2023—regional partners urged the United States to continue building on this approach, which couples processes for noncitizens to find protection in the region or travel directly to the United States with consequences for those who do not avail themselves of these processes.[16]  But the lawful processes and regional protection mechanisms by themselves are not sufficient, as described above—DHS's ability to implement its border-

---

[16] Following the announcement of the Venezuela parole process in October 2022 and the subsequent announcement of the Cuba, Haiti, and Nicaragua parole processes in January 2023, migration flows through the region, and at the U.S.-Mexico border slowed.

**Add.57**

management strategy is predicated on its ability to impose consequences on those who do not take advantage of lawful processes to access opportunity and protection in the United States.

43.     Continuing to implement and build on this approach is critical to the United States' ongoing engagements on migration management with regional partners.  For example, a number of foreign partners, including Mexico, Guatemala, Panama, and Colombia, announced significantly enhanced efforts to enforce their borders in the days leading up to the end of Title 42.  These governments recognized that the United States was taking new measures to strengthen enforcement of its border, in large part through the application of the rule, and committed to doing the same in order to impact irregular migratory flows in the region.

44.     For example, following the transition from DHS processing under Title 42 public health Order to processing under Title 8 authorities, Mexican authorities announced the continued acceptance of the return into Mexico of nationals from these CHNV countries under Title 8 processes.  This is the first time in the United States' bilateral history with Mexico that the Mexican government has stated it would accept the return or removal of non-Mexican nationals under Title 8.[17]  This decision was premised on the existence of lawful pathways and processes for nationals of these countries that were combined with a meaningful consequence framework to reduce irregular border crossings; this consequence framework includes the rule's rebuttable presumption of asylum ineligibility for noncitizens who chose to circumvent lawful pathways.  If DHS can no longer rely on the rule—thus creating a gap in the carefully balanced incentive structure that has been created—it could potentially put this arrangement in jeopardy.

---

[17] White House, Press Release, *Mexico and United States Strengthen Joint Humanitarian Plan on Migration* (May 2, 2023), https://www.whitehouse.gov/briefing-room/statements-releases/2023/05/02/mexico-and-united-states-strengthen-joint-humanitarian-plan-on-migration/.

**Add.58**

45. Like the United States, officials from a number of countries, including Mexico, have expressed grave concerns about the impacts that another significant increase in migrants will have on their communities and government agencies. If DHS cannot apply the rule, DHS assesses there will be an increase in migration flows, and regional partner countries may take the view that the United States has reneged on the shared goal of stabilizing migratory populations and addressing migration collectively as a region.

46. Ultimately, continued implementation of the rule is central to achieving a key foreign policy goal—fostering a hemisphere-wide approach of addressing migration on a regional basis. Implementation of the rule responds to discussions with and feedback from regional partner countries, several of whom have previously criticized the United States for maintaining policies that create a pull factor throughout the region. Eliminating the visible consequence for irregular migrants that is a core component of the rule would concern many foreign partners because it would incentivize migrants to make the journey north—particularly given how smugglers would weaponize the change in policy to drive migration. This, in turn, would directly undermine the increased enforcement policies the United States' partners have undertaken, many of which were implemented at substantial cost for those governments—including, for example, the current unprecedented campaign by Colombia and Panama to attack smuggling networks operating in the Darién, and Mexico's deployments of law enforcement and military personnel to conduct enforcement along its southern border and transit routes. Partner governments could be less inclined to support U.S. efforts to manage migratory flows through region—particularly through robust enforcement of their borders—if they perceive that United States is not committed to enforcing its own.

**Add.59**

47.     In short, the rule is a substantive demonstration of the U.S. Government's partnership and commitment to the shared goal of stabilizing migratory populations and addressing migration collectively as a region, both of which are critical to maintaining strong bilateral and multilateral relationships.  If the rule is enjoined, it could serve to undermine the regional approach that has been carefully developed through thoughtful and intensive diplomatic effort.

**Conclusion**

48.     This rule is a foundational component of the comprehensive, all of government approach that DHS implemented to prepare for the end of Title 42 and respond to the unprecedented movement of people in our hemisphere.  This approach provides incentives for intending migrants to use safe and orderly pathways and processes that have been expanded to come to the United States, even as it seeks to disincentivize noncitizens from crossing unlawfully between ports of entry or without authorization at ports of entry.  The rule is a critical component of this measured and thoughtful approach to managing migratory flows, by imposing strengthened consequences at the border in order to change the calculus of intending migrants.

49.     This approach is working as intended, rapidly and significantly reducing encounters at the border while providing record numbers of noncitizens with access to lawful pathways and processes to seek protection in the region or come to the United States.  The more than 18-month long planning effort that DHS undertook, which included making key, ongoing enhancements to the expedited removal process, has allowed it to deliver the rule's strengthened consequences under Title 8 processes that are operating at a higher scale and more quickly than ever before.

**Add.60**

50.      Should the rule no longer be in effect, DHS anticipates a return to elevated encounter levels that would place significant strain on DHS components, border communities, and interior cities, despite the careful planning and significant investments that have been made. CBP facilities will be overcrowded once again, placing the noncitizens in our custody and the frontline personnel who care for them at risk.  Border communities, and the NGOs that support them, will once again receive large scale releases of noncitizens that will overwhelm their ability to coordinate safe temporary shelter and quick onward transportation.  And interior destination cities will, once again, see their systems strained.

51.      DHS does not have to imagine what the impacts of a surge in migration of the anticipated scale would look like; we just experienced it.


I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.  Executed on this 16th day of June, 2023.

_____
Blas Nuñez-Neto
Assistant Secretary
Border and Immigration Policy
U.S. Department of Homeland Security

**Add.61**