No. 23-16032

## IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

**EAST BAY SANCTUARY COVENANT, *et al.*,**

*Plaintiffs-Appellees*,

v.

**JOSEPH R. BIDEN, President of the United States, *et al.***

*Defendants-Appellants.*

*On Appeal from the United States District Court*
*for the Northern District of California*
*No. 4:18-cv-06810-JST*

### APPELLEES' OPPOSITION TO APPELLANTS' MOTION FOR STAY PENDING APPEAL

Lee Gelernt
Omar C. Jadwat
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
125 Broad St., 18th Floor
New York, NY 10004
Telephone: (212) 549-2660

Katrina Eiland
Morgan Russell
Spencer Amdur
Oscar Sarabia Roman
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
IMMIGRANTS' RIGHTS
PROJECT
39 Drumm Street
San Francisco, CA 94111
Telephone: (415) 343-0770

*Attorneys for Plaintiffs-Appellees*

*(Additional Counsel on Next Page)*

Melissa Crow
CENTER FOR GENDER &
REFUGEE STUDIES
1121 14th Street, NW, Suite 200
Washington, DC 20005
T: (202) 355-4471
F: (415) 581-8824

Anne Peterson
Blaine Bookey
Julie Bourdoiseau
Karen Musalo
CENTER FOR GENDER &
REFUGEE STUDIES
200 McAllister Street
San Francisco, CA 94102
T: (415) 610-5729
F: (415) 581-8824

Robert Pauw
CGRS Cooperating Attorney
GIBBS HOUSTON PAUW
1000 Second Avenue, Suite 1600
Seattle, WA 98104
T: (206)682-1080
F: (206)689-2270

Keren Zwick
Richard Caldarone
Colleen Cowgill
Mary Georgevich
NATIONAL IMMIGRANT JUSTICE
CENTER
224 S. Michigan Ave., Suite 600
Chicago, IL 60604
T: (312) 660-1370
F: (312) 660-1505

Michelle (Minju) Y. Cho
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION OF
NORTHERN CALIFORNIA, INC.
39 Drumm Street
San Francisco, CA 94111
T: (415) 621-2493
F: (415) 255-1478

# CORPORATE DISCLOSURE STATEMENT

Appellees are non-profit entities that do not have parent corporations.  No publicly held corporation owns 10 percent or more of any stake or stock in Appellees.

By: /s/ Katrina Eiland
Katrina Eiland
AMERICAN CIVIL LIBERTIES UNION
  FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
39 Drumm Street
San Francisco, CA 94111
T: (415) 343-0774
F: (415) 395-0950

# TABLE OF CONTENTS

INTRODUCTION .................................................................................1

ARGUMENT .......................................................................................2

  I.  THE EQUITIES WEIGH DECISIVELY AGAINST A STAY ...................2

 II. THE GOVERNMENT IS UNLIKELY TO SUCCEED ON THE
     MERITS ......................................................................................10

    A. The Rule Violates the Asylum Statute....................................10

    B. The Rule Is Arbitrary and Capricious....................................18

    C. The Rule Is Procedurally Defective .......................................19

    D. The Government's Threshold Arguments Are Meritless.....................20

       1. Plaintiffs Have Standing Under Binding Precedent.......................20

       2. Nothing Bars Vacatur.....................................................21

CONCLUSION ................................................................................23

# INTRODUCTION

The Court should deny the stay. The Rule is illegal under binding precedent, because it reimposes asylum requirements this Court has already invalidated. And in practice, it bars asylum for nearly everyone who enters between ports, which alone is enough to vacate the Rule under 8 U.S.C. § 1158(a)(1) and *East Bay Sanctuary Covenant v. Biden*, 993 F.3d 640 (9th Cir. 2021) (*East Bay I*). The ban is inflicting enormous harm on Plaintiffs and on thousands of asylum seekers, who are being deported to countries where they face persecution and death.

The government speculates that, without the Rule, many more people will cross the border between ports of entry, straining DHS resources. Its own data belies that overblown claim. Recent government data shows that people subject to the Rule are entering at ports at the *exact same rate* as those not subject to the Rule—meaning the Rule is not "channeling" people to ports at all. That is unsurprising since, as the government admits, the previous transit ban had no effect on border crossings. And the government has no evidence that the Rule itself is responsible for the decrease in crossings between ports after Title 42 expired. The more obvious driving force was the transition from Title 42, which encouraged entry between ports, to Title 8, which does not—and instead imposes serious and lasting consequences on people ordered removed. Vacatur would leave those consequences in place, along with other factors the government agrees create

1

strong incentives and opportunities for people to enter at ports rather than between them. Indeed, the district court's order will not eliminate any "lawful pathway" discussed in the Rule.

