No. 23-16032

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

———————————

East Bay Sanctuary Covenant, *et al.*,

*Plaintiffs-Appellees*,

v.

Joseph R. Biden, President of the United States, in his official capacity, *et al.*,

*Defendants-Appellants.*

———————————

On Appeal from the United States District Court
for the Northern District of California

———————————

## BRIEF FOR APPELLANTS

———————————

WILLIAM C. PEACHEY
*Director*

EREZ REUVENI
*Assistant Director*

PATRICK GLEN
CHRISTINA P. GREER
*Senior Litigation Counsel*
*Office of Immigration Litigation*
*Civil Division*
*U.S. Department of Justice*
*P.O. Box 868, Ben Franklin Station*
*Washington, DC 20044*

BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney*
*General*

DANIEL TENNY
SEAN R. JANDA
BRIAN J. SPRINGER
*Attorneys, Appellate Staff*
*Civil Division, Room 7260*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-3388*

## TABLE OF CONTENTS

**Page**

INTRODUCTION ....................................................................................................1

STATEMENT OF JURISDICTION ........................................................................3

STATEMENT OF THE ISSUES.............................................................................3

PERTINENT STATUTES .......................................................................................4

STATEMENT OF THE CASE .................................................................................4

      A.    Statutory and Regulatory Background ...........................................4

      B.    The Lawful Pathways Rule .............................................................7

      C.    Prior Proceedings..........................................................................12

SUMMARY OF ARGUMENT..............................................................................14

STANDARD OF REVIEW ...................................................................................18

ARGUMENT .........................................................................................................18

I.      Plaintiffs' Claims Fail at the Threshold ..................................................18

      A.    Plaintiffs Lack Article III Standing ..............................................18

      B.    Multiple Features of the INA Render Plaintiffs' Claims
             Unreviewable ................................................................................22

II.     The Rule Is Lawful ...................................................................................28

      A.    The Rule Comports with the INA .................................................28

      B.    The Rule Is Reasonable and Reasonably Explained....................37

      C.    The Departments Provided Ample Notice and Opportunity to
             Comment.......................................................................................42

III.    The District Court Erred in Vacating the Rule.........................................45

    A.    The INA Precludes Vacatur of the Rule ......................................................45

    B.    The District Court's Universal Vacatur Was Erroneous ..........................49

        1.    The District Court Failed to Justify Its Universal Remedies.........49

        2.    Constitutional and Equitable Principles Precluded the
              District Court's Universal Vacatur in This Case ............................51

CONCLUSION ............................................................................................ 58

STATEMENT OF RELATED CASES

CERTIFICATE OF COMPLIANCE

ADDENDUM

# TABLE OF AUTHORITIES

**Cases:** <span style="float:right">**Page(s)**</span>

*Aberdeen & Rockfish R.R. v. Students Challenging Regulatory Agency Procedures,*
   422 U.S. 289 (1975) ................................................................ 47

*Air Courier Conference of Am. v. American Postal Workers Union,*
   498 U.S. 517 (1991) ................................................................ 22

*Allied Concrete & Supply Co. v. Baker,*
   904 F.3d 1053 (9th Cir. 2018) .............................................. 18

*Arizona v. Biden,*
   40 F.4th 375 (6th Cir. 2022) ................................................. 51

*Arizona v. United States,*
   567 U.S. 387 (2012) ......................................................... 29, 39

*Barr v. East Bay Sanctuary Covenant,*
   140 S. Ct. 3 (2019) ................................................................ 34

*Block v. Community Nutrition Inst.,*
   467 U.S. 340 (1984) ..................................................... 25, 26, 27

*Bob Jones Univ. v. United States,*
   461 U.S. 574 (1983) ................................................................ 30

*Califano v. Yamasaki,*
   442 U.S. 682 (1979) ................................................................ 56

*California Cmtys. Against Toxics v. US EPA,*
   688 F.3d 989 (9th Cir. 2012) (per curiam) ......................... 50

*California Wilderness Coal. v. U.S. Dep't of Energy,*
   631 F.3d 1072 (9th Cir. 2011) .............................................. 50

*Clapper v. Amnesty Int'l USA,*
   568 U.S. 398 (2013) ................................................................ 24

*Clarke v. Securities Indus. Ass'n,*
   479 U.S. 388 (1987) ................................................................ 23

*D-A-C-, Matter of,*
   27 I. & N. Dec. 575 (B.I.A. 2019) ....................................... 32

*Department of Commerce v. New York,*
    139 S. Ct. 2551 (2019) ........................................................... 42

*Dhakal v. Sessions,*
    895 F.3d 532 (7th Cir. 2018) ................................................. 6

*Direct Mktg. Ass'n v. Brohl,*
    575 U.S. 1 (2015) .................................................................. 46

*East Bay Sanctuary Covenant v. Biden* (*East Bay I*),
    993 F.3d 640 (9th Cir. 2021) ........................................ passim

*East Bay Sanctuary Covenant v. Garland* (*East Bay II*),
    994 F.3d 962 (9th Cir. 2021) ........................................ passim

*East Bay Sanctuary Covenant v. Trump,*
    932 F.3d 742 (9th Cir. 2018) ................................................. 25

*eBay Inc. v. MercExchange, LLC,*
    547 U.S. 388 (2006) .............................................................. 51

*Environmental Def. Fund, Inc. v. EPA,*
    82 F.3d 451 (D.C. Cir. 1996) (per curiam) ....................... 28

*Environmental Integrity Project v. EPA,*
    425 F.3d 992 (D.C. Cir. 2005) ............................................ 43

*FCC v. Prometheus Radio Project,*
    141 S. Ct. 1150 (2021) .......................................................... 39

*Garland v. Aleman Gonzalez,*
    142 S. Ct. 2057 (2022) ............................................. 45, 46, 47

*Gill v. Whitford,*
    138 S. Ct. 1916 (2018) .......................................................... 55

*Gonzales v. DHS,*
    508 F.3d 1227 (9th Cir. 2007) .............................................. 48

*Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.,*
    527 U.S. 308 (1999) .............................................................. 56

*Guerrero-Lasprilla v. Barr,*
    140 S. Ct. 1062 (2020) .................................................. 26, 27

*Holder v. Humanitarian Law Project*,
    561 U.S. 1 (2010) ........................................................................... 29

*INS v. Cardoza-Fonseca*,
    480 U.S. 421 (1987) ................................................................. 4, 28

*INS v. Legalization Assistance Project of L.A. Cty. Fed'n of Labor*,
    510 U.S. 1301 (1993) ..................................................................... 23

*Judulang v. Holder*,
    565 U.S. 42 (2011) ......................................................................... 39

*Kern Cty. Farm Bureau v. Allen*,
    450 F.3d 1072 (9th Cir. 2006) ....................................................... 45

*Kowalski v. Tesmer*,
    543 U.S. 125 (2004) ....................................................................... 24

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
    572 U.S. 118 (2014) ....................................................................... 23

*Linda R.S. v. Richard D.*,
    410 U.S. 614 (1973) ................................................................. 14, 19

*Long Island Care at Home, Ltd. v. Coke*,
    551 U.S. 158 (2007) ....................................................................... 43

*Los Angeles Haven Hospice, Inc. v. Sebelius*,
    638 F.3d 644 (9th Cir. 2011) ......................................................... 51

*Moncrieffe v. Holder*,
    569 U.S. 184 (2013) ......................................................................... 5

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) ......................................................................... 37

*Munaf v. Geren*,
    553 U.S. 674 (2008) ....................................................................... 42

*National Lifeline Ass'n v. FCC*,
    921 F.3d 1102 (D.C. Cir. 2019) ..................................................... 43

*National Wildlife Fed'n v. Espy*,
    45 F.3d 1337 (9th Cir. 1995) ................................................... 50, 52

*Natural Res. Def. Council v. Wheeler*,
  955 F.3d 68 (D.C. Cir. 2020) ......................................................... 49

*Omnipoint Corp. v. FCC*,
  78 F.3d 620 (D.C. Cir. 1996) ....................................................... 43

*Pacific Power & Light Co. v. Federal Power Comm'n*,
  111 F.2d 1014 (9th Cir. 1940) ..................................................... 28

*Pollinator Stewardship Council v. U.S. EPA*,
  806 F.3d 520 (9th Cir. 2015) ....................................................... 52

*Pula, Matter of*,
  19 I. & N. Dec. 467 (B.I.A. 1987) ................................................ 32

*Reno v. Flores*,
  507 U.S. 292 (1993) ..................................................................... 32

*Riverbend Farms, Inc. v. Madigan*,
  958 F.2d 1479 (9th Cir. 1992) ..................................................... 43

*Sure-Tan, Inc. v. NLRB*,
  467 U.S. 883 (1984) ..................................................................... 19

*Taylor, In re*,
  655 F.3d 274 (3d Cir. 2011) ......................................................... 57

*Tompkins v. Cyr*,
  202 F.3d 770 (5th Cir. 2000) ....................................................... 57

*Trump v. Hawaii*,
  138 S. Ct. 2392 (2018) ................................................................ 56

*United States v. Texas*,
  143 S. Ct. 1964 (2023) ......................................................... passim

*Yang v. INS*,
  79 F.3d 932 (9th Cir. 1996) ......................................................... 32

**Statutes:**

Administrative Procedure Act (APA):
  5 U.S.C. § 553(b) ......................................................................... 42
  5 U.S.C. § 553(c) ......................................................................... 42
  5 U.S.C. § 701(a)(1) ..................................................................... 25

5 U.S.C. § 702 ................................................................................ 22
5 U.S.C. § 702(1) ........................................................................... 50
5 U.S.C. § 703 ................................................................................ 50
5 U.S.C. § 706(2) ........................................................................... 50

Illegal Immigration Reform and Immigrant Responsibility Act of 1996,
    Pub. L. No. 104-208, div. C, § 604, 110 Stat. 3009
    (codified at 8 U.S.C. § 1158(b)(2)) ...............................................30

Immigration and Nationality Act (INA):
    8 U.S.C. § 1101(a)(42) ................................................................ 4
    8 U.S.C. § 1158 ..................................................................... 4, 22
    8 U.S.C. § 1158(a) ....................................................................... 4
    8 U.S.C. § 1158(a)(1) ............................................................ 33, 40
    8 U.S.C. § 1158(a)(2) ................................................................... 4
    8 U.S.C. § 1158(a)(2)(B) ............................................................ 31
    8 U.S.C. § 1158(a)(2)(C) ............................................................ 31
    8 U.S.C. § 1158(b) ....................................................................... 4
    8 U.S.C. § 1158(b)(1)(A) ..................................................... 4, 28, 30
    8 U.S.C. § 1158(b)(2) ................................................................... 4
    8 U.S.C. § 1158(b)(2)(C) ..................................................... 5, 9, 15, 28
    8 U.S.C. § 1158(d)(5)(A) .............................................................. 4
    8 U.S.C. § 1225(b)(1) ................................................................... 6
    8 U.S.C. § 1225(b)(1)(B)(v) ....................................................... 6, 8
    8 U.S.C. § 1229a ......................................................................... 6
    8 U.S.C. § 1231(b)(3) ................................................................... 5
    8 U.S.C. § 1252(a)(5) ............................................................. 26, 27
    8 U.S.C. § 1252(b)(9) ................................................................ 26
    8 U.S.C. § 1252(e)(3) ............................................................. 26, 27
    8 U.S.C. § 1252(f)(1) ..................................................... 13, 17, 45, 47

Refugee Act of 1980,
    Pub. L. No. 96-212, § 201(b), 94 Stat. 102, 103-05 ..................... 29, 30

28 U.S.C. § 1291 ............................................................................ 3

28 U.S.C. § 1331 ............................................................................ 3

42 U.S.C. § 265 ............................................................................. 7

**Regulations:**

8 C.F.R. § 208.2(a) ............................................................. 6

8 C.F.R. § 208.2(b) ............................................................. 6

8 C.F.R. § 208.13 ............................................................. 30

8 C.F.R. § 208.16 ............................................................. 5

8 C.F.R. § 208.17 ............................................................. 5

8 C.F.R. § 208.18 ............................................................. 5

8 C.F.R. § 208.30(f) ............................................................. 6

8 C.F.R. § 208.33(a)(1) ............................................................. 9

8 C.F.R. § 208.33(a)(2)(i) ............................................................. 10

8 C.F.R. § 208.33(a)(2)(ii) ............................................................. 10

8 C.F.R. § 208.33(a)(2)(ii)(A) ............................................................. 34

8 C.F.R. § 208.33(a)(2)(ii)(C) ............................................................. 34

8 C.F.R. § 208.33(a)(3) ............................................................. 10, 34

8 C.F.R. § 1208.2(b) ............................................................. 6

8 C.F.R. § 1208.16 ............................................................. 5

8 C.F.R. § 1208.17 ............................................................. 5

8 C.F.R. § 1208.18 ............................................................. 5

8 C.F.R. § 1208.33(a)(1) ............................................................. 9

8 C.F.R. § 1208.33(a)(2)(i) ............................................................. 10

8 C.F.R. § 1208.33(a)(2)(ii) ............................................................. 10

8 C.F.R. § 1208.33(a)(3) ............................................................. 10

8 C.F.R. § 1240.11(c) ............................................................. 6

**Other Authorities:**

Asylum Procedures,
   65 Fed. Reg. 76,121 (Dec. 6, 2000) .................................................. 5

CBP, *CBP One Appointments Increased to 1,450 Per Day* (June 30, 2023),
   https://perma.cc/F3L4-48FB ...................................................... 11

Circumvention of Lawful Pathways,
   88 Fed. Reg. 31,314 (May 16, 2023) ....................................... passim

Circumvention of Lawful Pathways,
   88 Fed. Reg. 11,704 (Feb. 23, 2023).......................................... 44

*Consistent*, Webster's Third New International Dictionary of the
   English Language (1993)................................................................28

*Enjoin*, Black's Law Dictionary (6th ed. 1990) ................................... 47

*Restrain*, Black's Law Dictionary (6th ed. 1990) ............................... 47

**INTRODUCTION**

The Rule challenged in this case was promulgated by the Department of Homeland Security and the Department of Justice in anticipation of a significant increase in migrants seeking to enter the United States at the southwest border following the end of the Title 42 public health order—under which migrants without proper travel documents generally were not processed into the United States but instead expelled. *See* Circumvention of Lawful Pathways, 88 Fed. Reg. 31,314 (May 16, 2023). The Rule conditions eligibility for a discretionary grant of asylum on migrants' using certain orderly migration pathways, absent exceptionally compelling circumstances. The Departments reasonably concluded that temporarily imposing such a condition in the circumstances at issue, and as part of cooperative efforts with foreign governments to address increases in migration across the region, would help encourage the use of orderly migration pathways and discourage irregular migration, which diverts the government's limited resources and threatens to overwhelm the immigration system.

