No. 23-16032

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

––––––––––––––––––

East Bay Sanctuary Covenant, *et al.*,

*Plaintiffs-Appellees,*

v.

Joseph R. Biden, President of the United States, in his official capacity, *et al.*,

*Defendants-Appellants.*

––––––––––––––––––

On Appeal from the United States District Court
for the Northern District of California

––––––––––––––––––

## EXCERPTS OF RECORD

––––––––––––––––––

WILLIAM C. PEACHEY
*Director*

EREZ REUVENI
*Assistant Director*

PATRICK GLEN
CHRISTINA P. GREER
*Senior Litigation Counsel*
*Office of Immigration Litigation*
*Civil Division*
*U.S. Department of Justice*
*P.O. Box 868, Ben Franklin Station*
*Washington, DC 20044*

BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney General*

DANIEL TENNY
SEAN R. JANDA
BRIAN J. SPRINGER
*Attorneys, Appellate Staff*
*Civil Division, Room 7260*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-3388*

# TABLE OF CONTENTS

**Page**

Clerk's Judgment (Dkt. No. 188) ................................................................... ER-3

Order Granting Plaintiffs' Motion for Summary Judgment and
   Denying Defendants' Motion for Summary Judgment (Dkt. No. 187) .............. ER-4

Declaration of Blas Nuñez-Neto (Dkt. No. 176-2) .................................................. ER-39

Amended and Supplemental Complaint for Declaratory and
   Injunctive Relief (Dkt. No. 164) ............................................................. ER-65

Fact Sheet: Biden-Harris Administration Announces
   New Border Enforcement Actions (AR4553-56) ............................................. ER-122

Notice of Appeal (Dkt. No. 189) ............................................................... ER-127

District Court Docket Sheet ................................................................... ER-130

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

EAST BAY SANCTUARY COVENANT, et al.,

               Plaintiffs,

       v.

JOSEPH R. BIDEN, et al.,

               Defendants.

Case No. 18-cv-06810-JST

**CLERK'S JUDGEMENT**

Re: Dkt. No. 187

      Pursuant to the Order Granting Plaintiffs' Motion for Summary Judgment and Denying Defendants' Motion for Summary Judgment signed July 25, 2023, judgment is hereby entered.

      **IT IS SO ORDERED AND ADJUDGED.**

Dated: Tuesday, July 25, 2023

                             Mark B. Busby
                             Clerk, United States District Court

                             By:
                             Mauriona Lee, Deputy Clerk to the
                             Honorable JON S. TIGAR

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| EAST BAY SANCTUARY COVENANT, et al., | Case No. 18-cv-06810-JST |
| Plaintiffs, | **ORDER GRANTING PLAINTIFFS'** |
| v. | **MOTION FOR SUMMARY** |
| | **JUDGMENT AND DENYING** |
| JOSEPH R. BIDEN, et al., | **DEFENDANTS' MOTION FOR** |
| | **SUMMARY JUDGMENT** |
| Defendants. | Re: ECF Nos. 169, 176 |

Before the Court are motions for summary judgment filed by Plaintiffs East Bay Sanctuary Covenant ("EBSC"), Central American Resource Center of Los Angeles, Tahirih Justice Center, National Center for Lesbian Rights, Immigrant Defenders Law Center, and American Gateways, ECF No. 169; and Defendants Joseph R. Biden, Merrick Garland, United States Department of Justice ("DOJ"), David Neal, Executive Office of Immigration Review, Alejandro Mayorkas, United States Department of Homeland Security ("DHS"), Ur Jaddou, United States Citizenship and Immigration Services, Troy A. Miller, United States Customs and Border Protection ("CBP"), Tae D. Johnson, and Immigration and Customs Enforcement ("ICE"), ECF No. 176. The Court will grant Plaintiffs' motion for summary judgment and deny Defendants' motion for summary judgment.

## I. BACKGROUND

On May 16, 2023, DHS and DOJ published a final rule, Circumvention of Lawful Pathways ("the Rule"), which applies a presumption of asylum ineligibility to noncitizens who traveled through a country other than their own before entering the United States through the southern border with Mexico. 88 Fed. Reg. 31314, 31449–52 (May 16, 2023). Unless they meet one of several exceptions, such individuals will be presumed ineligible for asylum; they may rebut

this presumption only upon a showing of "exceptionally compelling circumstances" at the time of entry. *Id.* The Rule provides exceptions for unaccompanied children, noncitizens authorized to travel to the United States pursuant to a DHS-approved parole process, certain noncitizens who present at a port of entry, and noncitizens who have been denied asylum or other forms of protection by another country. *Id.*

Plaintiffs are organizations that represent and assist asylum seekers. They argue the Rule is invalid under the Administrative Procedure Act ("APA") for three reasons: first, it is contrary to law; second, it is arbitrary and capricious; and third, it was issued without adequate opportunity for public comment.

### A. Statutory Framework

"In 1980, to limit the [Executive's] parole power, create a predictable and permanent admissions system, and fulfill international obligations, Congress passed the Refugee Act," which "provided a statutory basis for asylum, the granting of status to refugees who arrive or have been physically present in the United States." *Bringas-Rodriguez v. Sessions*, 850 F.3d 1051, 1060 (9th Cir. 2017) (en banc); *see also EBSC v. Biden* (*Entry V*), 993 F.3d 640, 658 (9th Cir. 2021) ("[T]he Refugee Act of 1980 . . . established an asylum procedure available to any migrant, 'irrespective of such alien's status,' and irrespective of whether the migrant arrived 'at a land border or port of entry.'") (quoting Pub. L. No. 96-212, § 208(a), 94 Stat. 102, 105 (1980)).

This statutory basis is now found in the Immigration and Nationality Act ("INA"), which provides that any noncitizen who arrives in the United States, "whether or not at a designated port of arrival" and "irrespective of [their] status, may apply for asylum." 8 U.S.C. § 1158(a)(1).[1] The statute grants the Attorney General or Secretary of Homeland Security discretion to grant asylum to applicants who qualify as refugees, *id.* § 1158(b)(1)(A), defined as those "unable or unwilling to return to" their home countries "because of persecution or a well-founded fear of persecution on

---

[1] This provision does not apply to noncitizens whom the Attorney General determines can be removed to a safe third country, 8 U.S.C. § 1158(a)(2)(A); or to noncitizens who apply for asylum more than one year after arrival or have previously been denied asylum in the United States, *id.* § 1158(a)(2)(B)–(C), unless they demonstrate changed or extraordinary circumstances, *id.* § 1158(a)(2)(D).

2

account of race, religion, nationality, membership in a particular social group, or political

opinion," *id.* § 1101(a)(42).  Certain noncitizens are statutorily barred from eligibility for asylum:

those who have persecuted others on the basis of race, religion, nationality, membership in a

particular social group, or political opinion; those who have been convicted by final judgment of a

particularly serious crime; those who there are serious reasons to believe have committed a serious

nonpolitical crime outside the United States prior to arrival; those who there are reasonable

grounds to regard as terrorists or a danger to the security of the United States; and those who have

firmly resettled in another country prior to arriving in the United States.  *Id.* § 1158(b)(2)(A)(i)–

(vi).  The statute also provides that "[t]he Attorney General may by regulation establish additional

limitations and conditions" on asylum eligibility, so long as such limitations and conditions are

"consistent with this section."  *Id.* § 1158(b)(2)(C).

### B.    The Challenged Rule

The Rule establishes a "rebuttable presumption" of asylum ineligibility which applies to all

noncitizens who enter the United States at the southern border between May 11, 2023, and

May 11, 2025, "after . . . travel[ing] through a country other than [their] country of citizenship,

nationality, or, if stateless, last habitual residence."[2]  88 Fed. Reg. at 31450.  The presumption

does not apply to unaccompanied minor children.  *Id.*  Otherwise, noncitizens are exempt from

this presumption only if they (1) have "authorization to travel to the United States to seek parole,

pursuant to a DHS-approved parole process"; (2) "[p]resented at a port of entry, pursuant to a pre-

scheduled time and place, or presented at a port of entry without a pre-scheduled time and place,"

provided they demonstrate, by a preponderance of the evidence, that "it was not possible to access

or use the DHS scheduling system due to language barrier, illiteracy, significant technical failure,

or other ongoing and serious obstacle"; or (3) "[s]ought asylum or other protection in a country

---

[2] This requirement applies only if the country or countries the noncitizen traveled through are parties to the 1951 Convention Relating to the Status of Refugees, July 28, 1951, 19 U.S.T. 6259, 189 U.N.T.S. 150, or 1967 Protocol Relating to the Status of Refugees, Jan. 31, 1967, 19 U.S.T. 6223, 606 U.N.T.S. 268.  88 Fed. Reg. at 31450.  As noted in the preamble to the Rule, all but one of the countries in North, Central, and South America are parties to at least one of these agreements.  88 Fed. Reg. at 31411.

3

through which [they] traveled and received a final decision denying that application," provided the denial was for a reason other than abandonment of the claim.[3]  *Id.*  To rebut this presumption, noncitizens must demonstrate, by a preponderance of the evidence, the existence of "exceptionally compelling circumstances" at the time of entry.  Such circumstances exist in cases of acute medical emergencies, "imminent and extreme threat to life or safety, such as an imminent threat of rape, kidnapping, torture, or murder," or "severe . . . trafficking in persons."  *Id.*[4]

In simpler terms, under the Rule, noncitizens other than Mexican nationals who cross the southern border are presumed ineligible for asylum unless they (1) have received advance permission to travel to the U.S. to apply for parole; (2) present at a port of entry for a pre-scheduled appointment (or without an appointment, if they can demonstrate an "ongoing and serious obstacle" that precluded pre-scheduling); or (3) have already sought and been denied asylum or other protection in another country en route to the U.S.[5]  The presumption may be rebutted only upon a showing of exceptionally compelling circumstances.

The Attorney General and DHS Secretary issued the challenged Rule "pursuant to their shared and respective authorities concerning asylum, statutory withholding, and CAT determinations" under the INA, including their discretionary authority to grant asylum to refugees,

---

[3] The exception for noncitizens who apply for and are denied asylum or other protection in transit countries does not differentiate among denials for reasons other than abandonment—for example, claims that are not cognizable under the asylum laws of those transit countries or applications that are procedurally barred.  *See* 88 Fed. Reg. at 31450 ("A final decision includes any denial by a foreign government of the applicant's claim for asylum or other protection through one or more of that government's pathways for that claim.  A final decision does not include a determination by a foreign government that the alien abandoned the claim.").  To qualify for this exception, noncitizens must have applied for and been denied asylum in a country through which they traveled, regardless of whether or not their applications had any possibility of being granted, and regardless of whether or not that country is a safe option for them.

[4] The Rule provides that exceptionally compelling circumstances will also be found, in removal proceedings pursuant to 8 U.S.C. § 1229(a), where a principal asylum applicant is eligible for statutory withholding of removal or Convention Against Torture ("CAT") withholding and would be granted asylum but for the presumption, and an accompanying family member does not independently qualify for protection from removal or the principal applicant has a spouse or child who would be eligible to follow to join them if they were granted asylum.  88 Fed. Reg. at 31452.  In such cases, the presumption will be deemed rebutted.

[5] As noted above, unaccompanied children are also not subject to the presumption.  Because this challenge largely does not concern the exception for unaccompanied children, the Court does not discuss this exception in detail.

United States District Court
Northern District of California

8 U.S.C. § 1158(b)(1)(A); their authority to establish requirements and procedures to govern asylum applications, *id.*; and their authority to establish additional limitations and conditions for asylum eligibility "consistent with this section," *id* § 1158(b)(2)(C). 88 Fed. Reg. at 31323.

The agencies issued a Notice of Proposed Rulemaking ("the Notice") on February 23, 2023, and received public comments until March 27, 2023. Circumvention of Lawful Pathways, 88 Fed. Reg. 11704, 11704 (Feb. 23, 2023). Including the last day, the comment period spanned 33 days.[6] In promulgating the Rule, the agencies invoked the foreign affairs and good cause exceptions to the APA's required 30-day delayed effective date for substantive rules. *Id.* at 31444–47. The Rule took effect on May 11, 2023. *Id.* at 31314.

**C.    Procedural History**

This case began in November 2018, when Plaintiffs filed suit to challenge an interim final rule, Aliens Subject to a Bar on Entry Under Certain Presidential Proclamations; Procedures for Protection Claims, 83 Fed. Reg. 55934 (Nov. 9, 2018), and accompanying presidential proclamation which together barred asylum eligibility for noncitizens who entered the United States outside of designated ports of entry ("Entry Rule"). ECF No. 1. This Court enjoined the Entry Rule. *EBSC v. Trump* (*Entry I*), 349 F. Supp. 3d 838 (N.D. Cal. 2018) (granting temporary restraining order); *EBSC v. Trump* (*Entry II*), 354 F. Supp. 3d 1094 (N.D. Cal. 2018) (granting preliminary injunction). The Ninth Circuit and Supreme Court declined to stay the temporary restraining order pending appeal. *EBSC v. Trump* (*Entry III*), 932 F.3d 742 (9th Cir. 2018); *Trump v. EBSC* (*Entry IV*), 139 S. Ct. 782 (2018) (mem.). This Court stayed the case in March 2019, pending resolution of the appeal. ECF No. 113. The Ninth Circuit subsequently held that the Entry Rule was substantively invalid and affirmed this Court's orders granting preliminary injunctive relief. *Entry V*, 993 F.3d at 640.

In 2019, DOJ and DHS issued an interim final rule that rendered noncitizens who crossed

---

[6] The parties dispute the exact length of the comment period: Defendants include the final day of the comment period in their calculation, while Plaintiffs omit the final day. For purposes of this motion, the Court assumes that the public could begin submitting comments on the day the Notice was issued and could continue to submit comments until the end of the day the comment period closed, such that the comment period was 33 days long.

5

the southern border after traveling through a country other than their own categorically ineligible for asylum ("Transit Rule"). Asylum Eligibility and Procedural Modifications, 84 Fed. Reg. 33829 (July 16, 2019). The Transit Rule contained three exceptions under which noncitizens could remain eligible for asylum: (1) if they had applied for and been denied asylum or other protection in at least one country en route to the United States; (2) if they qualified as victims of human trafficking; and (3) if the only countries they traveled through were not parties to one of three international treaties. *Id.* at 33843. This Court enjoined the Transit Rule. *EBSC v. Barr* (*Transit I*), 385 F. Supp. 3d 922 (N.D. Cal. 2019). The Ninth Circuit narrowed the scope of the injunction, staying it outside of the Ninth Circuit, and explained that this Court retained jurisdiction to further develop the record in support of a broader injunction. *EBSC v. Barr* (*Transit II*), 934 F.3d 1026 (9th Cir. 2019). Following remand, this Court restored the nationwide scope of the injunction. *EBSC v. Barr* (*Transit III*), 391 F. Supp. 3d 974 (N.D. Cal. 2019). The Supreme Court then stayed the injunction pending appeal. *Barr v. EBSC* (*Transit IV*), 140 S. Ct. 3 (2019) (mem.). On appeal, the Ninth Circuit affirmed this Court's order granting a nationwide injunction and held that the Transit Rule was substantively invalid. *EBSC v. Garland* (*Transit V*), 994 F.3d 962 (9th Cir. 2020).

The Rule Plaintiffs presently challenge removed provisions implementing the Entry and Transit Rules. *See* 88 Fed. Reg. at 31319. On May 11, 2023—the day the Rule was scheduled to take effect, which was five days before its publication—Plaintiffs filed a motion seeking to lift the stay in this case and requesting leave to file an amended and supplemental complaint. ECF No. 147. Pursuant to the parties' subsequent stipulation, the Court granted the motion and adopted the parties' proposed case schedule, which contemplated proceeding directly to summary judgment. ECF No. 163. The parties now move for summary judgment. ECF Nos. 169, 176. The Court permitted and has considered amicus briefs by a group of former immigration judges and members of the Board of Immigration Appeals ("BIA"), ECF No. 172, and by National Citizenship and Immigration Services Council 119, ECF No. 174-1.

## II. JURISDICTION

The Court has jurisdiction under 28 U.S.C. § 1331.

6

### III. LEGAL STANDARD

Granting summary judgment is proper when a "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). For cases involving review of agency action under the APA, "[t]he function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." *City & County of San Francisco v. United States*, 130 F.3d 873, 877 (9th Cir. 1997) (quoting *Occidental Eng'g Co. v. INS*, 753 F.2d 766, 769 (9th Cir. 1985)). In such cases, a court's review is generally limited to the administrative record. *Lands Council v. Powell*, 395 F.3d 1019, 1029–30 (9th Cir. 2005).

### IV. DISCUSSION

#### A. Preliminary Issues

The Court begins by addressing preliminary issues that affect this Court's jurisdiction to reach the merits and grant the relief sought—namely, Article III standing, statutory standing, and provisions of the INA that limit judicial review.

##### 1. Article III Standing

"Article III confines the federal judicial power to the resolution of 'Cases' and 'Controversies.'" *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021). "For there to be a case or controversy under Article III, the plaintiff must have a 'personal stake' in the case—in other words, standing." *Id.* (quoting *Raines v. Byrd*, 521 U.S. 811, 819 (1997)). "[T]o establish standing, a plaintiff must show (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant, and (iii) that the injury would likely be redressed by judicial relief." *Id.* "The party invoking federal jurisdiction bears the burden of establishing" each element of standing. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). At summary judgment, plaintiffs "must 'set forth' by affidavit or other evidence 'specific facts,' which for purposes of the summary judgment motion will be taken as true." *Id.* (internal citation omitted).

Plaintiffs assert organizational standing to challenge the Rule. "An organization may establish standing on its own behalf by showing that the defendant's conduct resulted in 'a

United States District Court
Northern District of California

diversion of its resources and frustration of its mission,' or caused a substantial loss in organizational funding." *Transit V*, 994 F.3d at 974 (internal citation omitted) (quoting *Fair Hous. of Marin v. Combs*, 285 F.3d 899, 905 (9th Cir. 2002)); *see Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982) (allegations that challenged practices "frustrated" organization's mission and required reallocation of resources are sufficient to confer direct standing because "[s]uch concrete and demonstrable injury to the organization's activities—with the consequent drain on the organization's resources—constitutes far more than simply a setback to the organization's abstract social interests"). "[U]nder *Havens Realty*, 'a diversion-of-resources injury is sufficient to establish organizational standing,' if the organization shows that, independent of the litigation, the challenged 'policy frustrates the organization's goals and requires the organization to expend resources in representing clients they otherwise would spend in other ways.'" *Entry III*, 932 F.3d at 765 (first quoting *Nat'l Council of La Raza v. Cegavske*, 800 F.3d 1032, 1040 (9th Cir. 2015), then quoting *Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 657 F.3d 936, 943 (9th Cir. 2011) (en banc)).

Plaintiffs are immigration legal services organizations that represent noncitizens seeking asylum. ECF No. 169-2 ¶¶ 5, 7; ECF No. 169-3 ¶¶ 4, 12–13; ECF No. 169-5 ¶ 10; ECF No. 169-6 ¶¶ 6, 9, 11; ECF No. 169-7 ¶¶ 6, 12; ECF No. 175 ¶¶ 6–7. Plaintiffs assert that the Rule frustrates their organizational goals, requires them to reallocate resources in a manner which will limit the number of clients they serve, and will cause them to lose funding. ECF No. 169-2 ¶¶ 11, 13; ECF No. 169-3 ¶ 17; ECF No. 169-5 ¶ 11; ECF No. 169-6 ¶ 14; ECF No. 169-7 ¶¶ 19–20, 26; ECF No. 175 ¶ 18.

The Rule will frustrate Plaintiffs' missions and require them to divert resources from existing programs. ECF No. 169-2 ¶ 16; ECF No. 169-3 ¶¶ 25–26; ECF No. 169-5 ¶ 24; ECF No. 175 ¶¶ 18, 21. Under the Rule, many of Plaintiffs' clients will be presumed ineligible for asylum. ECF No. 169-2 ¶¶ 7, 11; ECF No. 169-3 ¶ 18; ECF No. 169-5 ¶¶ 15, 28–43; ECF No. 169-6 ¶¶ 10–11; ECF No. 169-7 ¶¶ 20, 32–43; ECF No. 175 ¶¶ 15, 37. To assist asylum seekers, Plaintiffs will need to overhaul their screening and intake processes to determine whether clients can qualify for an exception to the Rule or rebut the presumption, and assign staff to gather

8

relevant evidence and prepare such arguments. ECF No. 169-2 ¶ 13; ECF No. 169-3 ¶ 24; ECF No. 169-5 ¶¶ 20–23. Because many of their clients will be presumed ineligible for asylum, Plaintiffs will have to assist clients who cannot meet an exception or rebut the presumption in seeking other forms of relief—statutory withholding of removal and CAT withholding—which are far more time- and resource-intensive than asylum, largely because they impose a higher evidentiary standard. ECF No. 169-2 ¶ 11; ECF No. 169-3 ¶ 21; ECF No. 169-5 ¶ 17; ECF No. 169-7 ¶ 24. Because of the higher evidentiary standard, Plaintiffs will have to devote resources to filing appeals to the BIA and petitions for review. ECF No. 169-7 ¶ 24. Statutory withholding and CAT withholding do not permit principal applicants to petition for derivative applicants—as asylum does—so Plaintiffs will have to devote additional resources to preparing separate applications to ensure the safety of applicants' family members. ECF No. 169-2 ¶ 12; ECF No. 169-3 ¶¶ 22–23; ECF No. 169-5 ¶¶ 18–19. Plaintiffs will also need to adjust outreach programs to educate the community about the new Rule and develop new materials for such outreach. ECF No. 169-3 ¶ 27; ECF No. 169-4 ¶ 35; ECF No. 169-6 ¶ 22; ECF No. 175 ¶ 37.

Because Plaintiffs will need to devote additional resources to each client seeking asylum— for additional screening and preparation to argue that exceptions apply or rebut the presumption; for the complexities involved in preparing statutory withholding and CAT withholding applications; and for the training required to prepare staff to take on these tasks—Plaintiffs will be able to represent fewer clients. ECF No. 169-2 ¶¶ 13–14; ECF No. 169-4 ¶ 36; ECF No. 169-5 ¶ 23; ECF No. 169-6 ¶ 16; ECF No. 169-7 ¶ 22. Several Plaintiffs additionally anticipate a loss of funding due to these operational shifts. ECF No. 169-2 ¶¶ 8, 13–14; ECF No. 169-6 ¶ 16; ECF No. 175 ¶ 36.

EBSC, for instance, focuses on affirmative asylum, which is "core to the organization's mission, and accounts for almost half . . . [its] budget." ECF No. 169-6 ¶ 8. A substantial number of EBSC's affirmative asylum clients are likely to be subject to the Rule's presumption of ineligibility: in 2022, nearly a third of EBSC's affirmative asylum clients crossed the southern border between ports of entry after transiting through a third country, *id.* ¶ 10; EBSC's clients include victims of gender-based violence and indigenous, LGBT, and HIV positive individuals,

9

who are particularly vulnerable to violence en route to the United States and are likely to have

"great difficulty accessing protection" in transit countries, *id.* ¶ 11; and many of EBSC's clients

are "illiterate or only marginally literate," such that they will struggle to use the CBP One mobile

scheduling application, *id.* Because such individuals will be presumed ineligible for asylum,

EBSC will need to "significantly cut [its] affirmative asylum program," which is core to its

mission, *id.* ¶ 18, and "make [an] enormous and costly shift in how [it] provide[s] services," *id.*

¶ 19, by pivoting to removal defense work, for which it would need to find new funding sources,

*id.* ¶ 21. "If EBSC were no longer able to file [affirmative asylum] cases for most individuals who

entered without inspection after transiting through a third country, [it] would face a marked

decrease in [its] budget, which would jeopardize [its] entire asylum program." *Id.* ¶ 16.

Because Plaintiffs offer uncontroverted evidence that the Rule will frustrate their

organizational goals, require diversion of resources, and substantially affect their funding, the

Court finds that Plaintiffs have standing to challenge the Rule.

Defendants argue that Plaintiffs nevertheless lack standing to challenge "what is, in

essence, a decision regarding enforcement of the immigration laws against third parties," such that

standing is barred by *Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973), and *Sure-Tan, Inc. v.*

*NLRB*, 467 U.S. 883, 897 (1984). ECF No. 176-1 at 22. The Ninth Circuit previously rejected

this argument, explaining that those cases concern third-party, not organizational, standing. *Entry*

*V*, 993 F.3d at 664 n.6.[7]

On reply, Defendants argue that *United States v. Texas*, 143 S. Ct. 1964 (2023),

additionally precludes Plaintiffs from challenging the Rule. ECF No. 182 at 8–9. In that case, the

Supreme Court held that two states lacked standing to challenge DHS's immigration-related arrest

and prosecution priorities, which the states argued conflicted with arrest mandates in the INA. *Id.*

at 1969–70. Relying on *Linda R.S.*, the Supreme Court explained that the states had no judicially

cognizable interest in the Executive's "exercise of enforcement discretion over whether to arrest or

prosecute." *Id.* at 1970. The Court also explicitly noted that "a challenge to an Executive Branch

---

[7] The Court notes that the Supreme Court's decision in *United States v. Texas*, 143 S. Ct. 1964
(2023), suggests these cases are not limited to third-party standing.

policy that involves both the Executive Branch's arrest or prosecution priorities *and* the Executive Branch's provision of legal benefits or legal status could lead to a different standing analysis . . . because the challenged policy might implicate more than simply the Executive's traditional enforcement discretion." *Id.* at 1974 (emphasis in original).

The Rule Plaintiffs challenge does not seem to implicate the Executive's exercise of enforcement discretion over whether to arrest or prosecute. Regardless, the Rule certainly implicates the Executive's provision of legal benefits or legal status because it categorically limits eligibility for asylum, which offers "a number of benefits, including pathways to lawful permanent resident status and citizenship," the opportunity to obtain derivative asylum for spouses and unmarried children, employment authorization, the freedom to travel abroad without prior government approval, and eligibility for certain federal financial benefits. *Entry III*, 932 F.3d at 759–60. Thus, *United States v. Texas*, 143 S. Ct. at 1964, does not bar Plaintiffs from challenging the Rule.

The Court concludes that Plaintiffs have established Article III standing.

### 2. Statutory Standing

Courts "presume that a statutory cause of action extends only to plaintiffs whose interests 'fall within the zone of interests protected by the law invoked.'" *Lexmark Int'l, Inc v. Static Control Components, Inc.*, 572 U.S. 118, 129 (2014) (quoting *Allen v. Wright*, 468 U.S. 737, 751 (1984)). "[T]he test 'forecloses suit only when a plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that' Congress authorized that plaintiff to sue." *Id.* at 130 (quoting *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 225 (2012)). Because Plaintiffs bring an APA challenge to rules promulgated pursuant to the INA, the Court considers whether Plaintiffs fall within the zone of interests protected by the INA. *Patchak*, 567 U.S. at 224.

The Ninth Circuit has already held that organizations that provide asylum services—some of which are parties to this case—fall within the zone of interests protected by the INA, and therefore satisfy the zone-of-interests standard to bring an APA challenge. *See Entry III*, 932 F.3d at 768–69 ("Although the Organizations are neither directly regulated nor benefitted by the INA,

11

Case: 23-16094, 09/25/2023, DktEntry: 18-2, Page 15 of 179

we nevertheless conclude that their interest in 'provid[ing] the [asylum] services [they were] formed to provide' falls within the zone of interests protected by the INA.") (alterations in original) (quoting *El Rescate Legal Servs. v. EOIR*, 959 F.2d 742, 748 (9th Cir. 1991)); *Entry V*, 993 F.3d at 668 ("The Organizations' claims fall within the zone of interests of the INA and of the regulatory amendments implemented by the Rule.").  Because Plaintiffs' "purpose is to help individuals apply for and obtain asylum, provide low-cost immigration services, and carry out community education programs with respect to those services," their "interests are 'marginally related to' and 'arguably within' the scope of the statute," such that the zone-of-interests analysis does not foreclose suit.  *Entry V*, 993 F.3d at 668.

The Court concludes that Plaintiffs have statutory standing to challenge the validity of the Rule.

### 3.    Jurisdictional Bars

Defendants argue that several provisions of the INA prohibit this Court from reviewing the Rule or granting any remedy.

#### a.    8 U.S.C. §§ 1252(a)(2)(A)(iv), (e)(1), and (e)(3)

First, Defendants argue that the Rule implements expedited removal, such that 8 U.S.C. §§ 1252(a)(2)(A)(iv), (e)(1), and (e)(3) divest this Court of jurisdiction to review or vacate the Rule.  Section 1252(a)(2)(A)(iv) provides that "no court shall have jurisdiction to review . . . except as provided in subsection (e), procedures and policies adopted by the Attorney General to implement" expedited removal.  Section 1252(e)(1) provides that no court may grant equitable relief "in any action pertaining to an order to exclude" based on expedited removal, while Section 1252(e)(3) limits judicial review of regulations implementing the expedited removal statute to cases initiated in the United States District Court for the District of Columbia.  These provisions therefore limit judicial review of rules implementing the expedited removal statute.

Defendants argue that the Rule implements the expedited removal statute because the presumption of asylum ineligibility must be applied in expedited removal proceedings.  The argument stretches too far.  As the Ninth Circuit previously explained, "[b]ars to asylum eligibility may eventually be relevant to removal proceedings, but they are not 'regulation[s] . . . to

implement [removal orders]' or otherwise entirely linked with removal orders." *Entry V*, 993 F.3d at 666–67. "This is consistent with the purposes of these jurisdictional limitations: allowing collateral APA challenges to an asylum-eligibility rule does not undermine Congress's desire to 'limit all aliens to one bite of the apple with regard to challenging' their removal orders." *Id.* at 667 (quoting *Martinez v. Napolitano*, 704 F.3d 620, 622 (9th Cir. 2012)). The Rule implements the asylum statute by imposing new conditions on asylum eligibility; that the standard articulated in the Rule is also applied in the expedited removal process does not convert the Rule into one implementing the expedited removal statute.

The Court is not persuaded that Defendants' proposed reading of the limit on judicial review imposed by Sections 1252(a)(2)(A)(iv), (e)(1) and (e)(3) is appropriate. "As the Supreme Court has observed, where 'Congress wanted [a] jurisdictional bar to encompass [particular] decisions [under the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA")] . . . it expressed precisely that meaning." *Entry II*, 354 F. Supp. 3d. at 1119 (alterations in original) (quoting *Kucana v. Holder*, 558 U.S. 233, 248 (2010)). Congress could have imposed similar limits on judicial review of challenges to regulations that implement the asylum statute, but it did not do so. "[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Nken v. Holder*, 556 U.S. 418, 430 (2009) (alteration in original) (quoting *INS v. Cardoza-Fonseca*, 480 U.S. 421, 432 (1987)). In the absence of binding authority holding that these provisions limit judicial review of regulations implementing the asylum statute, the Court concludes that it has jurisdiction over this case.

**b.     8 U.S.C. § 1252(f)(1)**

Defendants also argue that 8 U.S.C. § 1252(f)(1) divests this Court of jurisdiction to grant the relief Plaintiffs seek. Section 1252(f), titled "[l]imit on injunctive relief," provides that "no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of the provisions of part IV of this subchapter . . . other than with respect to the application of such provisions to an individual alien against whom proceedings under such part

13

have been initiated." 8 U.S.C. § 1252(f)(1). As the Supreme Court has explained, "[Section] 1252(f)(1) generally prohibits lower courts from entering injunctions that order federal officials to take or to refrain from taking actions to enforce, implement, or otherwise carry out the specified statutory provisions." *Garland v. Aleman Gonzalez*, 142 S. Ct. 2057, 2065 (2022).

First, the Court notes that Plaintiffs seek vacatur under the APA, not an injunction. Though Defendants argue that the Section 1252(f)(1) bar also applies to vacatur, they cite no binding authority on this point, and this Court is not aware of any.

Further, even if Section 1252(f)(1) did bar relief under the APA, the asylum statute is not among the statutory provisions specified in Section 1252(f)(1). Defendants argue that, because the Rule provides that the presumption of asylum ineligibility shall apply in removal proceedings initiated under 8 U.S.C. §§ 1225(b)(1) and 1229a, vacating or enjoining the Rule would effectively "enjoin or restrain the operation" of those removal statutes in violation of Section 1252(f)(1) by preventing the agencies from applying the Rule's presumption in removal proceedings.

The Court is not persuaded by this argument. "At best, the law governing asylum is collateral to the process of removal." *Entry V*, 993 F.3d at 667. The Rule imposes conditions on eligibility for asylum; these conditions are applied across all contexts in which asylum claims may arise. That any injunction would have a collateral effect on the conditions for asylum eligibility as applied during removal proceedings does not bring it within the bar imposed by Section 1252(f). *See Gonzales v. DHS*, 508 F.3d 1227, 1233 (9th Cir. 2007) (holding that Section 1252(f)(1) did not prohibit injunction directly implicating adjustment of status—which is not among the statutory provisions specified in Section 1252(f)(1)—despite collateral effect on removal); *Aleman Gonzalez*, 142 S. Ct. at 2067 n.4 (noting that *Gonzales*, 508 F.3d at 1227, "stands at most for the unresponsive proposition that a court may enjoin the unlawful operation of a provision *that is not specified in § 1252(f)(1)* even if that injunction has some collateral effect on the operation of a covered provision") (emphasis in original). Congress expressly limited the jurisdictional bar of Section 1252(f)(1) to "the provisions of part IV of this subchapter," which do not include the asylum statute. *Gonzalez v. ICE*, 975 F.3d 788, 813 (9th Cir. 2020) ("[B]y specifying only 'the

14

United States District Court
Northern District of California

provisions of Part IV' and reinforcing its focus on only '*such* provisions,' the statute's plain text makes clear that its limitations on injunctive relief do *not* apply to *other* provisions of the INA.") (emphasis in original) (internal citation omitted). The fact that the removal statutes cross-reference the asylum statute does not bring the asylum statute within the limited jurisdictional bar of Section 1252(f)(1).

The Court concludes that it has jurisdiction to review the Rule and grant an appropriate remedy under the APA.

## B.     APA Claims

The APA provides, in relevant part, that courts "shall . . . hold unlawful and set aside agency action . . . found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; . . . in excess of statutory jurisdiction, authority, or limitations . . . ; [or] without observance of procedure required by law." 5 U.S.C. § 706(2). "[I]n reviewing agency action, a court is ordinarily limited to evaluating the agency's contemporaneous explanation in light of the existing administrative record." *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2573 (2019).

### 1.     Substantive Validity

Plaintiffs argue the Rule is substantively invalid because it is both not in accordance with law and arbitrary and capricious.

#### a.     "Not in Accordance with Law"

The Rule imposes additional conditions on asylum eligibility; such conditions must be "consistent with" Section 1158. 8 U.S.C. § 1158(b)(2)(C). The government argues that the conditions imposed by the Rule are consistent with Section 1158, and that the Court should defer to the agencies' interpretation of the statute.

To determine whether judicial deference to an agency's interpretation of a statute is appropriate, courts apply the framework articulated by the Supreme Court in *Chevron*, *U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). Under *Chevron*, courts first consider "whether Congress has directly spoken to the precise question at issue"; "[i]f the intent of Congress is clear, that is the end of the matter." *Campos-Hernandez v. Sessions*, 889 F.3d 564,

15

568 (9th Cir. 2018) (quoting *Chevron*, 467 U.S. at 842). "The first and most important canon of statutory construction is the presumption 'that a legislature says in a statute what it means and means in a statute what it says there.'" *In re Pangang Grp. Co., LTD.*, 901 F.3d 1046, 1056 (9th Cir. 2018) (quoting *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253 (1992)). The Court "starts with the plain statutory text and, 'when deciding whether the language is plain, . . . must read the words in their context and with a view to their place in the overall statutory scheme.'" *Altera Corp. & Subsidiaries v. Comm'r of Internal Revenue*, 926 F.3d 1061, 1075 (9th Cir. 2019) (quoting *King v. Burwell*, 576 U.S. 473, 486 (2015)). "In addition, [courts] examine the legislative history, the statutory structure, and 'other traditional aids of statutory interpretation' in order to ascertain congressional intent." *Id.* (quoting *Middlesex Cnty. Sewerage Auth. v. Nat'l Sea Clammers Ass'n*, 453 U.S. 1, 13 (1981)). "If 'the statute is silent or ambiguous with respect to [a] specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.'" *Wide Voice, LLC v. FCC*, 61 F.4th 1018, 1025 (9th Cir. 2023) (quoting *Chevron*, 467 U.S. at 843).

Congress granted the agencies authority to impose additional conditions on asylum eligibility, but only those consistent with Section 1158. The Rule effectively conditions asylum eligibility on whether a noncitizen qualifies for any of three exceptions—presenting at a port of entry, having been denied protection by another country in transit, and having parole-related travel authorization—or can show exceptionally compelling circumstances.[8] The agencies can only condition asylum eligibility based on these factors if doing so is consistent with Section 1158.

Two of the conditions imposed by the Rule have been previously found to be inconsistent with Section 1158. Under binding Ninth Circuit precedent, conditioning asylum eligibility on presenting at a port of entry or having been denied protection in transit conflicts with the unambiguous intent of Congress as expressed in Section 1158. *Entry V*, 993 F.3d at 671 ("[T]he [Entry] Rule is substantively invalid because it conflicts with the plain congressional intent

---

[8] As noted above, by its terms, the Rule only applies to individuals who transited through a country other than their own en route to the U.S. border. The Rule also contains an exception for unaccompanied minors.

16

United States District Court
Northern District of California

1   instilled in [Section] 1158(a), and is therefore 'not in accordance with law.'") (quoting 5 U.S.C.

2   § 706(2)(A)); *Transit V*, 994 F.3d at 976 ("We hold, independently of *Chevron*, that the [Transit]

3   Rule is not 'consistent with' [Section] 1158.  We note, however, that we would come to the same

4   conclusion even if we were to apply *Chevron*, for the Rule is contrary to the unambiguous

5   language of [Section] 1158.").  Section 1158(a) permits noncitizens to apply for asylum regardless

6   of whether or not they arrive at a designated port of entry; a rule that conditions eligibility for

7   asylum on presentment at a port of entry conflicts with Section 1158(a).  *Entry V*, 993 F.3d at

8   669–70.  The safe-third-country and firm-resettlement bars, 8 U.S.C. § 1158(a)(2)(A), (b)(2)(A),

9   "specifically address[] the circumstances in which an alien who has traveled through, or stayed in,

10  a third country can be deemed sufficiently safe in that country to warrant a denial of asylum in the

11  United States"; conditioning asylum eligibility on having been denied protection in transit is not

12  consistent with these bars.  *Transit V*, 994 F.3d at 978.

13          Defendants argue that this Court is not bound by the Ninth Circuit's holdings in *Entry V*

14  and *Transit V* because, unlike the Entry and Transit Rules, this Rule does not impose a categorical

15  bar, and a noncitizen may avoid the application of the presumption by qualifying for a different

16  exception.  ECF No. 176-1 at 27–29; *see also* 88 Fed. Reg. at 31374 ("[U]nder this [R]ule . . .

17  manner of entry, standing alone, is never dispositive. . . .  [T]he narrower application and

18  numerous exceptions and methods of rebutting the presumption demonstrate the differences

19  between the prior, categorical bars [and the Rule]."); *id.* at 31379 ("[T]he [R]ule imposes a

20  condition on asylum . . . eligibility relating to whether the noncitizen availed themselves of a

21  lawful pathway, but the [R]ule does not direct an inquiry as to whether the noncitizen can or

22  should return to a third country.").

23          The Court is not persuaded that the existence of other exceptions or the opportunity to

24  rebut the presumption materially distinguishes this Rule from the reasoning of *Entry V* and *Transit

25  V*.  In *Entry V*, the Ninth Circuit explained that requiring noncitizens to present at ports of entry

26  "effectively [constitutes] a categorical ban on migrants who use a method of entry explicitly

27  authorized by Congress in [S]ection 1158(a)."  993 F.3d at 669–70.  The Entry Rule was contrary

28  to law because it excluded noncitizens from eligibility for asylum based on their failure to present

United States District Court
Northern District of California

United States District Court
Northern District of California

at a port of entry, despite express statutory language providing that any noncitizen may apply for asylum, regardless of "whether or not [they arrived] at a designated port of arrival." 8 U.S.C. § 1158(a). That a noncitizen may attempt to preserve their eligibility for asylum by meeting another of the Rule's exceptions, or that their failure to present at a port of entry may be excused upon a showing of exceptionally compelling circumstances, does not address the reason why restricting asylum eligibility based on place of entry conflicts with the law. Defendants are correct that the Rule does not impose a categorical bar on all noncitizens subject to the Rule; however, failure to present at a port of entry will exclude those for whom other exceptions are not available and who cannot rebut the presumption.[9]

In *Transit V*, the Ninth Circuit explained that "regulations imposing additional limitations and conditions under [Section] 1158(b)(2)(C) must be consistent with the core principle of [Sections] 1158(a)(2)(A) and (b)(2)(A)(vi)—that an otherwise qualified alien can be denied asylum only if there is a 'safe option' in another country." 994 F.3d at 979. As written, the Rule imposes a presumption of ineligibility on asylum seekers who did not apply for or were granted asylum in a transit country regardless of whether that country is a safe option. That noncitizens may try to escape the presumption by satisfying a different exception, or that the presumption of ineligibility may be rebutted in exceptionally compelling circumstances, does not address whether a noncitizen has a safe option in another country. While Defendants are correct that failure to seek protection in a transit country alone may not be dispositive for many noncitizens subject to the Rule, it would be so for the subset of noncitizens for whom the other exceptions are unavailable

---

[9] For example, a noncitizen ineligible for existing DHS parole programs who has been in Mexico for more than 30 business days—and is therefore ineligible for asylum in Mexico, AR 5715 (Ley Sobre Refugiados, Protección Complementaria y Asilo Político, Diario Oficial de la Federación [DOF] 27-01-2011, últimas reformas DOF 18-02-2022 (Mex.))—must present at a port of entry to avoid the presumption altogether. If they cannot safely wait for a CBP One appointment to become available, and cannot show some exceptionally compelling circumstance, they are barred from asylum.

18

and who cannot rebut the presumption.[10]  Regulations imposing additional conditions on asylum must be consistent with the core principle of the safe-third-country and firm-resettlement bars. This Rule is not.

The Court concludes that the Rule is contrary to law because it presumes ineligible for asylum noncitizens who enter between ports of entry, using a manner of entry that Congress expressly intended should not affect access to asylum.  The Rule is also contrary to law because it presumes ineligible for asylum noncitizens who fail to apply for protection in a transit country, despite Congress's clear intent that such a factor should only limit access to asylum where the transit country actually presents a safe option.

### b.   Arbitrary and Capricious

"The APA's arbitrary-and-capricious standard requires that agency action be reasonable and reasonably explained."  *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021). "The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency."  *Wide Voice*, 61 F.4th at 1024 (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

> Nevertheless, [courts] require the agency to 'examine the relevant data and articulate a satisfactory explanation for its action,' and [courts] will strike down agency action as 'arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency,' or if the agency's decision 'is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'

*Turtle Island Restoration Network v. U.S. Dep't of Com.*, 878 F.3d 725, 732–33 (9th Cir. 2017)

---

[10] For instance, a noncitizen originating from a third country presently in Mexico who is ineligible for existing DHS parole programs and for whom Mexico is not safe, such that they cannot wait for a CBP One appointment to become available, would be subject to the presumption, regardless of whether any country they traveled through presented a safe option for them.  To rebut the presumption, that noncitizen must wait until they experience an extreme and imminent threat to life or safety to enter the United States to seek protection.  88 Fed. Reg. at 31396 ("[D]anger in Mexico generally would justify failing to pre-schedule a time and place to appear at a [port of entry] . . . only when it amounts to an extreme and imminent threat to life or safety.").  If they cannot show that or some other exceptionally compelling circumstance, they are barred from asylum.

19

1    (quoting *State Farm*, 463 U.S. at 43).

2         The Rule is arbitrary and capricious for at least two reasons.  First, it relies on the

3    availability of other pathways for migration to the United States, which Congress did not intend

4    the agencies to consider in promulgating additional conditions for asylum eligibility.  Second, it

5    explains the scope of each exception by reference to the availability of the other exceptions,

6    although the record shows that each exception will be unavailable to many noncitizens subject to

7    the Rule.

8                              i.     "Lawful Pathways"[11]

9         As the preamble states, "[t]he [R]ule's primary purpose is to incentivize migrants,

10   including those intending to seek asylum, to use lawful, safe, and orderly pathways to enter the

11   United States, or seek asylum or other protection in another country through which they travel."

12   88 Fed. Reg. at 31336.  The final Rule offers several examples of these "lawful pathways," namely

13   temporary worker visa programs, parole programs, and refugee admission in the United States.  *Id.*

14   The agencies justify imposing conditions on asylum eligibility by reference to the availability of

15   these other pathways.  *See, e.g.*, *id.* at 31318 ("Available pathways provide lawful, safe[,] and

16   orderly mechanisms for migrants to enter the United States and make their protection claims. . . .

17   [T]his [R]ule also imposes consequences on certain noncitizens who fail to avail themselves of the

18   range of lawful, safe, and orderly means for entering the United States."); *id.* at 31347 ("[T]he

19   meaningful pathways detailed in the [R]ule, combined with the exceptions and rebuttals to the

20   presumption, provide sufficient opportunities for individuals to meet an exception to or rebut the

21   presumption."); *see also* ECF No. 176-1 at 33 ("The [R]ule was promulgated based on several

22   urgent and compelling considerations, including . . . the expansion of lawful, safe, and orderly

23

24   [11] The preamble to the Rule defines "lawful pathways" and "lawful, safe, and orderly pathways"
     as "the range of pathways and processes by which migrants are able to enter the United States or
25   other countries in a lawful, safe, and orderly manner and seek asylum and other forms of
     protection as described in this [R]ule."  88 Fed. Reg. at 31316 n.18.  The Rule elsewhere appears
26   to use "pathways" to describe the means by which an individual may qualify for an exception to,
     or rebut, the presumption.  *See, e.g.*, *id.* at 31410 ("The Departments believe that these alternative
27   pathways for a noncitizen to be excepted from or rebut the presumption against asylum eligibility
     are sufficient.").  For the sake of clarity, the Court uses "pathways" and "lawful pathways" to refer
28   to the means by which noncitizens may enter the United States, and not to refer to any exceptions
     to or opportunities to rebut the presumption imposed under the Rule.

United States District Court
Northern District of California

20

pathways noncitizens can pursue to seek entry to the United States.").

The agencies' authority to promulgate regulations imposing additional limitations and conditions on asylum eligibility requires only that such conditions be "consistent with" the asylum statute, 8 U.S.C. § 1158(b)(2)(C); the statute does not otherwise mandate that particular factors be considered in the rulemaking process. However, "agency action must be based on non-arbitrary, 'relevant factors.'" *Judulang v. Holder*, 565 U.S. 42, 55 (2011) (quoting *State Farm*, 463 U.S. at 43). The availability of refugee admissions, parole, or work visas is irrelevant to the availability of asylum, which Congress considered to be independent of any particular means of entry.

Consider, for example, parole. The Executive's longstanding discretion to parole noncitizens into the country, codified in 1952, has changed only slightly in the decades since. *Compare* 8 U.S.C. § 1182(d)(5) (1952) ("The Attorney General may in his discretion parole into the United States temporarily under such conditions as he may prescribe for emergent reasons or for reasons deemed strictly in the public interest any alien applying for admission to the United States.") *with* 8 U.S.C. § 1182(d)(5) (2018) ("The Attorney General may . . . in his discretion parole into the United States temporarily under such conditions as he may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit any alien applying for admission to the United States.").[12] "Prior to the [1980 Refugee Act], asylum for aliens who were within the United States had been governed by regulations promulgated by the INS, pursuant to the Attorney General's broad parole authority." *Cardoza-Fonseca*, 480 U.S. at 427 n.4. The 1980 Refugee Act ordered the Attorney General to "establish a procedure for an alien physically present in the United States or at a land border or port of entry, irrespective of such alien's status, to apply for asylum." Pub. L. No. 96-212, § 208(a), 94 Stat. 102, 105 (1980). Asylum would therefore be a benefit for which any qualifying noncitizen at a border or port of entry could apply, independent of the Attorney General's parole power. Imposing conditions on asylum eligibility based on the availability of parole programs relies on a factor that Congress did not intend to be

---

[12] While parole is discretionary and must be granted on a case-by-case basis, the Executive has created country-specific programs through which eligible noncitizens may seek individual grants of parole. *See, e.g.*, 87 Fed. Reg. at 63507.

21

considered in the asylum context.[13]

Work visas and refugee admissions are similarly irrelevant to asylum. The H-2A and H-2B temporary worker visa programs predate Congress's enactment of the asylum statute. *See Mendoza v. Perez*, 754 F.3d 1002, 1007 (D.C. Cir. 2014) ("The H-2A visa program—created by the [INA] of 1952 [] and amended by the Immigration Reform and Control Act of 1986 ["IRCA"]—permits employers to hire foreign workers to perform temporary agricultural work in the United States."); *La. Forestry Ass'n Inc. v. Sec'y U.S. Dep't of Lab.*, 745 F.3d 653, 659 (3d Cir. 2014) ("In 1986, Congress enacted [IRCA], which amended the INA by, among other things, bifurcating the H-2 visa program into the H-2A and H-2B programs, which govern the admission of agricultural and nonagricultural workers, respectively."). The asylum statute expressly instructs that the ability to apply for asylum should not be limited based on status; whether temporary work visas are sufficiently available is irrelevant to whether asylum should remain so. The Refugee Act, which codified the availability of asylum protection, separately established a permanent refugee admission system. Pub. L. No. 96-212, §§ 207–08. That Congress provided for refugees and asylees separately—and has maintained that distinction in the intervening decades—indicates that the availability of refugee protection should not impact asylum eligibility.

Simply put, the asylum statute contemplates that, subject to certain exceptions, any noncitizen physically present in the United States—regardless of whether they entered on a work visa or with parole-related travel authorization—or at a land border or port of entry—regardless of the size and scope of refugee admissions efforts—may apply for asylum. To justify limiting eligibility for asylum based on the expansion of other means of entry or protection is to consider factors Congress did not intend to affect such eligibility. The Rule is therefore arbitrary and capricious.

### ii.     Scope of Exceptions

Plaintiffs additionally argue that the agencies rely on the exceptions to justify the Rule,

---

[13] That Congress later imposed additional limitations on asylum eligibility and granted the Attorney General the authority to impose further limitations consistent with the statute does not alter this analysis; none of the statutory limitations is related to the availability of other ways to enter or be admitted to the United States.

22

while the record demonstrates that many asylum seekers will be unable to qualify for these exceptions. In the preamble, the agencies acknowledge that the Rule's exceptions and opportunity for rebuttal are insufficient to ensure that all noncitizens with otherwise meritorious asylum claims will remain eligible for asylum:

> The Departments acknowledge that despite the protections preserved by the [R]ule and the availability of lawful pathways, the rebuttable presumption adopted in the [R]ule will result in the denial of some asylum claims that otherwise may have been granted, but . . . believe that the [R]ule will generally offer opportunities for those with valid claims to seek protection through asylum, statutory withholding of removal, or protection under the CAT . . . .

88 Fed. Reg. at 31332. However, the Rule justifies the breadth of its presumption of ineligibility by reference to its multiple exceptions and the opportunity to rebut it. *See, e.g.*, 88 Fed. Reg. at 31325 ("These exceptions and opportunities for rebuttal are meant to ensure that migrants who are particularly vulnerable, who are in imminent danger, or who could not access the lawful pathways provided are not made ineligible for asylum by operation of the rebuttable presumption."); *id.* at 31334 (distinguishing the Transit Rule because "this [R]ule includes a number of broader exceptions and means for rebutting the presumption" and "the means of rebutting or establishing an exception to the presumption are not unduly burdensome"); *id.* at 31347 ("[T]he meaningful pathways detailed in the [R]ule, combined with the exceptions and rebuttals to the presumption, provide sufficient opportunities for individuals to meet an exception to or rebut the presumption."); *id.* at 31418 ("The Departments believe that the [R]ule will generally offer opportunities for those with valid claims to seek protection."). The Rule further points to the other exceptions and opportunity for rebuttal to justify the scope of each exception. *See, e.g.*, *id.* at 31411 ("Applying for, and being denied, asylum or other protection in a third country is one exception to the rebuttable presumption, but noncitizens who choose not to pursue this path may instead seek authorization to travel to the United States to seek parole pursuant to a DHS-approved parole process, or present at a [port of entry] at a pre-scheduled time and place."); *id.* at 31408 (noting that "the parole processes are not universally available, even to the covered populations," but that individuals who cannot qualify for parole processes "can present at a [port of entry] by using a DHS scheduling mechanism to schedule a time to arrive at [ports of entry] at the [southern

23

United States District Court
Northern District of California

border] and not be subject to the presumption of ineligibility"). The Rule therefore assumes that these exceptions will, at the very least, present meaningful options to noncitizens subject to the Rule.

Parole programs are not meaningfully available to many noncitizens subject to the Rule. Though other parole programs exist, *see* ECF No. 176-1 at 31, the Rule generally relies on the parole programs for Cuban, Haitian, Nicaraguan, Venezuelan, and Ukrainian nationals. These programs are country-specific and "are not universally available, even to the covered populations." 88 Fed. Reg. at 31408. The programs are further limited numerically, capped at 30,000 total individuals from Cuba, Haiti, Nicaragua, and Venezuela per month. AR 4553. Puzzlingly, these programs require that individuals fly to an interior port of entry—that is, an airport—rather than cross the southern border. Implementation of a Parole Process for Cubans, 88 Fed. Reg. 1266, 1273 (Jan. 9, 2023) ("Beneficiaries are required to fly at their own expense to an interior [port of entry], rather than arriving at the [southern border]."); Implementation of a Parole Process for Nicaraguans, 88 Fed. Reg. 1255, 1261 (Jan. 9, 2023) (same); Implementation of a Parole Process for Haitians, 88 Fed. Reg. 1243, 1249 (Jan. 9, 2023) (same); Implementation of Changes to the Parole Process for Venezuelans, 88 Fed. Reg. 1279, 1279–80 (Jan. 9, 2023) ("DHS provided the new parole process for Venezuelans who are backed by supporters in the United States to come to the United States by flying to interior [ports of entry]—thus obviating the need for them to make the dangerous journey to the [southern border]."); *see also* Implementation of the Uniting for Ukraine Parole Process, 88 Fed. Reg. 25040, 25041 (Apr. 27, 2022) ("If advance authorization is granted, the recipient will be permitted to board a flight to the United States for the purpose of requesting parole."). Because the Rule's presumption only applies at the southern land border, it necessarily would not apply to beneficiaries of these programs arriving at interior ports of entry. Of course, some number of individuals who receive travel authorization pursuant to a parole program might conceivably cross the southern border anyway.[14] Nevertheless, the record shows

---

[14] For instance, a prior version of the Venezuelan parole program "required [beneficiaries] to fly to the interior, rather than arriving at the [southern border], *absent extraordinary circumstances*," suggesting that there are circumstances in which applicants may have remained eligible for parole despite arriving at the southern border. Implementation of a Parole Process for Venezuelans, 87

24

that the presumption's exception for parole-related travel authorization will necessarily be unavailable to many asylum seekers—due to the parole programs' limited scope and eligibility requirements—and irrelevant to many noncitizens with travel authorization to apply for parole programs that require applicants to fly to interior ports.

Seeking protection in a transit country is similarly infeasible for many asylum seekers subject to the Rule. The preamble to the Rule notes that, while the agencies "recognize that not every country will be safe for every migrant," they "expect that many migrants seeking protection will be able to access asylum or other protection in at least one transit country." 88 Fed. Reg. at 31411. The record evidence available to Defendants, however, undermines this finding. Though Defendants argue that "the [R]ule adduces substantial evidence that seeking asylum in transit countries is a viable option for many migrants," ECF No. 176-1 at 38, the final Rule only specifically discusses Belize, Colombia, and Mexico as countries where noncitizens can effectively seek protection, 88 Fed. Reg. at 31410–11.

The record suggests that seeking asylum or other protection in Belize or Colombia is not a viable option for many migrants. Belize has a limited asylum system: the country has only ever received 4,104 applications for asylum and has granted just 74 of those applications. AR 5423; *see also* AR 4188–89; AR 4967. The Rule highlights Belize's 2022 amnesty program, which provided a path to citizenship for asylum seekers registered with the Department of Refugees before March 31, 2020, and limited categories of migrants residing in Belize. AR 5425–26; PC 22825.[15] As of September 30, 2022—two months after the end of the registration period—5,097

_____

Fed. Reg. 63507, 64512 (Oct. 19, 2022) (emphasis added).

[15] At oral argument, Defendants challenged Plaintiffs' reliance on data provided in public comments. ECF No. 186 at 50:10–13 ("I saw many citations to the comments, the PC record citations, but no citations really, very few, to the actual AR, the record itself."). Public comments form part of the administrative record in the context of informal rulemaking. *Rodway v. U.S. Dep't of Agric.*, 514 F.2d 809, 817 (D.C. Cir. 1975) ("The APA requires the reviewing court to 'review the whole record' in measuring the validity of agency action. The whole record in an informal rule-making case is comprised of comments received, hearings held, if any, and the basis and purpose statement.") (internal citation omitted); *Nat'l Ass'n of Chain Drug Stores v. U.S. Dep't of Health & Hum. Servs.*, 631 F. Supp. 2d 23, 26 (D.D.C. 2009) ("An informal rulemaking record consists of the following materials: (1) the notice of proposed rulemaking; (2) comments submitted by interested persons; (3) hearing transcripts, if any; (4) other factual information considered by the agency; (5) reports of advisory committees, if any; and (6) the agency's

25

United States District Court
Northern District of California

1   people had applied for amnesty. AR 4968. Because the registration period has ended and

2   eligibility generally requires prior presence in Belize, the amnesty program is not available to

3   newly arriving asylum seekers. Colombia's asylum system has limited capacity and a significant

4   backlog. AR 4231 (2021 State Department report noting that, of approximately 37,000

5   applications submitted between January 2017 and June 2021, just 753 were granted); AR 1575

6   (2023 DHS memorandum noting 26,000-case backlog of asylum cases). The Rule specifically

7   references Colombia's two-year-old temporary protection program for Venezuelans, 88 Fed. Reg.

8   at 31411, but eligibility is limited to those who arrived irregularly before January 31, 2021, PC

9   23296, and those who arrived regularly before January 31, 2023, PC 23398. Nothing in the record

10  suggests this program will be available to newly arriving migrants going forward. And migrants

11  who apply for asylum or other protection in Belize or Colombia are at risk of violence while they

12  wait for their applications to be adjudicated. *See, e.g.*, AR 5423 (Belizean government source

13  noting "many migrants find themselves victims of human trafficking" in the country); AR 4204–

14  05 (2021 State Department report noting that migrants are at risk of forced labor in Belize); AR

15  4224, 4228–29, 4248 (2021 State Department report noting forced labor and human trafficking of

16  migrants, forced recruitment of migrant children by armed groups, and other violence by armed

17  groups in Colombia); PC 22186–93 (2022 non-governmental organization ["NGO"] report

18  documenting gender-based violence against Venezuelan women in Colombia); PC 25592–607,

19  25615–19 (2022 news report documenting rising violence related to ongoing armed conflict in

20  Colombia).

21          The record refutes the suggestion that seeking protection in Mexico is a viable option for

22  many asylum seekers. The Rule cites the large number of individuals applying for protection in

23  Mexico as evidence that noncitizens subject to the presumption may seek safety there. 88 Fed.

24  Reg. at 31414–15 ("The Departments . . . note that more than 100,000 individuals felt safe enough

25  to apply for asylum in Mexico in 2022."). However, while a total of 118,478 individuals applied

26  for protection in 2022, Mexico processed just 34,762 applications that year. AR 5707. Mexico's

27  _____

28  statement of basis and purpose."). The Court must review the whole record in determining the
    validity of the agencies' action, and data submitted in public comments is part of that record.

                                          26

refugee agency is underfunded and unable to keep up with demand.  *See, e.g.*, PC 24183 (2021 State Department report noting that the increase in agency's budget "was not commensurate with the growth in refugee claims"); PC 22811 (2023 news report quoting refugee agency director explaining that, as a result of increased demand, the agency is "in a situation of near-breakdown"); PC 23082 (2023 NGO report noting that funding has not kept pace with the increase in applications and that the applications processed in 2022 included "many from previous years"); PC 32446–47 (2022 State Department report noting that civil society groups in Mexico reported that migration authorities did not provide information about how to request asylum, dissuaded migrants from doing so, and encouraged them to instead accept voluntary return to their countries of origin).  While they wait for an adjudication, applicants for asylum must remain in Mexico, where migrants are generally at heightened risk of violence by both state and non-state actors. *See, e.g.*, PC 32446–68 (2022 State Department report noting credible reports of gender-based violence against migrants; reports of migrants being tortured by migration authorities; "numerous instances" of armed groups targeting migrants for kidnapping, extortion, and homicide; and that asylum seekers and migrants were vulnerable to forced labor); PC 22839–42 (NGO report documenting violent crimes against 13,480 migrants in Mexico, by both state and non-state actors, between January 2021 and December 2022); PC 76248–87 (table of crimes summarized in preceding report); PC 21752–58 (2022 NGO report discussing gender-based violence in northern Mexico border cities, including against LGBTQI+ and Black migrants); PC 21610–11 (2022 NGO report concerning gender-based violence against Venezuelan women and LGBTIQ+ migrants in southern Mexico).[16]

---

[16] In addition to these examples, the record is replete with additional documentation of the extraordinary risk of violence many migrants face in Mexico.  *See, e.g.*, PC 22129–30 (2023 news report documenting instances of kidnapping of asylum seekers in northern Mexico); PC 23247–50 (2022 news report quoting Chihuahua state police chief stating that "organized criminal gangs are financing their operations through migrant trafficking"); PC 23082 (2023 NGO report discussing treatment of migrants and asylum seekers); PC 20937–43 (2021 NGO report documenting kidnapping and extortion of Venezuelan migrants in Mexico); PC 29740–29744 (2021 NGO report documenting instances of rape, kidnapping, and other violence experienced by migrant women in Mexico); PC 75946–48 (2022 NGO report documenting violence against migrants in Mexico); AR 4881 (2022 NGO report noting that asylum seekers from Central America have been pursued across the border and found in southern Mexico by their persecutors).

27

United States District Court
Northern District of California

The record thus undermines the Rule's finding that Belize, Colombia, and Mexico present viable, safe options for many asylum seekers. Defendants argue that sufficient record evidence supports the Rule's finding that transit countries present a viable option for many asylum seekers, instructing the Court to "see generally" over 1,200 pages of the administrative record. ECF No. 176-1 at 31 n.11. At oral argument, Defendants directed the Court to this footnote and sources cited within it for data regarding improved safety and conditions in transit countries. ECF No. 186 at 49:9–20. The sources cited in the footnote document asylum, temporary protection, or other immigration programs of varying capacity presently or formerly available in transit countries. *See, e.g.*, AR 1575–77 (2023 DHS memorandum noting that Costa Rica has established a temporary protection program for certain Cuban, Nicaraguan, and Venezuelan asylum seekers and that Ecuador has opened registration for temporary residence permits for Venezuelans); AR 5465–69 (Costa Rica government website explaining that the temporary protection program applies to nationals of designated countries who applied for asylum prior to September 2022, and is therefore not available to newly arrived migrants); AR 5757–61 (press release from Government of Mexico noting the expansion of temporary labor programs). But none of the sources Defendants cite suggests that safety and conditions in these transit countries have improved, and several of the sources suggest migrants are susceptible to harm in these countries. *See, e.g.*, AR 4256–81 (2021 State Department report noting that migrants in Costa Rica are subject to forced labor and that employers use threats of deportation to withhold wages from Nicaraguan migrants); AR 4282–325 (2021 State Department report noting that migrants and refugees in Ecuador are subject to gender-based violence, human trafficking, forced labor, and forcible recruitment into criminal activity). The record evidence cited by Defendants does not support their argument.

That leaves the exception for noncitizens who present at a port of entry. To avoid the presumption under this exception, noncitizens must secure an appointment using the CBP One mobile application and present at the selected port of entry at the pre-scheduled date and time; if a noncitizen presents at a port of entry but lacks an appointment, they must show "it was not possible to access or use the DHS scheduling system due to language barrier, illiteracy, significant technical failure, or other ongoing and serious obstacle," or they will be subject to the

1    presumption. 88 Fed. Reg. at 31450. "This exception [to the exception] captures a narrow set of

2    circumstances in which it was truly not possible for the noncitizen to access or use the CBP One

3    app," and exceptions for language barriers or illiteracy "will be assessed on a case-by-case basis."

4    *Id.* at 31406. The sub-exception for technical failure is "intended to cover technical failures of the

5    app itself . . . rather than a situation in which a migrant is unable to schedule an appointment due

6    to high demand or one where there is a fleeting temporary technical error." *Id.* at 31407.

7         The Rule acknowledges various limitations associated with CBP One, including the

8    existence of "connectivity gaps and unreliable Wi-Fi in central and northern Mexico," the only

9    parts of Mexico in which the app is available; that some individuals may lack smartphones; that

10   the appointment system creates unique challenges for larger families traveling together; that the

11   app is only available in English, Spanish, and Haitian Creole, and some error messages only

12   appear in English; that Login.gov, which applicants must use to access CBP One, is exclusively

13   available in English; and that users have identified various technical issues since the app was first

14   implemented, including the app timing out or becoming overloaded by requests. *Id.* at 31401–05.

15   Additionally, when the Rule was issued, CBP One offered only 1,250 appointments per day across

16   eight southern border ports of entry. AR 2489; 88 Fed. Reg. at 31358. Demand for appointments

17   exceeds supply. PC 21003; PC 21167; PC 25458; PC 25475.

18        The agencies also "acknowledge that individuals seeking to make an appointment . . . will

19   generally need to wait in Mexico" and "that, in some cases, the conditions in which such

20   individuals wait may be dangerous." 88 Fed. Reg. at 31400. Because CBP One access is limited

21   to central and northern Mexico, asylum seekers must remain in these areas until they successfully

22   secure an appointment. As discussed above, the record suggests that migrants waiting in Mexico

23   are at serious risk of violence. Under the Rule, however, "danger in Mexico generally would

24   justify failing to pre-schedule a time and place to appear at a [port of entry] . . . only when it

25   amounts to an extreme and imminent threat to life or safety." *Id.* at 31396. Until the risk of

26   violence rises to this level, individuals seeking to maintain their eligibility for asylum in the

27   United States—and who cannot satisfy either of the other exceptions to the rule—must remain in

28   Mexico, where the record suggests many will not be safe.

29

United States District Court
Northern District of California

While the Rule explains each exception by reference to another, the record suggests these exceptions will not be meaningfully available to many noncitizens subject to the Rule. The Rule is therefore arbitrary and capricious.

### 2. Procedural Validity

Prior to promulgating a rule, the APA generally requires agencies to publish notice of the proposed rulemaking in the Federal Register. 5 U.S.C. § 553(b). After providing notice, "the agency shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation." 5 U.S.C. § 553(c). "The purpose of the notice and comment requirement is to provide for meaningful public participation in the rule-making process." *Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1404 (9th Cir. 1995). "[Courts] determine 'the adequacy of the agency's notice and comment procedure, without deferring to an agency's own opinion of the . . . opportunities it provided.'" *Kern Cnty. Farm Bureau v. Allen*, 450 F.3d 1072, 1076 (9th Cir. 2006) (quoting *Nat. Res. Def. Council v. EPA*, 279 F.3d 1180, 1186 (9th Cir. 2002)). "[T]he failure to provide notice and comment is harmless only where the agency's mistake 'clearly had no bearing on the procedure used or the substance of decision reached.'" *California v. Azar*, 911 F.3d 558, 580 (9th Cir. 2018) (quoting *Riverbend Farms, Inc. v. Madigan*, 958 F.2d 1479, 1487 (9th Cir. 1992)).

Plaintiffs argue that the comment period was too short; that the agencies announced closely related policy changes after the public comment period closed; and that the agencies did not disclose the Office of Immigration Statistics ("OIS") analysis, model, or data underpinning the agencies' prediction of a sharp rise in migrants arriving at the southern border.

The agencies provided 33 days for public comment, which Defendants argue is both sufficient under the APA and justified by the impending expiration of Title 42. "When substantial rule changes are proposed, a 30-day comment period is generally the shortest time period sufficient for interested persons to meaningfully review a proposed rule and provide informed comment." *Nat'l Lifeline Ass'n v. FCC*, 921 F.3d 1102, 1117 (D.C. Cir. 2019); *see also Pangea Legal Servs. v. DHS*, 501 F. Supp. 3d 792, 820 (N.D. Cal. Nov. 19, 2020) (noting that, "[w]hile

30

not binding, the government's own internal orders state that 'a comment period . . . should generally be at least 60 days'") (quoting Exec. Order No. 13,563, 76 Fed. Reg. 3821, 3821–22 (Jan. 18, 2011)).  The COVID-19 public health emergency, pursuant to which the Title 42 public health order was in effect, was extended several times; at least as of December 13, 2022, DHS was actively preparing for the end of Title 42.  AR 2591.  On January 30, 2023, the Administration formally announced that the COVID-19 public health emergency would expire on May 11.  88 Fed. Reg. at 31435 n.312.  On February 23, the agencies published the Notice.  *Id.* at 11714.  The public comment period extended until March 27, and the final Rule was published on May 16.  *Id.* at 31433.

Shortly after the close of the Rule's comment period, the agencies implemented additional policy changes:  DHS announced it would resume conducting credible fear interviews in CBP custody and would only provide 24 hours' notice for such interviews; DHS would remove non-Mexican nationals, including nationals of Cuba, Haiti, Nicaragua, and Venezuela, to Mexico; and the agencies would indefinitely pause a prior regulation which permitted asylum officers to adjudicate certain asylum applications.[17]  The agencies did not disclose that they would undertake these policy changes, so the public was unable to comment on how they would interact with the Rule, and the Rule did not address these policies.  Plaintiffs argue that these policy changes undermined the rationale for the Rule, because conducting interviews in CBP custody on short notice was likely to dampen the passage rate, while being able to effectuate removals more quickly would lessen overcrowding in border and detention facilities.

The agencies also justified the broad presumption imposed by the Rule using OIS encounter projections which predicted that, once Title 42 was lifted, the agencies would encounter between 11,000 and 13,000 individuals attempting to cross the border without authorization each

---

[17] In the preamble to the Rule, the agencies state that the Rule does not present staggered rulemaking concerns, noting that "[t]he last asylum-related rulemaking, the Asylum Processing [Interim Final Rule ("IFR")], was published on March 27, 2022, and was effective on May 31, 2022[,] . . . [so] commenters did not have to contend with the interplay of intersecting rules and related policy changes when drafting their comments."  88 Fed. Reg. at 31434.  The Asylum Processing IFR was paused shortly after the close of the comment period for the challenged Rule.

31

day, "absent policy changes and absent a viable mechanism for removing Cuban, Haitian, Nicaraguan, and Venezuelan [] nationals who do not have a valid protection claim."[18] 88 Fed. Reg. at 11705. "[T]he notice required by the APA, or information subsequently supplied to the public, must disclose the thinking that has animated the form of a proposed rule and the data upon which that rule is based." *California ex rel. Becerra v. U.S. Dep't of the Interior*, 381 F. Supp. 3d 1153, 1173 (N.D. Cal. 2019) (quoting *Home Box Off., Inc. v. FCC*, 567 F.2d 9, 35 (D.C. Cir. 1977)). "Integral to an agency's notice requirement is its duty to 'identify and make available technical studies and data that it has employed in reaching the decisions to propose particular rules.'" *Kern Cnty. Farm Bureau*, 450 F.3d at 1076 (quoting *Solite Corp. v. EPA*, 952 F.2d 473, 484 (D.C. Cir. 1991)). In a footnote, the Notice explains that OIS "generates encounter projections every 2–4 weeks, using the best data and modeling available," and describes the statistical basis for the model and the mathematical processes it incorporates. 88 Fed. Reg. at 11705 n.11. But the Notice does not provide the relevant data that goes into the projections, the factors that impact the model, or the complete OIS analysis on which the Rule depends.

Taken together, these circumstances persuade the Court that the Rule's notice procedures are insufficient under the APA. The Rule is unquestionably complex—it establishes a presumption of asylum ineligibility for noncitizens who enter at the southern border that is subject to various exceptions ,one of which contains its own exception, and is rebuttable only in certain circumstances. That presumption of ineligibility applies across all contexts in which such individuals might be screened for asylum or other protection. The complexity of the Rule suggests that 30 days is unreasonable, particularly because the agencies were preparing for the end of Title 42 well before it was announced, such that they could have issued the Notice with sufficient time to grant a longer comment period and still have had the Rule in place when Title 42 expired. The agencies also did not disclose other, relevant policy changes that would affect the agencies' reasoning for adopting the Rule, including one that controverted an assumption central

---

[18] The removal-to-Mexico policy announced after the comment period closed provides the "viable mechanism" referenced here.

to the agencies' projection of post-Title 42 encounters at the southern border. *See* 88 Fed. Reg. at 11705 ("[E]ncounters could rise to 11,000–13,000 . . . *absent a viable mechanism for removing* Cuban, Haitian, Nicaraguan, and Venezuelan [] nationals who do not have a valid protection claim.") (emphasis added); *Pangea*, 501 F. Supp. 3d at 821 (noting that staggered policy changes "add[] to the overall context in which the notice provided . . . failed to give the public a meaningful opportunity to comment"). The agencies further justified the breadth and urgency of the Rule on the basis of data that they did not disclose; without any insight into the model or the relevance of the factors it is designed to consider, the public had no means by which to challenge that justification. Together, these circumstances denied the public a meaningful opportunity to comment on the Rule.

Defendants argue that the number of comments received, and the fact that Plaintiffs each submitted a comment, indicates that the public was provided sufficient opportunity to provide meaningful commentary. Given more time, however, Plaintiffs would have provided more in-depth analysis of the Rule and its potential impact on their clients. ECF No. 169-5 ¶ 26; ECF No. 169-7 ¶ 30; ECF No. 175 ¶ 19. Had they known about the contemplated policy changes, Plaintiffs would have discussed how these policy changes would intersect with the Rule to affect their clients. ECF No. 169-3 ¶ 30; ECF No. 169-5 ¶ 26; ECF No. 175 ¶ 20. The Court cannot assume that the agencies would not have taken into consideration more comprehensive comments addressing the related border policies or the OIS analysis that justified the Rule, such that the "agenc[ies'] mistake 'clearly had no bearing . . . on the substance of decision reached,'" *Azar*, 911 F.3d at 580. Accordingly, the Court concludes that the agencies' error was not harmless.

## C. Scope of Relief

When an agency decision is unlawful under the APA, the standard remedy is to vacate the agency action and remand to the agency. *See* 5 U.S.C. § 706(2)(A) (instructing reviewing court to "set aside" agency action); *All. for the Wild Rockies v. U.S. Forest Serv.*, 907 F.3d 1105, 1121 (9th Cir. 2018) ("Although not without exception, vacatur of an unlawful agency action normally accompanies a remand."); *Cal. Wilderness Coal. v. U.S. Dep't of Energy*, 631 F.3d 1072, 1095 (9th Cir. 2011) ("When a court determines that an agency's action failed to follow Congress's

United States District Court
Northern District of California

33

1    clear mandate the appropriate remedy is to vacate that action.").

2        Defendants urge the Court to remand the Rule without vacating it. "[Courts] leave an

3    invalid rule in place only 'when equity demands' that [they] do so." *Pollinator Stewardship*

4    *Council v. EPA*, 806 F.3d 520, 532 (9th Cir. 2015) (quoting *Babbitt*, 58 F.3d at 1405). "Whether

5    agency action should be vacated depends on how serious the agency's errors are and the disruptive

6    consequences of an interim change that may itself be changed." *350 Montana v. Haaland*, 50

7    F.4th 1254, 1273 (9th Cir. 2022) (quoting *Nat'l Family Farm Coal. v. EPA*, 966 F.3d 893, 929

8    (9th Cir. 2020)). Courts also consider "whether the agency would likely be able to offer better

9    reasoning[;] [] whether by complying with procedural rules, it could adopt the same rule on

10   remand[;] or whether such fundamental flaws in the agency's decision make it unlikely that the

11   same rule would be adopted on remand." *Pollinator*, 806 F.3d at 532.

12       The severity of the agencies' errors in this case counsels strongly in favor of vacatur. The

13   Rule is both substantively and procedurally invalid. The agencies cannot adopt the same rule on

14   remand; as described above, the Rule is contrary to law. "[T]he threat of disruptive consequences

15   cannot save a rule when its fundamental flaws 'foreclose [the agency] from promulgating the same

16   standards on remand.'" *North Carolina v. EPA*, 531 F.3d 896, 929 (D.C. Cir. 2008) (quoting *Nat.

17   Res. Def. Council v. EPA*, 489 F.3d 1250, 1261–62 (D.C. Cir. 2007)); *see also Nat'l Fam. Farm

18   Coal.*, 966 F.3d at 1145 (holding that vacatur was necessary, despite potential adverse impacts,

19   because "the 'fundamental flaws' in the [agency's] analysis are so substantial that it is exceedingly

20   'unlikely that the same rule would be adopted on remand'") (quoting *Pollinator*, 806 F.3d at 532).

21       The Court is not persuaded that deviating from the presumed remedy of vacatur and

22   remand is appropriate in this case. The Court is mindful that this is "a time of heightened irregular

23   migration throughout the Western Hemisphere," ECF No. 176-2 ¶ 4; that such migration has

24   dropped since the Rule went into effect, *id.* ¶¶ 13–16; and that, in the absence of the Rule's

25   presumption of asylum ineligibility, "DHS anticipates a return to elevated encounter levels that

26   would place significant strain on DHS components, border communities, and interior cities," *id.*

27   ¶ 50. But the Rule—which has been in effect for two months—cannot remain in place, and

28   vacating the challenged Rule would restore a regulatory regime that was in place for decades

*United States District Court*
*Northern District of California*

34

before.

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion for summary judgment is granted. Defendants' motion for summary judgment is denied. The Rule is hereby vacated and remanded to the agencies.

This order shall be stayed for 14 days. The Clerk shall enter judgment and close the file.

**IT IS SO ORDERED.**

Dated: July 25, 2023



_____
JON S. TIGAR
United States District Judge

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
## OAKLAND DIVISION

East Bay Sanctuary Covenant, *et al.*,

        Plaintiffs,

v.

Joseph R. Biden, *et al.*,

        Defendants.

No. 4:18-cv-06810-JST

## DECLARATION OF BLAS NUÑEZ-NETO

    I, Blas Nuñez-Neto, pursuant to 28 U.S.C. § 1746, and based upon my personal knowledge and documents and information made known or available to me from official records and reasonably relied upon in the course of my employment, hereby declare as follows:

    1.    I am the Assistant Secretary for Border and Immigration Policy for the U.S. Department of Homeland Security (DHS) and have served in this role since March 26, 2023. I previously served as the Acting Assistant Secretary for Border and Immigration Policy since October 1, 2021.  Prior to this acting role, I served as the Chief Operating Officer for U.S. Customs and Border Protection (CBP), a DHS component, since March 5, 2021. In a prior administration, I served DHS as Senior Advisor to then-CBP Commissioner Richard Gil Kerlikowske, from January 12, 2015 to January 16, 2017.

1

## **The challenged rule is critical to DHS' plan to effectively manage irregular migration.**

2.      On May 12, 2023, after a robust regulatory process that included responding to more than 50,000 comments from the public, DHS and the Department of Justice (DOJ) implemented the Circumvention of Lawful Pathways rule.  The rule is designed to incentivize noncitizens to use the new and existing lawful, safe, and orderly processes that DHS has established and expanded, and disincentivize dangerous and irregular border crossings by placing a condition on asylum eligibility for those noncitizens who fail to do so, and who do not otherwise qualify for an exception.  Critically, the rule fits into a broader strategy to address historic migratory challenges impacting the entire Western Hemisphere.  Through a variety of actions, the United States and its foreign partners are seeking to incentivize migrants to use lawful, safe, and orderly pathways, as well as to disincentivize irregular migration.  As such, this rule is a critical component of the United States' regional strategy and aims to discourage noncitizens from crossing the Southwest Border (SWB) unlawfully between ports of entry, or without authorization at a port of entry.[1]

3.      Imposing consequences for unlawfully, or irregularly, crossing the border is, by itself, not sufficient to deter irregular migration.  Migrants have, time and time again, shown that they are willing to endure unfathomable suffering for an opportunity to come to the United States, even if their chances of success are small.  To be effective, the consequences DHS applies must be paired with incentives for migrants to use lawful processes.  DHS and the U.S. Department of State have been working with our foreign partners in the Western Hemisphere to enhance enforcement efforts along national borders and expand lawful pathways in countries

---

[1] U.S. Dep't of Homeland Sec., *Fact Sheet: Department of State and Department of Homeland Security Announce Additional Sweeping Measures to Humanely Manage Border through Deterrence, Enforcement, and Diplomacy* (May 10, 2023), https://www.dhs.gov/news/2023/05/10/fact-sheet-additional-sweeping-measures-humanely-manage-border

throughout the region—including protection programs—to address the current migration challenge.  DHS has, over the past two years, undertaken a series of measures designed to increase access to processes and pathways for noncitizens to come to the United States or in a safe, orderly, and lawful manner.  But similarly, incentives without consequences are insufficient to deter irregular migration—they must go hand-in-hand.  In concert with the increase in lawful means for migrants to come to the United States in a safe and orderly manner, this rule imposes strengthened consequences on noncitizens who do not avail themselves of the wide range of lawful pathways the U.S. Government has made available for entering the United States, do not seek protection from countries they travel through, and do not merit an exception or otherwise overcome the rule's presumption.  In this way, the rule follows the successful model of the Cuban, Haitian, Nicaraguan, and Venezuelan ("CHNV") processes, which significantly reduced encounters from those countries after their implementation: it creates a viable lawful, safe, and orderly option for noncitizens, and imposes consequences for failing to follow that process.

4.      The rule's condition on asylum eligibility is a temporary measure intended to respond to a time of heightened irregular migration throughout the Western Hemisphere. Importantly, and as detailed further below, the rule is working as intended and has already significantly reduced encounters at the border. In the absence of the rule, DHS planning models suggest that irregular migration could meet or exceed the levels that DHS recently experienced in the days leading up to the end of the Centers for Disease Control and Prevention's (CDC) Title 42 public health Order.  These levels of irregular migration would severely stress DHS and DOJ's continued ability to safely, effectively, and humanely enforce and administer U.S. immigration law, including the asylum system.  They would also quickly overwhelm shelter capacity in border communities and interior cities.

3

**Hemispheric conditions are driving encounter levels that strain DHS resources.**

5.      Violence, food insecurity, severe poverty, corruption, climate change, the continuing effects of the COVID-19 pandemic, and dire economic conditions have all contributed to a significant increase in irregular migration around the globe, fueling the highest levels of irregular migration since World War II.  This wave of global migration is challenging many nations' immigration systems, including the United States.  In the Western Hemisphere, failing authoritarian regimes in Venezuela, Cuba, and Nicaragua, along with an ongoing humanitarian crisis in Haiti, have driven millions of people from those countries to leave their homes.  Additionally, violence, corruption, and the lack of economic opportunity—challenges that are endemic throughout the region—are driving noncitizens from countries such as Brazil, Colombia, Ecuador, and Peru to make the dangerous journey to the U.S. border.  This is in addition to the continuing economic headwinds and rule of law concerns in traditional sending countries, such as Guatemala, Honduras, and El Salvador.

6.      In the early 2010s, after three decades of bipartisan investments in border security and strategy, encounters along the SWB reached modern lows, averaging fewer than 400,000 per year from 2011 to 2017.  This followed decades during which annual encounters routinely numbered in the millions.  However, even during this period of relatively low encounter levels at the border, DHS faced significant challenges in 2014 due to an unprecedented surge in migration of unaccompanied children, and in 2016 due to a surge in family units at the border—demographics that present unique challenges due to their vulnerability.  Between 2017 and 2019, however, encounters along the SWB more than doubled, and—following a significant drop during the beginning of the COVID-19 pandemic, which shut down travel across the world—continued to increase in 2021 and 2022.  In fiscal year (FY) 2021, encounters at the SWB reached levels not seen since the early 2000s, with U.S. Border Patrol (USBP) making 1.7

4

million encounters. In FY 2022, DHS reached a new high-water mark for encounters at the land border, with total USBP encounters at the SWB exceeding 2.2 million. As a result of the hemispheric conditions described above, much of this growth in encounters was driven by nationalities that DHS has historically not encountered in large numbers at the border—including countries that make it difficult for DHS to repatriate their nationals who do not establish a legal basis to remain in the United States.

7.      From March 20, 2020 to May 11, 2023, the DHS implemented the CDC's Title 42 public health Order, under which noncitizens encountered by DHS personnel could be quickly expelled to Mexico or to their home country—but only if Mexico or their home country accepted their return.[2] Importantly, an expulsion under the Title 42 public health Order did not carry with it any lasting consequences for noncitizens, aside from their expulsion. It was, however, a relatively quick process for frontline personnel. By contrast, a removal under DHS' traditional Title 8 authorities carries with it significant and lasting consequences, including a minimum 5-year ban on admission and the potential to be criminally prosecuted for illegal re-entry. Title 8 processes, however, are substantially longer than Title 42 processes.

8.      In preparation for the return to Title 8 processing of all noncitizens, DHS led a comprehensive, all of government planning effort that lasted more than 18 months. This included record deployments of personnel, infrastructure, and resources to support DHS's frontline personnel at a substantial cost to other DHS operations. This effort also included the

---

[2] The Title 42 public health Order applied to certain noncitizens arriving from Canada or Mexico who would otherwise be held in a "congregate setting" at a port of entry or U.S. Border Patrol station at or near the U.S. land and adjacent coastal borders. Public Health Reassessment and Order Suspending the Right To Introduce Certain Persons From Countries Where a Quarantinable Communicable Disease Exists 86 Fed. Reg. 42,828 42,841 (Aug 5, 2021). Under the Title 42 public health Order, "covered noncitizens apprehended at or near U.S. borders" were "expelled" to Mexico, Canada, or their country of origin. *Id.* at 42,836. As a result, they could be processed much faster—in "roughly 15 minutes," as compared to "approximately an hour and a half to two hours" for noncitizens who are processed and issued a notice to appear for removal proceedings under Title 8. *Id.*

development and implementation of policy measures, including the rule and its associated lawful pathways and processes, that were critically important components of DHS preparations to manage the anticipated significant influx of migrants at the SWB associated with the end of Title 42's application at the border.

9.    In the days leading up to the end of the Title 42 public health Order on May 12, 2023, DHS saw a historic surge in migration.  This surge culminated with the highest recorded encounter levels in U.S. country's history over the days immediately preceding May 11, which placed significant strain on DHS's operational capacity at the border.  Encounters between ports of entry (thus excluding arrivals scheduled through the CBP One application, who appear at ports of entry) almost doubled from an average of approximately 4,900 per day the week ending April 11, 2023, to an average of approximately 9,500 per day the week ending May 11, 2023, including an average of approximately 10,000 encounters immediately preceding the termination of the public health Order (from May 8 to May 11).  The sharp increase in encounters during the 30 days preceding May 11 represents the largest month over month increase in almost two decades—since January 2004.

10.    As a result, in the days leading up to the end of the Title 42 public health Order, USBP saw a steady increase in the numbers of noncitizens in custody, leading to significant operational challenges as described below.  From May 8 to 11, 2023, USBP's daily in-custody average was approximately 27,000, with a single-day peak of approximately 28,500 on May 10—well above its holding capacity at that time of approximately 18,500.  During this same timeframe, eight out of nine SWB sectors were over their holding capacity—with four sectors (El Centro, El Paso, RGV, and Yuma) more than 50 percent over their holding capacity and one sector (Tucson) more than two-and-a-half times its holding capacity.

11.     As discussed more fully below, this record number of encounters severely strained DHS operations and resources, as well as the resources of other federal government agencies, local communities, and non-governmental organizations.  CBP had to redirect limited resources from other mission needs—particularly, legitimate travel and trade operations, the volume of which now surpasses pre-pandemic levels—to focus on processing apprehended noncitizens.  Overcrowding in CBP facilities increased the potential of health and safety risks to noncitizens, government personnel, and contract support staff—risks which were exacerbated by an increase in the average time in custody, which generally occurs when there are large numbers of noncitizens in custody that must be processed.  To manage these overcrowded conditions, USBP sectors had to pull personnel from the field to perform tasks including processing, transporting, escorting, and detaining noncitizens in custody, as well as other related functions.  This, in turn, decreased USBP's ability to respond to noncitizens avoiding detection, other agency calls for assistance, and noncitizens in distress.

12.     The surge in encounters immediately preceding the end of Title 42 also led to significant challenges for local border communities.  For example, in the days leading up to May 12, local community resources in El Paso, Texas were soon overwhelmed as the number of noncitizens arriving in the United States quickly surpassed the city's capacity.  In anticipation of an influx of noncitizens arriving to the city—an influx that ultimately materialized—the city declared a state of emergency,[3]  as more than 1,000 noncitizens were sleeping on the sidewalks

---

[3] Sneha Dey, *As Title 42 comes to an end, El Paso declares state of emergency,* Tex. Tribune (Apr. 30, 2023), https://www.texastribune.org/2023/04/30/el-paso-state-of-emergency-title-42.

7

and left without shelter.[4]  Similarly, the cities of Brownsville and Laredo, Texas, declared states

of emergency to allow them to seek additional resources to bolster their capacities.[5]

### Implementation of the rule has significantly reduced encounters at the U.S. border and migration throughout the Western Hemisphere.

13.     In the weeks since May 12, 2023, DHS has executed on its more than 18-month

post-Title 42 planning effort by leading a whole-of-government effort to ensure the safe, orderly,

and humane management of the nation's borders and the continued enforcement of U.S.

immigration laws.  The rule plays an integral role in this effort.  These efforts, and in particular

the disincentives to irregular migration put in place through the new rule, have produced

significant results.  From May 12 to June 13, 2023, encounters between ports of entry at the

SWB have decreased by 69 percent compared to their peak just before the end of Title 42, with

CBP averaging approximately 3,360 USBP encounters between ports of entry.  As a result of this

swift and sustained decline in encounters, the number of noncitizens in USBP holding facilities

has decreased from a high of more than 28,500 on May 10—or 153 percent of its rated holding

capacity at that time—to approximately 8,600 on June 9, or 46 percent of its holding capacity.

14.     The strengthened consequences in place at the border under Title 8 authorities,

including use of the rule, has reduced migration throughout the Western Hemisphere as intending

migrants and the smuggling networks that move them assess the new policies.  For example,

daily entries into the perilous Darién jungle between Colombia and Panama have declined by

more than 50 percent since May 11, from nearly 1,900 encounters between May 1 and May 11 to

---

[4] Rose Flores, Dakin Andone & Nouran Salahieh, *Migrants Living on the Streets of El Paso are Urged to Turn Themselves in to Immigration Authorities as Expiration of Title 42 Looms,* CNN (May 9, 2023), https://www.cnn.com/2023/05/09/us/title-42-expires-border-immigration-tuesday/index.html.
[5] Edgar Sandoval, Eileen Sullivan & Miriam Jordan, *Some Texas Border Cities Are Already Under a State of Emergency,* New York Times (May 11, 2023), https://www.nytimes.com/2023/05/11/us/texas-el-paso-state-emergency-title-42.html.

approximately 800 a day between June 1 and June 14.  It is clear that actions taken by the U.S.
Government to provide both legal pathways and consequences to irregular migration—actions
that also spurred regional partners to undertake their own measures seeking to address irregular
movements of migrants—were critical factors in reducing migratory flows throughout the
Western Hemisphere.

15.     The rule has strengthened the consequences for noncitizens who cross unlawfully
between ports of entry, or without prior authorization at ports of entry.  Overall, in the four
weeks since the rule has been implemented, 46 percent of single adults processed under the rule[6]
making credible fear claims have been screened-in,[7] compared to an 83 percent screen-in rate in
the pre-pandemic period of 2014 to 2019.  As intended, the rule has significantly reduced screen-
in rates for noncitizens encountered along the SWB.  The decline in encounters at the U.S.
border, and entries into the Darién Gap, show that the application of consequences as a result of
the rule's implementation is disincentivizing noncitizens from pursuing irregular migration and
incentivizing them to use safe and orderly pathways.

16.     Between May 12 to June 13, 2023, U.S. Citizenship and Immigration Services
(USCIS) has interviewed approximately 8,195 noncitizens who have been subject to the rule.
Out of these noncitizens, 261 (3 percent) were able to establish an exception to the rule; 689 (8
percent) were able to rebut the presumption; and 7,243 (88 percent) were subject to the
presumption.  Of the noncitizens who were able to establish an exception to the rule, 189 (72
percent) were able to establish a credible fear of persecution or torture under the "significant

---

[6] This includes all categories of noncitizens processed under the rule, including those who establish an exception or
rebut the presumption.
[7] The screen-in rate refers to the percentage of cases with a positive fear determination calculated by dividing the
number of cases that receive a positive fear determination by cases adjudicated on merit (i.e. positive and negative
fear determinations).

9

possibility" standard. Of the noncitizens who were able to rebut the presumption, 528 (77 percent) were able to establish a credible fear of persecution or torture under the "significant possibility" standard. Of the noncitizens who were subject to the rule's presumption, 3,036 (42 percent) were able to establish a credible fear of persecution or torture under the "reasonable possibility" standard. Additionally, thousands more are currently in CBP or U.S. Immigration and Customs Enforcement (ICE) custody going through the expedited removal process.

17.     The rebuttable presumption established by the rule has allowed DHS to significantly increase its use of expedited removal, including by applying it to more nationalities than it otherwise would have. This is because, prior to the rule's implementation, the screen-in rates for noncitizens from some key countries—including Venezuela, Cuba, and Nicaragua—were sufficiently high as to make it ineffective to refer nationals of those countries into expedited removal, given the significant, multiagency resources required to process them. Absent the rule's impact on screen-in rates, it is likely that DHS would not devote the resources to process noncitizens from those countries for expedited removal as it would result in issuing a notice to appear before an immigration judge anyway while unnecessarily increasing time in custody. This, in turn, may lead to increased encounter levels and all the challenges that they entail.

18.     In its preparations for the end of the Title 42 public health Order, DHS made improvements to the technology and processes at the border that are now allowing it to process credible fear cases more quickly than ever before—enhancing its ability to quickly deliver consequences to noncitizens who do not establish a legal basis to remain in the United States. DHS has reduced the median time for USCIS to complete fear claim cases for single adults encountered since May 12 by 57 percent, to 13 days from CBP apprehension compared to 30 days in the pre-pandemic period (2014–2019). These process enhancements and the rule work

10

together to more quickly and effectively, impose consequences on those who do not establish a legal basis to remain in the United States.  The rule allows DHS to place more noncitizens into the expedited removal process, and the process enhancements help ensure that the increased use of expedited removal does not result in unhelpful backlogs or increased holding times.  Without the rule, these process enhancements would be substantially less effective given significantly higher screen in rates that would, as noted above, make it largely impractical for DHS to apply expedited removal to key nationalities encountered at the border.

19.　　The rule's implementation has generated widespread understanding that DHS has strengthened consequences at the border for those who enter without authorization even as DHS has significantly increased lawful pathways and processes for noncitizens to come to the United States in a safe and orderly manner. The effect of these developments is that there has been an immediate reduction in encounters at the border.

20.　　As part of these efforts, DHS has repatriated approximately 50,000 noncitizens, including single adults and family units to more than 100 countries since May 12.  This includes more than 1,650 noncitizens from Cuba, Haiti, Nicaragua, and Venezuela who were returned or removed to Mexico during this time-frame—the first time in the United States' bilateral history that the Government of Mexico has accepted third country nationals under Title 8 authorities at the border at scale.

21.　　The ability to quickly apply consequences at the border is important because DHS must contend with callous human smuggling networks that weaponize misinformation and look for any opportunity to put intending migrants' lives at risk for profit.[8]  These criminal

---

[8] *See* U.S. Dep't of Justice, Press Release, *Defendants Indicted in Tractor Trailer Smuggling Incident That Resulted in 53 Deaths* (July 20, 2022), https://www.justice.gov/usao-wdtx/pr/defendants-indicted-tractor-trailer-smuggling-incident-resulted-53-deaths; U.S. Dep't of Justice, Press Release, *Cuban National Sentenced to Over 38 Years in*

11

organizations intentionally twist information about U.S. immigration policy for the express
purposes of encouraging would-be migrants to use their services—services that regularly result
in tragedy. Because profit is the motivating factor, criminal organizations have no qualms when
it comes to exploiting migrants through false promises—particularly when there are changes in
the United States' immigration policy or border operations. This familiar pattern was seen in the
weeks leading up to the lifting of Title 42.

      22.     In the days immediately following the rule's effective date, media reporting
confirmed internal DHS analyses that the rule and accompanying messaging were ultimately
effective in communicating that there would be stricter consequences for crossing the SWB
unlawfully between ports of entry, or without authorization at ports of entry, after the end of
Title 42. For example, a *Washington Post* article states that in interviews with migrants waiting
on the Mexican side of the SWB, U.S. messaging relating to stricter penalties under Title 8
authorities were a factor in many intending migrants' decisions to attempt to cross the border
"before—not after—Title 42's expiration."[9] Similarly, the article further describes migrants'
understanding that there would be consequences associated with irregularly crossing the SWB
without scheduling an appointment at a port of entry through the CBP One app.[10]

      23.     As part of its preparations for the end of the Title 42 public health Order and the
implementation of the rule, DHS significantly expanded access to land border ports of entry.
The CBP One mobile app, which is available to download for free to a mobile device, allows

---

*Prison for Drug Trafficking and Other Crimes after Using His Border Ranch as a Criminal Corridor* (Mar. 9,
2022), https://www.justice.gov/usao-wdtx/pr/cuban-national-sentenced-over-38-years-prison-drug-trafficking-and-
other-crimes-after.
[9] *See* Mary Beth Sheridan, Reyes Mata III, Maria Sacchetti & Nick Miroff, *End of Title 42 Pandemic Border Policy
Brings Reset, But No Sudden Rush*, Wash. Post (May 12, 2023).
https://www.washingtonpost.com/nation/2023/05/12/title-42-pandemic-ends-border-migrants/
[10] *See also* Valerie Gonzalez, *Migrants Rush Across U.S. Border in Final Hours Before Title 42 Asylum Restrictions
are Lifted*, Associated Press: PBS (May 11, 2023), https://www.pbs.org/newshour/politics/migrants-rush-across-u-s-
border-in-final-hours-before-title-42-asylum-restrictions-are-lifted.

noncitizens of any nationality who are in Central or Northern Mexico to schedule an appointment to present at a port of entry along the SWB in a safe and orderly manner. The advance biographic and biometric information captured by the app allows CBP to significantly improve the efficiency of its processes at the border—even as it ensures that every individual processed is thoroughly vetted against national security and public safety systems. This, in turn, has allowed CBP to greatly increase its ability to process inadmissible noncitizens at land border ports of entry compared to its 2014-2019 pre-pandemic average. On June 1, CBP expanded the number of available daily appointments from 1,000 to 1,250 per day—almost four times the average number of noncitizens processed per day at ports of entry than in the years preceding the pandemic. This expansion has allowed a greater number of noncitizens to present themselves in a safe and orderly manner at ports of entry each day during their scheduled appointment time. DHS has also made a series of updates to the app that have significantly improved access to appointments and provided greater predictability to migrants about the process. This app, available in English, Spanish, and Haitian Creole, effectively cuts out the smugglers, decreases migrant exploitation, and improves safety and security in addition to making the process more efficient.

24.     The rule's combination of strengthened consequences at the U.S. land border, regional partnership, and increased lawful pathways and processes for noncitizens has had an immediate impact on encounters at the U.S. border and migration throughout the region. **If DHS cannot rely on the rule, DHS expects an increase in encounters between ports of entry that will severely tax operational capacities to the detriment of other critical missions and expects the absence of the rule to negatively impact receiving communities in the United States and our relationships with foreign partners.**

25.     As detailed in the rule, DHS planning models suggest that, without the strengthened consequences, including those put in place by the rule, these elevated encounter

13

levels would have continued after May 11.[11]  Thus, if the rule is unavailable for any amount of time, DHS expects that the current decline in border encounters will quickly be erased by a surge in border crossings that could match—or even exceed—the levels seen in the days leading up to the end of the Title 42 public health Order.

26.     To put the current situation on the ground into perspective, CBP's Southern Border Intelligence Center estimates that as of June 14, 2023, approximately 104,000 migrants are in Northern Mexico, within eight hours of the U.S. border, with many more along the transit route between Colombia and the SWB.  It appears that many of these migrants are waiting to see whether the strengthened consequences associated with the rule's implementation are real.[12]  DHS anticipates that any interruption in the rule's implementation will result in another surge in migration that will significantly disrupt and tax DHS operations.  This expectation is not speculative.  DHS needs only to look back to the pre-May 12 surge, which was only blunted by the application of strengthened consequences at the border and expanded access to lawful pathways and processes, in large part as a result of the rule's implementation on May 12, to identify the repercussions of losing the rule.  A similar surge now would put even greater strain on DHS operations, given that Title 8 processes take substantially longer and are more operationally complex than Title 42 processes at the border.

**Impact on CBP**

---

[11] *Circumvention of Lawful Pathways*, 88 Fed. Reg. 31,314, 31316 & n.14 (May 16, 2023).

[12] *See* José Ignacio Castañeda Perez, *Here's Why There Was No Immediate Migrant Influx at the Arizona Border When Title 42 Ended*, Ariz. Republic (June 1, 2023) https://www.azcentral.com/story/news/politics/border-issues/2023/06/01/title-42-lifted-but-no-immediate-migrant-influx-was-seen/70269773007/.  This news article explains that due to new immigration rules and consequences, migrants and transnational smuggling networks are taking a "wait and see" approach when it comes to the SWB.  This observation is noted by Adam Isacson, director for defense oversight at the Washington Office on Latin America, who states that "[b]oth migrants and their smugglers right now are trying to figure out what those new pathways are."

14

27.     CBP, a component of DHS, is charged with enforcing federal customs and immigration laws at or near the international border, including at and between U.S. ports of entry, while facilitating lawful international travel and trade.  CBP facilities, whether operated by the Office of Field Operations (OFO) or USBP, are designed for short-term custody and have limited holding capacity.  These facilities are only designed to hold noncitizens for a few days, generally for the purpose of immigration processing and subsequent transfer to the custody of another agency, or release pending removal proceedings, as appropriate.  CBP facilities typically do not provide services adequate for longer-term detention, such as beds, routine medical care, or recreational areas.  If the rule is enjoined, CBP will likely once again be required to hold more noncitizens than its short-term, small capacity holding facilities can handle.  This will exacerbate overcrowding of facilities, which can create unsafe conditions.

28.     As noted above, CBP experienced severe overcrowding in the period leading up to May 12, 2023.  During this time, USBP encounters outpaced processing and movement out of USBP custody—generally via transfer to ICE custody, repatriation, expulsion, or release—of noncitizens from CBP holding facilities by an average of 950 noncitizens daily for seven days in a row.  The inability to process noncitizens out of USBP custody quickly enough to match the rate at which agents were making apprehensions led to a sharp increase in the number of noncitizens in USBP custody, as detailed above.  This sharp increase in its in-custody numbers, in turn, required Border Patrol agents to be reassigned from frontline border security enforcement activities to support processing operations in its facilities.

29.     Previous migration trends tended to heavily impact only a couple of sectors over a given period of time, shifting locations across the SWB over time.  Under these circumstances, USBP had the ability to "laterally decompress" migrants to less-impacted sectors by leveraging

15

air and ground transportation contracts, helping to mitigate the effects of migrant surges in over-capacity sectors.  As noted above, between May 8 and 11, 2023, however, eight out of the nine SWB Sectors were over capacity, which limited USBP's ability to move noncitizens laterally to alleviate the pressure in over capacity sectors.

30.     As part of its preparations for and response to this surge, CBP instituted a number of other extraordinary measures at great expense to the agency.  For example, USBP had to expand processing facility support by hiring additional armed facility guards, porters, data entry specialists, and Border Patrol Processing Coordinators.  To address personnel shortages caused by the increased encounter numbers, USBP executed memoranda of agreement with other federal agencies to provide surge support.[13]  Some of these agreements required USBP to reimburse the cost of these agencies' support, totaling more than $50,600,000 in FY 2023 (almost twice the cost in FY 2022).[14]  USBP also expanded transportation contracts to increase its number of leased buses, transportation routes, transportation hours, and flights and routes in response to the increased encounter numbers.  It also began increasing holding capacity through the expansion of the soft-sided facilities in El Paso and Yuma sectors.  These facilities have significantly increased USBP's temporary holding capacity, but at a cost.  Specifically, the El Paso expansion cost more than $46 million to mobilize, and costs nearly $26 million per month to maintain.  The Yuma expansion cost more than $14 million to mobilize and more than $6 million per month to maintain.

31.     Overcrowding at CBP facilities adversely impacts noncitizens in CBP custody as well as CBP personnel.  DHS's Office of Health Security (OHS) notes that overcrowding and

---

[13] Agencies included ICE Homeland Security Investigations, Federal Air Marshals, U.S. Marshals Service, Bureau of Prisons, U.S. Secret Service, National Oceanic and Atmospheric Administration, U.S. Coast Guard, U.S. Forest Service, DHS Volunteer Support, and ICE Enforcement and Removal Operations
[14] Total cost in FY 2022 was more than $26,500,000.

16

increased movement of noncitizens between facilities may result in adverse health outcomes, including the spread of communicable diseases (e.g., COVID-19, measles, varicella, etc.) among noncitizens held in these facilities.  Furthermore, noncitizens held in overcrowded facilities may be particularly vulnerable to communicable diseases due to situational factors relating to the arduous journey to the SWB, including, in many cases, days and weeks of poor health and nutrition, lack of access to health care, and/or inadequate water, sanitation, and hygiene services. For these reasons, surges, which inherently increase the risk of overcrowding in CBP holding facilities along the SWB, negatively impact CBP's ability to avoid preventable harm and mitigate health and welfare risks to noncitizens and the DHS workforce.

32.     OFO operations at ports of entry would also be adversely impacted if the rule is unavailable to DHS.  During surges of noncitizens encountered between ports of entry, OFO often needs to provide assistance to USBP to process noncitizens.   Because each port of entry has a finite number of resources and processing capacity to facilitate lawful trade and travel, and irregular migration, any diversion of resources toward processing increased numbers of noncitizens takes resources away from those missions.  This, in turn, challenges OFO's ability to execute its national security, counter-narcotics, and trade and travel missions by requiring the diversion of critical resources.

33.     In response to the pre-May 11 surge, 124 OFO personnel—who are dedicated to the processing of legitimate travel and trade operations of which volume now surpasses pre-pandemic levels—were detailed to assist USBP processing of apprehensions between ports of entry.   For example, in April 2023, OFO detailed staff from ports of entry in Laredo, Texas, to the Rio Grande Valley—a move that required Laredo to close some vehicle lanes, slowing down its operations.  In mid-April 2023, CBP also had to temporarily close ports of entry in the El

17

Paso, TX area in order to manage the surge in encounters in that area of operations.  This included the cessation, and subsequent resumption at reduced volume, of all port of entry operations at the Bridge of the Americas (BOTA) in El Paso, Texas—a port of entry that primarily focuses on processing cargo shipments—from April 13 through April 17, 2023.  The economic impact of this five-day processing slowdown was likely acute; in FY2022, more than $10.7 billion in imports passed through the BOTA port of entry, or roughly $205 million per week.  Additionally, from April 13 to 17, 2023, the Ysleta port of entry in El Paso also detailed personnel to assist USBP, necessitating a reduction on open travel lanes by approximately 37 percent for commercial cargo and 58 percent for passenger traffic.  At both locations, increased wait times for inspection reached as high as 180 minutes—with substantial economic costs as a result.

34.　　OFO also had to take extraordinary measures to ensure that legitimate trade and travel continued to flow along the SWB.  In addition to the personnel detailed to support USBP operations between ports of entry, OFO temporarily deployed approximately 420 personnel to support SWB ports of entry, at a cost of approximately $4 million monthly, and deployed approximately 39 OFO Special Response Team operators to SWB locations to ensure continuation of safe and secure operations at ports of entry.  In the weeks leading up to the end of the Title 42 public health Order, as certain ports of entry began processing increased numbers of noncitizens seeking an exception to the public health Order and due to OFO providing assistance to USBP to process noncitizens encountered between ports of entry, OFO spent over $8 million in support of overtime needs.  OFO also repurposed the Brownsville Immigration Hearing Facility to process noncitizens at a cost of over $13.8 million in FY23 through June 30, and approximately $1.5 million monthly thereafter.

18

**Impact on ICE**

35. Within ICE, ERO oversees programs and conducts operations to identify and arrest removable noncitizens, to detain these noncitizens when necessary, and to remove noncitizens with final orders of removal from the United States to more than 170 countries around the world. ERO employs approximately 6,000 immigration officers nationwide, including executive leadership, the supervisory chain of command, and all field officers. Over the past two years, ERO has routinely detailed personnel to the SWB to support USBP frontline operations—impacting its ability to execute its missions. As of June 6, 2023, ERO had 134 personnel deployed to support USBP operations along the SWB.

36. As of May 10, 2023, ICE had approximately 22,000 noncitizens in custody, or 64 percent of its funded bedspace, in part due to pandemic-related restrictions on congregant settings that impacted ERO's ability to fully utilize beds in its detention network. These COVID-19 related restrictions were lifted with the end of the public health emergency on May 11, 2023. Since then, ICE bed usage increased quickly as part of DHS' comprehensive efforts to deliver consequences at the border. On June 11, 2023, ICE had approximately 29,800 noncitizens in its custody. This sharp increase in detention bed usage has come even as daily encounters have remained comparatively low compared to their pre-May 12 levels—a direct result of the record number of noncitizens being processed under expedited removal through the rule. However, if another surge developed as a result of the rule not being in place, the anticipated increase of custodial transfer requests from CBP under Title 8 processes would quickly overwhelm ICE's detention capacity—which is limited by its appropriated funding—such that further CBP requests for bedspace would have to be declined. This, in turn, would

19

require CBP to release more noncitizens from its custody who might otherwise be processed for expedited removal.

37.     In the event of a similar surge in the future, increased CBP encounters would have a significant impact on ICE transportation resources.  If CBP sectors become overwhelmed to the point where CBP's transportation assets and contracts are insufficient, ICE would have to divert its transportation resources from interior and removal operations to assist CBP.  This would include the use of ICE Air Charters typically needed for removal and interior movements to instead decompress the border, an increase in ICE Air Commercial removals, and increased ground transportation for removals to Mexico.  This, in turn, would impact ERO's ability to execute its core enforcement mission of apprehending and removing noncitizens from the interior of the United States.

**Impact on Communities**

38.     An increase in encounters between ports of entry will also strain the communities along the border and in the interior of the United States who receive noncitizens released from DHS custody pending the outcome of their immigration proceedings.  DHS generally seeks to release noncitizens in the vicinity of hospitality sites—locations which provide immediate resources and social service assistance—run by non-governmental organizations or municipalities along the SWB.  DHS has, over the past two years, worked closely with partners to build these kinds of capacity at the border. As a result of these efforts, these sites can currently provide overnight shelter and other kinds of support for thousands of noncitizens each day. Absent the rule, DHS anticipates encounter levels that would require noncitizens to be released from custody at levels that will greatly exceed the capacity of these sites to receive them.

20

39.     The Department supports border and interior communities receiving noncitizens through the humanitarian relief provided under the Emergency Food and Shelter Program (EFSP) as well as the newly established Shelter and Services Program (SSP).  However, even with the increase in Congressional funding from $150 million in FY2022 to $800 million in FY 2023 for these programs, DHS recognizes that the demand from communities and NGOs for this funding still far exceeds what has been made available.  For example, in April, the EFSP National Board received $1.26 billion in applications for only $350 million in available funds. DHS anticipates that SSP funding will also, unfortunately, not fully meet the needs of our community and NGO partners at the border and within the interior.

**Impact on Relationships with Foreign Partners**

40.     The United States' border management strategy is predicated on the belief that migration is a shared responsibility among all countries in the region—something that is reflected by the critical diplomatic efforts that DHS and the Department of State have been making to engage with partners throughout the Western Hemisphere.  DHS relies on and works closely with its foreign partners to manage migration throughout the region.[15]  Regional partner countries have encouraged and supported DHS's approach to address irregular migration through the application of disincentives for unlawful entry—through increased enforcement and consequences—coupled with incentives to provide intending migrants with expanded lawful pathways and processes, including humanitarian protection, innovative parole processes, and labor migration.

---

[15] *See, e.g., Creating a Comprehensive Regional Framework to Address the Causes of Migration, To Manage Migration Throughout North and Central America, and To Provide Safe and Orderly Processing of Asylum Seekers at the United States Border*, Exec. Order 14,010, 86 FR 8,267, 8,270 (Feb. 2, 2021); The White House, *Los Angeles Declaration on Migration and Protection* (June 10, 2022), *https://www.whitehouse.gov/briefing-room/statements-releases/2022/06/10/los-angeles-declaration-on-migration-and-protection/*

41.      Prior to the end of the Title 42 public health Order, regional partner countries expressed great concern that, without specific action from the United States to combat the misperception that the end of the Order would mean an open U.S. border, a surge of irregular migration would flow through their countries as migrants seek to enter the United States.  One foreign partner, for example, noted that they believed the formation of caravans in the spring of 2022 were spurred by rumors—and the subsequent official announcement—of the anticipated end of the Title 42 public health Order.  Moreover, regional partner countries have repeatedly expressed concerns about the ways in which recent migratory flows challenge their local communities and immigration infrastructure and have regularly highlighted how policy announcements have a direct and immediate impact on migratory flows through their countries.

42.      Regional partners have observed that, as a central part of a consequence framework that aims to slow migratory flows in the region, this rule is working and has reduced irregular migration in their countries as well as on our border.  As noted earlier, following the development of the enforcement process for Venezuelans announced in October 2022—an approach that was subsequently expanded to include processes for Cuban, Haitian, and Nicaraguan nationals in January 2023—regional partners urged the United States to continue building on this approach, which couples processes for noncitizens to find protection in the region or travel directly to the United States with consequences for those who do not avail themselves of these processes.[16]  But the lawful processes and regional protection mechanisms by themselves are not sufficient, as described above—DHS's ability to implement its border-

---

[16] Following the announcement of the Venezuela parole process in October 2022 and the subsequent announcement of the Cuba, Haiti, and Nicaragua parole processes in January 2023, migration flows through the region, and at the U.S.-Mexico border slowed.

22

management strategy is predicated on its ability to impose consequences on those who do not take advantage of lawful processes to access opportunity and protection in the United States.

43.    Continuing to implement and build on this approach is critical to the United States' ongoing engagements on migration management with regional partners.  For example, a number of foreign partners, including Mexico, Guatemala, Panama, and Colombia, announced significantly enhanced efforts to enforce their borders in the days leading up to the end of Title 42.  These governments recognized that the United States was taking new measures to strengthen enforcement of its border, in large part through the application of the rule, and committed to doing the same in order to impact irregular migratory flows in the region.

44.    For example, following the transition from DHS processing under Title 42 public health Order to processing under Title 8 authorities, Mexican authorities announced the continued acceptance of the return into Mexico of nationals from these CHNV countries under Title 8 processes.  This is the first time in the United States' bilateral history with Mexico that the Mexican government has stated it would accept the return or removal of non-Mexican nationals under Title 8.[17]  This decision was premised on the existence of lawful pathways and processes for nationals of these countries that were combined with a meaningful consequence framework to reduce irregular border crossings; this consequence framework includes the rule's rebuttable presumption of asylum ineligibility for noncitizens who chose to circumvent lawful pathways.  If DHS can no longer rely on the rule—thus creating a gap in the carefully balanced incentive structure that has been created—it could potentially put this arrangement in jeopardy.

---

[17] White House, Press Release, *Mexico and United States Strengthen Joint Humanitarian Plan on Migration* (May 2, 2023), https://www.whitehouse.gov/briefing-room/statements-releases/2023/05/02/mexico-and-united-states-strengthen-joint-humanitarian-plan-on-migration/.

45.     Like the United States, officials from a number of countries, including Mexico, have expressed grave concerns about the impacts that another significant increase in migrants will have on their communities and government agencies.  If DHS cannot apply the rule, DHS assesses there will be an increase in migration flows, and regional partner countries may take the view that the United States has reneged on the shared goal of stabilizing migratory populations and addressing migration collectively as a region.

46.     Ultimately, continued implementation of the rule is central to achieving a key foreign policy goal—fostering a hemisphere-wide approach of addressing migration on a regional basis.  Implementation of the rule responds to discussions with and feedback from regional partner countries, several of whom have previously criticized the United States for maintaining policies that create a pull factor throughout the region.  Eliminating the visible consequence for irregular migrants that is a core component of the rule would concern many foreign partners because it would incentivize migrants to make the journey north—particularly given how smugglers would weaponize the change in policy to drive migration.  This, in turn, would directly undermine the increased enforcement policies the United States' partners have undertaken, many of which were implemented at substantial cost for those governments—including, for example, the current unprecedented campaign by Colombia and Panama to attack smuggling networks operating in the Darién, and Mexico's deployments of law enforcement and military personnel to conduct enforcement along its southern border and transit routes.  Partner governments could be less inclined to support U.S. efforts to manage migratory flows through region—particularly through robust enforcement of their borders—if they perceive that United States is not committed to enforcing its own.

24

47.     In short, the rule is a substantive demonstration of the U.S. Government's partnership and commitment to the shared goal of stabilizing migratory populations and addressing migration collectively as a region, both of which are critical to maintaining strong bilateral and multilateral relationships.  If the rule is enjoined, it could serve to undermine the regional approach that has been carefully developed through thoughtful and intensive diplomatic effort.

## Conclusion

48.     This rule is a foundational component of the comprehensive, all of government approach that DHS implemented to prepare for the end of Title 42 and respond to the unprecedented movement of people in our hemisphere.  This approach provides incentives for intending migrants to use safe and orderly pathways and processes that have been expanded to come to the United States, even as it seeks to disincentivize noncitizens from crossing unlawfully between ports of entry or without authorization at ports of entry.  The rule is a critical component of this measured and thoughtful approach to managing migratory flows, by imposing strengthened consequences at the border in order to change the calculus of intending migrants.

49.     This approach is working as intended, rapidly and significantly reducing encounters at the border while providing record numbers of noncitizens with access to lawful pathways and processes to seek protection in the region or come to the United States.  The more than 18-month long planning effort that DHS undertook, which included making key, ongoing enhancements to the expedited removal process, has allowed it to deliver the rule's strengthened consequences under Title 8 processes that are operating at a higher scale and more quickly than ever before.

50.     Should the rule no longer be in effect, DHS anticipates a return to elevated encounter levels that would place significant strain on DHS components, border communities, and interior cities, despite the careful planning and significant investments that have been made. CBP facilities will be overcrowded once again, placing the noncitizens in our custody and the frontline personnel who care for them at risk. Border communities, and the NGOs that support them, will once again receive large scale releases of noncitizens that will overwhelm their ability to coordinate safe temporary shelter and quick onward transportation. And interior destination cities will, once again, see their systems strained.

51.     DHS does not have to imagine what the impacts of a surge in migration of the anticipated scale would look like; we just experienced it.


I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief. Executed on this 16th day of June, 2023.


_____
Blas Nuñez-Neto
Assistant Secretary
Border and Immigration Policy
U.S. Department of Homeland Security

26

Omar C. Jadwat*
Lee Gelernt*
Anand Balakrishnan*
ACLU FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
125 Broad Street, 18th Floor
New York, NY 10004
T: (212) 549-2660
F: (212) 549-2654
*ojadwat@aclu.org*
*lgelernt@aclu.org*
*abalakrishnan@aclu.org*

Katrina Eiland (SBN 275701)
Morgan Russell (SBN 296137)
Spencer Amdur (SBN 320069)
Oscar Sarabia Roman (SBN 341385)
ACLU FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
39 Drumm Street
San Francisco, CA 94111
T: (415) 343-0770
F: (415) 395-0950
*keiland@aclu.org*
*mrussell@aclu.org*
*samdur@aclu.org*
*osarabia@aclu.org*

*Attorneys for Plaintiffs (additional counsel listed on following page)*

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA

East Bay Sanctuary Covenant; Central American Resource Center; Al Otro Lado; Innovation Law Lab; Tahirih Justice Center; National Center for Lesbian Rights; Immigrant Defenders Law Center; and American Gateways,

        *Plaintiffs*,

        v.

Joseph R. Biden, President of the United States, in his official capacity; Merrick Garland, Attorney General, in his official capacity; U.S. Department of Justice; David Neal, Director of the Executive Office for Immigration Review, in his official capacity; the Executive Office for Immigration Review; Alejandro Mayorkas, Secretary of Homeland Security, in his official capacity; U.S. Department of Homeland Security; Ur Jaddou, Director of the U.S. Citizenship and Immigration Services, in her official capacity; U.S. Citizenship and Immigration Services; Troy A. Miller, Acting Commissioner of U.S. Customs and Border Protection, in his official capacity; U.S. Customs and Border Protection; Tae D. Johnson, Acting Director of Immigration and Customs Enforcement, in his official capacity; Immigration and Customs Enforcement,

        *Defendants*.

Case No.: 18-cv-06810-JST

**AMENDED AND SUPPLEMENTAL COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

1   Melissa Crow*                          Keren Zwick**
    CENTER FOR GENDER & REFUGEE             Richard Caldarone**
2   STUDIES                                 Colleen Cowgill (SBN 321542)
    1121 14th Street, NW, Suite 200         Mary Georgevich**
3   Washington, DC 20005                    NATIONAL IMMIGRANT JUSTICE
    T: (202) 355-4471                       CENTER
4   F: (415) 581-8824                       224 S. Michigan Ave., Suite 600
    crowmelissa@uchastings.edu              Chicago, IL 60604
5                                           T: (312) 660-1370
    Anne Peterson (SBN 258673)              F: (312) 660-1505
6   Blaine Bookey (SBN 267596)              kzwick@heartlandalliance.org
    Julie Bourdoiseau (SBN 340462)          rcaldarone@heartlandalliance.org
7   Karen Musalo (SBN 106882)               ccowgill@heartlandalliance.org
    CENTER FOR GENDER & REFUGEE             mgeorgevich@heartlandalliance.org
8   STUDIES
    200 McAllister Street                   Michelle (Minju) Y. Cho (SBN 321939)
9   San Francisco, CA  94102                AMERICAN CIVIL LIBERTIES UNION
    T: (415) 610-5729                       FOUNDATION OF NORTHERN
10  F: (415) 581-8824                       CALIFORNIA, INC.
    petersonanne@uchastings.edu             39 Drumm Street
11                                          San Francisco, CA 94111
12                                          T: (415) 621-2493
                                            F: (415) 255-1478
13                                          mcho@aclunc.org

14  Attorneys for Plaintiffs

15  *Admitted Pro hac vice
    ** Application for admission pro hac vice
16  forthcoming

17

18

19

20

21

22

23

24

25

26

27

28

**INTRODUCTION**

1.      The Rule challenged here attempts to resuscitate and combine the illegal features of the two previous asylum bans that this Court and the Ninth Circuit found to be unlawful.  *See* 83 Fed. Reg. 55,934 (the "entry ban"); 84 Fed. Reg. 33,829 (the "transit ban").  This new Rule is no less illegal or harmful.  It will effectively eliminate asylum for nearly all non-Mexican asylum seekers who enter between designated ports of entry, and even for those who present at a port without first securing an appointment.  *See* Circumvention of Lawful Pathways at 14-16 (May 16, 2023) (the "Rule").[1]  The Rule is set to take effect once the Title 42 policy sunsets at the end of the day on May 11, 2023.  *Id.* at 2.

2.      The Rule is convoluted, but its operation is straightforward: It applies to all non-Mexican asylum seekers at the southern land border and adjacent coastal borders.  *Id.* at 15-16, 326, 438.  It requires the automatic denial of an applicant's asylum claim unless the person satisfies one of three conditions: presenting at a port of entry after securing one of a tightly-restricted number of appointments through a complicated mobile application called CBP One; applying for and being denied asylum in a transit country; or obtaining advance permission to travel to the United States through an approved parole program.  *Id.* at 14, 25-26, 438-49.  The Rule contains extremely narrow exceptions to this asylum bar for things like acute medical emergencies.  *Id.* at 15, 439.  Like the previous asylum bans, the Rule would bar vulnerable people from asylum for reasons wholly unrelated to the strength or urgency of their need for protection under our laws.

3.      The Rule is unlawful in numerous ways.  The Ninth Circuit has already held that the Rule's main requirements are illegal.  The government cannot force asylum seekers to enter at ports. *E. Bay Sanctuary Covenant ("EBSC") v. Biden*, 993 F.3d 640, 658 (9th Cir. 2021) (invalidating the

---

[1] Citations to the Rule refer to the unpublished pdf version that Defendants released for public inspection on May 10, 2023, available at https://public-inspection.federalregister.gov/2023-10146.pdf.  The Rule will not be published in the Federal Register until May 16, 2023.

AM. AND SUPPL. COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

prior entry ban). And the government cannot force asylum seekers to apply for asylum in transit countries. *EBSC v. Garland*, 994 F.3d 962, 982 (9th Cir. 2020) (invalidating the prior transit ban). The Rule revives these illegal requirements by forcing asylum seekers to choose between them, even though neither is consistent with the asylum statute.

4.    In practice, the Rule will function just like the enjoined entry ban, because the Rule's other requirements are virtually impossible for most asylum seekers to meet. While the prior transit rule was in effect, more than 98% of asylum seekers were unable to satisfy its conditions because of danger and overwhelmed or nonexistent asylum systems in transit countries.

5.    The Rule's other conditions are vanishingly small if they exist at all. The Rule mentions that people from a handful of countries can obtain advance parole. Rule at 264. But virtually no one can overcome the Rule this way, because the Rule only applies at the southern land border, whereas these parole programs require participants to fly to U.S. airports. *Id.* at 307.

6.    The Rule also contains a few extremely narrow exceptions, many of which mirror similar exceptions in the prior enjoined bans. *Id.* at 318.

7.    As a result, the Rule will effectively require nearly all covered asylum seekers to enter at a port of entry. Indeed, that's exactly how the government itself has described the Rule: "[I]ndividuals who unlawfully cross the U.S. southwest border will be presumed ineligible for asylum under new regulations. . . ."

8.    The government cannot reinstate the enjoined entry ban, even if this time it is couched in a more complex set of categories. Congress provided for an opportunity to seek asylum in this country, "whether or not at a designated port of arrival." 8 U.S.C. § 1158(a)(1). And it "mandated equity in its treatment of all refugees, however they arrived." *EBSC v. Biden*, 993 F.3d at 658. The Rule goes even further than the last entry ban, because even people who present at ports will be cut off from asylum unless they can navigate the CBP One app and wait weeks or months for an appointment. Rule at 25, 267, 438.

2

9.      Although the administration characterizes the Rule as creating only a "rebuttable presumption" of asylum ineligibility, it does no such thing.  The Rule operates just as the Trump administration's prior asylum bans did: Asylum seekers subject to the Rule—all non-Mexicans—are categorically barred unless they satisfy one of the enumerated and limited conditions or exceptions.  That's a simple ban with narrow exemptions, and it turns the asylum process on its head.

10.      Like its predecessors, this new ban is both inconsistent with Congress's statutory directive, and arbitrary and capricious, in numerous ways.  Among other reasons, it bars asylum based on manner of entry and transit through a third country, which this Court and the Ninth Circuit have already held to be irrelevant, arbitrary bases on which to bar asylum.  *EBSC v. Trump*, 349 F. Supp. 3d 838, 857-59 (N.D. Cal. 2018); *EBSC v. Biden*, 993 F.3d at 671-72; *EBSC v. Barr*, 385 F. Supp. 3d 922, 945-46 (N.D. Cal. 2019); *EBSC v. Garland*, 994 F.3d at 980.

11.      As with the prior bans, the government has also entirely failed to grapple with evidence that contradicts the Rule's core assumptions.  Transit countries are not safe for many asylum seekers, who continue to be subject to unspeakable violence even when merely passing through them.  In Northern Mexico, where the Rule would force most migrants to wait for limited CBP One appointments, thousands of asylum seekers have been kidnapped, raped, or otherwise violently attacked.  And the underdeveloped asylum systems of transit countries are stretched to the breaking point, unable to handle more than a tiny percentage of the cases that reach the U.S. border each year.  The government not only failed to meaningfully address these facts, but also ignored evidence of the multiple barriers asylum seekers face in trying to access CBP One appointments.  Nor has the government meaningfully explored alternatives that would inflict less suffering on asylum seekers.

12.      After campaigning on a promise to restore our asylum system, the Biden administration has instead doubled down on its predecessor's cruel asylum restrictions.  The agencies claim the Rule merely provides consequences for asylum seekers circumventing lawful

3
AM. AND SUPPL. COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
ER-69

pathways.  Rule at 19, 53.  But seeking asylum *is* a lawful pathway protected by our laws *regardless* of how one enters the country.  Although the administration's efforts at creating new avenues through country-specific parole programs is a benefit to those who qualify, that limited option cannot substitute for ensuring the basic right to seek asylum for those who arrive at the border.

13.     Plaintiffs now seek a declaration that the Rule violates the INA and the Administrative Procedure Act ("APA") and an order vacating and enjoining the Rule.

## JURISDICTION AND VENUE

14.     This case arises under the APA, 5 U.S.C. § 701, *et seq.* and the INA, 8 U.S.C. § 1101, *et seq.*  This Court has subject matter jurisdiction under 28 U.S.C. § 1331 and §§ 2201-02.

15.     Venue is proper under 28 U.S.C. § 1391(e)(1) because the defendants are agencies of the United States and officers of the United States acting in their official capacity, at least one plaintiff resides in this district, and a substantial part of the events or omissions giving rise to the claim occurred in this district.

## PARTIES

### I.  Plaintiffs

16.     Plaintiff East Bay Sanctuary Covenant ("EBSC") is a nonprofit organization incorporated in California.  EBSC's main office is in Berkeley, California.  EBSC was founded in 1982 to assist refugees fleeing the civil wars and violence in El Salvador and Guatemala.  EBSC's mission is to offer sanctuary, support, community organizing assistance, advocacy, and legal services to people escaping political persecution, terror, war, intolerance, exploitation, and other violence.  One of EBSC's critical missions is to assist individuals fleeing persecution in applying for asylum and other humanitarian relief in the United States.  EBSC also trains and mentors law students and attorneys to help people apply for asylum.

17.     Plaintiff Central American Resource Center ("CARECEN") is a nonprofit organization incorporated in California primarily serving the Los Angeles, Van Nuys, and San

4

Bernardino areas.  CARECEN's mission is to empower Central Americans and all immigrants by defending human and civil rights, working for social and economic justice and promoting cultural diversity.  CARECEN offers low-cost immigration legal services, including asylum representation, and community education programs, and engages in advocacy and organizing to achieve fair and more inclusive immigration, education, and labor laws and policies.

18.     Plaintiff Al Otro Lado is a nonprofit, nonpartisan organization established in 2014 and incorporated in California.  Al Otro Lado is a legal services organization that serves indigent deportees, migrants, refugees, and their families, and operates primarily in Los Angeles, California, and Tijuana, Mexico.  Al Otro Lado's mission is to coordinate and provide screening, advocacy, and legal representation for individuals in asylum and other immigration proceedings; to seek redress for civil rights violations; and to provide assistance with other legal and social service needs.[2]

19.     Plaintiff Innovation Law Lab is a nonprofit organization that has projects in multiple states.  Innovation Law Lab seeks to advance the legal rights of immigrants and refugees in the United States, with a focus on providing representation to asylum seekers.[3]

20.     Plaintiff the Tahirih Justice Center ("Tahirih") is a nonprofit and non-partisan organization with offices in San Bruno, California; Falls Church, Virginia; Baltimore, Maryland; Atlanta, Georgia; and Houston, Texas.  Tahirih was founded in 1997 and provides free legal immigration services to survivors of gender-based violence.  Tahirih's mission is to provide free holistic services to women, girls, and other survivors of gender-based violence such as rape, domestic violence, female genital mutilation/cutting, forced marriage, and human trafficking.  Tahirih offers legal representation and social services for individuals who seek protection, including asylum, affirmatively and in removal proceedings.  Tahirih also trains and co-counsels with private

---

[2] Al Otro Lado continues to challenge the Trump administration's entry ban, which was the original subject of this case.  It does not bring claims against the new Rule.
[3] Like Al Otro Lado, Innovation Law Lab continues to challenge the original entry ban but does not bring claims against the new Rule.

5

attorneys to provide representation to survivors of gender-based violence in seeking asylum and other protection from removal.

21.     Plaintiff National Center for Lesbian Rights ("NCLR") is a nonprofit organization that was founded in 1977, and is located in San Francisco, California.  NCLR provides free legal services to lesbian, gay, bisexual, transgender, and queer ("LGBTQ") people.  NCLR's mission is to advocate for and advance the rights of LGBTQ people in the United States, including through provision of free legal services to LGBTQ asylum seekers fleeing persecution and torture on account of their sexual orientation, gender identity, or gender expression.  NCLR offers direct legal representation, a help line, community education, and Know Your Rights presentations for LGBTQ individuals who seek protection, including asylum, in their immigration proceedings.

22.     Plaintiff Immigrant Defenders Law Center ("ImmDef") is a nonprofit organization incorporated in California and based in Los Angeles, with additional offices in San Diego, Santa Ana, and Riverside.  It serves immigrants and asylum seekers throughout Southern California and in Tijuana, Mexico.  ImmDef's mission is to defend immigrants against the injustices of the U.S. immigration system.  To this end, they provide *pro bono* legal services through a universal representation model so that no immigrant is forced to face removal proceedings alone.  ImmDef pursues its mission through several different programs and projects, including a Cross-Border Initiative that assists asylum seekers preparing to enter the United States and a Community Defense Program that provides removal defense legal representation and services to immigrants facing deportation.  ImmDef also plays a core role in the California Welcoming Task Force, a bi-national coalition of organizations that provide services to individuals seeking asylum in the United States.

23.     Plaintiff American Gateways is a nonprofit organization founded in 1987 that is incorporated in Texas, with offices in Austin, San Antonio, and Waco, Texas.  American Gateways provides free legal services to migrants and is particularly focused on serving people who are fleeing persecution.  American Gateways' mission is to provide free, culturally sensitive, trauma-informed

6

legal representation to individuals and families seeking asylum and other kinds of immigration relief in the United States.  American Gateways also works to engage and educate immigrant communities and local stakeholders about immigration laws, processes, and about an individual's rights in the immigration process.

## II. Defendants[4]

24.     Defendant Joseph R. Biden is the President of the United States.  He is sued in his official capacity.  He is successor to the public official who issued the Proclamation challenged in this suit.

25.     Defendant Merrick Garland is the Attorney General of the United States.  He is sued in his official capacity.  In that capacity, he issued the Rule challenged in this suit.  He directs each of the component agencies within the Department of Justice.  The Attorney General is responsible for the administration of the immigration laws pursuant to 8 U.S.C. § 1103 and is empowered to grant asylum or other relief.

26.     Defendant U.S. Department of Justice ("DOJ") is a cabinet-level department of the United States.

27.     Defendant David Neal is the Director of the Executive Office for Immigration Review ("EOIR").  He is sued in his official capacity.

28.     Defendant EOIR is the sub-agency of DOJ that, through its immigration judges and appellate immigration judges, conducts limited review of negative credible fear determinations in expedited removal proceedings and adjudicates regular removal proceedings and agency appeals.

29.     Defendant Alejandro Mayorkas is the Secretary of Homeland Security.  He is sued in his official capacity.  In that capacity, he issued the Rule challenged in this suit.  He directs each of the component agencies within the Department of Homeland Security.  In his official capacity,

---

[4] "The officer's successor is automatically substituted as a party" under Federal Rule of Civil Procedure 25(d).

7

Defendant Mayorkas is responsible for the administration of the immigration laws pursuant to 8 U.S.C. § 1103 and is empowered to grant asylum or other relief.

30. Defendant U.S. Department of Homeland Security ("DHS") is a cabinet-level department of the United States federal government. Its components include U.S. Citizenship and Immigration Services ("USCIS"), U.S. Customs and Border Protection ("CBP"), and U.S. Immigration and Customs Enforcement ("ICE").

31. Defendant Ur Jaddou is the Director of USCIS. She is sued in her official capacity.

32. Defendant USCIS is the sub-agency of DHS that, through its asylum officers, conducts interviews of individuals who apply for asylum.

33. Defendant Troy A. Miller is the Acting Commissioner of CBP. He is sued in his official capacity.

34. Defendant CBP is the sub-agency of DHS that is responsible for the apprehension, detention, and processing of individuals seeking asylum or other relief at or near the U.S. border.

35. Defendant Tae D. Johnson is the Acting Director of ICE. He is sued in his official capacity.

36. Defendant ICE is the sub-agency of DHS that is responsible for carrying out removal orders and overseeing immigration detention.

## BACKGROUND

### I. The U.S. Protection System

37. The modern U.S. asylum system was established by the Refugee Act of 1980, Pub. L. 96-212, 94 Stat. 102. The Act reflects "one of the oldest themes in America's history—welcoming homeless refugees to our shores," and "gives statutory meaning to our national commitment to human rights and humanitarian concerns." Sen. Rep. No. 256, 96th Cong., 1st Sess. 1 (1979), *reprinted in* U.S. Code Cong. and Admin. News 141, 141. One of Congress's "primary purposes" in enacting the statutory provisions governing asylum, codified at 8 U.S.C. § 1158, was "to bring

8

United States refugee law into conformance" with international refugee treaties. *INS v. Cardoza-Fonseca*, 480 U.S. 421, 436 (1987).[5]

### A. Asylum

38.     Asylum affords protection from removal to individuals who have a "well-founded fear of persecution" on account of one or more of five protected grounds: race, religion, nationality, political opinion, or membership in a particular social group, if their country is unable or unwilling to protect them from this harm.  8 U.S.C. § 1101(a)(42)(A).  A "well-founded fear of persecution" is defined as a ten percent chance of persecution.  *Cardoza-Fonseca*, 480 U.S. at 430, 440.  An asylum seeker's past persecution gives rise to a presumption of a well-founded fear of future persecution and, thus, of asylum eligibility.

39.     There are three principal ways to seek asylum.  First, a noncitizen who is not in removal proceedings may file an "affirmative" application with USCIS and complete a non-adversarial interview with an asylum officer.  8 C.F.R. §§ 208.2(a), 208.9.  Second, a noncitizen in regular removal proceedings, 8 U.S.C. § 1229a, may submit a "defensive" asylum application to the immigration judge as a form of relief from removal, 8 C.F.R. § 208.2(b).  The application is decided in an adversarial proceeding where the noncitizen has the right to be represented by counsel, introduce evidence, and present and cross-examine witnesses.  8 U.S.C. § 1229a(b)(4).  Third, a noncitizen who has been placed in "expedited removal"—a truncated removal process that may be applied to certain noncitizens who arrive at a port of entry or enter without inspection, 8 U.S.C. § 1225(b)(1)—may also seek asylum.  The noncitizen may do so by expressing fear of removal and undergoing a "credible fear" screening interview with an asylum officer.  Any noncitizen who satisfies the threshold screening standard must be referred to regular removal proceedings to apply for asylum.

---

[5] Although the United States is a party only to the later protocol, through that agreement, "the United States agreed to comply with the substantive provisions of Articles 2 through 34 of the 1951 United Nations Convention Relating to the Status of Refugees."  *Cardoza Fonseca*, 480 U.S. at 429.

9

40.     The spouse and children of a person granted asylum can likewise receive asylum as derivative beneficiaries, even if they are not physically present in the United States.  8 U.S.C. § 1158(b)(3).  People granted asylum can become lawful permanent residents, *id.* § 1159(b), and eventually U.S. citizens, *id.* § 1427.

41.     In crafting the statutory provisions governing asylum, Congress took care to ensure that noncitizens already within the United States or arriving at the border or a border port of entry would be able to apply for asylum, regardless of their manner of arrival at or entry within our borders.  8 U.S.C. § 1158(a)(1) specifically provides:

> Any [noncitizen]who is physically present in the United States or who arrives in the United States (whether or not at a designated port of arrival . . .), irrespective of such [noncitizen's] status, may apply for asylum.

42.     Accordingly, the Board of Immigration Appeals has long held that—to the extent manner of entry is considered at all—it can be assessed only as one discretionary factor among many once asylum eligibility is determined, and never "in such a way that the practical effect is to deny [asylum] in virtually all cases."  *Matter of Pula*, 19 I&N Dec. 467, 474 (BIA 1987).

43.     Additionally, two provisions of the asylum statute specifically address the terms under which asylum eligibility can be denied based on the ability of an asylum seeker to safely reside in a third country.  Congress imposed significant constraints in these two provisions to ensure that applicants could be barred from asylum in the United States only if residing elsewhere is "genuinely safe."  *EBSC v. Garland*, 994 F.3d at 977.

44.     The first of those, the safe third country provision, 8 U.S.C. § 1158(a)(2)(A), requires a formal international agreement with the third country; that the third country be able to provide asylum seekers "access to a full and fair procedure for determining [their] claim[s] to asylum"; and an individualized determination that the applicant will not face persecution there.

45.     The other, the firm resettlement provision, 8 U.S.C. § 1158(b)(2)(A)(vi), addresses asylum eligibility for applicants who were "firmly resettled in another country prior to arriving in

10

the United States."  For this bar to apply, however, the government must show "that the government

of the third country issued to the [noncitizen] a formal offer of some type of official status"

permitting indefinite residency, after which the applicant has the opportunity "to show that the

nature of his stay and ties was too tenuous, or the conditions of his residence too restricted, for him

to be firmly resettled."  *Maharaj v. Gonzales*, 450 F.3d 961, 976-77 (9th Cir. 2006) (en banc).

### B.  Withholding of Removal and Protection Under the Convention Against Torture

46.  Like asylum, withholding of removal protects noncitizens from removal to any

country where they would face persecution on account of a protected ground, such as race, religion,

or political opinion.  8 U.S.C. § 1231(b)(3).

47.  Immigration regulations implementing the Convention Against Torture ("CAT")

likewise prohibit the removal of a noncitizen to any country where "it is more likely than not that he

or she would be tortured."  8 C.F.R. § 208.16(c)(2).

48.  The withholding of removal statute and CAT regulations implement international

treaty obligations not to send noncitizens to countries where they face persecution or torture, known

as *non-refoulement* obligations, and the relief is mandatory for those who meet the requirements.

*INS v. Stevic*, 467 U.S. 407, 421, 426 n.20 (1984); *Maldonado v. Lynch*, 786 F.3d 1155, 1162 (9th

Cir. 2015) (en banc).

49.  These prohibitions encompass both direct *refoulement*—sending asylum seekers

directly to countries where they face persecution or torture—and indirect *refoulement*—returning

asylum seekers to countries where they are at risk of being sent onward to persecution or torture.

50.  A noncitizen facing removal proceedings, even one who is ineligible for asylum, may

be granted withholding of removal or CAT protection by an immigration judge after an adversarial

hearing.  However, these forms of relief have significant drawbacks compared to asylum.  First,

whereas winning asylum requires showing just a ten percent chance of persecution, being granted

AM. AND SUPPL. COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Case: 4:18-cv-06810-JST Document 186-29 Filed 05/18/23 Page 14 of 57

withholding or CAT protection requires showing that persecution or torture is more likely than not—a much higher threshold. *Stevic*, 467 U.S. at 429-30.

51. Second, these alternative forms of relief from removal do not provide a pathway to permanent residency or U.S. citizenship; they instead come with a removal order and simply prevent the government from executing that order as to a particular country. The decision to withhold removal can be revoked if conditions change or if a third country agrees to accept the individual. *See* 8 C.F.R. §§ 208.24(b)(1), (f) (termination of withholding of removal); 8 C.F.R. § 208.17(d) (termination of CAT deferral); 8 C.F.R. § 208.16 (removal to third country).

52. Third, withholding of removal and CAT protection do not permit individuals to include their spouse and children as derivative applicants. Instead, those individuals must be present in the United States, apply separately, and be granted protection independently, which can result in long-term family separation.

53. Finally, winning withholding of removal and CAT protection is more time- and resource-intensive for applicants and their attorneys. Both types of claims have a higher more-likely-than-not standard, and CAT claims have multiple elements that are distinct from both asylum and withholding of removal. These differences increase the need for expert testimony and other detailed evidence, and require additional legal research and analysis. These differences also mean more people are denied these forms of protection on the merits, requiring them to pursue complex appeals to the Board of Immigration Appeals and then to the federal Courts of Appeals.

## II. The Trump Administration's Asylum Bans and Resulting Court Challenges

54. The new Rule reprises two attempts by the Trump administration to restrict asylum eligibility. The first was based on an asylum seeker's manner of entry (the "entry ban") and the second was based on their transit through third countries on their way to the southern U.S. border (the "transit ban"). This Court enjoined these earlier bans in decisions affirmed by the Ninth Circuit.

AM. AND SUPPL. COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

### A. The Entry Ban

55.     The Trump administration issued the entry ban in November 2018 as an interim final rule barring asylum eligibility to anyone subject to a presidential proclamation concerning the southern border.  83 Fed. Reg. 55,934.  That same day, former President Trump issued a proclamation suspending entry of noncitizens through the southern border, excepting only lawful permanent residents and those who presented for inspection at a port of entry.  83 Fed. Reg. 57,661, 57,663.  Together, the rule and proclamation barred asylum eligibility for those who crossed the southern border between designated ports of entry.

56.     Plaintiffs EBSC, CARECEN, Innovation Law Lab, and Al Otro Lado challenged the entry ban in this Court on November 9, 2018, the same day it was issued, in this case.  This Court enjoined the entry ban, in part, because it "irreconcilably conflict[ed]" with 8 U.S.C. § 1158(a)(1) and was impermissibly issued without notice and comment.  *EBSC v. Trump*, 349 F. Supp. 3d at 844, 862-63.

57.     The Ninth Circuit denied the government's request to stay that injunction, agreeing with this Court that the ban conflicted with § 1158(a)(1) and impermissibly conditioned "eligibility for asylum on a criterion that has nothing to do with asylum itself"; and that the government violated the APA's requirements.  *EBSC v. Trump*, 932 F.3d 742, 771-72, 775-78 (9th Cir. 2018) (corrected opinion).

58.     The Supreme Court likewise denied the government's request to stay this Court's order.  *Trump v. EBSC*, 139 S. Ct. 782 (2018).

59.     On February 28, 2020, the Ninth Circuit affirmed this Court's injunction on the merits, reiterating that the ban contravened § 1158(a)(1) and was arbitrary and capricious, and that the government violated the APA.  *EBSC v. Biden*, 993 F.3d 671, 675-77.

60.     Separately, on August 2, 2019, a district court in the District of Columbia vacated the asylum entry ban as in conflict with § 1158(a)(1).  *O.A. v. Trump*, 404 F. Supp. 3d 109 (D.D.C. 2019), *appeal pending sub nom O.A. v. Biden*, No. 19-5272 (D.C. Cir.).

**B.  The Transit Ban**

61.     In July 2019, with the entry ban enjoined, the Trump administration promulgated the transit ban as an interim final rule.  It provided that noncitizens who transited through another country prior to reaching the southern border of the United States were ineligible for asylum.  84 Fed. Reg. 33,829.  The asylum transit ban had three narrow exceptions for noncitizens who: (1) had applied for and were denied protection in a transit country; (2) met the definition of a "victim of a severe form of trafficking in persons"; or (3) had transited only through countries not party to the Refugee Convention or Protocol or the CAT.  *Id.* at 33,835, 33,843.  These exceptions exempted almost no one from the eligibility bar.

62.     The same day the transit ban issued, EBSC, CARECEN, Innovation Law Lab, and Al Otro Lado again filed suit in this Court, in a case related to this one.  On July 24, 2019, the Court preliminary enjoined the ban.  *EBSC v. Barr*, 385 F. Supp. 3d at 960.  The Court concluded that the transit ban conflicted with the asylum statute's safe third country and firm resettlement provisions, 8 U.S.C. §§ 1158(a)(2)(A) and (b)(2)(A), because, unlike those provisions, it did "virtually nothing to ensure that a third country is a 'safe option.'"  *Id.* at 944.  The Court also held the rule arbitrary and capricious because failure to seek protection in a third country has no bearing on the merits of asylum claims and is thus an invalid basis for denying asylum, *id.* at 945-47, and because the agencies impermissibly ignored extensive contrary evidence documenting the dangers to asylum seekers in Mexico, *id.* at 951-56.  And the Court again determined that the government likely violated the APA's notice-and-comment requirements.  *Id.* at 948-50.

63.     The Ninth Circuit subsequently stayed the operation of this Court's injunction outside the Ninth Circuit.  *EBSC v. Barr*, 934 F.3d 1026 (9th Cir. 2019).  On September 9, 2019, this Court

14

issued a new nationwide injunction supported by further findings. *EBSC v. Barr*, 391 F. Supp. 3d 974, 985 (N.D. Cal. 2019). On September 11, 2019, the Supreme Court entered a four-sentence order staying this Court's preliminary injunction pending appeal. *Barr v. EBSC*, 140 S. Ct. 3 (2019).

64. The transit ban took effect following the Supreme Court's stay decision and remained in place for nearly a year. For those to whom it applied, it functioned as a near-total elimination of asylum. According to government data, the agency determined that 98.3% of more than 25,000 asylum seekers subjected to the transit ban during that time failed to qualify for any exception and were thus barred from asylum.

65. Meanwhile, separate plaintiffs had also challenged the transit ban in the D.C. district court. On June 30, 2020, that court vacated the transit ban interim final rule for violating the APA's notice-and-comment requirements. *Cap. Area Immigrants' Rights Coal. v. Trump*, 471 F. Supp. 3d 25 (D.D.C. 2020), *appeal dismissed sub nom I.A. v. Garland*, No. 20-5271, 2022 WL 696459 (D.C. Cir. Feb. 24, 2022).

66. The Ninth Circuit affirmed this Court's preliminary injunction against the asylum transit ban on the merits, agreeing that the ban conflicted with § 1158's firm resettlement and safe third country provisions and was arbitrary and capricious. *EBSC v. Garland*, 994 F.3d at 977-78, 980-83.

67. In December 2020, the outgoing administration re-issued the transit ban as a final rule, which was "almost verbatim the interim final rule this Court previously enjoined." *EBSC v. Barr*, 519 F. Supp. 3d 663, 665 (N.D. Cal. 2021) (internal quotation marks omitted); *see* 85 Fed. Reg. 82,260 (Dec. 17, 2020). This Court preliminarily enjoined the final rule as contrary to § 1158 and arbitrary and capricious. *EBSC v. Barr*, 519 F. Supp. 3d at 666-68.

68.     Because of the injunctions and vacatur, the prior asylum bans have not been in effect during the Biden administration.

**III.  The Biden Administration's Unwinding of Title 42 and Its New Asylum Ban Rule**

69.     President Biden signaled that his administration's approach to asylum would be different from that of his predecessor.  Shortly after his election, he indicated his intention to "restore and strengthen" the "badly damaged" U.S. asylum system, including by having Defendants Garland and Mayorkas "promptly review and decide whether to rescind" the asylum entry and transit bans. Exec. Order No. 14,010, 86 Fed. Reg. 8,267, 8,269-70 (Feb. 5, 2021).

70.     The Biden administration at first maintained the previous administration's Title 42 policy that has resulted in systematic summary expulsion of asylum seekers under the pretext of a pandemic-related public health measure.  *See* 85 Fed. Reg. 17,060 (Mar. 26, 2020).  However, beginning in February 2021, President Biden ordered DHS to "begin taking steps to reinstate the safe and orderly reception and processing of arriving asylum seekers."  86 Fed. Reg. at 8,269.

71.     On April 1, 2022, the CDC terminated the Title 42 order, effective May 23, 2022, during which time DHS would implement appropriate COVID-19 mitigation protocols in preparation for resuming normal processing.  87 Fed. Reg. at 19,941-42.

72.     But Title 42 did not end on May 23, 2022, or on December 21, 2022—the date by which a D.C. district court ordered its end, *Huisha-Huisha v. Mayorkas*, ___ F. Supp. 3d ___, 2022 WL 16948610 (D.D.C. Nov. 15, 2022) —due to litigation brought by Louisiana and other states, *see Louisiana v. CDC*, 603 F. Supp. 3d 406 (W.D. La. 2022); *Arizona v. Mayorkas*, 143 S. Ct. 478 (2022).

73.     In December 2022, DHS issued a string of press releases asserting that it was continuing to prepare for the end of Title 42 and the resumption of regular Title 8 processing.  News reports that month indicated that the agencies had drafted a version of the Rule to be implemented when Title 42 lifted.

74.     On January 5, 2023, DHS and DOJ issued a press release confirming that they would soon issue the Rule challenged here.

75.     Meanwhile, on January 30, 2023, the government announced that it would allow the COVID-19 public health emergency declaration to expire at the end of the day on May 11, 2023, which would also spell the end of Title 42.

76.     On February 23, 2023, Defendants finally published the Notice of Proposed Rulemaking ("NPRM") with a truncated 30-day comment period.  88 Fed. Reg. 11,704 (Feb. 23, 2023).  When more than 170 organizations asked them to extend the comment period, they refused to do so, solely on the ground that Title 42 was set to end on May 11, 2023.

77.     The Rule is virtually unchanged from the NPRM and was issued without the required 30-day delay in effective date—instead taking effect the very next day.  The Rule expressly rescinds and supersedes the enjoined asylum entry and transit bans.  Rule at 370, 380.  Like those bans, however, the new Rule would dramatically curtail the availability of asylum in the United States.  While the Rule purports to provide three "options" to preserve asylum eligibility, nearly all covered asylum seekers will be unable to satisfy two of these conditions, and only a limited number will be able to utilize the third: securing scarce appointments booked using CBP One.  The Rule will eviscerate the asylum system that Congress created.

**A.  The New Rule's Asylum Eligibility Bar**

78.     Despite its complex wording, the Rule's basic operation is straightforward.  The asylum eligibility bar applies to anyone who arrives at the southern land border after traveling through a third country en route to the United States.  In other words, it applies to all non-Mexican adults and families seeking asylum at the southern U.S. border.

79.     The Rule bars asylum unless a covered person (1) presents at a port of entry and obtains one of a small number of border port appointments through a complicated mobile application called CBP One; (2) applies for asylum or similar relief in a transit country, and receives a denial

before coming to the United States; or (3) applies for parole through a government-approved program and receives advance permission to travel to the United States. Rule at 25-26, 443-44. People who do not fall into one of these three categories are automatically barred from obtaining asylum, no matter the strength of their claims to refugee protections.

80. The Rule also contains two extremely narrow exceptions. The first exception allows a person to avoid the bar in "exceptionally compelling circumstances," including an "acute medical emergency," an "imminent and extreme threat" to life or safety, or being a "victim of a severe form of trafficking in persons." *Id.* at 26, 444. The Rule makes clear that these are meant to be circumscribed and only exempt a tiny number of people. For instance, the "imminent and extreme threat" exception requires an "imminent threat of rape, kidnapping, torture, or murder," *id.* at 26, 444, and does not include "generalized concerns about safety, or based on a prior threat that no longer poses an immediate threat." *Id.* at 15 n.36.

81. The second exception is only for individuals who present at a port of entry. They can avoid the CBP One appointment requirement if they "demonstrate [] by a preponderance of the evidence that it was not possible to access or use the CBP One app due to language barriers, illiteracy, significant technical failure, or other ongoing and serious obstacle." *Id.* at 298, 444. This exception only "captures a narrow set of circumstances in which it was truly not possible for the noncitizen to access or use" CBP One. *Id.* at 298. Notably, there is no exception for a person's inability to secure one of the limited CBP One appointments due to insufficient availability, regardless of how long someone has attempted to obtain one. *See id.* at 119-20, 438. Nor is there an exception for someone who lacks the requisite type of phone, access to internet service, to the ability to charge their phone, or the sophistication necessary to navigate the CBP One app.

82. Despite this structure, the Rule asserts that it creates only a "presumption" of ineligibility for asylum that can be "rebutted." That description is inaccurate. For every person who is subject to the Rule, asylum is barred unless they meet one of the conditions or narrow exceptions

18

that, under the Rule, preserves asylum eligibility. This Rule is no different from any other prohibition with exemptions, including the enjoined prior bans.

83. By contrast, a presumption typically arises when one fact is inferred from other facts. A presumption is rebuttable if the party it operates against may provide evidence to disprove the inferred fact. The Rule doesn't work that way: it doesn't infer one fact from another. It simply bars a huge category of people from asylum and identifies several narrow categories of people who remain eligible.

84. Moreover, in practice, the Rule preserves far less asylum eligibility than it does on paper, because two of the three conditions—advance parole and denial of asylum by a transit country—are unavailable to almost all of the asylum seekers who are subject to the Rule.

85. Under the Rule, for instance, people who "sought asylum or other protection in a country through which the noncitizen traveled and received a final decision denying that application" are not barred. Rule at 26, 198, 444. But this purported exception is virtually meaningless. Many transit countries lack a functioning asylum system, others have systems that are stretched to the breaking point, and most are not remotely safe enough for asylum seekers to find refuge. As this Court and the Ninth Circuit previously found, it is not possible or advisable for many asylum seekers to seek protection in transit to the United States.

86. The Rule also purportedly exempts people who were granted permission to enter the United States after applying for parole from outside the United States. *Id.* at 14. The Rule points to a handful of nationality-specific parole processes that the government recently launched. *See id.* at 10, n.19; 82, n.86; 423, n.380 (citing 87 Fed. Reg. 63507 (Oct. 19, 2022) (Venezuela); 88 Fed. Reg. 1243 (Jan. 9, 2023) (Haiti); 88 Fed. Reg. 1255 (Jan. 9, 2023) (Nicaragua); 88 Fed. Reg. 1266 (Jan. 9, 2023) (Cuba); 87 Fed. Reg. 25040 (Apr. 27, 2022) (Ukraine))). The parole criteria are not tied to the need for asylum or danger in any way. And nationals of these countries can only obtain parole if they have a financial sponsor in the United States, can afford a plane ticket, and are able to obtain a

19

passport. *Id.* at 303-05. Nationals of other countries, including many significant refugee-producing countries, are not eligible for these nationality-specific parole processes. *See, e.g.*, 88 Fed. Reg. 1243, 1252 (eligibility requirements for Haitian parole program); 87 Fed. Reg. 25040, 25042 (eligibility requirements for Ukrainian parole program).

87. The Rule's supposed exception for these parolees will encompass almost no one, because the Rule only applies to individuals who enter at the southern U.S. border, while participants in these parole programs are required to fly to U.S. airports—they *may not* enter at the border. In other words, this supposed "option" for preserving asylum eligibility generally only applies to people who are not subject to the Rule in the first place.

### B. Procedures for Applying the Bar

88. The Rule applies in any proceeding where a person might raise an asylum claim: the affirmative asylum process, expedited removal, and full removal proceedings in immigration court. Rule at 26, 71, 300.

89. First, the Rule applies in affirmative asylum adjudications conducted by USCIS asylum officers. *Id.* at 178. Asylum officers must determine whether an applicant is barred by the Rule, and whether the applicant satisfies any of the Rule's exceptions before adjudicating the merits of their asylum claim. *Id.* at 300. If an asylum officer finds that the applicant does not meet a condition or qualify for an exception and is therefore barred from asylum, the applicant will generally be referred to immigration court for removal proceedings. *Id.* at 35, 72-73, 357, 439-40.

90. Second, the Rule applies in the credible fear screening process conducted in expedited removal proceedings. *Id.* at 26, 71. The statutory standard requires assessing whether the asylum seeker has a "significant possibility" of later establishing asylum eligibility in a full hearing before an immigration judge. *Id.* at 212-13. Anyone barred by the Rule will receive a negative credible fear finding and face immediate removal if they are unable to meet a higher screening standard for withholding of removal and CAT claims. *Id.* at 214-15. By design, the Rule will result

20

in people being rapidly sent back to persecution because they are barred from asylum. *See, e.g.*, *id.* at 6, 95, 152-53, 192-93, 225-26.

91.     Third, the Rule applies in immigration court, when a person raises asylum as a defense to removal. *Id.* at 300.  Immigration judges must determine whether the Rule applies and whether the applicant can meet one of its conditions or exceptions. *Id.* at 300-01, 445.  Those who are referred for full proceedings after passing a credible fear screening or being denied asylum in affirmative proceedings must also establish, in immigration court, that they are eligible for asylum despite the Rule. *Id.*

## IV.  Additional Sweeping Changes to the Asylum System

92.     In addition to the Rule, the government recently has made other sweeping changes to the way the asylum system operates that will compound the Rule's harm.  These significant changes were announced after the comment period on the Rule closed, making it impossible for commenters to assess the true impact of the Rule on border processing and on asylum seekers.

93.     **Credible Fear Interviews in CBP Custody**.  First, in April 2023, the agencies revived the Trump administration's practice of forcing asylum seekers at the border to undergo their credible fear screening interviews on extremely expedited timelines while detained in CBP custody, rather than after being transferred to ICE custody.  Asylum seekers subjected to this policy under Trump had "restricted opportunities to consult with a person of their choosing during the credible fear interview process," *Las Americas Immigrant Advoc. Ctr. v. Wolf*, 507 F. Supp. 3d 1, 9 (D.D.C. 2020), and were subjected to deplorable confinement conditions, both of which negatively impacted their credible fear passage rates.  Now that this policy is reactivated, people barred from asylum under the Rule may be forced, not only to meet a higher screening standard, but to do so under these extremely challenging conditions.  Further, on May 11, DHS announced a related policy change under which the waiting period before a credible fear interview would be reduced to 24 hours, making adequate preparation even more difficult.  Most commenters did not raise these concerns

AM. AND SUPPL. COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

because the resumption of this program came after the close of comments on the Rule, but in response to the few commenters who did raise this issue, the agencies dismissed it as beyond the scope of the Rule.  *See* Rule at 157.

94.     **Execution of Expedited Removal Orders of Third Country Nationals to Mexico**. In the Rule's NPRM, the agencies said, "Once Title 42 is no longer in place," DHS plans to combine implementation of the new Rule with an unprecedented practice of carrying out "Title 8 *removals* of individuals subject to expedited removal" to Mexico.  88 Fed. Reg. at 63,511 (emphasis added).  In one sense, this will continue Defendants' practice of "expelling" certain non-Mexicans to Mexico under Title 42, with even graver consequences for the people subject to removal.  *See* Rule at 69 (recognizing five-year bar to re-entry that applies to people removed under an expedited removal order).  However, the United States has never before sought to systematically subject non-Mexicans to expedited removal to Mexico under the immigration laws.

95.     At minimum, the government plans to subject Haitians, Nicaraguans, Cubans, and Venezuelans to such third-country expedited removals to Mexico.[6]

96.     Despite the mention of this plan in the NPRM, the agencies did not confirm until May 2, 2023, that the Mexican government has agreed to accept removals of third country nationals after Title 42 lifts.

97.     The administration has stated that those barred by the new Rule "will generally be processed under Title 8 expedited removal authority in a matter of days."  Accordingly, for Haitians, Cubans, Venezuelans, and Nicaraguans—and perhaps also for others—being barred from asylum because of the new Rule may lead to rapid removal to northern Mexico, where they will once again face grave dangers.

---

[6] 88 Fed. Reg. at 1,249 (Haitians); 88 Fed. Reg. at 1,260 (Nicaraguans); 88 Fed. Reg. at 1,272 (Cubans); 88 Fed. Reg. at 1,279 (Venezuelans).

AM. AND SUPPL. COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

98.    **Asylum Processing Rule**. In addition to these sweeping changes, the Biden administration halted use of an interim final rule (the "asylum processing rule") that made several changes to asylum processing at the border, and like this Rule, was justified as a means of ensuring efficient processing of asylum claims.  87 Fed. Reg. 18,078, 18,098-107 (Mar. 29, 2022); *see* 8 C.F.R. § 1240.17.  The asylum processing rule's central change was to permit asylum officers, rather than just immigration judges, to adjudicate the asylum applications of people who were subject to expedited removal and passed their credible fear screenings.  87 Fed. Reg. at 18,086; 8 C.F.R. § 208.2(a)(1)(ii); *id.* § 208.9(a)(1).

99.    The administration paused the program indefinitely on April 12, 2023, just over a year after issuing the rule, shortly before issuing this Rule but after the close of comments on the NPRM.

## V.  The Rule's Core Assumptions Are False and Contrary to Evidence.

100.    The Rule assumes that the three conditions, one of which individuals must satisfy to maintain asylum eligibility, are readily available, safe options.  Rule at 60.  This is simply wrong, and the agencies have failed to grapple with the evidence contradicting this premise.

### A.  The Parole Processes Cannot Substitute for Asylum Access.

101.    The parole processes discussed above may provide a route for some number of people who otherwise would have sought asylum at the border to instead come to the United States via parole.  But they do not justify the Rule's near-elimination of access to asylum at the southern border.

102.    The parole programs the Rule discusses encompass only five nationalities.  In 2019—the last full year before Title 42 went into effect—people from more than 150 countries sought asylum in the United States, and only a fraction of asylum applications was filed by individuals from the parole countries.

AM. AND SUPPL. COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

103.     Even as to individuals from the five countries, these parole programs impose significant barriers to access, which means that the most vulnerable (and thus most in need of refugee protections) will be unable to avail themselves of this process.  For example, to qualify for this parole program, an applicant must have a U.S.-based financial supporter, which may be unavailable for many asylum seekers.  Similarly, the requirement of traveling to the United States on a commercial flight will be unaffordable for many of the most vulnerable asylum seekers.

104.     The programs also impose a passport requirement, which excludes asylum seekers who fear applying for passports from their countries' governments (which may be involved in or complicit in their persecution),  as well as those who cannot afford to do so.  For others, passport application processing times will be a barrier, since many asylum seekers flee immediate dangers.

105.     In addition, the wait required for parole application processing renders parole unavailable to those who must make an urgent decision to flee persecution.

106.     The parole processes are also unavailable to people who entered the United States, Mexico, *or* Panama irregularly after January 9, 2023.  This means that those at whom the Rule is purportedly most directed—asylum seekers waiting in Mexico to seek asylum in the United States at the end of Title 42—cannot actually qualify for parole because they likely entered Panama or Mexico without inspection after the cut-off date.

107.      Finally, the government has capped the number of people who will be accepted into these parole programs, so even individuals who can meet all the requirements may be unable to obtain parole.  And because the parole criteria are not tied to one's need for asylum or danger, some of the limited slots may be used by non-asylum seekers.

**B.  Many Asylum Seekers Are Unable to Present at Ports of Entry with an Appointment.**

108.     The Rule fails to account for the various reasons that many people seeking refuge in the United States cannot present at a port of entry after securing an appointment using CBP One.  As

24

the Ninth Circuit has recognized, "Many migrants enter between ports of entry out of necessity: they 'cannot satisfy regular exit and entry requirements and have no choice but to cross into a safe country irregularly prior to making an asylum claim.'" *EBSC v. Biden*, 993 F.3d at 673 (citation omitted).

109. Many asylum seekers are unaware that designated locations for entering the United States even exist. Those who do know about designated ports of entry often have no idea where they are or how to find them. Others are unable to access them due to the well-documented dangers—including rampant kidnapping and physical and sexual violence—and unstable living conditions that refugees face in Mexico's northern border region.

110. Even those who can access ports of entry may still be barred from asylum under the Rule. That is because nearly all non-Mexican nationals will be forced to obtain a CBP One appointment to remain eligible for asylum, and many will be unable to secure one in a timely fashion.

111. This requirement will put asylum seekers in an impossible position. To maintain eligibility for asylum, individuals must secure an appointment using the CBP One app and appear at the designated time and place. However, there are numerous onerous hurdles to doing so.

112. First, asylum seekers must spend weeks or months in dangerous areas of Mexico while they wait to obtain an appointment and then appear at the designated time and place. Recent experience with asylum seekers' use of the CBP One app to make appointments for Title 42 exemptions demonstrates that securing an appointment via CBP One can take significant time. CBP One appointments have not been made immediately available, and instead have been offered two weeks in the future at the earliest. In addition, under Title 42, the number of appointments has been tightly restricted to 750 appointments per day border-wide, which does not come anywhere near to matching the demand. For example, as of late March 2023, in the Mexican border cities along the Rio Grande Valley "approximately 25 people [were] competing for every 1 appointment spot."

These appointments have been released at a set time each day and claimed in minutes. Reports indicate that some asylum seekers have tried to get an appointment every day for three months without success.

113. Appointments will not be meaningfully easier to obtain under the Rule. Demand for seeking asylum at ports of entry will continue to far outpace the availability of appointments. In March 2023, the most recent month for which data is publicly available, DHS reported an average of nearly 6,200 encounters per day at the southern border. Yet, on May 5, 2023, the agencies confirmed that they would continue to cap appointments once Title 42 lifts, at just 1,000 per day border-wide. Further, although the agencies recently eliminated the daily scramble for appointments, they have replaced it with a daily lottery system that gives people a longer window in which to request an appointment. *See* Rule at 272 (referring to a "daily appointment allocation process"). The agencies have confirmed that appointments will generally still be available only two weeks in advance.

114. People are not free to wait in a safe location while they seek a CBP One appointment. CBP One uses "geo-fencing" technology, which requires users to be within a defined proximity to the United States border in order to use the application. Thus, people can only make appointments once they reach the geo-fenced area, currently restricted to central and northern Mexico, and cannot do so earlier to minimize their wait time in the border zone.

115. This means that, to use CBP One to make an appointment, many asylum seekers must wait weeks or months in dangerous conditions in Mexico.

116. But many asylum seekers cannot wait to seek protection. Many are subjected to horrific violence while waiting in Mexico to seek asylum in the United States. For example, a Venezuelan family who could not make an appointment at the nearest port of entry was kidnapped, tortured, and extorted en route to another port for a CBP One appointment. In January 2023, a teenager was murdered in Monterrey, Mexico, while waiting with his family for their scheduled CBP One appointment. Asylum seekers in Mexico, particularly Honduran, Salvadoran, Guatemalan

26

nationals, have also reported that persecutors can easily find them within Mexico, including following them from other parts of the region. Thus, asylum seekers who need to reach safety as quickly as possible often feel compelled to enter the United States along the border, outside of a port of entry, or without an appointment in order to escape their persecutors and the violence on Mexico's side of the border.

117. Second, the CBP One app requires individuals to have access to a smartphone that is compatible with the app and can connect to the internet. While many people fleeing harm may bring a smartphone, not all smartphones are able to use CBP One. For many others, their smartphones are stolen, lost, or broken on the journey. By some estimates, three out of every ten individuals seeking asylum have had to purchase a new cellphone in order to try to access the app. Purchasing a device in Mexico presents a financial barrier for many, especially considering that many features of CBP One reportedly operate better, and in some cases only, on newer, more expensive devices.

118. Third, CBP One requires reliable internet for a sustained period of time in order to navigate and input the required information to secure an appointment. But many asylum seekers at the border do not have access to reliable and consistent internet. Further, seeking out a strong internet connection can require asylum seekers in hiding in Mexico to expose themselves to danger. Asylum seekers have had to spend their entire savings buying cellphone data to try to schedule appointments and have been forced to pay cartels to charge their phones.

119. Fourth, CBP One poses significant language barriers. To access CBP One, a user must first create an account through a government site, Login.gov. The account-creation process is available only in English, French, and Spanish. Then, assuming a person is able to complete this step, the CBP One app is currently available only in English, Spanish, and Haitian Creole. Many in-app messages, including important notices and most error messages, appear only in English, even in the Spanish or Haitian Creole versions. Therefore, people who cannot read and write in one of these languages cannot use CBP One.

27

AM. AND SUPPL. COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

120.    The application thus prejudices refugees who speak Indigenous languages and those from non-English speaking portions of Africa, Asia, and the Middle East.  It also disadvantages native Spanish and Haitian Creole speakers who lack robust literacy skills, because the application requires both "a high level of literacy" and familiarity with smartphone apps.

121.    As a result of these issues, most migrants who have tried to use CBP One in the past several months needed the assistance of others.  Because the app requires assistance for meaningful use, migrants face being charged hundreds or thousands of dollars by people in Mexico offering to "help" with the process, thereby exacerbating the kind of extortion of migrants that the Rule purports to mitigate.  The U.N. International Organization for Migration has reported individuals posing as lawyers or other professionals charging fees to help people navigate the app.

122.    Fifth, CBP One is plagued by technical issues, with many reports of the application repeatedly crashing or freezing.  For example, the app requires frequent updating, is prone to timeout in the middle of the application process, and tends to freeze on various screens without saving data.  Nearly everyone interviewed about their attempts to use CBP One has reported that the app freezes or crashes unpredictably.  Others have reported having to try different lighting and backgrounds, just to take a photograph of themselves that the application will accept.

123.    Sixth, CBP One uses problematic and prejudicial facial recognition software.  It routinely fails to register darker skin tones, and without the ability to upload a photo, asylum seekers are unable to move past the photo confirmation page to secure an appointment.

124.    The result of these multiple, compounding barriers is that requiring CBP One appointments will leave many asylum-seekers stranded indefinitely in Mexico, unable to obtain an appointment, and faced with the impossible decision between entering elsewhere along the southern border or waiting longer in dangerous conditions.

**C. Transit Countries Cannot Provide Vulnerable Asylum Seekers With Protection.**

125.     The Rule asserts that asylum seekers can instead readily find refuge in Mexico, Guatemala, Belize, Costa Rica, Colombia, or Ecuador.  Rule at 328.  Easily accessible information, including reports from the U.S. State Department, and other documents cited by many commenters, show this to be false.

126.     In reality, for most asylum seekers who approach the U.S.-Mexico border, applying for protection in a transit country is not an option because it is not safe to do so.  Although some countries in this hemisphere have made efforts to address the needs of migrants, these efforts are limited and leave refugees unprotected.  Even the Rule acknowledges that "Mexico or other countries through which certain individuals travel en route to the United States may not be a safe alternative for particular individuals."  *Id.* at 186.

**1. *Mexico***

127.     For most asylum seekers who come to the U.S. southern border, seeking protection in Mexico is not an option.  The country is extraordinarily dangerous for migrants and lacks a full and fair asylum system.

128.     According to the U.S. State Department, migrants in Mexico are frequently victimized throughout the country "by criminal groups and in some cases by police, immigration officers, and customs officials, including at land borders and airports."  Recent years have seen "numerous instances of criminal armed groups extorting, threatening, or kidnapping asylum seekers and other migrants."  In fact, there were nearly 13,500 documented violent attacks, including reports of torture, kidnapping, murder, and rape, of migrants blocked in Mexico or expelled from the United States to Mexico in 2021 and 2022.  Between 2018 and 2021, Mexican authorities registered the killings of 2,823 migrants in just five southern states.  Over 60 percent of these homicides occurred after the kidnapping, assault, robbery, or extortion of the victims by criminal groups.  DHS itself has

acknowledged that asylum seekers forced to remain in the northern states of Mexico are "subject to extreme violence and insecurity at the hands of transnational criminal organizations."

129.    Certain groups are uniquely vulnerable to harm in Mexico, including women and children, who face a heightened risk of sexual violence, kidnapping, and robbery.  LGBTQI+ people and Indigenous people also regularly experience persecution in Mexico.  Black and non-Spanish speaking asylum seekers face racism, xenophobia, and violence, and language barriers further impede their access to both the asylum system and social services.

130.    Mexican authorities fail to protect migrants from harm.  In fact, immigration or law enforcement authorities are responsible for a large share of violence and crimes committed against asylum seekers.  Government agents have dragged, kicked, violently pushed, raped, and killed migrants during enforcement operations.

131.    In addition to threats from Mexican criminal groups and authorities, migrants also face risks from persecutors who follow them to Mexico.  Gangs operate transnationally and have sophisticated communication networks throughout Central America and Mexico.  People fleeing gangs in Guatemala have been found and threatened by the gangs' members in Mexico, and Honduran asylum seekers detained in Mexico have reportedly been located through gang members detained in the same facility.  Central American survivors of gender-based violence have been tracked down and persecuted in Mexico by their abusive ex-partners.

132.    The Rule's acknowledgement that "Mexico has a significant asylum backlog" is an understatement.  Rule at 323.  Mexico's asylum system has been "at [] risk of collapsing" and has serious deficiencies.  The system would be unable to support even a modest increase in asylum applications spurred by the Rule's condition to first seek asylum in a transit country.

133.    Mexico's asylum agency has significant "capacity limitations," which have caused major obstacles to securing protection in Mexico.  The budget of the agency ("COMAR") is "not

30

ER-96

commensurate with the growth in refugee claims in the country." As a result, in February 2023, COMAR's director stated that the agency is "in a situation of near-breakdown."

134. Even as increased applications overwhelm Mexico's system, they represent a tiny fraction of the asylum seekers who transit through Mexico. And they do not accurately reflect the number of asylum seekers who can actually find refuge in Mexico. For instance, many asylum seekers apply in Mexico only because it allows them to obtain documents that prevent Mexican officials from unlawfully arresting or expelling them to the countries they fled while they travel through Mexico to the United States. And recent asylum application increases occurred during the same period when access to asylum was blocked at the U.S. southern border under Title 42. They accordingly do not necessarily signal improved safety or asylum accessibility in Mexico.

135. Those who do attempt to seek protection in Mexico face "multiple obstacles": they must apply within 30 days of entering the country, with only very limited exceptions; they must apply in person but there are only ten COMAR offices in the country; they must remain in the state where they filed their application and must present themselves at the COMAR office regularly or their applications are considered abandoned; and "many of COMAR's offices are situated in some of the country's poorest states where labor opportunities are scarce."

136. Mexico's screening for asylum claims is also woefully inadequate, resulting in frequent *refoulement*. Asylum seekers are often detained in migration stations, frequently without being informed of the option to seek asylum, and quickly expelled.

137. Many asylum seekers are also detained in deplorable conditions. They experience overcrowding, unsanitary conditions, lack of services, and inadequate food and healthcare, forcing many detained individuals to forego their claims in order to be released. The recent horrific fire in a detention facility in Ciudad Juarez that killed at least 39 people—where immigration officials refused to release dozens of migrants from their cells even as they were engulfed in smoke and flames—illustrates the dangers migrants face. Detained asylum seekers have also endured sexual

31

abuse and corporal punishment, including beatings, electroshock, and choking, and reporting such abuse can lead to retaliation.

### 2. Guatemala

138.    According to the State Department, "Guatemala remains among the most dangerous countries in the world."  The country's "high murder rate is driven by narcotrafficking activity, gang-related violence, a heavily armed population, and a law enforcement and judicial system unable to hold criminals accountable."  Violence against women, including rape and femicide; violence against children, including sexual exploitation and gang-recruitment; and "[e]xtreme violence" against LGBTQI+ persons are all "serious problems" in Guatemala.  For these reasons, in 2019, 2020, and 2021, Guatemala was one of the top four countries whose nationals were granted asylum in the United States.  Asylum seekers who lack social networks and stable housing are even more vulnerable to these dangers.  Due to permeable borders in the region, persecutors are also able to locate individuals from other Central American countries in Guatemala.

139.    Guatemala's asylum system barely functions.  According to the State Department, the asylum process in Guatemala is cumbersome and complicated, resulting in significant delays in decision making and an increasing backlog.  UNHCR data indicate that between 2000 and mid-2022—a period of more than 20 years—Guatemala granted asylum to a cumulative total of just 660 people.  According to an official from the Guatemalan Office of the Ombudsman, Guatemala does not "resolve [asylum] cases because the [National] Migration Authority, the institution responsible for resolving the cases, is not interested in resolving them," as "[a]sylum is not a priority for [the] country."

### 3. Belize

140.    Although the Rule points to the fact that Belize launched an amnesty program for some asylum seekers, Rule at 313, that program is limited to those who filed their claims before March 31, 2020, and migrants who entered irregularly before 2017.

141.     Apart from that program, Belize is not an option for asylum seekers.  It "has one of the highest per capita murder rates in the world," and violent crime such as sexual and gender-based violence remains an epidemic.

142.     Moreover, Belize's asylum system is inefficient and cumbersome, and receives and processes very few applications each year.  In the nearly 20 years between 2003 and mid-2022, Belize granted asylum or other forms of protection in just 129 cases.

**4. Costa Rica**

143.     Costa Rica—a nation of just five million people—is already tightening its asylum policies "in the face of an overwhelmed system" that cannot absorb any significant increase in asylum seekers from neighboring Nicaragua or elsewhere.  In recent years, Costa Rica has received eight times as many asylum requests per capita, and has accepted *ten* times as many refugees per capita, as the United States.  In March 2022, UNCHR reported that ongoing migration will "strain Costa Rica's already stretched asylum system and overwhelm support networks in the country."  As DHS acknowledged in January 2023, "increasing numbers of Nicaraguans are traveling north to the [southwest Border] due to renewed unrest in Nicaragua and the strained asylum system in Costa Rica."

144.     The number of asylum officers in Costa Rica is inadequate to deal with the increased flow of asylum applications, resulting in extreme processing delays.  As of September 2022, over 200,000 asylum applications were pending in Costa Rica, and over 50,000 individuals were waiting for appointments to make formal applications.  From 2018 to mid-2022, Costa Rica adjudicated only 22% of its total pending asylum cases, and granted asylum in only about 10% of cases.  UNHCR data indicates that between 2000 and mid-2022, Costa Rica granted asylum or other protection to only around 20,000 people.

145.     In response to the backlog of asylum applications, Costa Rica's new government has severely curtailed asylum eligibility and imposed a one-month deadline to apply for asylum.  It has

33

also discouraged people from seeking asylum by restricting access to employment authorization for those with pending applications. The Rule mentions that Costa Rica has responded to the overwhelming strain on its system in part by offering Nicaraguan, Cuban, and Venezuelan asylum applicants an option to instead request temporary status. However, this program is only available to people who applied for asylum in Costa Rica by September 30, 2022.

146.    Xenophobia and discrimination against migrants in Costa Rica have increased as the number of refugees from Nicaragua and other countries has grown. Due to xenophobia, migrants' access to public services and social welfare is limited in Costa Rica. Nicaraguans in particular face discrimination in the Costa Rican education system, leading to social exclusion, harassment, and hostile treatment by academic officials. In addition, according to the State Department, groups of Nicaraguan exiles in Costa Rica have "alleged harassment and political oppression by parapolice and [Ortega regime] sympathizers who crossed the border to target exiles, as well as by intelligence officials within the Nicaraguan embassy in Costa Rica."

### 5. Colombia

147.    According to the State Department, homicide, assault, armed robbery, extortion, robbery, and kidnapping are widespread in Colombia. Other significant human rights abuses include arbitrary killings, torture and arbitrary detention. Black, Indigenous, and LGBTQI+ individuals are at particular risk, and gender-based violence is also prevalent. Armed groups and narcotics traffickers routinely perpetrate violent crimes, and millions of people were affected by conflicts involving these groups in 2022. Government corruption is rampant, and perpetrators generally operate with impunity.

148.    Colombia is particularly dangerous for many asylum seekers and refugees. According to UNHCR data, Venezuelans make up about 86% of refugees in Colombia and 99% of applicants with pending asylum claims. During the first half of 2021, 1,059 assaults, 362 homicides, and 335 incidents of sexual violence against Venezuelans were reported in Colombia. Over the previous five-year period, from 2015 to 2020, there were a reported 1,933 homicide cases and 2,319 incidents

of sexual violence against Venezuelans. Moreover, according to the State Department, Venezuelans in Colombia face a heightened risk of forced labor, domestic servitude, forced begging, and forced recruitment. Venezuelan women repeatedly experience brutal abuse and sexual violence, and Venezuelan transgender women are especially vulnerable. A recent study documented that displaced Venezuelan women in Colombia "are repeatedly subjected to attacks and sexual violence in public spaces, both in the host cities where they live and along the migration route."

149. The Rule discusses a temporary status for Venezuelans, which is only available to people who entered Colombia before January 31, 2021. Rule at 312-13. This temporary program has not alleviated this dangerous situation for migrants, either, and Venezuelans and other migrants continue to suffer throughout the country.

150. Colombia's limited asylum system is inefficient, bureaucratic, and cumbersome. The two-month deadline for filing an application presents a substantial roadblock, especially given the general lack of information about the asylum process and the small number of offices that adjudicate asylum claims. The adjudication process can last for a prolonged period, sometimes years. A tiny group of government officials reviews asylum applications, conducts interviews, and makes non-binding adjudication recommendations. The Minister of Foreign Relations, a high-level cabinet member, then makes final determinations. While awaiting their decisions, asylum seekers are permitted to remain in Colombia, but cannot work legally or access basic services.

151. UNHCR data from 2019 to mid-2022 show that only 1,257 applicants were granted asylum, out of more than 40,000 filed, while the vast majority of claims were either closed or remained pending. It is no surprise that Colombia's asylum system is overtaxed, as the country already accommodates more foreign refugees than any country except Turkey.

### 6. Ecuador

152. The Rule mentions a temporary option for people who entered Ecuador prior to August 2023. But this program is limited, providing only a two-year status and providing a benefit

AM. AND SUPPL. COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

only to people who have entered the country by a few months into the Rule's validity period. The State Department warns that murder, assault, express kidnapping, and armed robbery are common in Ecuador. From 2020 to 2021, homicides increased by 180 percent, and in 2022 Ecuador recorded its highest rate of violent deaths. The mayor of Guayaquil, the most populous city in Ecuador, stated that "criminal gangs have become a state within a state." As a result of the violence, an increasing number of Ecuadorans have been forced to flee the country.

153. According to the State Department, migrants and refugees, especially women, children and LGBTQ+ individuals, face sexual and gender-based violence and human trafficking in Ecuador. Venezuelan refugee women face a particular risk of physical, psychological, sexual, patriarchal, and other acts of violence in public and private spaces. The Ecuadoran state is not capable of protecting these women. The State Department has also reported an increase in forced labor, sex trafficking, and forced recruitment of migrants and refugees into criminal activity on Ecuador's northern and southern borders, "particularly by transnational criminal organizations and criminal groups that also operated in Colombia."

154. Asylum seekers in Ecuador face significant barriers in accessing the asylum system. These barriers include a 90-day application deadline, as well as a general lack of information about asylum proceedings. Moreover, some applicants must travel long distances to certain large cities for their interviews. Ecuadoran migration officials reportedly discourage asylum seekers from applying for refugee status.

155. Ecuador has granted refugee status in only about 4% of cases, while about 68% were rejected and about 28% remain pending.

### 7. Other Transit Countries

156. The Rule fails to address whether asylum seekers can find refuge in other transit countries not listed. For example, the Rule makes no mention of El Salvador, Honduras, or Nicaragua—and for good reason. The evidence from the thousands of comments submitted in

36

response to the NPRM shows that these countries are exceptionally dangerous for their own citizens and migrants alike. Indeed, El Salvador's president placed that country under a state of emergency to combat overwhelming gang violence that the country faces, Nicaragua's ruling party uses a campaign of terror and violence to hold on to power, and Honduras has one of the highest murder rates in the world. Moreover, these countries have wholly inadequate asylum systems incapable of fairly processing even tiny numbers of applications.

## VI. The Rule Will Cause Irreparable Harm to Plaintiffs.

157.    Plaintiffs are nonprofit organizations that aid asylum seekers. Many of their current clients are from countries other than Mexico, entered the United States outside a port of entry, have experienced significant violence or harm in their journey to the United States, and could not have sought asylum in transit. The substantive changes in the Rule will cause each Plaintiff significant harm, and they are also harmed by the abbreviated comment period and lack of a 30-day implementation delay for the Rule's effective date.

### A. EBSC

158.    Plaintiff EBSC provides legal and social services to immigrants and refugees in California, Washington, Oregon, and part of Nevada. EBSC's affirmative asylum program is a key part of the organization's mission, and accounts for nearly half of its budget. Since 1992, EBSC has filed nearly 6,000 affirmative asylum cases. Nearly 98 percent of the decided cases have been granted.

159.    In 2022, a significant percentage of the clients in EBSC's affirmative asylum program were non-Mexicans who entered the United States by crossing the southern border between ports of entry. It expects its client base to consist of similar individuals in the future.

160.    The Rule frustrates EBSC's central mission of providing legal services to these affirmative asylum applicants. If such people are made ineligible for asylum, EBSC will be unable to continue much of its affirmative asylum work. The new Rule will force EBSC to expend

37

AM. AND SUPPL. COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1   additional time and resources to help the relatively small number of affirmative asylum clients who

2   might qualify for a narrow exception. EBSC will be unable to assist the large majority of

3   prospective clients with no viable argument for an exception, frustrating its mission and jeopardizing

4   its funding.

5          161.   To serve clients barred under the Rule, EBSC will have to try to represent them in

6   removal proceedings, and attempt to satisfy the much higher standards for withholding of removal

7   and CAT claims. Alternatively, EBSC will have to abandon much of its longstanding client base

8   and shift to representing people placed directly in removal proceedings who remain eligible for

9   asylum. Either of these scenarios will require EBSC to make enormous and costly shifts in its

10  operations.

11         162.   Shifting from an affirmative asylum model to providing complex removal defense in

12  an adversarial context would be extremely resource intensive, especially for people ineligible for

13  asylum. Currently, EBSC very rarely provides representation in removal proceedings, and it does

14  not have the funding or capacity to do so on a larger scale.

15         163.   The new Rule also jeopardizes EBSC's existing funding streams. Funding for

16  EBSC's affirmative asylum program is based in part on the number of cases EBSC handles per year.

17  If EBSC is no longer able to represent people barred by the Rule in their affirmative asylum

18  applications, it will face a marked decrease in its budget and will have to significantly cut its

19  program and staff, or else dramatically overhaul its program to provide types of assistance is it not

20  currently equipped or trained to provide.

21         164.   EBSC will also have to divert significant resources to, among other things,

22  understanding the new policy and its impact on the communities EBSC serves, and educating and

23  advising its staff, clients, and prospective clients accordingly.

38

**B.  CARECEN**

165.    Plaintiff CARECEN provides and manages immigration legal services to clients throughout Southern California.  These services include affirmative and defensive representation for asylum seekers.

166.    Funding for CARECEN's asylum work is based in part on the number of cases it handles and expects to handle each year.  The Rule will frustrate CARECEN's mission and divert organizational resources.

167.    For example, CARECEN's mission as it relates to affirmative asylum applicants will be frustrated because it will be unable to assist asylum seekers barred by the Rule.  The Rule will force CARECEN to expend additional time and resources in its intake process to assess whether potential clients are subject to the Rule's bar and whether they have viable arguments for any of its narrow exceptions.  CARECEN will likely be unable to assist many of those without such arguments in applying for asylum affirmatively.

168.    Representing clients with viable exception arguments will require significant additional time gathering and reviewing supporting evidence.  All of this will mean that CARECEN will have to represent fewer affirmative asylum clients.  The Rule will thus jeopardize CARECEN's per-case funding for affirmative asylum representation and reduce the funding that it receives as program administrator for affirmative asylum representation by another nonprofit provider.

169.    CARECEN's representation of people who seek asylum defensively in removal proceedings will also be frustrated.  The vast majority of CARECEN's clients are individuals who would be subject to the new Rule.  CARECEN will have to assist these removal clients in applying for withholding and CAT protection, which are more time- and resource-intensive, and this will require diverting resources from other critical areas of work.  And because the standards for withholding and CAT are more demanding, the Rule will also likely lead to more losses in immigration court and a need to litigate more appeals.

39

170.    Moreover, unlike in asylum cases that allow derivative beneficiaries, CARECEN will be required to submit withholding and CAT applications for every member of a family.  This will result in significant additional staff time preparing and litigating each case, including preparing separate evidence and putting on witnesses in each case, which will require diverting resources from other critical areas of work.

171.    CARECEN will also have to divert resources to training staff and educating prospective clients and community members about the effects of the new Rule.

**C.  Tahirih**

172.    Plaintiff Tahirih provides free legal and social services to women, girls, and other survivors of gender-based violence who are seeking asylum or other protection under U.S. law.

173.    Tahirih conducts a sizeable affirmative asylum practice, and most of its clients— regardless of nationality—enter the United States via the land border with Mexico.

174.    The Rule will severely compromise Tahirih's mission. Because far fewer people who enter via the U.S.-Mexico border will be eligible for asylum under the Rule, Tahirih will no longer have a substantial pool of clients eligible for affirmative asylum.  Instead, almost all of Tahirih's new clients will have to seek relief defensively in immigration court. On average, Tahirih attorneys spend twice as much time on defensive cases as affirmative cases—meaning that, even if the Rule made no other relevant changes, Tahirih would be able to take on only one defensive client under the Rule for every two affirmative clients it could have previously served.

175.    The Rule, however, makes three other changes that would independently and significantly reduce the number of clients Tahirih could serve. First, the Rule forces Tahirih attorneys to represent new clients in removal proceedings on claims for statutory withholding of removal or CAT relief.  Because an applicant for such relief must meet higher standards than people seeking asylum, the preparation of withholding or CAT cases is even more time consuming than the preparation of a defensive asylum case.

176.     Second, under the Rule, Tahirih must file separate, individual CAT and withholding petitions for the spouses and children of clients, because they could no longer be included as derivatives on an asylum application. For many family members, especially children fleeing trauma, this would require not only significant additional attorney time but also time devoted to finding both counseling for trauma and psychiatric evaluations.

177.     Third, Tahirih attorneys representing clients under the Rule will also have to assess whether they believe a client might meet one of the narrow exceptions to the Rule. If a client might do so, the attorney will have to gather evidence, and present legal argument, not only on that issue but on every element of an asylum claim as well as withholding and CAT claims.

178.     For these reasons, under the Rule, Tahirih will be able to serve only a fraction of the number of clients it currently serves.

179.     The Rule has also required, and will continue to require, Tahirih to divert significant resources. Tahirih must expend money and staff time to understand the Rule's impact on the communities it serves, to train staff and volunteers, to update guidance materials given to professional partners and community members, and to advise prospective clients, and immigrant communities.

180.     The Rule will also affect Tahirih's funding.  More than half of Tahirih's staff time is billed to grants that require clients to be physically present within designated areas within the United States.  Because the Rule uses CBP One to limit the number of people who can seek asylum in the United States and imposes heightened screening standards at the credible fear stage for people who are barred from asylum, the Rule will significantly lower the number of people who are allowed to enter the United States to pursue *any* kind of relief.  By preventing people from reaching the areas in which Tahirih provides service, the Rule will have a direct and substantial impact on Tahirih's budget.

AM. AND SUPPL. COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

### D. NCLR

181.    Plaintiff NCLR provides free legal services to LGBTQ individuals who are seeking asylum or other protection under U.S. law.

182.    The vast majority of NCLR's asylum practice, which comprises the largest portion of its immigration project, is affirmative and nearly all of its clients entered the United States via the U.S.-Mexico border.

183.    The Rule will severely compromise NCLR's mission.  Under the Rule, most people who enter the United States between ports of entry on the U.S.-Mexico border will be ineligible for affirmative asylum.  Because of this, NCLR's ability to identify clients for affirmative asylum representation will be severely limited.  Instead, many of NCLR's otherwise prospective clients will be in more complex defensive removal proceedings or will be removed before they can even reach those proceedings.  Because of the additional time required to prepare cases in a defensive posture, NCLR will have to significantly reduce the number of clients it serves.

184.    Aside from being in a defensive posture, other aspects of the Rule will require additional staff resources, further limiting the number of clients NCLR can serve.  First, NCLR staff will have to argue for an exception to asylum ineligibility.  This will require gathering significant additional information, including asking detailed questions about clients' efforts to use CBP One and their experiences in Northern Mexico, gathering evidence, and presenting legal arguments to support an exception.  Notably, because the most common transit countries for NCLR's clients—Mexico, and the Northern Triangle—are exceptionally dangerous for LGBTQ people, the task of pursuing an exemption to the Rule's bar will be onerous for NCLR and traumatizing for its clients as they try to demonstrate the risk of persecution in a client's home country, as well as harms they may have experienced in transit.

185.    Second, under the Rule, NCLR will be forced to represent clients on claims for withholding of removal and CAT relief.  These forms of relief have higher evidentiary standards

than asylum, meaning that, on top of the additional preparation detailed above, NCLR will have to devote additional resources in order to represent clients on these claims.

186.    For these reasons, under the Rule, NCLR will be able to serve only a fraction of the number of clients it currently serves.

187.    The Rule has also required, and will continue to require, NCLR to divert significant resources towards understanding and explaining the Rule's impact to staff and the communities it serves.  NCLR must expend money and staff time to update guidance and training materials disseminated to immigrant communities and professional partners.

**E.  ImmDef**

188.    Plaintiff ImmDef represents approximately 2,500 noncitizens in their removal proceedings on a pro bono basis and provides other types of free legal services to approximately 21,000 additional noncitizens annually.  At present, ImmDef has approximately 2,150 open immigration cases, more than half of which involve asylum-eligible clients. The vast majority of ImmDef's clients who pursue asylum are in removal proceedings.  Most of ImmDef's asylum-seeking clients are not Mexican nationals.  Many of these clients are Guatemalan, Salvadoran, Honduran, Afghan, and Colombian. Most of ImmDef's clients enter the United States through the U.S.-Mexico border.

189.    In accordance with ImmDef's mission of expanding access to representation to any and all noncitizens within the immigration system, they assist and represent individuals without regard to how they entered the United States or what countries they transited through on their way to the border. The Rule will severely compromise ImmDef's mission, and it will force the organization to divert substantial resources away from its existing programs and alter its service-delivery model, both to address the urgent needs of asylum seekers at the border and to represent individuals who are barred from asylum.

43

AM. AND SUPPL. COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

190.    ImmDef has already been forced to divert resources from other projects in response to the Rule and will continue to do so.  Since April 2023, members of ImmDef's San Diego team have had to reduce the time they dedicate to providing removal defense legal services in order to provide triage information for individuals in Mexico who are waiting for CBP One appointments and who need assistance in completing the registration process.

191.    The fact that ImmDef's San Diego office will be able to handle fewer removal cases than they would otherwise accept could impact the San Diego-based team's funding stream, as they must maintain set caseloads to receive sufficient funding under ImmDef's contract with the State of California.  Further, as panel attorneys through a program with the Public Defenders Office in San Diego, ImmDef will not receive any of its budgeted funding from that source if they are unable to take on new matters.

192.    A significant portion of ImmDef's future asylum-seeking client base will be ineligible for asylum under the Rule.  As a result, ImmDef will have to take on more cases in a defensive posture.

193.    The Rule will also make ImmDef's representation of such clients subject more complicated and labor intensive.  In order to attempt to establish an exception to the Rule, ImmDef will have to spend more time conducting intakes, preparing arguments, and collecting evidence, thereby reducing the total number of cases that ImmDef can take on.

194.    Because more clients will be eligible only for withholding of removal or protection under the Convention Against Torture, ImmDef will be forced to invest more resources in each case.  The number of ImmDef cases requiring appeals to the Board of Immigration Appeals and petitions to the Ninth Circuit Court of Appeals will also increase.

195.    The mandatory use of CBP One will continue to frustrate ImmDef's mission to provide all immigrants with counsel in their immigration proceedings.  Given the requirement to obtain a CBP One appointment, despite its capacity limits, errors, and glitches, individuals and

44

families who would otherwise have been able to present themselves at the border to seek asylum will be unable to access the asylum system.

196. To provide legal advice and assistance to individuals subject to the Rule, ImmDef will be forced to engage in international, cross-border travel to Mexico. This work entails additional costs, including travel expenses to both Tijuana and Mexicali from Los Angeles, Santa Ana, and San Diego, international phone plans for staff, and international travel insurance. Since January 2023, ImmDef has spent approximately $16,500 to support limited representation, Know Your Rights presentations, and CBP One clinics for asylum seekers at the southern border. ImmDef has largely funded this work through the reallocation of previously raised funds that had been designated for removal defense and the provision of other legal services, including representation at bond hearings and on appeals before the Board of Immigration Appeals.

197. ImmDef will also be forced to respond to the rule by increasing the number of legal clinics, community education sessions, and Know Your Rights presentations it provides to individuals and families, and by creating new materials to explain the Rule and its limitations on the ability to obtain asylum.

**F. American Gateways**

198. Plaintiff American Gateways represents people seeking asylum before the asylum office in Houston, Texas, and the immigration court in San Antonio, Texas. It also provides legal orientations and legal workshops at three immigration detention facilities in Texas.

199. Roughly one-third of the asylum cases that American Gateways handles are affirmative cases before USCIS and two-thirds are defensive cases in immigration court. In defensive asylum cases, American Gateways generally represents people who are, or were, detained. Many of the organization's asylum clients entered the United States via the border with Mexico, and the vast majority are non-Mexican.

200.     The Rule will frustrate both the ability of American Gateways to represent people seeking asylum and its organizational mission.  After the Rule takes effect, DHS has said that it may parole the few people who remain eligible for asylum through CBP One appointments.  As a result, all of the clients that American Gateways serves in Texas detention centers—a population that accounts for most of its asylum clients—would be ineligible for asylum.

201.     American Gateways will thus be forced to bring claims for statutory withholding of removal or relief under the Convention Against Torture on behalf of its detained clients.  These claims involve higher standards of proof and therefore are more time consuming than asylum claims. Further, because spouses and children may not be included on claims for withholding or CAT relief, American Gateways will have to prepare individual applications for each member of every family it serves.  It will also have to screen each client to determine whether they might fall within an exception to the bar and prepare evidence and arguments on that additional issue. The result is that American Gateways will be able to serve fewer detained asylum clients than it does today.

202.     The Rule will also make it more difficult for American Gateways to serve affirmative asylum clients. Far fewer people will be eligible for asylum under the Rule, including the African and Indigenous language speakers, who make up roughly 20% of American Gateways' client base but who will face serious trouble using the CBP One application. The number of affirmative asylum clients in Central Texas—the sole area that American Gateways serves—will therefore decline, and much of the affirmative asylum work that American Gateways does will therefore be shifted to representation of clients in immigration court proceedings on time-consuming withholding and CAT claims. This shift, too, will cause American Gateways to serve fewer clients and harm its mission.

203.     The Rule will require American Gateways to divert its resources.  Most significantly, the Rule will require American Gateways to revamp the materials and presentations it uses for legal orientations and legal workshops at Texas detention centers.  American Gateways will also have to

AM. AND SUPPL. COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

divert resources to understanding how the Rule operates in practice and how it affects immigrant communities in Central Texas, and to educating those communities on the Rule and its effects.

**VII.    If It Were Reinstated, the Entry Ban Would Cause Irreparable Harm to Plaintiffs EBSC, CARECEN, Al Otro Lado, and Innovation Law Lab.**

204.    The original plaintiffs continue to assert claims against the entry ban.  Should it go back into effect, those plaintiffs will continue their challenge, because the entry ban would cause them the same harms they have asserted throughout this case.

**A.  EBSC**

205.    The entry ban would seriously frustrate EBSC's mission and cause it to divert organizational resources.

206.    As a result of the entry ban, EBSC would have to divert significant resources to, among other things, understanding the new policy and its impact on the communities ESBC serves, and educating and advising its staff, clients, and prospective clients accordingly. To properly counsel new prospective clients who seek its affirmative asylum services going forward, ESBC will need to invest resources in training multiple intake staff not only to screen for asylum eligibility based on the new rule, but to conduct detailed screenings for alternative forms of relief to facilitate referrals or other forms of assistance as appropriate.

207.    Under the entry ban, EBSC would no longer be able to train law students to handle affirmative asylum cases, or would have to substantially reduce its training program, which would frustrate its mission of helping to train legal professionals to assist individuals fleeing violence and persecution.

208.    The ban would also directly frustrate EBSC's mission of providing assistance and support to individuals fleeing persecution and violence.

209.    The ban would jeopardize ESBC's funding streams. If ESBC is no longer able to handle affirmative asylum cases for individuals who enter without inspection, it will face a marked

AM. AND SUPPL. COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

decrease in its budget and will have to significantly cut its program and staff, or dramatically overhaul its program to provide types of assistance it is not currently equipped or trained to provide.

**B. CARECEN**

210.    Plaintiff CARECEN provides immigration legal services to clients throughout Southern California. These services include affirmative and defensive representation for asylum seekers.  CARECEN educates immigrants through citizenship classes, trainings to develop organizing and advocacy skills, and workshops to facilitate the integration of immigrants into their communities.  CARECEN also helps to organize immigrant communities to advocate on behalf of their rights on specific policy items.

211.    Funding for CARECEN's asylum cases is based in part on the number of cases it handles per year, and the number it anticipates serving.  The entry ban would seriously harm CARECEN in multiple respects, and frustrate CARECEN's mission and divert organizational resources.

212.    For example, CARECEN's mission as it relates to affirmative asylum applicants would be frustrated because the organization will be unable to assist asylum seekers who entered between ports of entry because they would no longer be eligible for asylum.  CARECEN's representation of individuals who enter between ports of entry and seek asylum while in removal proceedings also would be compromised, and CARECEN would be forced to assist them in applying for withholding and CAT, which require additional resources and would divert staff time from other critical areas of work.

213.    CARECEN would also have to divert resources to training staff and educating prospective clients about the effects of the new policy.

**C. Al Otro Lado**

214.    Plaintiff Al Otro Lado routinely provides representation or other assistance to asylum seekers who have entered the United States between ports of entry.

48

215.     The entry ban would frustrate Al Otro Lado's mission and force Al Otro Lado to divert significant resources away from its other programs.  Because individuals who enter without inspection at the southern border are categorically ineligible for asylum under entry ban, Al Otro Lado has to revamp its representation strategy, overhaul the materials it uses to train pro bono attorneys, and evaluate the eligibility of each of its clients for other types of immigration relief.  It also has to expend resources to brief eligibility issues, resulting in additional hearings and time spent on each case.

216.     The new entry ban would also jeopardize some of Al Otro Lado's most critical funding streams.

217.     Most of Al Otro Lado's asylum clients are families traveling with minor children.  Because they will be ineligible for asylum under the new policy, spouses and minor children can no longer be counted as derivatives in a single application.  Al Otro Lado must now prepare separate cases for each family member, exponentially increasing the number of hours required to prepare a family's case.

**D.  Innovation Law Lab**

218.     Plaintiff Innovation Law Lab, among other services, has established "Centers of Excellence," which provide support to noncitizens and their pro bono attorneys including legal, technical, and strategic assistance in the preparation and presentation of claims.  These projects are established in Georgia, Kansas, Missouri, North Carolina, and Oregon.

219.     The entry ban would require Innovation Law Lab to significantly divert its limited resources.  The vast majority of people Innovation Law Lab serves are asylum seekers.  The entry ban would, among other things, require Innovation Law Lab to entirely rework the advice and guidance it provides in pro se workshops, and respond to a flood of inquiries and uncertainty from the immigrant communities Innovation Law Lab serves regarding the attempt to change asylum law.

AM. AND SUPPL. COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

It would also require Innovation Law Lab to evaluate eligibility for other types of relief in all of the cases that it screens and mentors.

220.    The changes created by the entry ban would have a substantial impact on Innovation Law Lab.  For example, the Law Lab would have to deploy expensive and limited engineering resources to recode its software to create new analytical modeling to account for the new rule.  The Innovation Law Lab publishes materials for pro bono attorneys and asylum applicants, including printed guides, worksheets, training videos, self-help videos, and other resources that are used around the country.  The entry ban would require the Innovation Law Lab to substantially revise this material and create new learning engagements and materials on the asylum rule.

221.    Thousands of individuals rely on the Innovation Law Lab's systems; the entry ban would require the organization to divert its limited resources away from other projects and priorities. For example, Innovation Law Lab would have to divert its attention away from the noncitizen population who remain eligible for asylum under the entry ban and who would remain in desperate need of Innovation Law Lab's services.  Innovation Law Lab would also have to divert its limited resources away from developing additional, new technologies to support and improve the rights of immigrants.

### FIRST CLAIM FOR RELIEF[7]
***Challenge to Circumvention of Lawful Pathways Rule***
***by Plaintiffs EBSC, CARECEN, Tahirih, NCLR, ImmDef and American Gateways***

**(Violation of Immigration and Nationality Act and Administrative Procedure Act, Contrary to Law)**

222.    All of the foregoing allegations are repeated and realleged as if fully set forth herein.

223.    The Immigration and Nationality Act provides, with certain exceptions not relevant here, that "[a]ny alien who is physically present in the United States or who arrives in the United

---

[7] Counts I, II, and III, which address the present Rule, are brought only by Plaintiffs EBSC, CARECEN, Tahirih, ImmDef, NCLR, and American Gateways.

50

States (whether or not at a designated port of arrival . . . ), irrespective of such alien's status, may apply for asylum in accordance with this section or, where applicable, section 1225(b) of this title." 8 U.S.C. § 1158(a)(1).

224. The Immigration and Nationality Act further provides that a noncitizen is ineligible for asylum if he or she "was firmly resettled in another country prior to arriving in the United States." 8 U.S.C. § 1158(b)(2)(A)(vi).

225. The Immigration and Nationality Act further provides that asylum is not available to a noncitizen "if the Attorney General determines that the alien may be removed, pursuant to a bilateral or multilateral agreement, to a country" where, among other things, "the alien's life or freedom would not be threatened on account of race, religion, nationality, membership in a particular social group, or political opinion, and where the alien would have access to a full and fair procedure for determining a claim to asylum or equivalent temporary protection." 8 U.S.C. § 1158(a)(2)(A).

226. Any additional condition or limitation on asylum established by regulation must be "consistent with" § 1158. *See* 8 U.S.C. § 1158(b)(2)(C); *see also id.* § 1158(d)(5)(B) (providing that any "conditions or limitations on the consideration of an application for asylum" established by regulation must be "not inconsistent with this chapter").

227. The Administrative Procedure Act, 5 U.S.C. § 706, provides that a Court "shall hold unlawful and set aside agency action, findings, and conclusions found to be" "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"; "contrary to constitutional right, power, privilege, or immunity"; [or] "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. §§ 706(2)(A)-(C).

228. The Rule is contrary to law, including 8 U.S.C. §§ 1158(a)(1), (a)(2)(A), and (b)(2)(A)(vi).

229.    The Rule exceeds the authority delegated to the Attorney General by Congress in 8 U.S.C §§ 1158(b)(2)(C) and (d)(5)(B).  The Attorney General lacks the authority to issue asylum bars that conflict with the asylum statute.

## SECOND CLAIM FOR RELIEF

### Challenge to Circumvention of Lawful Pathways Rule
### by Plaintiffs EBSC, CARECEN, Tahirih, NCLR, ImmDef and American Gateways
### (Violation of Administrative Procedure Act, Arbitrary & Capricious)

230.    All of the foregoing allegations are repeated and realleged as if fully set forth herein.

231.    The APA provides that courts "shall . . . hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

232.    Among other reasons, the Rule is arbitrary and capricious because, in adopting it, Defendants have failed to articulate a reasoned explanation for their decision, which represents a change in the agency's longstanding policy; considered factors that Congress did not intend to be considered; entirely failed to consider important aspects of the problem; and offered explanations for their decision that run counter to the evidence before the agency.

## THIRD CLAIM FOR RELIEF

### Challenge to Circumvention of Lawful Pathways Rule
### by Plaintiffs EBSC, CARECEN, Tahirih, NCLR, ImmDef and American Gateways

### (Violation of the APA, 5 U.S.C.§ 706(2)(D) – Failure to Observe Required Procedures)

233.    All of the foregoing allegations are repeated and realleged as if fully set forth herein.

234.    The APA provides that a "reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . without observance of procedure required by law." 5 U.S.C. § 706(2)(D). Specifically, the APA provides that agencies must "give interested persons an opportunity to participate in the rule making," *id.* § 553(c), which requires a meaningful opportunity to comment.

52

235.    Defendants failed to comply with the APA's requirement of an adequate opportunity to comment by imposing a truncated, 30-day comment period.

236.    The abbreviated comment period deprived the public of the ability to comment on the interaction between the Rule and the other proposed (and subsequently enacted) rules, among other infringements on the right to an adequate opportunity to comment.

237.    Defendants failed to provide a 30-day period between the Rule's enactment and its effective date, and did not have good cause to skip this requirement.

### FOURTH CLAIM FOR RELIEF[8]

*Challenge to Trump Administration's Entry Ban by Plaintiffs EBSC, CARECEN, Al Otro Lado, and Innovation Law Lab*

#### (Violation of the Immigration and Nationality Act and APA)

238.    All of the foregoing allegations are repeated and realleged as if fully set forth herein.

239.    The Proclamation and entry ban rule that effectuate the entry ban are contrary to law, including 8 U.S.C. § 1158.

240.    The President's power to suspend or restrict entry pursuant to 8 U.S.C. § 1182(f) does not encompass the ability to limit the forms of relief available to noncitizens once they have entered the country, nor does his power pursuant to 8 U.S.C. § 1158(a)(1).

241.    The entry ban exceeds the authority delegated to the Attorney General by Congress in 8 U.S.C §§ 1158(b)(2)(C) and (d)(5)(B). The Attorney General lacks the authority to issue asylum bars as broad as the President's § 1182(f) entry suspension authority permits.

### FIFTH CLAIM FOR RELIEF

*Challenge to Trump Administration's Entry Ban by Plaintiffs EBSC, CARECEN, Al Otro Lado, and Innovation Law Lab*

#### (Violation of the Administrative Procedure Act)

---

[8] Counts IV and V, which address the entry ban, are brought only by original Plaintiffs EBSC, CARECEN, Al Otro Lado, and Innovation Law Lab.

53

242.    All of the foregoing allegations are repeated and realleged as if fully set forth herein.

243.    In promulgating the entry ban, DHS failed to provide notice and an opportunity to comment in a timely manner.

244.    In promulgating the entry ban, DHS failed to publish the regulation 30 days before its effective date.

245.    DHS has not articulated reasons sufficient to shown good cause why these requirements are inapplicable, nor is the foreign affairs exception applicable.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully pray for the following relief:

a.    A declaration pursuant to 28 U.S.C. § 2201 that the entry ban and the Rule are unlawful and invalid;

b.    Vacatur of the entry ban and the Rule;

c.    A preliminary and permanent injunction enjoining Defendants, their officials, agents, employees, assigns, and all persons acting in concert or participating with them from implementing or enforcing the entry ban or the Rule;

d.    An order awarding Plaintiffs costs of suit, and reasonable attorneys' fees and expenses pursuant to any applicable law;

e.    Such other and further relief as the Court deems equitable, just, and proper.


Dated: May 11, 2023                    Respectfully submitted,

Lee Gelernt*                           /s/ Katrina Eiland
Omar Jadwat*                           Katrina Eiland (SBN 275701)
Anand Balakrishnan*                    Morgan Russell (SBN 296137)
AMERICAN CIVIL LIBERTIES UNION         Spencer Amdur (SBN 320069)
FOUNDATION                             Oscar Sarabia Roman (SBN 341385)
IMMIGRANTS' RIGHTS PROJECT             AMERICAN CIVIL LIBERTIES UNION
125 Broad St., 18th Floor              FOUNDATION
New York, NY 10004                     IMMIGRANTS' RIGHTS PROJECT
T:  (212) 549-2660                     39 Drumm Street
F:  (212) 549-2654                     San Francisco, CA 94111
lgelernt@aclu.org

54

ojadwat@aclu.org
abalakrishnan@aclu.org

Melissa Crow*
CENTER FOR GENDER & REFUGEE
STUDIES
1121 14th Street, NW, Suite 200
Washington, D.C. 20005
T: (202) 355-4471
F: (415) 581-8824
crowmelissa@uchastings.edu

Anne Peterson (SBN 258673)
Blaine Bookey (SBN 267596
Julie Bourdoiseau (SBN 340462)
Karen Musalo (SBN 106882)
CENTER FOR GENDER & REFUGEE
STUDIES
200 McAllister Street
San Francisco, CA  94102
T: (415) 610-5729
F: (415) 581-8824
petersonanne@uchastings.edu

T:  (415) 343-1198
F:  (415) 395-0950
keiland@aclu.org
mrussell@aclu.org
samdur@aclu.org
osarabia@aclu.org

Keren Zwick**
Richard Caldarone**
Colleen Cowgill (SBN 321542)
Mary Georgevich**
NATIONAL IMMIGRANT JUSTICE
CENTER
224 S. Michigan Ave., Suite 600
Chicago, Illinois 60604
T: (312) 660-1370
F: (312) 660-1505
kzwick@heartlandalliance.org
rcaldarone@heartlandalliance.org
ccowgill@heartlandalliance.org
mgeorgevich@heartlandalliance.org

Michelle (Minju) Y. Cho (SBN 321939)
AMERICAN CIVIL LIBERTIES UNION OF
NORTHERN CALIFORNIA, INC.
39 Drumm Street
San Francisco, CA 94111
T: (415) 621-2493
F: (415) 255-1478
mcho@aclu.org

*Attorneys for Plaintiffs*

*Admitted Pro hac vice*

*\*\* Application for pro hac vice admission
forthcoming*

Case: 23-16038, 09/07/2023, ID: 12788620, DktEntry: 33, Page 122 of 179

JANUARY 05, 2023

# FACT SHEET: Biden-Harris Administration Announces New Border Enforcement Actions

*New Measures Leverage Success of Venezuela Enforcement Initiative to Limit Disorderly and Unsafe Migration*

While the courts have prevented the Title 42 public health order from lifting for now, the Biden-Harris Administration today is announcing new enforcement measures to increase security at the border and reduce the number of individuals crossing unlawfully between ports of entry. These measures will expand and expedite legal pathways for orderly migration and result in new consequences for those who fail to use those legal pathways. They also draw on the success of the Venezuela initiative, which launched in October 2022 and has resulted in a dramatic drop in the number of Venezuelan nationals attempting to enter the United States unlawfully.

The Administration is also announcing that it is surging additional resources to the border and the region, scaling up its anti-smuggling operations, and expanding coordination and support for border cities and non-governmental organizations. Importantly, the actions announced today are being implemented in close partnership with Mexico and governments across the Western Hemisphere.

While these steps will help address some of the most acute challenges at the Southwest border, they will not solve all of the problems in an immigration system that has been broken for far too long. That can only happen if Republicans in Congress who have spent the past two years talking about border security quit blocking the comprehensive immigration reform and border security measures President Biden proposed on his first day in office, and opposing the billions of dollars in additional funds the President has requested for border security and management.

Unlike some Republican officials playing political games and obstructing real solutions to fix our broken immigration system, President Biden has a plan and is taking action.

CLP_AR_004552

Under the new enforcement measures announced today, the Biden-Harris Administration will:

**Impose New Consequences for Individuals who Attempt to Enter Unlawfully**

To facilitate a return to the processing of all noncitizens under Title 8 authorities when Title 42 eventually lifts, the Department of Homeland Security (DHS) is:

- **Increasing the Use of Expedited Removal.** Effective immediately, individuals who attempt to enter the United States without permission, do not have a legal basis to remain, and cannot be expelled pursuant to Title 42 will be increasingly subject to expedited removal to their country of origin and subject to a five-year ban on reentry.

- **Announcing New Measures to Encourage Individuals to Seek Orderly and Lawful Pathways to Migration.** DHS and the Department of Justice today are announcing their intent to propose a new regulation that would encourage individuals to seek orderly and lawful pathways to migration and reduce overcrowding along the southwest border and the strain on the immigration system.

**Expand Legal Pathways for Safe, Orderly, and Humane Migration**

The Biden-Harris Administration and its international partners in the region are also announcing new and expanded legal pathways to the United States and other countries that individuals can and should use to avoid consequences for crossing the border unlawfully. These include:

- **Expanding the Parole Process for Venezuelans to Nicaraguans, Haitians, and Cubans.** Today, the Biden Administration is announcing it will extend the successful Venezuela parole process and expand it to nationals of Nicaragua, Haiti, and Cuba. Up to 30,000 individuals per month from these four countries, who have an eligible sponsor and pass vetting and background checks, can come to the United States for a period of two years and receive work authorization. Individuals who irregularly cross the Panama, Mexico, or U.S. border after the date of this announcement will be ineligible for the parole process and will be subject to expulsion to Mexico, which will accept returns of 30,000 individuals per

CLP_AR_004553

month from these four countries who fail to use these
new pathways.

- **Tripling Refugee Resettlement from the Western
  Hemisphere.** The Biden-Harris Administration intends
  to welcome up to 20,000 refugees from Latin American
  and Caribbean countries during Fiscal Years 2023 and
  2024, putting the United States on pace to *more than
  triple* refugee admissions from the Western Hemisphere
  this Fiscal Year alone. This delivers on the President's
  commitment under the *Los Angeles Declaration for
  Migration and Protection* to scale up refugee admissions
  from the Western Hemisphere.

- **Launching Online Appointment Portal to Reduce
  Overcrowding and Wait Times at U.S. Ports of Entry.**
  When Title 42 eventually lifts, noncitizens located in
  Central and Northern Mexico seeking to enter the United
  States lawfully through a U.S. port of entry have access to
  the CBP One mobile application for scheduling an
  appointment to present themselves for inspection and to
  initiate a protection claim instead of coming directly to a
  port of entry to wait. This new feature will significantly
  reduce wait times and crowds at U.S. ports of entry and
  allow for safe, orderly, and humane processing.

- **New Legal Pathways to Other Countries Across the
  Region.** Countries across the Western Hemisphere are
  delivering on their commitments under the *Los Angeles
  Declaration* to expand legal immigration pathways.
  Colombia, Ecuador, Costa Rica, and Belize are each
  implementing new regularization or temporary
  protection policies to provide legal status to hundreds of
  thousands of migrants. Canada, Mexico, and Spain have
  expanded refugee resettlement and temporary work
  opportunities. Mexico and Guatemala have also
  significantly grown their asylum system. Individuals are
  encouraged to avail themselves of this wide range of legal
  pathways in the region and avoid the dangerous
  consequences of irregular migration.

- **Increasing Humanitarian Assistance in Mexico and
  Central America.** The United States is announcing today
  nearly $23 million in additional humanitarian assistance
  in Mexico and Central America. This new assistance will
  help governments in the region respond to the increased
  humanitarian and protection needs of migrants, refugees
  and other vulnerable populations in their
  care. Recognizing that no one country can respond to
  these needs alone, this assistance will help support
  shelter, health, legal assistance, mental health and

CLP_AR_004554

psychosocial support, water, sanitation, hygiene products, gender-based violence response, livelihoods, other protection related activities, and capacity building for partners.

**Surge Resources to Secure the Border, Disrupt Criminal Smuggling Networks, and Support Border Communities**

The Biden-Harris Administration is surging resources and expanding efforts to securely manage the border, disrupt the criminal smuggling networks preying on vulnerable migrants, and support communities receiving migrants as they await their immigration enforcement proceedings. New and expanded efforts include:

- **Mobilizing Record Resources for Safe, Orderly, and Humane Processing of Migrants.** The Biden Administration is marshalling available authorities and resources from across the Federal Government to help ensure the border is secure and well-managed when the Title 42 public health order eventually lifts. DHS and DOJ are surging asylum officers and immigration judges to review asylum cases at the border more quickly – with the aim of reducing initial processing times from months to days. The two agencies are also expanding capabilities and technologies to support faster processing, including by installing hundreds of phone lines and privacy booths to conduct these interviews and proceedings. DHS is also hiring and deploying additional agents and officers to join the over 23,000 already working to secure the border. In addition, DHS is significantly scaling up its air and ground transportation capabilities to quickly remove migrants when warranted or transport migrants to less-congested border sectors for further immigration enforcement proceedings.

- **Taking Thousands of Smugglers off the Streets and Countering Smuggler Misinformation.** In Los Angeles earlier this year, President Biden announced a first-of-its kind operation against the multi-billion-dollar human smuggling industry. Since April, this operation has led to over 7,300 arrests, forcing many criminal smuggling organizations out of business. The Administration is also taking on the smuggler misinformation. The Department of State is expanding its paid and earned media outreach to ensure timely and accurate information is reaching migrants. Messaging and outreach will target high out-migration communities and migrant routes through relevant communications channels (e.g., radio, digital,

CLP_AR_004555

ER-125

trusted partners, and more.) with an estimated reach of over 85 million potential migrants

- **Expanding Coordination with and Support for Border Cities, Receiving Communities, and Non-Governmental Organizations.** The Biden-Harris Administration is increasing funding available to border cities and those cities receiving an influx of migrants, in addition to strengthening ongoing coordination and collaboration across all levels of government. DHS is also expanding outreach efforts with local jurisdictions to provide coordination of resources and technical assistance support and the Administration has been facilitating coordination between state and local officials and other federal agencies. Additionally, the Administration will continue to mobilize faith-based and non-profit organizations supporting migrants, including those providing temporary shelter, food, and humanitarian assistance before often reuniting with family as they await the outcome of their immigration proceedings.

The Biden-Harris Administration will do everything within its authority and available resources to manage this challenge, but until and unless Congress delivers the funding as well as comprehensive immigration reform measures President Biden requested, the United States' broken immigration system will indeed remain broken.

###

CLP_AR_004556

1  BRIAN M. BOYNTON
   *Principal Deputy Assistant Attorney General*
2  WILLIAM C. PEACHEY
   *Director*
3  EREZ REUVENI
   *Assistant Director*
4  Office of Immigration Litigation
5  U.S. Department of Justice, Civil Division
   P.O. Box 868, Ben Franklin Station
6  Washington, DC 20044
   Tel: (202) 307-4293
7  Email: Erez.R.Reuveni@usdoj.gov
8  PATRICK GLEN
   CHRISTINA P. GREER
9  *Senior Litigation Counsel*

10

11              **UNITED STATES DISTRICT COURT**
            **FOR THE NORTHERN DISTRICT OF CALIFORNIA**
12                  **OAKLAND DIVISION**

13

14  East Bay Sanctuary Covenant, *et al.*,        No. 4:18-cv-06810-JST

15              Plaintiffs,                        **NOTICE OF APPEAL**

16        v.

17

18  Joseph R. Biden, *et al.*,

19              Defendants.

20

21

22

23

24

25

26

27

28

Defendants hereby appeal from the Court's Order and Judgment entered July 25, 2023 (ECF Nos. 187-88), in the above-captioned case to the United States Court of Appeals for the Ninth Circuit.

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

WILLIAM C. PEACHEY
Director

By: /s/ *Erez Reuveni*
EREZ REUVENI
Assistant Director
Office of Immigration Litigation
U.S. Department of Justice, Civil Division
P.O. Box 868, Ben Franklin Station
Washington, DC 20044
Tel: (202) 307-4293
Email: Erez.R.Reuveni@usdoj.gov

PATRICK GLEN
CHRISTINA P. GREER
Senior Litigation Counsel

Dated: July 25, 2023                    *Attorneys for Defendants*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**CERTIFICATE OF SERVICE**

I hereby certify that on July 25, 2023, I electronically filed the foregoing document with the Clerk of the Court for the United States Court of for the Northern District of California by using the CM/ECF system. Counsel in the case are registered CM/ECF users and service will be accomplished by the CM/ECF system.

By: */s/ Erez Reuveni*
EREZ REUVENI
Assistant Director
United States Department of Justice
Civil Division

**Query    Reports    Utilities    Help    Log Out**

APPEAL,CLOSED,RELATE

# U.S. District Court
## California Northern District (Oakland)
## CIVIL DOCKET FOR CASE #: 4:18-cv-06810-JST

| | |
|---|---|
| East Bay Sanctuary Covenant et al v. Biden et al | Date Filed: 11/09/2018 |
| Assigned to: Judge Jon S. Tigar | Date Terminated: 07/25/2023 |
| Relate Case Case: <u>4:19-cv-04073-JST</u> | Jury Demand: None |
| Case in other court: 23-16032 | Nature of Suit: 465 Other Immigration |
| USCA#:18-17274 | Actions |
| USCA#:18-17436 | Jurisdiction: U.S. Government Defendant |
| Cause: 05:702 Administrative Procedure Act | |

**Plaintiff**

**East Bay Sanctuary Covenant**                    represented by   **Lee Gelernt**
ACLU Immigrants' Rights Project
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2616
Fax: (212) 549-2654
Email: lgelernt@aclu.org
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Angelo Guisado**
Center for Constitutional Rights
666 Broadway, 7th Floor
New York, NY 10012
212-614-6464
Fax: 212-614-6499
Email: aguisado@ccrjustice.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Anne Elizabeth Peterson**
Center for Gender and Refugee Studies
200 McAllister Street
San Francisco, CA 94102
(415) 610-5729
Email: petersonanne@uclawsf.edu
*ATTORNEY TO BE NOTICED*

**Baher Azmy**
Center for Constitutional Rights
666 Broadway, 7th Floor
New York, NY 10012
(212) 614-6464

Fax: (212) 614-6499
Email: bazmy@ccrjustice.org
*ATTORNEY TO BE NOTICED*

**Celso Javier Perez**
ACLU Foundation IRP
125 Broad Street
New York, NY 10004
646-905-8935
Email: cperez@aclu.org
*TERMINATED: 02/22/2021*

**Christine Patricia Sun**
ACLU Foundation of Northern California
39 Drumm Street
San Francisco, CA 94111
(415) 621-2493
Fax: (415) 255-8437
Email: csun@aclunc.org
*TERMINATED: 09/20/2019*

**Cody H. Wofsy**
ACLU Immigrants' Rights Project
39 Drumm Street
San Francisco, CA 94111
415-343-0785
Fax: 415-395-0950
Email: cwofsy@aclu.org
*ATTORNEY TO BE NOTICED*

**Ghita Schwarz**
Center for Constitutional Rights
666 Broadway, 7th Floor
New York, NY 10012
212-614-6445
Fax: 212-614-6499
Email: gschwarz@ccrjustice.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jennifer C. Newell**
ACLU Foundation Immigrants' Rights
Project
39 Drumm Street
San Francisco, CA 94111
(415) 343-0774
Fax: (415) 395-0950
Email: jnewell@aclu.org
*TERMINATED: 01/28/2020*

**Judy Rabinovitz**
ACLU Foundation Immigrants' Rights
Project
125 Broad Street, 18th Floor

New York, NY 10004-2400
(212) 549-2618
Fax: (212) 549-2654
Email: jrabinovitz@aclu.org
*ATTORNEY TO BE NOTICED*

**Julie Beatrice Bourdoiseau**
Center for Gender and Refugee Studies
200 McAllister St
San Francisco, CA 94102
415-581-8818
Email: bourdoiseaujulie@uclawsf.edu
*ATTORNEY TO BE NOTICED*

**Julie Michelle Veroff**
Cooley LLP
3 Embarcadero Center, 20th Floor
San Francisco, CA 94111-4004
(415) 693-2179
Fax: (415) 693-2222
Email: jveroff@cooley.com
*TERMINATED: 02/16/2021*

**Katrina Leigh Eiland**
ACLU Foundation Immigrants' Rights
Project
39 Drumm Street
San Francisco, CA 94111
(415) 343-0770
Fax: (415) 395-0950
Email: keiland@aclu.org
*ATTORNEY TO BE NOTICED*

**Mary Catherine Bauer**
Muslim Advocates
P.O. Box 34440
Washington, DC 20043
(202) 873-1550
Email: mary@muslimadvocates.org
*ATTORNEY TO BE NOTICED*

**Mary Georgevich**
National Immigrant Justice Center
224 S. Michigan Ave.
Suite 600
Chicago, IL 60604
312-660-1615
Fax: 312-660-1505
Email: mgeorgevich@heartlandalliance.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Melissa E Crow**
Center for Gender and Refugee Studies

1121 14th Street, NW
Suite 200
Washington, DC 20005
202-355-4471
Email: crowmelissa@uclawsf.edu
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Michelle Young Cho**
ACLU Foundation of Northern California
39 Drumm Street
San Francisco, CA 94111
(415) 621-2493
Fax: (415) 255-8437
Email: mcho@aclunc.org
*ATTORNEY TO BE NOTICED*

**Morgan Shahan Russell**
American Civil Liberties Union Foundation
39 Drumm Street
San Francisco, CA 94111
415-343-0776
Email: mrussell@aclu.org
*ATTORNEY TO BE NOTICED*

**Omar C. Jadwat**
ACLU Foundation Immigrants' Rights
Project
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2620
Fax: (212) 549-2654
Email: ojadwat@aclu.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Oscar Sarabia Roman**
American Civil Liberties Union Foundation
Immigrants' Rights Project
39 Drumm St
San Francisco, CA 94111
916-813-7891
Email: osarabia@aclu.org
*ATTORNEY TO BE NOTICED*

**Richard Caldarone**
National Immigration Justice Center
224 S. Michigan Ave.
Suite 600
Chicago, IL 60604
717-870-2267
Email: rcaldarone@heartlandalliance.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Spencer Elijah Wittmann Amdur**
ACLU Immigrants' Rights Project
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2572
Email: samdur@aclu.org
*ATTORNEY TO BE NOTICED*

**Vasudha Talla**
Emery Celli Brinckerhoff Abady Ward &
Maazel LLP
600 Fifth Avenue
10th Floor
New York, NY 10020
212-763-5000
Fax: 212-763-5001
Email: vtalla@ecbawm.com
*TERMINATED: 07/05/2022*

**Plaintiff**

**Al Otro Lado**                    represented by  **Lee Gelernt**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Angelo Guisado**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Baher Azmy**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Celso Javier Perez**
(See above for address)
*TERMINATED: 02/22/2021*

**Christine Patricia Sun**
(See above for address)
*TERMINATED: 09/20/2019*

**Cody H. Wofsy**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Ghita Schwarz**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jennifer C. Newell**

(See above for address)
*TERMINATED: 01/28/2020*

**Judy Rabinovitz**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Julie Michelle Veroff**
(See above for address)
*TERMINATED: 02/16/2021*

**Katrina Leigh Eiland**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Mary Catherine Bauer**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Melissa E Crow**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Michelle Young Cho**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Omar C. Jadwat**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Spencer Elijah Wittmann Amdur**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Vasudha Talla**
(See above for address)
*TERMINATED: 07/05/2022*

**Plaintiff**

**Innovation Law Lab**                    represented by   **Lee Gelernt**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Angelo Guisado**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Baher Azmy**

(See above for address)
*ATTORNEY TO BE NOTICED*

**Celso Javier Perez**
(See above for address)
*TERMINATED: 02/22/2021*

**Christine Patricia Sun**
(See above for address)
*TERMINATED: 09/20/2019*

**Cody H. Wofsy**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Ghita Schwarz**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jennifer C. Newell**
(See above for address)
*TERMINATED: 01/28/2020*

**Judy Rabinovitz**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Julie Michelle Veroff**
(See above for address)
*TERMINATED: 02/16/2021*

**Katrina Leigh Eiland**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Mary Catherine Bauer**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Melissa E Crow**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Michelle Young Cho**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Omar C. Jadwat**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Spencer Elijah Wittmann Amdur**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Vasudha Talla**
(See above for address)
*TERMINATED: 07/05/2022*

**Plaintiff**

**Central American Resource Center**        represented by  **Lee Gelernt**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Angelo Guisado**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Baher Azmy**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Celso Javier Perez**
(See above for address)
*TERMINATED: 02/22/2021*

**Christine Patricia Sun**
(See above for address)
*TERMINATED: 09/20/2019*

**Cody H. Wofsy**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Ghita Schwarz**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jennifer C. Newell**
(See above for address)
*TERMINATED: 01/28/2020*

**Judy Rabinovitz**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Julie Michelle Veroff**
(See above for address)
*TERMINATED: 02/16/2021*

**Katrina Leigh Eiland**

(See above for address)
*ATTORNEY TO BE NOTICED*

**Mary Catherine Bauer**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Melissa E Crow**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Michelle Young Cho**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Morgan Shahan Russell**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Omar C. Jadwat**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Oscar Sarabia Roman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Richard Caldarone**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Spencer Elijah Wittmann Amdur**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Vasudha Talla**
(See above for address)
*TERMINATED: 07/05/2022*

**Plaintiff**

**American Gateways**                    represented by   **Morgan Shahan Russell**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Oscar Sarabia Roman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Spencer Elijah Wittmann Amdur**
(See above for address)
*ATTORNEY TO BE NOTICED*

Katrina Leigh Eiland
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Tahirih Justice Center**       represented by    **Morgan Shahan Russell**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Oscar Sarabia Roman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Spencer Elijah Wittmann Amdur**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Katrina Leigh Eiland**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**National Center for Lesbian Rights**       represented by    **Morgan Shahan Russell**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Oscar Sarabia Roman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Spencer Elijah Wittmann Amdur**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Katrina Leigh Eiland**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Immigrant Defenders Law Center**       represented by    **Morgan Shahan Russell**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Oscar Sarabia Roman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Spencer Elijah Wittmann Amdur**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Katrina Leigh Eiland**

(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Joseph R. Biden**
*President of the United States*

represented by  **Christina P Greer**
U.S. Department of Justice
Civil Division, Office of Immigration
Litigation
P.O. Box 878
Washington, DC 20044
202-598-8770
Email: christina.p.greer@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Erez R. Reuveni**
United States Department of Justice, Civil
Division
Office of Immigration Litigation
450 5th Street NW
Washington, DC 20530
(202) 307-4293
Fax: (202) 305-7000
Email: erez.r.reuveni@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Francesca Genova Matozzo**
Religious Liberty Clinic
Civil Division
1305 Biolchini Hall
Notre Dame, IN 46556
574-631-6882
Email: FGenova@nd.edu
*TERMINATED: 02/01/2022*

**Scott G. Stewart**
U.S. Department of Justice
Office of Immigration Litigation, Civil
Division
P.O. Box 868, Ben Franklin Station
Washington, DC 20044
202-307-6482
Email: scott.g.stewart@usdoj.gov
*TERMINATED: 01/14/2021*

**Defendant**

**Attorney General Mathew Whitaker**

represented by  **Christina P Greer**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Erez R. Reuveni**
(See above for address)

*ATTORNEY TO BE NOTICED*

**Francesca Genova Matozzo**
(See above for address)
*TERMINATED: 02/01/2022*

**Scott G. Stewart**
(See above for address)
*TERMINATED: 01/14/2021*

**Defendant**

**Dir. EOIR James McHenry**                  represented by  **Christina P Greer**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Erez R. Reuveni**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Francesca Genova Matozzo**
(See above for address)
*TERMINATED: 02/01/2022*

**Scott G. Stewart**
(See above for address)
*TERMINATED: 01/14/2021*

**Defendant**

**Executive Office for Immigration Review
(EOIR)**                                      represented by  **Christina P Greer**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Erez R. Reuveni**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Francesca Genova Matozzo**
(See above for address)
*TERMINATED: 02/01/2022*

**Scott G. Stewart**
(See above for address)
*TERMINATED: 01/14/2021*

**Defendant**

**Secretary of DHS Kirstjen M. Nielsen**      represented by  **Christina P Greer**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Erez R. Reuveni**
(See above for address)
*ATTORNEY TO BE NOTICED*

                                                     **Francesca Genova Matozzo**
                                                     (See above for address)
                                                     *TERMINATED: 02/01/2022*

                                                     **Scott G. Stewart**
                                                     (See above for address)
                                                     *TERMINATED: 01/14/2021*

**Defendant**

**Dir. USCIS Lee Francis Cissna**          represented by   **Christina P Greer**
                                                     (See above for address)
                                                     *ATTORNEY TO BE NOTICED*

                                                     **Erez R. Reuveni**
                                                     (See above for address)
                                                     *ATTORNEY TO BE NOTICED*

                                                     **Francesca Genova Matozzo**
                                                     (See above for address)
                                                     *TERMINATED: 02/01/2022*

                                                     **Scott G. Stewart**
                                                     (See above for address)
                                                     *TERMINATED: 01/14/2021*

**Defendant**

**U.S. Citizenship and Immigration**       represented by   **Christina P Greer**
**Services**                                         (See above for address)
                                                     *ATTORNEY TO BE NOTICED*

                                                     **Erez R. Reuveni**
                                                     (See above for address)
                                                     *ATTORNEY TO BE NOTICED*

                                                     **Francesca Genova Matozzo**
                                                     (See above for address)
                                                     *TERMINATED: 02/01/2022*

                                                     **Scott G. Stewart**
                                                     (See above for address)
                                                     *TERMINATED: 01/14/2021*

**Defendant**

**Commissioner U.S.CBP Kevin K.**          represented by   **Christina P Greer**
**McAleenan**                                        (See above for address)
                                                     *ATTORNEY TO BE NOTICED*

                                                     **Erez R. Reuveni**
                                                     (See above for address)
                                                     *ATTORNEY TO BE NOTICED*

                                                     **Francesca Genova Matozzo**
                                                     (See above for address)

*TERMINATED: 02/01/2022*

**Scott G. Stewart**
(See above for address)
*TERMINATED: 01/14/2021*

**Defendant**

**U.S Customs and Border Protection**               represented by   **Christina P Greer**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Erez R. Reuveni**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Francesca Genova Matozzo**
(See above for address)
*TERMINATED: 02/01/2022*

**Scott G. Stewart**
(See above for address)
*TERMINATED: 01/14/2021*

**Defendant**

**Acting Dir. U.S.ICE Ronald D. Vitiello**          represented by   **Christina P Greer**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Erez R. Reuveni**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Francesca Genova Matozzo**
(See above for address)
*TERMINATED: 02/01/2022*

**Scott G. Stewart**
(See above for address)
*TERMINATED: 01/14/2021*

**Defendant**

**U.S. Immigration and Customs**                     represented by   **Christina P Greer**
**Enforcement**                                                        (See above for address)
*ATTORNEY TO BE NOTICED*

**Erez R. Reuveni**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Francesca Genova Matozzo**
(See above for address)
*TERMINATED: 02/01/2022*

**Scott G. Stewart**
(See above for address)
*TERMINATED: 01/14/2021*

**Defendant**

U.S. Department of Justice                represented by    **Christina P Greer**
                                                            (See above for address)
                                                            *ATTORNEY TO BE NOTICED*

                                                           **Erez R. Reuveni**
                                                           (See above for address)
                                                           *ATTORNEY TO BE NOTICED*

                                                           **Francesca Genova Matozzo**
                                                           (See above for address)
                                                           *TERMINATED: 02/01/2022*

                                                           **Scott G. Stewart**
                                                           (See above for address)
                                                           *TERMINATED: 01/14/2021*

                                                           **Thomas Benton York**
                                                           United States Department of Justice, Civil
                                                           Division
                                                           Office of Immigration Litigation, District
                                                           Court Section
                                                           P.O. Box 868, Ben Franklin Station
                                                           Washington, DC 20044
                                                           (202) 598-6073
                                                           Fax: (202) 305-7000
                                                           Email: thomas.b.york@usdoj.gov
                                                           *ATTORNEY TO BE NOTICED*

**Defendant**

U.S. Department of Homeland Security      represented by    **Christina P Greer**
                                                            (See above for address)
                                                            *ATTORNEY TO BE NOTICED*

                                                           **Erez R. Reuveni**
                                                           (See above for address)
                                                           *ATTORNEY TO BE NOTICED*

                                                           **Francesca Genova Matozzo**
                                                           (See above for address)
                                                           *TERMINATED: 02/01/2022*

                                                           **Scott G. Stewart**
                                                           (See above for address)
                                                           *TERMINATED: 01/14/2021*

**Defendant**

Merrick Garland                           represented by    **Erez R. Reuveni**
                                                            (See above for address)

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Christina P Greer**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Neal**                                      represented by   **Erez R. Reuveni**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Christina P Greer**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**David Neal**                                represented by   **Erez R. Reuveni**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Christina P Greer**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Alejandro Mayorkas**                        represented by   **Erez R. Reuveni**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Christina P Greer**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Ur Mendoza Jaddou**                         represented by   **Erez R. Reuveni**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Christina P Greer**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Troy A. Miller**                            represented by   **Erez R. Reuveni**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Christina P Greer**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Tae D. Johnson**                    represented by  **Erez R. Reuveni**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Christina P Greer**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Amicus**

**State of Washington**              represented by  **Megan Dy Lin**
Washington Attorney General's Office
PO Box 40100
Olympia, WA 98504
3104977100
Email: mlin@perkinscoie.com
*ATTORNEY TO BE NOTICED*

**Amicus**

**Immigration Reform Law Institute** represented by **Francesca Genova Matozzo**
(See above for address)
*TERMINATED: 02/01/2022*

**Lawrence John Joseph**
Law Office of Lawrence J. Joseph
1250 Connecticut Avenue, NW
Suite 700
Washington, DC 20036
United Sta
202-355-9452
Fax: 202-318-2254
Email: ljoseph@larryjoseph.com
*ATTORNEY TO BE NOTICED*

**Amicus**

**Office of United Nations High**    represented by  **Brian Hauck**
**Commissioner for Refugees**
Jenner and Block LLP
515 South Flower Street
Suite 3300
Los Angeles, CA 90071
213-239-5100
Email: bhauck@jenner.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Patrick W Pearsall**
Jenner & Block LLP

1099 New York Avenue, NW
Washington, DC 20001
202-639-6000
Email: PWPearsall@jenner.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Amicus**

**Immigration Law Professors**                  represented by **David Charles Marcus**
Wilmer Cutler Pickering Hale and Dorr LLP
350 South Grand Avenue, Suite 2400
Los Angeles, CA 90071
213-443-5300
Email: david.marcus@wilmerhale.com
*ATTORNEY TO BE NOTICED*

**Peter Simon Margulies**
Roger Williams University School of Law
10 Metacom Avenue
Bristol, RI 02806
401-258-6086
Email: pmargulies@rwu.edu
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Shoba Wadhia**
Penn State Law
329 Innovation Blvd., Suite 118
University Park, PA 16802
814-865-3823
Email: SSW11@psu.edu
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Amicus**

**National Center for Lesbian Rights**          represented by **Julie Wilensky**
San Francisco City Attorney's Office
1390 Market Street
Ste 7th Floor
94102
San Francisco, CA 94102
415-554-4274
Email: julie.wilensky@sfcityatty.org
*TERMINATED: 03/15/2022*
*LEAD ATTORNEY*

**Katrina Leigh Eiland**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Lee Gelernt**
(See above for address)
*LEAD ATTORNEY*

*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Amy Whelan**
National Center for Lesbian Rights
870 Market Street, Suite 370
San Francisco, CA 94102
415-392-6257
Fax: 415-392-8442
Email: awhelan@nclrights.org
*ATTORNEY TO BE NOTICED*

**Mary Georgevich**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Omar C. Jadwat**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Richard Caldarone**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Shannon Minter**
National Center For Lesbian Rights
870 Market Street, Suite 370
San Francisco, CA 94102
415-392-6257
Fax: 415-392-8442
Email: sminter@nclrights.org
*ATTORNEY TO BE NOTICED*

**Amicus**

**Asian Law Alliance**                  represented by   **Harrison J. Frahn , IV**
                                                         Simpson Thacher & Bartlett LLP
                                                         2475 Hanover Street
                                                         Palo Alto, CA 94304
                                                         (650) 251-5025
                                                         Fax: (650) 251-5002
                                                         Email: hfrahn@stblaw.com
                                                         *LEAD ATTORNEY*
                                                         *ATTORNEY TO BE NOTICED*

**Amicus**

**Bet Tzedek**                           represented by   **Harrison J. Frahn , IV**
                                                         (See above for address)
                                                         *LEAD ATTORNEY*
                                                         *ATTORNEY TO BE NOTICED*

**Amicus**

**CASA**

represented by **Harrison J. Frahn , IV**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

<u>Amicus</u>

**Central American Refugee Center**

represented by **Harrison J. Frahn , IV**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Lee Gelernt**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Mary Georgevich**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

<u>Amicus</u>

**City Bar Justice Center**

represented by **Harrison J. Frahn , IV**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

<u>Amicus</u>

**Dolores Street Community Services**

represented by **Harrison J. Frahn , IV**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

<u>Amicus</u>

**Empire Justice Center**

represented by **Harrison J. Frahn , IV**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

<u>Amicus</u>

**Her Justice**

represented by **Harrison J. Frahn , IV**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

<u>Amicus</u>

**HIAS and Council Migration Services,
Inc. of Philadelphia**

represented by **Harrison J. Frahn , IV**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

<u>Amicus</u>

**Immigrant Justice Corps**                          represented by **Harrison J. Frahn , IV**
                                                     (See above for address)
                                                     *LEAD ATTORNEY*
                                                     *ATTORNEY TO BE NOTICED*

<u>Amicus</u>

**Immigrant Legal Resource Center**                  represented by **Harrison J. Frahn , IV**
                                                     (See above for address)
                                                     *LEAD ATTORNEY*
                                                     *ATTORNEY TO BE NOTICED*

<u>Amicus</u>

**International Refugee Assistance Project**         represented by **Harrison J. Frahn , IV**
                                                     (See above for address)
                                                     *LEAD ATTORNEY*
                                                     *ATTORNEY TO BE NOTICED*

<u>Amicus</u>

**LatinoJustice PRLDEF**                             represented by **Harrison J. Frahn , IV**
                                                     (See above for address)
                                                     *LEAD ATTORNEY*
                                                     *ATTORNEY TO BE NOTICED*

<u>Amicus</u>

**Legal Aid Society of New York**                    represented by **Harrison J. Frahn , IV**
                                                     (See above for address)
                                                     *LEAD ATTORNEY*
                                                     *ATTORNEY TO BE NOTICED*

<u>Amicus</u>

**Loyola Immigrant Justice Clinic**                  represented by **Harrison J. Frahn , IV**
                                                     (See above for address)
                                                     *LEAD ATTORNEY*
                                                     *ATTORNEY TO BE NOTICED*

<u>Amicus</u>

**Make the Road New York**                           represented by **Harrison J. Frahn , IV**
                                                     (See above for address)
                                                     *LEAD ATTORNEY*
                                                     *ATTORNEY TO BE NOTICED*

<u>Amicus</u>

**New York Immigration Coalition**                   represented by **Harrison J. Frahn , IV**
                                                     (See above for address)
                                                     *LEAD ATTORNEY*
                                                     *ATTORNEY TO BE NOTICED*

<u>Amicus</u>

**Public Law Center**                                represented by **Harrison J. Frahn , IV**
                                                     (See above for address)
                                                     *LEAD ATTORNEY*
                                                     *ATTORNEY TO BE NOTICED*

ER-150

**Amicus**

**Safe Passage Project**            represented by    **Harrison J. Frahn , IV**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**The Legal Project**           represented by    **Harrison J. Frahn , IV**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**Torture Abolition Survivors Support Coalition**        represented by    **Harrison J. Frahn , IV**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**University of California, Irvine School of Law Immigrant Rights**    represented by    **Harrison J. Frahn , IV**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**UnLocal, Inc.**             represented by    **Harrison J. Frahn , IV**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**Public Citizen, Inc.**           represented by    **Lindsay Polastri Nako**
Impact Fund
2080 Addison Street, Suite 5
Berkeley, CA 94704
510-845-3473 ext. 307
Fax: 510-845-3654
Email: lnako@impactfund.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**David S Nahmias**
Impact Fund
2080 Addison Street, Suite 102
Berkeley, CA 94704-1693
(510) 845-3473
Fax: (510) 845-3654
Email: dnahmias@impactfund.org
*TERMINATED: 09/10/2021*

**Jocelyn Dion Larkin**
Impact Fund
2080 Addison Street, Suite 5

Berkeley, CA 94704
510-845-3473 x306
Fax: 510-845-3654
Email: jlarkin@impactfund.org
*TERMINATED: 01/04/2019*

**Rebecca Harriet Smullin**
Public Citizen Litigation Group
1600 20th Street, NW
Washington, DC 20009
202-588-7714
Fax: 202-588-7795
Email: rebecca.smullin@cfpb.gov
*TERMINATED: 09/10/2021*

**Amicus**

**State of California**                    represented by   **James F. Zahradka , II**
California Department of Justice
Bureau of Children's Justice
California State Attorney General's Office
1515 Clay Street, 20th Floor
Oakland, CA 946120550
(510) 879-1247
Fax: (510) 622-2121
Email: james.zahradka@doj.ca.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**Tahirih Justice Center**              represented by   **Lee Gelernt**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Katrina Leigh Eiland**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Keren Hart Zwick**
National Immigrant Justice Center
224 S. Michigan Ave. Suite 600
Chicago, IL 60604
United Sta
312-660-1364
Fax: 312-660-1505
Email: kzwick@heartlandalliance.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Mary Georgevich**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Omar C. Jadwat**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Richard Caldarone**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Spencer Elijah Wittmann Amdur**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Amicus**

**Immigrant Defenders Law Center**        represented by    **Lee Gelernt**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Katrina Leigh Eiland**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Mary Georgevich**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Omar C. Jadwat**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Richard Caldarone**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Spencer Elijah Wittmann Amdur**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Amicus**

**American Gateways**        represented by    **Lee Gelernt**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Katrina Leigh Eiland**
(See above for address)

*ATTORNEY TO BE NOTICED*

**Mary Georgevich**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Omar C. Jadwat**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Richard Caldarone**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Spencer Elijah Wittmann Amdur**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Amicus**

**Judges & Former Members of the Board of Immigration Appeals**       represented by   **Ashley Brooke Vinson Crawford**
Akin Gump Strauss Hauer & Feld
100 Pine Street, Suite 3200
San Francisco, CA 94111
415-765-9561
Fax: 415-765-9501
Email: avcrawford@akingump.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**National Citizenship and Immigration Services Council 119**       represented by   **Kathleen R. Hartnett**
Cooley LLP
3 Embarcadero Center, 20th Floor
San Francisco, CA 94111-4004
415-693-2071
Fax: 415-693-2222
Email: khartnett@cooley.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 11/09/2018 | 1 | COMPLAINT for Declaratory and Injunctive Relief (Immigration Action) against All Defendants, (Filing Fee: $400.00, receipt number 0971-12836235). Filed by Al Otro Lado, East Bay Sanctuary Covenant, Innovation Law Lab, Central American Resource Center. (Attachments: #(1) Civil Cover Sheet)(Newell, Jennifer) (Filed on 11/9/2018) (Entered: 11/09/2018) |
| 11/09/2018 | 2 | Case assigned to Magistrate Judge Donna M. Ryu. |

| | | |
|---|---|---|
| | | Counsel for plaintiff or the removing party is responsible for serving the Complaint or Notice of Removal, Summons and the assigned judge's standing orders and all other new case documents upon the opposing parties. For information, visit *E-Filing A New Civil Case* at http://cand.uscourts.gov/ecf/caseopening.<br><br>Standing orders can be downloaded from the court's web page at www.cand.uscourts.gov/judges. Upon receipt, the summons will be issued and returned electronically. Counsel is required to send chambers a copy of the initiating documents pursuant to L.R. 5-1(e)(7). A scheduling order will be sent by Notice of Electronic Filing (NEF) within two business days. Consent/Declination due by 11/23/2018. (as, COURT STAFF) (Filed on 11/9/2018) (Entered: 11/09/2018) |
| 11/09/2018 | [3](#) | Proposed Summons. (Newell, Jennifer) (Filed on 11/9/2018) (Entered: 11/09/2018) |
| 11/09/2018 | [4](#) | NOTICE of Appearance by Cody H. Wofsy (Wofsy, Cody) (Filed on 11/9/2018) (Entered: 11/09/2018) |
| 11/09/2018 | [5](#) | MOTION for leave to appear in Pro Hac Vice ( Filing fee $ 310, receipt number 26DE7N7T.) Filing fee previously paid on 11/9/2018 filed by Al Otro Lado, Central American Resource Center, East Bay Sanctuary Covenant, Innovation Law Lab. (Gelernt, Lee) (Filed on 11/9/2018) (Entered: 11/09/2018) |
| 11/09/2018 | [6](#) | MOTION for leave to appear in Pro Hac Vice ( Filing fee $ 310, receipt number 0971-12838766.) filed by Al Otro Lado, Central American Resource Center, East Bay Sanctuary Covenant, Innovation Law Lab. (Rabinovitz, Judy) (Filed on 11/9/2018) (Entered: 11/09/2018) |
| 11/09/2018 | [7](#) | MOTION for leave to appear in Pro Hac Vice ( Filing fee $ 310, receipt number 0971-12838819.) filed by Al Otro Lado, Central American Resource Center, East Bay Sanctuary Covenant, Innovation Law Lab. (Jadwat, Omar) (Filed on 11/9/2018) (Entered: 11/09/2018) |
| 11/09/2018 | [8](#) | MOTION for Temporary Restraining Order filed by Al Otro Lado, Central American Resource Center, East Bay Sanctuary Covenant, Innovation Law Lab. (Attachments: # [1](#) Memorandum In Support of a Temporary Restraining Order, # [2](#) Declaration Adam Isacson, # [3](#) Declaration of Daniel Sharp, # [4](#) Declaration of Erika Pinheiro, # [5](#) Declaration of Guy Goodwin-Gill, # [6](#) Declaration of Stephen Manning, # [7](#) Declaration of Michael Smith, # [8](#) Proposed Order, # [9](#) Common)(Newell, Jennifer) (Filed on 11/9/2018) (Entered: 11/09/2018) |
| 11/09/2018 | [13](#) | CLERK'S NOTICE of Impending Reassignment to U.S. District Judge. (napS, COURT STAFF) (Filed on 11/9/2018) (Entered: 11/13/2018) |
| 11/13/2018 | [9](#) | **ORDER REASSIGNING CASE. Case reassigned to Judge Jon S. Tigar for all further proceedings. Magistrate Judge Donna M. Ryu no longer assigned to the case. This case is assigned to a judge who participates in the Cameras in the Courtroom Pilot Project. See General Order 65 and http://cand.uscourts.gov/cameras. Signed by Executive Committee on 11/13/2018. (Attachments: # [1](#) Notice of Eligibility for Video Recording)(jmlS, COURT STAFF) (Filed on 11/13/2018) (Entered: 11/13/2018)** |
| 11/13/2018 | [10](#) | Certificate of Interested Entities by Al Otro Lado, Central American Resource Center, East Bay Sanctuary Covenant, Innovation Law Lab (Newell, Jennifer) (Filed on 11/13/2018) (Entered: 11/13/2018) |
| 11/13/2018 | [11](#) | **SCHEDULING ORDER re [8](#) MOTION for Temporary Restraining Order filed by East Bay Sanctuary Covenant, Innovation Law Lab, Central American Resource Center, Al Otro Lado. Responses due by 11/15/2018. Replies due by 11/16/2018.** |

| | | Motion Hearing set for 11/19/2018 at 9:30 AM in San Francisco, Courtroom 9, 19th Floor before Judge Jon S. Tigar. Signed by Judge Jon S. Tigar on November 13, 2018. (wsn, COURT STAFF) (Filed on 11/13/2018) (Entered: 11/13/2018) |
|---|---|---|
| 11/13/2018 | 12 | NOTICE of Appearance by Erez R. Reuveni (Reuveni, Erez) (Filed on 11/13/2018) (Entered: 11/13/2018) |
| 11/14/2018 | 14 | NOTICE of Appearance by Vasudha Talla (Talla, Vasudha) (Filed on 11/14/2018) (Entered: 11/14/2018) |
| 11/14/2018 | 15 | NOTICE of Appearance by Christine Patricia Sun (Sun, Christine) (Filed on 11/14/2018) (Entered: 11/14/2018) |
| 11/14/2018 | 16 | Clerk's Notice of Video Recording Request. Video Camera hearing set for 11/19/2018 at 9:30 AM. Objections to Video Recording due 11/16/2018 by 12:00 PM. (wsn, COURT STAFF) (Filed on 11/14/2018) (Entered: 11/14/2018) |
| 11/14/2018 | 17 | CERTIFICATE OF SERVICE by Al Otro Lado, Central American Resource Center, East Bay Sanctuary Covenant, Innovation Law Lab (Wofsy, Cody) (Filed on 11/14/2018) (Entered: 11/14/2018) |
| 11/14/2018 | 18 | Summons Issued as to All Defendants. (msrS, COURT STAFF) (Filed on 11/14/2018) (Entered: 11/14/2018) |
| 11/14/2018 | 19 | Consent MOTION to File Amicus Curiae Brief *on Shortened Time* filed by State of Washington. Motion Hearing set for 11/14/2018 06:00 PM before Judge Jon S. Tigar. Responses due by 11/14/2018. Replies due by 11/14/2018. (Attachments: # 1 Exhibit Brief of Amicus Curiae)(Lin, Megan) (Filed on 11/14/2018) (Entered: 11/14/2018) |
| 11/14/2018 | 20 | **ORDER GRANTING MOTION TO FILE AMICUS CURIAE BRIEF** Before the Court is an Administrative Motion for Leave to File an Amicus Brief in support of Plaintiffs' request for a temporary restraining order, filed by the States of Washington, Massachusetts, New York, and California (the "States"). ECF No. 19. The motion includes the proposed amicus brief as an exhibit. See ECF No. 19-1. The States represent that Defendants do not oppose the motion, provided that the proposed amicus brief is fewer than ten pages and this motion was filed by 6:00 p.m. on November 14, 2018. ECF No. 19 at 2. The States have complied with these requirements. See ECF No. 19-1. "There are no strict prerequisites that must be established prior to qualifying for amicus status; an individual seeking to appear as amicus must merely make a showing that his participation is useful to or otherwise desirable to the court." *In re Roxford Foods Litig.*, 790 F. Supp. 987, 997 (E.D. Cal. 1991) (citation omitted). Having reviewed the proposed amicus brief, the Court grants the States' motion for leave to file. The States shall file their proposed amicus brief, see ECF No. 19-1, as soon as practicable, and in any event, no later than November 15, 2018 by 12:00 p.m. *(This is a text-only entry generated by the court. There is no document associated with this entry.)* (Entered: 11/14/2018) |
| 11/15/2018 | 21 | **ORDER UNSEALING DOCKET. Signed by Judge Jon S. Tigar on November 14, 2018. (wsn, COURT STAFF) (Filed on 11/15/2018) (Entered: 11/15/2018)** |
| 11/15/2018 | 22 | **ORDER GRANTING APPLICATION FOR ADMISSION OF ATTORNEY LEE GELERNT *PRO HAC VICE* by Judge Jon S. Tigar granting 5 Motion for Pro Hac Vice. (wsn, COURT STAFF) (Filed on 11/15/2018) (Entered: 11/15/2018)** |
| 11/15/2018 | 23 | **ORDER GRANTING APPLICATION FOR ADMISSION OF ATTORNEY OMAR JADWAT *PRO HAC VICE* by Judge Jon S. Tigar granting 7 Motion for Pro Hac** |

| | | |
|---|---|---|
| | | Vice. (wsn, COURT STAFF) (Filed on 11/15/2018) (Entered: 11/15/2018) |
| 11/15/2018 | [24](#) | **ORDER GRANTING APPLICATION FOR ADMISSION OF ATTORNEY JUDY RABINOVITZ *PRO HAC VICE* by Judge Jon S. Tigar granting [6](#) Motion for Pro Hac Vice. (wsn, COURT STAFF) (Filed on 11/15/2018) (Entered: 11/15/2018)** |
| 11/15/2018 | [25](#) | First MOTION for leave to appear in Pro Hac Vice *Baher Azmy* ( Filing fee $ 310, receipt number 0971-12848902.) filed by Al Otro Lado, Central American Resource Center, East Bay Sanctuary Covenant, Innovation Law Lab. (Attachments: # [1](#) Certificate/Proof of Service Certificate Good Standing)(Azmy, Baher) (Filed on 11/15/2018) (Entered: 11/15/2018) |
| 11/15/2018 | [26](#) | **ORDER GRANTING APPLICATION FOR ADMISSION OF BAHER AZMY *PRO HAC VICE* by Judge Jon S. Tigar granting [25](#) Motion for Pro Hac Vice. (wsn, COURT STAFF) (Filed on 11/15/2018) (Entered: 11/15/2018)** |
| 11/15/2018 | [27](#) | OPPOSITION/RESPONSE (re [8](#) MOTION for Temporary Restraining Order ) filed byLee Francis Cissna, Executive Office for Immigration Review (EOIR), Kevin K. McAleenan, James McHenry, Kirstjen M. Nielsen, Donald J. Trump, U.S Customs and Border Protection, U.S. Citizenship and Immigration Services, U.S. Department of Homeland Security, U.S. Department of Justice, U.S. Immigration and Customs Enforcement, Ronald D. Vitiello, Matthew G. Whitaker. (Attachments: # [1](#) Proposed Order)(Reuveni, Erez) (Filed on 11/15/2018) (Entered: 11/15/2018) |
| 11/16/2018 | [28](#) | First MOTION for leave to appear in Pro Hac Vice *Angelo Guisado* ( Filing fee $ 310, receipt number 0971-12854228.) filed by Al Otro Lado. (Attachments: # [1](#) Exhibit Certificate of Good Standing)(Guisado, Angelo) (Filed on 11/16/2018) (Entered: 11/16/2018) |
| 11/16/2018 | [29](#) | NOTICE of Appearance by Scott G. Stewart (Stewart, Scott) (Filed on 11/16/2018) (Entered: 11/16/2018) |
| 11/16/2018 | [30](#) | NOTICE of Appearance by Julie Michelle Veroff (Veroff, Julie) (Filed on 11/16/2018) (Entered: 11/16/2018) |
| 11/16/2018 | [31](#) | NOTICE of Appearance by Celso Javier Perez (Perez, Celso) (Filed on 11/16/2018) (Entered: 11/16/2018) |
| 11/16/2018 | [32](#) | NOTICE REGARDING VIDEO RECORDING re: [16](#) Clerk's Notice of Video Recording Request. *All parties have consented to the video recording of the proceeding.* (wsn, COURT STAFF) (Filed on 11/16/2018) (Entered: 11/16/2018) |
| 11/16/2018 | [33](#) | **ORDER GRANTING APPLICATION FOR ADMISSION OF ATTORNEY ANGELO GUISADO *PRO HAC VICE* by Judge Jon S. Tigar granting [28](#) Motion for Pro Hac Vice. (wsn, COURT STAFF) (Filed on 11/16/2018) (Entered: 11/16/2018)** |
| 11/16/2018 | [34](#) | MOTION for Leave to File *Amicus Brief on Jurisdictional Issues in Support of Defendants* filed by Immigration Reform Law Institute. (Attachments: # [1](#) Proposed Order Proposed Order, # [2](#) Exhibit Proposed Amicus Brief, # [3](#) Certificate/Proof of Service COS)(Joseph, Lawrence) (Filed on 11/16/2018) (Entered: 11/16/2018) |
| 11/16/2018 | [35](#) | REPLY (re [8](#) MOTION for Temporary Restraining Order ) filed byAl Otro Lado, Central American Resource Center, East Bay Sanctuary Covenant, Innovation Law Lab. (Attachments: # [1](#) Declaration of Chavla, # [2](#) Declaration of Cutlip-Mason, # [3](#) Declaration of Griffey, # [4](#) Declaration of Isacson, # [5](#) Declaration of Love, # [6](#) Declaration of Manning, # [7](#) Declaration of Penman, # [8](#) Declaration of Pinheiro, # [9](#) Declaration of Rodriguez, # [10](#) Declaration Seyler)(Gelernt, Lee) (Filed on 11/16/2018) (Entered: 11/16/2018) |

9/6/23, 10:44 PM             CAND-ECF

| | | |
|---|---|---|
| 11/16/2018 | 36 | **ORDER GRANTING MOTION FOR LEAVE TO FILE AMICUS CURIAE BRIEF** Amicus Curiae Immigration Reform Law Institutes (IRLI) has filed a motion for leave to file an amicus brief. ECF No. 34. The brief seeks to support Defendants' arguments that Plaintiffs lack standing to bring their lawsuit. ECF No. 34-2 at 5. The motion was filed less than 90 minutes before Plaintiffs' reply brief was due, and in fact Plaintiffs' reply brief has now been filed. Nonetheless, given the importance of the case and to ensure full consideration of all the relevant issues, the Court GRANTS the motion. IRLI's brief is not deemed filed. IRLI must file its brief by Saturday, November 16, 2018, at 5:00 p.m. IRLI's brief appears to repeat arguments already made by the Government, as IRLI acknowledges. ECF No. 34 at 4. Plaintiffs might therefore conclude that no response is necessary. Should they wish to file one, however, they may do so by Sunday, November 18, 2018, at 4:00 p.m. Any such response must not exceed four pages, the length of IRLI's brief. *(This is a text-only entry generated by the court. There is no document associated with this entry.)* (Entered: 11/16/2018) |
| 11/16/2018 | 37 | Brief re 36 Order on Motion for Leave to File,,,,, *Amicus Brief filed as previously lodged as ECF 34-2* filed byImmigration Reform Law Institute. (Related document(s) 36 ) (Joseph, Lawrence) (Filed on 11/16/2018) (Entered: 11/16/2018) |
| 11/18/2018 | 38 | NOTICE of Appearance by Francesca M Genova (Genova, Francesca) (Filed on 11/18/2018) (Entered: 11/18/2018) |
| 11/19/2018 | 39 | **Minute Entry for proceedings held before Judge Jon S. Tigar: Motion Hearing held on 11/19/2018 re 8 MOTION for Temporary Restraining Order filed by East Bay Sanctuary Covenant, Innovation Law Lab, Central American Resource Center, Al Otro Lado. Total Time in Court: 1 hour, 19 minutes. Court Reporter: Belle Ball. (wsn, COURT STAFF) (Date Filed: 11/19/2018) (Entered: 11/19/2018)** |
| 11/19/2018 | 40 | First MOTION for leave to appear in Pro Hac Vice ( Filing fee $ 310, receipt number 0971-12859792.) filed by Al Otro Lado, Central American Resource Center, East Bay Sanctuary Covenant, Innovation Law Lab. (Attachments: # 1 Exhibit Certificate of Good Standing)(Schwarz, Ghita) (Filed on 11/19/2018) (Entered: 11/19/2018) |
| 11/19/2018 | 41 | **ORDER GRANTING APPLICATION FOR ADMISSION OF ATTORNEY GHITA SCHWARZ *PRO HAC VICE* by Judge Jon S. Tigar granting 40 Motion for Pro Hac Vice. (wsn, COURT STAFF) (Filed on 11/19/2018) (Entered: 11/19/2018)** |
| 11/19/2018 | 42 | Joint MOTION to File Amicus Curiae Brief *to Deem Amicus Brief Filed* filed by State of Washington. Motion Hearing set for 11/19/2018 04:00 PM before Judge Jon S. Tigar. Responses due by 11/19/2018. Replies due by 11/19/2018. (Lin, Megan) (Filed on 11/19/2018) (Entered: 11/19/2018) |
| 11/19/2018 | 43 | **ORDER GRANTING TEMPORARY RESTRAINING ORDER; ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION by Judge Jon S. Tigar granting 8 Motion for TRO. Stipulation or proposals due by 11/26/2018. Order to Show Cause Hearing set for 12/19/2018 at 9:30 AM in Courtroom 9, 19th Floor, San Francisco, before Judge Jon S. Tigar. (wsn, COURT STAFF) (Filed on 11/19/2018) (Entered: 11/19/2018)** |
| 11/20/2018 | 44 | TRANSCRIPT ORDER for proceedings held on 11/19/2018 before Judge Jon S. Tigar by Lee Francis Cissna, Executive Office for Immigration Review (EOIR), Immigration Reform Law Institute, Kevin K. McAleenan, James McHenry, Kirstjen M. Nielsen, Donald J. Trump, U.S Customs and Border Protection, U.S. Citizenship and Immigration Services, U.S. Department of Homeland Security, U.S. Department of Justice, U.S. Immigration and Customs Enforcement, Ronald D. Vitiello, Matthew G. Whitaker, for |

| | | |
|---|---|---|
| | | Court Reporter Belle Ball. (Genova, Francesca) (Filed on 11/20/2018) (Entered: 11/20/2018) |
| 11/20/2018 | 45 | Transcript of Proceedings held on November 19, 2018, before Judge Jon S. Tigar. Court Reporter Belle Ball, CSR, CRR, RDR, telephone number (415)373-2529, belle_ball@cand.uscourts.gov. Per General Order No. 59 and Judicial Conference policy, this transcript may be viewed only at the Clerk's Office public terminal or may be purchased through the Court Reporter until the deadline for the Release of Transcript Restriction. After that date it may be obtained through PACER. Any Notice of Intent to Request Redaction, if required, is due no later than 5 business days from date of this filing. (Re 44 Transcript Order,, ) Release of Transcript Restriction set for 2/19/2019. (Related documents(s) 44 ) (ballbb15S, COURT STAFF) (Filed on 11/20/2018) (Entered: 11/20/2018) |
| 11/20/2018 | 46 | TRANSCRIPT ORDER for proceedings held on 11/19/2018 before Judge Jon S. Tigar by Al Otro Lado, Central American Resource Center, East Bay Sanctuary Covenant, Innovation Law Lab, for Court Reporter Belle Ball. (Wofsy, Cody) (Filed on 11/20/2018) (Entered: 11/20/2018) |
| 11/21/2018 | 47 | MOTION for Leave to Appear in Pro Hac Vice *Mary Bauer,* (Filing Fee: $310.00, receipt number 0971-12867291) filed by Al Otro Lado, Central American Resource Center, East Bay Sanctuary Covenant, Innovation Law Lab. (Newell, Jennifer) (Filed on 11/21/2018) (Entered: 11/21/2018) |
| 11/26/2018 | 48 | STIPULATION WITH [PROPOSED] ORDER filed by Al Otro Lado, Central American Resource Center, East Bay Sanctuary Covenant, Innovation Law Lab. (Attachments: #(1) [Proposed] Order)(Gelernt, Lee) (Filed on 11/26/2018) (Entered: 11/26/2018) |
| 11/27/2018 | 49 | **ORDER GRANTING APPLICATION FOR ADMISSION OF ATTORNEY MARY BAUER *PRO HAC VICE* by Judge Jon S. Tigar; granting 47 Motion for Pro Hac Vice. (wsn, COURT STAFF) (Filed on 11/27/2018) (Entered: 11/27/2018)** |
| 11/27/2018 | 50 | **SCHEDULING ORDER. Plaintiffs' motion for preliminary injunction due 12/3/2018. Amicus briefs in support of Plaintiffs or neither party due 12/5/2018. Defendants' opposition due 12/12/2018 by 12:00 PM. Amicus briefs in support of Defendants due 12/12/2018 by 12:00 PM. Plaintiffs' reply due 12/14/2018. Motion Hearing set for 12/19/2018 at 2:00 PM in San Francisco, Courtroom 9, 19th Floor before Judge Jon S. Tigar. Signed by Judge Jon S. Tigar on November 27, 2018. (wsnS, COURT STAFF) (Filed on 11/27/2018) (Entered: 11/27/2018)** |
| 11/27/2018 | 51 | NOTICE OF APPEAL to the 9th Circuit Court of Appeals filed by Lee Francis Cissna, Executive Office for Immigration Review (EOIR), Kevin K. McAleenan, James McHenry, Kirstjen M. Nielsen, Donald J. Trump, U.S Customs and Border Protection, U.S. Citizenship and Immigration Services, U.S. Department of Homeland Security, U.S. Department of Justice, U.S. Immigration and Customs Enforcement, Ronald D. Vitiello, Matthew G. Whitaker. Appeal of Order on Motion for TRO, 43 - (Appeal Fee: FEE WAIVED). (Reuveni, Erez) (Filed on 11/27/2018) (Entered: 11/27/2018) |
| 11/27/2018 | 52 | Emergency MOTION to Stay re 43 Order on Motion for TRO, filed by Lee Francis Cissna, Executive Office for Immigration Review (EOIR), Kevin K. McAleenan, James McHenry, Kirstjen M. Nielsen, Donald J. Trump, U.S Customs and Border Protection, U.S. Citizenship and Immigration Services, U.S. Department of Homeland Security, U.S. Department of Justice, U.S. Immigration and Customs Enforcement, Ronald D. Vitiello, Matthew G. Whitaker. Motion Hearing set for 1/3/2019 10:00 AM before Judge Jon S. Tigar. Responses due by 12/11/2018. Replies due by 12/18/2018. (Attachments: # 1 Proposed Order)(Reuveni, Erez) (Filed on 11/27/2018) (Entered: 11/27/2018) |

| 11/27/2018 | 53 | Emergency MOTION to Shorten Time *For Decision on Motion to Stay Pending Appeal* filed by Lee Francis Cissna, Executive Office for Immigration Review (EOIR), Kevin K. McAleenan, James McHenry, Kirstjen M. Nielsen, Donald J. Trump, U.S Customs and Border Protection, U.S. Citizenship and Immigration Services, U.S. Department of Homeland Security, U.S. Department of Justice, U.S. Immigration and Customs Enforcement, Ronald D. Vitiello, Matthew G. Whitaker. (Attachments: # 1 Proposed Order)(Reuveni, Erez) (Filed on 11/27/2018) (Entered: 11/27/2018) |
|---|---|---|
| 11/27/2018 | 54 | **ORDER by Judge Jon S. Tigar granting in part 53 Emergency MOTION to Shorten Time. Plaintiffs' opposition to 52 Emergency MOTION to Stay re 43 Order on Motion for TRO due by 11/29/2018 at 5:00 p.m. The Court will rule on the motion to stay by the end of 11/30/2018. (jstlc3, COURT STAFF) (Filed on 11/27/2018) (Entered: 11/27/2018)** |
| 11/27/2018 | | Set/Reset Deadlines as to 52 Emergency MOTION to Stay re 43 Order on Motion for TRO. Responses due 11/29/2018 by 5:00 PM. (wsn, COURT STAFF) (Filed on 11/27/2018) (Entered: 11/28/2018) |
| 11/28/2018 | 55 | STIPULATION WITH [PROPOSED] ORDER re 50 Order filed by Lee Francis Cissna, Executive Office for Immigration Review (EOIR), Kevin K. McAleenan, James McHenry, Kirstjen M. Nielsen, Donald J. Trump, U.S Customs and Border Protection, U.S. Citizenship and Immigration Services, U.S. Department of Homeland Security, U.S. Department of Justice, U.S. Immigration and Customs Enforcement, Ronald D. Vitiello, Matthew G. Whitaker. (Reuveni, Erez) (Filed on 11/28/2018) (Entered: 11/28/2018) |
| 11/28/2018 | 56 | **ORDER RE: STIPULATED EXTENSION FOR PRODUCTION OF ADMINISTRATIVE RECORD re 55 STIPULATION WITH PROPOSED ORDER. Signed by Judge Jon S. Tigar on November 28, 2018. (wsn, COURT STAFF) (Filed on 11/28/2018) (Entered: 11/28/2018)** |
| 11/29/2018 | 57 | NOTICE of Appearance by Thomas Benton York (York, Thomas) (Filed on 11/29/2018) (Entered: 11/29/2018) |
| 11/29/2018 | | Set/Reset Deadlines. Motion Hearing set for 12/19/2018 at 9:30 AM in San Francisco, Courtroom 9, 19th Floor before Judge Jon S. Tigar. *Correcting docketing error. Time of hearing set by the Order at docket number 50* . (wsn, COURT STAFF) (Filed on 11/29/2018) (Entered: 11/29/2018) |
| 11/29/2018 | 58 | NOTICE of Appearance by Christina P Greer (Greer, Christina) (Filed on 11/29/2018) (Entered: 11/29/2018) |
| 11/29/2018 | 59 | OPPOSITION/RESPONSE to (re 52 Emergency MOTION to Stay re 43 Order on Motion for TRO) filed by Al Otro Lado, Central American Resource Center, East Bay Sanctuary Covenant, Innovation Law Lab. (Gelernt, Lee) (Filed on 11/29/2018) (Entered: 11/29/2018) |
| 11/29/2018 | 60 | NOTICE filed by Lee Francis Cissna, Executive Office for Immigration Review (EOIR), Kevin K. McAleenan, James McHenry, Kirstjen M. Nielsen, Donald J. Trump, U.S Customs and Border Protection, U.S. Citizenship and Immigration Services, U.S. Department of Homeland Security, U.S. Department of Justice, U.S. Immigration and Customs Enforcement, Ronald D. Vitiello, Matthew G. Whitaker *Filing of the Administrative Record* (Greer, Christina) (Filed on 11/29/2018) (Entered: 11/29/2018) |
| 11/30/2018 | 61 | **ORDER DENYING MOTION FOR STAY PENDING APPEAL by Judge Jon S. Tigar; denying 52 Motion to Stay. (wsn, COURT STAFF) (Filed on 11/30/2018) (Entered: 11/30/2018)** |

| 12/03/2018 | 62 | NOTICE of Appearance by Brian Hauck *on behalf of United Nations High Commissioner for Refugees* (Hauck, Brian) (Filed on 12/3/2018) (Entered: 12/03/2018) |
|---|---|---|
| 12/03/2018 | 63 | MOTION for Leave to Appear in Pro Hac Vice, (Filing Fee: $310.00, receipt number 0971-12893705) filed by United Nations High Commissioner for Refugees. (Attachments: #(1) Certificate of Good Standing)(Pearsall, Patrick) (Filed on 12/3/2018) (Entered: 12/03/2018) |
| 12/03/2018 | 64 | **ORDER by Judge Jon S. Tigar granting 63 Motion for Pro Hac Vice. (wsnS, COURT STAFF) (Filed on 12/3/2018) (Entered: 12/03/2018)** |
| 12/03/2018 | 65 | NOTICE of Appearance by Spencer Elijah Wittmann Amdur (Amdur, Spencer) (Filed on 12/3/2018) (Entered: 12/03/2018) |
| 12/04/2018 | 66 | MOTION for Leave to Appear in Pro Hac Vice *for Melissa Crow,* (Filing Fee: $310.00, receipt number 0971-12896080) filed by Al Otro Lado, Central American Resource Center, East Bay Sanctuary Covenant, Innovation Law Lab. (Newell, Jennifer) (Filed on 12/4/2018) (Entered: 12/04/2018) |
| 12/04/2018 | 67 | **ORDER by Judge Jon S. Tigar granting 66 Motion for Pro Hac Vice. (wsnS, COURT STAFF) (Filed on 12/4/2018) (Entered: 12/04/2018)** |
| 12/04/2018 | 68 | MOTION for Leave to Appear in Pro Hac Vice, (Filing Fee: $310.00, receipt number 0971-12898756) filed by Immigration Law Professors. (Attachments: #(1) Certificate in Good Standing)(Margulies, Peter) (Filed on 12/4/2018) (Entered: 12/04/2018) |
| 12/04/2018 | 69 | USCA Case Number 18-17274 for 51 Notice of Appeal filed by Ronald D. Vitiello, U.S. Department of Homeland Security, Executive Office for Immigration Review (EOIR), U.S. Department of Justice, U.S. Immigration and Customs Enforcement, U.S. Citizenship and Immigration Services, James McHenry, Matthew G. Whitaker, U.S Customs and Border Protection, Kevin K. McAleenan, Kirstjen M. Nielsen, Lee Francis Cissna & Donald J. Trump. (tnS, COURT STAFF) (Filed on 12/4/2018) (Entered: 12/04/2018) |
| 12/04/2018 | 70 | **ORDER by Judge Jon S. Tigar granting 68 Motion for Pro Hac Vice. (wsn, COURT STAFF) (Filed on 12/4/2018) (Entered: 12/04/2018)** |
| 12/04/2018 | 71 | MOTION for Preliminary Injunction filed by Al Otro Lado, Central American Resource Center, East Bay Sanctuary Covenant, Innovation Law Lab. Motion Hearing set for 12/19/2018 09:30 AM in San Francisco, Courtroom 09, 19th Floor before Judge Jon S. Tigar. Responses due by 12/12/2018. Replies due by 12/14/2018. (Attachments: # 1 Proposed Order, # 2 Declaration Corrected Pinheiro Supp., # 3 Declaration Alvarez, # 4 Declaration Joint Former Officials, # 5 Declaration Slack, # 6 Declaration Mitchell-Bennett, # 7 Declaration Brane, # 8 Declaration Ramos, # 9 Declaration Penman Supp., # 10 Declaration Smith Supp., # 11 Declaration Manning Second Supp.)(Gelernt, Lee) (Filed on 12/4/2018) (Entered: 12/04/2018) |
| 12/05/2018 | 72 | First MOTION for Leave to Appear in Pro Hac Vice, (Filing Fee: $310.00, receipt number 0971-12900213) filed by Immigration Law Professors. (Attachments: #(1) Exhibit Certificate in Good Standing)(Wadhia, Shoba) (Filed on 12/5/2018) (Entered: 12/05/2018) |
| 12/05/2018 | 73 | **ORDER by Judge Jon S. Tigar granting 72 Motion for Pro Hac Vice. (wsn, COURT STAFF) (Filed on 12/5/2018) (Entered: 12/05/2018)** |
| 12/05/2018 | 74 | NOTICE of Appearance by Julie Wilensky *for proposed Amicus NCLR et al.* (Wilensky, Julie) (Filed on 12/5/2018) (Entered: 12/05/2018) |

| 12/05/2018 | 75 | MOTION for Leave to File *Brief of Amici Curiae NCLR et al.* filed by National Center for Lesbian Rights. (Attachments: # 1 Proposed Brief of Amici Curiae, # 2 Proposed Order)(Wilensky, Julie) (Filed on 12/5/2018) (Entered: 12/05/2018) |
|---|---|---|
| 12/05/2018 | 76 | NOTICE of Appearance by David Charles Marcus *as Counsel for Amici Curiae Professors of Immigration Law* (Marcus, David) (Filed on 12/5/2018) (Entered: 12/05/2018) |
| 12/05/2018 | 77 | MOTION for Leave to File *Amicus Brief* filed by Immigration Law Professors. (Attachments: # 1 Proposed Order)(Marcus, David) (Filed on 12/5/2018) (Entered: 12/05/2018) |
| 12/05/2018 | 78 | *AGREED MOTION OF TWENTY-THREE ORGANIZATIONS REPRESENTING ASYLUM SEEKERS FOR LEAVE TO FILE AN AMICUS CURIAE BRIEF* filed by Asian Law Alliance, Bet Tzedek, CASA, Central American Refugee Center, City Bar Justice Center, Dolores Street Community Services, Empire Justice Center, Her Justice, HIAS and Council Migration Services, Inc. of Philadelphia, Immigrant Justice Corps, Immigrant Legal Resource Center, International Refugee Assistance Project, LatinoJustice PRLDEF, Legal Aid Society of New York, Loyola Immigrant Justice Clinic, Make the Road New York, New York Immigration Coalition, Public Law Center, Safe Passage Project, The Legal Project, Torture Abolition Survivors Support Coalition, University of California, Irvine School of Law Immigrant Rights, UnLocal, Inc.. Motion Hearing set for 12/19/2018 09:30 AM in San Francisco, Courtroom 09, 19th Floor before Judge Jon S. Tigar. Responses due by 12/19/2018. Replies due by 12/19/2018. (Attachments: # 1 Proposed Order, # 2 Exhibit A - Amicus Brief)(Frahn, Harrison) (Filed on 12/5/2018) (Entered: 12/05/2018) |
| 12/05/2018 | 79 | Brief in Support of re 77 MOTION for Leave to File *Amicus Brief* filed by Immigration Law Professors. (Related document(s) 77 ) (Marcus, David) (Filed on 12/5/2018) (Entered: 12/05/2018) |
| 12/05/2018 | 80 | Amicus Curiae APPEARANCE entered by Jocelyn Dion Larkin on behalf of Public Citizen Litigation Group. (Attachments: # 1 Amicus Curiae Brief, # 2 Certification of Interested Entities, # 3 Corporate Disclosure)(Larkin, Jocelyn) (Filed on 12/5/2018) (Entered: 12/05/2018) |
| 12/05/2018 | 81 | MOTION for Leave to File *Amicus Curiae Brief* filed by Office of United Nations High Commissioner for Refugees. (Attachments: #(1) Amicus Curiae Brief)(Pearsall, Patrick) (Filed on 12/5/2018) (Entered: 12/05/2018) |
| 12/05/2018 | 82 | MOTION for Leave to File *Amicus Curiae Brief of the States of California, Washington, Massachusetts, New York, Connecticut, Hawaii, Illinois, Maryland, Minnesota, New Jersey, Oregon, Vermont, and the District of Columbia* filed by State of California. (Attachments: # 1 Exhibit 1: States' Proposed Amicus Brief, # 2 Proposed Order) (Zahradka, James) (Filed on 12/5/2018) (Entered: 12/05/2018) |
| 12/06/2018 | 83 | **ORDER GRANTING IN PART LEAVE TO FILE AMICUS BRIEFS by Judge Jon S. Tigar; granting 75 Motion for Leave to File; granting 77 Motion for Leave to File; granting 78 Motion to File Amicus Curiae Brief; granting 80 Motion to File Amicus Curiae Brief. *The Court further orders Defendants to file any objections to the 81 MOTION for Leave to File Amicus Curiae Brief filed by United Nations High Commissioner for Refugees or 82 MOTION for Leave to File Amicus Curiae Brief of the States of California, Washington, Massachusetts, New York, Connecticut, Hawaii, Illinois, Maryland, Minnesota, New Jersey, Oregon, Vermont, and the District of Columbia proposed briefs by 5:00 pm on December 7, 2018.* (wsn, COURT STAFF) (Filed on 12/6/2018) (Entered: 12/06/2018)** |

| 12/06/2018 | | Set/Reset Deadlines as to 81 MOTION for Leave to File *Amicus Curiae Brief*, 82 MOTION for Leave to File *Amicus Curiae Brief of the States of California, Washington, Massachusetts, New York, Connecticut, Hawaii, Illinois, Maryland, Minnesota, New Jersey, Oregon, Vermont, and the District of Columbia*. Responses due 12/7/2018 by 5:00 PM. (wsn, COURT STAFF) (Filed on 12/6/2018) (Entered: 12/06/2018) |
|---|---|---|
| 12/06/2018 | 84 | NOTICE OF ERRATA *regarding ECF No. 71-8 (Notice of Corrected Declaration)* filed by Al Otro Lado, Central American Resource Center, East Bay Sanctuary Covenant, Innovation Law Lab. (Attachments: #(1) Declaration of Nicole Ramos)(Gelernt, Lee) (Filed on 12/6/2018) (Entered: 12/06/2018) |
| 12/07/2018 | 85 | Statement of Non-Opposition to re 81 MOTION for Leave to File *Amicus Curiae Brief*, re 82 MOTION for Leave to File *Amicus Curiae Brief of the States of California, Washington, Massachusetts, New York, Connecticut, Hawaii, Illinois, Maryland, Minnesota, New Jersey, Oregon, Vermont, and the District of Columbia - RESPONSE to Court's Order on Amicus Filings* filed by Lee Francis Cissna, Executive Office for Immigration Review (EOIR), Kevin K. McAleenan, Kirstjen M. Nielsen, Donald J. Trump, U.S Customs and Border Protection, U.S. Citizenship and Immigration Services, U.S. Department of Homeland Security, U.S. Department of Justice, U.S. Immigration and Customs Enforcement, Ronald D. Vitiello, Matthew G. Whitaker. (Related document(s) 81 , 82 ) (Reuveni, Erez) (Filed on 12/7/2018) (Entered: 12/07/2018) |
| 12/07/2018 | 86 | **ORDER GRANTING LEAVE TO FILE AMICUS BRIEFS by Judge Jon S. Tigar; granting 81 Motion for Leave to File; granting 82 Motion for Leave to File. (wsnS, COURT STAFF) (Filed on 12/7/2018) (Entered: 12/07/2018)** |
| 12/12/2018 | 87 | OPPOSITION/RESPONSE to (re 71 MOTION for Preliminary Injunction ) filed by Lee Francis Cissna, Executive Office for Immigration Review (EOIR), Kevin K. McAleenan, James McHenry, Kirstjen M. Nielsen, Donald J. Trump, U.S Customs and Border Protection, U.S. Citizenship and Immigration Services, U.S. Department of Homeland Security, U.S. Department of Justice, U.S. Immigration and Customs Enforcement, Ronald D. Vitiello, Matthew G. Whitaker. (Attachments: #(1) [Proposed] Order) (Reuveni, Erez) (Filed on 12/12/2018) (Entered: 12/12/2018) |
| 12/12/2018 | 88 | MOTION to Strike 71 MOTION for Preliminary Injunction, re 35 Reply to Opposition/Response, re 8 *MOTION for Temporary Restraining Order* filed by Lee Francis Cissna, Executive Office for Immigration Review (EOIR), Kevin K. McAleenan, James McHenry, Kirstjen M. Nielsen, Donald J. Trump, U.S Customs and Border Protection, U.S. Citizenship and Immigration Services, U.S. Department of Homeland Security, U.S. Department of Justice, U.S. Immigration and Customs Enforcement, Ronald D. Vitiello, Matthew G. Whitaker. Responses due by 12/26/2018. Replies due by 1/2/2019. (Attachments: #(1) [Proposed] Order)(Greer, Christina) (Filed on 12/12/2018) (Entered: 12/12/2018) |
| 12/13/2018 | 89 | Consent MOTION for Extension of Time to File Response/Reply *to Motion to Strike Extra-Record Evidence* filed by Al Otro Lado, Central American Resource Center, East Bay Sanctuary Covenant, Innovation Law Lab. (Attachments: # 1 Proposed Order) (Gelernt, Lee) (Filed on 12/13/2018) (Entered: 12/13/2018) |
| 12/13/2018 | 90 | **ORDER by Judge Jon S. Tigar granting in part and denying in part 89 Motion for Extension of Time to File Response/Reply re 88 MOTION to Strike. Responses due by 5:00 p.m. on 12/15/2018. Replies due by 5:00 p.m. on 12/16/2018. (jstlc1S, COURT STAFF) (Filed on 12/13/2018) (Entered: 12/13/2018)** |
| 12/13/2018 | 91 | ORDER of USCA as to 51 Notice of Appeal filed by Ronald D. Vitiello, U.S. Department of Homeland Security, Executive Office for Immigration Review (EOIR), U.S. Department of Justice, U.S. Immigration and Customs Enforcement, U.S. Citizenship and |

| | | |
|---|---|---|
| | | Immigration Services, James McHenry, Matthew G. Whitaker, U.S Customs and Border Protection, Kevin K. McAleenan, Kirstjen M. Nielsen, Lee Francis Cissna, Donald J. Trump. (tnS, COURT STAFF) (Filed on 12/13/2018) (Entered: 12/13/2018) |
| 12/14/2018 | | Set/Reset Deadlines as to 88 MOTION to Strike. Responses due 12/15/2018 by 5:00 PM. Replies due 12/16/2018 by 5:00 PM. (wsn, COURT STAFF) (Filed on 12/14/2018) (Entered: 12/14/2018) |
| 12/14/2018 | 92 | REPLY (re 71 MOTION for Preliminary Injunction ) filed byAl Otro Lado, Central American Resource Center, East Bay Sanctuary Covenant, Innovation Law Lab. (Gelernt, Lee) (Filed on 12/14/2018) (Entered: 12/14/2018) |
| 12/15/2018 | 93 | OPPOSITION/RESPONSE to (re 88 MOTION to Strike 71 MOTION for Preliminary Injunction, re 35 Reply to opposition/Response, *re 8 MOTION for Temporary Restraining Order*) filed by Al Otro Lado, Central American Resource Center, East Bay Sanctuary Covenant, Innovation Law Lab. (Gelernt, Lee) (Filed on 12/15/2018) (Entered: 12/15/2018) |
| 12/16/2018 | 94 | REPLY (re 88 MOTION to Strike 71 MOTION for Preliminary Injunction, re 35 Reply to Opposition/Response, *re 8 MOTION for Temporary Restraining Order*) filed by Lee Francis Cissna, Executive Office for Immigration Review (EOIR), Kevin K. McAleenan, James McHenry, Kirstjen M. Nielsen, Donald J. Trump, U.S Customs and Border Protection, U.S. Citizenship and Immigration Services, U.S. Department of Homeland Security, U.S. Department of Justice, U.S. Immigration and Customs Enforcement, Ronald D. Vitiello, Matthew G. Whitaker. (Attachments: #(1) Proposed Order Updated) (Greer, Christina) (Filed on 12/16/2018) (Entered: 12/16/2018) |
| 12/17/2018 | 95 | SUMMONS Returned Executed by Al Otro Lado, East Bay Sanctuary Covenant, Innovation Law Lab, Central American Resource Center Served Upon All Defendants. (Newell, Jennifer) (Filed on 12/17/2018) (Entered: 12/17/2018) |
| 12/18/2018 | 96 | USCA ORDER - Dissenting in Part as to 51 Notice of Appeal filed by Ronald D. Vitiello, U.S. Department of Homeland Security, Executive Office for Immigration Review (EOIR), U.S. Department of Justice, U.S. Immigration and Customs Enforcement, U.S. Citizenship and Immigration Services, James McHenry, Matthew G. Whitaker, U.S Customs and Border Protection, Kevin K. McAleenan, Kirstjen M. Nielsen, Lee Francis Cissna, Donald J. Trump. (tnS, COURT STAFF) (Filed on 12/18/2018) (Entered: 12/18/2018) |
| 12/18/2018 | 97 | ORDER of USCA Denying Government's Emergency Motion for a Stay Pending Appeal as to 51 Notice of Appeal filed by Ronald D. Vitiello, U.S. Department of Homeland Security, Executive Office for Immigration Review (EOIR), U.S. Department of Justice, U.S. Immigration and Customs Enforcement, U.S. Citizenship and Immigration Services, James McHenry, Matthew G. Whitaker, U.S Customs and Border Protection, Kevin K. McAleenan, Kirstjen M. Nielsen, Lee Francis Cissna, Donald J. Trump. (tnS, COURT STAFF) (Filed on 12/18/2018) (Entered: 12/18/2018) |
| 12/19/2018 | 98 | **Minute Entry for proceedings held before Judge Jon S. Tigar: Show Cause Hearing held on 12/19/2018, Motion Hearing held on 12/19/2018 re 71 MOTION for Preliminary Injunction filed by East Bay Sanctuary Covenant, Innovation Law Lab, Central American Resource Center, Al Otro Lado. Total Time in Court: 41 minutes. Court Reporter: Jo Ann Bryce. (wsn, COURT STAFF) (Date Filed: 12/19/2018) (Entered: 12/19/2018)** |
| 12/19/2018 | 99 | **ORDER GRANTING PRELIMINARY INJUNCTION by Judge Jon S. Tigar; granting 71 Motion for Preliminary Injunction; denying 88 Motion to Strike. Case Management Statement due by 3/11/2019. Initial Case Management Conference set** |

ER-164

| | | for 3/18/2019 at 2:00 PM in San Francisco, Courtroom 9, 19th Floor. (wsn, COURT STAFF) (Filed on 12/19/2018) (Entered: 12/19/2018) |
|---|---|---|
| 12/26/2018 | [100](#) | NOTICE OF APPEAL to the 9th Circuit Court of Appeals filed by Lee Francis Cissna, Executive Office for Immigration Review (EOIR), Kevin K. McAleenan, James McHenry, Kirstjen M. Nielsen, Donald J. Trump, U.S Customs and Border Protection, U.S. Citizenship and Immigration Services, U.S. Department of Homeland Security, U.S. Department of Justice, U.S. Immigration and Customs Enforcement, Ronald D. Vitiello, Matthew G. Whitaker. Appeal of Order on Motion for Preliminary Injunction, Order on Motion to Strike [99](#) - (Appeal Fee: FEE WAIVED) (Reuveni, Erez) (Filed on 12/26/2018) (Entered: 12/26/2018) |
| 12/27/2018 | [101](#) | ORDER of USCA as to [51](#) Notice of Appeal filed by Ronald D. Vitiello, U.S. Department of Homeland Security, Executive Office for Immigration Review (EOIR), U.S. Department of Justice, U.S. Immigration and Customs Enforcement, U.S. Citizenship and Immigration Services, James McHenry, Matthew G. Whitaker, U.S Customs and Border Protection, Kevin K. McAleenan, Kirstjen M. Nielsen, Lee Francis Cissna, Donald J. Trump. (tnS, COURT STAFF) (Filed on 12/27/2018) (Entered: 12/27/2018) |
| 12/27/2018 | [102](#) | USCA Case Number 18-17436 for [100](#) Notice of Appeal filed by Ronald D. Vitiello, U.S. Department of Homeland Security, Executive Office for Immigration Review (EOIR), U.S. Department of Justice, U.S. Immigration and Customs Enforcement, U.S. Citizenship and Immigration Services, James McHenry, Matthew G. Whitaker, U.S Customs and Border Protection, Kevin K. McAleenan, Kirstjen M. Nielsen, Lee Francis Cissna, Donald J. Trump. (tnS, COURT STAFF) (Filed on 12/27/2018) (Entered: 12/27/2018) |
| 12/27/2018 | [103](#) | ORDER of USCA as to [100](#) Notice of Appeal filed by Ronald D. Vitiello, U.S. Department of Homeland Security, Executive Office for Immigration Review (EOIR), U.S. Department of Justice, U.S. Immigration and Customs Enforcement, U.S. Citizenship and Immigration Services, James McHenry, Matthew G. Whitaker, U.S Customs and Border Protection, Kevin K. McAleenan, Kirstjen M. Nielsen, Lee Francis Cissna, Donald J. Trump. (tnS, COURT STAFF) (Filed on 12/27/2018) (Entered: 12/27/2018) |
| 01/04/2019 | [104](#) | NOTICE of Change In Counsel by Lindsay Polastri Nako (Attachments: # [1](#) Proposed Order Permitting withdrawal and addition of counsel for amicus curiae Public Citizen, Inc.)(Nako, Lindsay) (Filed on 1/4/2019) (Entered: 01/04/2019) |
| 01/04/2019 | [105](#) | **ORDER PERMITTING WITHDRAWAL AND ADDITION OF COUNSEL FOR AMICUS CURIAE PUBLIC CITIZEN, INC. re [104](#) Notice of Change In Counsel filed by Public Citizen, Inc. Signed by Judge Jon S. Tigar on January 4, 2019. (wsn, COURT STAFF) (Filed on 1/4/2019) (Entered: 01/07/2019)** |
| 02/04/2019 | [106](#) | Transcript Designation Form for proceedings held on 12/19/2018 before Judge Jon S. Tigar, re [100](#) Notice of Appeal,, Transcript due by 2/8/2019. (Genova, Francesca) (Filed on 2/4/2019) (Entered: 02/04/2019) |
| 02/04/2019 | [107](#) | TRANSCRIPT ORDER for proceedings held on 12/19/2018 before Judge Jon S. Tigar by Lee Francis Cissna, Executive Office for Immigration Review (EOIR), Kevin K. McAleenan, James McHenry, Kirstjen M. Nielsen, Donald J. Trump, U.S Customs and Border Protection, U.S. Citizenship and Immigration Services, U.S. Department of Homeland Security, U.S. Department of Justice, U.S. Immigration and Customs Enforcement, Ronald D. Vitiello, Mathew Whitaker, for Court Reporter Jo Ann Bryce. (Genova, Francesca) (Filed on 2/4/2019) (Entered: 02/04/2019) |

| 02/11/2019 | [108] | Transcript of Proceedings held on 12/19/18, before Judge Jon S. Tigar. Court Reporter Jo Ann Bryce, telephone number 510-910-5888, joann_bryce@cand.uscourts.gov. Per General Order No. 59 and Judicial Conference policy, this transcript may be viewed only at the Clerk's Office public terminal or may be purchased through the Court Reporter until the deadline for the Release of Transcript Restriction after 90 days. After that date, it may be obtained through PACER. Any Notice of Intent to Request Redaction, if required, is due no later than 5 business days from date of this filing. (Re [107] Transcript Order,, ) Release of Transcript Restriction set for 5/13/2019. (Related documents(s) [107] ) (jabS, COURTSTAFF) (Filed on 2/11/2019) (Entered: 02/11/2019) |
|---|---|---|
| 02/11/2019 | [109] | MOTION to Stay *Proceedings* filed by Lee Francis Cissna, Executive Office for Immigration Review (EOIR), Kevin K. McAleenan, James McHenry, Kirstjen M. Nielsen, Donald J. Trump, U.S Customs and Border Protection, U.S. Citizenship and Immigration Services, U.S. Department of Homeland Security, U.S. Department of Justice, U.S. Immigration and Customs Enforcement, Ronald D. Vitiello, Mathew Whitaker. Motion Hearing set for 3/18/2019 02:00 PM before Judge Jon S. Tigar. Responses due by 2/25/2019. Replies due by 3/4/2019. (Genova, Francesca) (Filed on 2/11/2019) (Entered: 02/11/2019) |
| 02/14/2019 | [110] | ADMINISTRATIVE MOTION to Consider Whether Cases Should Be Related, Pursuant to Civil L.R. 7-11 filed by Al Otro Lado, Central American Resource Center, East Bay Sanctuary Covenant, Innovation Law Lab. (Attachments: #(1) Declaration of Jennifer Chang Newell, #(2) [Proposed] Order)(Gelernt, Lee) (Filed on 2/14/2019) (Entered: 02/14/2019) |
| 02/19/2019 | [111] | OPPOSITION/RESPONSE to (re [110] Administrative MOTION to Consider Whether Cases Should Be Related, Pursuant to Civil L.R. 7-11 filed by Lee Francis Cissna, Executive Office for Immigration Review (EOIR), Kevin K. McAleenan, James McHenry, Kirstjen M. Nielsen, Donald J. Trump, U.S Customs and Border Protection, U.S. Citizenship and Immigration Services, U.S. Department of Homeland Security, U.S. Department of Justice, U.S. Immigration and Customs Enforcement, Ronald D. Vitiello, Mathew Whitaker. (Reuveni, Erez) (Filed on 2/19/2019) (Entered: 02/19/2019) |
| 02/20/2019 | [112] | CLERK'S NOTICE re [110] ADMINISTRATIVE MOTION to Consider Whether Cases Should Be Related. The court has reviewed the motion and determined that no cases are related and no reassignments shall occur. (wsn, COURT STAFF) (Filed on 2/20/2019) (Entered: 02/20/2019) |
| 03/05/2019 | [113] | **ORDER GRANTING MOTION TO STAY PROCEEDINGS by Judge Jon S. Tigar; granting [109] Motion to Stay. (wsn, COURT STAFF) (Filed on 3/5/2019) (Entered: 03/05/2019)** |
| 03/05/2019 | 114 | CLERK'S NOTICE VACATING HEARING. The Case Management Conference set for 3/18/2019 is vacated. *(This is a text-only entry generated by the court. There is no document associated with this entry.)* (wsnS, COURT STAFF) (Filed on 3/5/2019) (Entered: 03/05/2019) |
| 07/16/2019 | [115] | ADMINISTRATIVE MOTION to Consider Whether Cases Should be Related filed by Al Otro Lado, Central American Resource Center, East Bay Sanctuary Covenant, Innovation Law Lab. Responses due by 7/22/2019. (Attachments: # [1] Declaration, # [2] Proposed Order)(Veroff, Julie) (Filed on 7/16/2019) (Entered: 07/16/2019) |
| 07/16/2019 | [116] | **ORDER TO FILE OPPOSITION TO MOTION TO RELATE.** Signed by Judge Jon S. Tigar on July 16, 2019. (jstlc1S, COURT STAFF) (Filed on 7/16/2019) (Entered: 07/16/2019) |

| 07/17/2019 | 117 | OPPOSITION/RESPONSE to (re 115 ADMINISTRATIVE MOTION to Consider Whether Cases Should be Related) filed by Lee Francis Cissna, Executive Office for Immigration Review (EOIR), Kevin K. McAleenan, James McHenry, Kirstjen M. Nielsen, U.S Customs and Border Protection, U.S. Citizenship and Immigration Services, U.S. Department of Homeland Security, U.S. Department of Justice, U.S. Immigration and Customs Enforcement, Ronald D. Vitiello, Mathew Whitaker. (Reuveni, Erez) (Filed on 7/17/2019) (Entered: 07/17/2019) |
|---|---|---|
| 07/17/2019 | 118 | **Order by Judge Jon S. Tigar granting 115 Administrative Motion to Relate Cases 18-cv-06810-JST and 19-cv-04073-WHO. Telephone Conference set for 7/18/2019 08:30 AM in San Francisco, Chambers before Judge Jon S. Tigar.(mllS, COURT STAFF) (Filed on 7/17/2019) (Entered: 07/17/2019)** |
| 07/18/2019 | 119 | **Minute Entry for proceedings held before Judge Jon S. Tigar: Telephone Conference held on 7/18/2019. Parties are to meet and confer regarding the Temporary Restraining Order briefing and submit a proposed schedule by noon today. Proposed Schedule due by 7/18/2019 by 12:00 PM PST.Total Time in Court: 30 minutes. Court Reporter: Not Reported or Recorded. Plaintiff Attorney: Lee Gelernt, Melissa Crow, Julie Veroff, Bahar Azmy, Katrina Eiland. Defendant Attorney: Erez Reuveni.** *(This is a text-only entry generated by the court. There is no document associated with this entry.)* **(mllS, COURT STAFF) (Date Filed: 7/18/2019) (Entered: 07/18/2019)** |
| 07/26/2019 | 120 | ORDER of USCA as to 51 Notice of Appeal **18-17274**, filed by Ronald D. Vitiello, U.S. Department of Homeland Security, Executive Office for Immigration Review (EOIR), U.S. Department of Justice, U.S. Immigration and Customs Enforcement, U.S. Citizenship and Immigration Services, James McHenry, U.S Customs and Border Protection, Kevin K. McAleenan, Kirstjen M. Nielsen, Mathew Whitaker, Donald J. Trump, Lee Francis Cissna. (Attachments: # 1 Superseding Order) (wsnS, COURT STAFF) (Filed on 7/26/2019) (Entered: 07/26/2019) |
| 08/21/2019 | 121 | CLERKS NOTICE REGARDING LOCATION CHANGE FOR JUDGE JON S. TIGAR<br><br>Effective August 26, 2019:<br><br>Judge Jon S. Tigar's courtroom and chambers will be located at the Ronald V. Dellums Federal Building and United States Courthouse, Courtroom 6, 2nd Floor, 1301 Clay Street, Oakland, CA 94612.<br><br>On or after the effective date, all court appearances, filings, and deliveries of chambers copies must be made at the Oakland Courthouse (https://cand.uscourts.gov/locations). For updated scheduling information, please visit https://cand.uscourts.gov/jst.<br><br>Judge Tigar's case assignments will be updated to reflect the correct office assignment (for example: 3:19-cv-00123-JST will now be 4:19-cv-00123-JST). *(This is a text-only entry generated by the court. There is no document associated with this entry.)* (ecgS-adi, COURT STAFF) (Filed on 8/21/2019) (Entered: 08/21/2019) |
| 09/19/2019 | 122 | NOTICE of Change In Counsel by Vasudha Talla (Talla, Vasudha) (Filed on 9/19/2019) (Entered: 09/19/2019) |
| 09/20/2019 | | *** Attorney Christine Patricia Sun terminated. 122 NOTICE OF CHANGE INCOUNSEL. (jmlS, COURT STAFF) (Filed on 9/20/2019) (Entered: 09/20/2019) |
| 01/24/2020 | 123 | NOTICE of Change In Counsel by Lee Gelernt *Notice of Withdrawal of Counsel* (Gelernt, Lee) (Filed on 1/24/2020) (Entered: 01/24/2020) |

| | | |
|---|---|---|
| 01/27/2020 | | Electronic filing error. Case division and case location information are incorrect. **The correct information, per the ECF notification sent August 21, 2019, is Oakland Division and the case number should be 4:18-cv-6810 JST.** Please re-file in its entirety. Re: 123 Notice of Change In Counsel filed by East Bay Sanctuary Covenant, Central American Refugee Center, Innovation Law Lab, Al Otro Lado (jmlS, COURT STAFF) (Filed on 1/27/2020) (Entered: 01/27/2020) |
| 01/28/2020 | 124 | *Notice of Withdrawal of Counsel* by Lee Gelernt (Gelernt, Lee) (Filed on 1/28/2020) Modified on 1/28/2020 (jmlS, COURT STAFF). (Entered: 01/28/2020) |
| 01/28/2020 | | *** Attorney Jennifer C. Newell terminated. 124 Notice of Withdrawal. (jmlS, COURT STAFF) (Filed on 1/28/2020) (Entered: 01/28/2020) |
| 02/28/2020 | 125 | ORDER of USCA Appellants motion for judicial notice, dkt. 24, is granted as to 102 USCA Case Number, 69 USCA Case Number, (jmlS, COURT STAFF) (Filed on 2/28/2020) (Entered: 02/28/2020) |
| 02/28/2020 | 126 | USCA Opinion as to 100 Notice of Appeal,, filed by Ronald D. Vitiello, U.S. Department of Homeland Security, Executive Office for Immigration Review (EOIR), U.S. Department of Justice, U.S. Immigration and Customs Enforcement, U.S. Citizenship and Immigration Services, James McHenry, U.S Customs and Border Protection, Kevin K. McAleenan, Kirstjen M. Nielsen, Mathew Whitaker, Donald J. Trump, Lee Francis Cissna, 51 Notice of Appeal,, filed by Ronald D. Vitiello, U.S. Department of Homeland Security, Executive Office for Immigration Review (EOIR), U.S. Immigration and Customs Enforcement, U.S. Department of Justice, James McHenry, U.S. Citizenship and Immigration Services, U.S Customs and Border Protection, Kevin K. McAleenan, Kirstjen M. Nielsen, Mathew Whitaker, Lee Francis Cissna, Donald J. Trump (jmlS, COURT STAFF) (Filed on 2/28/2020) (Entered: 02/28/2020) |
| 05/20/2020 | 127 | ORDER of USCA as to 102 USCA Case Number, 69 USCA Case Number. (jmlS, COURT STAFF) (Filed on 5/20/2020) (Entered: 05/21/2020) |
| 06/30/2020 | 128 | ORDER of USCA as to 100 Notice of Appeal,, filed by Ronald D. Vitiello, U.S. Department of Homeland Security, Executive Office for Immigration Review (EOIR), U.S. Department of Justice, U.S. Immigration and Customs Enforcement, U.S. Citizenship and Immigration Services, James McHenry, U.S Customs and Border Protection, Kevin K. McAleenan, Kirstjen M. Nielsen, Mathew Whitaker, Donald J. Trump, Lee Francis Cissna, 51 Notice of Appeal,, filed by Ronald D. Vitiello, U.S. Department of Homeland Security, Executive Office for Immigration Review (EOIR), U.S. Immigration and Customs Enforcement, U.S. Department of Justice, James McHenry, U.S. Citizenship and Immigration Services, U.S Customs and Border Protection, Kevin K. McAleenan, Kirstjen M. Nielsen, Mathew Whitaker, Lee Francis Cissna, Donald J. Trump (jmlS, COURT STAFF) (Filed on 6/30/2020) (Entered: 06/30/2020) |
| 01/14/2021 | 129 | NOTICE *of request to withdraw attorney Scott G. Stewart* by Lee Francis Cissna, Executive Office for Immigration Review (EOIR), Kevin K. McAleenan, James McHenry, Kirstjen M. Nielsen, Donald J. Trump, U.S Customs and Border Protection, U.S. Citizenship and Immigration Services, U.S. Department of Homeland Security, U.S. Department of Justice, U.S. Immigration and Customs Enforcement, Ronald D. Vitiello, Mathew Whitaker (Reuveni, Erez) (Filed on 1/14/2021) Modified on 1/15/2021 (jmlS, COURT STAFF). (Entered: 01/14/2021) |
| 02/16/2021 | 130 | NOTICE of Change In Counsel by Lee Gelernt (Gelernt, Lee) (Filed on 2/16/2021) Modified on 2/17/2021 (jmlS, COURT STAFF). (Entered: 02/16/2021) |

| | | |
|---|---|---|
| 02/22/2021 | [131](#) | NOTICE of Change In Counsel by Lee Gelernt (Gelernt, Lee) (Filed on 2/22/2021) Modified on 2/22/2021 (jmlS, COURT STAFF). (Entered: 02/22/2021) |
| 03/24/2021 | [132](#) | ORDER and Amended Opinion of USCA as to [100](#) Notice of Appeal to the Ninth Circuit,, filed by Ronald D. Vitiello, U.S. Department of Homeland Security, Executive Office for Immigration Review (EOIR), U.S. Department of Justice, U.S. Immigration and Customs Enforcement, U.S. Citizenship and Immigration Services, James McHenry, U.S Customs and Border Protection, Kevin K. McAleenan, Kirstjen M. Nielsen, Mathew Whitaker, Donald J. Trump, Lee Francis Cissna, [51](#) Notice of Appeal to the Ninth Circuit,, filed by Ronald D. Vitiello, U.S. Department of Homeland Security, Executive Office for Immigration Review (EOIR), U.S. Immigration and Customs Enforcement, U.S. Department of Justice, James McHenry, U.S. Citizenship and Immigration Services, U.S Customs and Border Protection, Kevin K. McAleenan, Kirstjen M. Nielsen, Mathew Whitaker, Lee Francis Cissna, Donald J. Trump (jmlS, COURT STAFF) (Filed on 3/24/2021) (Entered: 03/24/2021) |
| 09/10/2021 | [133](#) | NOTICE of Change In Counsel by Lindsay Polastri Nako *for Amicus Curiae Public Citizen, Inc.* (Nako, Lindsay) (Filed on 9/10/2021) (Entered: 09/10/2021) |
| 02/01/2022 | [134](#) | NOTICE of Change In Counsel by Erez R. Reuveni *requesting withdrawal of Francesca Genova as counsel* (Reuveni, Erez) (Filed on 2/1/2022) (Entered: 02/01/2022) |
| 03/15/2022 | [135](#) | NOTICE by National Center for Lesbian Rights *of Withdrawal of Counsel* (Whelan, Amy) (Filed on 3/15/2022) (Entered: 03/15/2022) |
| 03/16/2022 | 136 | CLERK'S NOTICE SETTING CASE MANAGEMENT CONFERENCE. *(This is a text-only entry generated by the court. There is no document associated with this entry.)*. Case Management Statement due by 3/22/2022. Further Case Management Conference set for 3/29/2022 02:00 PM in Oakland, - Videoconference Only. This proceeding will be held via a Zoom webinar.

**Webinar Access:** All counsel, members of the public, and media may access the webinar information at https://www.cand.uscourts.gov/jst

**Court Appearances:** Advanced notice is required of counsel or parties who wish to be identified by the court as making an appearance or will be participating i n the argument at the hearing. One list of names of all counsel appearing for all counsel must be sent in one email to the CRD at JSTCRD@cand.uscourts.gov no later than March 28, 2022 by 2:00 P.M.

**General Order 58.** Persons granted access to court proceedings held by telephone or videoconference are reminded that photographing, recording, and rebroadcasting of court proceedings, including screenshots or other visual copying of a hearing, is absolutely prohibited.

**Zoom Guidance and Setup:** https://www.cand.uscourts.gov/zoom/.

Case Management Statement due by 3/22/2022. Further Case Management Conference set for 3/29/2022 02:00 PM in Oakland, - Videoconference Only. (mll, COURT STAFF) (Filed on 3/16/2022) (Entered: 03/16/2022) |
| 03/22/2022 | [137](#) | CASE MANAGEMENT STATEMENT *(joint)* filed by Lee Francis Cissna, Executive Office for Immigration Review (EOIR), Kevin K. McAleenan, James McHenry, Kirstjen M. Nielsen, Donald J. Trump, U.S Customs and Border Protection, U.S. Citizenship and Immigration Services, U.S. Department of Homeland Security, U.S. Department of |

| | | |
|---|---|---|
| | | Justice, U.S. Immigration and Customs Enforcement, Ronald D. Vitiello, Mathew Whitaker. (Reuveni, Erez) (Filed on 3/22/2022) (Entered: 03/22/2022) |
| 03/22/2022 | 138 | **ORDER CONTINUING CASE MANAGEMENT CONFERENCE** For the reasons stated in the parties' joint case management statement, ECF No. 137, the case management conference scheduled for March 29, 2022 is continued to June 28, 2022 at 2:00 p.m. An updated joint case management statement is due June 21, 2022. In all other respects, this case is stayed by agreement of the parties until further order of the Court. *(This is a text-only entry generated by the court. There is no document associated with this entry.)* (Tigar, Jon) (Filed on 3/22/2022) (Entered: 03/22/2022) |
| 03/23/2022 | 139 | CLERK'S NOTICE SETTING ZOOM HEARING. *(This is a text-only entry generated by the court. There is no document associated with this entry.)*,. Case Management Statement due by 6/21/2022. Further Case Management Conference set for 6/28/2022 02:00 PM in Oakland, - Videoconference Only. This proceeding will be held via a Zoom webinar.<br><br>**Webinar Access:** All counsel, members of the public, and media may access the webinar information at https://www.cand.uscourts.gov/jst<br><br>**Court Appearances:** Advanced notice is required of counsel or parties who wish to be identified by the court as making an appearance or will be participating in the argume nt at the hearing. One list of names of all counsel appearing for all parties must be sent in one email to the CRD at JSTCRD@cand.uscourts.gov no later than June 21, 2022 by 2:00 p.m..<br><br>**General Order 58.** Persons granted access to court proceedings held by telephone or videoconference are reminded that photographing, recording, and rebroadcasting of court proceedings, including screenshots or other visual copying of a hearing, is absolutely prohibited.<br><br>**Zoom Guidance and Setup:** https://www.cand.uscourts.gov/zoom/.<br><br>Case Management Statement due by 6/21/2022. Further Case Management Conference set for 6/28/2022 02:00 PM in Oakland, - Videoconf erence Only. (mll, COURT STAFF) (Filed on 3/23/2022) (Entered: 03/23/2022) |
| 06/21/2022 | 140 | CASE MANAGEMENT STATEMENT *(joint) and request to continue stay and to continue case management conference* filed by Lee Francis Cissna, Executive Office for Immigration Review (EOIR), Kevin K. McAleenan, James McHenry, Kirstjen M. Nielsen, Donald J. Trump, U.S Customs and Border Protection, U.S. Citizenship and Immigration Services, U.S. Department of Homeland Security, U.S. Department of Justice, U.S. Immigration and Customs Enforcement, Ronald D. Vitiello, Mathew Whitaker. (Reuveni, Erez) (Filed on 6/21/2022) (Entered: 06/21/2022) |
| 06/23/2022 | 141 | Consent MOTION to Continue *case management conference* filed by Lee Francis Cissna, Executive Office for Immigration Review (EOIR), Kevin K. McAleenan, James McHenry, Kirstjen M. Nielsen, Donald J. Trump, U.S Customs and Border Protection, U.S. Citizenship and Immigration Services, U.S. Department of Homeland Security, U.S. Department of Justice, U.S. Immigration and Customs Enforcement, Ronald D. Vitiello, Mathew Whitaker. (Attachments: # 1 Proposed Order)(Reuveni, Erez) (Filed on 6/23/2022) (Entered: 06/23/2022) |
| 06/24/2022 | 142 | **ORDER GRANTING MOTION TO CONTINUE STAY re (140 in 4:18-cv-06810-JST) Case Management Statement (153 in 4:19-cv-04073-JST). Signed by Judge Jon** |

| | | S. Tigar on June 24, 2022. (mll, COURT STAFF) (Filed on 6/24/2022) (Entered: 06/24/2022) |
|---|---|---|
| 07/05/2022 | 143 | NOTICE of Substitution of Counsel by Michelle Young Cho (Cho, Michelle) (Filed on 7/5/2022) (Entered: 07/05/2022) |
| 09/22/2022 | 144 | STATUS REPORT *(joint)* by Lee Francis Cissna, Executive Office for Immigration Review (EOIR), Kevin K. McAleenan, James McHenry, Kirstjen M. Nielsen, Donald J. Trump, U.S Customs and Border Protection, U.S. Citizenship and Immigration Services, U.S. Department of Homeland Security, U.S. Department of Justice, U.S. Immigration and Customs Enforcement, Ronald D. Vitiello, Mathew Whitaker. (Reuveni, Erez) (Filed on 9/22/2022) (Entered: 09/22/2022) |
| 12/21/2022 | 145 | STATUS REPORT by Lee Francis Cissna, Executive Office for Immigration Review (EOIR), Kevin K. McAleenan, James McHenry, Kirstjen M. Nielsen, Donald J. Trump, U.S Customs and Border Protection, U.S. Citizenship and Immigration Services, U.S. Department of Homeland Security, U.S. Department of Justice, U.S. Immigration and Customs Enforcement, Ronald D. Vitiello, Mathew Whitaker. (Reuveni, Erez) (Filed on 12/21/2022) (Entered: 12/21/2022) |
| 02/23/2023 | 146 | STATUS REPORT by Lee Francis Cissna, Executive Office for Immigration Review (EOIR), Kevin K. McAleenan, James McHenry, Kirstjen M. Nielsen, Donald J. Trump, U.S Customs and Border Protection, U.S. Citizenship and Immigration Services, U.S. Department of Homeland Security, U.S. Department of Justice, U.S. Immigration and Customs Enforcement, Ronald D. Vitiello, Mathew Whitaker. (Reuveni, Erez) (Filed on 2/23/2023) (Entered: 02/23/2023) |
| 05/11/2023 | 147 | MOTION for Leave to File *Amended and Supplemental Complaint and to Lift Stay of Proceedings* filed by American Gateways, Central American Resource Center, East Bay Sanctuary Covenant, Immigrant Defenders Law Center, National Center for Lesbian Rights, Tahirih Justice Center. (Attachments: # 1 Memorandum in support of Motion to File Amended and Supplemental Complaint and to Lift Stay of Proceedings, # 2 Exhibit A - Proposed First Amended and Supplemental Complaint, # 3 Exhibit B - Redline version of additions and alterations to Complaint, # 4 Proposed Order)(Eiland, Katrina) (Filed on 5/11/2023) Modified on 5/12/2023 (slh, COURT STAFF). (Entered: 05/11/2023) |
| 05/12/2023 | 148 | **ORDER SETTING CASE MANAGEMENT CONFERENCE. Further Case Management Conference set for 5/16/2023 09:00 AM in Oakland, - Videoconference Only. This proceeding will be held via a Zoom webinar.**<br><br>**Webinar Access: All counsel, members of the public, and media may access the webinar information at https://www.cand.uscourts.gov/jst**<br><br>**Court Appearances: Advanced notice is required of counsel or parties who wish to be identified by the court as making an appearance or will be participating in the argument at the hearing. One list of names of all counsel appearing for all parties must be sent in one email to the CRD at JSTCRD@cand.uscourts.gov no later than May 15, 2023 by Noon.**<br><br>**General Order 58. Persons granted access to court proceedings held by telephone or videoconference are reminded that photographing, recording, and rebroadcasting of court proceedings, including screenshots or other visual copying of a hearing, is absolutely prohibited.**<br><br>**Zoom Guidance and Setup: https://www.cand.uscourts.gov/zoom/.** |

| | | |
|---|---|---|
| | | Further Case Management Conference set for 5/16/2023 09:00 AM in Oakland, - Videoconference Only.. Signed by Judge Jon S. Tigar on May 12, 2023. (mll, COURT STAFF) (Filed on 5/12/2023) (Entered: 05/12/2023) |
| 05/12/2023 | 149 | MOTION for leave to appear in Pro Hac Vice ( Filing fee $ 317, receipt number ACANDC-18261427.) filed by American Gateways, Central American Refugee Center, East Bay Sanctuary Covenant, Immigrant Defenders Law Center, National Center for Lesbian Rights, Tahirih Justice Center. (Attachments: # 1 Exhibit)(Georgevich, Mary) (Filed on 5/12/2023) (Entered: 05/12/2023) |
| 05/14/2023 | 150 | MOTION for leave to appear in Pro Hac Vice *on behalf of East Bay Sanctuary Covenant, Central American Resource Center, Immigrant Defenders, American Gateways, National Center for Lesbian Rights, and Tahirih Justice Center* ( Filing fee $ 317, receipt number ACANDC-18262508.) filed by Tahirih Justice Center. (Attachments: # 1 Certificate of Good Standing)(Zwick, Keren) (Filed on 5/14/2023) (Entered: 05/14/2023) |
| 05/15/2023 | 151 | **Order by Judge Jon S. Tigar granting 149 Motion for Pro Hac Vice as to Mary Georgevich.(mll, COURT STAFF) (Filed on 5/15/2023) (Entered: 05/15/2023)** |
| 05/15/2023 | 152 | MOTION for leave to appear in Pro Hac Vice ( Filing fee $ 317, receipt number ACANDC-18264102.) filed by American Gateways, Central American Resource Center, East Bay Sanctuary Covenant, Immigrant Defenders Law Center, National Center for Lesbian Rights. (Attachments: # 1 Certificate of good standing) (Caldarone, Richard) (Filed on 5/15/2023) (Entered: 05/15/2023) |
| 05/15/2023 | 153 | **Order by Judge Jon S. Tigar granting 150 Motion for Pro Hac Vice as to Keren Zwick.(mll, COURT STAFF) (Filed on 5/15/2023) (Entered: 05/15/2023)** |
| 05/16/2023 | 154 | MOTION for leave to appear in Pro Hac Vice ( Filing fee $ 317, receipt number ACANDC-18267716.) filed by American Gateways, Central American Resource Center, East Bay Sanctuary Covenant, Immigrant Defenders Law Center, National Center for Lesbian Rights, Tahirih Justice Center. (Attachments: # 1 Certificate of Good Standing) (Gelernt, Lee) (Filed on 5/16/2023) (Entered: 05/16/2023) |
| 05/16/2023 | 155 | **Order by Judge Jon S. Tigar granting 152 Motion for Pro Hac Vice as to Richard Calderone.(mll, COURT STAFF) (Filed on 5/16/2023) (Entered: 05/16/2023)** |
| 05/16/2023 | 156 | **Minute Entry for proceedings held before Judge Jon S. Tigar: Further Case Management Conference held on 5/16/2023. Hearing held via Zoom videoconference. The parties are ordered to meet and confer about, and make a joint proposal regarding, the motion briefing schedule and discovery that must be exchanged immediately among the parties. If the parties are unable to agree, they must submit competing proposals. In the latter event, the Court will endeavor to choose, in all respects, the single proposal it concludes is most reasonable. Joint or competing proposals due by 5/17/2023. Further Case Management Conference set for 5/18/2023 03:30 PM in Oakland, - Videoconference Only. This proceeding will be held via a Zoom webinar.**<br><br>**Webinar Access: All counsel, members of the public, and media may access the webinar information at https://www.cand.uscourts.gov/jst**<br><br>**Court Appearances: Advanced notice is required of counsel or parties who wish to be identified by the court as making an appearance or will be participating in the argument at the hearing. One list of names of all counsel appearing for all parties must be sent in one email to the CRD at JSTCRD@cand.uscourts.gov no later than May 17, 2023 by 2:00 p.m.** |

|  |  |  |
|---|---|---|
|  |  | **General Order 58. Persons granted access to court proceedings held by telephone or videoconference are reminded that photographing, recording, and rebroadcasting of court proceedings, including screenshots or other visual copying of a hearing, is absolutely prohibited.**<br><br>**Zoom Guidance and Setup: https://www.cand.uscourts.gov/zoom/.**<br>**Case Management Statement due by 5/17/2023. Further Case Management Conference set for 5/18/2023 03:30 PM in Oakland, - Videoconference Only.Total Time in Court: 16 minutes. Court Reporter: Not Reported or Recorded. Plaintiff Attorney: Counsel for the American Civil Liberties Union: Katrina Eiland; Counsel for the National Immigrant Justice Center: Keren Zwick, Richard Calderone; Counsel for the Center for Gender and Refugee Studies: Melissa Crow. Defendant Attorney: Erez Reuveni, Christina Greer.** *(This is a text-only entry generated by the court. There is no document associated with this entry.)* **(mll, COURT STAFF) (Date Filed: 5/16/2023) (Entered: 05/16/2023)** |
| 05/16/2023 | 157 | MOTION for leave to appear in Pro Hac Vice ( Filing fee $ 317, receipt number ACANDC-18268448.) filed by American Gateways, Central American Resource Center, East Bay Sanctuary Covenant, Immigrant Defenders Law Center, National Center for Lesbian Rights, Tahirih Justice Center. (Attachments: # 1 Certificate of Good Standing) (Jadwat, Omar) (Filed on 5/16/2023) (Entered: 05/16/2023) |
| 05/17/2023 | 158 | MOTION for leave to appear in Pro Hac Vice ( Filing fee $ 317, receipt number ACANDC-18273793.) filed by Al Otro Lado, Central American Resource Center, East Bay Sanctuary Covenant, Innovation Law Lab. (Attachments: # 1 Certificate/Proof of Service Certificate of Good Standing)(Crow, Melissa) (Filed on 5/17/2023) (Entered: 05/17/2023) |
| 05/17/2023 | 159 | **Order by Judge Jon S. Tigar granting 154 Motion for Pro Hac Vice as to Lee Gelernt.(mll, COURT STAFF) (Filed on 5/17/2023) (Entered: 05/17/2023)** |
| 05/17/2023 | 160 | **Order by Judge Jon S. Tigar granting 157 Motion for Pro Hac Vice as to Omar Jadwat.(mll, COURT STAFF) (Filed on 5/17/2023) (Entered: 05/17/2023)** |
| 05/17/2023 | 161 | **Order by Judge Jon S. Tigar granting 158 Motion for Pro Hac Vice as to Melissa Crow.(mll, COURT STAFF) (Filed on 5/17/2023) (Entered: 05/17/2023)** |
| 05/17/2023 | 162 | STIPULATION WITH PROPOSED ORDER filed by American Gateways, Central American Resource Center, East Bay Sanctuary Covenant, Immigrant Defenders Law Center, National Center for Lesbian Rights, Tahirih Justice Center. (Attachments: # 1 Proposed Order)(Eiland, Katrina) (Filed on 5/17/2023) (Entered: 05/17/2023) |
| 05/17/2023 | 163 | **ORDER granting 162 STIPULATION WITH PROPOSED ORDER. Pursuant to the stipulation, 147 Plaintiffs' motion for leave to file an amended and supplemental complaint is granted. Signed by Judge Jon S. Tigar on May 17, 2023. (jstlc2, COURT STAFF) (Filed on 5/17/2023) (Entered: 05/17/2023)** |
| 05/18/2023 | 164 | AMENDED AND SUPPLEMENTAL COMPLAINT *FOR DECLARATORY AND INJUNCTIVE RELIEF* against Joseph R. Biden, Executive Office for Immigration Review (EOIR), U.S Customs and Border Protection, U.S. Citizenship and Immigration Services, U.S. Department of Homeland Security, U.S. Department of Justice, U.S. Immigration and Customs Enforcement, Merrick Garland, Neal, David Neal, Alejandro Mayorkas, Ur Mendoza Jaddou, Troy A. Miller, Tae D. Johnson. Filed by East Bay Sanctuary Covenant, Central American Resource Center, American Gateways, Tahirih Justice Center, National Center for Lesbian Rights, Immigrant Defenders Law Center. (Eiland, Katrina) (Filed on 5/18/2023) Modified on 5/19/2023 (slh, COURT STAFF). (Entered: 05/18/2023) |

| | | |
|---|---|---|
| 05/23/2023 | [165](#) | STIPULATION WITH PROPOSED ORDER filed by American Gateways, Central American Resource Center, East Bay Sanctuary Covenant, Immigrant Defenders Law Center, National Center for Lesbian Rights, Tahirih Justice Center. (Attachments: # [1](#) Proposed Order)(Eiland, Katrina) (Filed on 5/23/2023) (Entered: 05/23/2023) |
| 05/24/2023 | [166](#) | **ORDER RE: JOINT STIPULATION AND PROPOSED SCHEDULE by Judge Jon S. Tigar granting [165](#) Stipulation.Amicus Briefs in support of Plaintiffs due by 6/7/2023. Amicus Briefs in support of Defendants due by 6/20/2023. (mll, COURT STAFF) (Filed on 5/24/2023) (Entered: 05/24/2023)** |
| 05/24/2023 | 167 | CLERKS NOTICE SETTING ZOOM HEARING. Motion Hearing set for 7/19/2023 09:30 AM in Oakland, - Videoconference Only before Judge Jon S. Tigar. This proceeding will be held via a Zoom webinar.<br><br>**Webinar Access:** All counsel, members of the public, and media may access the webinar information at https://www.cand.uscourts.gov/jst<br><br>**Court Appearances:** Advanced notice is required of counsel or parties who wish to be identified by the court as making an appearance or will be participating in the argument at the hearing. One list of names of all counsel appearing for all parties must be sent in one email to the CRD at jstcrd@cand.uscourts.gov no later than July 18, 2023 by Noon.<br><br>**General Order 58.** Persons granted access to court proceedings held by telephone or videoconference are reminded that photographing, recording, and rebroadcasting of court proceedings, including screenshots or other visual copying of a hearing, is absolutely prohibited.<br><br>**Zoom Guidance and Setup:** https://www.cand.uscourts.gov/zoom/.<br><br>, Set/Reset Deadlines as to Motion Hearing set for 7/19/2023 09:30 AM in Oakland, - Videoconference Only before Judge Jon S. Tigar. *(This is a text-only entry generated by the court. There is no document associated with this entry.)* (mll, COURT STAFF) (Filed on 5/24/2023) (Entered: 05/24/2023) |
| 06/01/2023 | [168](#) | NOTICE of Appearance by Anne Elizabeth Peterson (Peterson, Anne) (Filed on 6/1/2023) (Entered: 06/01/2023) |
| 06/05/2023 | [169](#) | NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT filed by American Gateways, Central American Resource Center, East Bay Sanctuary Covenant, Immigrant Defenders Law Center, National Center for Lesbian Rights, Tahirih Justice Center. Responses due by 6/16/2023. Replies due by 6/23/2023. (Attachments: # [1](#) Memorandum In Support of Plaintiffs' Motion for Summary Judgement, # [2](#) Declaration Declaration of Camila Alvarez, # [3](#) Declaration Declaration of Edna Yang, # [4](#) Declaration Declaration of Lindsay Toczylowski, # [5](#) Declaration Declaration of MariCarmen Garza, # [6](#) Declaration Declaration of Michael Smith, # [7](#) Declaration Declaration of Noemi Calonje, # [8](#) Excerpts of Records Part 1, # [9](#) Excerpts of Records Part 2, # [10](#) Proposed Order Proposed Order)(Eiland, Katrina) (Filed on 6/5/2023) (Entered: 06/05/2023) |
| 06/06/2023 | [170](#) | NOTICE of Appearance by Julie Beatrice Bourdoiseau (Bourdoiseau, Julie) (Filed on 6/6/2023) (Entered: 06/06/2023) |
| 06/07/2023 | [171](#) | Amicus Curiae APPEARANCE entered by Ashley Brooke Vinson Crawford on behalf of Judges & Former Members of the Board of Immigration Appeals. (Crawford, Ashley) (Filed on 6/7/2023) (Entered: 06/07/2023) |

| 06/07/2023 | 172 | MOTION to File Amicus Curiae Brief filed by Judges & Former Members of the Board of Immigration Appeals. Responses due by 6/21/2023. Replies due by 6/28/2023. (Crawford, Ashley) (Filed on 6/7/2023) (Entered: 06/07/2023) |
|---|---|---|
| 06/07/2023 | 173 | Amicus Curiae APPEARANCE entered by Kathleen R. Hartnett on behalf of National Citizenship and Immigration Services Council 119. (Hartnett, Kathleen) (Filed on 6/7/2023) (Entered: 06/07/2023) |
| 06/07/2023 | 174 | MOTION to File Amicus Curiae Brief filed by National Citizenship and Immigration Services Council 119. Responses due by 6/21/2023. Replies due by 6/28/2023. (Attachments: # 1 Council 119's Brief of Amicus Curiae, # 2 Proposed Order Re Motion to File Brief of Amicus Curiae)(Hartnett, Kathleen) (Filed on 6/7/2023) (Entered: 06/07/2023) |
| 06/09/2023 | 175 | EXHIBITS re 169 MOTION for Summary Judgment *CORRECTION OF DOCKET # [169-4]* filed byEast Bay Sanctuary Covenant. (Related document(s) 169 ) (Crow, Melissa) (Filed on 6/9/2023) (Entered: 06/09/2023) |
| 06/16/2023 | 176 | MOTION for Summary Judgment filed by Joseph R. Biden, Lee Francis Cissna, Merrick Garland, Ur Mendoza Jaddou, Tae D. Johnson, Alejandro Mayorkas, Kevin K. McAleenan, James McHenry, Troy A. Miller, Neal, David Neal, Kirstjen M. Nielsen, U.S Customs and Border Protection, U.S. Citizenship and Immigration Services, U.S. Department of Homeland Security, U.S. Department of Justice, U.S. Immigration and Customs Enforcement, Ronald D. Vitiello, Mathew Whitaker. Motion Hearing set for 7/19/2023 09:30 AM in Oakland, - Videoconference Only before Judge Jon S. Tigar. Responses due by 6/23/2023. Replies due by 6/30/2023. (Attachments: # 1 Memorandum in Support, # 2 Declaration of Blas Nunez-Neto, # 3 Proposed Order)(Reuveni, Erez) (Filed on 6/16/2023) (Entered: 06/16/2023) |
| 06/20/2023 | 177 | NOTICE of Appearance by Oscar Sarabia Roman (Sarabia Roman, Oscar) (Filed on 6/20/2023) (Entered: 06/20/2023) |
| 06/21/2023 | 178 | NOTICE of Appearance by Spencer Elijah Wittmann Amdur (Amdur, Spencer) (Filed on 6/21/2023) (Entered: 06/21/2023) |
| 06/22/2023 | 179 | NOTICE of Appearance by Morgan Shahan Russell (Russell, Morgan) (Filed on 6/22/2023) (Entered: 06/22/2023) |
| 06/23/2023 | 180 | **ORDER by Judge Jon S.Tigar granting 172 Motion to File Amicus Curiae Brief; granting 174 Motion to File Amicus Curiae Brief. (mll, COURT STAFF) (Filed on 6/23/2023) (Entered: 06/23/2023)** |
| 06/23/2023 | 181 | REPLY (re 169 MOTION for Summary Judgment , 176 MOTION for Summary Judgment ) *Plaintiffs' Reply to Their Motion for Summary Judgement and Opposition to Defendants' Cross Motion* filed byAmerican Gateways, Central American Resource Center, East Bay Sanctuary Covenant, Immigrant Defenders Law Center, National Center for Lesbian Rights, Tahirih Justice Center. (Attachments: # 1 Supplemental Declaration of Edna Yang, # 2 Declaration of Jaime Paredes and Exhibits A through D, # 3 Plaintiffs Supplemental Excerpts of Record)(Eiland, Katrina) (Filed on 6/23/2023) (Entered: 06/23/2023) |
| 06/30/2023 | 182 | REPLY (re 169 MOTION for Summary Judgment , 176 MOTION for Summary Judgment ) filed byJoseph R. Biden, Lee Francis Cissna, Executive Office for Immigration Review (EOIR), Merrick Garland, Ur Mendoza Jaddou, Tae D. Johnson, Alejandro Mayorkas, Kevin K. McAleenan, James McHenry, Troy A. Miller, Neal, David Neal, Kirstjen M. Nielsen, U.S Customs and Border Protection, U.S. Citizenship and Immigration Services, U.S. Department of Homeland Security, U.S. Department of |

| | | |
|---|---|---|
| | | Justice, U.S. Immigration and Customs Enforcement, Ronald D. Vitiello, Mathew Whitaker. (Greer, Christina) (Filed on 6/30/2023) (Entered: 06/30/2023) |
| 07/19/2023 | 183 | **Minute Entry for proceedings held before Judge Jon S. Tigar: Motion Hearing held on 7/19/2023 re 176 MOTION for Summary Judgment filed by Troy A. Miller, Tae D. Johnson, U.S. Immigration and Customs Enforcement, Joseph R. Biden, U.S. Citizenship and Immigration Services, David Neal, Neal, U.S. Department of Homeland Security, Ronald D. Vitiello, Alejandro Mayorkas, Ur Mendoza Jaddou, Merrick Garland, U.S. Department of Justice, James McHenry, Kevin K. McAleenan, U.S Customs and Border Protection, Mathew Whitaker, Kirstjen M. Nielsen, Lee Francis Cissna. Hearing held via Zoom videoconference. Argument heard from both parties. Motions taken under submission. Written order to issue. Total Time in Court: 1 hour 15 minutes. Court Reporter: Pamela Hebel. Plaintiff Attorney: Katrina Eiland, Lee Gelernt, Spencer Amdur, Morgan Russell, Keren Zwick, Richard Calderone, Melissa Crow. Defendant Attorney: Brian Boynton, Erez Reuveni, Christina Greer. _(This is a text-only entry generated by the court. There is no document associated with this entry.)_ (mll, COURT STAFF) (Date Filed: 7/19/2023) (Entered: 07/19/2023)** |
| 07/19/2023 | 184 | TRANSCRIPT ORDER for proceedings held on 07/19/2023 before Judge Jon S. Tigar by Joseph R. Biden, Lee Francis Cissna, Executive Office for Immigration Review (EOIR), Merrick Garland, Ur Mendoza Jaddou, Tae D. Johnson, Alejandro Mayorkas, Kevin K. McAleenan, James McHenry, Troy A. Miller, Neal, David Neal, Kirstjen M. Nielsen, U.S Customs and Border Protection, U.S. Citizenship and Immigration Services, U.S. Department of Homeland Security, U.S. Department of Justice, U.S. Immigration and Customs Enforcement, Ronald D. Vitiello, Mathew Whitaker, for Court Reporter: Pamela Hebel. (Reuveni, Erez) (Filed on 7/19/2023) Modified on 7/20/2023 (nap, COURT STAFF). (Entered: 07/19/2023) |
| 07/20/2023 | 185 | TRANSCRIPT ORDER before Judge Jon S. Tigar by American Gateways, Central American Resource Center, East Bay Sanctuary Covenant, Immigrant Defenders Law Center, National Center for Lesbian Rights, Tahirih Justice Center, for Court Reporter Pam Batalo-Hebel. (Eiland, Katrina) (Filed on 7/20/2023) (Entered: 07/20/2023) |
| 07/21/2023 | 186 | Transcript of Proceedings held on 07/19/2023, before Judge Tigar. Court Reporter Pamela Batalo Hebel, telephone number 626-688-7509; pamela_batalo-hebel@cand.uscourts.gov. Per General Order No. 59 and Judicial Conference policy, this transcript may be viewed only at the Clerk's Office public terminal or may be purchased through the Court Reporter/Transcriber until the deadline for the Release of Transcript Restriction. After that date it may be obtained through PACER. Any Notice of Intent to Request Redaction, if required, is due no later than 5 business days from date of this filing. (Re 184 Transcript Order,, ) Redaction Request due 8/11/2023. Redacted Transcript Deadline set for 8/21/2023. Release of Transcript Restriction set for 10/19/2023. (Related documents(s) 184 ) (Batalo, Pam) (Filed on 7/21/2023) (Entered: 07/21/2023) |
| 07/25/2023 | 187 | **ORDER GRANTING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT by Judge Jon S. Tigar granting 169 Motion for Summary Judgment; denying 176 Motion for Summary Judgment. (mll, COURT STAFF) (Filed on 7/25/2023) (Entered: 07/25/2023)** |
| 07/25/2023 | 188 | CLERK'S JUDGMENT. (mll, COURT STAFF) (Filed on 7/25/2023) (Entered: 07/25/2023) |
| 07/25/2023 | | ***Civil Case Terminated. (mll, COURT STAFF) (Filed on 7/25/2023) (Entered: |

| | | |
|---|---|---|
| | | 07/25/2023 |
| 07/25/2023 | 189 | NOTICE OF APPEAL to the 9th Circuit Court of Appeals filed by Joseph R. Biden, Merrick Garland, Ur Mendoza Jaddou, Tae D. Johnson, Alejandro Mayorkas, Kevin K. McAleenan, James McHenry, Troy A. Miller, Neal, David Neal, Kirstjen M. Nielsen, U.S Customs and Border Protection, U.S. Citizenship and Immigration Services, U.S. Department of Homeland Security, U.S. Department of Justice, U.S. Immigration and Customs Enforcement, Ronald D. Vitiello, Mathew Whitaker. Appeal of Clerk's Judgment 188 , Order on Motion for Summary Judgment,,, 187 (Appeal fee FEE WAIVED.) (Reuveni, Erez) (Filed on 7/25/2023) **(USCA Case No. 23-16032)** Modified on 7/27/2023 (slh, COURT STAFF). (Entered: 07/25/2023) |
| 07/25/2023 | 190 | Emergency MOTION to Stay re 188 Clerk's Judgment, 187 Order on Motion for Summary Judgment,,, filed by Joseph R. Biden, Executive Office for Immigration Review (EOIR), Merrick Garland, Ur Mendoza Jaddou, Tae D. Johnson, Alejandro Mayorkas, Kevin K. McAleenan, James McHenry, Troy A. Miller, Neal, David Neal, Kirstjen M. Nielsen, U.S Customs and Border Protection, U.S. Citizenship and Immigration Services, U.S. Department of Justice, U.S. Immigration and Customs Enforcement, Ronald D. Vitiello, Mathew Whitaker. Motion Hearing set for 8/8/2023 09:30 AM in Oakland, - To be determined before Judge Jon S. Tigar. Responses due by 8/8/2023. Replies due by 8/15/2023. (Attachments: # 1 Proposed Order)(Reuveni, Erez) (Filed on 7/25/2023) (Entered: 07/25/2023) |
| 07/25/2023 | 191 | Emergency MOTION to Shorten Time *For Decision on Motion to Stay Pending Appeal (ECF 190)* filed by Joseph R. Biden, Lee Francis Cissna, Executive Office for Immigration Review (EOIR), Merrick Garland, Ur Mendoza Jaddou, Tae D. Johnson, Alejandro Mayorkas, Kevin K. McAleenan, James McHenry, Troy A. Miller, Neal, David Neal, Kirstjen M. Nielsen, U.S Customs and Border Protection, U.S. Citizenship and Immigration Services, U.S. Department of Homeland Security, U.S. Department of Justice, U.S. Immigration and Customs Enforcement, Ronald D. Vitiello, Mathew Whitaker. (Attachments: # 1 Proposed Order)(Reuveni, Erez) (Filed on 7/25/2023) (Entered: 07/25/2023) |
| 07/25/2023 | 192 | **ORDER by Judge Jon S. Tigar. 191 Defendants' emergency motion to shorten time is granted in part and denied in part. Defendants have not demonstrated good cause for the issuance of a ruling before Plaintiffs can be heard in opposition. Plaintiffs' opposition to Defendants' emergency motion to stay is due by July 26, 2023, at 5:00 p.m. At that time, the Court will take the motion to stay under submission without a reply brief or a hearing unless the Court orders otherwise.** *(This is a text-only entry generated by the court. There is no document associated with this entry.)* **(jstlc2, COURT STAFF) (Filed on 7/25/2023) (Entered: 07/25/2023)** |
| 07/26/2023 | 193 | OPPOSITION/RESPONSE (re 190 Emergency MOTION to Stay re 188 Clerk's Judgment, 187 Order on Motion for Summary Judgment,,, ) filed byAmerican Gateways, Central American Resource Center, East Bay Sanctuary Covenant, Immigrant Defenders Law Center, National Center for Lesbian Rights, Tahirih Justice Center. (Eiland, Katrina) (Filed on 7/26/2023) (Entered: 07/26/2023) |
| 07/26/2023 | 194 | USCA Case Number 23-16032 for 189 Notice of Appeal to the Ninth Circuit filed by Troy A. Miller, Tae D. Johnson, U.S. Immigration and Customs Enforcement, Joseph R. Biden, U.S. Citizenship and Immigration Services, David Neal, Neal, U.S. Department of Homeland Security, Ronald D. Vitiello, Alejandro Mayorkas, Ur Mendoza Jaddou, Merrick Garland, U.S. Department of Justice, James McHenry, Kevin K. McAleenan, U.S Customs and Border Protection, Mathew Whitaker, Kirstjen M. Nielsen. (slh, COURT STAFF) (Filed on 7/26/2023) (Entered: 07/26/2023) |

| 08/01/2023 | 195 | **ORDER DENYING EMERGENCY MOTION FOR STAY PENDING APPEAL by Judge Jon S. Tigar denying 190 Motion to Stay.**(mll, COURT STAFF) (Filed on 8/1/2023) (Entered: 08/01/2023) |
| 08/03/2023 | 196 | ORDER of USCA as to 189 Notice of Appeal to the Ninth Circuit **No. 23-16032**. (wsn, COURT STAFF) (Filed on 8/3/2023) (Entered: 08/10/2023) |
| 08/18/2023 | 197 | ORDER of USCA as to 189 Notice of Appeal to the Ninth Circuit filed by Troy A. Miller, Tae D. Johnson, U.S. Immigration and Customs Enforcement, Joseph R. Biden, U.S. Citizenship and Immigration Services, David Neal, Neal, U.S. Department of Homeland Security, Ronald D. Vitiello, Alejandro Mayorkas, Ur Mendoza Jaddou, Merrick Garland, U.S. Department of Justice, James McHenry, Kevin K. McAleenan, U.S Customs and Border Protection, Mathew Whitaker, Kirstjen M. Nielsen (slh, COURT STAFF) (Filed on 8/18/2023) (Entered: 08/18/2023) |

| PACER Service Center | | |
|---|---|---|
| Transaction Receipt | | |
| 09/06/2023 19:44:22 | | |
| **PACER Login:** | bjspringer | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 4:18-cv-06810-JST |
| **Billable Pages:** | 30 | **Cost:** | 3.00 |

## CERTIFICATE OF SERVICE

I hereby certify that on September 7, 2023, I electronically filed the foregoing excerpts of record with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit via the appellate CM/ECF system. Service will be accomplished by the appellate CM/ECF system.

*s/ Sean R. Janda*
Sean R. Janda