No. 23-16032

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

EAST BAY SANCTUARY COVENANT, *et al.*,
*Plaintiffs-Appellees,*

*v.*

JOSEPH R. BIDEN, PRESIDENT OF THE UNITED STATES, *et al.*,
*Defendants-Appellants.*

On Appeal from the United States District Court
for the Northern District of California
No. 4:18-cv-06810-JST

BRIEF FOR NATIONAL CITIZENSHIP AND IMMIGRATION
SERVICES COUNCIL 119 AS AMICUS CURIAE
IN SUPPORT OF PLAINTIFFS-APPELLEES

Kathleen R. Hartnett
Zoë Helstrom
COOLEY LLP
3 Embarcadero Center, 20th Floor
San Francisco, CA 94111
Telephone: (415) 693-2000
khartnett@cooley.com

*Counsel for Amicus Curiae*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, amicus curiae hereby certifies that it has no parent corporations and that no publicly held company owns 10% or more of its stock.

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT ................................................. i

INTEREST OF AMICUS CURIAE ............................................................. 1

INTRODUCTION AND SUMMARY OF ARGUMENT ............................ 3

ARGUMENT ............................................................................................... 8

I.      THE RULE IS INCONSISTENT WITH ASYLUM LAW. ................. 8

II.     THE RULE RESTS ON ARBITRARY AND MISTAKEN
        PREMISES. .......................................................................... 14

        A.      Asylum Seekers Cannot Safely and Meaningfully Access
                Asylum in Transit Countries. .................................... 14

        B.      Many Asylum Seekers Cannot Secure Appointments at
                Ports of Entry. ........................................................ 27

        C.      Most Asylum Seekers Cannot Access Parole Programs........... 31

III.    THE RULE UNDERMINES OUR NATION'S
        LONGSTANDING COMMITMENT TO PROVIDE SAFE
        HAVEN TO THE PERSECUTED AND IS NOT NECESSARY
        TO ADDRESS THE FLOW OF MIGRANTS AT THE
        SOUTHERN BORDER...................................................... 33

CONCLUSION ......................................................................... 35

# TABLE OF AUTHORITIES

Page

**Cases**

*Andriasian v. I.N.S.*,
180 F.3d 1033 (9th Cir. 1999) ..................................................12

*Arrey v. Barr*,
916 F.3d 1149 (9th Cir. 2019) ..................................................12

*East Bay Sanctuary Covenant v. Barr*,
385 F. Supp. 3d 922 (N.D. Cal. 2019) ......................................13

*East Bay Sanctuary Covenant v. Biden*,
993 F.3d 640 (9th Cir. 2021) ......................................................4

*East Bay Sanctuary Covenant v. Garland*,
994 F.3d 962 (9th Cir. 2020) ................................... 4, 10, 12, 13

*Matter of Pula*,
19 I. & N. Dec. 467 (BIA 1987) ..................................................9

*Rosenberg v. Yee Chien Woo*,
402 U.S. 49 (1971).....................................................................13

**Statutes**

5 U.S.C. § 3331 ................................................................................8

8 U.S.C.
§ 1158(a)(1) ...............................................................................9
§ 1158(a)(2)(A)................................................................. 10, 11
§ 1158(b)(2) ...................................................................... 10, 13

**Other Authorities**

Azmi Haroun & Erin Snodgrass, *The app designed to help asylum-seekers has inadvertently separated families as Title 42 expires, advocates say*, Business Insider (May 12, 2023)................................................28

Bernd Debusmann Jr., *At US border, tech issues plague new migrant applications*, BBC News (Mar. 8, 2023)........................................27

ii

# TABLE OF AUTHORITIES
(continued)

Page

Center for Gender & Refugee Studies, *Far from Safety: Dangers and Limits to Protection for Asylum Seekers Transiting through Latin America* (Apr. 2023)........................................................................ *passim*

HIAS, *2022-2023 Overview: HIAS Panama* (2022) ......................................24

Hilary Beaumont, *'It doesn't work': Migrants struggle with US immigration app*, Al Jazeera (May 15, 2023) ................................29

Human Rights First, *Human Rights Stain, Public Health Farce* (Dec. 2022) ........................................................................16

Human Rights First, *Is Honduras Safe for Refugees and Asylum Seekers?* (May 1, 2020) ............................................................20

International Rescue Committee, *Venezuelan migrants: Colombia* (last accessed Oct. 5, 2023) ........................................................25

Lorena Rios, MIT Tech. Rev., *The new US border wall is an app* (June 16, 2023) ........................................................................28

Maria Abi-Habib et al., *Migrants Struggle to Get Appointments on Border Protection App*, N.Y. Times (May 11, 2023)...................................... 28, 30

María-Teresa Gil-Bazo, *The Safe Third Country Concept in Int'l Agreements on Refugee Protection*, 33/1, Netherlands Quarterly of Human Rights 42 (2015)........................................................................10

Moises Castillo and Christopher Sherman, *Fleeing Nicaraguans strain Costa Rica's asylum system*, AP (Sept. 2, 2022) ..................................................23

Sanya Mansoor, *Extreme Asylum Claims Aren't Prioritized in new U.S. Government* App, TIME (May 25, 2023)....................................................30

Sanya Mansoor, *'It's Like a Lottery.' Migrants Struggle to Make Asylum Appointments Through U.S. Government App*, TIME (May 16, 2023) .....29

U.S. Customs and Border Protection, *CBP Makes Changes to CBP One™ App* (May 5, 2023)........................................................................27

iii

# TABLE OF AUTHORITIES
### (continued)

**Page**

U.S. Dep't of Homeland Sec'y, Office of Immigration Statistics, *2021 Refugee and Asylees Annual Flow Report* (Sept. 2022)............................18

U.S. Dep't of State, *Belize 2022 Human Rights Report* (Mar. 20, 2023) ................................................................................26

U.S. Dep't of State, *Colombia 2022 Human Rights Report* (Mar. 20, 2023) ......................................................................... 24, 25

U.S. Dep't of State, *Costa Rica 2022 Human Rights Report* (Mar. 20, 2023) ................................................................................23

U.S. Dep't of State, *Ecuador 2022 Human Rights Report* (Mar. 20, 2023) ................................................................................25

U.S. Dep't of State, *El Salvador 2022 Human Rights Report* (Mar. 20, 2023) ......................................................................... 21, 22

U.S. Dep't of State, *Guatemala 2022 Human Rights Report* (Mar. 20, 2023) ................................................................................19

U.S. Dep't of State, *Honduras 2022 Human Rights Report* (Mar. 20, 2023) ................................................................................20

U.S. Dep't of State, *Mexico 2022 Human Rights Report* (Mar. 20, 2023) ..................................................................... 16, 17, 18

