**No. 23-16032**

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

EAST BAY SANCTUARY COVENANT, et al.,
*Plaintiffs-Appellees,*

v.

JOSEPH R. BIDEN, President of the United States, et al.,
*Defendants-Appellants.*

*Appeal from the United States District Court for the Northern District of California (Oakland),*
*No. 4:18-cv-06810-JST • Jon S. Tigar, District Judge*

### BRIEF OF ASYLUM ACCESS MÉXICO A.C. AND INSTITUTO PARA LAS MUJERES EN LA MIGRACIÓN A.C. AS *AMICI CURIAE* SUPPORTING APPELLEES AND AFFIRMANCE

CAMERON C. RUSSELL
REBECCA BERMAN
**FRESHFIELDS BRUCKHAUS DERINGER US LLP**
601 Lexington Avenue, 31st Floor
New York, New York 10022
Telephone: (212) 277-4000
cameron.russell@freshfields.com
rebecca.berman@freshfields.com

JUSTINA SESSIONS
J. MIA TSUI
**FRESHFIELDS BRUCKHAUS DERINGER US LLP**
855 Main Street
Redwood City, California 94063
Telephone: (650) 618-9250
justina.sessions@freshfields.com
mia.tsui@freshfields.com

SEVE KALE
**FRESHFIELDS BRUCKHAUS DERINGER US LLP**
700 13th Street, NW, 10th Floor
Washington, DC 20005
Telephone: (202) 777-4500
seve.kale@freshfields.com

*Attorneys for Amici Curiae*
*Asylum Access México A.C. and Instituto para las Mujeres en la Migración A.C.*

 

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rules of Appellate Procedure 26.1 and 29(a)(4)(A), *amicus curiae* Asylum Access México A.C. states that it is a nonprofit organization dedicated in part to the provision of legal, counseling, and other services to refugees and asylum seekers; Asylum Access México A.C.'s parent company is Asylum Access, a 501(c)(3) non-profit that has no parent corporation and does not issue shares of stock.

*Amicus curiae* Instituto para las Mujeres en la Migración A.C. states that it is a nonprofit organization dedicated in part to defending the rights of migrant women and their families in Mexico and the surrounding region, and that it has no parent corporation and does not issue shares of stock.

## CONSENT OF PARTIES

Pursuant to Federal Rules of Appellate Procedure 29(a)(2) and 29(a)(4)(D), all parties have consented to the filing of this brief.

Dated: October 11, 2023

 /s/ Cameron C. Russell 

CAMERON C. RUSSELL
FRESHFIELDS BRUCKHAUS DERINGER
US LLP

*Attorney for Amici Curiae*
*Asylum Access México and Instituto*
*para las Mujeres en la Migración A.C.*

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ...................................................... ii

CONSENT OF PARTIES ........................................................................... ii

TABLE OF CONTENTS ............................................................................ iv

TABLE OF AUTHORITIES ........................................................................ v

IDENTITY AND INTEREST OF THE *AMICI CURIAE* ........................................ 1

INTRODUCTION ................................................................................... 3

ARGUMENT ......................................................................................... 4

    I.  THE COURT MUST CONSIDER THE ASYLUM SYSTEM IN MEXICO WHEN EVALUATING WHETHER THE RULE SHOULD BE VACATED FOR BEING ARBITRARY AND CAPRICIOUS ............. 4

    II.  THE REALITIES OF MEXICO'S ASYLUM SYSTEM CONTRADICT DEFENDANTS' JUSTIFICATIONS FOR THE RULE .... 6

        A.  Many asylum seekers in Mexico will never receive a "final decision" on an asylum claim. ........................................... 7

           1. Many asylum seekers in Mexico are unable to file an application for asylum. ................................................. 7

           2. Many asylum applicants in Mexico are unable to receive a "final decision" on their claim. ........................................... 12

        B.  Mexico is not safe for asylum seekers. .............................. 18

        C.  Mexico's asylum system is broken. .................................... 22

        D.  The Rule will exacerbate all of the issues described above. ............... 26

CONCLUSION ....................................................................................... 27

CERTIFICATE OF COMPLIANCE .................................................................. 29

CERTIFICATE OF SERVICE ....................................................................... 30

# TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*E. Bay Sanctuary Covenant v. Barr*,
  385 F. Supp. 3d 922 (N.D. Cal. 2019) ............................................................26

*E. Bay Sanctuary Covenant v. Garland*,
  994 F.3d 962 (9th Cir. 2020) ...............................................................................6

*E. Bay Sanctuary Covenant v. Biden*,
  No. 4:18-cv-06810-JST (N.D. Cal. July 25, 2023) ...............................................4

*F.C.C. v. Prometheus Radio Project*,
  141 S. Ct. 1150 (2021) ...................................................................................5, 25

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983) .................................................................5, 12, 25, 27

*Sierra Club v. Bosworth*,
  510 F.3d 1016 (9th Cir. 2007) .................................................................5, 18, 26

**Statutes, Code of Federal Regulations, and Federal Register**

5 U.S.C. § 706 .........................................................................................................4

8 C.F.R. § 208.33 .................................................................................7, 12, 15, 22

88 Fed. Reg. 31,314 *et seq.* (May 16, 2023) ................................................. *passim*

**Other Authorities**

Acuerdo por el que se amplía la suspensión de plazos, términos, y actividades en la
  Secretaria de Gobernación, con las exclusiones que en el mismo se indican,
  Diario Oficial de la Federación [DOF] 05-27-2020 (Mex.) ........................14, 16

Acuerdo por el que se amplia la suspensión de plazos, términos, y actividades en la
  Secretaria de Gobernación hasta el 30 de mayo de 2020, con las exclusiones que
  en el mismo se indican, Diario Oficial de la Federación [DOF] 04-30-2020
  (Mex.) ........................................................................................................14, 15

Acuerdo por el que se establece la suspensión de plazos, términos legales en los
  trámites de la Secretaria de Gobernación que se indican, Diario Oficial de la
  Federación [DOF] 03-24-2020 (Mex.) ........................................................14, 15

v

Al Otro Lado, *Letter to the U.S. Dep't of Homeland Security and the U.S. Dep't of Just.* (Mar. 27, 2023) ...........................................20, 21

Asylum Access, *Mexican Asylum System for U.S. Immigration Lawyers FAQ* (Nov. 2019) ....................................................*passim*

