No. 23-16032

**IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT**

**EAST BAY SANCTUARY COVENANT, *et al.*,**

*Plaintiffs-Appellees,*

v.

**JOSEPH R. BIDEN, President of the United States, *et al.***

*Defendants-Appellants.*

*On Appeal from the United States District Court*
*for the Northern District of California*
*No. 4:18-cv-06810-JST*

**BRIEF OF *AMICI CURIAE* HUMAN RIGHTS AND LEGAL SERVICES ORGANIZATIONS IN SUPPORT OF PLAINTIFFS-APPELLEES**

Anwen Hughes
Christina Asencio
Rebecca Gendelman
Licha M. Nyiendo
HUMAN RIGHTS FIRST
75 Broad St., 31st Fl.
New York, NY 10004
(212) 845-5200

Farida Chehata
HUMAN RIGHTS FIRST
3680 Wilshire Blvd., Ste PO4-414
Los Angeles, CA 90010
Telephone: (213) 294-2648

*Attorneys for Amici Curiae*

i

# CORPORATE DISCLOSURE STATEMENT

*Amici* are non-profit entities that do not have parent corporations.  No publicly held corporation owns 10 percent or more of any stake or stock in *amici curiae*.

/s/ *Farida Chehata*

Farida Chehata

HUMAN RIGHTS FIRST
3680 Wilshire Blvd., Ste PO4-414
Los Angeles, CA 90010
T: (213) 294-2648

**TABLE OF CONTENTS**

STATEMENT OF INTEREST OF AMICI……………………………………………1

INTRODUCTION AND SUMMARY OF ARGUMENT…………………………5

ARGUMENT……………………………………………………………………6

I.      IN PRACTICE, THE RULE'S "LAWFUL PATHWAYS" AMOUNT TO A
        REQUIREMENT TO APPLY FOR ASYLUM BY APPOINTMENT AT A
        PORT OF ENTRY………………………………………………….....6

        A.      The other "pathways" contemplated by the Rule are not
                practical realities……………………………………………6

        B.      Access to CBP One appointments is inequitable, discriminating
                against those not conversant in the languages available on CBP
                One, the illiterate, and those with the least financial
                resources……………………………………………………9

        C.      Even asylum seekers not subject to the ban are being prevented
                from approaching ports of entry without CBP One
                appointments, and if successful in doing so are being "metered"
                and facing long waits before they are allowed to enter the port
                of entry…………………………………………………..12

II.     THESE ILLEGAL OBSTACLES ARE SUBJECTING ASYLUM
        SEEKERS IN MEXICO TO EXTREME VIOLENCE AND HARM…….13

        A. Killings, violent assaults and rape………………………………15
        B. Forced disappearances, trafficking and extortion………………..19
        C. Harms to children……………………………………………..23
        D. Pervasive violence and discrimination against Black, Indigenous,
           and LGBTQI+ migrants…………………………………………26

III.    THE ASYLUM BAN IS RETURNING ASYLUM SEEKERS TO
        PERSECUTION WITHOUT ADEQUATE ASSESSMENT OF THEIR
        CLAIMS……………………………………………………………29

CONCLUSION………………………………………………………...…………30

# TABLE OF AUTHORITIES

## Cases

*E. Bay Sanctuary Covenant v. Biden,* 993 F.3d 640 (9th Cir. 2021)..........................5

*E. Bay Sanctuary Covenant v. Garland*, 994 F.3d 962 (9th Cir. 2021) ......................5

## Other Authorities

Black Alliance for Just Immigration*, "There Is A Target On Us" – The Impact of Anti-Black Racism on African Migrants at Mexico's Southern Border* (2021)....27

*Cientos de Migrantes Desaparecen en México: Tamaulipas, el Estado Más Peligroso [Hundreds of Migrants Disappear in Mexico: Tamaulipas the Most Dangerous State]*, El Financiero (Aug. 30, 2023)................................................19

Customs and Border Protection, CBP One English Reference Guide....................10

Human Rights First*, Human Rights Stain, Public Health Farce* (Dec. 2022).....7, 15

Human Rights First, *Refugee Protection Travesty* (July 2023) ....................... passim

Maham Javaid & Paulina Villegas, *What We Know About Matamoros and the Kidnapped Americans*, Wash. Post (Mar. 7, 2023)...............................................27

U.S. Dep't of State, *2021 Country Reports on Human Rights Practices: Guatemala* (2022)...................................................................................................................8

U.S. Dep't of State, *2022 Country Reports on Human Rights Practices: Honduras* (2023)...................................................................................................................8

U.S. Dep't of State, *2022 Country Reports on Human Rights Practices: Mexico* (2023) ................................................................................ 14, 16, 19, 28

U.S. Dep't of State, Mexico Travel Advisory (Oct. 5, 2022) ..................................16

USCIS, *Frequently Asked Questions About the Processes for Cubans, Haitians, Nicaraguans, and Venezuelans* ................................................................................9

USCIS, *Uniting for Ukraine* (last updated September 20, 2023) ............................9

Women's Refugee Commission, *Stuck in Uncertainty and Exposed to Violence: The Impact of US and Mexican Migration Policies on Women Seeking Protection in 2021* (Feb. 2, 2022) ................................................................................16

## Regulations

88 Fed. Reg. 31,314 (May 16, 2023) ........................................................................1

## STATEMENT OF INTEREST OF AMICI[1]

*Amici* are non-governmental non-profit organizations that serve noncitizens and advocate for their rights, including asylum seekers affected by the new asylum ban promulgated under the title Circumvention of Lawful Pathways, 88 Fed. Reg. 31,314 (May 16, 2023) (the "asylum ban" or the "Rule"). *Amici* submit this brief to provide context on the situation in Mexico of persons seeking asylum in the United States and affected by the asylum ban, and on the harms they face in Mexico.

