No. 23-16032

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

_____

East Bay Sanctuary Covenant, *et al.*,

*Plaintiffs-Appellees,*

v.

Joseph R. Biden, President of the United States, in his official capacity, *et al.*,

*Defendants-Appellants.*

_____

On Appeal from the United States District Court
for the Northern District of California

_____

**REPLY BRIEF FOR APPELLANTS**

_____

WILLIAM C. PEACHEY
  *Director*

EREZ REUVENI
  *Assistant Director*

PATRICK GLEN
CHRISTINA P. GREER
  *Senior Litigation Counsel*
  *Office of Immigration Litigation*
  *Civil Division*
  *U.S. Department of Justice*
  *P.O. Box 868, Ben Franklin Station*
  *Washington, DC 20044*

BRIAN M. BOYNTON
  *Principal Deputy Assistant Attorney*
  *General*

DANIEL TENNY
SEAN R. JANDA
BRIAN J. SPRINGER
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7260*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-3388*

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES...................................................................................ii

INTRODUCTION AND SUMMARY...............................................................1

ARGUMENT.........................................................................................................3

I.     Plaintiffs' Claims Are Barred at the Threshold.......................................3

II.    The Rule Comports with the INA and APA ...........................................9

III.   The District Court's Vacatur Was Independently Improper..............22

CONCLUSION...................................................................................................28

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Cases:** **Page(s)**

*Block v. Community Nutrition Inst.,*
467 U.S. 340 (1984) ............................................................................... 7, 9

*East Bay Sanctuary Covenant v. Biden,*
993 F.3d 640 (9th Cir. 2021) ........................................................... 1, 11

*East Bay Sanctuary Covenant v. Garland,*
994 F.3d 962 (9th Cir. 2021) ........................................... 1, 12, 15, 16

*East Bay Sanctuary Covenant v. Trump,*
932 F.3d 742 (9th Cir. 2018) ................................................................. 6

*FCC v. Prometheus Radio Project,*
141 S. Ct. 1150 (2021) ......................................................................... 17

*Garland v. Aleman Gonzalez,*
142 S. Ct. 2057 (2022) .................................................................. 22, 23

*Gonzales v. Department of Homeland Sec.,*
508 F.3d 1227 (9th Cir. 2007) ............................................................ 23

*Guerrero-Lasprilla v. Barr,*
140 S. Ct. 1062 (2020) ........................................................................... 8

*INS v. Cardoza-Fonseca,*
480 U.S. 421 (1987) ............................................................................. 18

*J.E.F.M. v. Lynch,*
837 F.3d 1026 (9th Cir. 2016) .............................................................. 8

*Kowalski v. Tesmer,*
543 U.S. 125 (2004) ............................................................................... 6

*Landon v. Plasencia,*
459 U.S. 21 (1982) ............................................................................... 27

*Linda R.S. v. Richard D.,*
410 U.S. 614 (1973) .......................................................................... 3, 5

*Lujan v. National Wildlife Fed'n,*
497 U.S. 871 (1990) ............................................................................... 6

ii

*New York v. United States,*
   505 U.S. 144 (1992) ................................................................................. 11

*Reno v. Flores,*
   507 U.S. 292 (1993) ................................................................................. 13

*Sure-Tan, Inc. v. NLRB,*
   467 U.S. 883 (1984) ................................................................................... 3

*United States v. Texas,*
   143 S. Ct. 1964 (2023) ................................................................. 2, 3, 4, 5, 23

**Statutes:**

Immigration and Nationality Act (INA):
   8 U.S.C. § 1101(a)(42) ........................................................................... 10
   8 U.S.C. § 1158(b)(1)(A) ........................................................................ 18
   8 U.S.C. § 1158(b)(2)(C) ............................................................... 9, 12, 18
   8 U.S.C. § 1231(b)(3) ............................................................................. 18
   8 U.S.C. § 1252 ....................................................................................... 7
   8 U.S.C. § 1252(a)(5) ............................................................................... 9
   8 U.S.C. § 1252(b)(9) ............................................................................ 7, 9
   8 U.S.C. § 1252(e)(3) ............................................................................ 8, 9
   8 U.S.C. § 1252(f)(1) ............................................................................. 22

**Regulations:**

8 C.F.R. § 208.33(a)(2)(ii)(A) .................................................................. 19

8 C.F.R. § 208.33(a)(2)(ii)(A)-(B) ........................................................... 12

8 C.F.R. § 208.33(a)(2)(ii)(C) .................................................................. 12

8 C.F.R. § 208.33(a)(3) ............................................................................ 26

8 C.F.R. § 208.33(a)(3)(i) ........................................................................ 12

8 C.F.R. § 1208.33(a)(3) .......................................................................... 26

**Other Authorities:**

84 Fed. Reg. 33,829 (July 16, 2019) ...................................................... 16

88 Fed. Reg. 11,704 (Feb. 23, 2023) ................................................... 21

88 Fed. Reg. 31,314 (May 16, 2023) ........................................ 1, 14, 17, 18, 19, 20, 21, 27

## INTRODUCTION AND SUMMARY

Plaintiffs ask this Court to hold unlawful a Rule that imposes an eminently reasonable limitation on asylum to address an anticipated increase in irregular migration throughout the Western Hemisphere. *See* Circumvention of Lawful Pathways, 88 Fed. Reg. 31,314 (May 16, 2023). They do so even though the Rule does not regulate plaintiffs or afford them any cognizable basis to bring this suit, was promulgated pursuant to the Executive's express statutory authority to impose limitations on the discretionary grant of asylum, and leaves open other pathways for noncitizens seeking asylum.

