23-16032

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

◆

EAST BAY SANCTUARY COVENANT, et al.,
*Plaintiffs-Appellees*,

v.

JOSPEH BIDEN, et al.,
*Defendants-Appellants,*

v.

ALABAMA, et al.,
*Proposed Intervenor-Defendants*.

◆

On Appeal from the United States District Court
for the Northern District of California
Case No. 4:18-cv-06810-JST

# MOTION TO INTERVENE BY THE STATES OF
# ALABAMA, KANSAS, GEORGIA, LOUISIANA, AND WEST VIRGINIA

STEVE MARSHALL
ALABAMA ATTORNEY GENERAL

EDMUND G. LACOUR JR.
*Solicitor General of Alabama*
DYLAN MAULDIN
*Assistant Solicitor General*
OFFICE OF THE ATTORNEY GENERAL
501 Washington Ave.
Montgomery, AL 36130
(334) 242-7300
Edmund.LaCour@AlabamaAG.gov
Dylan.Mauldin@AlabamaAG.gov

KRIS W. KOBACH
KANSAS ATTORNEY GENERAL

ANTHONY J. POWELL
*Solicitor General of Kansas*
ABHISHEK KAMBLI
*Deputy Attorney General*
OFFICE OF THE ATTORNEY GENERAL
120 SW 10th Ave.
Topeka, KS 66612
(785) 296-2215
Anthony.Powell@ag.ks.gov
Abhishek.Kambli@ag.ks.gov

March 7, 2024

(additional counsel listed on signature page)

## <u>TABLE OF CONTENTS</u>

TABLE OF CONTENTS ........................................................................... i

TABLE OF AUTHORITIES..................................................................... ii

INTRODUCTION ..................................................................................1

BACKGROUND ....................................................................................4

STANDARDS ......................................................................................10

ARGUMENT .......................................................................................11

    I.    Intervention as of Right...............................................................11

        A.    The Motion is Timely.........................................................11

        B.    The States' Interests Would be Impaired If Plaintiffs Prevail.............15

        C.    The Defendants Do Not Adequately Represent the States' Interest...................................................................................19

    II.    The States Should Be Allowed to Intervene Permissively .........................22

CONCLUSION ....................................................................................22

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Arizona v. City & Cnty. of San Francisco*,
    596 U.S. 763 (2022)......................................................................................3, 15

*Arizona v. Garland*,
    2022 WL 1267203 (W.D. La. filed Apr. 28, 2022)...............................................6

*Arizona v. Mayorkas*,
    143 S. Ct. 478 (2022)...........................................................................................6

*Arizona v. United States*,
    567 U.S. 387 (2012)............................................................................................6

*Danco Lab'ys v. All. for Hippocratic Med.*,
    143 S. Ct. 1075 (2023).........................................................................................3

*Day v. Apoliona*,
    505 F.3d 963 (9th Cir. 2007)...............................................................10, 11, 14

*Dep't of Commerce v. New York*,
    139 S. Ct. 2551 (2019)......................................................................................18

*Dep't of Homeland Sec. v. Thuraissigiam*,
    140 S. Ct. 1959 (2020)........................................................................................8

*Florida v. United States*,
    No. 3:21-cv-1066-TKW-ZCB, 2024 WL 677713 (N.D. Fla. Feb. 20, 2024).......5

*Florida v. United States*,
    660 F. Supp. 3d 1239 (N.D. Fla 2023)............................................................5, 6

*Freedom from Religion Found., Inc. v. Geithner*,
    644 F.3d 836 (9th Cir. 2011)..............................................................................22

*Fresno Cnty. v. Andrus*,
    622 F.2d 436 (9th Cir. 1980)..............................................................................15

*Gideon v. Wainwright*,
    372 U.S. 335 (1963) ........................................................................16

*Indiana v. Mayorkas*,
    No. 23CV00106, 2023 WL 3821388 (D.N.D. filed May, 31, 2023) ...................9

*Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am. v. Scofield*,
    382 U.S. 205 (1965) ........................................................................10

*Kalbers v. U.S. Dep't of Just.*,
    22 F.4th 816 (9th Cir. 2021) ..............................................................13

*League of United Latin Am. Citizens v. Wilson*,
    131 F.3d 1297 (9th Cir. 1997) ............................................................19

*Legal Aid Soc. of Alameda Co. v. Dunlop*,
    618 F.2d 48 (9th Cir. 1980) ...............................................................13

*M.A. v. Mayorkas*,
    No. 1:23-cv-1843 (D.D.C. filed June 23, 2023) ....................................... 9, 12, 20

*New York v. Scalia*,
    490 F. Supp. 3d 748 (S.D.N.Y. 2020) ....................................................17

*Plyler v. Doe*,
    457 U.S. 202 (1982) ........................................................................16

*Sagebrush Rebellion, Inc. v. Watt*,
    713 F.2d 525 (9th Cir. 1983) ............................................................ 19, 20, 21

*San Francisco v. USCIS*,
    992 F.3d 742 (9th Cir. 2021) ..............................................................15

*Texas v. Biden*,
    589 F. Supp. 3d 595 (N.D. Tex. 2022) ...................................................5, 6

*Texas v. Dep't of Homeland Security*,
    88 F.4th 1127 (5th Cir. 2023) ..............................................................6

iii

*Texas v. Mayorkas*,
  No. 2:23-cv-00024 (N.D. Tex. filed May 23, 2023)..............................................9

*Texas v. United States*,
  555 F. Supp. 3d 351 (S.D. Tex. 2021)....................................................................16

*Texas v. United States*,
  809 F.3d 134 (5th Cir. 2015)....................................................................................6

