No. 23-16032

## IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

**EAST BAY SANCTUARY COVENANT, *et al.*,**

*Plaintiffs-Appellees*,

v.

**JOSEPH R. BIDEN, President of the United States, *et al.***

*Defendants-Appellants.*

On Appeal from the United States District Court
for the Northern District of California
No. 4:18-cv-06810-JST

### APPELLEES' OPPOSITION TO MOTION TO INTERVENE

Lee Gelernt
Omar C. Jadwat
Wafa Junaid
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
125 Broad St., 18th Floor
New York, NY 10004
T: (212) 549-2660

Katrina Eiland
Morgan Russell
Spencer Amdur
Oscar Sarabia Roman
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
IMMIGRANTS' RIGHTS
PROJECT
425 California Street, Suite 700
San Francisco, CA 94104
T: (415) 343-0770

*Attorneys for Plaintiffs-Appellees*     *(Additional Counsel on Next Page)*

Melissa Crow
CENTER FOR GENDER &
REFUGEE STUDIES
1121 14th Street, NW, Suite 200
Washington, DC 20005
T: (202) 355-4471
F: (415) 581-8824

Anne Peterson
Blaine Bookey
Julie Bourdoiseau
Karen Musalo
CENTER FOR GENDER &
REFUGEE STUDIES
200 McAllister Street
San Francisco, CA 94102
T: (415) 610-5729
F: (415) 581-8824

Robert Pauw
CGRS Cooperating Attorney
GIBBS HOUSTON PAUW
1000 Second Avenue, Suite 1600
Seattle, WA 98104
T: (206) 682-1080
F: (206) 689-2270

Keren Zwick
Richard Caldarone
Colleen Cowgill
Mary Georgevich
NATIONAL IMMIGRANT JUSTICE
CENTER
224 S. Michigan Ave., Suite 600
Chicago, IL 60604
T: (312) 660-1370
F: (312) 660-1505

Michelle (Minju) Y. Cho
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION OF
NORTHERN CALIFORNIA, INC.
39 Drumm Street
San Francisco, CA 94111
T: (415) 621-2493
F: (415) 255-1478

## TABLE OF CONTENTS

INTRODUCTION ...................................................................................................1

BACKGROUND ....................................................................................................1

ARGUMENT .........................................................................................................2

    I. Intervention As of Right Should Be Denied. ...................................................2

        A. The States' Motion Is Untimely ...........................................................4

        B. The States Lack Standing And A Legally Protectable Interest..........12

        C. The States Fail To Show Inadequate Representation.........................18

    II. Permissive Intervention Should Be Denied...................................................19

    III. In The Alternative, The Court Should Hold The States' Motion In Abeyance Until The Parties Have Concluded Their Negotiations ............21

CONCLUSION .....................................................................................................21

# TABLE OF AUTHORITIES

## Cases

*Amador Cnty. v. U.S. Dep't of the Interior*,
   772 F.3d 901 (D.C. Cir. 2014)...............................................................11

*Arizona v. Mayorkas*,
   143 S. Ct. 1312 (2023) .......................................................................7

*Arizona v. Biden*,
   40 F.4th 375 (6th Cir. 2022)................................................................16

*Arpaio v. Obama*,
   797 F.3d 11 (D.C. Cir. 2015)........................................................ 14, 16

*Bush v. Viterna*,
   740 F.2d 350 (5th Cir. 1984) ...............................................................19

*Cameron v. EMW Women's Surgical Center, P.S.C.*,
   595 U.S. 267 (2022) ....................................................................... 3, 17

*Cooper v. Newsom*,
   13 F.4th 857 (9th Cir. 2021) ............................................... 3, 16, 20, 21

*Department of Commerce v. New York*,
   139 S. Ct. 2551 (2019) .......................................................................15

*Diamond v. Charles*,
   476 U.S. 54 (1986) .............................................................................13

*Huisha-Huisha v. Mayorkas*, No. 22-5325,
   2022 WL 19653946 (D.C. Cir. Dec. 16, 2022) (unpublished).........................7, 8

*League of United Latin Am. Citizens v. Wilson*,
   131 F.3d 1297 (9th Cir. 1997) .............................................................11

*Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*,
   140 S. Ct. 2367 (2020) .......................................................................13

*NAACP v. New York*,
   413 U.S. 345 (1973) ...................................................................... 4, 12

iv

*Perry v. Proposition 8 Off. Proponents*,
   587 F.3d 947 (9th Cir. 2009) .................................................................. 13, 19, 20

*Perry v. Schwarzenegger*,
   630 F.3d 898 (9th Cir. 2011) ........................................................................ 12, 16

*Peruta v. Cnty. of San Diego*,
   824 F.3d 919 (9th Cir. 2016) ..............................................................................17