The Rule is illegal, harmful, and unnecessary. No stay is warranted.

## ARGUMENT

## I. THE EQUITIES WEIGH DECISIVELY AGAINST A STAY.

The government wrongly asserts that the district court's order would cause a major uptick in crossings between ports, as occurred in the last days of Title 42. First, the expiration of the Title 42 order—not the Rule—was the key policy change that explains both the increase in border crossings leading up to May 11 and the subsequent decline. Second, the government's own data directly contradict its assertion that *the Rule* is "channeling migrants" to enter at ports rather than between them. And third, vacating the Rule leaves in place independent factors that disincentivize crossings between ports. The government's speculation does not remotely show that any irreparable injury is "*likely* to occur." *East Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 778 (9th Cir. 2018) (a "possibility of irreparable injury is insufficient"). And the government ignores the harm to Plaintiffs and thousands of asylum seekers facing severe violence because of the Rule.

1.  The government asserts that the Rule is the reason crossings between ports peaked in the days leading up to Title 42's expiration and dropped afterward. Mot. 8-10.  But the evidence shows that a much more fundamental policy shift accounted for that change: the end of Title 42 and the resumption of Title 8 processing.

Removal under Title 8 imposes "significant and lasting consequences," including deportation to a person's country of origin, "a minimum 5-year ban on admission[,] and the potential to be criminally prosecuted for illegal re-entry." Add.40.  Noncitizens who enter between ports, or at ports but without authorization, are subject to expedited removal procedures.  8 U.S.C. § 1225(b).

Under Title 42, by contrast, access to ports was highly restricted, and people who entered between ports were often "expelled to Mexico" rather than "their home country."  Add.40.  That expulsion imposed no "lasting consequences," since no removal order issued.  *Id.*  Migrants "acted in response" to these "unintended incentives" by crossing between ports in high numbers, and doing so repeatedly. Br. of Amicus Curiae Cato Inst. at 5-7, *Huisha-Huisha v. Mayorkas*, No. 22-592 (S. Ct. Feb. 9, 2023).  Some crossed the border "10 times or more."  Br. for Federal Respondents at 4, *Huisha-Huisha* (S. Ct. Feb. 7, 2023) (quotation omitted). Indeed, "39 percent of all Title 42 expulsions [were] followed by a re-encounter of the same individual within 30 days," compared to only a 9% "re-encounter rate"

under Title 8. 88 Fed. Reg. 31,314, 31,335 (May 16, 2023). In short, as the government has admitted, "expedited removal [under Title 8] has a greater deterrent effect than expelling a migrant to Mexico under Title 42." Gov't TRO Opp'n at 1, ECF No. 27, *Arizona v. CDC*, No. 6:22-cv-885 (W.D. La. Apr. 22, 2022).

In fact, Title 42's greatly-enhanced incentives led to more crossings between ports "than ever before in U.S. history." Quinn Owen, *Title 42 Actually Contributes to Increased Migration Numbers, Data Suggests*, ABC News (Dec. 23, 2022).[1] A graph of DHS apprehension data clearly shows this effect:



U.S. House of Reps., Judiciary Comm., Subm. by Rep. Escobar (July 26, 2023).[2]

---

[1] https://abcnews.go.com/Politics/title-42-contributes-increased-migration-numbers-data-suggests/story?id=95616742.

[2] https://www.congress.gov/event/118th-congress/house-event/116272?s=7&r=11.

4

It was well-known for months that Title 42 was to expire on May 11, meaning Title 8's consequences would resume the next day. As a result, many migrants naturally sought to cross the border "before—not after—Title 42's expiration." Add.47. Just as naturally, crossings between ports have been lower since May 12, when Title 8 processing kicked back in.

Since Title 42 undisputedly encouraged migrants to cross between ports in large numbers, it does not follow that vacating the Rule would cause an increase similar to the final days of Title 42—because vacating the Rule *would not put Title 42 back into place*. It would instead keep in place Title 8's concededly greater deterrent effect. Nor would vacating the Rule create the same sense of urgency as Title 42's impending expiration.

2. Despite the clear link between the return of Title 8 and the reduction in encounters beginning May 12, the government claims that the Rule is instead the cause, because its asylum bar is "channeling migrants" to ports. Mot. 8-10. Strikingly, however, DHS's own data dispels that claim.