To accomplish this dual goal, the government implemented a two-pronged approach. First, the United States significantly expanded the safe and orderly options available for migrants to seek entry to the country and, if desired, to seek asylum after arrival. Second, through the Rule, the Departments determined that certain noncitizens who do not use those expanded lawful pathways (or seek protection in third countries) shall be presumptively ineligible for a discretionary grant of asylum.

Noncitizens subject to the Rule may overcome that presumptive ineligibility by demonstrating exceptionally compelling circumstances. Moreover, the Rule ensures that even migrants who are unable to obtain discretionary asylum relief under its terms nonetheless receive appropriate screening for statutory withholding of removal or protection under the Convention Against Torture, such that they will not be removed to a country where there is a reasonable possibility of persecution on protected grounds or torture. Over the last four months, the Rule's approach has been extremely effective at encouraging migrants to use orderly migration pathways and alleviating the negative consequences of irregular migration.

The district court vacated the Rule, concluding that it is not authorized by the Immigration and Nationality Act (INA) and does not comply with the Administrative Procedure Act (APA). Those conclusions primarily rest on the premise that prior decisions by this Court holding unlawful two previous asylum-related rules control the outcome here. But that is incorrect. At the threshold, more recent Supreme Court precedent makes clear that plaintiffs lack standing to pursue their claims, and those claims are precluded by multiple provisions of the INA. On the merits, the Rule is materially different from the rules at issue in the previous cases, both because it does not categorically restrict eligibility for asylum and because it is directed at solving a different problem. The Rule represents a lawful exercise of the Executive's express authority under the INA to establish limitations on the discretionary grant of asylum. And in any event, the district court's universal vacatur—entered without an

2

appropriate weighing of the equities—is forbidden by the INA and unjustified by the equitable principles governing APA relief.

In light of the significant and immediate harms that would occur if the Rule were vacated, the United States immediately appealed the district court's order and sought a stay pending appeal. This Court granted a stay pending appeal and should now reverse.

## STATEMENT OF JURISDICTION

In this suit brought under the APA, plaintiffs invoked the district court's jurisdiction under 28 U.S.C. § 1331. ER-70. As explained below, the district court lacked jurisdiction to hear this case and to enter the relief that plaintiffs seek. The district court entered final judgment on July 25, 2023. *See* ER-3. The government filed a timely notice of appeal on the same day. *See* ER-128. This Court has appellate jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

The issues presented are:

1. Whether plaintiffs have Article III standing.

2. Whether the INA permits plaintiffs to pursue their claims.

3. Whether the Rule comports with the INA and was promulgated in accordance with the APA's requirements.

4. Whether the district court erred in universally vacating the Rule.

## PERTINENT STATUTES

Pertinent statutes are reproduced in the addendum to this brief.

## STATEMENT OF THE CASE

### A.    Statutory and Regulatory Background

1. Asylum is a form of discretionary immigration relief that (among other things) prevents the removal of a noncitizen and creates a path to lawful permanent residence and U.S. citizenship. *See* 8 U.S.C. § 1158. To obtain asylum, noncitizens generally must satisfy three statutory requirements. First, noncitizens must show that they qualify as "refugee[s]"—that is, that they are unable or unwilling to return to their home country "because of persecution or a well-founded fear of persecution on account of" a protected ground. *Id.* §§ 1101(a)(42), 1158(b)(1)(A). Second, they must show that they are not subject to an exception or mandatory bar that renders them ineligible for asylum. *See id.* § 1158(a)(2), (b)(2). Third, they must demonstrate that they merit a favorable exercise of the discretion to grant asylum. *See id.* § 1158(b)(1)(A).

In all cases, asylum is a matter of executive "discretion," not of "entitlement." *INS v. Cardoza-Fonseca*, 480 U.S. 421, 428 n.6 (1987). The INA specifies certain grounds under which noncitizens are statutorily ineligible to apply for or be granted asylum, 8 U.S.C. § 1158(a)-(b), and specifies certain procedures for considering applications, *id.* § 1158(d)(5)(A). Central to this case, Congress also provided that the Attorney General and Secretary of Homeland Security "may by regulation establish

4

additional limitations and conditions, consistent with [§ 1158], under which an alien shall be ineligible for asylum." *Id.* § 1158(b)(2)(C). Attorneys General and Secretaries have invoked that discretionary authority for decades to establish bars beyond those required by the statute. *See, e.g.*, Asylum Procedures, 65 Fed. Reg. 76,121, 76,126 (Dec. 6, 2000) (denying asylum to applicants who can safely relocate within their home countries).

Two forms of mandatory immigration protection—statutory withholding of removal, 8 U.S.C. § 1231(b)(3), and protection under the regulations implementing U.S. obligations under the Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment (CAT), 8 C.F.R. §§ 208.16-.18, 1208.16-.18—ensure that a noncitizen will not be removed to a country where he is likely to be persecuted or tortured. *See Moncrieffe v. Holder*, 569 U.S. 184, 187 n.1 (2013). These forms of protection are distinct from asylum in that they are mandatory, rather than discretionary. The Rule does not affect the availability of these forms of protection, neither of which is at issue in this case.

2. Generally speaking, a request for asylum may arise in two separate postures. First, a noncitizen present in the United States and not in removal proceedings may

affirmatively apply for asylum. *See Dhakal v. Sessions*, 895 F.3d 532, 536 (7th Cir. 2018); *see also* 8 C.F.R. § 208.2(a).[1]

Second, a noncitizen may request asylum in response to immigration enforcement proceedings. A noncitizen in removal proceedings under 8 U.S.C. § 1229a may apply for asylum as a defense to removal in those proceedings. 8 C.F.R. §§ 208.2(b), 1208.2(b), 1240.11(c). In addition, a noncitizen in expedited removal proceedings under 8 U.S.C. § 1225(b)(1) may seek protection from removal. In that circumstance, the noncitizen's claim is screened by an asylum officer who conducts an interview to determine if there is a "significant possibility" that the noncitizen "could establish eligibility for asylum." 8 U.S.C. § 1225(b)(1)(B)(v). Noncitizens who receive positive screening determinations are placed in removal proceedings under 8 U.S.C. § 1229a, where they may apply for asylum and other protection, or are given the opportunity to apply for asylum before an asylum officer. 8 C.F.R. § 208.30(f). Noncitizens who receive negative determinations (and who do not pass the screening for statutory withholding of removal or CAT protection) will be ordered removed if they do not request review by an immigration judge or if they request review and the immigration judge affirms the negative determination. *See* 8 U.S.C. § 1225(b)(1).

---

[1] In the stay papers, the government stated that the "vast majority" of asylum claims are raised defensively and adjudicated in removal proceedings. Stay Mot. 14. That statement did not account for affirmative applications that are not referred to an immigration judge. We apologize for this imprecision.

**B.** **The Lawful Pathways Rule**

1. During the COVID-19 pandemic, the government implemented a series of public-health orders, known as Title 42 orders, pursuant to 42 U.S.C. § 265. Under those orders, covered noncitizens who arrived at the southwest border were generally summarily expelled rather than being processed under the INA and were thus unable to seek asylum under the relevant INA provisions. When the COVID-19 public-health emergency expired on May 11, 2023, the final Title 42 order ended. *See generally* 88 Fed. Reg. at 31,314-16.

In fiscal year 2022, border encounters were "at historically high levels" even while the Title 42 orders were in effect. 88 Fed. Reg. at 31,331. The government expected that the end of the Title 42 orders would cause the number of noncitizens seeking to enter the United States irregularly at the southwest border to dramatically increase—perhaps to record highs. *See id.* That is because "[a]bsent policy changes, most non-Mexicans processed for expedited removal under Title 8 would likely establish credible fear and remain in the United States for the foreseeable future despite the fact that many of them will not ultimately be granted asylum." *Id.* at 31,363. And the concern was not just speculative: after a court decision that (had it not been stayed) would have resulted in the lifting of the Title 42 order, "migrants gathered in various parts of Mexico, including along the [southwest border], waiting to cross the border once the Title 42 public health Order was lifted." *Id.* at 31,315.

In addition to facing an expected surge in irregular migration when the Title 42 order ended, the government would be required to process all noncitizens encountered at the border under Title 8 authorities, which use substantially more resource-intensive procedures than are required for Title 42 expulsions. *See* 88 Fed. Reg. at 31,315. Under Title 8 procedures, as discussed above, noncitizens who are processed for expedited removal and who demonstrate a "significant possibility" that they "could establish eligibility for asylum," 8 U.S.C. § 1225(b)(1)(B)(v), are entitled to remain in the United States pending resolution of their claims—a process that often takes years. 88 Fed. Reg. at 31,326, 31,337.

The government predicted that the combination of those circumstances—a dramatic increase in migration and the need to use Title 8's more resource-intensive procedures—would overwhelm the government's ability to process noncitizens in a safe, expeditious, and orderly way. 88 Fed. Reg. at 31,331. Illustrating the potential for changes in migration patterns to have deleterious effects on the operation of the system, in the days before the end of the final Title 42 order, the Department of Homeland Security (DHS) "saw a historic surge in migration" that "culminated with the highest recorded encounter levels" in history and "placed significant strain on DHS's operational capacity at the border." ER-44.

2. Faced with that looming threat to the immigration system and the public interest, the Departments adopted measures that provide incentives for migrants to pursue specified orderly migration pathways rather than irregular migration, which

diverts limited government resources from processing those who enter in an orderly manner and from other critical border security initiatives.

The Departments issued a notice of proposed rulemaking and, following a 33-day comment period in which they received 51,952 comments, promulgated the Rule, which invokes the Departments' statutory authority to set conditions on the discretionary relief of asylum. *See* 8 U.S.C. § 1158(b)(2)(C); *see also* 88 Fed. Reg. at 31,314-452. Among other goals, the Rule seeks to "protect against an unmanageable flow of migrants arriving" at the southwest border and to "further ongoing efforts to share the responsibility of providing asylum and other forms of protection with the United States' regional partners." 88 Fed. Reg. at 31,318. To accomplish those goals, the Rule generally limits asylum eligibility for noncitizens who fail to pursue lawful, safe, and orderly migration pathways. That limitation is, however, subject to various exceptions, and its application may be rebutted in exceptionally compelling circumstances.

Specifically, the Rule establishes a "rebuttable presumption of ineligibility for asylum" that applies to noncitizens who "without documents sufficient for lawful admission" enter the United States "at the southwest land border or adjacent coastal borders" in the two-year period after the end of the Title 42 order and who traveled through a country other than their country of citizenship or nationality. *See* 8 C.F.R. §§ 208.33(a)(1), 1208.33(a)(1). Even for noncitizens who fall within the Rule, that presumption both is subject to exceptions and may be rebutted.

9

First, certain categories of noncitizens are excepted from the presumption of ineligibility. The presumption does not apply to noncitizens who are, at the time of entry, unaccompanied children. *See* 8 C.F.R. §§ 208.33(a)(2)(i), 1208.33(a)(2)(i). In addition, the presumption does not apply to noncitizens—and family members traveling with them—who availed themselves of specified orderly migration pathways. These specified pathways include: (1) using certain "DHS-approved parole process[es]"; (2) arriving at a port of entry pursuant to a prescheduled appointment; (3) arriving at a port of entry without a scheduled appointment if the noncitizen is unable to use DHS's scheduling system (currently administered through the CBP One mobile app) "due to language barrier, illiteracy, significant technical failure, or other ongoing and serious obstacle"; and (4) having had finally denied a request for asylum or other protection in another country through which they traveled. *See* 8 C.F.R. §§ 208.33(a)(2)(ii), 1208.33(a)(2)(ii).

Second, noncitizens subject to the presumption may rebut its applicability in their individual case by demonstrating that "exceptionally compelling circumstances" exist. *See* 8 C.F.R. §§ 208.33(a)(3), 1208.33(a)(3). Such circumstances necessarily exist where a noncitizen demonstrates that, at the time of entry, they—or a family member with whom they were traveling—either were a "victim of a severe form of trafficking in persons" or faced "an acute medical emergency" or an "imminent and extreme threat to life or safety, such as an imminent threat of rape, kidnapping, torture, or murder." *See id.* (quotation omitted).

10

At the same time, as part of its balanced approach to migration, the government has "taken significant steps to expand safe and orderly options for migrants to lawfully enter the United States." 88 Fed. Reg. at 31,317. Cumulatively, these expanded pathways now permit over 800,000 migrants a year to enter the United States in an orderly fashion and to seek asylum without having to overcome the Rule's presumptive limitation. The government has, for example, expanded "refugee processing in the Western Hemisphere" and increased "opportunities to lawfully enter the United States for the purpose of seasonal employment." *Id.* Since the Rule was issued, the government has also increased—to more than 40,000 per month—the number of appointments available through the CBP One app, which allows noncitizens to schedule their arrival at ports of entry for orderly processing. *See* CBP, *CBP One Appointments Increased to 1,450 Per Day* (June 30, 2023), https://perma.cc/F3L4-48FB.

In addition, the government has adopted parole processes that allow certain migrants from Cuba, Haiti, Nicaragua, and Venezuela to obtain authorization to travel to the United States to seek parole "in a lawful, safe, and orderly manner" without making the otherwise dangerous journey to the southwest border. 88 Fed. Reg. at 31,317. Together, these parole processes permit up to 30,000 migrants to lawfully enter the United States every month. *See* ER-123. Although Mexico had previously "not been willing to accept the return" of nationals from those countries—who the United States often cannot repatriate to their home countries—the Mexican

11

government made a "decision to allow such returns . . . predicated, in primary part, on the implementation of these processes." 88 Fed. Reg. at 31,317. That combination of a lawful pathway for seeking protection with prompt "consequences"—including returns to Mexico—"for those who cross the border without authorization to do so" led to "sharp reductions" in irregular migration from those countries. *Id.*; *see also id.* (describing "a 92% decline"). The Rule applies a similar carrot-and-stick approach and thus responds "to the requests of foreign partners" that have "urged that the United States to continue and build on this kind of approach." *Id.*

## C. Prior Proceedings

Plaintiffs are eight "immigration legal services organizations that represent noncitizens seeking asylum." ER-11. They challenged the Rule under the APA. The district court granted summary judgment in their favor and vacated the Rule.