U.S. Dep't of State, *Nicaragua 2022 Human Rights Report* (Mar. 20, 2023) ................................................................................22

U.S. Dep't of State, Overseas Security Advisory Council, *Guatemala Country Security Report* (Aug. 15, 2022)................................18

U.S. Dep't of State, *Panama 2022 Human Rights Report* (Mar. 20, 2023) ................................................................................24

UNHCR, *Global Trends: Forced Displacement in 2021* (June 2022)..... 19, 21

UNHCR, *Honduras Factsheet* (Mar. 2022) ............................................ 20, 21

iv

# TABLE OF AUTHORITIES
(continued)

**Page**

UNHCR, *How to Apply for Refugee Status in Mexico* (last accessed Oct. 5, 2023) ...........................................................................17

UNHCR, *International Protection Considerations with Regard to People Fleeing Nicaragua* (Jan. 2023) ................................................22

UNHCR, *Statement on new U.S. asylum policy* (Nov. 19, 2019) ..................20

UNHCR, *States Parties to the 1951 Convention relating to the Status of Refugees and the 1967 Protocol* (Apr. 2015) .............................................11

USCIS, *Family Reunification Parole Processes*, https://www.uscis.gov/FRP (Oct. 3, 2023) .................................................................8

USCIS, *Frequently Asked Questions About the Processes for Cubans, Haitians, Nicaraguans, and Venezuelans* (Sept. 20, 2023) .......................33

USCIS, *Processes for Cubans, Haitians, Nicaraguans, and Venezuelans* (Sept. 20, 2023) ........................................................ 8, 32

USCIS, *Refugee Timeline* (Feb. 7, 2023) ........................................34

Washington Office on Latin America, *Struggling to Survive: the Situation of Asylum Seekers in Tapachula, Mexico* (June 2022) ...................................17

The White House, *Memorandum on Presidential Determination on Refugee Admissions for Fiscal Year 2024* (Sept. 29, 2023) ......................................7

# INTEREST OF *AMICUS CURIAE*[1]

The National Citizenship and Immigration Services Council 119 ("Council 119") is a labor organization that represents over 14,000 bargaining unit employees of U.S. Citizenship and Immigration Services ("USCIS"), a division of the U.S. Department of Homeland Security ("DHS"). Council 119's constituents include approximately 1,400 asylum officers, refugee officers, and adjudications officers who are responsible for, among other things, adjudicating affirmative asylum claims, processing refugees overseas, conducting "credible fear" and "reasonable fear" screenings, researching conditions in refugee-producing countries and regions, and reviewing applications for humanitarian parole. Council 119 also represents several hundred USCIS employees who have been detailed to assist with such operations. Of particular relevance here, Council 119's constituent members and bargaining unit employees employed with or detailed to the Asylum Division are tasked with implementing the final rule entitled "Circumvention

---

[1] Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(e), *amicus curiae* certifies that this brief was not written in whole or in part by counsel for any party, and no person or entity other than *amicus curiae* and its counsel has made a monetary contribution to the preparation and submission of this brief. The parties have consented to the filing of this amicus brief. *See* Fed. R. App. 29(a)(2).

of Lawful Pathways" ("the Rule"), 88 Fed. Reg. 31,314 (May 16, 2023) (codified at 8 C.F.R. pt. 208), which is the subject of this litigation.

Council 119 has a special interest in this case as the representative of the collective bargaining unit of federal government employees who are at the forefront of interviewing and adjudicating the legal claims of individuals seeking protection in the United States, many of whom are now subject to the Rule and its asylum eligibility bar. Council 119's members have first-hand knowledge of how mandatory eligibility bars are applied in the context of affirmative asylum adjudications; how the Rule is impacting pre-screening operations; how the Rule is being implemented in credible fear interviews and affirmative asylum adjudications; whether the Rule is consistent with the United States' obligations under international and domestic laws concerning the right to seek asylum and the protection of refugees; and whether the Rule is necessary to address the flow of migrants through our nation's southern border.

This brief relies solely upon information that is publicly available, and it does not rely on any information that is confidential, law enforcement sensitive, or classified. It represents only the views of Council 119 on behalf of the

bargaining unit and does not represent the views of USCIS or USCIS employees in their official capacities.

## INTRODUCTION AND SUMMARY OF ARGUMENT

The commitment to provide a safe haven to people fleeing persecution is fundamental to the best parts of our nation's identity, history, and moral fabric. More than thirty years ago, the United States created a modern asylum system to reflect that commitment, including by establishing a process for fairly, humanely, and efficiently identifying and vetting noncitizens' claims for protection from harm. For decades, that system was used to ensure that noncitizens would not be returned to territories where they were at risk of persecution or torture.

Over the last few years, however, the Executive Branch has advanced policies that jeopardize the integrity of our carefully crafted asylum system and America's position as a global leader in refugee protection. Although Council 119 had not previously deemed it necessary to weigh in on proposed and enacted changes to immigration policy, focusing instead on the bread-and-butter work of union member representation, these policies have been such an affront to the steadfast commitments and working conditions of its members

that Council 119 felt compelled to express its opposition.[2]  This Court was asked to judge the lawfulness of some of the prior Administration's policies to which Council 119 objected, and it correctly recognized those policies' fundamental flaws.  *See, e.g.*, *East Bay Sanctuary Covenant ("EBSC") v. Biden*, 993 F.3d 640 (9th Cir. 2021); *EBSC v. Garland*, 994 F.3d 962 (9th Cir. 2020).

The Rule at issue here, promulgated by the current Administration, unfortunately repackages and revives policies that were already deemed unlawful.  Like those prior policies, the Rule puts asylum seekers, our asylum system, and our international and moral commitments at risk.  Council 119 raised its objections when the Rule was being considered, but as with prior policies, those objections were ignored.[3]

---

[2] *See, e.g.*, Amicus Curiae Br. of Council 119, *Wolf v. Innovation Law Lab*, No. 19-1212 (U.S. Jan. 22, 2021); Council 119, "Comments on 'Security Bars and Processing'" (Aug. 10, 2020), https://www.regulations.gov/comment/USCIS-2020-0013-1897; Council 119, "Comments on Joint Notice of Proposed Rulemaking: Procedures for Asylum and Withholding of Removal; Credible Fear and Reasonable Fear Review" (July 15, 2020), https://www.regulations.gov/comment/EOIR-2020-0003-6096; Amicus Curiae Br. of Council 119, *EBSC v. Barr*, No. 19-16487, Dkt. 68 (9th Cir. 2019).

[3] *See* Council 119, "Comments on 'Circumvention of Lawful Pathways'" (Mar. 27, 2023), https://www.regulations.gov/comment/USCIS-2022-0016-12267.