Asylum Access Mexico, *Informe de Investigación Sobre Alternativas a la Detención Para Personas Solicitantes de la Condición de Refugiado en México* (2021) .........................................................................16

Brewer, Stephanie *et al.*, *Struggling to Survive: the Situation of Asylum Seekers in Tapachula, Mexico*, Wash. Off. On Latin Am. (June 2022)....................................................................*passim*

Center for Justice and International Law & International Human Rights Clinic, *Asylum in Mesoamerica: Accessing International Protection in Mexico and Guatemala*, American University, Washington College Of Law ........................................... 8, 10, 15, 24

Comisión Nacional de los Derechos Humanos, *Recomendación No. 111VG/2023* (2023) ............................................20

Eduardo Torre Cantalapiedra *et al., The Mexican Asylum System: Between Protecting and Control*, Frontera Norte (Apr. 2021).........................12

Human Rights First, *Human Rights Stain, Public Health Farce* (2022) .................20

Human Rights First, *Is Mexico Safe for Refugees and Asylum Seekers?* (Nov. 2018)..............................................................9

Human Rights First, *Refugee Protection Travesty: Biden Asylum Ban Endangers and Punishes At-Risk Asylum Seekers* (July 2023) .........................19

Human Rights Watch, *Mexico: Asylum Seekers Face Abuses at Southern Border* (June 6, 2022)..............................................9, 10, 13

Human Rights Watch, *US: LGBT Asylum Seekers in Danger at the Border* (May 31, 2022) .......................................................20

IMUMI, *La militarización y violencia contra las mujeres migrantes, Cimacnoticia*s (July 15, 2022)...............................................19

vi

IMUMI, *Stuck in Uncertainty and Exposed to Violence: The Impact of US and Mexican Migration Policies on Women Seeking Protection in 2021*, Women's Refugee Commission (Feb. 2022) .........................................8

Kino Border Initiative Public Comment (Mar. 24, 2023) ................................13, 14

Lilian Hernandez Osorio, *Entrega la Acnur a la Comar más del doble de recursos que Gobernación*, La Jornada (May 8, 2023).........................14, 23, 26

*Mexico seeks to curb 'abuse' of asylum system by migrants who do not plan to stay*, Reuters, Feb. 13, 2023 ............................................................14

National Public Radio, *A deadly Mexico immigration center fire shows just a sliver of the abuse migrants see* (March 31, 2023, 12:39 PM)................19

Rachel Schmidtke, *A New Way Forward: Strengthening the Protection Landscape in Mexico* ..........................................................8, 9, 12, 24

Red de Documentación de las Organizaciones Defensoras de Migrantes (REDODEM), *La Esperanza en el camino: Informe 2021–2022* .....................16

Reglamento de la Ley Sobre Refugiados, Protección Complementaria y Asilo Político (Regulation of the Law on Refugees, Complementary Protection and Political Asylum of Mexico), Diario Oficial de la Federación [DOF] 27-10-2011, últimas reformas DOF 18-02-2022 (Mex.) ........................................7, 14

Rosa Flores, *Mexico plans to launch an asylum processing app next week*, CNN (Jun. 17, 2023, 6:34 PM)..............................................................................9

S. Priya Morley *et al.*, *A Journey of Hope: Haitian Women's Migration to Tapachula, Mexico* (2021) ...........................................................13

S. Priya Morley *et al.*, *"There is a Target on Us" – The Impact of Mexico's Anti-Black Racism on African Migrants at Mexico's Southern Border* (2021) ........ 21

U.S. Dep't of State, *Mexico 2022 Human Rights Report* (2022) .................8, 18, 19

Women's Refugee Commission *et al.*, *The consequences of US and Mexican immigration policies on the protection of Venezuelan women and LGBTIQ+ individuals in Southwest Mexico* (2022).......................21

vii

## **IDENTITY AND INTEREST OF THE *AMICI CURIAE***

Asylum Access México ("AAMX") is a human rights organization that has, since 2015, provided legal assistance and representation to applicants for asylum in Mexico, including in relation to family reunification, access to healthcare, job opportunities, and other social benefits. In addition to legal aid, AAMX works on the development of strategic litigation and advocacy strategies to support the strengthening of the Mexican asylum system.

Instituto para las Mujeres en la Migración A.C. ("IMUMI") is a human rights organization based in Mexico City, Mexico, that provides a range of legal and counseling services to women and their families who have been affected by migration, including by assisting asylum seekers with applications for asylum in Mexico and in the United States, and by assisting with family re-unification. IMUMI also conducts research on asylum-related issues and advocates for policy reform.

AAMX and IMUMI are both among the few NGOs in Mexico that have access to detention centers at which migrants may be held.

*Amici* have significant experience representing, assisting, and working with asylum seekers in Mexico, including in relation to seeking asylum in the United States. *Amici* therefore believe that they can assist the Court by providing information relevant to the final rule published by the U.S. Department of

1

Homeland Security and the U.S. Department of Justice entitled Circumvention of Lawful Pathways, 88 Fed. Reg. 31,314 (May 16, 2023) (the ***Rule***), including the unlikelihood of meeting the Rule's narrow exception to asylum ineligibility for individuals who have traveled to the United States through a third country and received a final decision denying their claim for asylum.[1]

---

[1] No counsel for a party authored this brief in whole or in part, and no such counsel or party contributed money that was intended to fund preparing or submitting this brief. No person other than the *amici curiae*, their members, or their counsel contributed money that was intended to fund preparing or submitting the brief. *See* Fed. R. App. P. 29(a)(4)(E).

# INTRODUCTION

Under the Rule, asylum seekers are presumptively ineligible for asylum if, after leaving their country of origin, they cross the United States' southern border having traveled through a third country (which, in many cases, will be Mexico) unless they have received a "final decision" denying a claim for asylum prior to entering the United States. Defendants claim that this new Rule—the latest in a series of similar rules aimed at preventing migrants from requesting asylum if they cross at the southern border—will encourage migrants to pursue safe, orderly avenues for seeking asylum. It will not.

In deciding whether this Rule must be vacated for being arbitrary and capricious, the Court must consider whether the justifications Defendants have marshalled to support it are consistent with the evidence. (*See* part I). They are not.