Al Otro Lado ("AOL") is a binational advocacy and legal aid organization serving migrants, refugees and deportees in the United States and Mexico. AOL provides legal and humanitarian support to indigent refugees, deportees, and other migrants, including providing free direct legal services on both sides of the U.S.-Mexico border and beyond. AOL's Border Rights Project, established in 2017, provides legal education, representation, accompaniment, and human rights monitoring for 10,000 to 15,000 asylum seekers in Tijuana each year. The project also documents human rights violations committed by U.S. and Mexican

---

[1] Amicus curiae certifies that this brief was not written in whole or in part by counsel for any party, and no person or entity other than amicus curiae and its counsel has made a monetary contribution to the preparation and submission of this brief. Fed. R. App. 29(a)(4)(3). The parties have consented to the filing of this amicus brief. See Fed. R. App. 29(a)(2).

government officials against refugees at the U.S.-Mexico border. AOL uses this data to demonstrate unlawful patterns or practices in its advocacy with U.S. policy makers, international human rights monitoring bodies, and nongovernmental human rights organizations. Its data has been cited by Amnesty International, Human Rights Watch, and numerous academic institutions studying the U.S.-Mexico border. The Border Rights Project is one of the largest programs of its kind operating in northern Mexico and engages hundreds of volunteers per year to serve refugees in Tijuana and beyond. AOL also provides reintegration services for individuals deported from the United States. Since 2020, AOL has provided substantial humanitarian assistance to refugees and deportees in need.

Haitian Bridge Alliance ("HBA") is a grassroots nonprofit community-based organization that advocates for fair and humane immigration policies and provides migrants and immigrants with humanitarian, legal, and social services. HBA focuses on Black people, the Haitian community, women and girls, LGBTQIA+ individuals, and survivors of torture and other human rights abuses. HBA staff are either located at or regularly visit border areas in Tijuana, Mexico/San Diego, California; Ciudad Juarez, Mexico/El Paso, Texas; Reynosa, Mexico/McAllen, Texas; and Matamoros, Mexico/Brownsville, Texas. HBA works with civil society partners in those locations and near other ports of entry along the southern border

to serve Haitian and other Black people who are trying to access legal protection, including asylum, in the United States.

Human Rights First ("HRF") is a non-governmental organization established in 1978 that works to ensure the United States' leadership on human rights globally and compliance domestically with its human rights commitments. HRF provides pro bono legal representation to refugees, working in partnership with volunteer lawyers at leading law firms to represent asylum seekers unable to afford counsel. HRF has conducted research and advocacy on the impact of the asylum ban at issue in this litigation, publishing multiple reports on the subject, as well as on policies and regulations promulgated under the prior administration that sought to subject asylum seekers to extra-statutory bars to asylum and blocked asylum seekers for extended periods of time in Mexico.

The Kino Border Initiative (KBI) is a binational, Catholic organization, locally rooted in Ambos Nogales on the Mexico - US border since 2008. KBI seeks to promote humane, just, and workable migration through direct humanitarian assistance and holistic accompaniment of migrants in Nogales, Sonora, Mexico, education and encounter to awaken solidarity with migrants, and policy advocacy in Mexico and the US. KBI provides services to thousands of migrant people each year, the vast majority of whom have fled their places of origin due to violence and who arrive to seek asylum in the United States. KBI

currently accompanies asylum seekers who must wait for months on the border until they can secure a CBP One appointment or seek entry on the de-facto metering list controlled by the Nogales municipal government.

RAICES, formally known as the Refugee and Immigrant Center for Education and Legal Services, is a 501(c)3 not-for-profit organization that models a welcoming nation by fighting for the freedoms of immigrant, refugee, and asylum-seeking families. Founded in San Antonio in 1986, RAICES is now the largest immigration legal services provider in Texas, and pairs direct legal representation and social services case management with impact litigation and advocacy. In addition to San Antonio headquarters, RAICES maintains a presence in Austin, Corpus Christi, Dallas, Fort Worth, Houston, and Laredo — and makes immigration legal services accessible in rural communities throughout the state. Each year, the not-for-profit supports more than 700 parents and children through expansive refugee resettlement programming; provides legal rights presentations and screenings in a dozen-plus shelters and select emergency facilities for unaccompanied minors; and opens approximately 10,000 affirmative and removal defense direct representation cases, representing individuals in both detained and non-detained proceedings. A number of RAICES' service recipients contend with Expedited Removal as a result of the asylum ban, and thus give rise to the organization's interest in this matter.

## INTRODUCTION AND SUMMARY OF THE ARGUMENT

The Rule at issue in this case renders nearly all asylum seekers who traveled through another country on their way to the U.S. southern border or adjacent coastal areas ineligible for asylum unless they either applied for and were denied asylum in one of those countries, or were able to secure one of a limited number of pre-scheduled appointments to enter at specified port of entry, using a notoriously glitchy smartphone application administered by U.S. Customs and Border Protection ("CBP") and known as CBP One.   As Plaintiffs-Appellees have described in their own briefing, and as this Court has previously held, these requirements contravene the asylum statute.  *E. Bay Sanctuary Covenant v. Biden,* 993 F.3d 640 (9th Cir. 2021) (invalidating prior entry ban); *E. Bay Sanctuary Covenant v. Garland*, 994 F.3d 962 (9th Cir. 2021)(invalidating prior transit ban).