Plaintiffs offer no meaningful defense from first principles of either their ability to bring this suit or their claims on the merits. Instead, plaintiffs primarily argue that the relevant questions are resolved by this Court's cases holding that two previous regulations related to asylum were likely invalid. *See East Bay Sanctuary Covenant v. Biden* (*East Bay I*), 993 F.3d 640 (9th Cir. 2021); *East Bay Sanctuary Covenant v. Garland* (*East Bay II*), 994 F.3d 962 (9th Cir. 2021). But plaintiffs' argument disregards more recent developments in the law and the substantial differences between the regulations at issue in those cases and the Rule at issue here.

At the outset, since the previous *East Bay* decisions, the Supreme Court has held that non-regulated entities—like plaintiffs—have no judicially cognizable interest in how the Executive exercises its discretion to enforce, or not enforce, the

immigration laws against noncitizens. *See United States v. Texas*, 143 S. Ct. 1964, 1970-72 (2023). That principle resolves this case.

On the merits, plaintiffs ignore the express statutory authorization for the Attorney General and Secretary of Homeland Security to adopt limitations on asylum eligibility, and avoid addressing the substance of the Rule by mischaracterizing it as merely the combination of the two categorical exclusions that this Court has previously addressed. But the Rule challenged here is materially different from the prior rules. This Court's previous decisions turned on the categorical and inflexible nature of the prior rules. The Rule does not replicate those alleged defects.

Instead, the Rule reflects a nuanced approach to addressing the systemic problems caused by an anticipated increase in irregular migration following the termination of the Title 42 order. Through the Rule and accompanying initiatives, the Executive has expanded orderly migration pathways, while encouraging other countries to share in addressing irregular migration in the Western Hemisphere. Indeed, plaintiffs do not dispute that expanded alternatives now permit over 800,000 noncitizens each year to enter the United States in an orderly fashion and to seek asylum without being subject to the Rule. At the same time, to ensure that noncitizens are encouraged to pursue those alternatives or seek protection in other countries, the Rule makes specified noncitizens who forgo those alternatives presumptively ineligible for a discretionary grant of asylum. That balanced approach, which includes numerous exceptions and means of rebuttal and also ensures that all noncitizens continue to

2

receive appropriate screening for other protection against removal to a country where there is a reasonable possibility of persecution on protected grounds or torture, is a sound and lawful approach to rendering discretionary decisions regarding asylum. This Court should reject plaintiffs' claims and reverse.

## ARGUMENT

### I. Plaintiffs' Claims Are Barred at the Threshold

**1.** As explained in the government's opening brief, plaintiffs lack Article III standing because the Rule—which regulates asylum eligibility for noncitizens but does not regulate organizations like plaintiffs—causes no cognizable injury to them. Plaintiffs lack any "judicially cognizable interest" in whether or how the Executive exercises its immigration enforcement discretion against someone else. *Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973); *see Sure-Tan, Inc. v. NLRB*, 467 U.S. 883, 897 (1984). The Supreme Court recently applied that principle to hold that States lacked standing to challenge the way in which the Executive prioritized noncitizens for arrest and removal, even though the States claimed that the Executive's decisions would cause them financial harm. *See United States v. Texas*, 143 S. Ct. 1964, 1970 (2023). For the same reasons, plaintiffs lack standing regardless of their claims that the Rule will inflict downstream financial harm on them. *See* Gov't Br. 18-22.

Indeed, plaintiffs do not dispute that each of the reasons articulated in *Texas* to support its conclusion—including that discretionary immigration enforcement decisions relating to third parties involve no exercise of coercive power over the

3

plaintiff; that challenges to those decisions implicate Article II and foreign-policy concerns; and that courts lack "meaningful standards" to assess such decisions, *see Texas*, 143 S. Ct. at 1971-72—applies with equal force here. *See* Gov't Br. 20-21. *Texas* thus controls.

Plaintiffs assert that *Texas* and *Linda R.S.* are inapposite because they concerned efforts to challenge "'non-enforcement' policies," while plaintiffs here "do not seek more arrests or prosecutions." Pls. Br. 14-15. But *Texas* reflects a broader principle that parties generally lack any judicially cognizable interest in avoiding attenuated effects that flow from discretionary government decisions about whether or how to enforce immigration laws against others. *See* Gov't Br. 20-22. That rule applies across the range of discretionary immigration enforcement decisions that the Executive makes—including the exercise of discretionary enforcement authority to establish conditions on asylum, which implicates "the Executive's traditional enforcement discretion." *Texas*, 143 S. Ct. at 1974.

It would make no sense, for Article III purposes, to distinguish between the States in *Texas* that sought to compel the government to enforce the laws *more* frequently against third parties, and plaintiffs here that seek to compel the government to enforce the laws *less* frequently against third parties. Supreme Court precedent draws no such distinction. To the contrary, the Supreme Court has explicitly articulated the relevant principle in a neutral fashion: "in American jurisprudence at least, a private citizen lacks a judicially cognizable interest in the

prosecution *or nonprosecution* of another." *Linda R.S.*, 410 U.S. at 619 (emphasis added). And plaintiffs cite no authority supporting their unlikely assertion that the manner in which the government exercises its enforcement discretion—whether by declining to institute an enforcement proceeding or through discretionary decisions regarding asylum—has any relevance to the standing analysis. The relevant point is that plaintiffs have no cognizable interest in avoiding attenuated costs that flow from immigration enforcement decisions relating to third parties not before the Court.