*United States v. Abbott, et al.*,
  No. 1:23-cv-00853-DAE, 2023 WL 5740596, (W.D. Tex. Sept. 6, 2023),
  *aff'd*, 87 F.4th 616 (5th Cir. 2023), *reh'g en banc granted, opinion vacated*,
  90 F.4th 870 (5th Cir. 2024)....................................................................................6

*United States v. Alisal Water Corp.*,
  370 F.3d 915 (9th Cir. 2004)..................................................................................11

*United States v. City of Los Angeles*,
  288 F.3d 391 (9th Cir. 2002)..................................................................................11

*United States v. Texas, et al.*,
  No. 1:24-cv-00008 (W.D. Tex. filed Jan. 3, 2024) ...............................................6

*W. Watersheds Project v. Haaland*,
  22 F.4th 828 (9th Cir. 2022)...................................................................................15

*Wilderness Soc. v. U.S. Forest Serv.*,
  630 F.3d 1173 (9th Cir. 2011) .........................................................................11, 15

**Statutes**

8 U.S.C. §1601(2)(B)...............................................................................................16

8 U.S.C. §1621(a) ....................................................................................................17

Kan. Stat. Ann. 8-237(i)...........................................................................................17

**Rules**

Fed. R. Civ. P. 24................................................................................10, 11

Fed. R. Civ. P. 24(a)(2)...............................................................................10

Fed. R. Civ. P. 24(b).....................................................................................22

Fed. R. Civ. P. 24(b)(1)(B)...................................................................... 10-11

**Regulations**

8 C.F.R. §208.33(a)(1) ..................................................................................7

8 C.F.R.§208.33(a)(2) ...................................................................................7

8 C.F.R.§208.33(a)(3) ...................................................................................7

8 C.F.R.§208.33(b)(2)(i) ...............................................................................7

8 C.F.R.§1208.33(c) ......................................................................................7

88 Fed. Reg. 31314 .............................................. 2-4, 7-12, 14, 16, 17, 19-22

88 Fed. Reg. 31315 .....................................................................................16

88 Fed. Reg. 31336 .......................................................................................8

**Acts**

Administrative Procedure Act...................................................................8, 13

**Other Authorities**

*A Sober Assessment of the Growing U.S. Asylum Backlog*, TRAC Immigration
    (Dec. 22, 2022), https://trac.syr.edu/reports/705/ .................................8

Julia Ainsley & Didi Martinez, *A City of 710,000 Struggles to Cope with 40,000 Migrant Arrivals*, NBC News (Jan. 27, 2024), https://www.nbcnews.com/news/us-news/denver-struggles-cope-40000-migrants-rcna135555 ........................................................................18

Bailey Brautigan, *WV Officially Loses House Seat, Electoral College Vote*, 13 News WOWK (May 10, 2021), https://www.wowktv.com/news/west-virginia/wv-officially-loses-house-seat-electoral-college-vote/ ........................19

Muzaffar Chishti & Jessica Bolter, *Border Challenges Dominate, But Biden's First 100 Days Mark Notable Under-the-Radar Immigration Accomplishments*, Migration Policy Institute (Apr. 26, 2021), https://www.migrationpolicy.org/article/biden-100-days-immigration ...............1

Russell Contreras, *Most Americans Say the Feds Are Doing a Bad Job with the Migrant Crisis*, Axios (Feb. 15, 2024), https://www.axios.com/2024/02/15/migrant-crisis-biden-pew-research-center........6

Exec. Order No. 13,986, Fed. Reg. 7015 (Jan. 20, 2021)........................................18

*How the U.S. Asylum Process Works*, PBS News (May 13, 2023), https://www.pbs.org/newshour/politics/how-the-u-s-asylum-process-works ...........8

Kelly Laco & Jon Michael Raasch, *They are not migrants, they are 'newcomers': Biden faces fury over new politically correct phrase for border crossers during historic crisis*, Daily Mail (Feb. 29, 2024), www.dailymail.co.uk/news/article-13142249/biden-fury-politically-correct-newcomers-illegal-migrants.html ... 1-2

Nick Mordowanec, *How Many Migrants Are Crossing the Border?*, Newsweek (Feb. 6, 2024), www.newsweek.com/how-many-migrants-are-crossing-border-1867407.............................................................................................................2

Quinn Owen, *Migrant Crisis Explained: What's Behind the Border Surge*, ABC News (Sep. 23, 2023), abcnews.go.com/Politics/migrant-crisis-explained-border-surge/story?id=103364219......................................................................4

*Public Health Reassessment and Order Suspending the Right to Introduce Certain Persons from Countries Where a Quarantinable Communicable Disease Exists*, 86 FR 42828-02)..........................................................................................5

Justo Robles, Alejandra Reyes-Velarde, & Wendy Fry, *Border Patrol Dropped 42,000 Migrants on San Diego Streets. Now County, Groups are Seeking Help*, Cal Matters (Dec. 4, 2023), https://calmatters.org/california-divide/2023/12/immigration-california-street-releases/ ............................... 18-19

Alex Thompson & Stef W. Knight, Exclusive, *How Biden Botched the Border*, Axios (Feb. 12, 2024), https://www.axios.com/2024/02/12/how-biden-botched-border ...................................................................................................................6

United States Census Bureau, *State Population Totals and Components of Change: 2020-2023*, *located at* https://www.census.gov/data/tables/time-series/demo/popest/2020s-state-total.html#v2023 .............................................19

U.S. Customs and Border Protection, *Nationwide Encounters*, *located at* https://www.cbp.gov/newsroom/stats/nationwide-encounters (last modified Feb. 13, 2024) ...........................................................................................................18

## **INTRODUCTION**

The States of Alabama, Kansas, Georgia, Louisiana, and West Virginia (the "States") respectfully move this Court to grant their intervention in this action as of right or in the alternative, intervene permissively. The States have no alternative means to protect their interests and to obtain relief. Specifically, the States seek intervention (1) to participate in settlement negotiations and to object, if necessary, to any proposed settlement, and (2) to move this Court, if necessary, to lift the abeyance and resume its expedited consideration. Defendants oppose this motion, and Plaintiffs take no position at this time pending review of the intervention motion.