*Sw. Ctr. for Biological Diversity v. Berg*,
   268 F.3d 810 (9th Cir. 2001) ..............................................................................12

*Texas v. Biden*,
   589 F. Supp. 3d 595 (N.D. Tex. 2022) ................................................................6

*Trump v. New York*,
   141 S. Ct. 530 (2020) ................................................................................... 13, 14

*United States v. Alisal Water Corp.*,
   370 F.3d 915 (9th Cir. 2004) .............................................................. 4, 5, 11, 13

*United States v. Texas*,
   599 U.S. 670 (2023) ...................................................................................... 15, 17, 21

*United States v. Washington*,
   86 F.3d 1499 (9th Cir. 1996) ..................................................................... passim

*Whitewater Draw Nat. Res. Conservation Dist. v. Mayorkas*,
   5 F.4th 997 (9th Cir. 2021) ................................................................................14

**Federal Register**

Final Rule, Circumvention of Lawful Pathways,
88 Fed. Reg. 31,314 (May 16, 2023) ....................................................................1

**Other Sources**

Complaint, *Arizona v. Garland*, No. 6:22-cv-1130,
2022 WL 1267203 (W.D. La. Apr. 28, 2022) .....................................................6, 7

States' Reply in Support Motion to Intervene, *Huisha-Huisha*,
No. 22-5325 (D.C. Cir. Dec. 15, 2022) ...................................................................7

American Governors' Border Strike Force: Overview, at 1-2 (Apr. 19, 2022) ........7

Georgia Gov. Brian P. Kemp, Tweet (Apr. 13, 2022)................................................8

Shayla Klein, *Gov. Jim Justice to Send W.Va. Troops to Texas Over Immigration
'Craziness from Biden,'* WCHS News (May 31, 2023) ........................................8

Alabama Gov. Kay Ivey, Tweet (Aug. 10, 2022)......................................................8

Complaint, *Indiana v. Mayorkas*,
No. 23-cv-106, 2023 WL 3821388 (D.N.D. May 31, 2023)...............................10

Opening Brief of Appellants, *United States v. Washington*,
No. 95-35442, 1995 WL 17017327 (9th Cir. Aug. 11,1995)..............................10

States of Indiana et al., *Comment to Notice of Proposed Rulemaking
"Circumvention of Lawful Pathways"* (Mar. 27, 2023)......................................11

## INTRODUCTION

Plaintiffs-Appellees file this opposition in response to the putative intervenor States' request to intervene in this appeal.  First, the motion is untimely.  Second, the States lack standing and a legally protectable interest in this litigation.  Third, the United States is adequately representing their interests.  These same factors also make permissive intervention inappropriate.  The States' motion should therefore be denied.  In the alternative, the motion should be held in abeyance pending the outcome of the parties' settlement negotiations.

## BACKGROUND

Upon the expiration of the COVID-related Title 42 policy previously in effect at the southern border, the Government issued the "Circumvention of Lawful Pathways" rule (the "Rule") effective May 11, 2023.  88 Fed. Reg. 31,314.  The Rule bars asylum eligibility for all non-Mexican adults and families unless they satisfy one of a few narrow exceptions.  *Id.* at 31,450-51.

On May 11, 2023, Plaintiffs filed an amended and supplemental complaint challenging the Rule.  N.D Cal. Dkt. No. 147.  The parties filed cross-motions for summary judgment, and the district court granted summary judgment in Plaintiffs' favor.  N.D. Cal. Dkt. No. 187.  The Government timely appealed and sought a stay pending appeal, which this Court granted on August 3, 2023.  Dkt. No. 21.

1

The parties filed their briefs on the merits, and this Court held oral argument on November 7, 2023.  Dkt. No. 82.

On February 5, 2024, the parties jointly moved to hold this appeal in abeyance because they "have been engaged in discussions regarding the Rule's implementation and whether a settlement could eliminate the need for further litigation."  Dkt. No. 83.  On February 21, 2024, this Court granted the motion and placed this appeal in abeyance pending the parties' settlement discussions.  Dkt. No. 85-1.

The States of Alabama, Kansas, Georgia, Louisiana, and West Virginia filed their motion to intervene on March 7, 2023.  Dkt. No. 86 ("Mot.").[1]

## ARGUMENT

### I.    Intervention As of Right Should Be Denied.

Because no statute or rule governs intervention on appeal, the Supreme Court has looked to "the policies underlying intervention in the district courts,