In June 2023, both Mexican nationals (to whom the Rule does not apply) and non-Mexicans (to whom it does) presented at ports at exactly the same rate of 31%.[3] If the Rule were meaningfully affecting people's decisions about where to

---

[3] 15,309 out of 49,267 encounters of Mexican nationals occurred at ports, as did 29,717 out of 95,295 encounters of non-Mexicans. U.S. Customs & Border

enter, one would expect Mexican nationals to enter between ports at notably higher rates than people subject to the Rule. The data shows the opposite.

This lack of any effect traceable to the Rule is unsurprising, because the same was true under the previous transit ban. In the current Rule, the government admits that the prior transit ban had no "noticeable impact on encounters" while it was in effect between September 2019 and June 2020, and that there was likewise "no noticeable change" upon its vacatur. 88 Fed. Reg. at 31,430 n.304.[4] The Rule suggests that things will be different this time, because some "alternative pathways" like the parole programs were unavailable while the prior transit ban was in place. 88 Fed. Reg. at 31,430. But as discussed below, such "pathways" exist independently of the Rule and would thus be unaffected by its vacatur.

3. Critically, the district court's order would not disturb any other policies or factors that the government acknowledges encourage people to present at ports and discourage crossing between them. Chief among those is Title 8 processing itself, with its lasting legal consequences that Title 42 lacked. Vacating the Rule will also leave in place the "pathways" discussed therein, since the Rule "does not

---

Protection (CBP), Southwest Land Border Encounters, https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters.

[4] Unlike the prior transit ban, the earlier entry ban never took effect.

create, expand, or otherwise constitute the basis for any lawful pathways." 88 Fed. Reg. at 31,370; *see* D. Ct. ECF No. 182 at 7 n.4 (acknowledging same).

For instance, vacating the Rule will not eliminate the CBP One scheduling system, which the government claims has "significantly improve[d]" the efficiency of port processing. Mot. 10. Nor will it reduce the incentives to use that system among asylum seekers who can safely wait for appointments.

Asylum seekers have always sought entry at ports when that option is available, even with no harsh asylum bar for crossing between ports. *See Al Otro Lado v. Wolf*, 952 F.3d 999, 1004-05 (9th Cir. 2020) (thousands of asylum seekers waited to enter at ports even when access was more limited); Record Excerpts, D. Ct. ECF No. 169-8 at 316 (asylum seekers "prefer to cross" at ports partly because cartels that control crossings between ports demand extortionate fees). It is therefore unsurprising that "[d]emand for appointments exceeds supply." Op. 29. That trend should continue if the Rule is vacated, since the data discussed above show that the Rule is not affecting the rates at which people present at ports. And, of course, the government could seek to further incentivize entry at ports by increasing CBP One appointments or processing more people at ports without appointments. D. Ct. ECF No. 181-2 at 56-57, 66 (recent reports that DHS officers routinely turn away people seeking asylum at ports).

Nor would vacatur affect other processing "improvements" made *before* the Rule, which the government states "allow[] it to process credible fear cases more quickly than ever before." Add.45.

Finally, vacating the Rule will leave in place the nationality-specific parole programs and DHS's policy of removing the parole countries' nationals to Mexico—two policies the government credited with "effectively deterring irregular migration," "yielding a substantial decrease in encounter numbers." 88 Fed. Reg. at 31,316-17.

The continuation of these two policies undermines the government's reliance on DHS's "planning models," Add.48-49, which assumed that both policies would end. The government cites the models as evidence that the "decline in border encounters will quickly be erased" without a stay. Mot. 10 (citing Add.48-49). But the models did not analyze the actual circumstances that would arise if the Rule is vacated. Instead, DHS projected only what would happen over the summer absent the Rule *and* absent the country-specific parole and removal policies, which the government has credited with dramatically reducing encounters. Record Excerpts, D. Ct. ECF No. 169-8 at 151 (assuming parole and removal programs would lapse); *see* Op. 32-33 (same defect in NPRM). That the government did not

8

even attempt to isolate whether the Rule would have any independent effect makes its speculation still more unreliable.[5]

4.  Finally, the government completely ignores the actual and ongoing harm the Rule imposes on Plaintiffs and the asylum seekers they serve.  As to Plaintiffs, the Rule "frustrate[s] their organizational goals, require[s] diversion of resources, and substantially affect[s] their funding."  Op. 10.  These harms constitute irreparable injury.  *East Bay I*, 993 F.3d at 677.