At the outset, the district court held that plaintiffs have Article III standing to challenge the Rule, even though they are not asylum seekers and the Rule does not regulate them. The court accepted plaintiffs' assertions that the Rule "frustrates their organizational goals" and will cause them to "devote additional resources" to their clients' asylum applications. ER-11-13. The court further concluded that plaintiffs "fall within the zone of interests protected by the INA," ER-14-15, and that the INA does not preclude review of plaintiffs' claims, ER-15-16.

On the merits, the district court held that the Rule is inconsistent with the INA, largely relying on this Court's decisions in two prior appeals that challenged

categorical bars on asylum for noncitizens who entered the United States at a place other than a port of entry and for noncitizens who had transited through another country without seeking asylum there. ER-18-22; *see East Bay Sanctuary Covenant v. Biden* (*East Bay I*), 993 F.3d 640 (9th Cir. 2021); *East Bay Sanctuary Covenant v. Garland* (*East Bay II*), 994 F.3d 962 (9th Cir. 2021). The court also deemed the Rule arbitrary and capricious on the ground that "Congress did not intend the agencies to consider" the availability of lawful pathways like parole and that the pathways referenced in the Rule "will be unavailable to many noncitizens." ER-23-33. Finally, the court concluded that the 33-day comment period was insufficient and that the government should have disclosed more data and information about other policy changes implemented after the comment period. ER-33-36.

The court rejected the government's reliance on the INA's admonition that "no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation" of certain INA provisions, including the provisions relating to removal. 8 U.S.C. § 1252(f)(1); *see* ER-16-18. The court suggested that the cited provision applies only to injunctions and not to vacatur. ER-17. And the court concluded that the requested relief would have only a "collateral effect on the conditions for asylum eligibility as applied during removal proceedings." ER-17.

Based on its belief that universal vacatur is the "default" or "presumed remedy" for unlawful agency action, the district court vacated the Rule, as applied in all circumstances. ER-36-37. The court acknowledged the "significant strain on DHS

13

components, border communities, and interior cities" that its relief would cause. ER-37 (quotation omitted). But the court concluded that because the errors it purported to have identified in the agencies' reasoning would preclude the entry of the same rule on remand, vacatur was appropriate to "restore a regulatory regime that was in place for decades before." ER-37-38. The district court did, however, grant a 14-day administrative stay. ER-38.

The United States immediately appealed and sought a stay pending appeal in light of the tremendous disruption that vacatur of the Rule would cause. On August 3, this Court granted a stay pending appeal, with one member of the panel dissenting. *See* 8/3/23 Order.

## SUMMARY OF ARGUMENT

**I.A.** Plaintiffs lack Article III standing to challenge the Rule because they have not identified any cognizable injury. The Rule regulates asylum eligibility for certain noncitizens, and the plaintiff organizations lack any "judicially cognizable interest" in how the Executive enforces the immigration laws against third parties. *Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973).

The Supreme Court recently held that these principles precluded plaintiff States from establishing standing to challenge the Executive's immigration enforcement priorities, even though the States contended that those priorities caused the States to spend additional money. *United States v. Texas*, 143 S. Ct. 1964, 1970 (2023). Plaintiffs' claims to standing here fail for the same reasons.

14

**B.** Plaintiffs' claims are also statutorily unreviewable. Plaintiffs do not fall within the zone of interests of the asylum statute, which is concerned with protecting the interests of asylum seekers, not third-party organizations like plaintiffs. Moreover, the INA reflects a comprehensive scheme that provides for administrative and judicial review of immigration determinations only by specified noncitizens through certain limited channels. By constructing that scheme, Congress has impliedly foreclosed others—like plaintiffs—from obtaining judicial review under the APA.

**II.** On the merits, the Rule comports with the INA and was promulgated in accordance with the APA's substantive and procedural requirements.

**A.** The INA's text, structure, and history all confirm that the Rule is lawful. Asylum is a discretionary benefit to which no noncitizen is entitled, and Congress has expressly provided the Executive with authority to establish limitations on asylum eligibility so long as those limitations are "consistent with" the asylum statute. 8 U.S.C. § 1158(b)(2)(C). The Rule is a valid exercise of that authority because it does not conflict with any provision of the statute. That conclusion is confirmed by the relevant context and history, which reflect the extensive discretion that Congress has conferred on the Executive to make decisions in this realm that implicate sensitive foreign-policy interests.

In nevertheless concluding that the Rule conflicts with the statute, the district court primarily concluded that two previous decisions of this Court addressing two other rules dictated the outcome here. But the rules at issue in those cases created new

categorical restrictions on asylum eligibility that this Court concluded were inconsistent with the asylum statute. One rule effectively categorically precluded asylum for noncitizens who entered at a location other than a port of entry, causing this Court to conclude that it nullified, as a practical matter, Congress's express statement that noncitizens who enter between ports of entry can apply for asylum. The other rule categorically precluded asylum for certain noncitizens who transited through another country without seeking asylum there, causing this Court to conclude that it effectively superseded, contrary to congressional intent, two statutory provisions that deny asylum to defined classes of applicants who do not need this country's protection. The Rule at issue here, by contrast, permissibly seeks to protect the effective functioning of the asylum and immigration systems by exercising the Executive Branch's discretion in a way that steers potential entrants to the United States toward lawful, safe, and orderly pathways.

**B.** The Rule is also reasonable and reasonably explained. The Departments explained that the Rule encourages migrants to use safe and lawful migration pathways in order to alleviate an expected increase in border encounters that threatened to overwhelm the immigration system. Although the Departments understood that the Rule would result in the denial of some otherwise-meritorious asylum claims, they determined that the cost was justified by the countervailing systemic benefits of the Rule. The district court erred in second-guessing the Departments' weighing of the relevant costs and benefits.

16

**C.** The detailed notice of proposed rulemaking and 33-day comment period that generated more than 50,000 comments sufficed to put interested parties on notice and afford an opportunity to provide input. The district court incorrectly suggested that the notice was inadequate because other policy initiatives have since been announced and certain data was not disclosed to the public. Agencies are not required to re-open comment periods every time they make separate policy decisions with some arguable bearing on a proposed rule, nor are they required to disclose all information used during rulemaking. Regardless, plaintiffs have failed to demonstrate any prejudice from these asserted errors.

**III.** Apart from its errors on the merits, the district court independently erred in two respects in determining that vacatur of the Rule was appropriate.

**A.** The INA precludes courts, other than the Supreme Court, from "enjoin[ing] or restrain[ing] the operation" of certain INA provisions—including those governing removal and expedited removal—other than with respect to an individual noncitizen. 8 U.S.C. § 1252(f)(1). The district court's vacatur has the effect of ordering federal officials to refrain from applying the Rule's standards when those officials adjudicate asylum claims while carrying out the statutory provisions governing removal and expedited removal. That order impermissibly restrains the operation of the covered INA provisions.

**B.** In all events, the district court's universal vacatur of the Rule is unwarranted. This Court's precedents make clear that universal vacatur is discretionary and

equitable, not automatic or compelled, and constitutional and equitable principles required a more limited remedy in this case. Particularly given the substantial equitable interest of the government and the public in enforcing the Rule, the district court should have declined to issue any coercive remedy—or, at the absolute most, should have entered relief tailored to redressing plaintiffs' specific asserted injuries.

## STANDARD OF REVIEW

The district court's grant of summary judgment is reviewed de novo. *Allied Concrete & Supply Co. v. Baker*, 904 F.3d 1053, 1060 (9th Cir. 2018).

## ARGUMENT

### I. Plaintiffs' Claims Fail at the Threshold

### A. Plaintiffs Lack Article III Standing

The district court's standing analysis largely relied on this Court's determination in two prior appeals that these plaintiffs had standing to challenge prior rules regarding eligibility for asylum. But those decisions were issued before the Supreme Court's recent decision in *United States v. Texas*, 143 S. Ct. 1964 (2023), which made clear that plaintiffs have no judicially cognizable injury in this case. The district court's decision should be vacated for lack of jurisdiction.[2]

---

[2] The federal government also disagrees with this Court's analysis in the prior decisions and reserves the right to raise additional arguments regarding plaintiffs' standing in the event that further review is sought in this case.

Plaintiffs have failed to identify a "legally and judicially cognizable" injury traceable to the Rule that would be redressed by a favorable decision in this case. *Texas*, 143 S. Ct. at 1970 (quotation omitted). The Rule's direct effect is to limit asylum eligibility for certain noncitizens in the exercise of the Executive's discretion. And "a private citizen"—including an organization—"lacks a judicially cognizable interest in the prosecution or nonprosecution of another." *Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973). An individual who does not face prosecution "lacks standing to contest the policies of the prosecuting authority." *Id.* An individual similarly has "no judicially cognizable interest in procuring" or preventing "enforcement of the immigration laws" against someone else. *Sure-Tan, Inc. v. NLRB*, 467 U.S. 883, 897 (1984).

The Supreme Court recently applied these principles to hold that two States lacked standing to challenge the Executive's immigration enforcement policies. *See Texas*, 143 S. Ct. at 1970. The Court had not previously opined on whether its prior statements regarding the lack of a judicially cognizable interest in enforcement against others of the laws in general and the immigration laws in particular applied to preclude standing in cases of this kind. In answering that question in the affirmative, the Court rejected the States' argument that they had standing because, for example, the States might spend money on incarceration and social services for "noncitizens who should be (but are not being) arrested by the Federal Government." *Id.* at 1969. The Supreme Court held that the States' asserted injury, which flowed from the

Executive's exercise of immigration enforcement discretion against third parties, was not judicially cognizable under the principles articulated above. *See id.* at 1970-71.

Those principles decide this case. Like the States in *Texas*, plaintiffs here seek to challenge a discretionary immigration enforcement policy on the basis that they will make additional expenditures—here, to "assist clients" and prepare "applications," to "gather relevant evidence" and prepare "arguments," and to file "appeals" and "petitions for review." ER-11-12. But like the States in *Texas*, plaintiffs cannot leverage the incidental effects of enforcement policies directed at third parties to create Article III standing for themselves. Any changes plaintiffs may make in their own affairs in light of the Executive's exercise of enforcement discretion with respect to others are not judicially cognizable injuries.

The Supreme Court detailed why "federal courts have not traditionally entertained lawsuits of this kind." *Texas*, 143 S. Ct. at 1971. When the Executive makes a discretionary enforcement decision regarding a third party, it "does not exercise coercive power" over "the plaintiff." *Id.* Additionally, lawsuits challenging enforcement policies "run up against the Executive's Article II authority to enforce federal law"—and such suits in the immigration context "implicate[] not only normal domestic law enforcement" discretion "but also foreign-policy objectives." *Id.* at 1971-72 (quotation omitted). And the Court explained that the contrary-to-law and arbitrary-and-capricious challenges in *Texas* should be dismissed because courts lack "meaningful standards for assessing" discretionary enforcement policies that reflect

20

the Executive's weighing of factors like "resource constraints" and "public-safety and public-welfare needs." *Id.* at 1972.

Each of those rationales highlights plaintiffs' inability to demonstrate a cognizable injury here. Plaintiffs do not challenge any exercise of coercive government power directed at them, but instead complain about the incidental effects of the government's choices with respect to third parties. Plaintiffs directly challenge the Executive's exercise of its Article II and statutory enforcement authority to establish conditions on asylum, and threaten to upset the substantial foreign-policy objectives undergirding the Rule. And the Rule is itself the product of the complicated balancing of many different factors—including factors related to the government's limited enforcement resources, its assessment of public-safety and public-welfare implications of the situation at the southwest border, and its efforts to address hemisphere-wide migration patterns and intergovernmental initiatives—that courts may not meaningfully assess.

The district court stated that the principles applied in *Texas* do not apply here because the Rule implicates not just traditional enforcement discretion regarding "whether to arrest or prosecute" but also "the Executive Branch's provision of legal benefits" to third parties. ER-13-14 (quotation omitted). But that attempted distinction carries no weight. Plaintiffs urge that the Executive Branch is impermissibly exercising its discretionary authority to deny asylum, and thus to subject noncitizens to removal; their entire interest therefore hinges on the circumstances in

21

which the federal government does, or does not, allow noncitizens to remain in the United States as opposed to enforcing the immigration laws by effectuating their removal.

**B.     Multiple Features of the INA Render Plaintiffs' Claims Unreviewable**

For similar reasons, multiple provisions of the INA taken together establish that plaintiffs' claims do not fall within the zone of interests of the asylum statute and that judicial review is precluded in this case.

1. Even if plaintiffs' asserted resource-diversion claim of injury satisfied Article III's requirements, their claims would nevertheless fail because the effect on their own expenditures does not fall within the zone of interests of 8 U.S.C. § 1158, the statute that plaintiffs seek to enforce. A plaintiff must be "adversely affected or aggrieved by agency action within the meaning of a relevant statute" to sue under the APA. 5 U.S.C. § 702. To satisfy that requirement, "the plaintiff must establish that the injury" it complains of "falls within the zone of interests sought to be protected by the statutory provision" at issue. *Air Courier Conference of Am. v. American Postal Workers Union*, 498 U.S. 517, 523 (1991) (quotation omitted). Where, as here, the plaintiff is not the object of a challenged regulatory action, the plaintiff has no right of review if its "interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the

suit." *Clarke v. Securities Indus. Ass'n*, 479 U.S. 388, 399 (1987); *cf. Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 127 (2014).

Nothing in the text, structure, or purpose of the INA generally, or § 1158 specifically, suggests that Congress intended to permit organizations like plaintiffs to contest asylum-related policies based on attenuated effects on their own spending decisions. To the contrary, consistent with the general rule that third parties like plaintiffs have no cognizable legal interest in the enforcement of immigration laws against others, the INA throughout reflects the principle that its provisions are addressed only to the noncitizens regulated by the INA. *See infra* pp. 25-27. And § 1158 focuses on the interests of asylum seekers without evincing any desire to protect the interests of organizations like plaintiffs that provide legal help to asylum seekers.