The Rule effectively eliminates asylum for most non-Mexican asylum seekers arriving at the southern border, irrespective of the merits or urgency of their claim for protection. It does so by requiring asylum officers to deem an applicant ineligible for and thus barred from asylum unless the person: (1) applied for and was denied asylum in a transit country; (2) presented at a port of entry at a pre-scheduled time and place pursuant to an appointment made through a flawed mobile application called CBP One; or (3) obtained advance permission to travel to the United States through a parole program. 8 C.F.R. §§ 208.33(a). For those asylum seekers who cannot satisfy one of these conditions—and most cannot—the Rule's bar to asylum is unyielding unless the asylum seeker can demonstrate by a preponderance of the evidence that they or a member of their family with whom they were traveling faced "exceptionally compelling circumstances"—a phrase narrowly defined to include "an acute medical emergency," "an imminent and extreme threat to life or safety," or being a "victim of a severe form of trafficking in persons." 8 C.F.R. § 208.33(a)(3). Although "other exceptionally compelling circumstances" may suffice, 88 Fed. Reg. at 31,334, the Rule provides no guidance on how to make that determination.

The Rule compels asylum officers to determine if asylum seekers are ineligible for asylum under the Rule before ever assessing whether they have a viable protection claim—in other words, it requires them to consider *exclusion* from protection before ever considering *inclusion*, contrary to the approach set out in the 1951 United Nations Convention Relating to the Status of Refugees, the international treaty from which our country's refugee obligations flow. *See* Office of the United Nations High Commissioner for Refugees, *Handbook on Procedures and Criteria for Determining Refugee Status* ¶ 31 (1979) ("The inclusion clauses define the criteria that a person must satisfy in order to be a refugee. The . . . exclusion clauses . . . enumerate the circumstances in which a person is excluded from the application of the 1951 Convention although meeting the positive criteria of the inclusion clauses.").

The upshot is that the Rule functions as a sweeping bar to asylum that will cause many individuals with strong claims for protection to be denied asylum for reasons having nothing to do with the merits of their claims and to likely be sent back to the very dangers they fled.

Council 119 opposes the Rule for the same reasons it opposed prior asylum policies. Council 119's members are highly trained experts in international and domestic asylum and refugee law. *See* 8 C.F.R. § 208.1(b).

They have extensive experience interviewing asylum seekers and vetting their claims. Based on that expertise, Council 119's members firmly believe that this Rule is at odds with our asylum law, premised on unfounded assumptions, and is causing bona fide asylum seekers to be wrongly sent back to harm.

Simply put, the Rule has nothing to do with improving the "effective[ness], human[ity], and efficien[cy]" of our asylum system. 88 Fed. Reg. 31,314. Nor will it advance the protection of those fleeing persecution and torture. Rather, it is merely an effort to deter noncitizens from seeking protection in the United States and so reduce the number of migrants arriving at the southern border. But extending protection to persons fleeing persecution and effectively managing the border are not mutually exclusive objectives. The United States has an agile, sophisticated asylum system that—if properly resourced—is capable of handling large flows of migrants through our southern border. And there are other lawful and humane policies that can help to regularize and streamline the processing of noncitizens arriving at the southern border, including two the Biden Administration has committed to undertaking: expanding family reunification and other parole processes and significantly increasing refugee processing in the Western Hemisphere. *See* The White House, *Memorandum on Presidential Determination on Refugee Admissions*

*for Fiscal Year 2024* (Sept. 29, 2023), https://www.whitehouse.gov/briefing-room/presidential-actions/2023/09/29/memorandum-on-presidential-determination-on-refugee-admissions-for-fiscal-year-2024/; USCIS, *Family Reunification Parole Processes*, https://www.uscis.gov/FRP (Oct. 3, 2023); USCIS, *Processes for Cubans, Haitians, Nicaraguans, and Venezuelans*, https://www.uscis.gov/CHNV (Sept. 20, 2023).

Council 119's members are deeply committed to advancing our country's proud tradition of serving as a refuge for the persecuted. The Rule forces them to help send people with meritorious claims for asylum back to harm, and thus to betray that tradition, their moral conscience, and their professional ethics; to violate their oath to faithfully discharge their duty to carry out the immigration laws adopted by Congress, *see* 5 U.S.C. § 3331; and to fear that they are being made complicit in violations of domestic and international law. Council 119 accordingly urges the Court to affirm the judgment of the District Court.

## ARGUMENT

## I.     The Rule Is Inconsistent with Asylum Law.

The Rule is plainly inconsistent with the United States' asylum law, in at least two critical respects. First, the Rule impermissibly forecloses asylum

for those individuals who cross the southern border outside of a port of entry or who arrive at a port of entry without having pre-scheduled the time and place pursuant to an appointment made through CBP One or without authorization to seek parole through a DHS-approved parole process. 8 C.F.R. § 208.33(a). But Congress expressly rejected the notion that eligibility for asylum can be conditioned on presenting at a port of entry and instead made clear that where and how a person arrives in the United States is irrelevant to their ability to seek asylum. Indeed, the very first provision in the asylum statute states that a noncitizen who is physically present or arrives in the United States "may apply for asylum" "whether or not" they arrived through "a designated port of arrival." 8 U.S.C. § 1158(a)(1). Although an asylum seeker's method of entry may, at most, be one of many factors considered in adjudicating an asylum claim, *see Matter of Pula*, 19 I. & N. Dec. 467 (BIA 1987), the Rule makes method-of-entry essentially dispositive in a vast number of cases. Because Congress has explicitly provided that the ability to seek asylum cannot turn on where or how an individual enters the United States, the Rule's use of manner of entry to categorically foreclose asylum is contrary to law.

Second, the Rule rewrites the careful balance struck by Congress with respect to the availability of protection in third countries as set forth in the "safe

third country" exception and the "firm resettlement" bar to asylum. The asylum statute provides that any new bar to asylum must be "consistent with" those provisions, as well as with the entire asylum statute. 8 U.S.C. § 1158(b)(2). As elaborated below, the Rule is not consistent with those provisions: under the Rule, an asylum seeker who transits through a third country while en route to the southern border is barred from asylum unless they apply for and are denied asylum in a transit country, but the "safe third country" and "firm resettlement" provisions make clear that the third country must offer safety and meaningful access to legal protection before some relationship with that third country can foreclose asylum. *See EBSC*, 994 F.3d at 977 ("A critical component of [the safe third country and firm resettlement] bars is the requirement that the [noncitizen's] 'safe option' be genuinely safe."); *id.* at 978 (rejecting the prior transit ban as inconsistent with asylum law in part because that ban did not require "that there be a 'full and fair' procedure for applying for asylum in that [transit] country" (quoting 8 U.S.C. § 1158(a)(2)(A))).