The record, and *amici*'s experience representing and working with asylum seekers in Mexico, demonstrate that Defendants' justifications do not withstand scrutiny. Many migrants worthy of asylum never receive a "final decision" on their asylum applications in Mexico, either because they are not permitted to file an application for asylum, or because their claims are never adjudicated, or because unbearable hardships force them to abandon their claims. (*See* part II.A). Seeking asylum in Mexico is not a viable option for many due to widespread violence and abuse, including at the hands of Mexican state actors. (*See* part II.B). Mexico's

asylum system is also inadequate: a lack of basic resources prejudices otherwise worthy asylum applicants. (*See* part II.C). Finally, the purpose of the Rule is to direct more asylum seekers away from the United States and towards Mexico, yet the Rule does not address how this will exacerbate the problems that Mexico's underfunded and overburdened system faces. (*See* part II.D).[2]

## ARGUMENT

### I. THE COURT MUST CONSIDER THE ASYLUM SYSTEM IN MEXICO WHEN EVALUATING WHETHER THE RULE SHOULD BE VACATED FOR BEING ARBITRARY AND CAPRICIOUS

The Rule must be justified by the evidence or else struck down. Binding precedent requires this Court to consider whether Defendants' stated rationale for introducing limitations on asylum eligibility is consistent with the available evidence. Because it is not, the Rule must be vacated.

The law requires courts to vacate agency rules that are "arbitrary [and] capricious." 5 U.S.C. § 706(2)(A). The arbitrary-and-capricious standard requires agencies to "examine the relevant data and articulate a satisfactory explanation for

---

[2] Defendants stamped documents compiled by the agencies with page numbers beginning "CLP_AR" (for documents in the administrative record), or "CLP_PC" (for public comments and their attachments). All citations in this brief beginning "CLP_AR_" or "CLP_PC_" are therefore to evidence available to Defendants during the rulemaking process. These documents can be found in the Appellees' Supplemental Excerpts of Record (ECF No. 53), or in the appendix to Plaintiff's Motion for Summary Judgment submitted to the district court (*E. Bay Sanctuary Covenant v. Biden*, No. 4:18-cv-06810-JST (N.D. Cal. July 25, 2023), ECF Nos. 169-8 and 169-9).

its action." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.* ("*State Farm*"), 463 U.S. 29, 43 (1983). A rule will be found arbitrary and capricious when the agency's explanation "runs counter to the evidence" and when the agency has "entirely failed to consider an important aspect of the problem." *Id.* Rules that are not "reasonable and reasonably explained" are arbitrary and capricious. *F.C.C. v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021). Deference is owed to an agency's decision "only if it is 'fully informed and well-considered,'" and a proposed rule is arbitrary and capricious if an agency has "made 'a clear error of judgment.'" *Sierra Club v. Bosworth*, 510 F.3d 1016, 1023 (9th Cir. 2007) (citations omitted).

Defendants justify the Rule's presumption of asylum ineligibility for asylum seekers who do not receive a "final decision" on their claims in Mexico by stating that they "do not agree with the generalization[] that . . . Mexico . . . lack[s] [a] functioning asylum system" or that Mexico is "universally unsafe and cannot provide protection to asylum seekers." 88 Fed. Reg. 31,410–11. Defendants add that Mexico has made "significant strides in developing [its] asylum system," and "exceptional strides to improve conditions for asylum seekers . . . within its borders." 88 Fed. Reg. 31,411. Finally, Defendants note that "Mexico has a significant asylum backlog [but] remains a viable option for many seeking protection in Mexico." 88 Fed. Reg. 31,414. (In other words, Defendants

5

understand that Mexico is not a viable option for everyone who seeks protection there.)

Given that Defendants justify the Rule by pointing to Mexico as an alternative to the United States for many asylum seekers, evidence that Mexico's asylum system is failing to function or failing to protect asylum seekers is relevant to whether Defendants have provided a "satisfactory explanation" for the Rule, whether the Rule is "reasonably explained," and whether Defendants have made "a clear error of judgment."

As detailed below, Mexico's asylum system is broken and frequently fails to protect those seeking asylum in Mexico. For many, asylum in Mexico is not a "viable option." Defendants' justification for the Rule—insofar as it relates to the ability of asylum seekers to seek protection in Mexico—fails. Like the "transit ban" rule that preceded it, the Rule is therefore arbitrary and capricious, and it must be struck down. *See E. Bay Sanctuary Covenant v. Garland*, 994 F.3d 962, 980–82 (9th Cir. 2020).

## II. THE REALITIES OF MEXICO'S ASYLUM SYSTEM CONTRADICT DEFENDANTS' JUSTIFICATIONS FOR THE RULE

Defendants support the Rule, in part, by claiming that Mexico has a functioning asylum system that can, and does, provide humanitarian protection to many migrants. *See, e.g.*, 88 Fed. Reg. 31,410–11, 31,414–15. Defendants' justifications ignore the realities faced by those seeking asylum in Mexico.

**A. Many asylum seekers in Mexico will never receive a "final decision" on an asylum claim.**

The Rule exempts from presumed asylum ineligibility those who have received a "final decision" denying a claim for asylum from a country through which they have traveled *en route* to the United States. 8 C.F.R. § 208.33(a)(2)(ii)(C). The Rule defines a "final decision" as "any denial by a foreign government of the applicant's claim for asylum or other protection through one or more of that government's pathways for that claim[,]" and further specifies that "[a] final decision does not include a determination by a foreign government that the alien abandoned the claim." *Id*.

To receive a "final decision" denying a claim for asylum, an asylum seeker must be able to both (*1*) file a claim for asylum, and (*2*) receive a decision on that claim. The reality is that neither of these elementary steps is guaranteed for those seeking asylum in Mexico. The Rule ignores this reality.

**1. *Many asylum seekers in Mexico are unable to file an application for asylum.***

Under Mexican law, claims for asylum must be filed within 30 business days of arrival in Mexico, with limited exceptions.[3] Reglamento de la Ley Sobre

---

[3] The 30-day deadline is strictly enforced. *Amicus curiae* AAMX worked with one asylum seeker who was found ineligible for asylum because their application was filed after 32 days.