*Amici* write to describe the impact of the present asylum ban on the men, women, and children who seek the protection of the United States at the southern border.  For these asylum seekers, the Rule's "lawful pathways" boil down in practice to a requirement to seek asylum by pre-scheduled appointment.  Access to those appointments is limited and inequitable.  As a result, people seeking asylum are forced to wait in increasingly dangerous conditions in Mexico, or risk suffering the ban's punitive asylum denials or wrongful returns to harm and persecution if they attempt to seek protection at a port of entry or cross outside ports of entry

without an appointment.  Asylum seekers in Mexico are targets of widespread and serious abuses including kidnapping, torture, and violent assaults, at the hands of forces including cartels that control territory as well as agents of the Mexican State.  By preventing them from pursuing asylum claims in the United States, the asylum ban is returning refugees to harm, both in Mexico and in their countries of origin.

## ARGUMENT

### I.  IN PRACTICE, THE RULE'S "LAWFUL PATHWAYS" AMOUNT TO A REQUIREMENT TO APPLY FOR ASYLUM BY APPOINTMENT AT A PORT OF ENTRY.

#### A. The other "pathways" contemplated by the Rule are not practical realities

In the experience of *amici,* the "pathways" the Rule contemplates as alternatives to requesting asylum at a port of entry with a CBP One appointment are not available to these asylum seekers in practice.  While the Rule allows those who have applied for and been denied asylum in a country of transit to request asylum without a CBP One appointment, of 408 asylum seekers in CBP and Immigration and Customs Enforcement ("ICE") custody whom *amicus* RAICES has interacted with from May 12, 2023, to the present, not a single person reported having applied for and been denied asylum in a country of transit.  The other signatory *amici* likewise have yet to encounter a noncitizen seeking asylum in the United States at the southern border who met this condition.

Many asylum seekers tell *amici* that they did not apply for asylum in countries of transit like Mexico, El Salvador, Honduras, or Guatemala because they felt actively unsafe there. This is a particular problem for Black, Indigenous, and LGBTQI+ asylum seekers, as well as women, children, and people with disabilities. Many refugees suffer racially motivated violence, anti-LGBTQI+ attacks, gender-based violence, and other harms while traveling through common transit countries including Mexico, as described in Part II.D of this Brief. Human Rights First has documented the stories of thousands of asylum seekers and migrants who suffered horrific attacks in Mexico, including persecution on the basis of nationality, race, sexual orientation, gender identity, and other protected characteristics. These include over 13,000 reports of murders, kidnappings, rapes, and other violent attacks against migrants blocked in or expelled to Mexico under the former Title 42 expulsion policy between January 2021 and the end of that policy in May 2023. *See* Human Rights First, *Human Rights Stain, Public Health Farce* 2 (Dec. 2022), https://humanrightsfirst.org/wp-content/uploads/2022/12/HumanRightsStainPublicHealthFarce-1.pdf

Some asylum seekers from Central America also do not feel safe in Mexico from the persecutors who targeted them in their home countries. A Honduran couple with two children in Matamoros, for example, whose home in Honduras was attacked by gunfire due to their resistance to a gang that controlled territory,

reported that after fleeing their country and while in Tapachula, Mexico, they had seen some of their persecutors in a local park and immediately fled northwards. Human Rights First, *Refugee Protection Travesty* 62 (July 2023) [hereinafter "*HRF Rep. July 2023*"].

In addition, many of the countries through which asylum seekers transit en route to the U.S. southern border have asylum systems that are not sufficiently developed to produce a decision of any kind within a reasonable timeframe or to process large numbers of cases. *Id.* The U.S. Department of State itself characterizes Honduras' asylum system as "nascent," while in Guatemala, 486 asylum applications were filed in 2020, and by October 2021, only 29 had been adjudicated. U.S. Dep't of State, *2022 Country Reports on Human Rights Practices: Honduras* 12 (2023), https://www.state.gov/reports/2022-country-reports-on-human-rights-practices/honduras/; U.S. Dep't of State, *2021 Country Reports on Human Rights Practices: Guatemala* 18 (2022), https://www.state.gov/reports/2021-country-reports-on-human-rights-practices/guatemala/.

As for the option of obtaining advance permission to travel to the United States through an approved parole program, the major parole programs currently in place and which the government has explicitly described as alternatives to seeking asylum at the southern border are available only to specific nationalities (Cubans,

Haitians, Venezuelans, Ukrainians and Nicaraguans), require that the applicant have a financial sponsor in the United States and arrive by air, and also disqualify those who entered Panama or Mexico irregularly, thereby excluding the overwhelming majority of those who seek asylum at the United States' southern land border.   USCIS, *Frequently Asked Questions About the Processes for Cubans, Haitians, Nicaraguans, and Venezuelans,* https://www.uscis.gov/CHNV (last updated Sept. 20, 2023); USCIS, *Uniting for Ukraine*, https://www.uscis.gov/ukraine (last updated September 20, 2023).

Consequently, for the asylum seekers covered by the Rule at issue in this litigation, the three "lawful pathways" envisioned in the rule are in effect a requirement to seek asylum by obtaining one of a very limited number of pre-scheduled appointments at specific ports of entry, and through a specific means: Customs and Border Protection's "CBP One" smartphone application.