Plaintiffs' effort, in a footnote, to distinguish *Sure-Tan* only highlights their unwillingness to acknowledge the significance of the *Texas* decision. Plaintiffs argue that *Sure-Tan* is irrelevant here because it "did not even address standing." Pls. Br. 15 n.1. But while it may not have been clear at the time of this Court's prior *East Bay* decisions that the principle articulated in *Sure-Tan* applies in the Article III context, the *Texas* decision explicitly relied on *Sure-Tan* to dismiss claims for lack of Article III standing. *See Texas*, 143 S. Ct. at 1970. Thus, while this Court had previously treated *Linda R.S.* and *Sure-Tan* as relevant only to prudential principles of third-party standing, the *Texas* decision undermines that approach, as the district court recognized. ER-13 & n.7.

**2.** Plaintiffs likewise fail to provide any meaningful response to the government's arguments that they fall outside the zone of interests of the Immigration and Nationality Act (INA) provisions that plaintiffs seek to enforce. They do not generally dispute that the INA is concerned with the interests of

noncitizens, not with the interests of nonprofit organizations. Nor do plaintiffs reconcile their attempt to bring this suit with the undisputed principle that lawyers generally lack an independent interest in the rules applicable to their clients. *See Kowalski v. Tesmer*, 543 U.S. 125, 130-34 (2004). And plaintiffs draw no distinction between themselves and other lawyers who might seek to challenge such rules.

Instead, plaintiffs rely almost entirely (at 15-16) on this Court's previous cases holding that similarly situated organizations fell within the INA's zone of interests. As the government explained (at 24-25), those previous cases rested on the Court's view that the plaintiff organizations had a cognizable "interest in aiding [the] immigrants seeking asylum" who the INA is directly concerned about, *East Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 768 (9th Cir. 2018). But the Supreme Court's recent *Texas* decision makes clear that non-regulated parties in fact have no cognizable interest in how the INA is enforced against others. Plaintiffs have no response to this point, except to note (at 16) that *Texas* directly addressed questions of Article III standing and not zone of interests.

The principles articulated in *Texas*, however, are also relevant to the zone-of-interests inquiry. *See* Gov't Br. 24-25. That inquiry requires a court to determine whether "the injury [the plaintiff] complains of (*his* aggrievement, or the adverse effect *upon him*) falls within" the interests protected by the relevant statute. *Lujan v. National Wildlife Fed'n*, 497 U.S. 871, 883 (1990). And *Texas* is relevant to that determination, affecting both what cognizable "aggrievement" or "adverse effect" a plaintiff can

6

assert and what interests are protected by the relevant statute. *Texas* makes clear that, in enacting a statute like the INA, Congress was not concerned with protecting the interests of non-regulated entities (like organizations or States) that claim that the Executive's immigration enforcement decisions impose downstream costs on them. Thus, *Texas* also undermines the foundational premise that underlay this Court's previous zone-of-interests holdings.

**3.** In addition, plaintiffs' claims are unreviewable because they are precluded by the INA. The INA's comprehensive scheme provides for administrative and judicial review of decisions related to immigration enforcement only by the noncitizens against whom the statute is being enforced and only through carefully prescribed channels. Congress's decision to construct that "complex scheme" while omitting any provision for participation by entities like plaintiffs "is sufficient reason to believe that Congress intended to foreclose" them from obtaining judicial review of immigration decisions under the Administrative Procedure Act (APA), *Block v. Community Nutrition Inst.*, 467 U.S. 340, 347 (1984), as plaintiffs seek to do here. *See* Gov't Br. 25-27.

Plaintiffs' primary response (at 16-17) is that they are not challenging a removal order. But 8 U.S.C. § 1252 does not speak only to removal orders; it makes clear that judicial review of any challenge that "aris[es] from any action taken" to "remove" a noncitizen must be obtained through "judicial review of a final [removal] order." 8 U.S.C. § 1252(b)(9). The point of that provision, as the Supreme Court and this Court have explained, is that all challenges—including challenges to policies—that relate to

7

the decision whether to remove should be brought in the context of a challenge by a noncitizen to a removal order. *See Guerrero-Lasprilla v. Barr*, 140 S. Ct. 1062, 1070 (2020) (noting Congress's intent to consolidate review); *J.E.F.M. v. Lynch*, 837 F.3d 1026, 1034-35 (9th Cir. 2016) (confirming that § 1252(b)(9) encompasses not only "individual" claims but also "challenges to agency policies"). And Congress provided a separate mechanism for claims that an agency regulation or directive implementing the expedited removal system is unconstitutional or contrary to law. *See* 8 U.S.C. § 1252(e)(3). This is the only mechanism for noncitizens to challenge immigration regulations outside of a challenge to a removal decision. It would be incongruous for Congress to limit the avenues for review for noncitizens who are subject to agency policies only to allow organizations who are not subject to those policies to bring freestanding APA challenges, and plaintiffs do not explain why Congress would have done so.

Contrary to plaintiffs' assertion, the Rule is not "collateral to the process of removal." Pls. Br. 17 (quotation omitted). As the government has explained (at 48-49), the Rule establishes a substantive condition on asylum eligibility that will be directly applied in removal proceedings to determine whether a noncitizen may succeed in a request for asylum as relief from removal. Challenges to a determination that a noncitizen is ineligible for asylum "are routinely raised in petitions for review filed with a federal court of appeals." *J.E.F.M.*, 837 F.3d at 1033. Noncitizens against

whom the Rule will be applied in removal proceedings thus may obtain judicial review of any argument that the Rule is invalid.