Unfortunately, the States cannot rely on President Biden, et al., ("Defendants") to defend and enforce the Nation's immigration laws. From the start, this presidential administration has been "more active on immigration than any prior U.S. administration."[1] Defendants have methodically rescinded policies designed to combat illegal immigration while simultaneously "enacting [their] own new policies to make the immigration system more welcoming." *Id.* The result has been record-shattering illegal immigration, including over 2.5 million "newcomers" last year,[2]

---

[1] Muzaffar Chishti & Jessica Bolter, *Border Challenges Dominate, But Biden's First 100 Days Mark Notable Under-the-Radar Immigration Accomplishments*, Migration Policy Institute (Apr. 26, 2021), https://www.migrationpolicy.org/article/biden-100-days-immigration.
[2] Kelly Laco & Jon Michael Raasch, *They are not migrants, they are 'newcomers': Biden faces fury over new politically correct phrase for border crossers during*

surpassing the previous record set in 2022.[3] As Defendants admitted in this Court, these levels "place[] significant strain on DHS's operational capacity at the border," "generate[] serious health and safety risks," and "le[a]d to significant challenges for local border communities." Blue Br. at 53 (cleaned up); *see* N.D. Cal. DE176-2.

The border debacle could be worse if not for the challenged rule, "Circumvention of Lawful Pathways," which created a (limited, temporary, and rebuttable) presumption that some illegal immigrants are not eligible for asylum. 88 Fed. Reg. 31314 (May 16, 2023) (the "Rule"). This Court stayed the lower court's order vacating the Rule after Defendants conveyed the Rule's "paramount importance" to prevent an even more "enormous influx of migrants." DE8.[4] The Court then *sua sponte* ordered an expedited briefing schedule. In their opening brief, Defendants reiterated that vacatur would cause "a surge in border crossings that could match—or even exceed—the levels seen in the days leading up to the end of [] Title 42," when "[e]ncounters between ports of entry nearly doubled … to approximately 9,500 per day, [and] even higher." Blue Br. 52, 54 (cleaned up).

---

*historic crisis*, Daily Mail (Feb. 29, 2024), www.dailymail.co.uk/news/article-13142249/biden-fury-politically-correct-newcomers-illegal-migrants.html.
[3] Nick Mordowanec, *How Many Migrants Are Crossing the Border?*, Newsweek (Feb. 6, 2024), www.newsweek.com/how-many-migrants-are-crossing-border-1867407.
[4] Citations to entries on this Court's docket will use the form "DE#," except for the opening brief, which will be cited as "Blue Br." Citations to the district court's docket in this case will use the form "N.D. Cal. DE#."

After oral argument, nothing appeared on the docket until the parties revealed out of the blue that they had been exploring a settlement. *See* DE82, DE83. On February 5, 2024, the parties stated that they "would like to engage in additional discussions without any further litigation developments." DE83 at 2. To that end, they requested and received an indefinite abeyance. But it makes no sense for Defendants, who argued vehemently that the Rule cannot be enjoined even for a moment during this border crisis, to countenance a settlement now. *See* DE84 at 8 (VanDyke, J., dissenting). It makes even less sense in light of their stance on nationwide injunctions: Defendants have argued (here and elsewhere) that nationwide injunctions are unconstitutional and inequitable and that relief should be "limit[ed] … to actual clients of [the] plaintiffs." Blue Br. 51-52. Based on their own statements, how could any settlement—a *nationwide* policy change at the urging of *six* plaintiffs (who may not have standing)—be lawful and just? And why would Defendants, who have a strong likelihood of success and have shown the Rule to be "remarkably effective," suddenly surrender now? *Id.* at 53.

Whatever their reasons for pursuing settlement, Defendants can no longer be trusted to defend the Rule. And given their track record, they cannot be trusted to negotiate a good settlement. *See, e.g.*, *Arizona v. City & Cnty. of San Francisco*, 596 U.S. 763 (2022) (Roberts, C.J., concurring); *Danco Lab'ys v. All. for Hippocratic Med.*, 143 S. Ct. 1075, 1076 (2023) (Alito, J., dissenting). Consequently, the States

3

are forced to intervene where Defendants appear unlikely to mount a vigorous defense of their own border controls. Before Defendants accede to any demands (of organizations representing non-citizens) that would weaken or eliminate the Rule, this Court should grant the motion and permit the States (representing tens of millions of citizens) to defend their weighty interests in this case.

## **BACKGROUND**

Given this Court's familiarity with the background of the case, the States will not belabor it here. But several factual and legal points are salient to the Court's consideration of the instant motion.

**A. Facts.** Defendants have repeatedly failed to secure the border, appropriately screen those entering the country, and deport those who do not have a legal entitlement to remain here. And the States are left to deal with the resulting chaos. As many officials have lamented, every State is a border State.