---

[1] The States have also moved to intervene in *M.A. v. Mayorkas*, No. 1:23-cv-1843 (D.D.C.).  As the parties stated in their abeyance motion here, the plaintiffs in *M.A.* "are represented by some of the same counsel representing plaintiffs in this suit."  Dkt. No. 83 at 2.  The parties in *M.A.* also sought and were granted an abeyance to pursue settlement discussions.  As the States note, the abeyance request in *M.A.* stated that the parties there are engaged in discussions regarding implementation of the Rule as well as related policies.  Mot. 12 n.12.  But contrary to the States' suggestions, there is nothing surprising about that.  In addition to the Rule, the complaint and briefing in *M.A.* challenge several other contemporaneous policies concerning the implementation of expedited removal.  *See, e.g.*, *M.A.* Dkt. Nos. 19, 37, 53.

including the legal 'interest' that a party seeks to 'protect' through intervention." *Cameron v. EMW Women's Surgical Center, P.S.C.*, 595 U.S. 267, 277 (2022) (cleaned up) (quoting Fed. Rule Civ. Proc. 24(a)(2)). To intervene as of right, an applicant must show that its motion is timely, that it has a significant protectable interest in the subject of the action that may be impaired, and that the existing parties do not adequately represent its interests. *Cooper v. Newsom*, 13 F.4th 857, 864 (9th Cir. 2021). The States must meet all of these requirements, *id.*, but fail to satisfy any of them.

First, the motion is untimely because the States admit they believed since this litigation began that they could not trust the United States to represent their interests. Second, the interests the States advance are insufficient to confer standing or a legally protectable. Third, the States' disagreements with Defendants' litigation strategy and their speculation about what any eventual settlement might entail do not establish inadequate representation. And, again, even if the States' disagreements with the Government could show inadequate representation, the fact that they believe their views and the Government's views have diverged since this litigation began renders their motion untimely. Either way, the States are not entitled to intervention as of right.

3

**A. The States' Motion Is Untimely.**

If intervention is untimely, it "must be denied." *NAACP v. New York*, 413 U.S. 345, 365 (1973). "Timeliness is to be determined from all the circumstances . . . in the exercise of [the Court's] sound discretion." *Id.* at 366. "A party must intervene when he 'knows or has reason to know that his interests might be adversely affected by the outcome of litigation.'" *United States v. Alisal Water Corp.*, 370 F.3d 915, 923 (9th Cir. 2004) (citation omitted).

The States admit that they believed they could not rely on the United States to represent their interests in this litigation from the beginning—and yet they did not seek to intervene in district court, or even in this Court until after the appeal was briefed and argued. The States' claim that they had no reason to believe their interests were at risk prior to the abeyance motion is belied by their own statements. First, the States have repeatedly said, including in this very motion, that even before this litigation commenced, they did not believe they could trust the current administration to protect their interests in immigration litigation. Second, as to this particular case, the States admit that they believed from the beginning of the litigation that even if Defendants prevailed, the States' asserted interests concerning the Rule would not be fully protected. For both these reasons, it was incumbent upon the States to seek intervention early in the litigation, while the case was in the district court.

4

1.  This Court has denied intervention as untimely where the putative intervenor previously had reason to know its interests were at risk, but took no action, especially where the existing party had engaged in a longstanding "course of conduct" that the proposed intervenor admittedly perceived to be "hostile to its interests." *United States v. Washington*, 86 F.3d 1499, 1503-04 (9th Cir. 1996). That is precisely the situation here.  The States' motion, and their previous statements, demonstrate that they have repeatedly disagreed with the Government's immigration and border policies—and with its litigation decisions concerning such policies—since the start of the current administration more than three years ago.[2]

The States claim that the parties' February 5, 2024 abeyance motion was the first time they could have known that "Defendants can *no longer* be trusted to defend the Rule."  Mot. 3 (emphasis added).  Elsewhere in their motion, however, the States admit that they believed all along that they could not rely on Defendants to protect the interests the States assert.  Indeed, the very first page of their motion declares that the States "cannot rely on [Defendants] to defend and enforce the

---

[2] That the States have long *believed* that the United States would not adequately protect their interests in immigration litigation does not mean that the United States is not actually protecting their interests in this litigation.  *See* Part I.C.  Rather, the fact that the States have long believed their interests would not be protected by the United States is relevant to the test for timeliness—when the proposed intervenor had reason to believe their interests might be inadequately represented by the existing parties.  *Alisal Water Corp.*, 370 F.3d at 923.

Nation's immigration laws" because, "*[f]rom the start*, this presidential

administration has . . . methodically rescinded policies designed to combat illegal

immigration." Mot. 1 (emphasis added).