Moreover, since the Rule's implementation, thousands of asylum seekers who would otherwise be pursuing their claims have been ordered removed, solely because they could not comply with the Rule's requirements.  D. Ct. ECF No. 181 at 29 & n.15.  Other asylum seekers are trapped waiting indefinitely for CBP One appointments in violent conditions in northern Mexico, at the mercy of cartels. Op. 27 (citing, *e.g.*, report documenting 13,480 violent crimes in 2021 and 2022 against migrants in Mexico, including by Mexican authorities; and 2022 State Department report discussing widespread violence against migrants in Mexico, including torture, kidnapping, and murder).  The government wrongly disregards the strong public interest in "'ensuring that we do not deliver [noncitizens] into the

---

[5] Even with this significant defect, DHS's models projected only around 20% fewer daily encounters in August without the Rule (and without the other two policies) in effect.  Record Excerpts, D. Ct. ECF No. 169-8 at 151-52; *see* 88 Fed. Reg. at 31,316 n.14 (focusing on high- and moderately-high-range projections).

hands of their persecutors,' and 'preventing [noncitizens] from being wrongfully removed, particularly to countries where they are likely to face substantial harm.'" *East Bay I*, 993 F.3d at 678 (citations omitted).

## II. THE GOVERNMENT IS UNLIKELY TO SUCCEED ON THE MERITS.

### A. The Rule Violates the Asylum Statute.

The Rule is illegal for two independent reasons. On its face, the Rule imposes entry- and transit-based requirements that this Court has already held violate 8 U.S.C. § 1158. And in practice, undisputed evidence shows that the Rule bars asylum for nearly all asylum seekers who enter between ports, just like the first entry ban. The Rule thus straightforwardly violates § 1158(a)(1) under *East Bay I*, which makes clear that manner of entry cannot be used to bar asylum eligibility.

1. As the district court correctly held, the Rule violates 8 U.S.C. § 1158. Op. 15-19. Subject to narrow exceptions, the Rule requires asylum seekers either to enter at ports (with a CBP One appointment), or apply for and be denied asylum in a transit country. 8 C.F.R. § 208.33(a). But this Court has already held that neither of those requirements is "consistent with" the asylum statute. 8 U.S.C. § 1158(b)(2)(C); *see East Bay I*, 993 F.3d at 669-675 (invalidating port-of-entry requirement); *East Bay Sanctuary Covenant v. Garland*, 994 F.3d 962, 976-80 (9th

10

Cir. 2020) (*East Bay II*) (invalidating transit-denial requirement). The government therefore cannot impose either requirement.[6]

And because each condition "standing alone" is illegal, "it follows that [the government] lacks the power to offer [asylum seekers] a choice between the two." *New York v. United States*, 505 U.S. 144, 176 (1992). These illegal requirements do not become "consistent with" § 1158 just because they are imposed in the alternative. Courts regularly bar the government from offering the false choice between alternatives that could not be imposed individually. *Simmons v. United States*, 390 U.S. 377, 394 (1968); *Doe v. Indian River Sch. Dist.*, 653 F.3d 256, 279 (3d Cir. 2011); *U.S. ex rel. Wilcox v. Johnson*, 555 F.2d 115, 120-21 (3d Cir. 1977); *Spence v. Bailey*, 465 F.2d 797, 800 (6th Cir. 1972); *Johnson v. Branch*, 364 F.2d 177, 180 (4th Cir. 1966).

2. The Rule is illegal for a second, even more straightforward reason. In practice, the record shows that the Rule offers asylum seekers at the border only one real choice: to enter at a port (and even then, only with an appointment). Its

---

[6] Nor can the government require anyone to seek parole before applying for asylum. Congress made asylum available "irrespective of [an] alien's status," 8 U.S.C. § 1158(a)(1), precisely to ensure that asylum seekers would *not* have to rely on "ad hoc" country-specific uses of "parole." *Bringas-Rodriguez v. Sessions*, 850 F.3d 1051, 1060 (9th Cir. 2017) (en banc). The government has never claimed otherwise.

two other supposed options are effectively non-existent and the exceptions are vanishingly narrow. This violates § 1158(a)(1)'s clear command that asylum be available "whether or not at a designated port of arrival." By effectively barring asylum between ports, the Rule would nullify "a method of entry explicitly authorized by Congress," just like the prior entry ban. *East Bay I*, 993 F.3d at 669-70. That alone would be enough to deny a stay. *See* D. Ct. ECF Nos. 169-1 at 11-14, and 181 at 8-10.