As Justice O'Connor explained in granting the government's stay application in an immigration case involving similar plaintiffs, organizations that "provide legal help to immigrants" could not satisfy the zone-of-interests test. *INS v. Legalization Assistance Project of L.A. Cty. Fed'n of Labor*, 510 U.S. 1301, 1302 (1993) (O'Connor, J., in chambers). Federal immigration law, Justice O'Connor explained, was "clearly meant to protect the interests of undocumented aliens, not the interests of organizations." *Id.* at 1305. The fact that an immigration regulation "may affect the way an organization allocates its resources" for representing noncitizens accordingly does not bring the organization "within the zone of interests" that the asylum statute protects. *Id.*

The disconnect between the Rule and plaintiffs underscores the problem. Plaintiffs are not regulated by the Rule. In their capacity as lawyers for asylum-seeking clients, they have no legally or judicially cognizable interest in avoiding whatever reallocation of resources they may choose to make in light of the Rule—a merely "indirect effect[]" of the Rule that makes their assertion of injury "more attenuated." *Texas*, 143 S. Ct. at 1972 n.3. Their reallocation decisions do not give rise to an injury with which the asylum statute is concerned. "If the law were otherwise, an enterprising plaintiff would be able to secure" the right to challenge a governmental action without any otherwise cognizable injury "simply by making an expenditure" in response to the action. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013).

Plaintiffs' theory would also, as a practical matter, nullify the principle that a lawyer has no independent litigable interest in the legal rules applicable to the lawyer's clients. *See, e.g.*, *Kowalski v. Tesmer*, 543 U.S. 125, 130-34 (2004). Their theory would, for example, allow "medical malpractice attorney[s]" to claim cognizable injury from "tort reform statutes," *id.* at 134 n.5, on the ground that the statutes require them to gather relevant evidence. It would also allow "attorney[s] specializing in Social Security cases [to] challenge implementation of a new regulation," *id.*, on the ground that they will respond by expending resources developing arguments. Nothing in precedent or logic countenances such limitless theories of standing.

The district court did not meaningfully grapple with any of these features of the asylum statute or with the implications of plaintiffs' arguments. Instead, the court

relied on this Court's conclusions in previous *East Bay* cases that similarly situated organizations fell within the INA's zone of interests. *See* ER-14-15 (citing *East Bay I*, 993 F.3d at 668; *East Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 768-69 (9th Cir. 2018)). But those cases rested on a purported "interest in aiding immigrants seeking asylum," *East Bay*, 932 F.3d at 768; *see also East Bay I*, 993 F.3d at 664 n.6, and the Supreme Court has since made clear in *Texas*—relying on principles that inform not only the scope of Article III but also the scope of the APA's cause of action—that third parties like plaintiffs have no protected or cognizable interest in the way that the Executive enforces the asylum statute against others.

2. Similarly, plaintiffs' claims are precluded by the INA. A plaintiff may not seek review under the APA if "statutes preclude judicial review." 5 U.S.C. § 701(a)(1). The Supreme Court has accordingly recognized that, by providing a detailed scheme for administrative and judicial review, Congress can displace the APA's default cause of action. *See, e.g.*, *Block v. Community Nutrition Inst.*, 467 U.S. 340, 345 (1984). Preclusion of review is determined "not only from [the statute's] express language, but also from the structure of the statutory scheme." *Id.*

In particular, Congress may impliedly preclude some parties from seeking judicial review of administrative action by constructing a detailed scheme that provides for review only by other parties. For example, in *Block*, Congress provided for dairy "[h]andlers and producers—but not consumers"—to "participate in the adoption and retention of" certain agency orders related to milk prices and for

25

handlers, at least, to pursue administrative remedies and obtain judicial review of agency orders with which they disagreed. 467 U.S. at 346. In holding that the statutory structure precluded consumers' attempt to challenge those orders through the APA, the Supreme Court explained that there was no "express provision for participation by consumers in any" administrative or judicial proceeding related to the orders and that, "[i]n a complex scheme of this type, the omission of such a provision is sufficient reason to believe that Congress intended to foreclose consumer participation in the regulatory process." *Id.* at 347.

The same is true here. The INA provides for administrative and judicial review at the behest of noncitizens, *see* 8 U.S.C. § 1252(a)(5), (b)(9), (e)(3), but its comprehensive scheme provides no role for third parties like the plaintiff organizations to play in that process in their own right (rather than as counsel for their clients). The omission of any such right to review is itself sufficient to conclude that Congress intended to preclude plaintiffs from challenging the Rule through the APA. The conclusion conforms to the principle, discussed above, that a person does not have Article III standing to challenge the government's enforcement decisions affecting third parties.

Even with respect to noncitizens, the INA imposes careful limitations on the mechanisms for that review. For example, a noncitizen may obtain judicial review only of questions arising out of removal proceedings through a challenge to a final removal order. *See* 8 U.S.C. § 1252(b)(9); *see also Guerrero-Lasprilla v. Barr*, 140 S. Ct.

1062, 1070 (2020) (explaining that "Congress intended th[is] zipper clause to consolidate judicial review of immigration proceedings into one action" (quotation omitted)). And challenges to regulations implementing the expedited removal process may be brought only in certain actions in the U.S. District Court for the District of Columbia subject to defined restrictions on the court's review. *See* 8 U.S.C. § 1252(a)(5), (e)(3). Permitting plaintiff organizations to challenge the Rule through an APA suit would "severely disrupt" the INA's "complex and delicate administrative scheme," including by providing plaintiffs' noncitizen clients "a convenient device for evading the statutory" restrictions on review. *Block*, 467 U.S. at 348. It is thus "clear that Congress intended that judicial review" of regulations implementing the INA "ordinarily be confined to suits brought by" noncitizens "in accordance with" the INA's scheme. *Id.*

This Court's prior analysis of these provisions focused on whether they, by their terms, "divest[ed] th[e] court of jurisdiction to entertain th[e] appeal." *East Bay I*, 993 F.3d at 666. We recognize that the panel is bound by that decision, which addressed a preclusion argument that bears some similarity to the structural argument advanced here. But the panel in the prior case did not opine on the distinct question whether the INA as a whole reflects Congress's determination to preclude review of APA claims like those brought by plaintiffs.

## II.    The Rule Is Lawful

### A.    The Rule Comports with the INA

1. The INA's text, structure, and history make clear that the Rule reflects a lawful exercise of the Executive's discretion to promulgate conditions on asylum eligibility. Asylum is always a matter of "discretion"—never of "entitlement." *INS v. Cardoza-Fonseca*, 480 U.S. 421, 428 n.6 (1987). Thus, Congress has specified that the Executive "*may* grant asylum" to a noncitizen who satisfies governing requirements but is never obligated to do so. 8 U.S.C. § 1158(b)(1)(A) (emphasis added). And the INA expressly provides that the responsible agency heads may by rule establish "limitations and conditions" on asylum eligibility, beyond those already set out in the statute, that are "consistent with" the asylum statute. *Id.* § 1158(b)(2)(C).

The Rule fits comfortably within that express statutory authorization, which enables the Executive to promulgate additional limitations so long as those limitations are "consistent"—that is, may "coexist[]" and do not reflect any "noteworthy opposing, conflicting, inharmonious, or contradictory qualities," Webster's Third New International Dictionary of the English Language 484 (1993)—with the statute. *See, e.g.*, *Environmental Def. Fund, Inc. v. EPA*, 82 F.3d 451, 457 (D.C. Cir. 1996) (per curiam) (holding that "consistent with" signals "congruity or compatibility"); *see also Pacific Power & Light Co. v. Federal Power Comm'n*, 111 F.2d 1014, 1016 (9th Cir. 1940) (similar). The Rule temporarily establishes a presumptive condition on asylum eligibility that is aimed at safeguarding the effective functioning of the immigration

system and the equitable allocation of the government's limited resources, as well as encouraging other countries in the region to address pressing migration issues, in the face of an anticipated dramatic increase in border encounters. No provision of § 1158 prohibits consideration of these factors or otherwise clashes with the Rule. Because the Rule and the statute comfortably coexist with no conflict or contradiction, the Rule is "consistent with" § 1158.

The statutory context and history reinforce that the Rule comports with the INA. The Executive's broad authority in this area stems not only from the statutory text, but also from the Executive's enforcement discretion in this specific context. Asylum decisions, like other "discretionary decisions" about whether noncitizens will be returned to other countries, necessarily "bear on this Nation's international relations," *Arizona v. United States*, 567 U.S. 387, 396 (2012)—indeed, the Rule is part of an overarching cooperative effort with foreign governments to manage regional migration. Decisions related to asylum eligibility implicate the "sensitive and weighty interests" of foreign affairs, *Holder v. Humanitarian Law Project*, 561 U.S. 1, 33-34 (2010), that are within the Executive's particular responsibility.

The statutory history further highlights the extensive discretion Congress has conferred on the Executive. When § 1158 was first enacted in 1980, the statute simply allowed for the Attorney General to grant asylum as a matter of discretion and did not include language allowing the Executive to create "additional limitations and conditions." *See* Refugee Act of 1980, Pub. L. No. 96-212, § 201(b), 94 Stat. 102, 103-

05. The Attorney General, implementing his categorical discretion concerning when or if to grant asylum, issued regulations establishing various restrictions on asylum, such as generally mandating discretionary denials for claims based on past persecution alone. *See* 8 C.F.R. § 208.13. In 1996, Congress codified six of the Attorney General's mandatory bars and amended the INA to expressly confirm the Attorney General's authority to add further "conditions or limitations." Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. No. 104-208, div. C, § 604, 110 Stat. 3009 (codified at 8 U.S.C. § 1158(b)(2)). That decision not only to leave undisturbed the Attorney General's construction of his authority, but also to affirmatively endorse the authority to promulgate additional limitations, confirms that the district court erred in its assessment of the Executive Branch's authority. *See Bob Jones Univ. v. United States*, 461 U.S. 574, 599 (1983) (concluding that failure to modify Executive Branch decisions and congressional awareness of an Executive Branch interpretation when enacting related legislation "make out an unusually strong case of legislative acquiescence in and ratification by implication" of those decisions).

Moreover, although not necessary to establish consistency with the statute, multiple provisions in § 1158 affirmatively underscore the permissibility of the Rule's focus on protecting the systemic efficiency of the asylum system. Congress conditioned the grant of asylum on a noncitizen's applying "in accordance with the requirements and procedures established by" the Departments. 8 U.S.C. § 1158(b)(1)(A). Consistent with Congress's recognition that a properly functioning

30

immigration system depends on orderly procedures that noncitizens must follow, the Departments have determined, in light of current exigent circumstances, that noncitizens should generally be required—absent exceptionally compelling circumstances—to pursue the multiple safe and orderly migration pathways to be eligible for asylum.

And Congress itself has already established mandatory bars to asylum that are aimed at promoting systemic efficiency. For example, Congress has generally prohibited applications for asylum more than one year after a noncitizen entered the United States. 8 U.S.C. § 1158(a)(2)(B). And Congress has generally prohibited noncitizens from pursuing successive asylum applications. *See id.* § 1158(a)(2)(C). These provisions make clear that the INA does not prioritize the identification of otherwise-meritorious asylum claims above all else, and that administrative practicality and systemic efficiency are legitimate considerations. Nothing in the statute suggests that Congress intended to foreclose the Departments from similarly taking systemic considerations into account.

Indeed, the Executive Branch has long considered factors similar to those underlying the Rule in determining whether any particular asylum applicant warrants a favorable exercise of discretion. As the Board of Immigration Appeals has explained, "[t]he ultimate consideration" for whether a noncitizen is deserving of discretionary relief, including asylum, is whether granting relief "appears to be in the best interest of the United States," as determined by the Executive Branch officials charged with

31

making asylum determinations. *Matter of D-A-C-*, 27 I. & N. Dec. 575, 578 (B.I.A. 2019). Consistent with that best-interest standard, the Board has long held that a noncitizen's "circumvention of orderly refugee procedures" is a relevant consideration. *Matter of Pula*, 19 I. & N. Dec. 467, 473 (B.I.A. 1987). And the Board has also considered the noncitizen's "manner of entry or attempted entry," "whether [they] passed through any other countries or arrived in the United States directly from [their] country, whether orderly refugee procedures were in fact available to help [them] in any country [they] passed through, and whether [they] made any attempts to seek asylum before coming to the United States." *Id.* at 473-74. Although Congress has amended the asylum statute since *Pula*, Congress has never foreclosed or limited consideration of these systemic factors in exercising discretion.

Consistent with the longstanding reliance on such factors in determining whether to favorably exercise discretion in individual cases, the Rule establishes a presumptive limitation on eligibility for discretionary relief—subject to being overcome in compelling circumstances—for noncitizens who circumvent orderly procedures and thereby undermine the interest of the United States in maintaining a safe and effective immigration system. *Cf. Reno v. Flores*, 507 U.S. 292, 313 (1993) (emphasizing the Executive's ability to promulgate "generic rules" even where the INA requires the exercise of discretion through "some level of individualized determination" (quotation omitted)); *Yang v. INS*, 79 F.3d 932, 936-37 (9th Cir. 1996)

(similar). Nothing about the asylum statute dictates how much weight the Executive may, through regulation, place on those systemic factors.

2. The district court did not identify any specific provision of the INA with which the Rule conflicts. Nor did the court meaningfully grapple with the statutory context and history described above. Instead, the court primarily concluded that this Court's decisions addressing two different asylum-related rules—in *East Bay I* and *East Bay II*—govern the outcome in this case. ER-19-22. But the court erred in likening the Rule to the rules at issue in those cases, which *categorically* denied asylum to most noncitizens who entered the United States between ports of entry (*East Bay I*) or who transited a third country without first seeking asylum there (*East Bay II*).

In *East Bay I*, this Court held that a rule that effectively categorically prohibited noncitizens from being granted asylum if they did not arrive at a port of entry was inconsistent with a provision of the asylum statute permitting noncitizens who arrive in the United States "whether or not at a designated port of arrival" to apply for asylum. *East Bay I*, 993 F.3d at 669-71 (quoting 8 U.S.C. § 1158(a)(1)). Although the Court acknowledged that both the Executive "and this court have long recognized that a refugee's method of entering the country is a discretionary factor in determining whether the migrant should be granted humanitarian relief," the Court concluded that the categorical port-of-entry rule impermissibly placed dispositive weight in nearly all cases on the method of entry. *Id.* at 671.

By contrast, the Rule at issue here does not treat manner of entry as dispositive in determining asylum eligibility. Noncitizens who are denied protection in another country are not subject to the Rule's presumption. *See* 8 C.F.R. § 208.33(a)(2)(ii)(A), (C). And although noncitizens can avoid the presumption by entering at a port of entry with a prescheduled appointment, even those who enter without an appointment will be eligible for asylum if they establish an exception or rebut the Rule's presumption by showing that they or a member of their family faced an acute medical emergency, faced an imminent and extreme threat to life or safety or were the victim of a severe form of trafficking at the time of entry, or that other exceptionally compelling circumstances exist. *See id.* § 208.33(a)(3). Thus, as *East Bay I* recognized is permissible, the Rule treats manner of entry as relevant to—but not, in all cases, dispositive of—asylum eligibility.