In the "safe third country" exception to the ability to seek asylum, Congress carefully balanced the need to afford asylum to those fleeing persecution with the desire to share the burden of extending such protection with other countries able and willing to provide similar protection. *See, e.g.,*

María-Teresa Gil-Bazo, *The Safe Third Country Concept in Int'l Agreements on Refugee Protection*, 33/1, Netherlands Quarterly of Human Rights 42, 48-49 (2015). The asylum statute accordingly provides that, for the "safe third country" exception to apply, the Attorney General or Secretary of Homeland Security must "determine[] that the [noncitizen] may be removed, pursuant to a bilateral or multilateral agreement, to a country . . . in which the [noncitizen's] life or freedom would not be threatened on account of [a protected class], and where the [noncitizen] would have access to a full and fair procedure for determining a claim to asylum or equivalent temporary protection." 8 U.S.C. § 1158(a)(2)(A). Here, however, the Rule's eligibility bar applies to *every* asylum seeker who transited through a third country and did not apply for and receive denial of protection there—irrespective of whether the asylum seeker could have safely stayed in that country or whether that country has "a full and fair" asylum system.[4] The Rule's exception for "imminent and extreme

---

[4] The Rule's requirement that the transit country be a party to the 1951 United Nations Convention Relating to the Status of Refugees or the 1967 Protocol Relating to the Status of Refugees, *see* 88 Fed. Reg. 31,450, is not a meaningful limitation. Every country commonly transited en route to the southern border is a party to one of these instruments, and being a signatory does not guarantee safety or a functioning asylum system. *See* UNHCR, *States Parties to the 1951 Convention relating to the Status of Refugees and the 1967 Protocol* (Apr.

threat[s] to life or safety" does not remedy this deficiency, as it requires an asylum seeker to endure until the moment of extreme, imminent danger to present at the southern border and makes no provision for the inability to meaningfully access asylum elsewhere. 8 C.F.R. § 208.33(a)(3)(i)(B).

The "firm resettlement" bar to asylum applies only to individuals who have *firmly* resettled in another country, meaning they "have either truly resettled in a third country, or have received an actual offer of firm resettlement in a country where they have ties and will be provided appropriate status," *EBSC*, 994 F.3d at 978, and are not at risk of "harm or persecution," *Andriasian v. I.N.S.*, 180 F.3d 1033, 1046-47 (9th Cir. 1999). Barring an individual from asylum pursuant to the firm resettlement bar requires an individualized determination that the noncitizen received "an offer of some type of permanent resettlement" from a country where their "stay and ties [were not] too tenuous, or the conditions of [their] residence too restricted, for [them] to be firmly resettled." *Arrey v. Barr*, 916 F.3d 1149, 1159 (9th Cir. 2019) (citation omitted). Moreover, "[t]he Supreme Court has long recognized that the firm-resettlement bar does not bar [noncitizens] who have merely traveled through

---

2015), https://www.unhcr.org/en-us/protection/basic/3b73b0d63/states-parties-1951-convention-its-1967-protocol.html.

third countries, since 'many refugees make their escape to freedom from persecution in successive stages and come to this country only after stops along the way.'" *EBSC*, 994 F.3d at 978 (quoting *Rosenberg v. Yee Chien Woo*, 402 U.S. 49, 57 n.6 (1971)).

Here, contrary to the "firm resettlement" bar, "the Rule does virtually nothing to ensure that a third country is a 'safe option.'" *Id.* at 977 (quoting *EBSC v. Barr*, 385 F. Supp. 3d 922, 944 (N.D. Cal. 2019)). "While the firm resettlement bar requires a determination regarding each [noncitizen]'s individual circumstances, and the safe third country bar requires a formalized determination as to the individual country under consideration, the Rule ignores an applicant's individual circumstances and categorically deems most of the world a 'safe option' . . . In short, Congress requires consideration of an applicant's circumstances and those of the third country; the Rule turns its back on those requirements." *EBSC*, 385 F. Supp. 3d at 944-45. Accordingly, the Rule it is not "consistent with" the asylum statute. 8 U.S.C. § 1158(b)(2).

Because the Rule renders noncitizens ineligible for asylum on bases that Congress has either expressly rejected (manner of entry) or has limited far more narrowly (relationship with a third country), it is contrary to law.

13

## II.     The Rule Rests on Arbitrary and Mistaken Premises.

As explained above, the Rule sets out three purported pathways by which asylum seekers can avoid its asylum eligibility bar: (1) seek and be denied asylum in another country while en route to the United States; (2) pre-schedule an appointment at a port of entry using the CBP One app and present at the set time and place; and (3) be authorized to seek parole through a DHS-approved parole process.  For the majority of asylum seekers, these options are illusory. That reality is obvious to Council 119's members from their international human rights expertise and experience interviewing asylum seekers and vetting their claims and was well known to the agencies enacting the Rule.  Yet those agencies chose to ignore the actual circumstances that asylum seekers face and to erect an arbitrary asylum policy based on unsupported premises.

### A.     Asylum Seekers Cannot Safely and Meaningfully Access Asylum in Transit Countries.

By providing that asylum seekers who first apply for and are denied asylum in a transit country can avoid the Rule's asylum eligibility bar, the Rule assumes that people fleeing persecution can safely and adequately access asylum in transit countries.  That assumption lacks any basis in reality, as U.S. government agencies, international bodies, and humanitarian organizations have long documented, and as Council 119's asylum officer members know

14

well from experience, as they regularly ask asylum seekers whether they transited through another country and sought protection there to document whether the asylum seeker may have been firmly resettled elsewhere.

Most of the countries through which asylum seekers transit en route to the U.S. southern border produce far more refugees than they accept, have inadequate asylum systems, and are unable or unwilling to provide migrants with meaningful protection. Forcing asylum seekers to remain in these countries to apply for protection and wait for a denial before continuing on to the United States puts them at risk of experiencing violence as well as refoulement to persecution or torture. The notion that it would be safe and practicable to stay in a transit country long enough to apply for asylum and wait for a decision is inconceivable to the vast majority of asylum seekers.

The most common countries that asylum seekers pass through en route to the U.S. southern border are Mexico, Guatemala, Honduras, El Salvador, Nicaragua, Costa Rica, Panama, Colombia, Ecuador, and Belize. As described below, the characteristics of each country pose massive obstacles for asylum seekers to safely and adequately access protection there.