Refugiados, Protección Complementaria y Asilo Político (Regulation of the Law on Refugees, Complementary Protection and Political Asylum of Mexico), art. 18, Diario Oficial de la Federación [DOF] 27-10-2011, últimas reformas DOF 18-02-2022 (Mex.). Applicants must file for asylum at an office of Mexico's asylum agency, Comisión Mexicana de Ayuda a Refugiados ("COMAR").[4] There are only a limited number of COMAR offices in the country, CLP_PC_023436 (Rachel Schmidtke, *A New Way Forward: Strengthening the Protection Landscape in Mexico*, Refugees International (Nov. 12, 2020) (hereinafter "*Strengthening the Protection Landscape*")); CLP_PC_033406 (*Asylum in Mesoamerica*, *supra*, at 15), and the COMAR offices in southern areas of Mexico that typically receive the majority of applicants for asylum are routinely understaffed. CLP_PC_021588

---

[4]    Mexican law does permit individuals to file for asylum with the Instituto Nacional de Migración ("INM") if they are not in a state or area close to a COMAR office. CLP_PC_020775 (Asylum Access, *Mexican Asylum System for U.S. Immigration Lawyers FAQ* 3 (Nov. 2019) (hereinafter "Asylum Access FAQ")); CLP_PC_033406 (Center for Justice and International Law & International Human Rights Clinic, *Asylum in Mesoamerica: Accessing International Protection in Mexico and Guatemala*, AMERICAN UNIVERSITY, WASHINGTON COLLEGE OF LAW, 15 (hereinafter "*Asylum in Mesoamerica*")). However, in *amici*'s experience, INM officers can arbitrarily refuse to accept applications for asylum or fail to forward asylum applications to COMAR, *see* CLP_PC_033406-07 (*Asylum in Mesoamerica*, at 15–16); CLP_PC_021588 (IMUMI, *Stuck in Uncertainty and Exposed to Violence: The Impact of US and Mexican Migration Policies on Women Seeking Protection in 2021*, Women's Refugee Commission 3 (Feb. 2022)), and encourage asylum seekers to return to their country of origin. *See* CLP_PC_032446–47 (U.S. Dep't of State, *Mexico 2022 Human Rights Report* 19–20 (2022)).

(IMUMI, *Stuck in Uncertainty and Exposed to Violence: The Impact of US and Mexican Migration Policies on Women Seeking Protection in 2021*, Women's Refugee Commission 3 (Feb. 2022)); CLP_PC_022852 (Human Rights First, *Is Mexico Safe for Refugees and Asylum Seekers?* (Nov. 2018)).

The Mexican system is so overburdened that asylum seekers often have to camp outside a COMAR office for the opportunity to file their claim for asylum. CLP_PC_022866 (Human Rights Watch, *Mexico: Asylum Seekers Face Abuses at Southern Border* 14 (June 6, 2022) (hereinafter "*Asylum Seekers Face Abuses*")). While individuals wait to apply for asylum they have no official status and face heightened risks of detention, deportation or refoulement. *See* CLP_PC_023437–38 (*Strengthening the Protection Landscape*, *supra*); CLP_PC_020775–76 (Asylum Access FAQ, *supra*, at 3–4). *Amicus curiae* IMUMI has worked with individuals who were denied the ability to file a claim for asylum in Mexico simply because their 30-day deadline expired while they were waiting to be processed at the COMAR office in Mexico City.[5]

---

[5] The process for applying for asylum varies between COMAR offices. For example, as of this year, asylum seekers in Mexico City only can book appointments to file their asylum applications online. *See, e.g.*, Rosa Flores, *Mexico plans to launch an asylum processing app next week*, CNN (Jun. 17, 2023, 6:34 PM), https://www.cnn.com/2023/06/01/americas/mexico-asylum-processing-app-intl-latam/index.html.

For individuals denied the ability to file an asylum claim, the process of appealing a decision can take many months. Asylum seekers also have no official status or documentation while awaiting such an appeal, and are at heightened risk of refoulement or other abuse. *See* CLP_PC_033412–13 (*Asylum in Mesoamerica*, *supra*, at 21–22) ("[D]etention in Mexico is used to punish people who request protection and deter people . . . from applying at all[,]" describing "lack of protections against indefinite detention" for asylum-seekers who "tr[y] to appeal an unfavorable decision").

The process for filing asylum applications can itself extend beyond a year at some COMAR offices. For example, in Tapachula, Chiapas (near the border with Guatemala), before an asylum seeker can file an application for asylum, they must first queue at the COMAR office and receive a tentative date for a future appointment at which they can make their filing.[6] In July of this year, one of

---

[6] The vast majority of applications for asylum in Mexico are made in Tapachula. *See* CLP_AR_004868 (Brewer, Stephanie *et al.*, *Struggling to Survive: the Situation of Asylum Seekers in Tapachula, Mexico*, WASH. OFF. ON LATIN AM. 8 (June 2022) (hereinafter "*Struggling to Survive*") ("Due to its location just inland of the Mexico-Guatemala border, size, and connectivity to main highways from Central America, Tapachula is the main point of arrival for a significant portion of migrants and asylum seekers coming by land to Mexico. A large majority of asylum claims—89,613 in 2021—were filed in COMAR's Tapachula office[.]"); *see also* CLP_AR_004875-76 (*id.* at 15–16); CLP_PC_022866 (*Asylum Seekers Face Abuses*, *supra*, at 14) (estimating 70% of refugee claims presented in COMAR's Tapachula office).

IMUMI's clients at the Tapachula COMAR office received a tentative appointment date to file their application of September 5 *next year*. AAMX has worked with clients with similar experiences. These asylum seekers have no legal status protecting them from deportation while they wait for their appointments.

Applicants face additional hurdles if they are able to reach the stage of actually filing their asylum applications. Due to the high numbers of applicants, COMAR officers can provide only very limited assistance to asylum seekers on how to fill out their application. Language barriers restrict many refugees' ability to file applications for asylum, and COMAR offices generally do not have trained interpreters on staff to facilitate the filing of applications. *See, e.g.*, CLP_PC_020777–78 (Asylum Access FAQ, *supra*, 5–6) ("Mexican law requires that the asylum process be conducted in a language the asylum seeker understands, but this requirement is routinely ignored and translators are rarely provided."). Non-Spanish speakers and the illiterate are at a significant disadvantage. *Amici* have worked with asylum seekers from Haiti, Togo, Nigeria, Ukraine, Afghanistan, and other Arabic-speaking countries all of whom have struggled with the Mexican asylum system due to language barriers.

The Rule's exception for asylum seekers who have received a final decision denying a claim for asylum presupposes that asylum seekers will have the ability to file a claim on which they can receive a decision. The reality is that many asylum

seekers are unable to overcome this first hurdle. The Rule "entirely fail[s] to consider [this] important aspect of the problem." *State Farm*, 463 U.S. at 43.