### B. Access to CBP One appointments is inequitable, discriminating against those not conversant in the languages available on CBP One, the illiterate, and those with the least financial resources

Although the Rule requires its use by asylum seekers speaking everything from Amharic to Zaghawa, the CBP One smartphone application remains available only in English, Spanish, and Haitian Creole.  Researchers who interviewed Indigenous asylum seekers in Matamoros in June 2023 reported to Human Rights First that some were unable to obtain CBP One appointments due to these

language-access flaws. *HRF Rep. July 2023* at 38. A man from China was struggling to use the CBP One app or to communicate with people in Matamoros as he waited to seek asylum there. When Human Rights First researchers met with him, he had recently been attacked, beaten, and robbed, which was consistent with reports from a local aid worker that Chinese nationals were specifically targeted by criminals and at risk of harm. *Id.*

Asylum applicants who are illiterate are at an obvious disadvantage in navigating a written online appointment system whose instructions confront them with directions like: "Select LOG IN OR SIGN UP. CBP One™ will redirect to login.gov where you can either create an account or log in to an existing account." Customs and Border Protection, CBP One English Reference Guide, https://www.cbp.gov/about/mobile-apps-directory/cbpone. Asylum seekers who are not tech-savvy for a range of reasons including old age, face similar difficulties. Those who find it impossible to navigate this system on their own are forced to seek assistance from others, assuming they can find someone with the necessary skills who speaks their language. This can both impose added costs on asylum seekers with limited resources and provide further opportunities for exploitation in an environment where asylum seekers are already targets for criminal groups.

CBP One requires daily access to a smartphone, disfavoring asylum seekers who cannot afford one, or cannot afford to replace a cellphone damaged or stolen from them during their journey. One family from a Latin American country, including two young children, had been trying for weeks to obtain a CBP One appointment when they were kidnapped in Reynosa, by member of a cartel. Their captors sexually assaulted the mother and terrified the children. *HRF Rep. July 2023* at 13-14. After 13 days of this captivity, the cartel released the family but kept their phones and their money, leaving them without resources to buy a new smartphone to use the CBP One app. As of late June, they had been able to borrow a phone and register on the CBP One app again but were still waiting for an appointment.

Having registered, asylum seekers need daily internet access in order to keep playing the appointment lottery. Human Rights First researchers have spoken with multiple asylum seekers who are depriving themselves and their families of the most basic necessities to pay for internet data in order to access the CBP One app. An Indigenous Honduran family, for example, reported spending their savings on internet data and going without food and water some days in their attempts to maintain access to CBP One. *HRF Rep. July 2023* report at 32. A couple from Venezuela with daughters one and three years of age had been trying to obtain a CBP One appointment for two months. Lacking funds to rent a room, they had

been sleeping outside the port of entry for five days, eating once a day as they prioritized purchasing internet data to use the CBP One app. *Id.* at 33-34. A Haitian man reported frequently lacking potable water for the same reason, this while living in extreme heat in a tent in a camp in Matamoros. *Id.* at 34.

Due to the precarity of their living situations, many asylum seekers in the border areas of Northern Mexico lack access to electricity to charge their phones and to internet coverage. Their daily quest for these critical resources forces them to walk streets that in many areas are controlled by cartels and where sexual assault, kidnapping, robbery, and exploitation are frequent. *Id.*

### C. Even asylum seekers not subject to the ban are being prevented from approaching ports of entry without CBP One appointments, and if successful in doing so are being "metered" and facing long waits before they are allowed to enter the port of entry

The effects of the asylum ban are also being felt by asylum seekers who on the face of the Rule are not subject to its requirements, due to actions on the part of Mexican authorities and CBP that the statute does not contemplate. Mexican authorities are illegally preventing people they identify as asylum seekers from approaching some U.S. ports of entry without a CBP One appointment, including asylum seekers such as unaccompanied minors and nationals of Mexico to whom the ban does not apply. CBP officers, meanwhile, are in many cases refusing to deal with asylum seekers who approach the port of entry without a CBP One

appointment but are not subject to this requirement under the Rule or qualify for an exception, and are directing them to make appointments through CBP One. Rather than processing them promptly, they are placing these asylum seekers on various types of waiting lists.

A pregnant Haitian unaccompanied minor, for example, was not subject to the ban or indeed authorized to use the CBP One app due to her age. She first attempted to approach the Matamoros port of entry on her own in June 2023, but Mexican immigration officers blocked her. *HRF Rep. July 2023* at 44. Local humanitarian workers then accompanied her and were able to approach U.S. CBP officers. When they informed the officers that she was an unaccompanied minor seeking asylum, a CBP officer responded, "Sweetheart, we're not going to take her." It was only after the humanitarian workers advocated with other U.S. officials by telephone that the girl was finally processed. *Id.* at 45.

## II. THESE ILLEGAL OBSTACLES ARE SUBJECTING ASYLUM SEEKERS IN MEXICO TO EXTREME VIOLENCE AND HARM.

Many asylum seekers are waiting several months—up to six months in some cases—in Mexico for CBP One appointments in an attempt to request asylum at one of the ports of entry where such appointments are given. Other asylum seekers are being returned to Mexico after being denied asylum in the United States under the ban. As the U.S. Department of State has repeatedly recognized, human rights

conditions in Mexico are marked by forced disappearances and arbitrary killings, including at the hands of government agents.  Criminal elements and groups, including local and transnational gangs and narcotics traffickers, commit "acts of homicide, torture, kidnapping, extortion, human trafficking, bribery, intimidation and other threats, resulting in high levels of violence and exploitation."  U.S. Dep't of State, *2022 Country Reports on Human Rights Practices: Mexico* at 2 (2023), https://www.state.gov/wp-content/uploads/2023/02/415610_MEXICO-2022-HUMAN-RIGHTS-REPORT.pdf [hereinafter "*2022 State Dep't Report*"].