Finally, plaintiffs briefly attempt (at 17-18) to distinguish *Block* on the ground that the Rule here was issued through the APA's notice-and-comment procedures. But the regulations challenged in *Block* were similarly adopted following notice-and-comment procedures that permitted public participation. *See* 467 U.S. at 341. The point in *Block* was not tied to notice-and-comment rulemaking, but rather to Congress's provision for review of the resulting action only by certain entities in certain circumstances. The same is true here: individual noncitizens can challenge the Rule as an improper implementation of the expedited removal system in the U.S. District Court for the District of Columbia, *see* 8 U.S.C. § 1252(e)(3), or they can file a petition for review of an individual removal order in the courts of appeals, *see id.* § 1252(a)(5), (b)(9). The tightly circumscribed review scheme adopted by Congress in the INA, however, forecloses review by organizations.

## II. The Rule Comports with the INA and APA

**1.** As the government detailed in its opening brief, the Rule represents a valid exercise of the Executive's express authority to impose additional "limitations and conditions" on asylum eligibility that are "consistent with" the asylum statute. 8 U.S.C. § 1158(b)(2)(C); *see* Gov't Br. 28-37. Plaintiffs' answering brief nowhere engages with the statutory text, context, and history, all of which confirm the

lawfulness of the Rule. Instead, plaintiffs erroneously contend (at 18-30) that the Rule is invalid because it is too similar to the rules at issue in *East Bay I* and *East Bay II*.

**a.** At the outset, plaintiffs' caricature of the Rule as simply combining the two previous regulations reflects a logical fallacy. As a matter of logic, plaintiffs are wrong to insist that this Court's conclusion that the government could not impose either of two conditions, standing alone, necessarily means that the government could not require applicants to satisfy one or the other of the conditions (even apart from the fact, discussed below, that this is an inaccurate description of the Rule). To illustrate the fallacy, one need look no further than the asylum statute itself. Asylum is available only to "refugee[s]," defined as people who (among other things) are unable or unwilling to return to their home country "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion," 8 U.S.C. § 1101(a)(42). This provision would not permit the government to adopt a rule limiting asylum only to cases of persecution based on race. Nor would it permit asylum to be granted only in cases of persecution based on political opinion. But obviously the government could require asylum applicants to demonstrate that they fear persecution based on one of the enumerated factors; that is exactly what the statute says.

This example illustrates the error in reading this Court's decisions regarding individual conditions to control the outcome here. In *East Bay I*, this Court held that the government could take into account whether asylum applicants entered through a

port of entry but could not condition eligibility for asylum solely on such entry. 993 F.3d at 669-71. That does not mean that it is unlawful for the government to say that asylum will be denied unless the applicant *either* entered through a port of entry *or* satisfies an alternative prerequisite. And that logic does not change if each of the other means by which an applicant can make the required showing could not alone be an independent prerequisite for asylum eligibility.

The cases on which plaintiffs rely (at 21) are inapposite because they involved pairing two unlawful options in circumstances where the pairing did not resolve the impermissibility of either option taken alone. For example, the government cannot force states to choose between taking title to waste or issuing regulations that it might prefer not to promulgate. *New York v. United States*, 505 U.S. 144 (1992). But that is because the option to take title to waste does nothing to ameliorate the Tenth Amendment problem with commandeering the States to enact regulations, and vice versa.

Here, by contrast, the addition of more options does ameliorate the concerns that this Court previously identified. As noted above, this Court concluded in *East Bay I* that it was likely unlawful to impose "a categorical ban" on migrants who cross between ports of entry—but this Court acknowledged that it is permissible to consider, in less dispositive fashion, a migrant's manner of entry. 993 F.3d at 669-71. Similarly, in *East Bay II*, this Court concluded that it was likely unlawful to impose a rigid requirement that noncitizens apply for asylum in a third country without

11

including additional safeguards to ensure that noncitizens for whom there was no "genuinely safe" third country could avoid the requirement. 994 F.3d at 976-78. Thus, in each case, an important aspect of the Court's reasoning was that the rule operated on a nearly categorical basis and without providing additional options. Because the identified problem in those cases was that one factor was being considered to the exclusion of all others, considering more factors and allowing more alternatives addresses the problem the Court perceived.

Under the Rule, noncitizens can avoid or rebut the Rule's presumption of asylum ineligibility in alternative ways, including if they are denied protection in another country, 8 C.F.R. § 208.33(a)(2)(ii)(C); if "exceptionally compelling circumstances exist," *id.* § 208.33(a)(3)(i); or if they use various specified pathways to enter the country, *id.* § 208.33(a)(2)(ii)(A)-(B). The logic of plaintiffs' position would suggest that no matter how long that list were extended, it would still be unlawful so long as each of the individual avenues for avoiding or rebutting the presumption could not be imposed as an individual stand-alone condition on asylum eligibility. That is plainly incorrect. And stripped of this logical fallacy, plaintiffs' reliance on *East Bay I* and *East Bay II* falls apart.

The Executive Branch has explicit statutory authority to promulgate asylum limitations. 8 U.S.C. § 1158(b)(2)(C). *East Bay I* and *East Bay II* thus cannot be read to "preempt[] the field" or otherwise "disable[]" the Executive from exercising that authority. *East Bay II*, 994 F.3d at 978-79; *see* Gov't Br. 36-37. Plaintiffs purport to

acknowledge that the government is entitled to make asylum regulations that consider "systemic efficiency" and the likelihood that a Rule will "encourage regular migration." Pls. Br. 29 (quotation omitted). But their insistence that the Executive could not consider the manner of entry and whether a noncitizen had sought asylum in another country outside the context of individual determinations by individual immigration judges cannot be reconciled with this concession or with controlling precedent. *See* Gov't Br. 32-33; *see also, e.g.*, *Reno v. Flores*, 507 U.S. 292, 313 (1993).