The basic facts of the current crisis are well known but some bear repeating. Since the Executive Branch repealed the Title 42 order, the number of illegal aliens entering surged to approximately 10,000 every single day.[5] Although they enter on the premise that they seek asylum, only a fraction will ultimately even apply for

---

[5] *See* N.D. Cal. DE176-2, ¶9 (Declaration of Assistant Secretary Blas Nuñez-Neto); Quinn Owen, *Migrant Crisis Explained: What's Behind the Border Surge*, ABC News (Sep. 23, 2023), abcnews.go.com/Politics/migrant-crisis-explained-border-surge/story?id=103364219.

4

asylum, and a much smaller number have their applications granted. Nonetheless, all it takes to enter America today is an assertion of eligibility; thereafter, Defendants make little effort to resolve their claims and remove them. *See Florida v. United States*, No. 3:21-cv-1066-TKW-ZCB, 2024 WL 677713, at *3 (N.D. Fla. Feb. 20, 2024) (finding Defendants had deported at most eight of the 2,572 "parolee" illegal aliens it had released into the country). As one federal court recently found, "Defendants have effectively turned the Southwest Border into a meaningless line in the sand and little more than a speedbump for aliens flooding into the country." *Florida v. United States*, 660 F. Supp. 3d 1239, 1249 (N.D. Fla. 2023), *appeal dismissed*, No. 23-11528 (11th Cir. July 11, 2023).

Defendants leave State and local governments to foot the bill, and public funds that should go to American citizens are redirected. *See, e.g.*, *Texas v. Biden*, 589 F. Supp. 3d 595, 607 (N.D. Tex. 2022) ("[T]he flow of migration directly impacts not only border communities and regions, but also destination communities and healthcare resources of both.") (quoting Defendants' *Public Health Reassessment and Order Suspending the Right to Introduce Certain Persons from Countries Where a Quarantinable Communicable Disease Exists*, 86 FR 42828-02); N.D. Cal. DE176-2, ¶39 (Declaration of Assistant Secretary Blas Nuñez-Neto) ("DHS recognizes that the demand from communities and NGOs for [] funding still far exceeds what has been made available.").

5

Defendants do not accept responsibility,[6] and their failures alarm millions of Americans in every State.[7] So the States must act. But under contemporary preemption jurisprudence, the States have limited power to enforce immigration law on their own. *See, e.g.*, *Arizona v. United States*, 567 U.S. 387 (2012). And when the States try to ameliorate the problem themselves, Defendants sue or threaten to sue to stop them. *See, e.g.*, *United States v. Texas, et al.*, No. 1:24-cv-00008 (W.D. Tex. filed Jan. 3, 2024); *United States v. Abbott, et al.*, No. 1:23-cv-00853-DAE, 2023 WL 5740596, (W.D. Tex. Sept. 6, 2023), *aff'd*, 87 F.4th 616 (5th Cir. 2023), *reh'g en banc granted, opinion vacated*, 90 F.4th 870 (5th Cir. 2024). The States are often forced to seek relief from the courts. *See, e.g.*, *Arizona v. Garland*, 2022 WL 1267203 (W.D. La. filed Apr. 28, 2022); *Florida*, 660 F. Supp. 3d 1239; *Texas*, 589 F. Supp. 3d 595; *Texas v. Dep't of Homeland Security*, 88 F.4th 1127, 1130-31 (5th Cir. 2023) (describing how Defendants interfered with Texas's wire fence even after the district court had granted Texas a temporary restraining order); *Arizona v. Mayorkas*, 143 S. Ct. 478 (2022); *Texas v. United States*, 809 F.3d 134 (5th Cir. 2015).

---

[6] *See, e.g.*, Alex Thompson & Stef W. Knight, Exclusive, *How Biden Botched the Border*, Axios (Feb. 12, 2024), https://www.axios.com/2024/02/12/how-biden-botched-border.

[7] Russell Contreras, *Most Americans Say the Feds Are Doing a Bad Job with the Migrant Crisis*, Axios (Feb. 15, 2024), https://www.axios.com/2024/02/15/migrant-crisis-biden-pew-research-center.

**B. The Rule.** To combat the growing crisis and forestall a worse one after the end of Title 42, DHS and DOJ issued the "Circumvention of Lawful Pathways" rule on May 16, 2023. *See* 88 Fed. Reg. 31314. Among other things, the Rule creates a rebuttable presumption that undocumented aliens entering the southwest border are ineligible for asylum if they enter: (1) between May 11, 2023, and May 11, 2025; (2) after the end of the Title 42 order, and (3) after traveling through another nation that is a party to the 1951 U.N. Convention on refugees or the 1967 Protocol on refugees. 8 C.F.R. §208.33(a)(1) (the presumption).

The Rule is a step in the right direction, although it contains numerous exceptions and limitations. For example, an alien can schedule an appointment to cross at a port of entry with the CPB One smartphone app. *Id.* §208.33(a)(2). An alien may rebut the presumption by showing "exceptionally compelling circumstances," which is an undefined phrase, but includes an "acute medical emergency," an "imminent and extreme threat to life or safety," *id.* §208.33(a)(3), a possibility of persecution or torture, *id.* §208.33(b)(2)(i), or a situation where the alien's spouse or child is eligible for asylum, *id.* §1208.33(c). Despite those exceptions, the Rule's presumption applied to over 8,000 illegal aliens in the first month, *see* N.D. Cal. DE176-2 (Declaration of Assistant Secretary Blas Nuñez-Neto). Since then, is likely that tens of thousands of individuals have been removed under these provisions.