Indeed, the proposed intervenors state that they "have good reason to believe

their interests are not represented" in this case because over the past *three years* the

current administration has, in the States' view, repeatedly "taken a hostile approach

to States that take border security seriously." Mot. 21. They assert that

"Defendants have actively sought to frustrate" such States' efforts to compensate

for the Government's "failures" at the border. *Id.* Their motion makes clear this is

a reference to instances in which the Government has "sue[d] or threaten[ed] to

sue" States that "try to ameliorate the problem themselves." Mot. 6. As further

evidence of the administration's perceived longstanding hostility to their interests,

they assert that "States are often forced to seek relief from the courts" in response

to Defendants' border policy decisions. *Id.* In support of that claim, they cite suits

that they and other States have filed against the Government as far back as April

2021. Mot. 6 (citing, inter alia, *Texas v. Biden*, 589 F. Supp. 3d 595 (N.D. Tex.

2022) (filed April 22, 2021), and the complaint in *Arizona v. Garland*, No. 6:22-

cv-1130, 2022 WL 1267203 (W.D. La. filed Apr. 28, 2022)).

Indeed, three of the five States now seeking intervention—Louisiana,

Georgia, and Kansas—are plaintiffs in one of those cases, *Arizona v. Garland*,

6

filed nearly two years ago. Their complaint there challenges a different asylum regulation issued by the current administration. Tracking the concerns raised in their present motion, the States' complaint in that case alleges that rule would cause "more lawlessness at the southern border, leaving the States to shoulder the enormous costs of Defendants' destructive policies." 2022 WL 1267203, at ¶ 9.

Notably, all five States seeking intervention here also moved to intervene as defendants in *Huisha-Huisha v. Mayorkas*, a lawsuit by asylum seekers that sought to vacate Title 42, the predecessor border policy to the Rule. The States' intervention papers in that case argued that the Government "vigorously defended the Title 42 Orders" until it "*suddenly shifted gears*" by deciding not to seek a stay pending appeal in the D.C. Circuit and thus leaving in place the district court's order vacating and enjoining the policy. *See* States' Reply in Support Motion to Intervene at 3-4, *Huisha-Huisha*, No. 22-5325, Doc. No. 1977950 (D.C. Cir. Dec. 15, 2022) (emphasis added and omitted). Nonetheless, the States' intervention there was held untimely. *Huisha-Huisha v. Mayorkas*, No. 22-5325, 2022 WL 19653946, at *2 (D.C. Cir. Dec. 16, 2022) (unpublished), *vacated as moot and remanded sub nom. Arizona v. Mayorkas*, 143 S. Ct. 1312 (2023). Here, by contrast, the district court's vacatur order has been stayed pending appeal and the

abeyance keeps that stay (and the Rule) in place—the situation the States also seek to preserve.[3]

By their own admission, then, the conditions the States cite to show divergent interests have existed since before the start of this case. These States have consistently clashed with Defendants on immigration policy—and on the defense of immigration policies in litigation—throughout the last three years. Apparently, however, the States had recovered from their shock at the Government's supposed "sudden" change of litigation strategy in *Huisha-Huisha* more than a year ago—because they now claim that they were blindsided yet again by the United States' decision to request an abeyance in this case.

In light of these admissions, this Court's reasons for denying intervention in *United States v. Washington*, 86 F.3d 1499 (9th Cir. 1996), are directly applicable

---

[3] The States' leaders have also expressed distrust of the administration outside of litigation. *E.g.*, American Governors' Border Strike Force: Overview, at 1-2 (Apr. 19, 2022) (states including Alabama, Georgia, and West Virginia announcing "border strike force" in response "to President Biden's disastrous border policies" and "the absence of federal leadership" concerning border crossings), *available at* https://perma.cc/275B-TLB4; Georgia Gov. Brian P. Kemp, Tweet (Apr. 13, 2022) ("the Biden administration" is "encouraging mass illegal immigration"), *available at* https://perma.cc/BA78-KHDY; Shayla Klein, *Gov. Jim Justice to Send W.Va. Troops to Texas Over Immigration 'Craziness from Biden,'* WCHS News (May 31, 2023) (West Virginia governor "calling the state of immigration 'craziness from the Biden Administration'"), *available at* https://perma.cc/56CN-6FMT; Alabama Gov. Kay Ivey, Tweet (Aug. 10, 2022) (asserting that the current administration is "ok with letting folks flood through the gates at our Southern Border unaccounted for"), *available at* https://perma.cc/5JHR-57QZ.

here. There, a commercial fishing group ("Harvest Divers") sought to intervene as a defendant in a suit brought by the United States against the State of Washington to enforce several Tribes' treaty fishing rights. After the district court issued a decision upholding the treaty rights and the parties began negotiations on implementing the decision, Harvest Divers moved to intervene in those negotiations, just like the States do here. 86 F.3d at 1503-04. Harvest Divers "argue[d] that it should have been allowed to intervene at that late date because Washington State"—the existing defendant—"became 'openly antagonistic' toward Harvest Divers only after the [district court's] opinion was issued." *Id.* This Court held intervention untimely because Harvest Divers' "own documents [filed in support of intervention] indicate[d] that it believed that Washington State was hostile to its interests since long before the [district court's] decision." *Id.* at 1504. Among other things, the intervenor's brief complained "that Washington State has followed a 'pro-Indian' policy 'by a continuous course of conduct,'" and that "'[t]he policies adopted by the State are to seek accommodation with Indians and use all possible means to achieve that goal.'" *Id.* The Court also found significant that Harvest Divers' declaration supporting its intervention motion stated: "We have absolutely no confidence in [the State] to represent our interests. In fact, I believe that their interests oppose ours *based on their actions this past two years*." *Id.* at 1504 (emphasis added).