Showing a denial from a transit country provides no real alternative to entering at a port. During the ten months the prior transit ban was in effect, fewer than 2% of asylum seekers (421 of 25,158 people) could show they had sought and were denied protection in a transit country, whether because those countries were too dangerous or because they lacked an effective asylum system. Record Excerpts, D. Ct. ECF No. 169-9 at 915 & n.29; *see* Op. 24-27 (continuing dangers and problems with asylum systems in Mexico and other transit countries). The government's declaration in this case confirms that this remains true. It reports that only 3% of people interviewed by DHS established either a denial from a transit country *or* complete inability to use CBP One. Add.44; *see* 8 C.F.R.

§ 208.33(a)(2)(ii).  While this combined 3% figure is already miniscule, the number of transit denials alone is likely much lower.[7]

The other "pathway" the Rule describes as an alternative to entering at ports is likewise illusory.  The parole programs are explicitly unavailable to virtually all asylum seekers to whom the Rule applies.  The Rule applies only to people who enter at the "southwest land border or adjacent coastal borders."  8 C.F.R. § 208.33(a)(1).  But the parole programs require participants to "*fly*" to "interior" U.S. airports.  Op. 24 (emphasis added).  Thus, the Rule "necessarily would not apply to beneficiaries of these programs arriving at interior ports of entry."  Op. 24-25 (calling the parole option "[p]uzzling[,]" since it is "irrelevant" to the Rule's operation).  Parole thus presents no real alternative for asylum seekers at the border, who must instead present at ports.

For people who do not enter at ports or satisfy the largely-illusory transit or parole conditions, the only hope of escaping the bar is the Rule's "exceptionally compelling circumstances" exception.  But the Rule makes clear that this exception

---

[7] The government did not dispute these numbers below, but suggested that the last ban was in place for "insufficient time" for people to obtain transit-country denials. D. Ct. ECF No. 182 at 9-10 n.7.  Even if that were true, it would be an admission that the current transit-denial option will likewise be unavailable for at least 10 of the 24 months the Rule is intended to apply.  8 C.F.R. § 208.33(a)(1)(i).  And "the record refutes the suggestion" that transit countries are any safer or otherwise better-equipped to offer asylum now.  Op. 25-27.

is meant to be extremely "narrow."  88 Fed. Reg. at 31,380.  It is for "acute"
emergencies, "severe" trafficking, and "imminent and extreme threats, … such as
an imminent threat of rape, kidnapping, torture, or murder."  88 Fed. Reg. at
31,350-51.  The Rule takes pains to emphasize just how high this bar is, explaining
that imminent threats of lesser violence do not count, nor do "generalized" threats
of rape or murder, threats that did not occur "at the time of entry," or even recent
violence near the border if the attacker "no longer posed an immediate threat."  *Id.*
at 31,393.  While some people will still satisfy this exception given the
unspeakable violence against asylum seekers in northern Mexico, the Rule is clear
that the exception barely dents the Rule's primary effect.

The Rule's function of barring asylum between ports is so clear that, even in
this litigation, the government cannot help but describe it that way.  In practice, the
government asserts, "[t]he rule has strengthened the consequences for noncitizens
who cross unlawfully between ports of entry."  Add.44; *see* Add.37, 47 (Rule
"aims to discourage noncitizens from crossing the [border] unlawfully between
ports of entry"); Add.43, 48, 55, 60 (goal of reducing "encounters between
ports").  Almost every page of its motion makes clear that the Rule's whole
purpose is to "discourage … irregular migration" by barring asylum "between
ports of entry."  Mot. 5, 10; *see, e.g.*, *id.* at 8-9, 11, 22.

14

Thus, like the prior entry ban, the Rule denies asylum to almost everyone who enters between ports. The government cannot re-enact the entry ban just by adding a couple of alternatives that are barely available to anyone. Courts regularly look to these "practical effects" to assess a rule's legality. *Gill v. DOJ*, 913 F.3d 1179, 1185 (9th Cir. 2019); *Gen. Elec. Co. v. EPA*, 290 F.3d 377, 382-85 (D.C. Cir. 2002); *see Texas v. United States*, 809 F.3d 134, 173-74 (5th Cir. 2015) (examining prior similar rule to determine how new rule would operate in practice). And here, the Rule's practical effect is clear from the record and has never been meaningfully disputed.