In *East Bay II*, this Court held unlawful a rule that generally deemed ineligible for asylum noncitizens who had transited through a third country unless they had applied for, and been denied, asylum in Mexico or another country through which they transited. *See* 994 F.3d at 968. Although the Supreme Court had stayed an order enjoining the transit rule, *Barr v. East Bay Sanctuary Covenant*, 140 S. Ct. 3 (2019), this Court subsequently concluded that the challenge to the rule was likely to succeed. This Court observed that two statutory bars in § 1158 are aimed at denying asylum to noncitizens who do not need this country's protection and that both include what the Court described as "critical" requirements to ensure the third-country option is

"genuinely safe." *See East Bay II*, 994 F.3d at 976-77. This Court held that the transit rule was inconsistent with those two statutory bars because it had the same aim— screening out noncitizens who do not need this country's protection—but failed to include a similar safeguard. *See id.* at 977-78.

The Rule challenged here is fully consistent with the principles reflected in *East Bay II*. This Court's conclusion that the transit rule was required to include a safeguard to ensure that the third-country option was "genuinely safe" flowed from this Court's determination that the rule was intended, like the statutory bars, to "cover[] aliens who do not need the protection of asylum in the United States." *East Bay II*, 994 F.3d at 976. That similarity between the statutory bars and the rule led this Court to conclude that the rule was inconsistent with the statute because it did not include safeguards similar to those that Congress had included in the statute. Here, by contrast, the Rule is not similarly intended to screen out noncitizens who do not require the United States' protection; instead, as explained, it is intended more broadly to encourage regular migration across the Western Hemisphere and to protect the ability of the immigration and asylum systems to function effectively in the face of an expected dramatic increase in border encounters. That is a permissible exercise of the Executive Branch's "discretion to deny asylum." *Id.* at 979.

Underscoring the point, far from imposing a rigid requirement that noncitizens apply for asylum in a third country, the Rule includes multiple provisions addressing circumstances in which noncitizens may receive asylum despite failing to apply first

elsewhere. As explained, noncitizens (including those who do not believe any third country through which they have traveled is genuinely safe) may avoid application of the Rule by presenting at a port of entry pursuant to a prescheduled appointment or by following other approved procedures—such as certain parole processes—to ensure orderly presentation. And a noncitizen who demonstrates exceptionally compelling circumstances, including a threat to life or safety, may forgo third-country options and nevertheless rebut the Rule's presumption.

No noncitizens will be denied asylum merely because they failed to enter the country at a designated port of entry or because they failed to seek asylum in another country; indeed, some noncitizens who do neither of those things can, consistent with the Rule, be granted asylum. This Rule thus does not mirror either of the prior categorical rules, or somehow combine them, but rather takes a more holistic approach, consistent with this Court's previous analyses.

Accordingly, it is not the Rule, but rather the district court's analysis, that cannot be reconciled with this Court's prior cases. In *East Bay I*, as noted, this Court expressly recognized that manner of entry could be relevant to asylum determinations so long as it was not dispositive—that is what the Rule at issue here does. And this Court made clear in *East Bay II* that its decisions are not properly read as construing the asylum statute's bars to "preempt[] the field, such that the government is entirely disabled from promulgating regulations with 'additional limitations and conditions' under which an alien would be ineligible for asylum." 994 F.3d at 978-79. To the

contrary, consistent with the statute's explicit delegation of authority to the Executive to promulgate such limitations, over and above what Congress has prescribed as the minimum, those decisions necessarily leave space for the Executive to in fact promulgate regulations that do more than simply mirror the statute. And here, the Rule—which reflects a nuanced, non-categorical approach to encouraging noncitizens to pursue available orderly and lawful migration pathways in order to safeguard the integrity of the asylum system overall—falls within that express delegation of authority.

### B.  The Rule Is Reasonable and Reasonably Explained

1. The Departments easily satisfied their obligation to consider "the relevant factors" and "relevant data" and to articulate "a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quotation omitted). The Rule was promulgated to address "the reality of unprecedented migratory flows, the systemic costs those flows impose on the immigration system, and the ways in which increasingly sophisticated smuggling networks cruelly exploit the system for financial gain." 88 Fed. Reg. at 31,316. Without the Rule, the expected increase in border encounters threatened to overwhelm the Departments' "ability to effectively process, detain, and remove, as appropriate, the migrants encountered," *id.*, with attendant increases in the number of migrants unlawfully present in the country, strains on government operations and resources, health and safety concerns for migrants at overcrowded

37

processing facilities, and impacts on local communities along the southwest border, *id.* at 31,325-26, 31,387.

To encourage migrants to use safe and orderly migration pathways, the Rule temporarily imposes a rebuttable condition presumption of asylum ineligibility for noncitizens who fail to pursue such pathways. *See* 88 Fed. Reg. at 31,329. By reducing irregular migration and channeling migrants to specified alternatives during a two-year period, the Rule will allow the government to devote more of its limited resources to processing migrants effectively. *See id.* at 31,326. The Rule also excepts migrants who demonstrate exceptionally compelling circumstances, including circumstances linked to the need to forgo using one of the specified pathways. *See id.* at 31,338 (identifying "acute medical emergencies, imminent and extreme threats to life or safety, and victims of severe forms of human trafficking" as sufficient but not exclusive means to rebut the presumption).

At the same time, the Departments did not premise the Rule on a belief that all or most migrants could successfully use the alternative pathways or establish an exception. The Rule describes in detail the functioning of and the limitations on those pathways and on the exceptionally-compelling-circumstances test, *see* 88 Fed. Reg. at 31,315-18, 31,325, 31,337, 31,398-405, 31,410-14, and acknowledges that it "will result in the denial of some asylum claims that otherwise may have been granted," *id.* at 31,332. But the Departments weighed those costs and concluded that they are justified by "the benefits to the overall functioning of the system" that the Rule

occasions. *Id.*; *see East Bay II*, 994 F.3d at 990 (Miller, J., concurring in part and dissenting in part) (explaining that review "would [have] be[en] deferential" had the agencies acknowledged that the costs of "denying meritorious claims" were outweighed by the benefits of "relieving burdens on the asylum system").

It is appropriate for the Executive Branch to consider the "operation of the immigration system," *Judulang v. Holder*, 565 U.S. 42, 55 (2011), particularly in the context of a Rule that limits a discretionary benefit in a manner that affects "this Nation's international relations," *Arizona*, 567 U.S. at 396. Indeed, the overall policies at issue are part of cooperative efforts with foreign governments to manage an increase in regional migration, *see* 88 Fed. Reg. at 31,341-42, thus implicating matters within the Executive's particular responsibility. The Rule readily survives arbitrary-and-capricious review, which asks only whether "the agency has acted within a zone of reasonableness." *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021).

2. The district court's bases for invalidating the Rule under this "deferential" standard, *Prometheus Radio Project*, 141 S. Ct. at 1158, do not withstand scrutiny. The court believed that the Departments were barred from considering the availability of alternative pathways to enter the United States or to seek protection in other countries in exercising their discretion to determine of asylum eligibility because those alternatives operate independently of asylum. ER-24-25. But the Executive is responsible for managing the entire immigration system, *see Judulang*, 565 U.S. at 55, and nothing in the statute's provisions governing the discretionary grant of asylum

prohibits the Executive from taking into account other means of reducing burdens at the border in calibrating the country's approach to immigration.

The interdependence of policies is particularly salient here, where experience shows that various alternatives affect one another and are all relevant to achieving the Executive's policy goals. The Departments sought to "promote lawful, safe, and orderly pathways to the United States" by "removing the incentive to make a dangerous irregular migration journey and reducing the role of exploitative transnational criminal organizations and smugglers." 88 Fed. Reg. at 31,345. Drawing on prior success in implementing similar processes, the Departments explained that "an increase in lawful pathways coupled with consequences for not using such pathways can significantly—and positively—affect behavior and undermine smuggling networks." *Id.* at 31,370.

Disregarding the reasoning of the Departments and the interrelatedness of alternatives, the district court focused on the fact that the asylum statute provides that noncitizens who arrive in the United States may apply for asylum "whether or not at a designated port of arrival" and "irrespective of [their] status." 8 U.S.C. § 1158(a)(1); *see* ER-25. That reasoning repackages the court's erroneous statutory holding and fails for the same reasons. The Rule does not affect any noncitizen's right to apply for asylum. And as explained, Congress expressly permitted the Executive to adopt limitations on asylum eligibility beyond those specified by statute and did not prohibit consideration of either the method of entry or the availability of alternatives. Indeed,

40

this Court previously recognized the longstanding practice of taking such considerations into account. *See East Bay I*, 993 F.3d at 671.

The district court also improperly discounted the Departments' justifications because, in the court's view based on its own reweighing of the evidence, the Rule does not establish sufficient exceptions to, and opportunities for noncitizens to rebut, the presumption. ER-25-33. That holding both misapprehends the Rule and effectively overrides the views of the Executive Branch on the proper balance between eligibility for asylum, benefits for the overall functioning of the immigration system, and efforts by other countries to address the migration crisis in the Western Hemisphere.

As noted above, the Departments recognized that some noncitizens may not be able to avoid or rebut the presumption. *See* 88 Fed. Reg. at 31,332. Nevertheless, the Departments expressly weighed the positives and negatives. The Departments recognized, for example, that asylum in transit countries will not be available or safe for all noncitizens, but nonetheless determined that "it is not unreasonable to expect" noncitizens to "pursue other safe options" to the extent they exist, or to "rebut the presumption by showing that exceptionally compelling circumstances exist." *Id.* at 31,411. And the Departments acknowledged that individuals waiting for CBP One appointments "will generally need to wait in Mexico," where conditions "may be dangerous," but concluded that "on balance, the benefits of the more transparent and efficient system created by use of the app outweigh the drawbacks," particularly given

41

that "migrants are not categorically required to preschedule an appointment" and may rebut the Rule's applicability where they face a serious threat to life or safety. *Id.* at 31,400.

The district court erred in "second-guessing the [Departments'] weighing of risks and benefits" and "substitut[ing] [its] judgment for that of the agenc[ies]." *Department of Commerce v. New York*, 139 S. Ct. 2551, 2571 (2019). That error is especially stark because it was based on the court's own perceptions about the safety of other countries and the adequacy of their immigration systems and the weight that should be accorded to that factor. *See* ER-28-31. "[I]t is for the political branches, not the judiciary, to assess practices in foreign countries and to determine national policy in light of those assessments." *Munaf v. Geren*, 553 U.S. 674, 700-01 (2008). By "pass[ing] judgment on" other countries' legal systems, the district court "undermine[d] the Government's ability to speak with one voice in this area," *id.* at 702, and to work with other countries on a solution to increases in regional migration.

## C. The Departments Provided Ample Notice and Opportunity to Comment

The detailed notice of proposed rulemaking and 33-day comment period, during which the agencies received 51,952 comments, were more than adequate to provide the public with "the terms or substance of the proposed rule" and "an opportunity to participate in the rule making through submission of written data, views, or arguments" under the APA. 5 U.S.C. § 553(b)-(c). These requirements "are

designed (1) to ensure that agency regulations are tested via exposure to diverse public comment, (2) to ensure fairness to affected parties, and (3) to give affected parties an opportunity to develop evidence in the record to support their objections to the rule and thereby enhance the quality of judicial review." *Environmental Integrity Project v. EPA*, 425 F.3d 992, 996 (D.C. Cir. 2005) (quotation omitted); *see Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 174 (2007) ("The object, in short, is one of fair notice."). The rulemaking here served those purposes.

With respect to the comment period's length, the APA "mandates no minimum comment period." *Riverbend Farms, Inc. v. Madigan*, 958 F.2d 1479, 1484 (9th Cir. 1992). As the district court acknowledged, *see* ER-33, courts have recognized that "a 30-day comment period" can provide the requisite opportunity for meaningful public participation, even when "substantial rule changes are proposed." *National Lifeline Ass'n v. FCC*, 921 F.3d 1102, 1117 (D.C. Cir. 2019); *see also Riverbend Farms*, 958 F.2d at 1484 (stating that a comment period is "usually thirty days or more"). That was the case here, as evidenced by the more than 50,000 comments (including comments from plaintiffs) received during the 33-day comment period. The comment period's length was particularly justified under the circumstances, which included the imminent end of the Title 42 order and the anticipated increase in irregular migration. *See* 88 Fed. Reg. at 31,319; *see also Omnipoint Corp. v. FCC*, 78 F.3d 620, 629-30 (D.C. Cir. 1996).

43

The district court's concerns about the announcement of other policy initiatives and the amount of data disclosed, *see* ER-34-35, were similarly misplaced. The court faulted the agencies for making arrangements to remove certain non-Mexican nationals to Mexico and for implementing changes to the timing and location of credible-fear interviews after the close of the comment period. ER-34. But the court cited no authority to support the notion that agencies must seek another round of comment whenever they make a separate policy change that has some arguable bearing on a pending proposed rule. Regardless, the public was not deprived of any opportunity to comment. The proposed rule indicated that, if Mexico agreed, the government would rely on returning or removing nationals of the affected countries to Mexico instead of their home countries both before and after the Title 42 order ended. 88 Fed. Reg. 11,704, 11,706, 11,712 (Feb. 23, 2023); *see also* 88 Fed. Reg. at 31,316-17 & n.21. And the procedural changes to credible fear interviews were "outside the scope" of the Rule's substantive asylum eligibility condition. 88 Fed. Reg. at 31,363.

The government also provided an adequate basis for comment on DHS's prediction of the number of anticipated border encounters. *See* ER-34-35. The Departments provided extensive data demonstrating the scope of the problem and explained how the government performed its calculations. *See* 88 Fed. Reg. at 31,328. In any event, as explained in the very case on which the district court relied, *see* ER-35, "the public is not entitled to review and comment on every piece of information

utilized during rule making." *Kern Cty. Farm Bureau v. Allen*, 450 F.3d 1072, 1076 (9th Cir. 2006). Publicly available data made clear that there was an urgent circumstance requiring a policy response—as was borne out in the days before the Rule went into effect—and no commenters submitted data suggesting anything to the contrary. Plaintiffs' nonspecific assertions of prejudice are unavailing given the adequate time to comment and the submission of more than 50,000 comments.