*Mexico.* All asylum seekers crossing the southern border who are not Mexican nationals will have passed through Mexico, which is not a safe haven

for them. The U.S. Department of State has reported that violence against migrants by organized criminal groups, and, at times, police, immigration officers, and customs officials, is a pervasive human rights issue in Mexico. *See* U.S. Dep't of State, *Mexico 2022 Human Rights Report*, at 19 (Mar. 20, 2023), https://www.state.gov/wp-content/uploads/2023/02/415610_MEXICO-2022-HUMAN-RIGHTS-REPORT.pdf; *see also* Ctr. for Gender & Refugee Studies, *Far from Safety: Dangers and Limits to Protection for Asylum Seekers Transiting through Latin America*, at 4 (Apr. 2023), https://cgrs.uchastings.edu/sites/default/files/Transit%20Countries%20Report_4.21.23_FINAL.pdf (noting that "Mexican immigration or law enforcement authorities are responsible for a large share of [the] violence and other crimes committed against asylum seekers . . . transiting or returned to Mexico"). Asylum seekers in Mexico are at risk of kidnapping, disappearance, trafficking, and sexual assault, among other harms. Between January 2021 and December 2022, Human Rights First identified 13,480 reports of murder, kidnapping, rape, torture, and other violent attacks against migrants who were stuck in Mexico or expelled there under Title 42. *See* Human Rights First, *Human Rights Stain, Public Health Farce*, at 2 (Dec. 2022), https://humanrightsfirst.org/wp-content/uploads/2022/12/HumanRightsStain

16

PublicHealthFarce-1.pdf. Mexico is especially dangerous for lesbian, gay, bisexual, and transgender people, as well as indigenous people, who have regularly faced violence and harm there. *See* U.S. Dep't of State, *Mexico 2022 Human Rights Report*, at 2; CGRS, *Far from Safety*, at 4.

Regarding Mexico's asylum process, migrants have only 30 days to apply for asylum upon entering, and the country's capacity to process claims is limited and backlogged—COMAR (the Mexican Refugee Assistance Commission) has only ten locations across the country. *See* UNHCR, *How to Apply for Refugee Status in Mexico*, https://help.unhcr.org/mexico/en/como-solicitar-la-condicion-de-refugiado-en-mexico/ (last accessed Oct. 5, 2023); CGRS, *Far from Safety*, at 4-5. Migrants who have tried to apply for asylum in Tapachula, Mexico—where, because of its proximity to Mexico's southern border, the majority of such claims are filed—have been subject to maltreatment and violence, including sometimes from the persecutors from which they fled. *See* Washington Office on Latin America, *Struggling to Survive: the Situation of Asylum Seekers in Tapachula, Mexico*, at 20-21 (June 2022), https://www.wola.org/wp-content/uploads/2022/06/FINAL-Struggling-to-Survive-Asylum-Seekers-in-Tapachula.pdf; *see also* U.S. Dep't of State, *Mexico 2022 Human Rights Report*, at 19 (noting "numerous instances" of

violence against asylum seekers by criminal armed groups and "credible reports of gender-based violence against migrants").  Migrants in Mexico are also at substantial risk of being involuntarily repatriated to the countries from which they fled despite their fears of persecution or torture there, due to Mexico's lack of a safe or adequate asylum process.  *See* CGRS, *Far from Safety*, at 5 (reporting that Mexican immigration authorities sometime dissuade migrants from pursuing asylum and instead pressure or force them to return to their home countries); U.S. Dep't of State, *Mexico 2022 Human Rights Report*, at 19 (similar).

**Guatemala.**  Remaining in Guatemala, one of the most dangerous countries in the world, to seek protection is not a safe or realistic option for asylum seekers.  *See* U.S. Dep't of State, Overseas Security Advisory Council, *Guatemala Country Security Report* (Aug. 15, 2022), https://www.osac.gov/Content/Report/2013f384-296b-4394-bfcb-1c9c40b9c7df.  Guatemala itself produces a significant number of asylum seekers.  *See* DHS, Office of Immigration Statistics, *2021 Refugee and Asylees Annual Flow Report*, at 9 (Sept. 2022), https://www.dhs.gov/sites/default/files/2023-03/2022_0920_plcy_refugees_ and_asylees_fy2021_v2.pdf (noting that Guatemalan nationals comprised

10.4% of affirmative asylum applicants and 17.2% of defensive asylum applicants in FY 2021). For similar reasons, Guatemala is often extremely dangerous for migrants, who also face harm there because of their race, nationality, gender, and sexual orientation, as well as their inherent vulnerability as migrants, among other reasons. *See* CGRS, *Far from Safety*, at 7; U.S. Dep't of State, *Guatemala 2022 Human Rights Report*, at 1-2 (Mar. 20, 2023), https://www.state.gov/wp-content/uploads/2023/03/415610_ GUATEMALA-2022-HUMAN-RIGHTS-REPORT.pdf.

Guatemala's asylum system is far from fair or functional. The U.S. Department of State reports that there are "gaps and shortcomings" in Guatemala's asylum procedures, that "[i]dentification and referral mechanisms for potential asylum seekers are inadequate," that access to the process is "limit[ed]," and that there have been "major delays on final case decisions and an increased backlog." U.S. Dep't of State, *Guatemala 2022 Human Rights Report*, at 16.

**Honduras.** Like Guatemala, Honduras produces a significant number of asylum seekers, with 59,800 Honduran nationals seeking protection in 2021. *See* UNHCR, *Global Trends: Forced Displacement in 2021*, at 32 (June 2022), https://www.unhcr.org/us/media/40152. Honduras also has nearly 250,000

internally displaced persons due to violence, gang activity, and human trafficking. *See* U.S. Dep't of State, *Honduras 2022 Human Rights Report*, at 11 (Mar. 20, 2023), https://www.state.gov/wp-content/uploads/2023/02/415610_HONDURAS-2022-HUMAN-RIGHTS-REPORT.pdf. Migrants and asylum seekers in Honduras are "vulnerable to abuse and sexual exploitation by criminal organizations," with women, children, and lesbian, gay, bisexual, transgender, queer, and intersex people particularly at risk. *Id*. Migrants have been pursued by their persecutors into Honduras and murdered in southern border towns. UNHCR, *Honduras Factsheet*, at 1 (Mar. 2022), https://reporting.unhcr.org/document/1831.

Opportunities for formal protection in Honduras are almost nonexistent. UNHCR and the U.S. Department of State have described Honduras' asylum system as "nascent." UNHCR, *Statement on new U.S. asylum policy* (Nov. 19, 2019), https://www.unhcr.org/us/news/news-releases/statement-new-u-s-asylum-policy; U.S. Dep't of State, *Honduras 2022 Human Rights Report* at 11. For example, as of 2020, there were only *three* locations in the entire country where asylum seekers could file requests for protection. Human Rights First, *Is Honduras Safe for Refugees and Asylum Seekers?* (May 1, 2020), https://humanrightsfirst.org/library/is-honduras-safe-for-refugees-and-asylum-

20

seekers-2/.  Only 299 asylum claims were filed in Honduras between 2018 and 2021, and the country's "legal framework and reception capacities severely limit[ed] an adequate response."  UNHCR, *Honduras Factsheet*, at 1.