### 2. Many asylum applicants in Mexico are unable to receive a "final decision" on their claim.

Just as there are significant barriers to filing a claim for asylum in Mexico, there are significant barriers to receiving a "final decision" on a claim once it has been filed: delays in case processing, and an inability to transfer an application from one COMAR office to another, work hand-in-hand with the result that many asylum seekers have no choice but to abandon their claims.[7] The Rule's exception for asylum seekers who have received a "final decision" on an application for asylum is unavailable to those who, having fled persecution in their own country, have then been forced to flee yet more hardship in Mexico, resulting in abandonment of their application. *See* 8 C.F.R. § 208.33(a)(2)(ii)(C) ("A final decision does not include a determination by a foreign government that the alien abandoned the claim.").

---

[7] AAMX data suggests over 10% of asylum applicants in Mexico are forced to abandon their claims. CLP_PC_021982 (Eduardo Torre Cantalapiedra *et al., The Mexican Asylum System: Between Protecting and Control*, Frontera Norte 15 (Apr. 2021)); *see also, e.g.*, CLP_PC_023437 (*Strengthening the Protection Landscape*, *supra*) ("According to Asylum Access, in 2019, 10,000 asylum seekers abandoned their claims after waiting an average of 164 days.") (citation omitted).

Processing of asylum claims in Mexico is out of control. "Mexico's asylum system is overwhelmed and under-resourced, with prolonged delays in case processing times." CLP_AR_004861 (*Struggling to Survive*, *supra*, at 1); *see also* CLP_AR_004874 (*Id*. at 14) (referring to Mexico's asylum system as "overwhelmed, under-resourced, and severely backlogged"); S. Priya Morley *et al.*, *A Journey of Hope: Haitian Women's Migration to Tapachula, Mexico* 66 (2021) ("COMAR by all accounts is understaffed, under-resourced, and overwhelmed by the number of cases.");[8] CLP_PC_020357 (Kino Border Initiative Public Comment (Mar. 24, 2023)). The number of refugees seeking asylum in Mexico has skyrocketed in recent years, CLP_PC_020779 (Asylum Access FAQ, *supra*, at 7); *see also* CLP_AR_004874–75 (*Struggling to Survive*, *supra*, at 14–15), but "the Mexican government has not provided a commensurate budgetary increase to process the applications." CLP_PC_020779 (Asylum Access FAQ, *supra*, at 7); *see also* CLP_PC_022864 (*Asylum Seekers Face Abuses*, *supra*, at 12) (174-fold increase in asylum cases met with a 2.5-fold increase in government funding from 2011 to 2021); CLP_AR_004875 (*Struggling to Survive*, *supra*, at 15) (COMAR budget "essentially stable from 2021 to 2022 despite skyrocketing

---

[8]    Available at https://imumi.org/attachments/2020/A-Journey-of-Hope-Haitian-Womens-Migration-to%20-Tapachula.pdf.

levels of asylum claims"). Despite COMAR turning to the UN Refugee Agency[9] to increase its capacity—such as through the opening of additional offices and hiring hundreds of additional staff members—"the resources afforded to COMAR are still far from sufficient to enable prompt processing of incoming asylum requests." CLP_AR_004875 (*Struggling to Survive*, *supra*, at 15). COMAR's director himself has stressed that the agency is "in a situation of near-breakdown." CLP_PC_022811 (*Mexico seeks to curb 'abuse' of asylum system by migrants who do not plan to stay*, Reuters, Feb. 13, 2023). Asylum seekers therefore face staggering delays to the resolution of their applications.[10] *See, e.g.,*

---

[9]     Between two-thirds and three-quarters of COMAR's budget comes from the UNHCR. Lilian Hernandez Osorio, *Entrega la Acnur a la Comar más del doble de recursos que Gobernación* ("*UNHCR delivers more than twice as many resources to Comar as the Interior Ministry*"), La Jornada (May 8, 2023), https://www.jornada.com.mx/2023/05/08/politica/006n1pol.

[10]     Although Mexico's asylum law requires adjudication of all asylum applications within 45 days (with an extension of an additional 45 days in certain circumstances), Reglamento de la Ley Sobre Refugiados y Protección Complementaria [RLRPC] art. 24, Diario Oficial de la Federación [DOF] 01-27-2011, ultimas reformas DOF 02-18-2022 (Mex.), that requirement has been suspended since the start of the COVID pandemic. Acuerdo por el que se establece la suspensión de plazos, términos legales en los trámites de la Secretaria de Gobernación que se indican, Diario Oficial de la Federación [DOF] 03-24-2020 (Mex.), https://dof.gob.mx/nota_detalle.php?codigo=5590337&fecha=24/03/2020 #gsc.tab=0; Acuerdo por el que se amplia la suspensión de plazos, términos, y actividades en la Secretaria de Gobernación hasta el 30 de mayo de 2020, con las exclusiones que en el mismo se indican, Diario Oficial de la Federación [DOF] 04-30-2020 (Mex.), https://dof.gob.mx/nota_detalle.php?codigo=5592529& fecha=30/04/2020#gsc.tab=0; Acuerdo por el que se amplía la suspensión de plazos, términos, y actividades en la Secretaria de Gobernación, con las

CLP_PC_020357 (Kino Border Initiative Public Comment (Mar. 24, 2023)) (COMAR takes an average of one year, and up to two years, to resolve cases); CLP_AR_004875 (*Struggling to Survive*, *supra*, at 15).

Having fled persecution in their own countries, asylum applicants are then restricted from moving throughout Mexico while their claim is being adjudicated—for many months or years—even to avoid further violence or other hardship in Mexico. CLP_PC_020777 (Asylum Access FAQ, *supra*, at 5); *see also infra* part II.B. COMAR offices will treat a claim as abandoned (and therefore no "final decision" will be issued for purposes of the Rule, 8 C.F.R. § 208.33(a)(2)(ii)(C)) if an applicant does not attend regularly scheduled check-ins. CLP_PC_020777 (Asylum Access FAQ, *supra*, at 5); CLP_PC_033419 (*Asylum in Mesoamerica*, *supra*, at 28). Since the start of the COVID pandemic, the statutory deadlines requiring COMAR to review asylum seekers' requests to transfer applications from one COMAR office to another have been suspended.[11] It is now

exclusiones que en el mismo se indican, Diario Oficial de la Federación [DOF] 05-27-2020 (Mex.), https://www.dof.gob.mx/nota_detalle.php?codigo=5593885 &fecha=27/05/2020#gsc.tab=0.