Asylum seekers and other migrants are frequent victims of these attacks, targeted "by criminal groups and in some cases by police, immigration officers, and customs officials, including at land borders and airports."  *Id.* at 19.  Migrants are targets for all these state and non-state actors because of their status as migrants, their often very visible foreignness, their lack of protection, and the fact that they may have U.S.-based family who could be targeted for extortion.  Human Rights First has documented the stories of thousands of asylum seekers and migrants who suffered horrific attacks in Mexico, including persecution on the basis of nationality, race, sexual orientation, gender identity, and other protected characteristics.  These include over 13,000 reports of murders, kidnappings, rapes, and other violent attacks against migrants blocked in or expelled to Mexico under the former Title 42 expulsion policy between January 2021 and the end of that

policy in May 2023.  Human Rights First*, Human Rights Stain, Public Health Farce* 2 (Dec. 2022), https://humanrightsfirst.org/library/human-rights-stain-public-health-farce/.

These attacks, which also target those returned to Mexico under the current asylum ban, are frequent and violent, as the following examples show.  And while the Rule provides that an "imminent and extreme threat to life or safety" is among the "exceptionally compelling" circumstances that can provide an exception to the asylum ban, those actually experiencing such extreme threats face extreme difficulties in presenting them to U.S. immigration authorities for consideration.

### A. Killings, violent assaults, and rape

The U.S. government flatly advises against travel to six Mexican states—one of them the border state of Tamaulipas—due to the threat of criminality and violence. In states where it will contemplate travel, the U.S. government prohibits its own employees, for security reasons, from most of the activities that asylum seekers have little choice but to engage in as they seek to apply for asylum at the U.S.-Mexico border. *See* U.S. Dep't of State, Mexico Travel Advisory (Oct. 5, 2022), https://travel.state.gov/content/travel/en/traveladvisories/traveladvisories/mexico-travel-advisory.html.  Cartels and gangs have been "implicated in numerous killings, acting with impunity and at times in collusion with corrupt federal, state,

local, and security officials." *2022 State Dep't Report* at 2. Mexico's drug-trafficking organizations "have substantial territorial control throughout the country and co-opt institutions through bribery and intimidation;" in addition to drug-trafficking, they engage in "oil theft, human trafficking, kidnapping, and extortion, earning billions of dollars annually. Global Organized Crime Index, Mexico, https://ocindex.net/country/mexico.

Violence against women and girls—including rape, sexual assault, and femicide—is pervasive in Mexico, with high rates of impunity. *2022 State Dep't Report* at 19-25. Migrant women face a particularly high risk of sexual assault. *See* Women's Refugee Commission, *Stuck in Uncertainty and Exposed to Violence: The Impact of US and Mexican Migration Policies on Women Seeking Protection in 2021* (Feb. 2, 2022), https://www.womensrefugeecommission.org/research-resources/stuck-in-uncertainty-and-exposed-to-violence-the-impact-of-us-and-mexican-migration-policies-on-women-seeking-protection-in-2021/.

A cartel in Reynosa, for example, kidnapped two young women and two young men from Venezuela in September 2023 while they were waiting to obtain a CBP One appointment. The kidnappers killed one of the young men, as the

survivors later described to a humanitarian aid provider in Matamoros. Telephone Interview by Human Rights First with humanitarian aid provider (Sept. 18, 2023).[2]

Also in September 2023, persons who identified themselves as members of a cartel in Reynosa kidnapped a Mexican family consisting of a mother, father, 13-year-old daughter, 12-year-old son, and five-year-old daughter, along with the father's two adult brothers. The cartel members tortured and killed the two adult brothers, sexually assaulted the five-year-old daughter, and forced her family to witness this assault, as they subsequently recounted to a humanitarian aid provider. The family was released after relatives paid the ransom, but they remain in danger in Mexico and in need of critical trauma-related psychiatric care. Telephone Interview by Human Rights First with humanitarian aid provider (Sept. 20, 2023).

In September 2023, while waiting to seek asylum in the U.S., a Venezuelan man was shot in the head by members of an organized criminal group after being pulled off a bus that had been taken by the criminal group to kidnap passengers. The man survived the shooting but lost his eye, as confirmed by a humanitarian aid provider. Telephone Interview by Human Rights First with humanitarian aid provider (Sept. 25, 2023).

---

[2] Due to increasing threats against and surveillance of migrants waiting in Mexico for CBP One appointments that also extend to humanitarian workers assisting these asylum seekers, humanitarian aid providers who spoke to Human Rights First asked not to be identified.

A woman who had fled persecution in Honduras was living alone in an encampment in Matamoros for three months trying to obtain a CBP One appointment to seek asylum when she was raped in her tent at night in late May 2023 by a man who cursed at her for being a migrant and threatened to kill her if she told anyone. She screamed for help, but no one came. Her rapist returned another night in early June 2023 and attempted to rape her again. This time she was able to defend herself and escape the camp. Terrified, she filed a police report in Mexico. She attempted to access the U.S. port of entry in Matamoros after both attacks, but on both occasions Mexican immigration officers blocked her from accessing the U.S. port of entry despite her evidence and testimony that she feared for her life. Instead, Mexican immigration officers questioned her as to whether she was in fact raped. She reports receiving death threats related to her sexual assault by telephone. "I am afraid for my life here," she told a Human Rights First researcher. "In my country, I'm a professional. I had a career. I'm not coming to work. I came because my life was in danger. And something that had never happened to me—a rape—happened to me here." *HRF Rep. July 2023* at 10-11.