**b.** Even apart from those overarching flaws in plaintiffs' argument, plaintiffs err in the specifics. Plaintiffs' contention that the Rule is inconsistent with *East Bay I* is premised on their view that, as a practical matter, presenting at a port of entry is the only viable option under the Rule. The district court properly did not accept that view. The record establishes that, even in the few months that the Rule has been in effect, many noncitizens have successfully used orderly migration alternatives beyond presenting at a port of entry or have rebutted the Rule's presumption by demonstrating exceptionally compelling circumstances.

For example, certain noncitizens from specified countries may avoid application of the Rule by obtaining authorization to travel to the United States to seek parole. As plaintiffs do not dispute, the relevant parole processes together cover up to 30,000 migrants every month, *see* ER-123—hardly an "illusory" exception or a "vanishingly" small number, Pls. Br. 9, 21. And although plaintiffs argue (at 23-24) that the parole processes are often unavailable for noncitizens who have already

13

traveled to the southwest border, that misses the point: the parole processes allow migrants to obtain advance authorization to travel directly to the United States by airplane in order to reduce strain at the border and to disincentivize noncitizens from making the potentially dangerous journey to the border by land. *See* 88 Fed. Reg. at 31,317. Contrary to plaintiffs' narrow framing, the Rule is part of a systemic effort to address hemisphere-wide concerns about irregular migration.

Plaintiffs make a similar error—and others—in focusing (at 22-23) on the percentage of applicants who could avoid the Rule's presumption in the few months the Rule has been in effect (or, similarly, on the experience during a 10-month period in which the prohibition at issue in *East Bay II* was in effect). One purpose of the Rule is to encourage noncitizens to pursue opportunities in other countries, such as by obtaining asylum there or by finding a safe place to stay while they await an opportunity to enter the United States in an orderly fashion. The possibility that noncitizens may not be able to apply for asylum right away does not render the Rule unlawful.

Moreover, although plaintiffs focus (at 22-23) on the fact that among a pool of 8,195 noncitizens subject to the Rule who were given credible-fear interviews in the expedited removal process between May 12 and June 13, only 3% established an exception to the Rule's presumption, the more relevant statistic (in the same declaration) is that almost 12% of those interviewed could either establish an exception or rebut the presumption. *See* ER-47. The 12% figure, moreover, excludes a

substantial number of noncitizens who were excepted from the Rule because they used one of the specified orderly pathways. Many such noncitizens are not placed into expedited removal proceedings and are thus excluded from the data referenced in the declaration. That 12% rate for just a subset of noncitizens who avoided the Rule's presumption—in the very early stages of application of the Rule when no noncitizen could have yet gone through the process of seeking and being denied asylum in another country in response to the Rule's promulgation—is hardly reflective of a "vanishingly narrow" set of alternatives. To the extent statistics from this period are relevant at all, they underscore that the Rule is not simply a recapitulation of the prior rules that this Court held were invalid. Indeed, plaintiffs say (at 22) that only 2% of applicants were able to establish eligibility under the regulation at issue in *East Bay II*. And it is not problematic that the substantial majority of noncitizens subject to the Rule were deemed ineligible for asylum. For the Rule to achieve its purpose, it must discourage irregular migration.

Plaintiffs also misunderstand this Court's reasoning in *East Bay II*, which turned on the view that the rule at issue there was intended to exclude from eligibility noncitizens "who do not need the protection of asylum in the United States." *East Bay II*, 994 F.3d at 976. By contrast, the Rule here is not intended to exclude noncitizens who do not require protection, but is instead aimed at discouraging irregular migration and protecting the asylum system's ability to function effectively.

15

Plaintiffs do not dispute that the Rule is in fact aimed at those goals. Instead, they suggest (at 29-30) that the rule in *East Bay II* was similarly aimed at systemic efficiency. But the rule there was concerned with "reliev[ing] strain" by "screening out meritless asylum claims"—that is, by excluding applicants who do not "need relief most urgently," as demonstrated by their failure to seek "protection in another country." *East Bay II*, 994 F.3d at 982 (quotation omitted); *see also id.* at 989 (Miller, J., concurring in part and dissenting in part) ("The stated purpose of the rule is to more efficiently identify aliens who are misusing the asylum system to enter and remain in the United States rather than legitimately seeking urgent protection from persecution or torture." (alteration and quotation omitted)); 84 Fed. Reg. 33,829, 33,839 (July 16, 2019). And it was that specific aim—excluding those noncitizens "who do not need the protection of asylum in the United States"—that gave rise to this Court's holding that the rule at issue there likely was required to include safeguards ensuring that other third-country options were "genuinely safe." *East Bay II*, 994 F.3d at 976-77. The Rule here does not operate in a similar way. Plaintiffs' reliance on the conclusion in *East Bay II* that the rule at issue there "would make entirely superfluous the protection provided by the two safe-place bars in § 1158," Pls. Br. 20 (quotation omitted), again ignores that the government has not adopted a stand-alone prohibition in this case: those bars would continue to have force and effect for those who either are not subject to the presumption or can rebut the presumption.