Prior to the adoption of the presumption, an alien seeking asylum interviewed with an asylum officer, who would determine whether the alien had a "credible fear" of persecution in his home country. *See Dep't of Homeland Sec. v. Thuraissigiam*, 140 S. Ct. 1959, 1965 (2020). If the alien was found to have a "credible fear," he would have been released into the United States,[8] where he could remain for years, 88 Fed. Reg. 31336 (citing an average processing time of four years), despite that the vast majority of asylum claims that originate with such interviews are not granted.[9] Numerous individuals had been released this way in the years before the presumption was promulgated.[10] The presumption has now prevented thousands of aliens without valid asylum claims from being released into the country. *See* N.D. Cal. DE176-2 (Declaration of Assistant Secretary Blas Nuñez-Neto). At least some of those would have ended up in the States.

**C. Procedural History.** Plaintiffs filed the operative complaint on May 18, 2023, challenging the Rule under the Administrative Procedure Act (APA). N.D. Cal. DE164. The parties each moved for summary judgment in June 2023. N.D. Cal.

---

[8] *How the U.S. Asylum Process Works*, PBS News (May 13, 2023), https://www.pbs.org/newshour/politics/how-the-u-s-asylum-process-works.

[9] Executive Office for Immigration Review Adjudication Statistics, *Asylum Decision and Filing Rates in Cases Originating with a Credible Fear Claim* (May 15, 2018), located                                                                                                       at https://www.justice.gov/d9/pages/attachments/2018/05/15/10_asylum_decision_an d_filing_rates_w_cf_origin.pdf.

[10] *See A Sober Assessment of the Growing U.S. Asylum Backlog*, TRAC Immigration (Dec. 22, 2022), https://trac.syr.edu/reports/705/.

DE169, DE176. Defendants argued that Plaintiffs lack standing, that the Rule is authorized by statute and consistent with the Administrative Procedure Act, and that relief should be limited to these Plaintiffs. N.D. Cal. DE176. The district court held a hearing on July 19, 2023, and on July 25, 2023, granted Plaintiffs' motion and denied Defendants' motion. N.D. Cal. DE187. Defendants sought a stay pending appeal from the district court, N.D. Cal. DE190, which denied the motion, N.D. Cal. DE195. Defendants appealed and sought a stay in this Court, which granted the motion and expedited the briefing and hearing of this appeal. DE21.

There are other cases challenging the validity of the Rule. Other States and private parties have brought suits across the country on various grounds, which are in various stages of resolution. *See M.A. v. Mayorkas*, No. 1:23-cv-1843 (D.D.C. filed June 23, 2023); *Indiana v. Mayorkas*, No. 23CV00106, 2023 WL 3821388 (D.N.D. filed May, 31, 2023); *Texas v. Mayorkas*, No. 2:23-cv-00024 (N.D. Tex. filed May 23, 2023).[11]

Until recently, the federal government defended the Rule in all cases. But on the same day it asked this Court to hold the case in abeyance, the federal government filed a similar stipulation to stop litigation in *M.A. v. Mayorkas*, which the district court granted. *See* DE66, DE67 (Minute Order) in *M.A. v. Mayorkas*, No. 1:23-cv-

---

[11] The Intervenor States are not parties to these other proceedings but are also moving to intervene in *M.A. v. Mayorkas*.

1843 (D.D.C.). Defendants continue to defend the Rule against state plaintiffs and their challenges that demand stronger enforcement. Those states have not been asked to participate in any settlement discussions.

On February 21, 2024, this Court granted the motion and placed this expedited appeal in abeyance pending further settlement discussions. DE84.

## STANDARDS

No rule specifically governs intervention in a case pending before this Court. But the Supreme Court has pointed to Federal Rule of Civil Procedure 24 as a "helpful analog[y]" for appellate courts because it reflects the "policies underlying intervention" in the district courts. *Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am. v. Scofield*, 382 U.S. 205, 216 & n.10 (1965). This Court too has applied Rule 24 to evaluate a State's motion to intervene. *Day v. Apoliona*, 505 F.3d 963, 965 (9th Cir. 2007).

Under Rule 24, a "court must permit anyone to intervene who … claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest." Fed. R. Civ. P. 24(a)(2) (intervention of right). And a "court *may* permit anyone to intervene who … has a claim or defense that shares with the

main action a common question of law or fact." Fed. R. Civ. P. 24(b)(1)(B).
(permissive intervention). Intervention must be timely sought.

This Court "normally follow[s] 'practical and equitable considerations' and
construe[s] the Rule 'broadly in favor of proposed intervenors.'" *Wilderness Soc. v.
U.S. Forest Serv.*, 630 F.3d 1173, 1179 (9th Cir. 2011) (quoting *United States v. City
of Los Angeles*, 288 F.3d 391, 397 (9th Cir. 2002)). It is the Court's policy to
"involv[e] as many apparently concerned persons as is compatible with efficiency
and due process." *Id.*

## ARGUMENT

The States satisfy Rule 24's requirements for intervention as of right and for
permissive intervention. The motion is timely, the States have protectable interests
in the action, the action threatens their interests, and Defendants do not adequately
represent those interests.

## I.     Intervention as of Right.

### A.     The Motion is Timely.

Because the parties broke the news that they may settle just weeks ago, the
Court should find this motion to be timely. "Determination of the timeliness of a
motion to intervene depends upon (1) 'the stage of the proceeding,' (2) 'the prejudice
to other parties,' and (3) 'the reason for and length of the delay.'" *Day*, 505 F.3d at
965 (quoting *United States v. Alisal Water Corp.*, 370 F.3d 915, 921 (9th Cir. 2004)).