9

Despite this longstanding policy dispute with Washington State, Harvest Divers nonetheless attempted to argue that "[i]t was impossible to predict" earlier in proceedings "what the quality and adequacy of the State of Washington's representation would be," and that they had thus "reasonably relied upon the State of Washington to adequately represent its interests." *See* Opening Brief of Appellants, *United States v. Washington*, No. 95-35442, 1995 WL 17017327, at *25 (9th Cir. Aug. 11, 1995). This Court rejected that argument in *Washington* and it should reject the States' identical argument here.

2. Beyond the States' longstanding general view that the United States could not be counted on to protect their border-related interests, the circumstances of this litigation should plainly have put the States on notice that they would not be satisfied with the outcome even if Defendants prevailed. Specifically, the States admit that while they hope the core of the Rule is upheld, they strongly object to the Rule's *exceptions*. And the States have long been aware that these exceptions are being vigorously defended by the United States. Indeed, the States note that the Government is currently defending the Rule's exceptions "in multiple other lawsuits." Mot. 21; *see id.* at 9 (citing, inter alia, the complaint in *Indiana v. Mayorkas*, No. 23-cv-106, 2023 WL 3821388 (D.N.D. filed May 31, 2023)). Not surprisingly, therefore, the States' intervention motion in this case acknowledges that for as long as the Rule has been in effect, their "interests [have] depart[ed]

10

from those of Defendants" in that they "have no interest in preserving the exceptions to the Rule that limit its effectiveness." Mot. 21. And they further concede that they believe this different perspective "makes Defendants *unable* to represent fully the States' interest in limiting illegal immigration and imposing order on the southern border." *Id.* (emphasis added). But, as noted, the fact that the United States would defend the Rule's exceptions has been clear since the beginning of district court litigation in this case.[4]

The States were therefore "on constructive notice of the United States' potentially adverse interest" from the very beginning of this litigation, but they did nothing. *See Alisal Water Corp.*, 370 F.3d at 923; *see also, e.g.*, *League of United Latin Am. Citizens v. Wilson*, 131 F.3d 1297, 1307 (9th Cir. 1997) (denying intervention where "any prospect for a future divergence of interests that exists now also existed when the . . . litigation was initiated"); *Washington*, 86 F.3d at 1504 (reasoning that intervenor could not complain of being caught off-guard since they had previously stated that they believed defendant's interests were not aligned with their own and that they therefore had "no confidence" that defendant would

---

[4] The States publicly disagreed with the Government about the Rule's exceptions even before the final Rule was issued. States of Indiana et al., *Comment to Notice of Proposed Rulemaking "Circumvention of Lawful Pathways,"* at 6 (Mar. 27, 2023) (comment submitted by all five States that seek intervention and others, arguing that the Rule "has so many exceptions that it might as well be called an 'always-rebutted presumption'"), *available at* https://perma.cc/PY39-8BUC.

adequately represent them in litigation); *Amador Cnty. v. U.S. Dep't of the Interior*, 772 F.3d 901, 904 (D.C. Cir. 2014) (holding intervention untimely where the movant admitted "it had 'earlier concerns about a potential conflict of interest in the United States' representation'").

In sum, the States have admitted that since the earliest stage of this litigation (and before), they believed the current administration would not protect their interests in immigration cases; and that in this case in particular, the United States would defend the Rule's exceptions, contrary to the States' purported interests. It was therefore "incumbent upon the [States], at that stage of the proceedings, to take immediate affirmative steps to protect their interests." *See NAACP*, 413 U.S. at 367. Because they failed to do so, their motion is untimely and "must be denied." *Id.* at 365.

## B. The States Lack Standing And A Legally Protectable Interest.

The States lack both standing and the significantly protectable interest required to intervene to defend the Rule on the merits. This Court has previously equated the two requirements. *Perry v. Schwarzenegger*, 630 F.3d 898, 906 (9th Cir. 2011) (where proposed intervenors "lacked any 'significant protectable interest'" to intervene as of right, "[i]t necessarily follows that they lack Article III standing to appeal"); *Sw. Ctr. for Biological Diversity v. Berg*, 268 F.3d 810, 821 n.3 (9th Cir. 2001) (the "standing requirement is at least implicitly addressed" by

12

the protectable interest requirement). And the requirements overlap in respects that are dispositive here.[5]

Standing requires "an injury that is concrete, particularized, and imminent rather than conjectural or hypothetical." *Trump v. New York*, 141 S. Ct. 530, 535 (2020) (cleaned up). Similarly, the legally protectable interest needed for intervention "must be concrete" and "non-speculative"; "[a]n undifferentiated, generalized interest in the outcome of an ongoing action" does not suffice. *Alisal Water Corp.*, 370 F.3d at 919-20 (cleaned up). Accepting the States' tenuous argument for intervention would render these requirements meaningless.