This clear conflict with § 1158(a)(1) renders the Supreme Court's stay in the transit ban case irrelevant. Mot. 7-8 (relying on stay). The transit ban did not require asylum seekers to enter at ports. When the government tried to do that, in the entry ban, the Supreme Court *denied* a stay. *Trump v. East Bay Sanctuary Covenant*, 139 S. Ct. 782 (2018). And for good reason, because "it would be hard to imagine a more direct conflict" with § 1158(a)(1) than barring asylum for nearly everyone who enters between ports, as the Rule does. *East Bay I*, 993 F.3d at 670 (cleaned up). The Court can resolve this motion on that principle alone.[8]

---

[8] Even as to the transit ban, the Supreme Court's unreasoned summary order did not "decide the merits," *Nken v. Holder*, 556 U.S. 418, 432 (2009); *Merrill v. Milligan*, 142 S. Ct. 879 (2022) (Mem.) (Kavanaugh, J., concurring), and this Court subsequently affirmed the injunction, *East Bay II*, 994 F.3d 962. Moreover, the Court was not faced with the critical fact that the transit ban barred nearly

3.  The government's main response is that the Rule is not as "categorical[]" as the prior bans, because it does not treat manner of entry or failure to apply in a transit country as "dispositive" in every case.  Mot. 2, 18-19.  But a couple of tiny exceptions to those requirements do not somehow make the Rule "consistent with" § 1158.  Nothing in *East Bay I* or *East Bay II* suggests that those bans' invalidity would have been cured by minor carve-outs for people facing "extreme" threats or "acute" medical emergencies.

To the contrary, courts frequently hold that small exceptions like these do not rescue otherwise-invalid rules.  The prior transit ban, for instance, contained small exceptions, but that did not save its legality.  *See* 84 Fed. Reg. 33,829, 33,843-44 (July 16, 2019); *East Bay II*, 994 F.3d at 973.  The Supreme Court recently held that several "narrow exemptions" did not impact a rule's legality where the exceptions affected few people or were hard to satisfy.  *NFIB v. Dep't of Labor*, 142 S. Ct. 661, 663-64 (2022).  Other cases likewise hold that a small or hard-to-access exception "falls short of saving" an otherwise-invalid rule.  *Am.*

---

*everyone*, practically eliminating asylum at the border.  That provides a new reason why *East Bay II* was correctly decided, because it is not "consistent with" the asylum statute to impose a requirement that, factually speaking, almost no one can satisfy.  *See Zheng v. Gonzales*, 422 F.3d 98, 119-20 (3d Cir. 2005) (agency cannot "essentially reverse[] the eligibility structure set out by Congress"); *Succar v. Ashcroft*, 394 F.3d 8, 26 (1st Cir. 2005) (same).

*Petroleum Inst. v. EPA*, 862 F.3d 50, 61 (D.C. Cir. 2017) (per curiam); *see Zheng*, 422 F.3d at 119 (rule invalid despite "narrow exception").

The Supreme Court has also held that, where the government cannot make an action "mandatory," it equally cannot demand a showing of "extraordinary circumstances to justify" a departure from that action. *Gall v. United States*, 552 U.S. 38, 46-47 (2007) (cleaned up) (because district courts cannot be required to sentence within the guidelines, they also cannot be required to show extraordinary circumstances to justify a departure). That principle applies directly here. Since the government cannot require asylum seekers to enter at ports, it cannot make them show "'extraordinary' circumstances" or impose an adverse "presumption" for entering between ports. *Id.* at 47; *see Dist. of Columbia v. USDA*, 444 F. Supp. 3d 1, 25 (D.D.C. 2020) ("exceptional circumstances" exception "cannot save" invalid rule).

Finally, the government argues that the Rule is meaningfully different from the prior bans "because it is directed at solving a different problem," namely "administrative practicality and systemic efficiency." Mot. 2, 17. But the prior bans had the same purpose. 83 Fed. Reg. 55,934, 55,935, 55,944-48 (Nov. 9, 2018); 84 Fed. Reg. at 33,831, 33,837-39; *East Bay II*, 994 F.3d at 982 (transit ban intended to "relieve[] strain" on "overburdened asylum system"); *id.* at 989 (Miller, J., concurring) (systemic efficiency was transit ban's "stated purpose").

17

And in any event, as this Court held, those bans violated the asylum statute because their operative terms conflicted with specific provisions in § 1158. A slightly reworded purpose does not change that.[9]

### B. The Rule Is Arbitrary and Capricious.

The government barely contests the district court's well-reasoned holding that the Rule is arbitrary and capricious. As to the court's conclusion that "expansion of other means of entry or protection" is an invalid justification for restricting asylum, Op. 22, the government argues only that this "repackages" the statutory holding. Mot. 21. But improper "justifications" render a rule arbitrary and capricious, regardless of whether the rule complies with statute. *Cal. Energy Comm'n v. DOE*, 585 F.3d 1143, 1146 (9th Cir. 2009).