## III. The District Court Erred in Vacating the Rule

### A. The INA Precludes Vacatur of the Rule

1. Even if plaintiffs had the ability to sue and were correct on the merits of their claims, the district court lacked jurisdiction to vacate the Rule under 8 U.S.C. § 1252(f)(1). That provision strips any court other than the Supreme Court of "jurisdiction or authority to enjoin or restrain the operation of" specified provisions of the INA "other than with respect to the application of such provisions to an individual alien against whom proceedings under such part have been initiated." 8 U.S.C. § 1252(f)(1).

As the Supreme Court has explained, § 1252(f)(1)'s reference to "the operation of the relevant statutes"—which include §§ 1225(b) and 1229a, the provisions governing expedited removal and removal—"is best understood to refer to the Government's efforts to enforce or implement" those statutes. *Garland v. Aleman Gonzalez,* 142 S. Ct. 2057, 2064 (2022) (quotation omitted). Thus, § 1252(f)(1) generally prohibits courts other than the Supreme Court from "order[ing] federal

officials to take or to refrain from taking actions to enforce, implement, or otherwise carry out the specified statutory provisions." *Id.* at 2065.

That is exactly what the district court did when it vacated the Rule. As explained, asylum claims are frequently raised defensively in connection with expedited removal and removal proceedings. As a result, the district court's order directs government officials implementing §§ 1225(b) and 1229a to apply a different substantive rule of decision when asylum claims are raised in the proceedings governed by those provisions. The vacatur contravenes § 1252(f)(1) because it "order[s]" federal officials "to refrain from" applying the Rule's standards in "implement[ing]" and "otherwise carry[ing] out" the specified statutory provisions. *Aleman Gonzalez*, 142 S. Ct. at 2065.

2. In disregarding this limitation on its remedial authority, the district court proffered two reasons why § 1252(f)(1) did not bar the vacatur it entered. First, the court suggested that § 1252(f)(1) may bar only injunctions rather than vacaturs. Second, the court stated that the vacatur would have only a permissible "collateral effect" on expedited removal and removal proceedings. *See* ER-17-18. Each was mistaken.

First, like an injunction, vacatur "restrict[s] or stop[s] official action," *Direct Mktg. Ass'n v. Brohl*, 575 U.S. 1, 13 (2015), by prohibiting officials from relying on the agency action under review. The district court's vacatur is practically equivalent to an

46

injunction compelling the Departments to rescind or stop implementing the Rule and therefore possesses the hallmark of the relief barred by § 1252(f)(1).

Consistent with that functional approach, the Supreme Court has repeatedly given a broad interpretation to terms such as "injunction" in other statutes. For example, the Court interpreted a statute conferring jurisdiction over appeals from "injunction[s]" in certain civil actions to apply to orders with a "coercive" effect. *Aberdeen & Rockfish R.R. v. Students Challenging Regulatory Agency Procedures (SCRAP)*, 422 U.S. 289, 307 (1975). The Court commented that it had "repeatedly exercised jurisdiction under [the provision] over appeals from orders" that were "not cast in injunctive language but which by their terms simply 'set aside' or declined to 'set aside' orders of the [agency]." *Id.* at 308 n.11 (quotation omitted). Here, too, the district court's order vacating the Rule qualifies as an injunction barred by § 1252(f)(1).

In any event, § 1252(f)(1), on its face, is not limited to injunctions. Instead, it prohibits lower-court orders that "enjoin *or restrain*" the Executive Branch's operation of the covered provisions. 8 U.S.C. § 1252(f)(1) (emphasis added). The common denominator of those terms is that they involve coercion. *See* Black's Law Dictionary 529 (6th ed. 1990) ("[e]njoin" means to "require," "command," or "positively direct" (emphasis omitted)); *id.* at 1314 ("[r]estrain" means to "limit" or "put compulsion upon" (emphasis omitted)). Together, they indicate that a court may not impose coercive relief that "interfere[s] with the Government's efforts to operate" the covered provisions in a particular way. *Aleman Gonzalez*, 142 S. Ct. at 2065. That

meaning easily encompasses judicial vacatur. The district court's contrary suggestion would read the word "restrain" out of the statute.

Second, the district court's vacatur does not have merely collateral consequences on the implementation of the covered provisions as contemplated in some of this Court's cases. As noted above, asylum claims are frequently raised in removal proceedings—which are conducted under provisions covered by § 1252(f)(1)—so the district court's vacatur would require Executive Branch officials to apply a different substantive standard in those removal proceedings. This case thus bears no resemblance to cases like *Gonzales v. DHS*, 508 F.3d 1227 (9th Cir. 2007), where this Court held that a district court could permissibly issue an injunction against a policy implementing "statutory provisions regarding adjustment of status," because the statute governing such adjustment of status is not covered by § 1252(f)(1). *Id.* at 1233. The Court reasoned that the possibility that a noncitizen whose application under § 1255 was denied might then be subject to being removed did not mean that an injunction affecting only § 1255 proceedings was prohibited by § 1252(f)(1); rather, any follow-on removal proceedings were just a "collateral consequence of an unsuccessful adjustment application" and, thus, "the injunction's effect on [covered] proceedings is one step removed." *Id.* (quotation omitted). Here, by contrast, the district court's vacatur would, in many asylum cases, directly require a different result in the removal proceedings themselves.

The possibility that some applications of the district court's vacatur might not directly implicate removal proceedings—such as when asylum claims are raised outside the context of those proceedings—cannot salvage the order. Rather, if there were any applications of the Rule that were sufficiently collateral to the covered provisions to escape § 1252(f)(1)'s bar, the district court would need to ascertain whether plaintiffs have standing to challenge the Rule as applied in those circumstances and, if so, limit any relief to those applications. *See Natural Res. Def. Council v. Wheeler*, 955 F.3d 68, 81 (D.C. Cir. 2020) (explaining that "a court may invalidate only some applications" of a regulation).

## B.   The District Court's Universal Vacatur Was Erroneous

The district court independently erred in granting a universal vacatur of the Rule. In imposing that remedy, the district court failed to consider either the balance of equities or the public interest. Instead, the court treated such relief as flowing automatically from its conclusion that the Rule is contrary to law. That reasoning was erroneous, and constitutional and equitable principles preclude the award of a coercive remedy or, at the most, allow only an award of party-specific relief.

### 1.   The District Court Failed to Justify Its Universal Remedies

Even apart from its errors on justiciability and the merits, the district court erred in universally vacating the challenged provisions of the Rule without any serious consideration of equitable principles. In explaining that decision, the court did not

49

suggest that such relief was necessary to remedy any injuries to plaintiffs or consonant with equitable principles. Instead, the court appeared to believe that universal vacatur is "the standard remedy" for APA violations. ER-36.

That is incorrect. Although this Court's precedents identify vacatur as an available remedy for a successful APA challenge to a regulation, *see, e.g.*, *California Wilderness Coal. v. U.S. Dep't of Energy*, 631 F.3d 1072, 1095 (9th Cir. 2011), the APA itself does not reference vacatur, instead remitting plaintiffs to traditional equitable remedies like injunctions, 5 U.S.C. § 703. There is no indication that Congress intended to create a new and radically different remedy in providing that courts reviewing agency action should "set aside" agency "action, findings, and conclusions." *Id.* § 706(2); *see Texas*, 143 S. Ct. at 1980-85 (Gorsuch, J., concurring in the judgment) (detailing "serious" arguments that "warrant careful consideration" as to whether the APA "empowers courts to vacate agency action").

In any event, this Court has treated universal vacatur of agency action as a discretionary equitable remedy—not a remedy that is automatic or compelled. *See, e.g.*, *National Wildlife Fed'n v. Espy*, 45 F.3d 1337, 1343 (9th Cir. 1995) (stating that the court "is not required to set aside every unlawful agency action."); *see California Cmtys. Against Toxics v. US EPA*, 688 F.3d 989, 994 (9th Cir. 2012) (per curiam) (declining to enter vacatur in favor of remand). Indeed, the APA is explicit that its provisions do not affect "the power or duty of the court" to "deny relief on" any "equitable ground," 5 U.S.C. § 702(1), and equitable relief does not "automatically follow[] a

50

determination" that a defendant acted illegally, *see eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 392-93 (2006).

The problems caused by universal injunctions are well catalogued. Such injunctions conflict with principles of Article III and equity, circumvent Rule 23's class-action requirements, "incentivize forum shopping," "short-circuit the decisionmaking benefits of having different courts weigh in on vexing questions of law," and overburden courts' "emergency dockets." *See, e.g.*, *Arizona v. Biden*, 40 F.4th 375, 395-98 (6th Cir. 2022) (Sutton, C.J., concurring); *Los Angeles Haven Hospice, Inc. v. Sebelius*, 638 F.3d 644, 664 (9th Cir. 2011). And those concerns apply equally to universal vacatur. *Texas*, 143 S. Ct. at 1985-86 (Gorsuch, J., concurring in the judgment). Universal vacatur of a rule, if authorized at all, thus should be reserved for "truly extraordinary circumstances." *Id.* No such circumstances exist here.

## 2. Constitutional and Equitable Principles Precluded the District Court's Universal Vacatur in This Case

As discussed above, the district court entered a universal vacatur of the Rule without identifying any extraordinary circumstances supporting that relief—and without even considering the balance of equities or the public interest. If the district court had considered the relevant equitable principles, it would have been improper to conclude that the universal vacatur was justified. Instead, constitutional and equitable principles required the district court to refuse to vacate the Rule—or, at the absolute least, to limit any vacatur to actual clients of plaintiffs.

a. As explained, the decision to order relief under the APA must be exercised in conformity with equitable principles, including the principle that courts must weigh the costs to each party of entering relief. *National Wildlife Fed'n*, 45 F.3d at 1343. Thus, this Court will "leave an invalid rule in place" if "equity demands" that outcome, including if "the disruptive consequences" of vacatur outweigh "the seriousness of the agency's errors." *Pollinator Stewardship Council v. U.S. EPA*, 806 F.3d 520, 532 (9th Cir. 2015) (quotation omitted). Here, that balancing analysis confirms that vacatur is inappropriate.

The government's and the public's substantial interest in enforcing the Rule counsel strongly in favor of forgoing vacatur. The Rule was promulgated to avert looming threats to the immigration system and the public interest by channeling irregular migration into orderly pathways. The government anticipated that the end of the Title 42 order would lead to a substantial increase in unlawful migration at the southwest border and would severely strain the government's enforcement resources.

These fears were well founded. "DHS saw a historic surge in migration" in the days before the Title 42 order ended that "culminated with the highest recorded encounter levels" in history and "placed significant strain on DHS's operational capacity at the border." ER-44. Encounters between ports of entry nearly doubled in the month before May 11, increasing "from an average of approximately 4,900 per day" to "approximately 9,500 per day," including even higher numbers in the final few days. ER-44.

That historic increase in migration had substantial consequences for DHS and the public. Between May 8 and 11, the Border Patrol's "daily in-custody average" was approximately 50% above "its holding capacity." ER-44. To manage that increase, the Border Patrol "had to redirect limited resources from other mission needs" to "focus on processing apprehended noncitizens." ER-45. As a result, the Border Patrol had a decreased "ability to respond to noncitizens avoiding detection, other agency calls for assistance, and noncitizens in distress." ER-45. In addition, that overcrowding, combined with an increased average time in custody because of the many noncitizens who CBP needed to process, generated serious "health and safety risks to noncitizens, government personnel, and contract support staff." ER-45. The substantial increase in migration "also led to significant challenges for local border communities." ER-45.

The Rule has proven remarkably effective in channeling migration into the United States through lawful and orderly pathways and alleviating the negative consequences of irregular migration. Between May 12 and June 13, "encounters between ports of entry at the [southwest border] decreased by 69 percent compared to their peak just before the end of [the] Title 42 [order]." ER-46. "As a result of this swift and sustained decline in encounters, the number of noncitizens" in Border Patrol holding facilities "decreased from a high of more than 28,500 on May 10" to "approximately 8,600 on June 9." ER-46.

Along with other improvements DHS has implemented, the Rule has also allowed DHS to "process credible fear cases more quickly than ever before," thereby

53

allowing claims to be adjudicated more quickly. ER-48-49. Similarly, noncitizens' use of the CBP One app to schedule an appointment to present at a port of entry, as encouraged under the Rule, has allowed CBP to "significantly improve the efficiency of its processes at the border." ER-50-51. That efficiency, "in turn, has allowed CBP to greatly increase its ability to process inadmissible noncitizens at land border ports of entry." ER-51.

Vacatur could erase that success. If the Rule is unavailable, the government expects "a surge in border crossings that could match—or even exceed—the levels seen in the days leading up to the end of" the Title 42 order. ER-51-52. The government thus "anticipates that any interruption in the rule's implementation will result in another surge in migration that will significantly disrupt and tax DHS operations." ER-52; *see* 88 Fed. Reg. at 31,446 (discussing immediate increases in border encounters following vacatur of other immigration initiatives). That is because, in the absence of the Rule, noncitizens who successfully establish a credible fear of persecution would not be expeditiously removed and thus could remain in the United States while their asylum claims were adjudicated, even if—as will be the case for many such noncitizens—their asylum claims were ultimately denied. *See* 88 Fed. Reg. at 31,363. And the negative consequences of such an increase in migration—for the government, for migrants, and for the public—would be even greater than the consequences of the pre-May 11 increase because "Title 8 processes take substantially

longer and are more operationally complex than" the Title 42 processes that were used before May 11. ER-52.

Conversely, plaintiffs themselves will not suffer substantial harm from the continued enforcement of the Rule. The Rule does not itself regulate plaintiffs, and the only asserted effect of the Rule relates to their diversion of their own resources to assist clients affected by the Rule. As explained, *see supra* pp. 18-27, that alleged harm is not a cognizable injury supporting plaintiffs' standing or an APA action. But even if it were, an organization's marginal reallocation of its resources cannot outweigh the substantial harms to the government and the public described above. In addition, many of the asserted defects that plaintiffs identify in the Rule could be remedied through additional explanation or notice-and-comment procedures. And even if this Court believes, as the district court did, that the Rule is contrary to law, the agency may well be able to adopt a different rule that similarly addresses the serious problems that the Rule is mitigating but that comports with this Court's construction of the statute. Thus, vacatur is unwarranted.

b. Even if some coercive remedy were appropriate, Article III and fundamental equitable principles should have counseled the district court to limit any relief to the named plaintiffs in this case or their actual clients. Under Article III, "a plaintiff's remedy must be limited to the inadequacy that produced his injury." *Gill v. Whitford*, 138 S. Ct. 1916, 1930 (2018) (alteration and quotation omitted). Principles of equity reinforce that constitutional limitation. A federal court's authority is generally

55

confined to the relief "traditionally accorded by courts of equity" in 1789. *Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 319 (1999). Such relief must "be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979). Thus, English and early American "courts of equity" typically "did not provide relief beyond the parties to the case." *Trump v. Hawaii*, 138 S. Ct. 2392, 2427 (2018) (Thomas, J., concurring).