**El Salvador.**  El Salvador does not have a safe or adequate asylum process in place for asylum seekers.  For years, it has been a refugee-producing country, responsible for almost 15,000 asylum applications (and 8% of total applications) in the United States in 2021.  UNHCR, *Global Trends: Forced Displacement in 2021*, at 31.  Since then, human rights conditions in El Salvador have markedly worsened.  CGRS, *Far from Safety*, at 9.  In response to a dramatic increase in gang-committed homicides, the government declared a state of emergency in 2022, pursuant to which there have been widespread arbitrary arrests and detentions, unjust prosecutions, serious restrictions on expression, corruption, lack of government responsiveness to gender-based violence, and crimes against lesbian, gay, bisexual, transgender, queer, and intersex individuals.  U.S. Dep't of State, *El Salvador 2022 Human Rights Report*, at 2 (Mar. 20, 2023), https://www.state.gov/wp-content/uploads/2023/02/415610_EL-SALVADOR-2022-HUMAN-

RIGHTS-REPORT.pdf.  These conditions jeopardize the safety of nationals and migrants alike.

As to the ability to seek asylum in El Salvador, the U.S. Department of State reports that there are "major regulatory and operational gaps" in El Salvador's refugee protection system.  *Id.* at 18-19.  The country requires asylum seekers to file their claims within *five days* of entering, a nearly impossible feat.  *Id*.  An average of only six people per year were granted asylum between 2014 and 2019.  CGRS, *Far from Safety*, at 10.

***Nicaragua.***  Nicaragua is not a safe place for refugees, and the country does not cooperate with UNHCR or other organizations in providing protection to refugees.  U.S. Dep't of State, *Nicaragua 2022 Human Rights Report*, at 23 (Mar. 20, 2023), https://www.state.gov/wp-content/uploads/2023/03/415610_ NICARAGUA-2022-HUMAN-RIGHTS-REPORT.pdf.  Widespread human rights violations, including arbitrary detention, torture, sexual violence, indiscriminate targeting, and "the worst forms of child labor" have been reported by the U.S. Department of State and documented by human rights organizations.  *Id.* at 2; *see also* UNHCR, *International Protection Considerations with Regard to People Fleeing Nicaragua* (Jan. 2023), https://www.refworld.org/docid/63bc17264.html.  The country is a large

producer of asylum applicants—recent political strife and violence has led nearly 250,000 Nicaraguans to seek asylum in neighboring Costa Rica alone as of September 2022. *See* Moises Castillo and Christopher Sherman, *Fleeing Nicaraguans strain Costa Rica's asylum system*, AP (Sept. 2, 2022), https://apnews.com/article/covid-health-elections-presidential-caribbean-52044748d15dbbb6ca706c66cc7459a5.

**Costa Rica.** Costa Rica's asylum system is extremely strained in light of the quarter-million asylum applications from Nicaraguans noted above. *Id.* The per capita rate of asylum applications is ten times greater than that of the United States. CGRS, *Far from Safety*, at 11. Asylum applicants must wait months to even file an asylum claim and up to 10 years to obtain a final resolution. *See* U.S. Dep't of State, *Costa Rica 2022 Human Rights Report*, at 7 (Mar. 20, 2023), https://www.state.gov/wp-content/uploads/2023/03/415610_COSTA-RICA-2022-HUMAN-RIGHTS-REPORT.pdf.

In December 2022, Costa Rica responded to this backlog by announcing new policies severely limiting eligibility for asylum and discouraging people from applying, including—similar to the Rule here—a ban on asylum for individuals transiting through certain countries without applying for and being denied asylum there. CGRS, *Far from Safety*, at 12.

***Panama***.  Approval rates for asylum are extremely low in Panama—less than 1% in 2021—and asylum seekers face barriers, long delays, and high costs accessing protection.  U.S. Dep't of State, *Panama 2022 Human Rights Report*, at 9 (Mar. 20, 2023), https://www.state.gov/wp-content/uploads/2023/02/ 415610_PANAMA-2022-HUMAN-RIGHTS-REPORT.pdf; CGRS, *Far from Safety*, at 13-14; HIAS, *2022-2023 Overview: HIAS Panama*, at 6 (2022), https://hias.org/where/panama/.  Asylum seekers in Panama have also been refouled back to their countries of origin.  U.S. Dep't of State, *Panama 2022 Human Rights Report*, at 9.  And those migrants who cross the Darién Gap, an area that connects North and South America, face extremely high rates of sexual violence.  CGRS, *Far from Safety*, at 15.

***Colombia***.  Colombia, which currently hosts millions of displaced refugees and migrants from Venezuela, suffers its own forced displacement crisis due to violence and armed conflict, with 6.7 million internally displaced persons as of 2022.  U.S. Dep't of State, *Colombia 2022 Human Rights Report*, at 21-22 (Mar. 20, 2023), https://www.state.gov/wp-content/uploads/2023/ 02/415610_COLOMBIA-2022-HUMAN-RIGHTS-REPORT.pdf.  There are significant human rights abuses in Colombia, and asylum seekers in Colombia face threats of violence including human trafficking and sexual exploitation by

organized crime networks. *Id.* at 1-2; International Rescue Committee, *Venezuelan migrants: Colombia*, https://www.rescue.org/country/colombia (last accessed Oct. 5, 2023); CGRS, *Far from Safety*, at 15 (collecting reports of "1059 assaults, 362 homicides, and 335 incidents of sexual violence" against Venezuelans in Colombia in the first half of 2021). The country's asylum system is "deficient, bureaucratic, and cumbersome," with a large backlog and multiple procedural barriers that impede access. CGRS, *Far from Safety*, at 15-16.

**Ecuador.** Migrants and refugees in Ecuador, especially women, children, and lesbian, gay, bisexual, transgender, queer, and intersex people, have faced sexual and gender-based violence and human trafficking. U.S. Dep't of State, *Ecuador 2022 Human Rights Report*, at 16 (Mar. 20, 2023), https://www.state.gov/wp-content/uploads/2023/02/415610_ECUADOR-2022-HUMAN-RIGHTS-REPORT.pdf. They also have experienced a variety of dangerous situations and human rights violations, including robberies, assault, human trafficking, sexual exploitation, and forced recruitment into criminal activity. *Id.* Refugees in Ecuador have faced discrimination in employment and housing, and barriers to enrolling their children in school. *Id.* at 17. The asylum system has a short application window of 90 days, and

Ecuadoran migration officials have reportedly discouraged migrants from applying for asylum. CGRS, *Far from Safety*, at 17.