[11] Acuerdo por el que se establece la suspensión de plazos, términos legales en los trámites de la Secretaria de Gobernación que se indican, Diario Oficial de la Federación [DOF] 03-24-2020 (Mex.), https://dof.gob.mx/nota_detalle.php? codigo=5590337&fecha=24/03/2020#gsc.tab=0; Acuerdo por el que se amplia la suspensión de plazos, términos, y actividades en la Secretaria de Gobernación hasta el 30 de mayo de 2020, con las exclusiones que en el mismo se indican,

practically impossible for an asylum applicant to transfer their application from one COMAR office to another.

Delays in the adjudication of their claims and the requirement to stay put force many asylum applicants to abandon their claims. Research by AAMX shows that asylum seekers abandon their applications before receiving a final decision for reasons including being discovered by the persecutors from whom they had fled in their home country, inability to earn a living wage, health issues, and other concerns. Asylum Access México, *Informe de Investigación Sobre Alternativas a la Detención Para Personas Solicitantes de la Condición de Refugiado en México* 99 (2021); *see also* Red de Documentación de las Organizaciones Defensoras de Migrantes (REDODEM), *La Esperanza en el camino: Informe 2021–2022* 67 (many asylum seekers are forced to abandon their claims because they cannot earn enough money to survive near the COMAR office with jurisdiction over their application during the extenuated process of adjudication); CLP_AR_004875–76, 004880–83 (*Struggling to Survive*, *supra*, at 15–16, 20–23) (describing asylum

---

Diario Oficial de la Federación [DOF] 04-30-2020 (Mex.), https://dof.gob.mx/nota_detalle.php?codigo=5592529&fecha=30/04/2020#gsc.tab =0; Acuerdo por el que se amplía la suspensión de plazos, términos, y actividades en la Secretaria de Gobernación, con las exclusiones que en el mismo se indican, Diario Oficial de la Federación [DOF] 05-27-2020 (Mex.), https://www.dof.gob.mx/nota_detalle.php?codigo=5593885&fecha=27/05/2020#gs c.tab=0.

applicants facing obstacles to maintaining employment, healthcare, education, housing, and basic necessities as they wait months for adjudication of their asylum claims in Tapahcula, Chiapas).

AAMX and IMUMI have both worked with clients forced to abandon their applications because they faced violence, poverty, xenophobia, and / or because they had been discovered by their persecutors while awaiting adjudication of their claims.[12] For example, IMUMI represented a family of asylum seekers from Central America who applied for asylum in Tapachula, but had to flee to Mexico City because their persecutors had tracked down their location. Despite IMUMI's assistance, the Tapachula COMAR office denied the family's application to transfer their case to the Mexico City office. In *amici*'s experience, COMAR fails to review requests to transfer an application to another location, and maintains a policy of treating asylum seekers as though they have voluntarily abandoned their claims even when it understands the necessity of relocation.

Under the proposed Rule, many asylum seekers will face a choice between abandoning their claims for asylum in Mexico and being presumed ineligible for

---

[12] Asylum seekers near Mexico's southern border are particularly vulnerable to inhumane working conditions and criminality, including kidnapping, extortion and robbery. CLP_AR_004880–83 (*Struggling to Survive*, *supra*, at 20–23) (describing lack of resources and violence directed particularly towards the most vulnerable, and characterizing Tapachula, Chiapas, as a "prison city" for asylum seekers).

asylum in the United States, or remaining at risk of further persecution while waiting—months or years—for a final decision on their claim for asylum.

Other asylum applicants will not have even this limited choice. *Amici* commonly work with clients who, as a consequence of domestic violence or kidnapping, were not able to attend their check-in appointments with the COMAR office retaining jurisdiction over their asylum applications; because these individuals had missed their appointments, COMAR treated their claims as abandoned.

Defendants justify the Rule with the cold comfort that Mexico is not "universally unsafe" and speculation that it is a "viable option for many." 88 Fed. Reg. 31,411, 31,414. But the evidence shows that many migrants fleeing persecution will face intolerable conditions in Mexico while they wait for a final decision on their asylum claim. Because Defendants' justifications for the rule do not engage with this reality, the Rule is neither "fully informed [nor] well-considered." *Sierra Club*, 510 F.3d at 1023. The Rule is therefore arbitrary and capricious.

### B. Mexico is not safe for asylum seekers.

It is well understood that asylum applicants waiting for adjudication in Mexico face a heightened risk of victimization by police and immigration authorities, as well as criminal groups. CLP_PC_032446–47 (U.S. Dep't of State,

*Mexico 2022 Human Rights Report* 19–20 (2022)) (detailing violence against asylum applicants by state and non-state actors); *see also* CLP_AR_004881 (*Struggling to Survive*, *supra*, at 21) (describing extortion by state actors, attacks by criminals and accounts of INM agents destroying asylum seeker's documents); Human Rights First, *Refugee Protection Travesty: Biden Asylum Ban Endangers and Punishes At-Risk Asylum Seekers* 61–62 (July 2023).[13]

Mexican authorities have tortured people held in migratory detention stations. CLP_PC_032447 (U.S. Dep't of State, *Mexico 2022 Human Rights Report* 20 (2022)) (detailing reports by Mexican human rights commission of state actors torturing migrants while in detention). *Amicus curiae* IMUMI has reported on violence against migrant women at the hands of Mexican authorities, including instances of asylum seekers being detained, stripped, and raped—digitally and with gun barrels—by the Mexican National Guard.[14] The horrific fire in a detention center in Ciudad Juárez is impossible to forget,[15] but it is just one example of the

---

[13]     Available at https://humanrightsfirst.org/wp-content/uploads/2023/07/Refugee-Protection-Travesty_Asylum-Ban-Report_July-2023-1.pdf.

[14]     IMUMI, *La militarización y violencia contra las mujeres migrantes*, Cimacnoticias (July 15, 2022), https://cimacnoticias.com.mx/2022/07/15/la-militarizacion-y-violencia-contra-las-mujeres-migrantes.