An elderly Colombian woman travelling alone was physically attacked and verbally assaulted in the Matamoros camp by a member of the cartel who identified himself as the person in charge and whom others said was the leader. *HRF Rep. July 2023* at 16. She hid in another family's tent, pleading to be allowed

18

to sleep there that night before escaping the camp the next day. "The terror I felt that night was the worst in my life. They [the cartel] don't respect if you're an older woman, a child, a pregnant woman. People are taken from the camp and disappeared, and no one can say anything." *Id.*

### B. Forced disappearances, trafficking and extortion

In Mexico, "[d]isappearances remained a persistent problem throughout the country, especially in areas with high levels of cartel- or gang-related violence." *2022 State Dep't Report* at 3. The Mexican National Search Commission registered 1,800 migrants of 55 nationalities as missing between January 2023 and end of August of this year and noted that one in four missing migrants is a child. *Cientos de Migrantes Desaparecen en México: Tamaulipas, el Estado Más Peligroso [Hundreds of Migrants Disappear in Mexico: Tamaulipas the Most Dangerous State]*, El Financiero (Aug. 30, 2023), https://www.elfinanciero.com.mx/nacional/2023/08/30/cientos-de-migrantes-desaparecen-en-mexico-tamaulipas-el-estado-mas-peligroso/. (The highest number of disappearances were registered in the northern border state of Tamaulipas where brazen, widespread kidnappings are occurring, followed by Mexico City, the southern border state of Chiapas, and northern border states of Baja California and Sonora. *Id.*)

An asylum seeker from a Latin American country waiting to seek U.S. asylum, for example, was kidnapped in Mexico where she was held captive and abused for about a month and a half, according to information received by an attorney with Lawyers for Good Government in Reynosa. She was able to escape her captors, only to be taken and held captive a second time. She said: "I was held captive at this house for about two months and I thought the only way I would leave the house was if I were dead." Her captors trafficked her to drug dealers who raped her on several different occasions. She went into hiding upon escaping and had been requesting a CBP One appointment daily without success. She was unable to present at the port of entry to seek U.S. asylum protection due to Mexican immigration officers unlawfully blocking access to individuals without CBP One appointments. *HRF Rep. July 2023* at 11-12.

A Venezuelan woman and child were kidnapped, and the mother was raped while waiting for a CBP One appointment. *Id.* at 12. They were then denied access to the port of entry by Mexican officers. They risk the punishment of the asylum ban if they attempt to enter between ports of entry or present without a CBP One appointment. The mother, her minor son, and adult sister attempted to obtain a CBP One appointment to seek asylum in mid-May 2023 when they were kidnapped and held for 12 days in Reynosa in June 2023. Their abductors threatened to take their organs if their families did not pay a ransom. *Id.*

Four young Venezuelans, one of them a minor, traveling together arrived in Matamoros after the asylum ban went into effect. They had been trying to obtain a CBP One appointment to seek U.S. asylum since April. *Id.* at 12-13. Mexican immigration officers blocked them from the U.S port of entry in Matamoros so they traveled to Reynosa in June, where they heard they might be able to access the port of entry. In Reynosa, they were intercepted by a car while walking. The driver asked where they were from and then kidnapped and held them hostage for three days. During that time, they were all physically assaulted and the women were tortured for ransom. The kidnappers threatened "[i]f you don't pay, we'll cut off your fingers." The family's relatives paid the ransom and they were released. After their release they lived in constant fear, as their kidnappers took their photos. Following the kidnapping, they escaped Reynosa and returned to Matamoros. They attempted to request asylum at the Matamoros port of entry, explaining their fear and what had happened, but were prevented from approaching the U.S. port of entry by Mexican immigration officers who wrongly turned them away because they did not have a CBP One appointment. *Id.*

These abuses are by no means limited to non-state criminal groups. Migrants and people seeking asylum are targets of violence by Mexican officials throughout the country, with the result that internal relocation is not a reliable option for those facing threats in the northern border areas while waiting to seek

asylum in the United States. Human Rights First researchers spoke with scores of people seeking asylum who experienced abuse by Mexican authorities during their transit through and wait in southern, central, and northern Mexico. The officials involved included national immigration officers, municipal, state and federal police, and members of the national guard. The abuses they inflicted on migrants included discriminatory and arbitrary detention, intimidation, robbery, extortion, sexual assault, and enforced disappearance through collusion with organized criminal groups by turning migrants and people seeking asylum over to them for kidnapping and ransom. *HRF Rep. July 2023* at 50.

In Ciudad Juárez, a Venezuelan family with a two-year old child had been sleeping outside the port of entry without shelter for 15 days, waiting to be processed to seek asylum, when a Human Rights First researcher met with them in June 2023. They recounted that while they were transiting through Mexico by bus, Mexican immigration police ordered them off the bus and handed them over to a cartel that held them captive them for 15 days and demanded a $1,500 USD ransom per person to release them. "We wanted to file a police report, but you never know if the police are good or are one of them," a member of the family explained. *HRF Rep. July 2023* at 51.

The threat or actual experience of such harm, and the long waits and difficulty of obtaining CBP One appointments, drive asylum seekers to cross the

U.S. border without inspection.  In September 2023, a Human Rights First researcher spoke with a Mexican woman who had spent eight months in Reynosa sleeping in a tent inside a migrant shelter with her adolescent daughter while struggling to obtain a CBP One appointment.  "Many kidnappings occurred outside the shelter in broad daylight because migrants were only allowed out during certain hours," she said.  "Trucks would arrive and take people. Many witnessed it.  The kidnappings got worse in the last three months and people barely left the shelter. . . Because of this, everyone crossed [into the United States]."  Interview by Human Rights First, in McAllen, Texas (Sept. 12, 2023).