16

**2.** The Rule is "reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021). The government appropriately weighed the availability of alternative pathways, the Rule's benefits, and the Rule's interaction with other relevant policies. Gov't Br. 37-42. The Rule's rebuttable presumption of asylum ineligibility for noncitizens who fail to pursue one of several alternatives in other countries or in seeking to enter the United States, coupled with a significant expansion of alternatives, encourages migrants to choose these alternatives for seeking entry into the United States over irregular migration during the two-year period that the Rule is in effect, *see* 88 Fed. Reg. at 31,329, or discourages them from undertaking the dangerous journey to begin with. By discouraging or channeling migration in this way, the Rule reduces reliance on dangerous smuggling networks and enables the government to devote more of its limited resources to processing noncitizens more efficiently. *See id.* at 31,326. Absent the Rule, the government expected an increase in border encounters that would overwhelm the immigration system, causing serious harms to the government, noncitizens, and the public. *See id.* at 31,325-26, 31,387.

Plaintiffs do not directly contest that these justifications support the Rule. Instead, plaintiffs first insist that, because the asylum system "has always coexisted with" the pathways identified in the Rule, the Executive may not take those pathways into account when setting conditions on asylum eligibility. Pls. Br. 30-31. But Congress did not make its own judgments about which individuals should receive asylum; it gave the Executive Branch discretion to determine whether asylum was

17

warranted in each individual case, 8 U.S.C. § 1158(b)(1)(A), and to promulgate regulations limiting eligibility for asylum, *id.* § 1158(b)(2)(C). Nothing in the broad grant of authority in § 1158(b)(2)(C) precludes the Executive from considering the availability of parole pathways or the potential effects of an asylum limitation on the immigration system as a whole.[1]

Like the district court, plaintiffs are mistaken to the extent they assert that "the Rule's basic premise" is that a significant proportion of asylum seekers will avoid or rebut the presumption. Pls. Br. 39. To the contrary, the Departments recognized that pathways might be unavailable, *see, e.g.*, 88 Fed. Reg. at 31,371 ("[F]or some individuals, particular third countries—or even all third countries—may not be a viable option."), and that the Rule "will result in the denial of some asylum claims that otherwise may have been granted," *id.* at 31,332, but struck a balance based on "the benefits to the overall functioning of the system," *id.* Plaintiffs cannot demonstrate (at 38) otherwise based on the Rule's statements that the pathways would be "available to many migrants," *id.* at 31,351, and would "generally offer opportunities for those with valid claims to seek protection," *id.* at 31,332. As discussed above, the Rule focused on the various ways that noncitizens can seek protection, including from other

---

[1] Plaintiffs suggest (but do not actually argue) that limiting asylum might run afoul of the United States' treaty obligations. But the case plaintiffs cite, *INS v. Cardoza-Fonseca*, 480 U.S. 421, 441 (1987), explains that the provision of the 1967 Protocol relating to asylum (Article 34) provides for a "precatory" benefit, unlike the mandatory protection afforded by Article 33, which the United States has implemented via statutory withholding of removal under 8 U.S.C. § 1231(b)(3).

countries, through use of the CBP One app, by presenting at a port of entry without an appointment if they can show that it was not possible to access or use the app for a specified reason,[2] or by qualifying for withholding of removal or application of the Convention Against Torture (CAT). The preamble cannot plausibly be read to suggest that every or nearly every noncitizen would have a means to avoid or rebut the presumption.

Plaintiffs' own characterization of the availability of the pathways omits key information. Not only do the approximately 360,000 noncitizens per year authorized to travel to the United States "pursuant to a DHS-approved parole process" fall outside the Rule's presumption, 8 C.F.R. § 208.33(a)(2)(ii)(A), but the Rule reduces burdens on the system by encouraging noncitizens to opt for this alternative over irregular migration. Similarly, while plaintiffs emphasize that the number of daily CBP One appointments is finite, Pls. Br. 36-37, they fail to acknowledge that at the current rate ((1,450 per day) there would be more than 500,000 appointments per year. It is not unreasonable for the government to afford a preference to noncitizens who wait for an appointment to become available so that they can be processed in an orderly fashion, instead of rewarding irregular migration.

---

[2] Plaintiffs contend (at 9) that this exception is unavailable if a noncitizen is illiterate or unable to schedule an appointment due to high demand, but the Rule makes clear that the exception does apply "to the extent that an individual is unable to access the app due to their language barriers," 88 Fed. Reg. at 31,406, and that in exigent circumstances a noncitizen can invoke the "ongoing and serious obstacle" ground for an exception if they are unable to schedule an appointment, *id.* at 31,407.

19

Plaintiffs' categorical argument "that *no* transit country can safely welcome and process . . . asylum applicants," Pls. Br. 34, rehashes comments "that these countries are universally unsafe and cannot provide protection to asylum seekers," which the Departments already considered and rejected, even while recognizing "that not every country will be safe for every migrant," 88 Fed. Reg. at 31,411. It would be a remarkable intrusion on the Executive's foreign affairs authority for a court to premise the rejection of the Rule on a disagreement with the Executive's assessment of the conditions in other countries, on plaintiffs' predictions about the capacity of other countries in the Western Hemisphere to accept and process migrants, or on a court's disagreement with the Executive's weighing of the costs and benefits of the Rule in exercising its discretion to adopt limitations on asylum eligibility.

Plaintiffs also largely disregard the ability to rebut the Rule's presumption based on "exceptionally compelling circumstances." Pls. Br. 37. This critical aspect of the Rule (absent from the prior rules) ensures that, at a minimum, individuals who have not pursued an alternative but at the time of entry experience an acute medical emergency, face an imminent threat to life or safety, or were a victim of a severe form of trafficking in persons will not be subject to the Rule's presumption. 88 Fed. Reg. at 31,338. At base, plaintiffs' disagreement with the specific calibration of the Rule does not render the Rule arbitrary and capricious.