The timeliness inquiry is contextual, and in this case, the third factor—the reason for the delay—should inform the others and ultimately be dispositive. The States did not intervene earlier because they believed that their interests would be well represented in this litigation; for a time, they were. Defendants vigorously defended the Rule below. When they lost, Defendants sought a stay from the district court and from this Court (where they were successful). They defended the Rule in robust briefs on the merits, on standing, and on the scope of relief. After oral argument, all that was left was to wait for the Court's decision.

Then out of nowhere, Defendants announced on February 5, 2024, that they may not defend the Rule. Without much explanation, Defendants filed a joint motion to hold this appeal in abeyance while the parties "engage[] in discussions regarding the Rule's implementation and whether a settlement could eliminate the need for further litigation." DE83 at 2.[12] Based on those representations, the Court granted the motion on February 21, 2024. DE84. This late-breaking development that Defendants may not represent the States' interests in the Rule is the sole cause for the delay.

The States acted quickly to bring this motion as soon as they learned the news. The motion was filed within 15 days of the Court's February 21, 2024 order holding

---

[12] In their similar stipulation in the D.D.C. case, Defendants also revealed that their negotiations concerned "related policies" as well. *See* DE66 in *M.A. v. Mayorkas*, No. 1:23-cv-1843 (D.D.C.).

this case in abeyance. The States acted promptly when they identified the triggering event for intervention. *See Kalbers v. U.S. Dep't of Just.*, 22 F.4th 816, 823 (9th Cir. 2021) ("Delay is measured from the date the proposed intervenor should have been aware that its interests would no longer be protected adequately by the parties, *not the date it learned of the litigation*."). Consequently, the third factor—the length of the delay and reason for the delay—strongly supports the motion's timeliness.

As to the stage of proceedings, the case is not so far progressed that intervention would be unduly disruptive or wasteful of court resources. The amended complaint was filed on May 18, 2023. The States did not miss much in the district court proceedings—motions for summary judgment were briefed, argued, and decided in a matter of weeks. This is an APA case in which the district court "determine[d] whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." N.D. Cal. DE187 at 7. There was no protracted discovery. Thus, the stage of the proceedings is not so far along that intervention would cause a problem. *See, e.g.*, *Legal Aid Soc. of Alameda Co. v. Dunlop*, 618 F.2d 48, 50–51 (9th Cir. 1980) (counting posture of case in favor of intervention where case had not progressed beyond summary judgment).

Although the appeal has already been briefed and argued, the States do not propose intervening in order to influence the Court's decision on the merits (unless invited to do so). The States seek merely to prevent a bad settlement and to defend

the Rule if needed. In *Day v. Apoliona*, the Court permitted the State of Hawaii to intervene *after* the three-judge panel decision in order to seek rehearing en banc. 505 F.3d at 965-66. Otherwise, the Court reasoned, "no petition for rehearing can be filed in this Court, and there will be no opportunity for the Supreme Court to consider whether to grant certiorari." *Id.* For similar reasons, the Court should grant intervention here because Defendants have indicated an unwillingness to defend the Rule to the end. And if intervention between panel decision and en banc proceedings is proper, then intervention here *before* the panel decision is not too late.

Finally, the timing of this motion does not prejudice any of the parties. They cannot complain that the States should have intervened sooner because it appeared until now that Defendants were representing the States' interests. Moreover, there is no important litigation milestone, such as a trial date, a hearing, or a briefing schedule, anywhere on the horizon. The court below lacks jurisdiction to act upon matters pending before this Court until the appeal is resolved. Participation by the States would not upset any contemplated proceedings here or in the district court. The appeal has already been briefed and submitted for decision.

Again, the purpose of the intervention is merely to prevent Defendants from abandoning the Rule and entering a settlement agreement adverse to the States' rights and interests. Such intervention will not disrupt the case or otherwise impair the rights of the parties, except for the Defendants' ability to engage in "'rulemaking-

14

by-collective-acquiescence,'" which is not a right but a "tactic" "to circumvent the usual and important requirement, under the Administrative Procedure Act, that a regulation originally promulgated using notice and comment … may only be repealed through notice and comment." *Arizona*, 596 U.S. at 766 (Roberts, C.J., concurring) (quoting *San Francisco v. USCIS*, 992 F.3d 742, 744 (9th Cir. 2021) (VanDyke, J., dissenting)).

### B.      The States' Interests Would be Impaired if Plaintiffs Prevail.

The interest and impairment factors are related and can be addressed together. These factors are construed liberally to promote "both efficient resolution of issues and broadened access to the courts." *Wilderness Soc.*, 630 F.3d at 1179. "In addition to mandating broad construction, [this Court's] review is guided primarily by practical considerations, not technical distinctions." *W. Watersheds Project v. Haaland*, 22 F.4th 828, 835 (9th Cir. 2022); *see also Fresno Cnty. v. Andrus*, 622 F.2d 436, 438 (9th Cir. 1980). The States have very practical interests in the outcome of this litigation, including any settlement. They have strong interests in reducing illegal immigration. Thousands of illegal immigrants may be entitled to certain benefits under federal law, and they may be precluded from other benefits. Either way, the State incurs significant costs. A settlement that would increase illegal immigration is unacceptable to the States.

First, the States are beneficiaries of the Nation's immigration laws. While the States do "have some authority to act with respect to illegal aliens," Congress ultimately has "plenary authority" over immigration and naturalization. *Plyler v. Doe*, 457 U.S. 202, 225 (1982). So "Congress has developed a complex scheme governing admission to our Nation and status within our borders." *Id.* The federal government enacts and enforces these immigration laws to protect the States' interests, for example, by not requiring States to provide benefits to certain illegal immigrants and by making illegal immigrants ineligible for certain benefits. *See, e.g.*, 8 U.S.C. §1601(2)(B). States have a recognized interest in ensuring immigration laws are upheld.