The States' theory is that (1) Defendants may enter into a settlement that rescinds the Rule; (2) such a settlement may, in turn, cause border crossings between ports of entry to increase; (3) some of those additional migrants entering between ports of entry will make their way to these five States; (4) the presence of

---

[5] This Court has "yet to decide" whether intervenors must always "satisfy standing independently of the parties to the case." *Perry v. Proposition 8 Off. Proponents*, 587 F.3d 947, 950 n.2 (9th Cir. 2009). At minimum, however, an intervenor must show standing "to continue a suit in the absence of the party on whose side intervention was permitted." *Diamond v. Charles*, 476 U.S. 54, 68 (1986); *see also Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 140 S. Ct. 2367, 2379 n.6 (2020) ("An intervenor of right must independently demonstrate Article III standing if it pursues relief that is broader than or different from the party invoking a court's jurisdiction."). And here, the States seek to intervene so they can move the Court "to lift the abeyance" and issue a decision on the merits, even if Defendants wish to resolve the case through settlement. Mot. 1, 20. They therefore seek additional relief, and must show standing to do so.

these additional migrants in the States will cause the States to incur various costs; but also (5) proportionally more of these additional migrants may settle in other States, potentially causing these five States to lose congressional representation and federal funding following "the 2030 census." Mot. 15-19 & n.15. This alleged causal chain is far too attenuated to provide a legally protectable interest that justifies intervention.

The States can only speculate as to what, if any, settlement might result from the parties' negotiations, and how any possible settlement might impact migration numbers—particularly given "the 'myriad economic, social, and political realities' that might influence [a noncitizen]'s decision to 'risk life and limb' to come to the United States." *Whitewater Draw Nat. Res. Conservation Dist. v. Mayorkas*, 5 F.4th 997, 1015 (9th Cir. 2021) (cleaned up) (quoting *Arpaio v. Obama*, 797 F.3d 11, 21 (D.C. Cir. 2015)). Similarly, the States cannot predict how the Government would implement a hypothetical settlement or what other policies or world events may come into play. *See Trump*, 141 S. Ct. at 535-36 (denying standing where it was not yet possible to "predict[] how the Executive Branch might eventually implement" challenged federal policy).

The States' speculation that one or more of them might lose congressional representation after the next census—more than five years away—is even more

14

attenuated, given the countless economic and social factors that influence the distribution of the States' respective populations over time.[6]

Just last term, the Supreme Court rejected a similarly expansive theory of standing advanced by two states in *United States v. Texas*, 599 U.S. 670 (2023). The Court held that Texas and Louisiana—the latter of which seeks intervention here—lacked standing to challenge the Government's immigration enforcement priorities based on the same sort of assertions the States raise here. *Id.* at 674; *see* Brief for Respondents at 13, *United States v. Texas*, No. 22-58 (S. Ct. Oct. 18, 2022) (asserting standing based on purported downstream costs). In so holding, the Supreme Court cautioned that "federal courts must remain mindful of bedrock Article III constraints in cases brought by States against an executive agency or officer," since "in our system of dual federal and state sovereignty, federal policies

---

[6] *Department of Commerce v. New York*, cited at Mot. 18, does not aid the States. The states there were able to show standing based on a "concrete and imminent" danger of losing federal funds directly due to "the predictable effect" of including a citizenship question *in the census itself*, where "[t]he evidence at trial established that noncitizen households have historically responded to the census at lower rates than other groups, and the District Court did not clearly err in crediting the Census Bureau's theory that the discrepancy is likely attributable at least in part to noncitizens' reluctance to answer a citizenship question." 139 S. Ct. 2551, 2565-66 (2019); *see also Arizona v. Biden*, 40 F.4th 375, 386 (6th Cir. 2022) (distinguishing *Department of Commerce* on this basis). By contrast, the States can only speculate about the residence of immigrants affected by the Rule and by this litigation. And innumerable factors unrelated to the Rule and any possible settlement of this action will influence how many residents the various states will have in 2030.

frequently generate indirect effects on state revenues or state spending." *Texas*, 599 U.S. at 680 n.3. Thus, when a State asserts that federal policy "has produced only those kinds of indirect effects, the State's claim for standing can become more attenuated." *Id.*

Other courts have rejected similarly limitless standing theories advanced by States and local officials seeking to litigate federal immigration policies. *Arizona v. Biden*, 40 F.4th 375, 386 (6th Cir. 2022) ("Are we really going to say that any federal regulation of individuals . . . that imposes peripheral costs on a State creates a cognizable Article III injury for the State to vindicate in federal court? If so, what limits on state standing remain?"); *Arpaio*, 797 F.3d at 25 ("If such allegations were routinely accepted as sufficient to confer standing, courts would be thrust into a far larger role of judging governmental policies than is presently the case, or than seems desirable.").