The government also does not contest the court's review of the record. The court found that the record utterly fails to support a key factual premise underlying the Rule: that each of the three ways to avoid the eligibility bar "at the very least, present meaningful options," Op. 24, such that those "who fail to avail themselves" of them should be barred, Op. 20. *See also East Bay II*, 994 F.3d at 980 (transit ban invalid because "record contradict[ed]" agencies' assertions about alternative

---

[9] The government's reliance on *Matter of Pula*, Mot. 18, is likewise foreclosed. *East Bay I*, 993 F.3d at 671-72.

"safe options"); *id.* at 989 (Miller, J., concurring) (record contradicted premise that other options were "available").

Instead, the government claims the agencies "describe[d] in depth … the limitations[] on the available orderly pathways" and simply found them "outweighed" by other considerations. Mot. 21. They did nothing of the sort. The Rule repeatedly relies on the assertion that the "pathways" are widely available. Op. 23-24. And as the district court found, the agencies deflected criticism about the limited "scope" of each option by referencing the other options, even though extensive evidence showed they were all "unavailable" to large numbers of people. Op. 20.

### C.     The Rule Is Procedurally Defective.

The district court correctly held the short comment period for this "unquestionably complex" Rule unjustified by the end of Title 42, because the agencies prepared for Title 42's expiration for over a year, and thus had "sufficient time to grant a longer comment period." Op. 32. The government is also wrong that the interrelated policies it failed to disclose were "outside the scope of the Rule." Mot. 22. As the court found, these policies' existence "would affect the agencies' reasoning." Op. 32. In particular, the parole-country removal policy implicated one of the Rule's "central" assumptions: that encounter numbers would

rise after Title 42 ended, "*absent a viable mechanism for removing*" those
countries' nationals.  Op. 32-33.

The agencies also improperly failed to disclose perhaps the most critical
information underpinning the Rule: DHS's model predicting that, absent the Rule,
unlawful entries would increase significantly.  Op. 31-32 (citing *Kern Cnty. Farm
Bureau v. Allen*, 450 F.3d 1072, 1076 (9th Cir. 2006)).  The agencies did "not
provide the relevant data that goes into the projections, the factors that impact the
model, or the complete [DHS] analysis."  Op. 32.  That deprived commenters of
the opportunity to identify flaws in the agencies' assumptions and methodology
before the agencies adopted the Rule.

### D. The Government's Threshold Arguments Are Meritless.

#### 1. Plaintiffs Have Standing Under Binding Precedent.

This Court has held that organizations in the exact same position as
Plaintiffs have standing.  *East Bay I*, 993 F.3d at 662-64; *East Bay II*, 994 F.3d at
974-75.  The government suggests that *United States v. Texas*, 143 S. Ct. 1964
(2023), somehow changes this result.  Mot. 12-13.  But as the district court
explained, Op. 10-11, *Texas* only addressed the "narrow" issue of standing to
challenge agencies' "enforcement discretion over whether or not to *arrest or
prosecute*," 143 S. Ct. at 1970, 1972, 1975 (emphasis added).  The Rule does not
implicate that discretion.  As a substantive bar on asylum eligibility, the Rule

instead "implicates the Executive's provision of legal benefits or legal status," Op. 11, which *Texas* explicitly carved out of its holding. 143 S. Ct. at 1974. And like *Texas*, the government's other cases address standing to procure "the prosecution of another," which is not at issue here. *Id.* at 1970 (quoting *Linda R.S.* and *Sure-Tan*) (cleaned up).

### 2. Nothing Bars Vacatur.

The government briefly raises several other objections to vacatur, but they all fail.

a. 8 U.S.C. § 1252(f)(1), which provides that courts cannot "enjoin or restrain the operation of" certain detention and removal statutes, does not apply for two reasons. First, § 1252(f)(1) does not bar vacatur. It "is nothing more or less than a limit on *injunctive* relief," *Reno v. Am-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 481 (1999) (emphasis added), and only "prohibits lower courts from *entering injunctions*." *Garland v. Aleman Gonzalez*, 142 S. Ct. 2057, 2065 (2022) (emphasis added). The courts to consider this issue have therefore uniformly held that § 1252(f)(1) as interpreted by *Aleman* "does not apply to vacatur." *Texas v. United States*, 50 F.4th 498, 528 (5th Cir. 2022); *accord, e.g.*, *Florida v. United States*, __ F. Supp. 3d. ___, No. 21-1066, 2023 WL 2399883, at *34-35 (Mar. 8, 2023); *Al Otro Lado v. Mayorkas*, 619 F. Supp. 3d 1029, 1045 (S.D. Cal. 2022).