To the extent that equitable principles did not preclude vacatur altogether, those principles at least required limiting any relief. As explained, in entering relief that went beyond plaintiffs or their clients, the district court did not conclude that such a universal vacatur was necessary to redress plaintiffs' asserted injuries. *See* ER-36-37. Thus, at the least, the court should have limited any relief to the plaintiffs—by, for example, entering a vacatur limited to identified "bona fide clients of the plaintiff organizations." *East Bay II*, 994 F.3d at 994 (Miller, J., concurring in part and dissenting in part).

Finally, to the extent that the district court believed that vacatur is a remedy that must be ordered universally, that belief was incorrect. Indeed, in other circumstances, courts recognize that the scope of a vacatur is subject to equitable considerations. For example, the general practice is to vacate a district court judgment only as to the party or parties that appeal, not as to non-appealing parties, though that rule is subject to relaxation based on equitable considerations. *See, e.g.*, *In re Taylor*, 655

56

F.3d 274, 287 (3d Cir. 2011) ("Ordinarily, of course, a party which does not appeal a decision by a district court cannot receive relief with respect to that decision."); *Tompkins v. Cyr*, 202 F.3d 770, 786-87 (5th Cir. 2000) (vacating erroneous damages calculation only as to "the losing defendants who have appealed" and declining to "vacate the damage award against the non-appealing defendants"). Regardless, if it were true that vacatur could only be universal, that would underscore the inappropriateness of ordering vacatur—rather than a tailored injunction instead or no coercive relief at all—when, as plainly is the case here, universal vacatur is not warranted.

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be reversed. In addition, in light of the substantial interests in continued enforcement of the Rule, the government respectfully requests that, if the Court affirms in whole or in part, it leave the stay pending appeal in place pending the filing and disposition of any petition for further review.

Respectfully submitted,

*Of Counsel:*

WILLIAM C. PEACHEY
   *Director*

EREZ REUVENI
   *Assistant Director*

PATRICK GLEN
CHRISTINA P. GREER
   *Senior Litigation Counsel*
   *Office of Immigration Litigation*
   *Civil Division*
   *U.S. Department of Justice*
   *P.O. Box 868, Ben Franklin Station*
   *Washington, DC 20044*

BRIAN M. BOYNTON
   *Principal Deputy Assistant Attorney*
   *General*

DANIEL TENNY

 *s/ Sean R. Janda*
SEAN R. JANDA
BRIAN J. SPRINGER
   *Attorneys, Appellate Staff*
   *Civil Division, Room 7260*
   *U.S. Department of Justice*
   *950 Pennsylvania Avenue NW*
   *Washington, DC 20530*
   *(202) 514-3388*
   *sean.r.janda@usdoj.gov*

September 2023

## STATEMENT OF RELATED CASES

Pursuant to Ninth Circuit Rule 28-2.6, appellants state that they know of no related case pending in this Court.

*s/ Sean R. Janda*

Sean R. Janda

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limit of Circuit Rule 32-1(a) because it contains 13,973 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Garamond 14-point font, a proportionally spaced typeface.

*s/ Sean R. Janda*
Sean R. Janda

ADDENDUM

## TABLE OF CONTENTS

8 U.S.C. § 1158.............................................................................................A1

8 U.S.C. § 1252.............................................................................................A9

**8 U.S.C. § 1158**

**§ 1158. Asylum**

### (a) Authority to apply for asylum

#### (1) In general

Any alien who is physically present in the United States or who arrives in the United States (whether or not at a designated port of arrival and including an alien who is brought to the United States after having been interdicted in international or United States waters), irrespective of such alien's status, may apply for asylum in accordance with this section or, where applicable, section 1225(b) of this title.

#### (2) Exceptions

##### (A) Safe third country

Paragraph (1) shall not apply to an alien if the Attorney General determines that the alien may be removed, pursuant to a bilateral or multilateral agreement, to a country (other than the country of the alien's nationality or, in the case of an alien having no nationality, the country of the alien's last habitual residence) in which the alien's life or freedom would not be threatened on account of race, religion, nationality, membership in a particular social group, or political opinion, and where the alien would have access to a full and fair procedure for determining a claim to asylum or equivalent temporary protection, unless the Attorney General finds that it is in the public interest for the alien to receive asylum in the United States.

##### (B) Time limit

Subject to subparagraph (D), paragraph (1) shall not apply to an alien unless the alien demonstrates by clear and convincing evidence that the application has been filed within 1 year after the date of the alien's arrival in the United States.

##### (C) Previous asylum applications

Subject to subparagraph (D), paragraph (1) shall not apply to an alien if the alien has previously applied for asylum and had such application denied.

##### (D) Changed circumstances

An application for asylum of an alien may be considered, notwithstanding subparagraphs (B) and (C), if the alien demonstrates to the satisfaction of

the Attorney General either the existence of changed circumstances which materially affect the applicant's eligibility for asylum or extraordinary circumstances relating to the delay in filing an application within the period specified in subparagraph (B).

**(E) Applicability**

Subparagraphs (A) and (B) shall not apply to an unaccompanied alien child (as defined in section 279(g) of title 6).

**(3) Limitation on judicial review**

No court shall have jurisdiction to review any determination of the Attorney General under paragraph (2).

**(b) Conditions for granting asylum**

**(1) In general**

**(A) Eligibility**

The Secretary of Homeland Security or the Attorney General may grant asylum to an alien who has applied for asylum in accordance with the requirements and procedures established by the Secretary of Homeland Security or the Attorney General under this section if the Secretary of Homeland Security or the Attorney General determines that such alien is a refugee within the meaning of section 1101(a)(42)(A) of this title.

**(B) Burden of proof**

**(i) In general**

The burden of proof is on the applicant to establish that the applicant is a refugee, within the meaning of section 1101(a)(42)(A) of this title. To establish that the applicant is a refugee within the meaning of such section, the applicant must establish that race, religion, nationality, membership in a particular social group, or political opinion was or will be at least one central reason for persecuting the applicant.

**(ii) Sustaining burden**

The testimony of the applicant may be sufficient to sustain the applicant's burden without corroboration, but only if the applicant satisfies the trier of fact that the applicant's testimony is credible, is persuasive, and refers to specific facts sufficient to demonstrate that the applicant is a refugee. In determining whether the applicant has met the applicant's burden, the trier of fact may weigh the credible testimony along with other evidence of record. Where the trier of fact

determines that the applicant should provide evidence that corroborates otherwise credible testimony, such evidence must be provided unless the applicant does not have the evidence and cannot reasonably obtain the evidence.

**(iii) Credibility determination**

Considering the totality of the circumstances, and all relevant factors, a trier of fact may base a credibility determination on the demeanor, candor, or responsiveness of the applicant or witness, the inherent plausibility of the applicant's or witness's account, the consistency between the applicant's or witness's written and oral statements (whenever made and whether or not under oath, and considering the circumstances under which the statements were made), the internal consistency of each such statement, the consistency of such statements with other evidence of record (including the reports of the Department of State on country conditions), and any inaccuracies or falsehoods in such statements, without regard to whether an inconsistency, inaccuracy, or falsehood goes to the heart of the applicant's claim, or any other relevant factor. There is no presumption of credibility, however, if no adverse credibility determination is explicitly made, the applicant or witness shall have a rebuttable presumption of credibility on appeal.

**(2) Exceptions**

**(A) In general**

Paragraph (1) shall not apply to an alien if the Attorney General determines that—

(i) the alien ordered, incited, assisted, or otherwise participated in the persecution of any person on account of race, religion, nationality, membership in a particular social group, or political opinion;

(ii) the alien, having been convicted by a final judgment of a particularly serious crime, constitutes a danger to the community of the United States;

(iii) there are serious reasons for believing that the alien has committed a serious nonpolitical crime outside the United States prior to the arrival of the alien in the United States;

(iv) there are reasonable grounds for regarding the alien as a danger to the security of the United States;

A3

(v) the alien is described in subclause (I), (II), (III), (IV), or (VI) of section 1182(a)(3)(B)(i) of this title or section 1227(a)(4)(B) of this title (relating to terrorist activity), unless, in the case only of an alien described in subclause (IV) of section 1182(a)(3)(B)(i) of this title, the Attorney General determines, in the Attorney General's discretion, that there are not reasonable grounds for regarding the alien as a danger to the security of the United States; or

(vi) the alien was firmly resettled in another country prior to arriving in the United States.

**(B) Special rules**

**(i) Conviction of aggravated felony**

For purposes of clause (ii) of subparagraph (A), an alien who has been convicted of an aggravated felony shall be considered to have been convicted of a particularly serious crime.

**(ii) Offenses**

The Attorney General may designate by regulation offenses that will be considered to be a crime described in clause (ii) or (iii) of subparagraph (A).

**(C) Additional limitations**

The Attorney General may by regulation establish additional limitations and conditions, consistent with this section, under which an alien shall be ineligible for asylum under paragraph (1).

**(D) No judicial review**

There shall be no judicial review of a determination of the Attorney General under subparagraph (A)(v).

**(3) Treatment of spouse and children**

**(A) In general**

A spouse or child (as defined in section 1101(b)(1)(A), (B), (C), (D), or (E) of this title) of an alien who is granted asylum under this subsection may, if not otherwise eligible for asylum under this section, be granted the same status as the alien if accompanying, or following to join, such alien.

**(B) Continued classification of certain aliens as children**

An unmarried alien who seeks to accompany, or follow to join, a parent granted asylum under this subsection, and who was under 21 years of age

on the date on which such parent applied for asylum under this section, shall continue to be classified as a child for purposes of this paragraph and section 1159(b)(3) of this title, if the alien attained 21 years of age after such application was filed but while it was pending.

**(C) Initial jurisdiction**

An asylum officer (as defined in section 1225(b)(1)(E) of this title) shall have initial jurisdiction over any asylum application filed by an unaccompanied alien child (as defined in section 279(g) of title 6), regardless of whether filed in accordance with this section or section 1225(b) of this title.

## (c) Asylum status

### (1) In general

In the case of an alien granted asylum under subsection (b), the Attorney General—

(A) shall not remove or return the alien to the alien's country of nationality or, in the case of a person having no nationality, the country of the alien's last habitual residence;

(B) shall authorize the alien to engage in employment in the United States and provide the alien with appropriate endorsement of that authorization; and

(C) may allow the alien to travel abroad with the prior consent of the Attorney General.

### (2) Termination of asylum

Asylum granted under subsection (b) does not convey a right to remain permanently in the United States, and may be terminated if the Attorney General determines that—

(A) the alien no longer meets the conditions described in subsection (b)(1) owing to a fundamental change in circumstances;

(B) the alien meets a condition described in subsection (b)(2);

(C) the alien may be removed, pursuant to a bilateral or multilateral agreement, to a country (other than the country of the alien's nationality or, in the case of an alien having no nationality, the country of the alien's last habitual residence) in which the alien's life or freedom would not be threatened on account of race, religion, nationality, membership in a

particular social group, or political opinion, and where the alien is eligible to receive asylum or equivalent temporary protection;

(D) the alien has voluntarily availed himself or herself of the protection of the alien's country of nationality or, in the case of an alien having no nationality, the alien's country of last habitual residence, by returning to such country with permanent resident status or the reasonable possibility of obtaining such status with the same rights and obligations pertaining to other permanent residents of that country; or

(E) the alien has acquired a new nationality and enjoys the protection of the country of his or her new nationality.

**(3) Removal when asylum is terminated**

An alien described in paragraph (2) is subject to any applicable grounds of inadmissibility or deportability under section [1] 1182(a) and 1227(a) of this title, and the alien's removal or return shall be directed by the Attorney General in accordance with sections 1229a and 1231 of this title.

**(d) Asylum procedure**

**(1) Applications**

The Attorney General shall establish a procedure for the consideration of asylum applications filed under subsection (a). The Attorney General may require applicants to submit fingerprints and a photograph at such time and in such manner to be determined by regulation by the Attorney General.

**(2) Employment**

An applicant for asylum is not entitled to employment authorization, but such authorization may be provided under regulation by the Attorney General. An applicant who is not otherwise eligible for employment authorization shall not be granted such authorization prior to 180 days after the date of filing of the application for asylum.

**(3) Fees**

The Attorney General may impose fees for the consideration of an application for asylum, for employment authorization under this section, and for adjustment of status under section 1159(b) of this title. Such fees shall not exceed the Attorney General's costs in adjudicating the applications. The Attorney General may provide for the assessment and payment of such fees over a period of time or by installments. Nothing in this paragraph shall be construed to require the Attorney General to charge fees for adjudication services provided to asylum applicants, or to limit the authority of the

Attorney General to set adjudication and naturalization fees in accordance with section 1356(m) of this title.

**(4) Notice of privilege of counsel and consequences of frivolous application**

At the time of filing an application for asylum, the Attorney General shall—

(A) advise the alien of the privilege of being represented by counsel and of the consequences, under paragraph (6), of knowingly filing a frivolous application for asylum; and

(B) provide the alien a list of persons (updated not less often than quarterly) who have indicated their availability to represent aliens in asylum proceedings on a pro bono basis.

**(5) Consideration of asylum applications**

**(A) Procedures**

The procedure established under paragraph (1) shall provide that—

(i) asylum cannot be granted until the identity of the applicant has been checked against all appropriate records or databases maintained by the Attorney General and by the Secretary of State, including the Automated Visa Lookout System, to determine any grounds on which the alien may be inadmissible to or deportable from the United States, or ineligible to apply for or be granted asylum;

(ii) in the absence of exceptional circumstances, the initial interview or hearing on the asylum application shall commence not later than 45 days after the date an application is filed;

(iii) in the absence of exceptional circumstances, final administrative adjudication of the asylum application, not including administrative appeal, shall be completed within 180 days after the date an application is filed;

(iv) any administrative appeal shall be filed within 30 days of a decision granting or denying asylum, or within 30 days of the completion of removal proceedings before an immigration judge under section 1229a of this title, whichever is later; and

(v) in the case of an applicant for asylum who fails without prior authorization or in the absence of exceptional circumstances to appear for an interview or hearing, including a hearing under section

1229a of this title, the application may be dismissed or the applicant may be otherwise sanctioned for such failure.