**Belize.** The asylum system in Belize is "barely functional." CGRS, *Far from Safety*, at 6. A single official gathers and reviews asylum claims, which are reviewed by a nine-member group that only meets monthly. *Id.* As of December 2022, Belize had a backlog of over 4,000 cases. *Id.* Belize sometimes arbitrarily denies migrants the ability to apply for refugee status. *Id.*; U.S. Dep't of State, *Belize 2022 Human Rights Report*, at 10 (Mar. 20, 2023), https://www.state.gov/wp-content/uploads/2023/02/415610_BELIZE-2022-HUMAN-RIGHTS-REPORT.pdf. Further, Belize has involuntarily repatriated irregular immigrants with Cuban citizenship to Cuba based on its agreement with the country, despite the immigrants' claims that their lives or freedom would be threatened due to the opposition to the Cuban government. *Id*.

\*\*\*

The Rule assumes that many asylum seekers bypass opportunities for protection in transit countries and instead come to the southern border simply because they "prefer to apply for asylum in the United States." 88 Fed. Reg. 31,411. But the vast majority of asylum seekers cannot safely remain in these

countries and access meaningful protection. The Rule's presumption that they could have done so is arbitrary and unfounded. Its misguided requirement that asylum seekers stay in one of these unsafe countries long enough to both apply for protection and have that application denied to have a chance at asylum in the United States cruelly puts them in harm's way.

**B.      Many Asylum Seekers Cannot Secure Appointments at Ports of Entry.**

The Rule provides that asylum seekers may avoid the Rule's eligibility bar if they schedule an appointment at a port of entry through the CBP One app and then present at the correct port of entry at the pre-set time. 8 C.F.R. § 208.33(a)(2). The Rule claims that widespread use of the CBP One app will improve processing at ports of entry. *Id.* at 31317-18. But the app has multiple, well-documented technical issues and accessibility problems, which were known to exist months before the Rule took effect and were not resolved by changes to the app that U.S. Customs and Border Protection made immediately prior to the Rule's effective date. *See, e.g.*, Bernd Debusmann Jr., *At US border, tech issues plague new migrant applications*, BBC News (Mar. 8, 2023), https://www.bbc.com/news/world-us-canada-64814095; U.S. Customs and Border Protection, *CBP Makes Changes to CBP One™ App* (May 5, 2023), https://www.cbp.gov/newsroom/national-media-release/cbp-makes-changes-

cbp-one-app; Maria Abi-Habib et al., *Migrants Struggle to Get Appointments on Border Protection App*, N.Y. Times (May 11, 2023), https://www.nytimes.com/2023/05/11/us/migrants-border-app-cbp-one.html.

Widespread reporting shows that the app's technical issues prevent many asylum seekers who have waited weeks, or even months, to secure an appointment from being able to do so. *See, e.g.*, *id.*. The app reportedly glitches and kicks users out at the time of day when appointments open up, leading asylum seekers to try to get appointments day after day to no avail. *See, e.g.*, Lorena Rios, MIT Tech. Rev., *The new US border wall is an app* (June 16, 2023), https://www.technologyreview.com/2023/06/16/1074039/border-wall-app/. The app also prompts families to register for individual appointments, such that when an individual does manage to secure an appointment, families sometimes face the heartbreaking possibility of separation where only some family members get appointments and others do not. *See, e.g.*, Azmi Haroun & Erin Snodgrass, *The app designed to help asylum-seekers has inadvertently separated families as Title 42 expires, advocates say*, Business Insider (May 12, 2023), https://www.businessinsider.com/the-cbp-one-app-has-inadvertently-facilitated-family-separations-2023-5.

In addition, the app has a range of accessibility hurdles that many asylum seekers cannot overcome. For example, the app uses facial recognition software that does not always recognize the faces of Black or dark-skinned people, rendering them unable to submit the photos necessary to schedule an appointment. *See, e.g.*, Hilary Beaumont, *'It doesn't work': Migrants struggle with US immigration app*, Al Jazeera (May 15, 2023), https://www.aljazeera.com/news/2023/5/15/it-doesnt-work-migrants-struggle-with-us-immigration-app. Additionally, accessing the app requires having both a smartphone and reliable internet, which many asylum seekers do not, making it difficult if not impossible for them to even have a chance at securing an appointment. Making access to asylum contingent on having a smartphone risks forcing asylum seekers fleeing extreme poverty to make trade-offs between paying for a phone and paying for daily essentials like food. *See, e.g.*, Sanya Mansoor, *'It's Like a Lottery.' Migrants Struggle to Make Asylum Appointments Through U.S. Government App*, TIME (May 16, 2023), https://time.com/6280220/migrants-border-cbp-app-asylum/. Moreover, the app is only available in English, Spanish, or Haitian Creole, so asylum seekers who do not speak or read those languages cannot understand the app. *Id.* And of those individuals who can access the app and understand one of the three

available languages, many do not have sufficient technological aptitude to successfully navigate through the app. *Id.*

Even if the app functioned perfectly, however, there are far fewer appointments available through the app each day than there are asylum seekers, despite CBP increasing the number of daily appointments. *See* Abi-Habib et al., *Migrants Struggle to Get Appointments on Border Protection App*, *supra* (noting that 62,000 people had applied for the 1,000 appointment slots available on May 24, 2023); U.S. Customs & Border Protection, *CBP One Appointments Increased to 1,450 Per Day* (June 30, 2023), https://www.cbp.gov/newsroom/national-media-release/cbp-one-appointments-increased-1450-day (increasing appointment slots to 1,450 per day). The Rule's requirement that asylum seekers make an appointment through CBP One before presenting at a port of entry thus functions like an unlawful metering system. And as long as demand for appointments far outstrips supply, a ballooning population of people will be forced to choose between waiting for entry in dangerous border towns where they risk being kidnapped, assaulted, or killed[5]; crossing without authorization

---

[5] Although the Rule excepts from its asylum eligibility bar those who face "imminent and extreme threat[s] to life or safety," 8 C.F.R. § 208.33(a)(3)(i)(B), the app does not ask asylum seekers why they feel they need protection or provide an opportunity to report that they are facing imminent and extreme danger, *see* Sanya Mansoor, *Extreme Asylum Claims*

between ports of entry; or remaining in their home countries where they risk persecution because they believe the American asylum system is closed.

In light of these and other problems, the CBP One app remains a barrier, rather than a tool, for asylum seekers. Conditioning access to asylum on the ability to successfully use this highly flawed technology is arbitrary and unfounded. And asking asylum officers to take part in a system that claims to be incentivizing lawful entry when it in fact discourages people from seeking protection does significant harm to their morale and ability to perform their jobs.