[15]     National Public Radio, *A deadly Mexico immigration center fire shows just a sliver of the abuse migrants see* (March 31, 2023, 12:39 PM), https://www.npr.org/2023/03/30/1166947456/ciudad-juarez-detention-fire-conditions-migrants-treatment (describing "[a] surveillance video of the fire that

kind of treatment asylum seekers in Mexico can expect. *See, e.g.*, CLP_PC_000091 (Human Rights First, *Human Rights Stain, Public Health Farce* 11 (2022)) (discussing an incident in which INM officers kidnapped and turned over to a cartel a Guatemalan family with two young children, who were then held hostage and tortured for months as the cartel killed fellow migrants in front of them); CLP_PC_000090 (*Id.* at 10) (between January 2021 and December 2022, Human Rights First "tracked at least 13,480 reports of murder, kidnapping, rape, torture, and other violent attacks" against asylum seekers forced to wait in Mexico due to United States' policies, characterizing this as "just the tip of the iceberg"); CLP_PC_029702 (Human Rights Watch, *US: LGBT Asylum Seekers in Danger at the Border* (May 31, 2022)) ("In the Mexican state of Tamaulipas . . . asylum seekers and other migrants are systematically targeted for kidnapping, extortion, rape, and other violence, by both government officials and criminals."); CLP_PC_033352 (Al Otro Lado, *Letter to the U.S. Dep't of Homeland Security and the U.S. Dep't of Just.* 14 (Mar. 27, 2023)) ("The State Department's 2022

---

killed dozens of people at an immigration processing center in Ciudad Juárez" which "appears to show detainees trapped in a locked cell as uniformed immigration agents are seen walking away"); Comisión Nacional de los Derechos Humanos, *Recomendación No. 111VG/2023* 48–50, 60 (2023), https://www.cndh.org.mx/sites/default/files/documentos/2023-07/RecVG_111.pdf (report from Mexican human rights commission finding that INM officials and private security guards could have, but did not, rescue detained migrants from fire).

Trafficking in Persons Report identifies . . . asylum seekers . . . as among those most vulnerable to trafficking in Mexico.").

Women, LGBTQ+, and minority asylum seekers are particularly vulnerable. *See, e.g.*, CLP_AR_004880 (*Struggling to Survive*, *supra*, at 20) (emphasizing the "racism faced by Haitian and other Afro-descendant and indigenous migrants"); CLP_PC_021610 (Women's Refugee Commission *et al.*, *The consequences of US and Mexican immigration policies on the protection of Venezuelan women and LGBTIQ+ individuals in Southwest Mexico* 16 (2022) (highlighting the violence that girls, women, and LGBTQ+ people face in Mexico)); CLP_PC_033352–53 (Al Otro Lado, *Letter to the U.S. Dep't of Homeland Security and the U.S. Dep't of Just.* 14 (Mar. 27, 2023); S. Priya Morley *et al.*, *"There is a Target on Us" – The Impact of Mexico's Anti-Black Racism on African Migrants at Mexico's Southern Border* 40–44 (2021)[16]).

Moreover, by requiring a "final decision" denying asylum as a precondition to qualifying for one of the Rule's exceptions, the Rule prevents individuals from seeking asylum in the United States while their Mexican asylum application is awaiting adjudication. The result is that asylum seekers in Mexico will only become eligible for the "final decision" exception to the Rule once they receive a

---

[16]     Available    at    https://baji.org/wp-content/uploads/2021/01/The-Impact-of-Anti-Black-Racism-on-African-Migrants-at-Mexico.pdf.

decision on their Mexican asylum claim that necessarily exposes them to deportation or refoulement. Again, this heightens the risks that asylum seekers will face while in Mexico, including risks relating to abuse at the hands of Mexican officials.

Defendants' claim that Mexico is "not . . . universally unsafe," 88 Fed. Reg. 31,411, is no comfort to those facing these ordeals. Nor have Defendants explained why asylum seekers that have been the victims of violence, rape, torture, or other abuse in Mexico should be required to remain in Mexico pending a "final decision" on their application for asylum in order to be eligible for the exception to asylum ineligibility under Section 208.33(a)(2)(ii)(C). Defendants' statement that "the [R]ule does not require any noncitizen to seek protection in a country where they do not feel safe," 88 Fed. Reg. 31,411, does nothing to address the reality that the Rule will compel many to do exactly that.

### C. Mexico's asylum system is broken.

The purpose of the Rule is to limit the numbers of migrants entering the United States irregularly. 88 Fed. Reg. 31,314. It attempts to do so by introducing restrictions designed to encourage migrants to seek refuge in different countries, including Mexico, and then justifies those restrictions by claiming that migrants will be able to find refuge in these countries. *Id.* at 31,410–11. According to Defendants, Mexico has made made "significant strides in developing [its] asylum

system[]." *Id.* at 31,411. But Mexico's asylum system is not functioning, and Defendants' conditioning of an exception to a presumption of ineligibility on asylum seekers navigating a broken system is not a reasonable or well-considered basis for the Rule.

COMAR's director has admitted that "[i]t is obvious that . . . we cannot cope," and that COMAR's "budget is insufficient."[17] Hernandez Osorio, *Entrega la Acnur a la Comar más del doble de recursos que Gobernación*, *supra*.

This lack of resources results in many applicants being denied asylum in Mexico for reasons unrelated to the merits of their asylum claims. For example, COMAR often lacks sufficient resources to interview applicants in a language they understand. *See supra* at part II.A.1. *Amicus curiae* AAMX has worked with non-Spanish speaking clients whose asylum applications were denied after they had unwittingly agreed to be interviewed in Spanish, even when it was clear that the applicants had no ability to speak or understand Spanish. In AAMX's experience, COMAR officers occasionally insist on proceeding with asylum interviews in

---

[17]     In the original Spanish, the quotation reads: "Es obvio que . . . pues no nos damos abasto," and "[e]l presupuesto es insuficiente."

Spanish even when the applicant has limited or no Spanish language ability because of COMAR's need to avoid further processing delays.[18]

COMAR also often lacks capacity to conduct asylum interviews in a sufficiently private space. Asylum interviews frequently require victims of persecution to describe incredibly traumatic and potentially embarrassing or intimate experiences. Fully sharing this information could be the difference between an affirmative decision or a denial of an asylum claim. Yet asylum applicants in Mexico can be asked to relive and recite horiffic experiences in public spaces. For example, IMUMI has worked with applicants at the COMAR office in Chihuahua who were required to participate in telephonic interviews from a public waiting room. *See also, e.g.*, CLP_PC_023436 (*Strengthening the Protection Landscape*, *supra*); CLP_PC_033406-07 (*Asylum in Mesoamerica*, *supra*, at 16–17) ("[E]ligibility interviews by telephone . . . mak[e] it challenging for an applicant to effectively address complex case issues").