### C. Harms to children

As the examples above illustrate, those affected by the asylum ban include many families with children ranging in age from adolescents to newborns.  These children are exposed in Mexico to what would be traumatic conditions and experiences even for an adult, and to living conditions so unhealthy as to be life-threatening to young children.

Parents blocked in Mexico by the asylum ban live in fear that their children will be kidnapped; several have told Human Rights First researchers that they tie their children to themselves with cable wires at night to prevent them from being taken. *HRF Rep. July 2023* at 16, 17.  Parents watch powerlessly as their children's mental health deterioratesff.  One mother, from Ecuador, living in an

23

unsafe camp in Matamoros for two months unsuccessfully trying to obtain a CBP One appointment, was at her wits' end and contemplating crossing the border without authorization as her teenage daughter's mental health was worsening. "She cuts herself. She feels very unsafe here. There is no privacy. How can we cross?" *HRF Rep. July 2023* at 17.

An entire family from Venezuela, consisting of a mother, father, and their adolescent and pre-school-aged children, who had been trying to obtain a CBP One appointment were kidnapped by a cartel in Reynosa in early June and held for ten days. *Id.* at 13. During this time, the mother was sexually abused by cartel members on two occasions. The family also described witnessing intense beatings of migrant men and hearing their screams, including one man who was severely assaulted and begged his family by telephone to send the money their captors required or he would be killed. "It was horrible," the mother said. "You don't know if you'll get out alive. My kids cried and cried. They wanted to leave, wanted to cross [to the United States]; they didn't want to be here." The cartel kept the smartphone the family had used to register for CBP One, so upon their release they had to register again, while continuing to receive threatening calls from their kidnappers demanding payment of more money on the phone they had managed to retain. *Id.*

A mother from Venezuela, her minor son, and adult sister attempted to obtain a CBP One appointment to seek asylum in mid-May 2023 when they were kidnapped and held for 12 days in Reynosa in June 2023. *HRF Rep. July 2023* at 12. Their abductors threatened to take their organs if their families didn't pay a ransom. The women described being placed in a room with 50 people from China, Cuba, Ecuador, Honduras, Mexico, and Russia, including children as young as two years old. Their kidnappers threatened and beat people, including the children. "We witnessed them [the cartel] taser men with electricity who screamed in pain right in front of us and severely beat men if the transfer payment hadn't come through. My son cried a lot, begging to leave. They'd also give drugs to the teenage children." That first night, a cartel member raped the Venezuelan mother. "He threatened to kill my son and sister and threatened me to stay quiet. We were terrified each time the door opened and our abusers entered. We prayed and prayed. We feel completely unsafe here in Mexico. We're terrified to go outside; afraid we'll be taken again." *Id.*

Many children, like their parents, are living in unsafe, unsanitary conditions, both outside the ports of entry and in open-air encampments along the edge of the Rio Grande. *Amici* have witnessed abysmal conditions in both Matamoros and Reynosa, Tamaulipas, where thousands of women, men, and children are living in makeshift tents made of blankets and garbage bags, lacking minimum

25

humanitarian standards of shelter, water, sanitation and hygiene, nutrition, and health services. *HRF Rep. July 2023* at 47. There are piles of garbage, burn pits to deal with waste, limited porta-potties, and a dangerous lack of sanitation and clean water which can present a risk of cholera. Respiratory and gastrointestinal illnesses and skin infections are prevalent. *Id.* Living in these conditions gives parents justifiable fears for the survival of their little children. A Haitian mother in June 2023 worried about her one-month-old, who was running a fever and having trouble breathing; the two were living in the extreme summer heat in a Haitian encampment in Matamoros. *Id.* at 49. A two-month-old Honduran baby who had had diarrhea for a week was sleeping in a tent in an encampment in Reynosa. His mother, who was still breastfeeding, told of how she and their entire family had gastrointestinal symptoms and diarrhea, with limited potable water to drink to stay hydrated. *Id.*

### D. Pervasive violence and discrimination against Black, Indigenous, and LGBTQI+ migrants

In Mexico, Black asylum seekers and migrants face pervasive anti-Black violence, harassment, and discrimination, including widespread abuse by Mexican authorities. *See* Black Alliance for Just Immigration*, "There Is A Target On Us" – The Impact of Anti-Black Racism on African Migrants at Mexico's Southern Border* (2021), https://baji.org/wp-content/uploads/2021/01/The-Impact-of-Anti-Black-Racism-on-African-Migrants-at-Mexico.pdf. Haitian Bridge Alliance organized at

least a dozen funerals since December 2021 for Haitian migrants who died or were killed in Mexico while stranded due to the recently ended Title 42 expulsion policy, including for a 34-year-old Haitian asylum seeker who was murdered last year. *HRF Rep. July 2023* at 61. The kidnapping in March 2023 of four Black U.S. residents—and murder of two of them—in Matamoros has underscored the violence and targeted attacks that Black people have long faced by cartels in Mexico. Maham Javaid & Paulina Villegas, *What We Know About Matamoros and the Kidnapped Americans*, Wash. Post (Mar. 7, 2023), https://www.washingtonpost.com/world/2023/03/06/americans-medicine-kidnapped-mexico/.