**3.** The Rule also provided an adequate opportunity for comment and responded to comments appropriately. Gov't Br. 42-45. As plaintiffs admit, "33 days

may be an appropriate period for some rules." Pls. Br. 43. Particularly given the increase in irregular migration that was expected to occur when the Title 42 order ended and the need to adopt the Rule by May 11, plaintiffs have no basis for asserting that the 33-day period was deficient. And plaintiffs' reliance (at 42-43) on non-analogous cases that involved the standards for forgoing notice and comment entirely does not advance their argument.

Plaintiffs' other arguments founder on the undisputed principles that agencies are not required to redo notice and comment whenever they issue tangentially related policy decisions and need not identify every piece of data used during a rulemaking. In any event, the separate policy initiatives that plaintiffs identify (at 41-42) were outside the scope of the Rule or expressly addressed. *See, e.g.*, 88 Fed. Reg. at 31,316-17 & n.21, 31,363. With regard to predictions about border encounters, commenters had access to publicly available data demonstrating the scope of the problem and the statistical basis for the Departments' model. *See* 88 Fed. Reg. 11,704, 11,705 n.11 (Feb. 23, 2023). Notably, no commenter "submitted data suggesting that the Departments d[id] not currently face, and [would] not imminently face, an urgent circumstance requiring a policy response." 88 Fed. Reg. at 31,328. Although plaintiffs may have desired additional information or additional time in which to comment, Pls. Br. 39-43, the Departments satisfied their obligation to provide the public an opportunity to participate in the rulemaking, as evidenced by the submission of more than 50,000 comments (including from plaintiffs themselves). To this day, plaintiffs do not

21

identify any comment that they were precluded from making, or that would have had any material effect on the agency's determination had they had more time to develop it.

### III. The District Court's Vacatur Was Independently Improper

**1.** Section 1252(f) independently bars the vacatur that the district court entered. Under that provision, the district court and this Court lack "jurisdiction or authority" to "enjoin or restrain" the "operation of," as relevant here, the statutes governing removal and expedited removal (§§ 1225(b)(1), 1229a). 8 U.S.C. § 1252(f)(1). That bar applies because the district court's relief "interfere[s] with the Government's efforts to operate" those statutes by forcing government officials "to refrain from" applying the Rule in those proceedings. *Garland v. Aleman Gonzalez*, 142 S. Ct. 2057, 2065 (2022).

Plaintiffs' rationales for avoiding § 1252(f)(1) are unpersuasive. Plaintiffs first suggest (at 45) that the statutory phrase "enjoin or restrain" refers only to injunctions and temporary restraining orders but not to vacatur, without explaining why Congress would have distinguished among forms of relief that have exactly the same practical effect: prohibiting agency officials from applying a rule. Nor do plaintiffs make any effort to explain how the district court's vacatur in this case is meaningfully different from injunctive relief, highlighting that their view could create an end run around the express remedial limitations that Congress put in place to prevent courts from interfering with the Executive's implementation of the covered immigration provisions.

Plaintiffs next suggest (at 45-46) that the district court's order does not restrain the operation of the removal statutes. But they do not dispute that asylum claims are often adjudicated during removal proceedings, such that the district court's order here would compel the government to "enforce or implement" the removal statutes differently. *Aleman Gonzalez*, 142 S. Ct. at 2064. The point is not that a prior "grant of asylum" could give rise to a different result in removal proceedings, Pls. Br. 47, but rather that the asylum claim itself will be adjudicated *during* the removal proceedings. Plaintiffs' reliance on *Gonzales v. Department of Homeland Security*, 508 F.3d 1227 (9th Cir. 2007), which involved an injunction directed at the denial of an application for adjustment of status that would be submitted and resolved outside of removal proceedings, is therefore misplaced.

In short, plaintiffs' position would contravene Congress's direction that courts not inhibit the Executive's implementation of removal and expedited removal proceedings. And plaintiffs offer no defense of the district court's failure to preserve the Rule as applied to such proceedings. Gov't Br. 49.

**2.** Plaintiffs assume that vacatur is the default remedy in actions under the APA, *but see Texas*, 143 S. Ct. at 1980-85 (Gorsuch, J., concurring in the judgment), and imply that universal vacatur is warranted simply because they are organizations challenging an immigration rule. Pls. Br. 49. Such categorical assertions divorced from the specific harms and equities in a particular case are inconsistent with Article III and traditional equitable principles.

23

**a.** Plaintiffs do not dispute that vacatur of a rule, to the extent it is even available as relief, is an equitable remedy that must be justified under the circumstances. Gov't Br. 50-51. Nor do they dispute that vacatur is inappropriate where perceived deficiencies in a rule may be cured and vacatur would be unduly disruptive. Gov't Br. 52. The district court's reflexive entry of vacatur in this case was improper, as the court undertook no serious balancing of the equities at play. Under the requisite analysis, plaintiffs' allegation that the Rule makes legal assistance "much costlier and more time- and labor-intensive," Pls. Br. 54, must be weighed against the substantial impacts on the border that would come with vacatur, and those impacts vastly outweigh any indirect and attenuated effects on plaintiffs. The well-supported and severely disruptive consequences of upending the Rule—which is directed at alleviating the negative consequences of irregular migration—should have led the district court to remand without vacatur. Gov't Br. 51-55.