Such interests are stronger now than ever. The United States is facing an unprecedented surge of illegal immigration over the southern border. *See* 88 Fed. Reg. at 31315. To mitigate the problem, Defendants promulgated the Rule and the presumption of ineligibility. Before the Rule, there were as many as 10,000 illegal border crossings every day. If those illegal immigrants arrive in the States, the States will have certain mandatory duties to provide government resources to them, regardless of their lawful status. *See, e.g.*, *Plyler*, 457 U.S. at 230 (public education); *Gideon v. Wainwright*, 372 U.S. 335, 345 (1963) (publicly funded counsel); *Texas v. United States*, 555 F. Supp. 3d 351, 391 (S.D. Tex. 2021) (healthcare). By decreasing

illegal crossings, the Rule greatly benefits the States, and affirmance of the universal injunction entered by the court below would impose tremendous costs.

The States have also benefited by not incurring administrative costs and facing compliance issues even regarding benefits that States can and do deny to illegal immigrants. For example, Kansas does not issue drivers licenses to anyone "[w]hose presence in the United States is in violation of federal immigration laws." Kan. Stat. Ann. 8-237(i). But the State must determine whether someone is eligible before issuing a license, which plainly requires some expenditure of administrative resources when illegal immigrants apply, even if the application is ultimately denied. States will be harmed if the Rule is vacated and they are forced to review more applications from ineligible illegal aliens. *See New York v. Scalia*, 490 F. Supp. 3d 748, 768 (S.D.N.Y. 2020).

Moreover, the States are required by federal law *not* to provide certain state or local benefits to illegal aliens. 8 U.S.C. §1621(a). Asylum seekers (even those with work authorizations) do not have lawful status unless and until their asylum claims are granted. A surge in those with improper asylum claims present significant burdens in determining whether someone qualifies for unemployment or housing assistance and policing those who are working without permits. This Rule benefits the States by reducing some of the asylum seekers who will not end up having valid claims.

17

Finally, the States have a political interest in maintaining this Rule even if the vast majority of illegal aliens settle in other States. According to Defendants' own data, there have been over *nine million* border encounters since the current administration began.[13] Fiscal Year 2024, which began in October 2023, is on pace to be the highest on record. There have been 1.2 million encounters from October 2023 through January 2024. *Id.* If nothing else, the volume of illegal aliens entering the country is politically important because they must be counted in the national census. *See* Exec. Order No. 13,986, Fed. Reg. 7015 (Jan. 20, 2021). And the census affects apportionment, the electoral college, and federal funding for States.

Political representation is a zero-sum game. If one State gains population— and consequently gains representatives, electoral votes, and federal funding— another State must necessarily lose them. *See Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2565 (2019). Political representation is currently based on the number of residents in a State, not the number of citizens in a State, and many illegal aliens are settling in New York, Illinois, California, and Colorado.[14] These States would

---

[13] U.S. Customs and Border Protection, *Nationwide Encounters*, *located at* https://www.cbp.gov/newsroom/stats/nationwide-encounters (last modified Feb. 13, 2024).

[14] *See* Julia Ainsley & Didi Martinez, *A City of 710,000 Struggles to Cope with 40,000 Migrant Arrivals*, NBC News (Jan. 27, 2024), https://www.nbcnews.com/news/us-news/denver-struggles-cope-40000-migrants-rcna135555; Justo Robles, Alejandra Reyes-Velarde, & Wendy Fry, *Border Patrol Dropped 42,000 Migrants on San Diego Streets. Now County, Groups are Seeking*

naturally increase their political representation and federal funding while others, such as the movant States, would lose out. These concerns are not speculative.[15]

The States have benefitted from the Rule and face irreparable impairment of their interests absent intervention.

## C.    The Defendants Do Not Adequately Represent the States' Interest.

The States must show only "that representation of [their] interests 'may be' inadequate," and "the burden of making this showing is minimal." *Sagebrush Rebellion, Inc. v. Watt*, 713 F.2d 525, 528 (9th Cir. 1983). Intervention is warranted unless the proposed intervenors and the party clearly share the same goals. *Cf. League of United Latin Am. Citizens v. Wilson*, 131 F.3d 1297, 1305 (9th Cir. 1997) (affirming denial where the "ultimate objective" of proposed intervenors was "identical to that of the current state defendants in the litigation").

It is now clear that Defendants will *not* provide adequate representation of the States' interest in maintaining the Rule. The federal government vigorously defended

---

*Help*, Cal Matters (Dec. 4, 2023), https://calmatters.org/california-divide/2023/12/immigration-california-street-releases/.

[15] West Virginia lost an electoral college vote due to the population trends from the 2020 census. *See* Bailey Brautigan, *WV Officially Loses House Seat, Electoral College Vote*, 13 News WOWK (May 10, 2021), https://www.wowktv.com/news/west-virginia/wv-officially-loses-house-seat-electoral-college-vote/. Population trends in Louisiana also present a real possibility that it too may lose an electoral vote in the 2030 census. United States Census Bureau, *State Population Totals and Components of Change: 2020-2023*, *located at* https://www.census.gov/data/tables/time-series/demo/popest/2020s-state-total.html#v2023

the Rule—until it mysteriously stopped. It seeks to settle with plaintiffs who are fighting the presumption, yet it continues to litigate against the states. It is "impossible to know the government's exact motives for its current course of action because it hasn't even attempted to tell us," DE84 at 15 (VanDyke, J., dissenting). Accordingly, it is also impossible for the States to rely on Defendants to support their interests.