In much the same way, this Court has recognized that government entities have no significantly protectable interest in intervening to defend policies that are peripheral to their own functions. *See Cooper v. Newsom*, 13 F.4th 857, 865-66 (9th Cir. 2021) (county district attorneys lacked protectable interest in defending the constitutionality of California's method of execution because the district attorneys had "no authority to choose the method by which California will execute condemned inmates" and no "authority to act as attorneys" for the bodies granted

such authority); *Schwarzenegger*, 630 F.3d at 904-05 (cleaned up) (holding that county supervisors lacked significantly protectable interest in defending state marriage law because marriage was "a matter of statewide concern rather than a municipal affair" and "the duties of the [s]upervisors themselves [were] not directly affected by [the] litigation"). Thus, the States have no protectable interest in intervening to defend the Rule.[7]

Allowing the States to intervene to try to push this case back before the Court would eviscerate "bedrock Article III constraints" as well as the strictures of Rule 24. *See Texas*, 599 U.S. at 680 n.3. Their theory would allow states to intervene to defend virtually any federal policy that might affect immigration—for example, an FBI policy about what resources to use to investigate smuggling; reduced enforcement against employers for hiring undocumented workers; or an agreement with Mexico on aid, trade, or immigration. Each of these decisions (and many others) might conceivably increase downstream costs that states bear vis-à-vis immigrants. And the same theory would apply to nearly every other kind of federal decision-making, such as budgeting or law enforcement. If effectively

---

[7] By contrast, a state does have a significantly protectable interest "in the continued enforceability of *its own* statutes." *Cameron v. EMW Women's Surgical Ctr.*, 595 U.S. 267, 277 (2022) (emphasis added); *accord Peruta v. Cnty. of San Diego*, 824 F.3d 919, 940-41 (9th Cir. 2016) (en banc) (California had a significantly protectable interest in intervening to defend its own "statutory scheme"), *abrogated on other grounds by N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022).

everything the federal government does provides states with standing and the ability to intervene as of right, the case-or-controversy and significantly protectable interest requirements are meaningless.

**C. The States Fail To Show Inadequate Representation.**

The States admit that the Government has "vigorously defended" the Rule below and before this Court. Mot. 12. Now that Defendants have agreed to an abeyance to explore the possibility of settlement, the States worry the Government may ultimately agree to a settlement that "abandon[s] the Rule," which the States wish to keep in place. Mot. 14.

But Defendants' course of action thus far keeps the Rule in place during the abeyance pursuant to this Court's stay pending appeal—the very situation the States also seek to preserve. For now, therefore, the Government's approach forestalls the risk of an adverse decision invalidating the portions of the Rule that the States seek to maintain. *See* Mot. 17 (asserting that "affirmance of the universal injunction entered by the court below would impose tremendous costs" on the States and that they "will be harmed if the Rule is vacated"); Dkt. No. 85-1, at 6 (VanDyke, J., dissenting) (noting the Government's stated concerns about "'any interruption in the rule's implementation[']"); *id.* at 13 (stating that "[p]lacing these proceedings in abeyance avoids the possibility of a loss before the Ninth Circuit that could potentially exacerbate the issues at the border").

18

The States' disagreement with the Government's decision to seek an abeyance thus boils down to "a dispute over litigation strategy or tactics," which cannot justify intervention as of right. *E.g.*, *Perry v. Proposition 8 Off. Proponents*, 587 F.3d 947, 954 (9th Cir. 2009); *see Bush v. Viterna*, 740 F.2d 350, 358 (5th Cir. 1984) ("[T]he mere possibility that a party *may* at some future time enter into a settlement cannot alone show inadequate representation. . . . If this were so, the requirement that the would-be intervenor show inadequacy of representation would be effectively written out of the rule, for it is always a possibility that the present parties will settle a lawsuit.").

Moreover, even if the parties ultimately reach a settlement—which remains to be seen—any such settlement will not necessarily implicate the States' interests, much less undermine those interests. The States suggest that a settlement would necessarily entail the Government "abandoning the Rule," Mot. 14, but they provide no basis at all for this speculation.

Accordingly, the States have also failed to show that Defendants are not adequately representing their interests.