Second, as the district court explained, the Rule implements the asylum statute, which is not covered by § 1252(f)(1). Op. 14-15. The government argues that vacating an asylum eligibility rule has collateral effects on removal operations because asylum rules are applied in removal proceedings. Mot. 14-15. But this Court has squarely held that such "collateral effect[s]" on the removal system do not trigger § 1252(f)(1). *Gonzales v. DHS*, 508 F.3d 1227, 1233 (9th Cir. 2007); *Catholic Social Services, Inc. v. INS*, 232 F.3d 1139, 1145, 1149-50 (9th Cir. 2000) (en banc); *cf. East Bay I*, 993 F.3d at 667 ("At best, the law governing asylum is collateral to the process of removal."). And *Aleman* explicitly left that rule undisturbed. 142 S. Ct. at 2067 n.4 (citing *Gonzales*).

b. This Court has similarly foreclosed the government's invocation of the expedited-removal provisions, 8 U.S.C. § 1252(a)(2)(A) and (e). *See East Bay I*, 993 F.3d at 667 (holding that jurisdictional provisions governing expedited removal did not bar review of entry ban). Just as in *East Bay I*, Plaintiffs here do not challenge expedited removal orders or procedures under 8 U.S.C. § 1225(b)(1). Rather, they are challenging a substantive asylum rule issued under § 1158. "[T]he jurisdiction-stripping provisions cited by the government were not intended to apply at all to challenges to asylum eligibility rules." *East Bay I*, 993 F.3d at 667; Op. 13.

c. The government claims that the district court should not have vacated the Rule in full, Mot. 15, but this Court has repeatedly held that vacatur is the "appropriate remedy" for statutory violations. Op. 15 (quoting *Cal. Wilderness Coal. v. U.S. Dep't of Energy*, 631 F.3d 1072, 1095 (9th Cir. 2011)); *see Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998) ("[T]he ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed.") (quotation omitted). In suggesting the district court should have limited its remedy, the government ignores this Court's rejection of identical arguments in *East Bay I*, 993 F.3d at 680-81, and *East Bay II*, 994 F.3d at 986-87.

Finally, the government mentions remand without vacatur, Mot. 15, but does not contest the district court's reasons for rejecting it, Op. 34.

## CONCLUSION

The motion should be denied.

23

Dated: August 1, 2023

Respectfully submitted,

Lee Gelernt
Omar C. Jadwat
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
125 Broad Street, 18th Floor
New York, NY 10004
T: (212) 549-2616
F: (212) 549-2654

Melissa Crow
CENTER FOR GENDER &
REFUGEE
STUDIES
1121 14th Street, NW, Suite 200
Washington, DC 20005
T: (202) 355-4471
F: (415) 581-8824

Anne Peterson
Blaine Bookey
Julie Bourdoiseau
Karen Musalo
CENTER FOR GENDER &
REFUGEE STUDIES
200 McAllister Street
San Francisco, CA 94102
T: (415) 610-5729
F: (415) 581-8824

Robert Pauw
CGRS Cooperating Attorney
GIBBS HOUSTON PAUW
1000 Second Avenue, Suite 1600
Seattle, WA 98104
T: (206)682-1080
F: (206) 689-2270

By: /s/ Katrina Eiland
Katrina Eiland
Morgan Russell
Spencer Amdur
Oscar Sarabia Roman
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
39 Drumm Street
San Francisco, CA 94111
T: (415) 343-0774
F: (415) 395-0950

Keren Zwick
Richard Caldarone
Colleen Cowgill
Mary Georgevich
NATIONAL IMMIGRANT JUSTICE
CENTER
224 S. Michigan Ave., Suite 600
Chicago, IL 60604
T: (312) 660-1370
F: (312) 660-1505

Michelle (Minju) Y. Cho
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION OF
NORTHERN CALIFORNIA, INC.
39 Drumm Street
San Francisco, CA 94111
T: (415) 621-2493
F: (415) 255-1478

*Attorneys for Plaintiffs-Appellees*

24

## CERTIFICATE OF SERVICE

I hereby certify that on August 1, 2023, I electronically filed the foregoing with the Clerk for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system. All participants in this case are registered CM/ECF users and will be served by the appellate CM/ECF system. There are no unregistered participants.

/s/ Katrina Eiland
Katrina Eiland
Dated: August 1, 2023

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing motion complies with the type-volume limitation of Fed. R. App. P. 27 because it contains 5,200 words. This brief complies with the typeface and the type style requirements of Fed. R. App. P. 27 because this brief has been prepared in a proportionally spaced typeface using Word 14-point Times New Roman typeface.

/s/ Katrina Eiland
Katrina Eiland
Dated: August 1, 2023