### (B) Additional regulatory conditions

The Attorney General may provide by regulation for any other conditions or limitations on the consideration of an application for asylum not inconsistent with this chapter.

### (6) Frivolous applications

If the Attorney General determines that an alien has knowingly made a frivolous application for asylum and the alien has received the notice under paragraph (4)(A), the alien shall be permanently ineligible for any benefits under this chapter, effective as of the date of a final determination on such application.

### (7) No private right of action

Nothing in this subsection shall be construed to create any substantive or procedural right or benefit that is legally enforceable by any party against the United States or its agencies or officers or any other person.

## (e) Commonwealth of the Northern Mariana Islands

The provisions of this section and section 1159(b) of this title shall apply to persons physically present in the Commonwealth of the Northern Mariana Islands or arriving in the Commonwealth (whether or not at a designated port of arrival and including persons who are brought to the Commonwealth after having been interdicted in international or United States waters) only on or after January 1, 2014.

**8 U.S.C. § 1252**

**§ 1252. Judicial review of orders of removal**

**(a) Applicable provisions**

**(1) General orders of removal**

Judicial review of a final order of removal (other than an order of removal without a hearing pursuant to section 1225(b)(1) of this title) is governed only by chapter 158 of title 28, except as provided in subsection (b) and except that the court may not order the taking of additional evidence under section 2347(c) of such title.

**(2) Matters not subject to judicial review**

**(A) Review relating to section 1225(b)(1)**

Notwithstanding any other provision of law (statutory or nonstatutory), including section 2241 of title 28, or any other habeas corpus provision, and sections 1361 and 1651 of such title, no court shall have jurisdiction to review—

(i) except as provided in subsection (e), any individual determination or to entertain any other cause or claim arising from or relating to the implementation or operation of an order of removal pursuant to section 1225(b)(1) of this title,

(ii) except as provided in subsection (e), a decision by the Attorney General to invoke the provisions of such section,

(iii) the application of such section to individual aliens, including the determination made under section 1225(b)(1)(B) of this title, or

(iv) except as provided in subsection (e), procedures and policies adopted by the Attorney General to implement the provisions of section 1225(b)(1) of this title.

**(B) Denials of discretionary relief**

Notwithstanding any other provision of law (statutory or nonstatutory), including section 2241 of title 28, or any other habeas corpus provision, and sections 1361 and 1651 of such title, and except as provided in subparagraph (D), and regardless of whether the judgment, decision, or action is made in removal proceedings, no court shall have jurisdiction to review—

(i) any judgment regarding the granting of relief under section 1182(h), 1182(i), 1229b, 1229c, or 1255 of this title, or

(ii) any other decision or action of the Attorney General or the Secretary of Homeland Security the authority for which is specified under this subchapter to be in the discretion of the Attorney General or the Secretary of Homeland Security, other than the granting of relief under section 1158(a) of this title.

**(C) Orders against criminal aliens**

Notwithstanding any other provision of law (statutory or nonstatutory), including section 2241 of title 28, or any other habeas corpus provision, and sections 1361 and 1651 of such title, and except as provided in subparagraph (D), no court shall have jurisdiction to review any final order of removal against an alien who is removable by reason of having committed a criminal offense covered in section 1182(a)(2) or 1227(a)(2)(A)(iii), (B), (C), or (D) of this title, or any offense covered by section 1227(a)(2)(A)(ii) of this title for which both predicate offenses are, without regard to their date of commission, otherwise covered by section 1227(a)(2)(A)(i) of this title.

**(D) Judicial review of certain legal claims**

Nothing in subparagraph (B) or (C), or in any other provision of this chapter (other than this section) which limits or eliminates judicial review, shall be construed as precluding review of constitutional claims or questions of law raised upon a petition for review filed with an appropriate court of appeals in accordance with this section.

**(3) Treatment of certain decisions**

No alien shall have a right to appeal from a decision of an immigration judge which is based solely on a certification described in section 1229a(c)(1)(B) of this title.

**(4) Claims under the United Nations Convention**

Notwithstanding any other provision of law (statutory or nonstatutory), including section 2241 of title 28, or any other habeas corpus provision, and sections 1361 and 1651 of such title, a petition for review filed with an appropriate court of appeals in accordance with this section shall be the sole and exclusive means for judicial review of any cause or claim under the United Nations Convention Against Torture and Other Forms of Cruel, Inhuman, or Degrading Treatment or Punishment, except as provided in subsection (e).

**(5) Exclusive means of review**

Notwithstanding any other provision of law (statutory or nonstatutory), including section 2241 of title 28, or any other habeas corpus provision, and sections 1361 and 1651 of such title, a petition for review filed with an appropriate court of appeals in accordance with this section shall be the sole and exclusive means for judicial review of an order of removal entered or issued under any provision of this chapter, except as provided in subsection (e). For purposes of this chapter, in every provision that limits or eliminates judicial review or jurisdiction to review, the terms "judicial review" and "jurisdiction to review" include habeas corpus review pursuant to section 2241 of title 28, or any other habeas corpus provision, sections 1361 and 1651 of such title, and review pursuant to any other provision of law (statutory or nonstatutory).

**(b) Requirements for review of orders of removal**

With respect to review of an order of removal under subsection (a)(1), the following requirements apply:

**(1) Deadline**

The petition for review must be filed not later than 30 days after the date of the final order of removal.

**(2) Venue and forms**

The petition for review shall be filed with the court of appeals for the judicial circuit in which the immigration judge completed the proceedings. The record and briefs do not have to be printed. The court of appeals shall review the proceeding on a typewritten record and on typewritten briefs.

**(3) Service**

**(A) In general**

The respondent is the Attorney General. The petition shall be served on the Attorney General and on the officer or employee of the Service in charge of the Service district in which the final order of removal under section 1229a of this title was entered.

**(B) Stay of order**

Service of the petition on the officer or employee does not stay the removal of an alien pending the court's decision on the petition, unless the court orders otherwise.

**(C) Alien's brief**

The alien shall serve and file a brief in connection with a petition for judicial review not later than 40 days after the date on which the administrative record is available, and may serve and file a reply brief not later than 14 days after service of the brief of the Attorney General, and the court may not extend these deadlines except upon motion for good cause shown. If an alien fails to file a brief within the time provided in this paragraph, the court shall dismiss the appeal unless a manifest injustice would result.

**(4) Scope and standard for review**

Except as provided in paragraph (5)(B)—

(A) the court of appeals shall decide the petition only on the administrative record on which the order of removal is based,

(B) the administrative findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary,

(C) a decision that an alien is not eligible for admission to the United States is conclusive unless manifestly contrary to law, and

(D) the Attorney General's discretionary judgment whether to grant relief under section 1158(a) of this title shall be conclusive unless manifestly contrary to the law and an abuse of discretion.

No court shall reverse a determination made by a trier of fact with respect to the availability of corroborating evidence, as described in section 1158(b)(1)(B), 1229a(c)(4)(B), or 1231(b)(3)(C) of this title, unless the court finds, pursuant to subsection (b)(4)(B), that a reasonable trier of fact is compelled to conclude that such corroborating evidence is unavailable.

**(5) Treatment of nationality claims**

**(A) Court determination if no issue of fact**

If the petitioner claims to be a national of the United States and the court of appeals finds from the pleadings and affidavits that no genuine issue of material fact about the petitioner's nationality is presented, the court shall decide the nationality claim.

**(B) Transfer if issue of fact**

If the petitioner claims to be a national of the United States and the court of appeals finds that a genuine issue of material fact about the petitioner's nationality is presented, the court shall transfer the proceeding to the

A12

district court of the United States for the judicial district in which the petitioner resides for a new hearing on the nationality claim and a decision on that claim as if an action had been brought in the district court under section 2201 of title 28.

**(C) Limitation on determination**

The petitioner may have such nationality claim decided only as provided in this paragraph.

**(6) Consolidation with review of motions to reopen or reconsider**

When a petitioner seeks review of an order under this section, any review sought of a motion to reopen or reconsider the order shall be consolidated with the review of the order.

**(7) Challenge to validity of orders in certain criminal proceedings**

**(A) In general**

If the validity of an order of removal has not been judicially decided, a defendant in a criminal proceeding charged with violating section 1253(a) of this title may challenge the validity of the order in the criminal proceeding only by filing a separate motion before trial. The district court, without a jury, shall decide the motion before trial.

**(B) Claims of United States nationality**

If the defendant claims in the motion to be a national of the United States and the district court finds that—

(i) no genuine issue of material fact about the defendant's nationality is presented, the court shall decide the motion only on the administrative record on which the removal order is based and the administrative findings of fact are conclusive if supported by reasonable, substantial, and probative evidence on the record considered as a whole; or

(ii) a genuine issue of material fact about the defendant's nationality is presented, the court shall hold a new hearing on the nationality claim and decide that claim as if an action had been brought under section 2201 of title 28.

The defendant may have such nationality claim decided only as provided in this subparagraph.

A13

**(C) Consequence of invalidation**

If the district court rules that the removal order is invalid, the court shall dismiss the indictment for violation of section 1253(a) of this title. The United States Government may appeal the dismissal to the court of appeals for the appropriate circuit within 30 days after the date of the dismissal.

**(D) Limitation on filing petitions for review**

The defendant in a criminal proceeding under section 1253(a) of this title may not file a petition for review under subsection (a) during the criminal proceeding.

**(8) Construction**

This subsection—

(A) does not prevent the Attorney General, after a final order of removal has been issued, from detaining the alien under section 1231(a) of this title;

(B) does not relieve the alien from complying with section 1231(a)(4) of this title and section 1253(g) [1] of this title; and

(C) does not require the Attorney General to defer removal of the alien.

**(9) Consolidation of questions for judicial review**

Judicial review of all questions of law and fact, including interpretation and application of constitutional and statutory provisions, arising from any action taken or proceeding brought to remove an alien from the United States under this subchapter shall be available only in judicial review of a final order under this section. Except as otherwise provided in this section, no court shall have jurisdiction, by habeas corpus under section 2241 of title 28 or any other habeas corpus provision, by section 1361 or 1651 of such title, or by any other provision of law (statutory or nonstatutory), to review such an order or such questions of law or fact.

**(c) Requirements for petition**

A petition for review or for habeas corpus of an order of removal—

(1) shall attach a copy of such order, and

(2) shall state whether a court has upheld the validity of the order, and, if so, shall state the name of the court, the date of the court's ruling, and the kind of proceeding.

**(d) Review of final orders**

A court may review a final order of removal only if—

(1) the alien has exhausted all administrative remedies available to the alien as of right, and

(2) another court has not decided the validity of the order, unless the reviewing court finds that the petition presents grounds that could not have been presented in the prior judicial proceeding or that the remedy provided by the prior proceeding was inadequate or ineffective to test the validity of the order.

**(e) Judicial review of orders under section 1225(b)(1)**

**(1) Limitations on relief**

Without regard to the nature of the action or claim and without regard to the identity of the party or parties bringing the action, no court may—

(A) enter declaratory, injunctive, or other equitable relief in any action pertaining to an order to exclude an alien in accordance with section 1225(b)(1) of this title except as specifically authorized in a subsequent paragraph of this subsection, or

(B) certify a class under Rule 23 of the Federal Rules of Civil Procedure in any action for which judicial review is authorized under a subsequent paragraph of this subsection.

**(2) Habeas corpus proceedings**

Judicial review of any determination made under section 1225(b)(1) of this title is available in habeas corpus proceedings, but shall be limited to determinations of—

(A) whether the petitioner is an alien,

(B) whether the petitioner was ordered removed under such section, and

(C) whether the petitioner can prove by a preponderance of the evidence that the petitioner is an alien lawfully admitted for permanent residence, has been admitted as a refugee under section 1157 of this title, or has been granted asylum under section 1158 of this title, such status not having been terminated, and is entitled to such further inquiry as prescribed by the Attorney General pursuant to section 1225(b)(1)(C) of this title.

**(3) Challenges on validity of the system**

**(A) In general**

Judicial review of determinations under section 1225(b) of this title and its implementation is available in an action instituted in the United States District Court for the District of Columbia, but shall be limited to determinations of—

(i) whether such section, or any regulation issued to implement such section, is constitutional; or

(ii) whether such a regulation, or a written policy directive, written policy guideline, or written procedure issued by or under the authority of the Attorney General to implement such section, is not consistent with applicable provisions of this subchapter or is otherwise in violation of law.

**(B) Deadlines for bringing actions**

Any action instituted under this paragraph must be filed no later than 60 days after the date the challenged section, regulation, directive, guideline, or procedure described in clause (i) or (ii) of subparagraph (A) is first implemented.

**(C) Notice of appeal**

A notice of appeal of an order issued by the District Court under this paragraph may be filed not later than 30 days after the date of issuance of such order.

**(D) Expeditious consideration of cases**

It shall be the duty of the District Court, the Court of Appeals, and the Supreme Court of the United States to advance on the docket and to expedite to the greatest possible extent the disposition of any case considered under this paragraph.

**(4) Decision**

In any case where the court determines that the petitioner—

(A) is an alien who was not ordered removed under section 1225(b)(1) of this title, or

(B) has demonstrated by a preponderance of the evidence that the alien is an alien lawfully admitted for permanent residence, has been admitted as a refugee under section 1157 of this title, or has been granted asylum under

section 1158 of this title, the court may order no remedy or relief other than to require that the petitioner be provided a hearing in accordance with section 1229a of this title. Any alien who is provided a hearing under section 1229a of this title pursuant to this paragraph may thereafter obtain judicial review of any resulting final order of removal pursuant to subsection (a)(1).

### (5) Scope of inquiry

In determining whether an alien has been ordered removed under section 1225(b)(1) of this title, the court's inquiry shall be limited to whether such an order in fact was issued and whether it relates to the petitioner. There shall be no review of whether the alien is actually inadmissible or entitled to any relief from removal.

## (f) Limit on injunctive relief

### (1) In general

Regardless of the nature of the action or claim or of the identity of the party or parties bringing the action, no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of the provisions of part IV of this subchapter, as amended by the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, other than with respect to the application of such provisions to an individual alien against whom proceedings under such part have been initiated.

### (2) Particular cases

Notwithstanding any other provision of law, no court shall enjoin the removal of any alien pursuant to a final order under this section unless the alien shows by clear and convincing evidence that the entry or execution of such order is prohibited as a matter of law.

## (g) Exclusive jurisdiction

Except as provided in this section and notwithstanding any other provision of law (statutory or nonstatutory), including section 2241 of title 28, or any other habeas corpus provision, and sections 1361 and 1651 of such title, no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this chapter.

A17