### C. Most Asylum Seekers Cannot Access Parole Programs.

The parole programs referenced in the Rule, while valuable, are not a meaningful alternative to seeking asylum at the southern border. The programs are not specifically designed for individuals who need protection from danger; they are available to asylum seekers and non-asylum seekers alike. And even then, only a small subset of asylum seekers will be able to access the programs

---

*Aren't Prioritized in new U.S. Government* App, TIME (May 25, 2023), https://time.com/6282428/asylum-claims-government-app-violence-migrants/. Thus, even those asylum seekers who might qualify for the very limited exception will not know about that option when they try to make an appointment through the app.

because of those programs' structural limitations and requirements.

To start, the parole programs discussed in the Rule are open only to nationals of five countries—Cuba, Haiti, Nicaragua, Venezuela, and Ukraine. *See* 88 Fed. Reg. 31,317 & n.19, 31,339 & n.86, 31,445 & n.380. They also impose requirements that may render the programs largely inaccessible to most of the individuals from these countries who seek asylum at the southern border. Specifically, to access the program, an individual must have a supporter in the United States who has lawful status or is a parolee or beneficiary of deferred action or Deferred Enforced Departure; can pass security and background vetting; and can "demonstrate[] sufficient financial resources to receive, maintain, and support the individual[]" throughout the up-to-two-year parole period. *Processes for Cubans, Haitians, Nicaraguans, and Venezuelans*, *supra*. The individual must also have "an unexpired passport valid for international travel," *id.*—a requirement that will be difficult to satisfy for those asylum seekers who fear seeking a passport from their country's government or cannot safely wait for their passport application to be processed. The individual must further be able to pay for a commercial flight to the United States, *id.*, a significant expense that will be far too high for many vulnerable asylum seekers.

The parole programs are further limited in that they are unavailable to people who entered the United States, Mexico, or Panama irregularly in the last nine months (after January 9, 2023), *id.*, meaning asylum seekers who are already en route to the United States or waiting in Mexico for processing cannot qualify. The parole programs are also capped at 30,000 individuals per month. *See* USCIS, *Frequently Asked Questions About the Processes for Cubans, Haitians, Nicaraguans, and Venezuelans* (Sept. 20, 2023), https://www.uscis.gov/humanitarian/frequently-asked-questions-about-the-processes-for-cubans-haitians-nicaraguans-and-venezuelans. And as noted, because the criteria for parole are unrelated to the need for asylum, it is unlikely that all or even most of these limited parole program slots will be allocated to asylum seekers.

For all these reasons, the notion that admission to a parole program should be a prerequisite to accessing regular asylum procedures is arbitrary and unfounded.

## III. The Rule Undermines Our Nation's Longstanding Commitment to Provide Safe Haven to the Persecuted and Is Not Necessary to Address the Flow of Migrants at the Southern Border.

The commitment to provide a safe haven to persecuted people is fundamental to the best traditions of our nation's identity and moral fabric. Our

asylum laws reflect that commitment, and for decades, our nation's resources were dedicated to establishing an agile system to identify, vet, and protect refugees that honored our values and laws. Since World War II, the United States has afforded protection to asylum seekers and refugees escaping violence, conflict, persecution, or natural disaster, sometimes in waves of hundreds of thousands of people. *See, e.g.*, USCIS, *Refugee Timeline* (Feb. 7, 2023), https://www.uscis.gov/history-and-genealogy/our-history/refugee-timeline.

The agencies contend that the Rule's extreme limitations on asylum are necessary to respond to the increased flow of migrants at the southern border. 88 Fed. Reg. 31,314-16. But our post-World War II refugee and asylum systems are designed to handle large influxes. Instead of responding to long backlogs in asylum processing by devising new ways to shut the door to bona fide asylum seekers, as the challenged Rule does, the appropriate response— the one consistent with governing law and our nation's longstanding commitment—is to allocate adequate resources to our existing asylum system to ensure that there are enough asylum officers, immigration judges, and administrative staff to fairly, humanely, and expeditiously hear and adjudicate asylum claims. The government also can and should further leverage the U.S.

Refugee Admissions Program to provide increased assistance and processing in the Western Hemisphere so that people can seek protection where they are without having to first travel to the southern border.

The Rule is illegal and immoral. It represents a decision to turn our back on our history and break from our longstanding commitment to offering protection to the vulnerable and persecuted. The Rule makes asylum officers complicit in the return of bona fide asylum seekers to persecution, thereby jeopardizing not only the integrity of our asylum system but its basic ability to function. The Rule is significantly and negatively impacting the morale of Council 119's members. They feel forced to choose between (1) breaking the law by applying the new Rule in screening interviews; (2) risking disciplinary action (up to removal from federal service) if they refuse; and (3) resigning from their jobs. Given the backlog in asylum processing, it is more essential than ever that we have a cohort of experienced and well-trained asylum officers, but the Rule makes continuing their work a source of moral injury.

## CONCLUSION

Council 119's members are duty-bound to protect vulnerable asylum seekers from persecution or torture. The challenged Rule requires them to choose between adhering to the directives of their departmental leaders and

adhering to our nation's legal and moral commitment to not return refugees to territories where they will face persecution. Asylum officers should not be forced to implement policies that are fundamentally contrary to our international treaty and statutory obligations, and to the best traditions of our nation.

For the foregoing reasons and those set forth by Plaintiffs, this Court should affirm the judgment of the District Court.

Respectfully submitted,

Dated: October 9, 2023

*/s/ Kathleen R. Hartnett*
Kathleen R. Hartnett
Zoë Helstrom
COOLEY LLP
3 Embarcadero Center, 20th Floor
San Francisco, CA 94111
Telephone: (415) 693-2000
khartnett@cooley.com

*Counsel for Amicus Curiae*

36

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

**9th Cir. Case Number(s)** 23-16032

1. I am the attorney or self-represented party.

2. **This brief contains 6,999 words,** including 0 words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

3. I certify that this brief *(select only one)*:

[] complies with the word limit of Cir. R. 32-1.

[] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[X] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [] it is a joint brief submitted by separately represented parties.
    [] a party or parties are filing a single brief in response to multiple briefs.
    [] a party or parties are filing a single brief in response to a longer joint brief.

[] complies with the length limit designated by court order dated _____.

[] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).


**Signature** */s/ Kathleen R. Hartnett*          **Date** October 9, 2023
                    Kathleen Hartnett

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on October 9, 2023.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated: October 9, 2023          */s/ Kathleen R. Hartnett*
                                 Kathleen R. Hartnett