Defendants have not provided (and cannot provide) any justification for why asylum seekers should qualify for one of the Rule's exceptions only if they have already spent months or years waiting (often in poverty and under constant threat

---

[18]  COMAR's lack of translators can cause significant delays to the adjudication of asylum claims. For example, one of IMUMI's Afghan asylum clients decided to abandon their claim for asylum because of the delays caused by COMAR's failure to provide the necessary translator.

of violence) for an asylum application to be adjudicated, when Mexico's asylum system lacks the basic resources necessary to decide asylum claims based on their merits. Defendants' claim that Mexico has "made significant strides in developing [its] asylum system[]" is beside the point: Mexico's asylum system lacks rudimentary protections for those whom it is meant to serve. Defendants have provided no reasonable or well-considered explanation for requiring asylum seekers to use it. The Rule therefore lacks a "satisfactory explanation." *State Farm*, 463 U.S. at 43.

In response to public comments expressing concern regarding the adequacy of Mexico's asylum system, Defendants note that "Mexico is the third highest recipient of asylum claims in the world," receiving "118,478 applicants for refugee status" in 2022, 88 Fed. Reg. 31,414, and add that "more than 100,000 individuals felt safe enough to apply for asylum in Mexico in 2022." *Id*. at 31,415. But this is not a "reasonabl[e] explan[ation]." *F.C.C. v. Prometheus Radio Project*, 141 S. Ct. at 1158. The fact that many asylum seekers have filed asylum applications in Mexico does not prove that Mexico's asylum system is functioning, or that the applicants feel safe in Mexico; it proves only that those asylum applicants would feel less unsafe to have official documentation of their status as an asylum seeker compared to having no official documentation at all. *See* CLP_AR_004874 (*Struggling to Survive*, *supra*, at 14) ("[W]ith the U.S. border closed to many

25

arriving asylum seekers under Title 42 since March 2020, some asylum seekers may have requested protection from COMAR even if they do not feel safe in Mexico . . . .”); *see also supra* at part II.A.1. Defendants' justification for the Rule is not “well-considered.” *Sierra Club*, 510 F.3d at 1023.

**D. The Rule will exacerbate all of the issues described above.**

Defendants acknowledge that “Mexico has a significant asylum backlog,” but claim that it “remains a viable option for many seeking protection in Mexico.” 88 Fed. Reg. 31,414. As was the case with earlier iterations of the Rule, therefore, whether the Rule is “arbitrary and capricious” must be assessed with reference to whether the Rule will impact the “viability” of the Mexican asylum system. *See E. Bay Sanctuary Covenant v. Barr*, 385 F. Supp. 3d 922, 952–53 (N.D. Cal. 2019). The Rule will inevitably put further pressure on Mexico's already overburdened asylum system, yet the Rule entirely fails to engage with this problem.

The stated purpose of the Rule is to incentivize thousands of migrants to file asylum applications in Mexico and elsewhere. 88 Fed. Reg. 31315–17 (explaining that the Rule is aimed at avoiding a daily increase of over 1,000 asylum applicants crossing the southwest border, and that it draws from other rules that led to a significant decline in requests for asylum in the United States). For an asylum system that—according to its director—already “cannot cope,” Hernandez Osorio, *Entrega la Acnur a la Comar más del doble de recursos que Gobernación*, *supra*,

the influx of asylum applicants in Mexico that the Rule will inevitably provoke will exacerbate the issues described above. The effect of the Rule will be, therefore, for thousands of migrants to face risks of violence, abuse, poverty, and refoulement beyond what they currently face, and beyond what they would face were the Rule not in place. There is no evidence that the Mexican asylum system will remain a "viable" option in these circumstances.

Defendants have "entirely failed to consider [these] important aspects of the problem." *State Farm*, 463 U.S. at 43. The Rule is therefore arbitrary and capricious and must be vacated.

## CONCLUSION

*Amici* respectfully submit that the Court should consider the foregoing when assessing the challenges to the Rule.

Dated:    October 11, 2023

Respectfully submitted,

By: /s/ Cameron C. Russell

**FRESHFIELDS BRUCKHAUS DERINGER US LLP**

CAMERON C. RUSSELL
REBECCA BERMAN
601 Lexington Avenue,
  31st Floor
New York, New York 10022
(212) 277-4000
cameron.russell@freshfields.com

JUSTINA SESSIONS
J. MIA TSUI
855 Main St,
Redwood City, CA 94063
(650) 618-9250

SEVE KALE
700 13th Street, NW,
  10th Floor
Washington, DC 20005
(202) 777-4500

*Attorneys for Amici Curiae*
  *Asylum Access México and*
  *Instituto para las Mujeres en la*
  *Migración A.C.*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation under Fed. R. App. P. 29(a)(5) because, excluding items exempted under Fed. R. App. P. 32(f), it contains 6,125 words.

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App.P. 32(a)(6) because it uses a proportionally spaced Times New Roman typeface in 14-point size.

Dated: October 11, 2023

      /s/ Cameron Russell

Cameron Russell
Freshfields Bruckhaus Deringer US LLP
*Attorney for Amici Curiae*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** No. 23-16032

I am the attorney or self-represented party.

**This brief contains** 6,125 **words,** including 0 words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

◯ complies with the word limit of Cir. R. 32-1.

◯ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

Ⓧ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

◯ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

◯ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.

☐ a party or parties are filing a single brief in response to multiple briefs.

☐ a party or parties are filing a single brief in response to a longer joint brief.

◯ complies with the length limit designated by court order dated _____ .

◯ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** s/ Cameron C. Russell **Date** 10/11/2023

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8**          *Rev. 12/01/22*

## CERTIFICATE OF SERVICE

I, Cameron Russell, hereby certify that I electronically filed the foregoing motionwith the Clerk of the Court for the U.S. Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on October 11, 2013.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated: October 11, 2023

    /s/ Cameron Russell

Cameron Russell
Freshfields Bruckhaus Deringer US LLP
*Attorney for Amici Curiae*