A Haitian mother traveling with her husband and young child who was trying to obtain a CBP One appointment described how while she and her family were aboard a bus to the border, a female Mexican immigration officer targeted only them, the only Black passengers aboard the bus, for a search of their belongings, and inappropriately groped her breasts and searched inside her pants. *HRF Rep. July 2023* at 39. A Venezuelan woman staying in a shelter in Tijuana with her family in July 2023 described how a week earlier, her husband had witnessed Mexican police officers beating up Haitians across the street from the shelter. When he intervened to defend them, she said, Mexican police pulled a gun on him. *Id.*

Indigenous people, LGBTQI+ individuals, women, children, and people with disabilities also face a high risk of violence in Mexico. The U.S. State Department noted frequent violence and discrimination against Indigenous women, among the most vulnerable groups in society according to the National Human Rights Commission. LGBTQI+ persons face widespread violence and mistreatment, including by Mexican police. Transgender women in particular face great risk of harm; in 2021, 55 transgender women were killed in Mexico. *HRF Rep. July 2023* at 62 (citing *2022 State Dep't Report*).

In Nogales, an LGBTQI+ asylum seeking woman fleeing sexual violence and persecution by Colombian authorities on account of her sexual orientation and displacement by armed groups was sexually assaulted by a female Mexican state police officer while transiting on a bus enroute to northern Mexico. *HRF Rep. July 2023* at 41. The Mexican officer solely targeted for search Colombian nationals on the bus and ordered the Colombian LGBTQI+ woman into the bus bathroom where the officer stripped off her clothing and digitally penetrated her vaginally without use of a glove, alleging the asylum seeker was transporting cocaine, and then robbed her of her money. *Id.*

"I'm gay," a young Venezuelan man living in the Matamoros camp waiting to seek asylum explained to Human Rights First. "And over there [in Venezuela], you're not free to be who you are. Being in the camp here is like being over there.

28

You live the same experiences: lack of respect and verbal violence. There was a group of migrant men in the camp who harassed gay and lesbian people to violate them." *Id.* at 42.

### III. THE ASYLUM BAN IS RETURNING ASYLUM SEEKERS TO PERSECUTION WITHOUT ADEQUATE ASSESSMENT OF THEIR CLAIMS.

Since its implementation, the asylum ban has prevented many asylum seekers who should have had the opportunity to pursue asylum in the United States from doing so, resulting in *refoulement*. Of the 37,075 the government subjected to the asylum ban between May 12 and August 11, 2023 the vast majority (85.5 percent) were deemed barred by the ban, while only 2.9 percent satisfied a condition that exempted them from it (for example, presenting at a port of entry without an appointment where they faced a significant and ongoing obstacle to using CBP One, or, at least theoretically, showing proof of a transit-country denial).

Like the Trump Administration's asylum transit ban, the current asylum ban is therefore preventing refugees in need of protection from pursuing asylum claims in the United States. A Colombian asylum seeker, for example, reported fleeing Colombia after being threatened with death and tortured, including being stabbed in the chest, by Colombian police and a guerrilla group. *HRF Rep. July 2023* at 55. While traveling through Mexico, he was kidnapped by a criminal organization

that tortured him and hit him in the chest where he had existing stab wounds from his experiences in Colombia, leading him to run for his life to the U.S. border. Though he told the asylum officer about the torture he had suffered in Mexico, the officer determined he was not eligible for an exception to the ban, despite entering the United States while experiencing a medical emergency and directly fleeing torture in Mexico. He was then deported, according to his attorney at the New Mexico Immigrant Law Center. *Id.* at 56.

A citizen of Guatemala had fled his country because of death threats he received in retaliation for witnessing and helping report to the police a brutal attack on his relative. In June 2023, an asylum officer determined that the man, who was unrepresented and had not had an opportunity to consult with an attorney, was barred by the asylum ban. *HRF Rep. July 2023* at 59. Deported to his country of persecution without any opportunity to be considered for U.S. asylum, the man is now terrified for his safety and barely leaves his home. *Id.*

## CONCLUSION

For these reasons and for those stated in Appellees' Answering Brief, *amici* urge the Court to affirm the district court's grant of summary judgment and vacatur of the Rule.

Dated: October 11, 2023                  Respectfully submitted,


                                         /s/Farida Chehata
                                         Farida Chehata (CA SBN# 272117)
                                         HUMAN RIGHTS FIRST
                                         3680 Wilshire Blvd., Ste. P04-414
                                         Los Angeles, CA 90010

                                         *Counsel for amici curiae*

# CERTIFICATE OF SERVICE

I hereby certify that on October 11, 2023, I electronically filed the foregoing with the Clerk for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.  All participants in this case are registered CM/ECF users and will be served by the appellate CM/ECF system.

/s/ *Farida Chehata*
Farida Chehata

Dated: October 11, 2023

**UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT**
**Form 8. Certificate of Compliance for Briefs**

**9th Cir. Case Number(s) 23-16032**

1. I am the attorney or self-represented party.

2. This brief contains 6,994 words, including 0 words manually counted in any

   visual images, and excluding the items exempted by FRAP 32(f). The

   brief's type size and typeface comply with FRAP 32(a)(5) and (6).

3. I certify that this brief (select only one):

[] complies with the word limit of Cir. R. 32-1.
[] is a cross-appeal brief and complies with the word limit of Cir. R. 28.1-1. [X] is an amicus brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).
[] is for a death penalty case and complies with the word limit of Cir. R. 32-4.
[] complies with the longer length limit permitted by Cir. R. 32-2(b) because (select only one):
    [] it is a joint brief submitted by separately represented parties.
    [] a party or parties are filing a single brief in response to multiple briefs.
    [] a party or parties are filing a single brief in response to a longer joint brief.
    [] complies with the length limit designated by court order dated
    _____.
    [] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

/s/ *Farida Chehata*
Farida Chehata

Dated: October 11, 2023