Plaintiffs' suggestion that vacating the Rule would cause minimal harm defies common sense. They rely on speculation about "existing incentives," extrapolation from statistics taken out of context, and comparisons to prior asylum rules to assert that the decline in encounters at the southwest border immediately upon the Rule's taking effect was unconnected to the Rule. Pls. Br. 51-53. It strains credulity to claim that the Rule has had no meaningful effect on noncitizens' decisions to cross the border between ports of entry. Media reporting "confirmed internal DHS analyses that" noncitizens reacted to the Rule as the government anticipated. *See* ER-50. And

24

the government's concerns about increased migration were borne out in the days before the end of the Title 42 order when "DHS saw a historic surge in migration" that "culminated with the highest recorded encounter levels" in history and "placed significant strain on DHS's operational capacity at the border." ER-44. Moreover, plaintiffs concede (at 55 n.9) that the percentage of noncitizens who receive positive screening determinations in credible-fear interviews is materially lower under the Rule than before.

Equally unpersuasive is plaintiffs' conjecture that the government's overall strategy to manage the border would remain unaffected by the Rule's vacatur. For example, while plaintiffs suggest that the government may continue to remove certain third-party nationals to Mexico even without the Rule, Pls. Br. 53, the Government of Mexico's decision to accept returns or removals of third country nationals "was premised on" the combination of expanded orderly alternatives for these nationals and a "meaningful consequence framework to reduce irregular border crossings," ER-61. Similarly, other "process enhancements" that DHS has implemented "would be substantially less effective" in the absence of the Rule. ER-48-49.

On the other side of the balance, plaintiffs identify no comparable harms to their organizations from the continued enforcement of the Rule. As to themselves, plaintiffs claim only that the Rule might cause them to reallocate their own resources, serve fewer clients, or lose funding. Pls. Br. 54. Those alleged harms are not of the

sort that would allow plaintiffs to challenge the Rule in the first place, let alone compel vacatur of the Rule for any asserted APA violation.

The Rule also expressly takes account of plaintiffs' concerns about asylum seekers being exposed to dangerous conditions in Mexico. *See* Pls. Br. 55-56. Noncitizens may rebut the Rule's presumption by demonstrating that they faced exceptionally compelling circumstances, including an "imminent and extreme threat to life or safety" at the time of entry. *See* 8 C.F.R. §§ 208.33(a)(3), 1208.33(a)(3). And noncitizens may continue to pursue other protection to prevent removal to a country where they are more likely than not to be persecuted or tortured. Even excluding many noncitizens who used the specified migration pathways, almost 12% of noncitizens subject to the Rule established an exception or rebutted the presumption in the first month of the Rule's operation, and 42% of those subject to the presumption nevertheless established a reasonable possibility of persecution under the statutory withholding and CAT standards. ER-47-48. The Rule, moreover, is designed in part to discourage migrants from pursuing unsafe options. In the Rule's first month, "daily entries into the perilous Darien jungle" dropped by more than 50%, ER-46, and scheduling appointments on the CBP One app worked to "effectively cut[] out the smugglers, decrease[] migrant exploitation, and improve[] safety and security," ER-51.

Nor can plaintiffs justify vacatur on the ground that some noncitizens may be removed under the Rule. *See* Pls. Br. 55. In pursuit of the government's "weighty"

interest "in efficient administration of the immigration laws," *Landon v. Plasencia*, 459 U.S. 21, 34 (1982), the Departments formulated the Rule to ensure "the overall functioning of the system," 88 Fed. Reg. at 31,332. Particularly given the Rule's mechanisms for protecting noncitizens who face persecution or imminent danger, the public interest would be ill-served by a vacatur that would impede the orderly administration of the immigration laws at the southwest border.

**b.** The district court's remedy also exceeded the bounds of Article III and traditional principles of equity by vacating the Rule as to every asylum seeker that falls within its scope, whether or not they have any connection to plaintiffs. Plaintiffs' sweeping suggestion that universal vacatur is warranted on the theory that the Rule frustrates their ability to take on other "asylum seekers they do not yet represent," Pls. Br. 49, is untenable. At the absolute minimum, the district court was required to craft relief tailored to redressing plaintiffs' asserted injuries, such as by prohibiting the application of the Rule as to specific identified clients of plaintiffs.

**CONCLUSION**

For the foregoing reasons and those given in our opening brief, the judgment of the district court should be reversed. In addition, in light of the substantial interests in continued enforcement of the Rule, the government respectfully requests that, if the Court affirms in whole or in part, it leave the stay pending appeal in place pending the filing and disposition of any petition for further review. Plaintiffs have not provided any response to that request, much less provided any compelling reason it should not be granted.

Respectfully submitted,

*Of Counsel:*

WILLIAM C. PEACHEY
    *Director*

EREZ REUVENI
    *Assistant Director*

PATRICK GLEN
CHRISTINA P. GREER
    *Senior Litigation Counsel*
    *Office of Immigration Litigation*
    *Civil Division*
    *U.S. Department of Justice*
    *P.O. Box 868, Ben Franklin Station*
    *Washington, DC 20044*

October 2023

BRIAN M. BOYNTON
    *Principal Deputy Assistant Attorney*
        *General*

DANIEL TENNY

 */s/ Sean R. Janda*
SEAN R. JANDA
BRIAN J. SPRINGER
    *Attorneys, Appellate Staff*
    *Civil Division, Room 7260*
    *U.S. Department of Justice*
    *950 Pennsylvania Avenue NW*
    *Washington, DC 20530*
    *(202) 514-3388*
    *sean.r.janda@usdoj.gov*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Circuit Rule 32-1(b) because it contains 6,998 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Garamond 14-point font, a proportionally spaced typeface.

*s/ Sean R. Janda*
Sean R. Janda