This is not merely a case where Defendants may not "make all of the intervenor's arguments" or "neglect[]" some "element to the proceedings." *Sagebrush Rebellion*, 713 F.2d at 528. Indeed, Defendants propose giving up the entire case. There could be no greater departure from the States' interests.

The States have good reasons to oppose settlement at this juncture, including for many of the reasons Defendants previously articulated but may abandon. First, settlement is inappropriate because the Rule is either lawful or it is not. This Court is poised to decide the statutory arguments implicated in this appeal. And it is important for the parties and the public to have a ruling. Second, the factual basis for the Plaintiffs' standing remains in doubt; it would be absurd for the federal government to change federal policy based on litigation brought by parties who have no legally enforceable interest in the first place. Third, the government represented in the *M.A.* case that "related policies" are up for discussion. Any settlement that repeals the Rule (in whole or in part) *and* impairs the ability of the federal

government to enforce *other* immigration policies is doubly damaging to the States' interests and may impair the public's right to notice-and-comment rulemaking.

Further, Defendants have taken a hostile approach to States that take border security seriously. After myriad failures by the federal government, States have attempted to fill the void. But instead of supporting State efforts, Defendants have actively sought to frustrate those attempts. The States thus have good reason to believe their interests are not represented. At a minimum, they "offer[] a perspective which differs materially from that of the present parties to this litigation." *Sagebrush Rebellion*, 713 F.2d at 528.

The States' interests depart from those of Defendants in another respect: The States have no interest in preserving the exceptions to the Rule that limit its effectiveness. Defendants, who are currently litigating these aspects in multiple other lawsuits, must maintain a consistent position toward the Rule as a whole. That posture makes Defendants unable to represent fully the States' interest in limiting illegal immigration and imposing order on the southern border.

Fortunately, the law does not require the States to sit back and hope that an inadequate representative will advocate for them. That is why the burden for this factor is "minimal." The divergence in views about how this appeal (and any potential settlement) should be handled is much more than minimal. Respectfully, the States should be allowed to intervene as a matter of right.

**II.     The States Should Be Allowed to Intervene Permissively.**

Even if the proposed intervenors do not have a *right* to enter this case, the Court still can (and should) permit them to enter. *See* Fed. R. Civ. P. 24(b). Under Rule 24(b), the Court considers whether the intervention is timely and whether the intervenor's claim or defense "shares with the main action a common question." *Id.* The States do not seek to bring any new counterclaims or cross-claims, so no independent jurisdictional basis is required. *See Freedom from Religion Found., Inc. v. Geithner*, 644 F.3d 836, 844 (9th Cir. 2011). For the reasons above, the States have filed a timely motion and have defenses in common with the main action—*viz.*, the States seek to preserve the Rule, while Plaintiffs want it enjoined.

<u>**CONCLUSION**</u>

The Court should grant the States' motion to intervene.

Respectfully submitted,

March 7, 2024

Kris W. Kobach
  KANSAS ATTORNEY GENERAL

s/ Anthony J. Powell
Anthony J. Powell*
  *Solicitor General*
Abhishek Kambli*
  *Deputy Attorney General*
Office of the Kansas Attorney General
120 SW 10th Ave.
Topeka, KS 66612
(785) 296-2215
Anthony.Powell@ag.ks.gov
Abhishek.Kambli@ag.ks.gov

*Counsel for the State of Kansas*

Christopher M. Carr
  GEORGIA ATTORNEY GENERAL

s/ Stephen J. Petrany
Stephen J. Petrany*
  *Solicitor General*
Office of the Georgia Attorney General
40 Capitol Square, SW
Atlanta, Georgia 33034
(404) 459-3408
spetrany@law.ga.gov

*Counsel for the State of Georgia*

*admission to the U.S. Court of Appeals
for the Ninth Circuit pending

Steve Marshall
  ALABAMA ATTORNEY GENERAL

s/ Edmund G. LaCour Jr.
Edmund G. LaCour Jr.*
  *Solicitor General*
Dylan Mauldin*
  *Assistant Solicitor General*
Office of the Alabama Attorney General
501 Washington Avenue
Montgomery, Alabama 36130-0152
(334) 242-7300
Edmund.LaCour@AlabamaAG.gov
Dylan.Mauldin@AlabamaAG.gov

*Counsel for the State of Alabama*

Liz Murrill
  LOUISIANA ATTORNEY GENERAL

s/ J. Benjamin Aguiñaga
J. Benjamin Aguiñaga
  *Solicitor General*
Office of the Louisiana Attorney General
1885 N. 3rd St.
Baton Rouge, LA 70802
(225) 506-3746
AguinagaB@ag.louisiana.gov

*Counsel for State of Louisiana*

Patrick Morrisey
    WEST VIRGINIA ATTORNEY GENERAL

s/ Lindsay S. See
Lindsay S. See
    *Solicitor General*
Michael R. Williams
    *Principal Deputy Solicitor General*
Office of the West Virginia
Attorney General
State Capitol Complex
Building 1, Room E-26
Charleston, WV 25301
(304) 558-2021
lindsay.s.see@wvago.gov
michael.r.williams@wvago.gov

*Counsel for the State of West Virginia*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Certificate of Compliance

**9th Cir. Case Number(s)**  23-16032 _____

I am the attorney or self-represented party.

**This brief contains** 5,198 _____ **words,** including  0 __ words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 27(d)(1)(E) and FRAP 32(a)(5) and (6).

I certify that this brief complies with the word limit of FRAP 27(d)(2)(A).

**Signature**  s/ Edmund G. LaCour Jr. _____ **Date**  March 7, 2024 __