## II. Permissive Intervention Should Be Denied

The Court should deny permissive intervention for essentially the same reasons explained above. An applicant for permissive intervention must show "(1) independent grounds for jurisdiction; (2) the motion is timely; and (3) the

applicant's claim or defense, and the main action, have a question of law or a question of fact in common." *Proposition 8 Off. Proponents*, 587 F.3d at 955 (quotation marks omitted). Where these baseline requirements are met, courts also consider discretionary factors "including 'the nature and extent of the intervenors' interest' and 'whether the intervenors' interests are adequately represented by other parties.'" *Id.* (citation omitted).

The States' motion is untimely, *supra* Part I.A., and permissive intervention should be denied on that basis alone. *E.g.*, *Washington*, 86 F.3d at 1507. Moreover, the "nature and extent" of the States' interest in this litigation are generalized and attenuated. *Supra* Part I.B. Permissive intervention should also be denied because the States have no role in enforcing the Rule and the United States is adequately representing their interests. *Supra* Parts I.B. & C.; *Cooper*, 13 F.4th at 868-69 (affirming denial of permissive intervention to county district attorneys who "had no role in promulgating [the state's] execution protocol"); *Proposition 8 Off. Proponents*, 587 F.3d at 955-56 (affirming denial of permissive intervention based in part on movants' failure to show inadequate representation).

The floodgates concerns expressed by the Supreme Court in *Texas* and by this Court in the intervention context further militate against granting permissive intervention. If the States are granted permissive intervention here, it would open the door to an untold number of similar intervention motions by state and local

officials who wish to defend policies that only affect them peripherally, if at all. *See Texas*, 599 U.S. at 680 n.3 (noting that "federal policies frequently generate indirect effects on state revenues or state spending"); *Cooper*, 13 F.4th at 868-69 (affirming denial of permissive intervention to county district attorneys seeking to defend state policy in part because "some or all of the fifty-five other" district attorneys in the state could make the same argument).

### III. In The Alternative, The Court Should Hold The States' Motion In Abeyance Until The Parties Have Concluded Their Negotiations.

The States claim that a settlement in this case could compromise their interests. But there is no certainty that the parties will eventually reach a settlement, much less one that undermines the States' alleged interests. Accordingly, if the Court chooses not to deny the motion at this point, the Court can hold it in abeyance and allow the States to renew it should the parties ultimately reach a settlement.

### CONCLUSION

The Court should deny the motion, or in the alternative hold it until the conclusion of the parties' settlement negotiations.

Dated: March 18, 2024

Respectfully submitted,

Katrina Eiland
Morgan Russell
Spencer Amdur
Oscar Sarabia Roman
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
425 California Street, Suite 700
San Francisco, CA 94104
T: (415) 343-0770

Melissa Crow
CENTER FOR GENDER &
REFUGEE STUDIES
1121 14th Street, NW, Suite 200
Washington, DC 20005
T: (202) 355-4471
F: (415) 581-8824

Anne Peterson
Blaine Bookey
Julie Bourdoiseau
Karen Musalo
CENTER FOR GENDER &
REFUGEE STUDIES
200 McAllister Street
San Francisco, CA 94102
T: (415) 610-5729
F: (415) 581-8824

Robert Pauw
CGRS Cooperating Attorney
GIBBS HOUSTON PAUW
1000 Second Avenue, Suite 1600
Seattle, WA 98104
T: (206) 682-1080
F: (206) 689-2270

By: /s/ Lee Gelernt
Lee Gelernt
Omar C. Jadwat
Wafa Junaid
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
125 Broad St., 18th Floor
New York, NY 10004
T: (212) 549-2660

Keren Zwick
Richard Caldarone
Colleen Cowgill
Mary Georgevich
NATIONAL IMMIGRANT JUSTICE
CENTER
224 S. Michigan Ave., Suite 600
Chicago, IL 60604
T: (312) 660-1370
F: (312) 660-1505

Michelle (Minju) Y. Cho
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION OF
NORTHERN CALIFORNIA, INC.
39 Drumm Street
San Francisco, CA 94111
T: (415) 621-2493
F: (415) 255-1478

22

## CERTIFICATE OF SERVICE

I hereby certify that on March 18, 2024, I electronically filed the foregoing with the Clerk for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system. All participants in this case are registered CM/ECF users and will be served by the appellate CM/ECF system. There are no unregistered participants.

/s/ Lee Gelernt
Lee Gelernt
Dated: March 18, 2024

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing motion complies with the type-volume limitation of Fed. R. App. P. 27 because it contains 5,166 words. This brief complies with the typeface and the type style requirements of Fed. R. App. P. 27 because this brief has been prepared in a proportionally spaced typeface using Word 14-point Times New Roman typeface.

/s/ Lee Gelernt
Lee Gelernt
Dated: March 18, 2024